Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLUMBIA

3    CIVIL DIVISION

4    ------------------------------x

5    JAMES MASH,                    )

6              Plaintiff            )    Case No.:

7         v.                        )    06-1319 (RMC)

8    DAVITA, INC.                   )

9              Defendant            )    Pages 1-170

10   ------------------------------x

11

12

13

14

15   DEPOSITION OF JOSHUA MATTHEW GOLOMB

16   Wednesday, March 28, 2007

17   Washington, DC

18   **COPY**

19

20

21   Reported by: Sherry L. Brooks

22   Job No. 180183

Page 5

1        P R O C E E D I N G S

2            JOSHUA MATTHEW GOLOMB

3   was called for examination by counsel and, after

4   having been duly sworn by the Notary, was examined

5   and testified as follows:

6        EXAMINATION BY COUNSEL FOR PLAINTIFF

7            BY MR. BRANCH:

8   Q.   Please state your name.

9   A.   Joshua Matthew Golomb.

10  Q.   Spell your last name, please.

11  A.   It's G-O-L-O-M-B.

12  Q.   What's your address?

13  A.   It is 201 Acacia Avenue, A-C-A-C-I-A, and

14  that's in San Bruno, California, B-R-U-N-O.  It's

15  94066.

16  Q.   Mr. Golomb, my name is David Branch.  My

17  office represents James Mason.  We are here today to

18  take your deposition.

19       I'm going to start by giving you some of

20  the general guidelines for the deposition and then

21  I'll proceed with the questions.

22       First, it's important that you understand

Page 13

1  Davita?

2  A.  My original title was senior manager of
3  special projects.

4  Q.  And what were your duties?

5  A.  It was primarily -- the first six months
6  was to evaluate this pharmacy business to decide
7  whether or not Davita should pilot a program, and
8  then we decided to pilot the Davita RX concept into
9  that point.  I believe it was then that I was
10 promoted to director and over the next approximately
11 two years had various roles within Davita RX as we
12 went from pilot to actually getting the business up
13 and running.

14 Q.  So you started at Davita in -- was it
15 2004?

16 A.  Yes, August of 2004.

17 Q.  And who did you report to when you started
18 work at Davita?

19 A.  His name is Bill Hughson, and the last
20 name is spelled H-U-G-H-S-O-N.

21 Q.  What was his title?

22 A.  I believe his title is Executive at Large

1    at the time.

2         Q.    Where was your work location when you
3    started at Davita?

4         A.    Northern California, specifically in
5    Burlingame, California.

6         Q.    You indicated that at some point you were
7    promoted to director?

8         A.    Yes.

9         Q.    What was your official title, director of
10   what?

11        A.    It became just director, Davita RX.

12        Q.    Were you a director before you became
13   employed at Davita RX or was it only after you became
14   employed at Davita RX?

15        A.    I can't remember for certain, and the
16   reason is is Davita RX -- I'm not entirely certain
17   the exact timing when it became an official separate,
18   legal entity.

19        Q.    I believe your testimony was that you were
20   working on a pilot program to determine if Davita RX
21   would be launched?

22        A.    Yes. So when I started, the first four

1  Davita. The reason I chose to do a phone interview
2  with him is that, from his description, it had
3  sounded as if we had done a poor job communicating to
4  him and I'd not shown him the courtesy that met my
5  standards, and so that's reason Number 1.
6          Reason Number 2 is that he had cited that
7  he felt that he was not selected for the position
8  because of his race, and although I had been very
9  impressed with the diversity of candidates that I had
10 seen throughout the second round of the process from
11 Kim, I felt it was an important enough allegation
12 that I talk to him myself to make sure that I agreed
13 with her assessment of the candidate.
14      Q.   And Mr. SanJuan -- why did you conduct a
15 telephone interview of Mr. SanJuan?
16      A.   My recollection with Mr. SanJuan is that
17 after I talked to Mr. Mason that he contacted me to
18 have a phone interview --
19      Q.   Who contacted you, Mr. SanJuan?
20      A.   I believe so. That is my recollection,
21 although I will be honest. I know that we ended up
22 on the phone, but I can't completely recall how we

1  A.  Yes, I did.

2  Q.  And were you alerted to the fact that Mr.
3  Mason was African American?

4  A.  When the complaint was provided, yes.

5  Q.  Were you alerted to the fact that he was
6  alleging that he was being discriminated against
7  based on his race?

8  A.  Yes. I mean, that's -- it's dated here in
9  this document, so when I read that, that flagged me
10 that that's what he was alleging.

11 Q.  Did you discuss with anyone at Davita the
12 fact that you were going to conduct a telephone
13 interview with Mr. Mason?

14 A.  I believe I let both Kim and Gayle Gardner
15 know that I would be doing a phone interview.

16 Q.  And who is Gayle Gardner?

17 A.  She is the people services representative
18 that had contacted me to let me know about this
19 complaint.

20 Q.  And why did you speak to Kim?

21 A.  Well, I talked to her first to make sure I
22 understood why she hadn't chosen the candidate and to

```
 1   talk to her about the communication back to the
 2   candidate about when he was no longer a part of the
 3   process.
 4        Q.   Okay.  What was discussed with Kim Easlon?
 5        A.   Why she thought he was too -- those two
 6   facts I just told you, why he was not chosen and how
 7   she communicated back to him.
 8        Q.   What reason did she give you for why he
 9   was not chosen?
10        A.   She said that he was -- my recollection of
11   the conversation was that Chris Jones was her top
12   candidate from that area, he was farther along in the
13   process and once he had come out to meet with us in
14   Northern California and there was a unanimous
15   decision to make him a job offer, there were no
16   longer positions that we were trying to fill in D.C.
17        Q.   Did she tell you any other reason why Mr.
18   Mason was not selected?
19        A.   Why she did not select him?
20        Q.   Yes.
21        A.   In that conversation, I don't believe she
22   gave me -- hang on.  I believe that she emphasized
```

Page 92

1              MS. VU: Objection. Misstates prior
2    testimony.
3              THE WITNESS: No.
4              BY MR. BRANCH:
5       Q.    Why did you interview Mr. Todaro?
6       A.    He was recommended as a good candidate.
7       Q.    By whom?
8       A.    By the vice president of finance.
9       Q.    Okay. That's what I wanted to establish.
10   All right. So you agreed to interview Mr. Mason in
11   person -- I'm sorry -- over the telephone?
12      A.    Yes.
13      Q.    After your initial telephone call with Mr.
14   Mason, how long did it take before you scheduled a
15   telephone interview of Mr. Mason?
16      A.    We scheduled the telephone interview
17   during that conversation.
18      Q.    And when was the telephone interview to
19   take place?
20      A.    I believe March 9th.
21      Q.    March 9th, 2006?
22      A.    Yes.

1    Q.    What time was it scheduled for?

2    A.    I believe 8:00 Eastern Time.

3    Q.    You scheduled an interview for 8:00

4    Eastern Standard Time?

5    A.    Yes.

6    Q.    And where were you?

7    A.    Where was I that day?

8    Q.    Yes, physically, where were you?

9    A.    I was going to be in Orlando, Florida that

10   day.

11   Q.    Where were you when you scheduled the --

12   when you spoke to Mr. Mason on the phone for the

13   first time?

14   A.    I believe I was in Dallas, Texas.

15   Q.    And where was your work location,

16   workstation, your permanent workstation at the time?

17   A.    My office is in Northern California, but I

18   travel quite frequently for my job.

19   Q.    Did you tell Mr. Mason that the interview

20   will be at 8:00 a.m. Eastern Standard Time?

21   A.    I remember spending quite a bit of time

22   clarifying the time because I have meetings with

Page 98

1  wording I said, but I think the gist of what I tried
2  to communicate to him was being timely and attention
3  to detail is very important, but I was still going to
4  proceed with the interview.
5      Q.   And where were you headed when you spoke
6  to him?
7      A.   We have a pharmacy in Orlando, and I was
8  heading to that site.
9      Q.   And did you conduct this telephone
10 interview?
11     A.   Yes.
12     Q.   And where were you when you conducted the
13 telephone interview?
14     A.   Well, we started while I was in the car
15 and then -- I wasn't in the car the whole time. I
16 pulled off. I was halfway between destinations, so I
17 pulled off the road and finished the phone interview
18 from my car.
19     Q.   How long did this phone interview last?
20     A.   I would estimate probably around 45
21 minutes.
22     Q.   Okay. So you -- Mr. Mason called you and

Page 105

1  place?  What does that mean?

2     A.    It means that you would not sleep in your
3  own bed on average about 75 percent of the time.

4     Q.    And what was Mr. Mason's response to your
5  questions about moving and travel -- the possibility
6  of moving and travel?

7     A.    He had relatively short, curt answers
8  saying, yes, it's fine from my memory.  I believe --
9  I think on the traveling he might have said he had
10 talked to his wife and they said they were fine with
11 it.

12    Q.    So for traveling and moving, Mr. Mason
13 said yes, travel is fine.  And for moving, he said
14 yes it's fine.  And for travel, he said he had talked
15 to his wife and it was fine?

16    A.    That is my recollection.  Again, the
17 wording might not be exact, but that was the gist of
18 what he was communicating.

19    Q.    Okay.  Do you recall any other questions
20 that you asked Mr. Mason?

21    A.    I don't recall any other questions.

22    Q.    Okay.  Did you have any concerns about how

1  he performed during the interview?

2     A.    Yes.

3     Q.    What were those concerns?

4     A.    Well, we'll start with the situational
5  questions. I would say he gave decent but not
6  particularly strong answers.

7     Q.    By situational questions, you mean how he
8  would respond to patients, teammates, or doctors?

9     A.    Yes.

10    Q.    What answer were you looking for for
11 those?

12    A.    A strong answer for those questions shows
13 a thoughtfulness and an empathy to understand where
14 the person is coming from and to tailor your answer.
15        So when someone is thinking about
16 teammates or physicians especially, I would -- well,
17 first financial incentives is not a very strong
18 answer because it's not a -- for our clinic
19 teammates, A) the relationship between Davita RX and
20 driving those financial incentives -- financial
21 performance of Davita is relatively low, but B) that
22 didn't demonstrate a strong understanding of what our

Page 107

1  teammates in the clinic actually care about, what
2  would motivate them.
3      Q.   What does motivate the teammates?
4      A.   The aspect that gets them excited about
5  Davita RX is that this supports patient care, that
6  this supports some of the metrics they're held
7  accountable to around patient quality.
8           So as a general answer, that would be much
9  more in line with what I would expect someone who
10 knew a clinic well and could sell this, but more
11 genuinely speaking an excellent answer and the type
12 of answer that Mr. Jones had given is understanding
13 first what to do is we don't go into a clinic --
14 understand where that clinic is coming from,
15 understand how they're performing on key metrics
16 related to patient care, and to try to tie Davita RX
17 back into those clinical metrics.
18          So for example, if a clinic has performed
19 poorly on a metric around bone and mineral
20 metabolism, which is one of our key metrics, then
21 there are a few drugs that we provide that we think
22 we drive greater adherence to and to emphasize that

Page 108

```
 1    patients using Davita RX will more likely take those

 2    drugs that are needed for that condition and have

 3    better outcomes over time.  That's just one example.

 4         Q.   Isn't it true that Mr. Jones was working

 5    as an administrative assistant at Davita?

 6         A.   Yes.

 7         Q.   And he had not worked as a patient care

 8    technician for Davita at any time, correct?

 9         A.   No.

10         Q.   And Mr. Mason had worked for Davita as a

11    patient care technician for more than ten years,

12    correct?

13         A.   Yes.

14         Q.   Okay.  And you believe Mr. Jones was a

15    better candidate based on -- I'm sorry.  Why did you

16    believe his response was better?

17         A.   He had a much more higher quality answer.

18    So that question specifically, he demonstrated a

19    greater knowledge of what motivates teammates and

20    physicians, and he demonstrated a better

21    understanding of the sales process in general, which

22    is to understand your customer and what they care
```

1  about and then tailor your message to them as opposed
2  to deciding yourself what you think they should care
3  about and pushing that message.
4      Q.    And Mr. Jones's response was in his
5  in-person interview with you in California?
6      A.    Yes.
7      Q.    And Mr. Mason's response was over the
8  telephone when you were in the Dunkin' Donuts parking
9  lot?
10     A.    Yes.
11     Q.    Okay.  What other concerns did you have
12 with Mr. Mason's response?
13     A.    So those on the physician side, just,
14 again, didn't demonstrate a strong understanding of
15 what our physicians care about and I think probably
16 more importantly that physicians are much more
17 diverse in their attitudes about this program or any
18 program within Davita and did not seem to demonstrate
19 as thoughtful of a response to, again, assess what
20 the doctor cared about, why Davita RX might be able
21 to match what their specific goals would be.
22     Q.    Well, I thought your testimony today was

Page 110

```
 1   that he didn't give a good response in terms of what
 2   the teammates cared about?
 3        A.   You asked me for the first thing.  That's
 4   where I started.  Now you're asking me for other
 5   things --
 6        Q.   Okay, the other concerns.  Now, this issue
 7   of --
 8        A.   Would you like me to finish this --
 9        Q.   Allow me to ask the questions.  The issue
10   about his response to teammates, you didn't mention
11   it in your E-mail of March 17th, 2006, did you?
12        A.   I don't know.  I'll have to -- let me see.
13   I think it's -- I think for the thoughtfulness for
14   working with physicians I intended to write teammates
15   and physicians.
16        Q.   Well, I'm not asking you what you intended
17   to write.  I'm asking you what you actually
18   mentioned.  You didn't mention anything about his
19   response --
20        A.   Well, sales effectiveness --
21        Q.   Allow me to finish the question, please.
22             MS. VU:  Well, allow the witness to
```

Page 111

1   answer.

2           BY MR. BRANCH:

3       Q.  You didn't mention anything in this E-mail
4   of March 17th about Mr. Mason's response to how he
5   would interact with teammates, did you?

6       A.  I disagree.

7       Q.  Well, where does --

8       A.  Can I finish my answer, please?

9       Q.  Well, let me ask you the question.  Where
10  in this document does it say anything about
11  teammates?

12      A.  Can I answer the question now?

13      Q.  Yes.

14      A.  Sales effectiveness, as I've said
15  throughout my testimony, when you think of sales as
16  being to patients, to teammates, and to clinics.  And
17  so when I say sales effectiveness, I'm referring to
18  all three of those entities.

19      Q.  Where are you referring to that in this
20  E-mail?

21      A.  In Bullet Point 2, it says sales
22  effectiveness in role plays.  If I had meant just

Page 112

```
 1   patients, I would have said role play.  I said in
 2   plural role plays that I did with them via phone.
 3        Q.   What other concerns did you have with him?
 4        A.   The travel piece.  I was concerned that he
 5   had not -- he had never traveled before.  A lot of
 6   the candidates who applied for our position had not
 7   traveled extensively before and did not appreciate
 8   the demands that that has on folks.
 9        Q.   How do you know he hadn't traveled before?
10        A.   I asked him, I believe.
11        Q.   And what was his response?
12        A.   I believe --
13             MS. VU:  Objection.  Asked and answered.
14             BY MR. BRANCH:
15        Q.   You asked him if he had ever traveled
16   before in any position?
17        A.   My recollection is I asked him if he
18   traveled before.
19        Q.   Now, I thought your previous testimony was
20   that he said he didn't have any problem moving and he
21   had discussed the travel with his wife and he was
22   okay with that?
```

Joshua Golomb

Page 121

```
 1    area, yes.
 2         Q.    Okay.  Did you interview -- well, after
 3    you spoke to Mr. Mason, did you tell him how he
 4    performed at the interview?
 5         A.    I called him.
 6         Q.    How long after the -- that interview?
 7         A.    I believe it was March 17th.
 8         Q.    So you called Mr. Mason on March 17th?
 9         A.    And let him know that while he was -- had
10    a lot of great qualities, while he was clearly an
11    excellent PCT and a value to Davita, we would not be
12    pursuing going further in the interview process.
13         Q.    And did you tell him why?
14         A.    I told him that he was not as strong as
15    some of our other candidates, that he didn't quite
16    meet the bar, but that he was still very good.  Mr.
17    Mason had performed solid.  A three out of five isn't
18    bad.  We just had the luxury of having a lot of fours
19    and fives applying for our positions.
20         Q.    Did you tell Mr. Mason words to the effect
21    that you just missed the team?
22         A.    I don't believe I would have communicated
```