## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

CECILIA GRILLO,

    Plaintiff,

      v.

LUCENT TECHNOLOGIES, INC.,

    Defendant.

</td><td>

Civil Action No.  02-0962 (JDB)

</td></tr>
</table>

## MEMORANDUM OPINION

Plaintiff Cecilia Grillo ("Grillo") brings several discrimination and contract claims relating to the termination of her employment with defendant Lucent Technologies, Inc. ("Lucent"). Count I of plaintiff's complaint alleges that Lucent violated the District of Columbia Human Rights Act, D.C. CODE ANN. § 1-2501, et seq. (2003) ("DCHRA"), by discriminating against her on the basis of race, age, and gender. Counts II and III allege breach of contract and promissory estoppel claims, respectively. Count IV alleges violations of Title VII of the Civil Rights Act of 1964,  42 U.S.C. §2000e et seq. ("Title VI"), and Count V alleges violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"). Finally, Count VI alleges race discrimination under 42 U.S.C. § 1981. Presently before the Court is defendant's motion to dismiss Counts I-III and to transfer Counts IV-VI to the United States District Court for the District of Maryland.

## BACKGROUND

Grillo is an African American female, born on October 1, 1958. She has at all relevant times been a resident of the state of Maryland. Am. Compl. ¶ 3. She began her employment with

1

Lucent in 1980 and was terminated on October 27, 2001. Id. ¶ 5.

At the time of her termination, Grillo was a project manager, responsible for overseeing Lucent's NetworkCare Knowledge Center ("NKC"). Id. She was the only African-American among the eight project managers in her division. From 1998 until her termination, Grillo was supervised by JoAnn Marchisio ("Marchisio"), who was based in New Jersey, Lucent's principle place of business. Marchisio Dec. ¶¶ 1-3. Grillo had a "virtual office": she worked from her home in Silver Spring, Maryland, and used office equipment provided by Lucent. Grillo identified her home office as her "jobsite" on her sworn EEO Charge of Discrimination. See Def. Mot. Dismiss, Ex. 1.

While under Marchisio's supervision, Grillo's primary responsibility was the management of an account in Northern Virginia. Marchisio Decl. ¶ 6. Grillo managed other smaller accounts as well, one of which was Bolling Air Force Base in Washington, D.C. According to her supervisor, Grillo made only one brief visit to Bolling Air Force base – on April 12, 2000. Marchisio Dec. ¶ 7. Grillo claims that she had monthly contact with Bolling through telephone and written communications, and *may* have visited Bolling Air Force Base more than once. Grillo Decl. ¶ 6. Other than her one, or perhaps few, visits to the Base, Grillo had no other employment activities in the District of Columbia, and all her other customers and accounts were located elsewhere. Marchisio Dec. ¶ 8.

Grillo received positive feedback on her job performance while employed by Lucent. She received high ratings on evaluations throughout her tenure and had been rewarded for her performance with stock options and the Lucent Chairman's Award. Am. Compl. ¶ 7. At the time of her termination, Grillo had approximately 6,650 outstanding shares of Lucent stock options

2

which were provided to her as compensation but had not yet vested.  Id. at ¶ 7.

Grillo claims that at some point between 2000 and 2001 she was offered an employment opportunity with another division of Lucent, but declined the offer because her manager assured her that she was not "releasable." Am. Compl. ¶ 8.  In 2001, several of Lucent's accounts began to generate less revenue than in prior years and some project managers were transferred from these underperforming accounts to other, more stable accounts.  Id. at ¶ 9.  When one of Grillo's customers went bankrupt, however, she was not reassigned.  Instead, on October 17, 2001, Grillo was terminated.  She was at the time the most senior project manager in her division, but she was the only project manager terminated.  Id.  She allegedly had better performance ratings and a more extensive educational background than several of the white employees who were retained.  Id. at ¶¶ 9-10.  Grillo claims that her termination was the result of Lucent's unlawful discrimination based on age, race, and gender; specifically, that Lucent made special efforts to retain white managers by reassigning them to profitable accounts while failing or refusing to reassign her.  Id.

Following her termination, Grillo filed an action against Lucent in the Superior Court of the District of Columbia on April 11, 2002, alleging a violation of the DCHRA, breach of employment contract, and promissory estoppel.  On May 16, 2002, Lucent removed the case to this Court pursuant to 28 U.S.C. §§ 1444 and 1446.  After the parties had briefed Lucent's motion to dismiss the complaint, Grillo filed a motion to amend her complaint in May 2003, which was granted on January 6, 2004.  The amended complaint added alleged violations of Title VII, the ADEA, and 42 U.S.C. § 1981.

## DISCUSSION

**A. Applicable Legal Standard**

A motion to dismiss for lack of subject-matter jurisdiction under FED R. CIV. P. 12(b)(1) should not prevail "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." Kowal v. MCI Commun. Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); Beverly Enters., Inc. v. Herman, 50 F. Supp. 2d 7, 11 (D.D.C. 1999). At this juncture, plaintiffs enjoy all favorable inferences that can be drawn from the alleged facts. See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). That notwithstanding, a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," and plaintiffs bear the burden of pleading a claim within a court's subject-matter jurisdiction. Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001); see also Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 18 (D.D.C. 1998). A court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case. See, e.g., St. Francis Xavier Parochial Sch., 117 F.3d at 624-25 n. 3; Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir.1992); Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987); Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986).

Furthermore, a court will dismiss or transfer a case if venue is improper or inconvenient in the plaintiff's chosen forum. FED. R. CIV. P. 12(b)(3). To prevail on a motion to dismiss for improper venue pursuant to Rule 12(b)(3), the defendant must present facts that will defeat the plaintiff's assertion of venue. See Flynn v. Veazey Const. Corp., 310 F. Supp. 2d 186, 190 (D.D.C. 2004); CHARLES ALAN WRIGHT & ARTHUR MILLER, 5B Fed. Prac. & Proc. 1352 (2004).

4

Venue in Title VII cases is governed exclusively by the statute's venue provision, which provides

that Title VII actions:

> may be brought in any judicial district in which the unlawful employment practice
> is alleged to have been committed, in the judicial district in which the employment
> records relevant to such practice are maintained and administered, or in the judicial
> district in which the aggrieved person would have worked but for the alleged
> unlawful employment practice, but if the respondent is not found within any such
> district, such an action may be brought within the judicial district in which the
> respondent has his principal office.

42 U.S.C. § 2000e-5(f)(3).

The courts have recognized that this Title VII venue provision reflects a deliberate intent

by Congress to "limit venue to the judicial districts concerned with the alleged discrimination."

Stebbins v. State Farm Mutual Auto. Ins. Co., 413 F.2d 1100, 1102 (D.C. Cir.), cert. denied, 396

U.S. 895 (1969). Hence, the initial inquiry must be as to the locus of the alleged discrimination.

See Washington v. General Elec. Corp., 686 F. Supp. 361, 363 (D.D.C. 1988); Donnell v.

National Guard Bureau, 568 F. Supp. 93, 94 (D.D.C. 1983); see also Lamont v. Haig, 590 F.2d

1124, 1134 (D.C. Cir. 1978). If the essence of the challenged employment practice occurred in a

specific district, then that is the locus of the discriminatory acts and the proper venue under 42

U.S.C. § 2000e-5(f)(3). James v. Booz-Allen & Hamilton, Inc., 227 F. Supp. 2d 16, 20 (D.D.C.

2002) (citing Donnell, 568 F. Supp. at 94).

Claims under the ADEA and § 1981 are subject to the general venue statute for federal

claims, 28 U.S.C. § 1391(b)(2). That provision states:

> A civil action wherein jurisdiction is not founded solely on diversity of
> citizenship may, except as otherwise provided by law, be brought only in (1)
> a judicial district where any defendant resides, if all defendants reside in the
> same State, (2) a judicial district in which a substantial part of the events or
> omissions giving rise to the claim occurred, or a substantial part of property
> that is the subject of the action is situated, or (3) a judicial district in which

any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b)(2).

**B. DCHRA Claim**

Grillo alleges that defendant unlawfully discriminated against her on the basis of race, age, and gender in violation of the DCHRA by subjecting her to disparate treatment in work assignments and selection for reduction in force, and by adopting a reduction-in-force policy that allegedly had a disparate impact on African Americans. Am. Compl. ¶ 15. Defendant argues that this claim must be dismissed for lack of subject matter jurisdiction because the alleged discriminatory activities are not covered by the DCHRA.

The stated purpose of the DCHRA is "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit." D.C. CODE § 2-1401.01. In determining jurisdiction under the DCHRA, "the critical factual issue is whether the[] events [alleged in plaintiff's complaint] took place in the District." Quarles v. Gen. Inv. & Dev. Co., 260 F. Supp. 2d 1, 20 (D.D.C. 2003) (citing Mathews v. Automated Bus. Sys. & Serv., Inc., 558 A.2d 1175 (D.C. 1989)). Defendant argues, and Grillo does not contest, that all of the allegedly discriminatory events in this case took place outside the District of Columbia. Grillo worked from her home in Maryland and made, at most, a few brief visits to a customer located in the District at Bolling Air Force Base. All decisions relating to Grillo's work assignments were made outside the District. Marchisio Decl. ¶ 9. Most importantly, the adoption of a force reduction policy and the decision to terminate her employment -- the actions that form the basis of her discrimination claim -- were employment decisions made outside of the District. The actual letter of termination was sent from Colorado to her home in Maryland. Id. ¶¶ 9-10.

6

Grillo argues, however, that the DCHRA applies even if Lucent's allegedly discriminatory employment decisions occurred outside of the District because "a critical portion of [her] job was in the District of Columbia," Pl. Opp. Mot. Dis. 3.[1]  She cites Green v. Kinney Shoe Corp., 704 F. Supp. 259, 260 (D.D.C. 1988), in which the plaintiff applied in Maryland for employment positions in the District and claimed discrimination when his application was denied.  The court in Green held that "[t]he broad language of the Act [DCHRA] leads the Court to understand that the Human Rights [Act] was intended to cover all discrimination concerning jobs located in the District of Columbia, even if the application and decision to discriminate were made outside of the District." Green, 704 F. Supp. at 260.  Reliance on Green, however, requires Grillo to show that her job was located in the District.  The jobs at issue in Green,"were clearly jobs to be performed primarily, if not exclusively, in the District of Columbia." 704 F. Supp. at 260.  That is not the case here.  Despite her acknowledgment that she worked from a home office in Maryland, Grillo asks the Court to accept that the performance of one or few employment assignments within the District of Columbia amounted to her having a job "located in the District of Columbia."  The truth is that Grillo's presence in the District "arose from occasional servicing of accounts" here.  Honig v. D.C. Office of Human Rights, 338 A.2d 887 (D.C. 1978) (upholding District of Columbia Office of Human Rights' decision dismissing complaint for lack of jurisdiction).  The fact that one of Grillo's customers was located in the District does not establish that her job was located in the District for DCHRA purposes, particularly because she spent the vast majority of her employment working outside the District for clients located outside the District.

---

[1] In her opposition to the motion presently before the Court, plaintiff incorporates by reference her June 7, 2002, opposition to Lucent's prior motion to dismiss.

7

In sum, plaintiff fails to establish either of two possible jurisdictional bases for bringing her claim within the DCHRA. She does not allege that any discriminatory actions were taken within the District of Columbia and thus lacks "the most crucial factual issue bearing on jurisdiction." Blake v. Prof'l Travel Corp., 768 A.2d 568, 571 (D.C. 2001). Further, the location of a single customer within the District does not establish that her job was located here. For these reasons, her DCHRA claim must be dismissed for lack of subject matter jurisdiction.

## C. Federal Law Claims

Plaintiff's claims under Title VII, the ADEA and 42 U.S.C. § 1981 are based on the same factual allegations as her DCHRA claims. As noted above, the Title VII venue provision states that Title VII claims may be brought in any judicial district in which the unlawful employment practice is alleged to have been committed, the employment records relevant to such practice are maintained and administered, or the aggrieved person would have worked but for the alleged unlawful employment practice, and only if the respondent is not found within any such district, the action may be brought within the judicial district in which the respondent has his principal office. See 42 U.S.C. § 2000e-5(f)(3). The Title VII venue provision is narrower than the general venue provision of 28 U.S.C. § 1392(b)(2), which governs plaintiff's ADEA and § 1981 claims. When a plaintiff brings a claim under both 42 U.S.C. § 1981 and Title VII, the narrower Title VII venue provision controls. James, 227 F. Supp. 2d at 21; Quarles, 260 F. Supp. 2d at 33. For actions brought under Title VII, if the plaintiff brings a suit in a jurisdiction that does not satisfy one of the venue requirements listed in 42 U.S.C. § 2000e-5(f)(3), venue is improper. James, 227 F. Supp. 2d at 20; Washington v. Gen. Elec. Corp., 686 F. Supp. 361, 363 (D.D.C. 1988).

Grillo fails to establish venue in the District of Columbia under any of Title VII's venue

criteria. None of the allegedly discriminatory conduct occurred within the District. All relevant

employment records are kept outside the District in either New Jersey, Colorado, or at a data

storage facility. Marchisio Decl. ¶ 9. Moreover, as discussed above, Grillo's home office was in

Maryland, and she spend the vast majority of her employment working for clients located outside

the District of Columbia. Grillo focuses on the third prong of the Title VII venue provision,

arguing that she may bring her Title VII action in the District because she "would have continued

to work as the project manager on the Bolling Air Force Base contract for Lucent in the District

of Columbia had she not been terminated." Pl. Opp'n at 3. Grillo's reading of the statute would

introduce a degree of contingency into the Title VII venue inquiry inconsistent with the statute's

emphasis on having each case heard in the jurisdiction that was the locus of the alleged

discrimination. See Stebbins, 413 F.2d at 1102; Washington, 686 F. Supp. at 363. Minimal

contact with a location would suffice to establish venue for Title VII purposes if a plaintiff could

simply hypothesize that continued employment would have resulted in further dealings there.

Nor do the relevant cases support Grillo's theory. In James, the court held that "the use of

the article 'the' rather than 'a' [in the third prong of the venue provision] strongly suggests that the

statutory requirement refers to the aggrieved individual's place of work, and not any district in

which the individual's work might take him." James, 227 F. Supp. 2d at 23; see also EEOC v.

Mayflower Transit, Inc., No. 93-0280-LFO, 1993 U.S. Dist. LEXIS 8181, *4-5 (D.D.C. 1993);

Elezovic v England, No. 03-0131, 2003 U.S. Dist. LEXIS 18747, *4 (D.D.C. 2003) ("If the

essence of the challenged employment practice occurred in a specific district, then that is the

locus of the discriminatory acts and the proper venue under 42 U.S.C. § 2000e-5(f)(3).").

Maryland, not the District of Columbia, is thus the judicial district in which Grillo would have

worked but for the alleged unlawful employment practice.

Grillo cannot establish venue under the first three prongs of the Title VII venue provision. The fourth prong only applies if there is no other district where venue is appropriate, which is not the case here. Because plaintiff could properly assert venue in Maryland, where she would have continued to work had she not been terminated, her Title VII claim is properly transferred to the District of Maryland. See, 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.").

Likewise, the District of Maryland is a proper venue for plaintiff's ADEA and § 1981 claims. "[A] substantial part of the events or omissions giving rise to the claim[s]" of Grillo's amended complaint occurred in Maryland. See 28 U.S.C. § 1391(b)(2). Thus, all of her federal claims are appropriately transferred to the District of Maryland.

**D. Common Law Claims**

In the interest of judicial economy, it is appropriate to transfer plaintiff's two common law contract claims along with her federal claims. See Morgan Guar. Trust Co. v. Tisdale, No. 95 Civ. 8023, 1996 U.S. Dist. LEXIS 14037 (S.D.N.Y. Sept. 23, 1996) (transferring common law claims as well as federal claims where federal claims were proper in another forum); Private Label, Ltd. v. Inoff, No. 92-7120, 1993 U.S. Dist. LEXIS 5041 (E.D. Pa. Apr. 19, 1993) (same). Hence, these claims will also be transferred to the District of Maryland.

## CONCLUSION

For the foregoing reasons, the Court will grant defendant's motion to dismiss plaintiff's DCHRA claim. Plaintiff's federal and common law claims will be transferred to the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 1404(a), venue for the

federal claims properly lying in that court but not in this Court.  A separate order accompanies

this memorandum opinion.

                                              /s/
                              _____
                                    JOHN D. BATES
                                United States District Judge

Signed this <u>28th</u> day of July, 2004.

Copies to:

David A. Branch
LAW OFFICE OF DAVID A. BRANCH
1825 Connecticut Avenue, NW
Suite 690
Washington, DC 20009
(202) 785-2805
Fax : (202) 785-0289
Email: dablaw@erols.com

Frank Charles Morris, Jr.
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, NW
Washington, DC 20037
(202) 861-1880
Fax : 202-296-2882
Email: fmorris@ebglaw.com

Brian Wayne Steinbach
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, NW
Suite 700
Washington, DC 20037
(202) 861-0900
Fax : (202) 861-2882
Email: bsteinbach@ebglaw.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CECILIA GRILLO,

      Plaintiff,

        v.

LUCENT TECHNOLOGIES, INC.,

      Defendant.

Civil Action No.  02-0962 (JDB)

## ORDER

Upon consideration of defendant's motion to dismiss Counts I through III and to transfer Counts IV through VI to the United States District Court for the District of Maryland, and for the reasons stated in the Memorandum Opinion issued herewith, it is this 28th day of July, 2004, hereby

      ORDERED that the motion is GRANTED in part; and it is further

      ORDERED that Count I of plaintiff's complaint is DISMISSED; and it is further

      ORDERED that this case, including Counts II through VI of the complaint, is TRANSFERRED to the United States District Court for the District of Maryland.

                           /s/
                        JOHN D. BATES
               United States District Judge

-1-

Copies to:

David A. Branch
LAW OFFICE OF DAVID A. BRANCH
1825 Connecticut Avenue, NW
Suite 690
Washington, DC 20009
(202) 785-2805
Fax : (202) 785-0289
Email: dablaw@erols.com

Frank Charles Morris, Jr.
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, NW
Washington, DC 20037
(202) 861-1880
Fax : 202-296-2882
Email: fmorris@ebglaw.com

Brian Wayne Steinbach
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, NW
Suite 700
Washington, DC 20037
(202) 861-0900
Fax : (202) 861-2882
Email: bsteinbach@ebglaw.com

Westlaw.

Slip Copy                                                                                          Page 1

Slip Copy, 2006 WL 3469532 (D.D.C.)
(Cite as: Slip Copy)

C
LaPrade v. Abramson
D.D.C.,2006.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Rona Foote LaPRADE, Plaintiff,
v.
Ronald M. ABRAMSON et al., Defendants.
**Civil Action No. 97-10 (RWR).**

Nov. 29, 2006.

John C. LaPrade, Steven W. Teppler, Sylvia Royce, Washington, DC, for Plaintiff.
Shirlie Norris Lake, Eccleston and Wolf, P.C., Baltimore, MD, for Defendants.

### *MEMORANDUM OPINION*
RICHARD W. ROBERTS, District Judge.
*1 Plaintiff Rona Foote LaPrade has brought claims against May Department Stores Company ("May Co.") for defamation and for violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1637(a)(7), 1666a, 1666a (a) (2000), and against the law firm Wolpoff & Abramson ("Wolpoff firm") and one of its members, Ronald M. Abramson, for violation of the TILA and for using unfair means to attempt to collect a debt in violation of D.C.Code § 28-3814(g)(5).

LaPrade has filed three motions. First, LaPrade has moved for leave to file a fourth amended complaint. Because LaPrade's motion was unduly delayed and she failed to cure the deficiencies in her complaint in amendments previously allowed, and because granting LaPrade's motion would prejudice Abramson and the Wolpoff firm, LaPrade's motion has been denied. Second, LaPrade has moved to reinstate Count Sixteen of her first amended complaint-a claim of defamation against Abramson and the Wolpoff firm. Because Laprade's motion in part rehashes legal arguments already rejected and in part impermissibly attempts to bring an old claim

under a new legal theory, her motion has been denied. Third, LaPrade has filed a motion styled as a motion for partial summary judgment, seeking a ruling on the issue of whether she owed a valid debt to May Co. Because May Co. has demonstrated that a genuine issue of material fact exists as to the existence of a valid debt, LaPrade is entitled to no relief under Rule 56 of the Federal Rules of Civil Procedure.

May Co. has filed a motion for summary judgment as to Counts I, II, III, IV, V and VIII of LaPrade's third amended complaint. Because May Co. did not extend to LaPrade an "open end credit plan" within the meaning of the TILA, there is no genuine issue of fact material to a claim under 15 U.S.C. § 1637(a)(7), and May Co.'s motion has been granted as to Count I. Because 15 U.S.C. § 1666(a) offers protection only to a consumer who has been extended consumer credit, and LaPrade was not extended consumer credit by May Co., May Co.'s motion has been granted as to Counts II, III, and IV. Because 15 U.S.C. § 1666a(a) offers protection only to a consumer entitled to invoke the protections of § 1666(a) and LaPrade is not entitled to invoke the protections of § 1666(a), May Co.'s motion has been granted as to Count V. Finally, May Co.'s motion has been denied as to Count VIII because if May Co. acted with malice or willful intent to injure LaPrade-a material fact in genuine dispute-then LaPrade's claim is not barred by 15 U.S.C. § 1681h(e).

### BACKGROUND

LaPrade maintained a credit card account with the department store Woodward and Lothrop ("Woodies"). It is not clear when she opened her account, but the account was in existence by late 1989. LaPrade asserts that her Woodies account was paid in full as of October 1990. LaPrade contends that when Woodies ceased doing business in 1994, her Woodies account ceased to exist. May Co., which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 2

**Slip Copy, 2006 WL 3469532 (D.D.C.)**
**(Cite as: Slip Copy)**

purchased Woodies' accounts receivable in 1995, counters that four documents from Woodies (the " Woodies documents") indicate that LaPrade owed $371.67 and that the account was in Woodies' collections department. May Co. relies on the Woodies documents and two affidavits submitted on its behalf-one by Richard Russell, former Recoveries and Bankruptcy Manager for Woodies ( *see* May Co .'s Mot. Summ. J., Russell Aff. ¶ 3, Dec. 12, 1997), and another by Richard J. Jansing, regional vice-president of Credit Support for May Co. (*See* May Co.'s Mot. Summ. J., Jansing Aff. ¶ 2, Dec. 11, 1997.) Two "internal document[s] from Woodies" indicate that as of December 15, 1989 and December 15, 1990, the LaPrade account was in Woodies' collections department and had been assigned to a collection agency. (Russell Aff. ¶¶ 4, 6.) The documents show that in November 1989 and again in December 1990, a purchase charge was processed for LaPrade through Woodies Distribution Center, the Woodies warehouse. The charges totaled $371.67. The Woodies Distribution Center did not have a connection to the Woodies Credit Center, so the Distribution Center would not have been aware that the account was delinquent. In each instance, as soon as the charge was sent to the Credit Center, it was placed in Woodies' collections department. (*Id.* ¶¶ 5, 7.) May Co. claims that on November 27, 1991, Woodies removed the balance due from its collections department and placed it on LaPrade's account. (*Id.* ¶ 8.) Yet, LaPrade cites a letter from Woodies' Credit Division stating that LaPrade's account was paid in full as of November 1991. May Co. also claims that on January 9, 1992, the delinquent amount was removed from LaPrade's account and reassigned to Woodies' collections department as "uncollectable." (*Id.* ¶ 9-10.) LaPrade, though, cites a facsimile of a note dated January 9, 1992 from Woodies' Corporate Credit Department stating that LaPrade's account had a zero balance and that all derogatory information connected to that account was being purged.

**\*2** In January 1996, Woodies' collections accounts receivable were transferred to May Co. (Jansing Aff. ¶ 16.) Each such account was assigned an internal May Co. number for administering the account during the collection process. (*Id.* ¶ 13.) Customers were not billed for these accounts.

Customers with these accounts did not have the ability to use the new May Co. number to make purchases. (*Id.*) May Co. asserts that no new accounts were opened in this process. (*Id.* ¶ 15.) LaPrade, though, alleges that May Co. intentionally opened a new open end credit plan in her name without her consent and then in March 1996, placed a false charge of $371.67 on that account.

LaPrade's old Woodies account with its new May Co. number was placed in May Co.'s accounts receivable computer database system in January 1996 or soon thereafter and it was removed from that system by September of the same year. (*Id.* ¶ 16, 22.) May Co. made reports to credit bureaus on a monthly basis based on its computer account receivables database. (*Id.* ¶ 21.) May Co. reported LaPrade's account as delinquent. LaPrade claims that as a direct result of May Co.'s reports to credit bureaus, she lost a credit line of more than $4,000 and was unable to refinance existing debts at a lower rate.

After receiving the Woodies collections accounts receivable and assigning them new numbers, May Co. submitted them to outside collections agencies. ( *Id.* ¶ 18.) LaPrade's account was assigned to the Wolpoff law firm for collection. (*Id.* ¶ 19.) On April 15, 1996, the Wolpoff firm sent LaPrade a letter requesting payment in the amount of $377.17, representing the original amount owed plus $5.50 interest. The letter stated:
Please be advised that your above account has been referred to our office for audit and review. After you have read the important notice on the reverse side of this letter, if appropriate please call our office to arrange for payment. If the balance indicated above [$377.17] is incorrect, please contact us as soon as possible so that we may adjust our records accordingly.

(Compl.Ex.1.) The "important notice" on the back of the letter stated, in part, that "this is an attempt to collect a debt and any information obtained will be used for that purpose." (Id.) LaPrade characterizes this letter as a "collection letter." Abramson and the Wolpoff firm deny that characterization. May Co. does not characterize the letter, but notes that the reference to debt collection appeared not in the text

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3469532 (D.D.C.)
(Cite as: Slip Copy)

Page 3

of the letter but only on the back of the letter in the standard disclosures required by the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 et seq., part of the TILA.

In late August and early September 1996, LaPrade's attorney, Steven Teppler, directly telephoned and sent facsimiles to May Co. regarding the alleged debt, conduct that Abramson and the Wolpoff firm viewed as a violation of Rule 4.2 of the D.C. Bar's Rules of Professional Conduct governing attorneys. In September 1996, May Co. removed LaPrade's alleged debt from its database because one of its employees, Elizabeth Bess, decided not to pursue collection because of the small amount of money involved compared to the effort it would take to locate supporting documentation.

*3 LaPrade filed her first complaint in January 1997 against Abramson and the Wolpoff firm and a month later amended it to add May Co. as a defendant. She served discovery requests in March 1997 seeking documentation of the alleged debt, to which May Co. responded in April 1997 by producing the Woodies documents. The April 9, 1997 scheduling order allowed all parties 90 days-until July 9, 1997-to file any amendments to pleadings.

On April 28, 1997, the Legal Times published an article about a bar complaint against Teppler alleging a violation of Rule 4.2 of the D.C. Rules of Professional Conduct. The article noted that LaPrade's account had been referred to the Wolpoff firm for collection and that Teppler had been successful in clearing LaPrade's credit rating. LaPrade argues that the article portrayed her as a delinquent debtor and that the information was provided by and through defendants. Defendants deny conveying any information to the Legal Times. Further, May Co. argues that the article portrayed LaPrade in a positive light because it reported that the disputed account information had been removed.

Many of LaPrade's claims, including Count Sixteen against Abramson and the Wolpoff firm for defamation under D.C.Code 28-3814, were dismissed by order dated June 27, 1997. In July and September 1997, LaPrade filed her second and third

amended complaints. LaPrade has now moved for leave to file a fourth amended complaint, to reinstate Count Sixteen, and for partial summary judgment, and May Co. has moved for summary judgment on all claims pending against it.

## DISCUSSION

### I. MOTION FOR LEAVE TO FILE A FOURTH AMENDED COMPLAINT

LaPrade seeks leave to file a fourth amended complaint. Motions to amend are governed by Rule 15(a), which provides that

[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise, a party may amend the party's pleading only by leave of the court or by written consent of the adverse party; and leave shall be freely granted when justice so requires.

Fed.R.Civ.P. 15(a). Because defendants have filed answers, LaPrade's motion to amend requires leave of court. While the term "freely" in Rule 15(a) does not mean "automatically," Foman v. Davis, 371 U.S. 178, 182 (1962), defendants bear the burden of demonstrating why leave should not be granted. See 3 James Wm. Moore et al., Moore's Fed. Prac. § 15.15[3] (3d ed.1999) (noting that the party opposing amendment bears the burden of producing reasons or evidence to deny leave to amend). Factors that might lead a court properly to deny leave to amend include, among other things, a plaintiff's "undue delay, bad faith or dilatory motive ..., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ..., futility of the amendment, etc. " Foman, 371 U.S. at 182; see also Atchinson v. District of Columbia, 73 F.3d 418, 425 (D.C.Cir.1996) (citing the Foman factors); Williamsburg Wax Museum v. Historic Figures, Inc., 810 F.2d 243, 247 (D.C.Cir.1987); cf. Harrison v. Rubin, 174 F.3d 249, 253 (D.C.Cir.1999) (deciding that where a plaintiff does not seek to allege new facts, but only to "do no more than clarify legal theories or make technical corrections," amendment should be denied for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 4

Slip Copy, 2006 WL 3469532 (D.D.C.)
**(Cite as: Slip Copy)**

undue delay only if defendant would be prejudiced by amendment).

### A. *Undue delay*

**\*4** A motion to amend may be denied as dilatory or unduly delayed where a plaintiff was aware of the facts giving rise to the cause of action before filing the complaint that she now wishes to amend. *Yager v. Carey,* 910 F.Supp. 704, 731-32 (D.D.C.1995) (denying leave to amend because plaintiff had not been unaware of the cause of action at the time the original complaint was filed). Defendants argue that LaPrade's motion for leave to amend her complaint is unduly delayed and filed in bad faith.[FN1] They note that the basis for the proposed claims-the legal theory that no debt existed-was alleged in LaPrade's first amended complaint, that she had material facts by at least April 1997 in the form of the Woodies documents regarding the existence of the debt, and that her motion was filed beyond the 90 days for amendments allowed by the April 9, 1997 scheduling order.

> FN1. The animosity between the parties is evident from their filings, but defendants have not presented evidence that LaPrade's motion was filed in bad faith.

LaPrade responds that she had not previously asserted her proposed claims under the FDCPA because she was relying on May Co. to produce proof of a credit purchase giving rise to the alleged debt, and that the Russell affidavit executed December 12, 1997 contains new factual allegations about when the alleged debt occurred. She argues that justice requires leave to amend, despite the 90-day limit imposed by the April 9, 1997 scheduling order.

Here, it is clear that LaPrade had sufficient information available to her by July 9, 1997, the scheduling order's deadline for amendments, to file her additional claims. LaPrade proposes to add a FDCPA claim under 15 U.S.C. § 1692e(2)(A), which prohibits "false representation of the character, amount, or legal status of any debt[.]"

LaPrade argues that since the Wolpoff firm's April 15, 1996 letter stated that her debt was $371.67 plus $5.50 in interest while the Woodies documents she received in April 1999 showed it to be only $371.67, Abramson and the Wolpoff firm made a false representation of the amount of her debt. The letter and documents on which LaPrade bases her proposed claim were available to her before the amendment deadline in July 1997.

LaPrade also proposes to add a claim under 15 U.S.C. § 1692e(10), which prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." LaPrade argues that the Wolpoff firm's April 15, 1996 letter contained a threat of court proceedings which is impermissible under sections 1692e(10) and 1692e(5). Similarly, LaPrade argues that this same letter establishes a violation of D.C.Code § 28-3814(f)(5), which prohibits a debt collector from making "any false representation or implication of the character, extent, or amount of a claim against a consumer, or of its status in any legal proceeding [,]" by containing a misrepresentation of court proceedings. The letter on which LaPrade bases her proposed claims was available to her before the amendment deadline in July 1997.

LaPrade also wants to add a claim under 15 U.S.C. § 1692f, which states that a "debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." LaPrade argues that instituting a collection action on a debt that appears to be time-barred is a violation of § 1692f, that the Wolpoff firm's April 15, 1996 letter instituted a collection action against her, and that defendants knew or should have known that either the debt did not exist or that action on it was barred by D.C.'s three-year statute of limitations. LaPrade also argues that the Russell affidavit, first available in December 1997, presented new evidence to the effect that the debt at issue accrued in May 1991. Even assuming that the Russell affidavit presented new evidence of a debt incurred in May 1991, the Woodies documents attributed debt to LaPrade as of December 1989, December 1990, December 1991, and December 1992. These documents, available to LaPrade before the amendment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5

Slip Copy, 2006 WL 3469532 (D.D.C.)
**(Cite as: Slip Copy)**

deadline in July 1997, provided LaPrade with sufficient facts on which to base a claim that to the extent that the Wolpoff firm's letter of April 15, 1996 constituted a collection action on any of the debts identified in 1989 through 1992, it was time-barred.

**\*5** LaPrade's motion for leave to file a fourth amended complaint was dilatory and unduly delayed because she knew sufficient facts before the amendment deadline in the claims she now seeks to add. LaPrade had possession of the Woodies documents in April 1997. Even if the Russell affidavit presented new evidence as to when the debt arose, LaPrade certainly knew before July 1997 that defendants asserted that a debt had arisen as early as December 1989.

### B. Failure to cure deficiencies

"Denial of leave to amend is appropriate where a party has had sufficient opportunity to state a claim but has failed to do so." *Mittleman v. United States,* 997 F.Supp. 1, 10 (D.D.C.1998) (citing *Williamsburg Wax Museum,* 810 F.2d at 247) (denying leave to amend and finding that even if new facts had surfaced, plaintiff had ample previous opportunity to bring the proposed claim); *Societe Liz, S.A. v. Charles of the Ritz Group, Ltd.,* 118 F.R.D. 2, 4-5 (D.D.C.1987) (denying leave to amend where plaintiff had previous knowledge of the facts underlying its proposed claims).

Abramson and the Wolpoff firm argue that LaPrade has amended her complaint three times already and had multiple prior opportunities to cure any deficiencies in her claims. LaPrade responds that her first amendment was made as a matter of course and that her subsequent amendments were submitted to comply with Abramson's counsel's request to clarify the factual allegations.

It has been clear since LaPrade filed her original complaint that she believes that May Co. created a false debt in her name and that Abramson and the Wolpoff firm engaged in illegal activity to collect that false debt. (Compl.¶¶ 16-22, 64.) Further, in amending her complaint three times, LaPrade had

ample opportunity to include her proposed claims, but simply did not. Hence, LaPrade has repeatedly failed to cure deficiencies by amendments previously allowed.

### C. Prejudice

A motion to amend may be denied as prejudicial where a defendant would have to conduct additional discovery and a plaintiff has filed an untimely motion to amend without demonstrating a good reason for the delay. *Hollinger-Haye v. Harrison Western/Franki-Denys,* 130 F.R.D. 1, 2 (D.D.C.1990) (denying leave to amend as prejudicial to defendants because the proposed counts were based on facts known to the plaintiff prior to the completion of discovery and the plaintiff demonstrated no good reason for delay in filing the motion to amend).

Abramson and the Wolfoff firm argue that discovery is completed and that allowing LaPrade to amend her complaint a fourth time will necessitate further discovery and expense. Although May Co. is not named in any of the proposed claims, it argues that it, too, will be forced to engage in additional discovery. LaPrade appears to respond that because defendants have not produced proof of the disputed debt, and because such proof is key to any defense to the proposed claims, she will be prejudiced if she is not allowed to assert these new claims.

**\*6** Granting LaPrade's motion would likely require Abramson and the Wolpoff firm to prepare more responsive pleadings and engage in additional discovery concerning the new claims. LaPrade has provided no good explanation for delaying her proposal to amend far beyond the amendment deadline in the scheduling order, and has not shown how defendants would not be prejudiced by the amendments.

Allowing a fourth amended complaint would result in prejudice to Abramson and the Wolpoff firm which is not balanced by any reasonable excuse for LaPrade seeking to amend long after the amendment deadline had passed. LaPrade's motion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 6

Slip Copy, 2006 WL 3469532 (D.D.C.)
**(Cite as: Slip Copy)**

is unduly delayed, and she failed to cure her pleading deficiencies in three prior amendments. Her motion has been denied.

## II. MOTION TO RECONSIDER

LaPrade moves for reconsideration of that part of the June 20, 1997 Order which dismissed Count Sixteen of the first amended complaint alleging that Abramson and the Wolpoff firm defamed her in violation of D.C.Code § 28-3814(c). That claim alleged that submissions made by defendants to the D.C. Bar Counsel as part of their grievance against Teppler, which included five pages regarding the credit dispute, were defamatory. The claim was dismissed because D.C. Bar Rule XI § 19(a), providing that "[c]omplaints submitted to the Board or Bar Counsel shall be absolutely privileged, and no claim or action predicated thereon may be instituted or maintained," precludes LaPrade's defamation claim here. *See* Slip. Op. at 8, June 20, 1997 (applying D.C. Bar Rule XI § 19(a) (1990) and citing *Weaver v. Grafio*, 595 A.2d 983, 987 (D.C.1991)).

A court should not grant a motion for reconsideration unless the moving party shows new facts or clear errors of law that compel a change to its prior ruling. *Nat'l Ctr. for Mfr'g Sciences v. Dep't of Defense*, 199 F.3d 507, 511 (D.C.Cir.2000). A motion to reconsider that merely rehashes previous arguments will be denied. *First Am. Corp. v. Al-Hahyan*, 948 F.Supp. 1107, 1116 (D.D.C.1996); *Mittleman v. United States Dep't of the Treasury*, 919 F.Supp. 461, 470 (D.D.C.1995). A motion to reconsider is also not a vehicle for bringing before a court theories or arguments that were not earlier advanced. *Graves v. United States*, 967 F.Supp. 572, 573 (D.D.C.1997).

LaPrade seeks reconsideration, relying on various Supreme Court and D.C. Circuit decisions to argue that the republication of defamatory material is not absolutely privileged under D.C. Bar Rule XI 19(a), and that the republication was foreseeable, making defendants-as the original authors of the information submitted to the D.C. Bar Counsel-liable under D.C.Code § 28-3814(c).

Defendants oppose the motion, arguing that the sole source of the information published was the public record of the D.C. Bar Counsel, and that under the D.C. Bar Rules, no action can be predicated upon information in the public record of the D.C. Bar Counsel. Defendants also argue that the cases on which LaPrade relies do not support her legal conclusion.

*7 LaPrade essentially argues that her defamation claim is not precluded because the privilege under D.C. Bar Rule XI § 19(a) is not absolute and an action based on a grievance before the Bar Counsel may be maintained. To a great extent, this argument merely rehashes arguments concerning the extent of immunity provided by Rule XI § 19(a) that were already considered and rejected. To a very limited extent, LaPrade's argument advances new theories or arguments that were not presented to the court before. Neither type of argument is availing on a motion for reconsideration. *Al-Hahyan*, 948 F.Supp. at 1116; *Graves v. United States*, 967 F.Supp. at 573. Because LaPrade attempts to reargue an issue of law previously decided without error and attempts inappropriately to introduce a new legal theory, her motion has been denied.

## III. SUMMARY JUDGMENT MOTIONS

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment.
Summary judgment is appropriate when evidence on file shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Not all alleged factual disputes represent genuine issues of material fact which may only be resolved by a jury. "Material facts are those 'that might affect the outcome of the suit under governing law,' and a genuine dispute about material facts exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Farmland Indus., Inc. v. Grain Board of Iraq*, 904 F.2d 732, 735-36 (D.C.Cir.1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 ... (1986)).

*America's Cmty. Bankers v. FDIC*, 200 F.3d 822,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 7

**Slip Copy, 2006 WL 3469532 (D.D.C.)**
**(Cite as: Slip Copy)**

831 (D.C.Cir.2000). On a motion for summary judgment, a court's function is not to try disputed issues of fact, but only to ascertain whether such an issue is present, and any doubt on that score is to be resolved against the movant. Since it is he who bears the onus of establishing his entitlement to summary judgment, his opponent enjoys the benefit of all favorable inferences from the evidence proffered; moreover, facts asserted by the non-movant, if adequately buttressed by evidentiary material, are to be taken as true.

*Abraham v. Graphics Arts Int'l Union,* 660 F.2d 811, 814 (D.C.Cir.1981) (footnotes omitted).

### A. *Laprade's motion for partial summary judgment*

LaPrade has moved under Rule 56 for what she calls partial summary judgment. She has clarified the purpose of her motion as "seeking judgment on one simple issue: the existence of a valid and unpaid debt.... Plaintiff is not now seeking summary judgment on any existing Count, or on any prospective Count for which reconsideration or leave to amend has been sought." (Pl.'s Reply in Support of Pl.'s Motion for Summ. J., Recons., and Leave to Amend at 3.) Rather, she seeks a ruling that no valid unpaid debt exists based on two alternative theories: (1) defendants have offered no proof of such a debt; or (2) that any debt is time barred under District of Columbia's statute of limitations. Defendants counter that they have indeed submitted evidence of LaPrade's debt and that the statute of limitations does not bar collection actions that do not consist of actual litigation.

*8 Rule 56 does not contemplate a motion for partial summary judgment of the sort LaPrade has filed. Judgment may not be entered as to a fact or an element of a claim. *Capitol Records, Inc. v. Progress Record Distrib., Inc.,* 106 F.R.D. 25, 28 (N.D.Ill.1985) (citing *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216 (7th Cir .1946), and other cases). Although Rule 56(d) contemplates an "order specifying the facts that appear without substantial controversy," Fed.R.Civ.P. 56(d), "[t]here is no such thing as an independent motion under Rule 56(d)." *Arado v. Gen. Fire Extinguisher Corp.,* 626

F.Supp. 506, 509 (N.D.Ill.1985); *see also Commodity Futures Trading Comm'n v. Clothier,* Civ. A. No. 92-1062-B, 1992 WL 123675, at *2 (D.Kan. May 29, 1992) (citing authorities). "The procedure described in subdivision (d) is designed to be ancillary to a motion for summary judgment.... Rule 56(d) does not authorize the entry of a judgment on part of a claim or the granting of partial relief." 10B Charles Alan Wright *et al., Fed. Practice & Procedure* § 2737, at 316 (2d ed.1998). Rather, Rule 56(d) authorizes an "order specifying uncontroverted facts." Fed.R.Civ.P. 56(d).

Nevertheless, the facts here entitle LaPrade to neither summary judgment nor an order that no valid debt exists. LaPrade expressly has not attempted to meet the summary judgment standard for any claim, and in fact, she has not done so. In addition, the record evidence on the existence of a valid debt is conflicting. May Co. has submitted the Woodies documents and the the Russell affidavit, which show that a debt existed from at least 1989 through at least 1992. LaPrade has submitted documents and her own declaration which show that her Woodies account had a zero balance as of January 9, 1992, and no unpaid debt after that point. (*See* Pl.'s Mem. Supp. Mot. Summ. J. & Opp'n May Co.'s Mot. Summ. J., Declaration of Rona F. LaPrade, Mar. 23, 1998 & Exs. A, B.) In light of the inconclusive and conflicting evidence on this material fact, no relief for LaPrade under Rule 56 is warranted.

### B. *May Co.'s motion for summary judgment*

#### 1. Count I: 15 U.S.C. § 1637(a)(7)

Count I of LaPrade's third amended complaint alleges that May Co. violated 15 U.S.C. § 1637(a)(7) by failing to transmit consumer protection statements to her despite reporting her allegedly delinquent debt to others. Section 1637(a)(7) requires that

[b]efore opening any account under an open end consumer credit plan, the creditor shall disclose to the person to whom credit is to be extended ... [a] statement, in a form prescribed by regulation of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                              Page 8

Slip Copy, 2006 WL 3469532 (D.D.C.)
**(Cite as: Slip Copy)**

[Federal Reserve] Board [,] of protection provided by sections 1666 and 1666i of this title to an obligor and the creditor's responsibilities under sections 1666a and 1666i of this title.

May Co. moves for summary judgment, arguing that § 1637(a)(7) does not apply to it because May Co. was the disputed debt's assignee, not the originator, and therefore May Co. was not a "creditor" to LaPrade for an "open end credit plan." More specifically, May Co. argues that only the person to whom the debt was initially payable is a creditor under the TILA.[FN2] May Co. also argues that it did not establish an "open end credit plan" for LaPrade as that term is defined in the TILA and used in § 1637. May Co. asserts that it did not open an account for LaPrade, but acquired the account with the Woodies purchase, that it never intended for LaPrade to charge purchases to that account, and that it never added any finance charge to what it believed was LaPrade's debt.

> FN2. May Co. acknowledges it was assigned the debt and that the TILA provides assignee liability, but only under circumstances which are not present here.

**\*9** LaPrade, relying on *Saunders v. Ameritrust of Cincinnati,* 587 F.Supp. 896 (S.D.Ohio 1984), counters that May Co. created a false debt and that the creation of a false debt gives her a cause of action under § 1637. *Saunders,* however, is inapposite. *Saunders* addressed a violation of § 1637(b), while LaPrade alleges a violation of § 1637(a)(7), which imposes different obligations a creditor. Unlike *Saunders,* this case presents the threshold question of whether the creation of a false debt by an entity with no prior credit relationship to the alleged obligor, where the debt is assigned to collections, falls under the provisions of § 1637(a)(7).[FN3] Stated differently, the question is whether, assuming May Co. created a false debt, doing so made it LaPrade's "creditor" of an "open end consumer credit plan," within the meaning of the TILA.

> FN3. None of these critical issues was

before the court in *Saunders.* In *Saunders,* the defendant had issued a VISA card to the plaintiff, the account became delinquent, the defendant's collections attorneys later told the plaintiff that his account had been paid in full, but the defendant continued to report a delinquent debt to the credit bureau. 587 F.Supp. at 897. There was no dispute that defendant was a "creditor" who had opened an "open end credit plan" account for plaintiff, as those terms are defined by TILA. *Id.* The court held that 15 U.S.C. §§ 1637(b), 1666(b)(6) and 1666a together "create a cause of action against a creditor who reports to a credit bureau that an account is delinquent after the debtor has paid the account in full." *Id.* at 897.

A "creditor" under the TILA is
a person who both (1) regularly extends ... consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of the indebtedness or, if there is not such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(f).

May Co. arguably could be a creditor to LaPrade under the TILA. May Co. admits that it "does regularly extend credit to other consumers." (May Co.'s Mem. Supp. Mot. Summ. J. at 14.) If May Co. created the debt, then May Co. could be the "person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of the indebtedness[.]" § 1602(f)(2). If LaPrade could prove that May Co. falsely created the debt, then May Co. in theory would be LaPrade's "creditor" under the TILA.

However, a creditor who creates a false debt and assigns that debt to collections does not extend credit to the alleged obligor under an "open end credit plan," which is defined by the TILA as
a plan under which the creditor reasonably

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3469532 (D.D.C.)
**(Cite as: Slip Copy)**

contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance.

15 U.S.C. § 1602(i). "Open-end credit" means consumer credit extended by a creditor under a plan in which:
(i) The creditor reasonably contemplates repeated transactions;
(ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and
(iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid.

12 C.F.R. § 226.2(a)(20). "Open-end credit is consumer credit that is extended under a plan and meets *all three* criteria set forth in the definition." 12 C.F.R. § 226, Supp. 1, 2(a)(20)(1).

**\*10** The criterion of reasonably contemplated repeated transactions of 15 U.S.C. § 1602(a)(20)(i) requires that "the credit plan must be usable from time to time and the creditor must legitimately expect that there will be repeat business rather than a one-time credit extension." 12 C.F.R. § 226, Supp. 1, 2(a)(20)(3). Here, even if May Co. did create a false debt, there is no evidence that the account was "usable from time to time" by LaPrade or that May Co. did "legitimately expect that there will be repeat business." For example, the record does not reflect that May Co. issued LaPrade a credit card or took any other measure to allow her to initiate a credit transaction. Thus, the facts in this case do not meet the first criterion of an open end consumer credit plan.

The third criterion of an open end consumer credit plan is that the amount of credit "is generally made available to the extent that any outstanding balance is repaid," 15 U.S.C. § 1602(a)(20)(iii), that is, " available credit is generally replenished as earlier advances are repaid." 12 C.F.R. § 226, Supp. 1, 2(a)(20)(5). "A line of credit is self-replenishing ... as long as during the plan's existence the consumer may use the line, repay, and reuse the credit." *Id.*

There is no evidence that LaPrade could either " make use of the line" or "reuse" the credit May Co. may have extended if it created a false debt.

In sum, even if May Co. created and charged a false debt to an account in LaPrade's name, no facts demonstrate that May Co. did "reasonably contemplate repeated transactions" by LaPrade under the disputed account. That account, then, did not constitute "reusable" credit and May Co. did not extend an "open end credit plan" to LaPrade as those terms are defined the TILA and its implementing regulations. There is no genuine issue of any fact material to LaPrade's claim under § 1637(a)(7) and May Co. is entitled to judgment as a matter of law on Count I.

### 2. Counts II, III, and IV: 15 U.S.C. § 1666(a)

Counts II, III and IV of LaPrade's third amended complaint allege that May Co. violated 15 U.S.C. § 1666(a). That provision states that if a creditor, " after having transmitted to an obligor a statement of the obligor's account in connection with an extension of consumer credit," receives from the obligor within 60 days a written notice disputing the statement, the creditor is required, within 90 days, to either
(i) make appropriate corrections in the account of the obligor, ... and transmit to the obligor a notification of such corrections and the creditor's explanation of any change[; or] ...
(ii) send a written explanation or clarification to the obligor, after having conducted an investigation, setting forth to the extent applicable the reasons why the creditor believes the account of the obligor was correctly shown in the statement and, upon request of the obligor, provide copies of documentary evidence of the obligor's indebtedness.

**\*11** 15 U.S.C. §§ 1666(a)(3)(B)(i)-(ii).

May Co. moves for summary judgment on grounds that § 1666(a) is not applicable to LaPrade's allegations or, alternatively, that it fulfilled its statutory responsibilities under that section while LaPrade failed to fulfill her responsibilities. LaPrade disputes each of these points. Because the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3469532 (D.D.C.)
**(Cite as: Slip Copy)**

provisions of § 1666(a) apply only where the creditor has "transmitted to an obligor a statement of the obligor's account in connection with an extension of consumer credit," and because May Co. did not extend consumer credit to LaPrade or transmit a statement to her in connection with an extension of consumer credit, the provisions of § 1666(a) do not apply. There is no genuine issue of fact material to LaPrade's claim under § 1666(a), and May Co. is entitled to judgment as a matter of law on Counts II through IV.

### 3. Count V: 15 U.S.C. § 1666a(a)

Count V of LaPrade's third amended complaint alleges that May Co. violated 15 U.S.C. § 1666a(a), which provides that

[a]fter receiving a notice from an obligor as provided in section 1666(a) of this title, a creditor ... may not directly or indirectly threaten to report to any person adversely on the obligor's credit rating or credit standing because of the obligor's failure to pay the amount indicated by the obligor under section 1666(a)(2) of this title, and such amount may not be reported as delinquent to any third party until the creditor has met the requirements of section 1666 of this title and has allowed the obligor the same number of days (not less than ten) thereafter to make payment as is provided under the credit agreement with the obligor for the payment of undisputed amounts.

May Co. moves for summary judgment on grounds that it is not LaPrade's creditor, that LaPrade did not send a timely objection to it under § 1666(a), and that within ten days of eventually being contacted by LaPrade, it removed the derogatory information from LaPrade's credit report. LaPrade disputes that May Co. is not her creditor, and argues that under *Saunders,* a creditor who creates an erroneous debt under an open end consumer credit plan is barred from reporting derogatory information to credit bureaus, even in the absence of an objection by the consumer.

As is discussed above, the account in dispute was not an open end credit plan under § 1637, and did not involve an extension of consumer credit as is

required to trigger the protections of § 1666(a). LaPrade, then, is not entitled to invoke the additional protections of § 1666a(a), which apply only when a consumer is entitled to file an objection under § 1666(a). With no existing genuine issue of fact material to LaPrade's claim under section 1666a(a), May Co. is entitled to judgment as a matter of law.

### 4. Count VIII: Defamation

Count VIII of LaPrade's third amended complaint alleges that by reporting false information regarding her credit history to credit bureaus, May Co. defamed LaPrade under D.C. law. May Co. moves for summary judgment on the grounds that it is immune from state defamation claims by virtue of 15 U.S.C. § 1681h(e), which provides that, with certain exceptions not applicable here,

**\*12** no consumer may bring any action or proceeding in the nature of defamation ... with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency ... except as to false information furnished with malice or willful intent to injure such consumer.

May Co. disputes that it acted with malice or willful intent to injure LaPrade when it reported LaPrade's alleged debt to the credit bureaus. In support, May Co. argues that there is no proof that it knew the debt was false, and that its act of promptly deleting the disputed debt when LaPrade objected indicates a lack of malice or willful intent to injure. May Co. also argues that its role as assignee rather than creator of the disputed debt further demonstrates its lack of malice or willful intent, and points to the Woodies documents and the Russell affidavit which show an outstanding balance of $371.67 in collections as of January 15, 1992 on LaPrade's account. Finally, May Co. argues that LaPrade has not demonstrated that she suffered any damages as a result of defamation.

LaPrade contends that May Co. acted with malice or willful intent to injure and therefore is not immune under § 1681h(e). She argues that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                            Page 11

**Slip Copy, 2006 WL 3469532 (D.D.C.)**
**(Cite as: Slip Copy)**

evidence shows that May Co. falsely created the debt. She cites to a document from Woodies' Credit Division shows that her account was paid in full as of November 1991, and to a document from Woodies' Corporate Credit Department that states that as of January 9, 1992, the account had a zero balance, that all derogatory information relating to LaPrade's account had been removed from Woodies' records, and that Woodies had asked several credit bureaus to remove any negative information related to that account. She also asserts that May Co. reported the existence of a false debt with full knowledge that it was false, and has continued to maintain that the false debt was valid. Finally, LaPrade contends that she suffered actual damage when Chevy Chase Bank revoked her $4,500 credit line upon examination of her credit reports. She supports her contention with a June 25, 1996 letter from Chevy Chase Bank stating that LaPrade's credit line was being withdrawn because, in part, her credit history showed she had not paid other accounts as agreed. (Pl.'s Sealed Mem. Opp'n to Wolpoff Firm's Mot. Summ. J., Ex. R, at 1.)

Giving LaPrade the benefit of all favorable inferences from the evidence proffered, *Abraham,* 660 F.2d at 814, a reasonable trier of fact could conclude that LaPrade owed no debt to Woodies, and that May Co. created and then knowingly reported a false debt to credit bureaus with malice or willful intent to injure LaPrade, causing damage to LaPrade. A genuine issue remains as to whether May Co. acted with malice or willful intent to injure LaPrade, and therefore whether May Co. is immune from a state defamation claim under § 1861h(e). May Co.'s motion for summary judgment on Count VIII, then, has been denied.

## *CONCLUSION*

**\*13** LaPrade's motion to amend her complaint has been denied because it was unduly delayed, she failed to cure the complaint's deficiencies in amendments previously allowed, and granting her motion would prejudice Abramson and the Wolpoff firm. LaPrade's motion to reconsider has been denied because it rehashes an argument previously rejected and impermissibly attempts to advance a

new legal theory not previously argued. LaPrade's motion for partial summary judgment has been denied since existing genuine issues of material fact entitle LaPrade to no relief under Rule 56.

May Co.'s motion for summary judgment has been granted in part and denied in part. The motion has been granted as to Count I because 15 U.S.C. § 1637 does not apply to the facts of this case. The motion has been granted as to Counts II, III, and IV because 15 U.S.C. § 1666(a) does not apply to the facts of this case. The motion has been granted as to Count V because 15 U.S.C. § 1666a(a) does not apply to the facts of this case. The motion has been denied as to Count VIII because LaPrade's defamation claim is not barred by § 1681h(e) if May Co. acted with malice or willful intent to injure, and genuine issues of material fact exist as to the nature of May Co.'s conduct.

D.D.C.,2006.
LaPrade v. Abramson
Slip Copy, 2006 WL 3469532 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                             Page 1

Not Reported in F.Supp., 1990 WL 209266 (D.Md.), 54 Fair Empl.Prac.Cas. (BNA) 61, 55 Empl. Prac. Dec. P 40,361
**(Cite as: Not Reported in F.Supp.)**

**C**
Martin v. Holiday Universal, Inc.
D.Md.,1990.

United States District Court, D. Maryland.
Cordell MARTIN et al., Plaintiffs
v.
HOLIDAY UNIVERSAL, INCORPORATED et al., Defendants.
**No. JH-90-1188.**

Oct. 3, 1990.

JOSEPH C. HOWARD, District Judge:
*1 Pending before the court is defendants' motion to dismiss plaintiffs' first amended complaint. Plaintiffs have opposed the motion and defendants replied. No hearing is necessary to resolve the legal questions presented. Local Rule 105.6.

The two count amended complaint was filed by six plaintiffs who allege violations of the 1866 Civil Rights Act, 42 U.S.C. § 1981, and the District of Columbia Human Rights Act, D.C.Code Ann. §§ 1-2501 to 1-2557 (1987) ( "DCHRA"). These causes of action center generally on the defendants' alleged corporate policy of maintaining segregated health clubs and the employment discrimination which flows from it.

The standard for a motion to dismiss is well known. On a motion to dismiss, the inquiry is whether the allegations are "a short and plain statement of the claim showing that the pleader is entitled to relief ... " as required by Fed.R.Civ.P. 8(a)(2). *Bolding v. Holshouser,* 575 F.2d 461, 464 (4th Cir.1978), *cert. denied,* 439 U.S. 837 (1978). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* [1 EPD ¶ 9656] 355 U.S. 4-45-46 (1957) (footnote omitted). Also, on a motion to dismiss

the court is required to view the facts in the complaint in a light most favorable to the plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). Further, the defense of limitations will only be successful when the running of the statute is apparent from the face of the complaint. *Conerly v. Westinghouse Elec. Corp.,* [23 EPD ¶ 31,107] 623 F.2d 117, 119 (9th Cir.1980).

Defendants' motion to dismiss focuses on four main arguments. First, the defendants argue that the recent Supreme Court case of *Patterson v. McLean Credit Union,* [50 EPD ¶ 39,066] 57 U.S.L.W. 4705 (June 15, 1989), disposes of many of plaintiffs' § 1981 claims, and second that the appropriate statute of limitations for the § 1981 claims bars recovery. Third, defendants assert that this court lacks subject matter jurisdiction of over the DCHRA claims, and finally that the DCHRA claims are barred by the statute of limitations. The court will address each argument in turn.

*Count One (Section 1981)*

The first argument in support of defendants motion to dismiss focuses on the scope of the Supreme Court's holding in *Patterson.* Generally, defendants argue that after *Patterson,* the plaintiffs can no longer state a cause of action under § 1981. Plaintiffs, of course, argue that the ramifications of *Patterson* are not as broad as defendants suggest.

Section 1981 of Title 42 of the United States Code provides that all "persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." However, this statute "cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts." *Id.* at 4708. Therefore, § 1981 "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 2

Not Reported in F.Supp., 1990 WL 209266 (D.Md.), 54 Fair Empl.Prac.Cas. (BNA) 61, 55 Empl. Prac. Dec. P 40,361
**(Cite as: Not Reported in F.Supp.)**

prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms." *Id.* Conduct, after the contractual relationship has been established and unrelated to an employee's right to enforce her contract, may not ordinarily be the basis for a § 1981 claim. *Id.* at 4709.

**\*2** All of the plaintiffs allege that they were refused, on discriminatory grounds, the opportunity to contract with defendants for employment on equal terms in violation of § 1981. As this states a cause of action pursuant to § 1981, the motion to dismiss will be denied. The remaining allegations in the amended complaint concerning working conditions are simply evidence of this and will remain in the complaint as surplus. *Id.* at 4710.

The plaintiffs, Cordell Martin and Raphael McKeython, allege an additional basis for their § 1981 claims based on the denial of their promotion and transfer requests. In *Patterson,* the Supreme Court held that under certain circumstances an employer's failure to promote is actionable under § 1981. The key determination "depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." *Id.* If the change does involve a new contract, "then the employer's refusal to enter the new contract is actionable under § 1981." *Id.* Accordingly, these allegations state a cause of action and further factual scrutiny may be appropriate.[FN1]

Two plaintiffs, Cordell Martin and Myrna Pitts, also allege that the discriminatory discharge from their employment with defendants violated § 1981. Defendants contend that this is postformation conduct and is therefore outside of the scope of § 1981 after *Patterson.* This issue has received considerable attention, but the district and circuit courts have not resolved the question uniformly. Other than the vacated holding in *Patterson v. McLean Credit Union,* 805 F.2d 1143, 1145 (4th Cir.1986), there is no definitive precedent in the Fourth Circuit.[FN2]

The court recognizes that sound arguments can be made for and against the holding that discriminatory discharge is actionable under § 1981. However, the court holds the thorough analysis in *Hicks v. Brown Group, Inc.,* [53 EPD ¶ 39,823] 902 F.2d 630 (8th Cir.1990), is the most compelling. In *Hicks,* the Eighth Circuit carefully considered the Supreme Court's holding in *Patterson, Hicks,* 902 F.2d at 635-38, as well as Supreme Court precedent after *Patterson, Hicks,* 902 F.2d at 637. In addition, *Hicks* analyzed the cases reaching a contrary result, *id.* at 640 n. 24, the relevant legislative history, *id.* at 642-48, and the purpose of § 1981. *Id.* at 638-42. After considering all of these factors, the court reached the conclusion that § 1981 permits a cause of action for retaliatory discharge. *Id.* at 648.

The court chooses to follow *Hicks* for several reasons. First, the reasoning of *Hicks* is extensive. On the other hand, the cases that hold to the contrary of *Hicks* end the analysis with a mechanical and uncritical application of the language in *Patterson.* That a more subtle analysis is appropriate is indicated by *Patterson* itself. For example, certain postformation conduct, such as the failure to promote, is actionable under § 1981, *Patterson,* 57 U.S.L.W. at 4710, as well as postformation conduct which impairs an employee's right to enforce his or her contract. *Id.* at 4709. In addition, if this issue were as obvious as these courts suggest, then the Supreme Court's conspicuous and repeated avoidance of deciding this question is curious indeed. *Lytle v. Household Mfg., Inc.,* [52 EPD ¶ 39,733] 58 U.S.L.W. 4341, 4343 n. 2 (March 20, 1990).

**\*3** Second, in the context of a motion to dismiss, it is difficult to carefully analyze precedent because the facts of this case are not in issue. The sole question before the court is whether the plaintiffs have stated a cause of action. Inasmuch as the plaintiffs have colorably stated a cause of action, it cannot be said to a certainty that the plaintiffs would be entitled to no relief under any set of facts which could be proved in support of the § 1981 claims. *Adams v. Bain,* 697 F.2d 1213, 1216 (4th Cir.1982).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3

Not Reported in F.Supp., 1990 WL 209266 (D.Md.), 54 Fair Empl.Prac.Cas. (BNA) 61, 55 Empl. Prac. Dec. P 40,361
**(Cite as: Not Reported in F.Supp.)**

Finally, plaintiff Cordell Martin alleges a violation of § 1981 based on his retaliatory discharge from his employment with defendants. Specifically, he contends that he was threatened with termination for speaking out against defendants' discriminatory policies. Once again, defendants make much of the holding in *Patterson* and argue that this postformation conduct may not be the basis for a § 1981 violation. Although the law is unsettled on this issue, the court disagrees with defendants' argument.

In the context of retaliatory discharge, the right to enforce a contract is even more clearly implicated than in the case of discriminatory discharge. When an employer retaliates against an employee by threatening discharge when the employee is attempting to enforce his § 1981 rights, the employer's action may intimidate the employee into refraining from resorting to the legal process to vindicate his rights. *Hicks*, 902 F.2d at 638 n. 20; *Malhotra v. Cotter & Co.*, [51 EPD ¶ 39,329] 885 F.2d 1305, 1312 (7th Cir.1989); *Fowler v. McCrory Corp.*, [52 EPD ¶ 39,665] 727 F.Supp. 228, 231-32 (D.Md.1989). Thus, Cordell Martin states a cause of action based on § 1981's guarantee of the right to enforce contracts equally.[FN3]

Defendants also attack Count One of the amended complaint by arguing that a one year statute of limitations applies in this case, thus barring many of plaintiffs' claims. The Court holds that the three year period applies for limitations purposes. *Banks v. Chesapeake & Potomac T. Co.*, [41 EPD ¶ 36,634] 802 F.2d 1416, 1421-23 (D.C.Cir.1986). In addition, the claims are not barred by limitations based on the allegation of continuing violations of § 1981. *Williams v. Norfolk & W. Ry. Co.*, [11 EPD ¶ 10,710] 530 F.2d 539, 542 (4th Cir.1975); *United Air Lines, Inc. v. Evans*, [14 EPD ¶ 7577] 431 U.S. 553, 558 (1977). Therefore, the amended complaint on its face does not indicate that the statute of limitations has run and dismissal is inappropriate.

*Count Two (DCHRA)*

Defendants argue next that count two of the amended complaint should be dismissed because the DCHRA does not apply to the claims of the plaintiffs. Specifically, defendants assert that the DCHRA only applies to discriminatory acts within the District of Columbia. Therefore, because plaintiffs in this case were not hired in Washington, D.C., were not employed in Washington, D.C., and did not experience any discrimination in Washington, D.C., these claims should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

**\*4** Defendants are correct that the DCHRA does not apply to acts occurring outside the District of Columbia. The only case addressing this question assumed but did not decide, that this was the law. *Matthews v. Automated Business Sys. & Serv., Inc.*, [51 EPD ¶ 39,429] 558 A.2d 1175, 1180 n. 8 (D.C.App.1989). According to the Court of Appeals for the District of Columbia, "the critical factual issue bearing on jurisdiction is whether these events took place in the District." *Id.* at 1180. Thus, the remaining question is whether the complaint alleges that each plaintiff was subjected to discriminatory acts within the District of Columbia.[FN4]

In this case each plaintiff alleges that he or she was discriminated against by the refusal to hire, transfer or promote them into facilities located in the District of Columbia. (Amended Complaint paragraphs 85, 86 and 87). The fact that defendants made the discriminatory decisions outside of Washington, D.C., and that the plaintiffs applied for employment outside of Washington, D.C. will not shield defendants from liability. *Green v. Kinney Shoe Corp.*, 704 F.Supp. 259, 260 (D.D.C.1988). The discriminatory act in this case consisted of not transferring or hiring plaintiffs in or to the District of Columbia facilities. Accordingly, both *Green* and *Matthews* support subject matter jurisdiction over these claims.[FN5]

Defendants also argue that the correct application of the District of Columbia's choice of law principles precludes the DCHRA cause of action. However, in light of the court's holding that discrimination occurred within Washington, D.C., the defendants'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1990 WL 209266 (D.Md.), 54 Fair Empl.Prac.Cas. (BNA) 61, 55 Empl. Prac. Dec. P
40,361
**(Cite as: Not Reported in F.Supp.)**

interest analysis is no longer persuasive. *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.,* 534 A.2d 1268, 1270 (D.C.1987).

The last of defendants' arguments focuses, once again, on the statute of limitations. The DCHRA requires the filing of an action within one year of occurrence of the unlawful discriminatory practice. *Davis v. Potomac Elec. Power Co.,* [29 EPD ¶ 32,999] 449 A.2d 278, 280-81 (D.C.1982). That period begins to run at the time "of the occurrence of the unlawful discriminatory practice, or the discovery thereof." D.C.Code § 1-2544(a) (1987). Defendants argue, therefore, that any act which is alleged to have occurred prior to June 14, 1988, is barred by limitations. Plaintiffs, on the other hand, contend that they have alleged a continuing course of discrimination which allows all claims to survive.

In support of the argument that there was a continuing course of conduct, plaintiffs rely on a line of federal cases permitting this theory in § 1981 cases. *See e.g., Williams,* 530 F.2d at 539. However, plaintiffs do not suggest why these § 1981 cases should be applied in the DCHRA context. This is particularly important in light of the District of Columbia Court of Appeal's recent expression that the federal Civil Rights Act is not the counterpart of the DCHRA, and the DCHRA will be interpreted differently. *Anderson v. United States Safe Deposit Co.,* [49 EPD ¶ 38,881] 552 A.2d 859, 862 (D.C.App.1989).

**\*5** Plaintiffs also cite *Jones v. Howard Univ.,* 574 A.2d 1343 (D.C.App.1990), for their position. In that case the District of Columbia Court of Appeals discussed precedent which distinguished, for purposes of the statute of limitations, "multiple breaches of a continuing duty and a single breach." *Id.* at 1347 (citing *Kyriakopoulos v. George Washington Univ.,* 866 F.2d 438 (D.C.Cir.1989)). The court held in *Jones* that the plaintiff had only been discharged once, thus it was a single breach and there would be no tolling of the limitations period. In the instant case, however, plaintiffs allege a continuing duty to promote, transfer or hire by the Washington, D.C. facilities. (Amended Complaint paragraphs 85, 86 and 87). Therefore,

every day in which the plaintiffs were not promoted, transferred or hired was a reaffirmation of the discriminatory policy. *Jones,* 574 A.2d at 1348.

This conclusion is also supported by the language of the DCHRA. Specifically, the period of limitations begins to run at the time "of the occurrence of the unlawful discriminatory *practice,* or the discovery thereof." D.C.Code § 1-2544(a) (1987) (emphasis added). In this case the unlawful discriminatory practice was refusing to promote, transfer or hire in the District of Columbia facilities. As each plaintiff alleges that the practices continues to this day, and that he or she was not promoted, transferred or hired after June 14, 1988, (Amended Complaint paragraphs 85, 86 and 87), the statute of limitations does not bar this cause of action.

The court will enter a separate order.

> FN1. In any event, these allegations are simply corroborative of the more general claim based on the refusal to form the original employment contract on a nondiscriminatory basis.

> FN2. Even though the Fourth Circuit's opinion was vacated, according to the Fourth Circuit "[c]laims of racially discriminatory hiring, firing, and promotion go to the very existence and nature of the employment contract and thus *fall easily* within § 1981's protection." *Patterson,* 805 F.2d at 1145.

> FN3. In any event, these allegations may simply be used as evidence of the non-neutral nature of the original employment contract.

> FN4. The plaintiffs' opposition to the motion to dismiss suggests that "plaintiffs allege a sufficient District of Columbia nexus." That the DCHRA requires a nexus test to establish jurisdiction was expressly rejected by the District of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 5

Not Reported in F.Supp., 1990 WL 209266 (D.Md.), 54 Fair Empl.Prac.Cas. (BNA) 61, 55 Empl. Prac. Dec. P 40,361
**(Cite as: Not Reported in F.Supp.)**

Columbia Court of Appeals. *Matthews,* 558 A.2d at 1181. In addition, the court notes that plaintiffs do not dispute that the DCHRA only applies to discriminatory acts within the District of Columbia.

FN5. It is true that this problem could be resolved against plaintiffs by focusing on the location of the discriminatory decision; namely in Maryland. However, in light of the absence of controlling authority directly on point, the court will resolve this issue in favor of plaintiffs and not dismiss their claims based solely on a judicial interpretation of *dicta.* Furthermore, the defendants do not raise a factual dispute that the District of Columbia facilities are at issue in this count of the amended complaint.

D.Md.,1990.
Martin v. Holiday Universal, Inc.
Not Reported in F.Supp., 1990 WL 209266 (D.Md.), 54 Fair Empl.Prac.Cas. (BNA) 61, 55 Empl. Prac. Dec. P 40,361

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                          Page 1

Slip Copy, 2007 WL 851860 (D.D.C.)
**(Cite as: Slip Copy)**

**H**
U.S., ex rel. Miller v. Bill Harbert Intern. Const.,
Inc.
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
UNITED STATES OF AMERICA, ex rel. Richard F.
MILLER, Plaintiffs,
v.
BILL HARBERT INTERNATIONAL
CONSTRUCTION, INC., et al., Defendants.
**Civil Action No. 95-1231 (RCL).**

March 14, 2007.

Robert B. Bell, Gregory B. Reece, Howard M.
Shapiro, Jennifer M. O'Connor, Jonathan Goldman
Cedarbaum, Matthew B. Baumgartner, Michael J.
Gottlieb, Monya Monique Bunch, Wilmer Cutler
Pickering Hale & Dorr LLP, Kevin Michael Henry,
Sidley Austin, LLP, Carolyn Gail Mark, Michael F.
Hertz, U.S. Department of Justice, Keith V. Morgan
, U.S. Attorney's Office, Washington, DC, for
Plaintiffs.
Charles Anthony Zdebski, June Ann Sauntry, Brian
P. Watt, Troutman Sanders LLP, Barry Coburn,
Trout Cacheris, PLLC, Charles Samuel Leeper,
Jeffrey J. Lopez, Michael Reilly Miner, Elizabeth
Ewert, Michael J. McManus, Drinker, Biddle &
Reath LLP, Alan William Hugh Gourley, Crowell
& Moring LLP, Washington, DC, Bryan B. Lavine,
James J. Mills, Timothy J. Kozik, Troutman &
Sanders, Atlanta, GA, for Defendants.

***MEMORANDUM OPINION & ORDER***
ROYCE C. LAMBERTH, United States District
Judge.

I. INTRODUCTION

\*1 This matter is before the Court on defendants'
Bill L. Harbert, and Bill Harbert International
Construction, Inc.'s ("BHIC") motion [583] in

limine for an Order precluding the relator from
offering evidence in furtherance of an alter ego
theory of liability against Bill L. Harbert and BHIC.
[FN1] Also at issue is whether the relator, in his Fifth
Amended Complaint, has successfully cured the
Rule 9(b) fraud deficiency within his Fourth
Amended Complaint, found by Magistrate Judge
Facciola and adopted by this Court. [FN2] Defendant
Harbert Corporation made an oral motion to dismiss
the relator's Fifth Amended Complaint on Rule 9(b)
grounds at the pretrial hearing. For the forgoing
reasons, the Court finds that the defendants motion
[583] should be GRANTED, and defendant Harbert
Corporation's oral motion will be GRANTED IN
PART and DENIED IN PART. The relator has
satisfied its burden of pleading fraud as to
defendant Harbert Corporation with sufficient
particularity solely as to Contract 20A, but the
relator's claims against defendant Harbert
Corporation as to contracts 07 and 29 shall be
DISMISSED.

> FN1. Prior to this filing, the issue of what
> amendments fell within the scope of the
> relator's Fifth Amended Complaint was
> previously addressed in the parties'
> pleadings surrounding the relator's motion
> [525] for leave to file a Fifth Amended
> Complaint. (*See also* Defs.' Opps. [539,
> 540] and Pl.'s Reply [549].)

> FN2. This issue was argued by counsel for
> defendant Harbert Corporation before the
> Court at the March 9, 2007, pretrial
> hearing.

II. DISCUSSION

A. Alter Ego Analysis

Defendants seek to prevent the relator from
introducing a new theory of alter ego liability into

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2

Slip Copy, 2007 WL 851860 (D.D.C.)
**(Cite as: Slip Copy)**

his Fifth Amended Complaint. Defendants argue that the addition of this claim at the last minute will unfairly prejudice the defendants, and will hinder the Court in light of the fact that the Court will have to make a separate determination of whether the relator has established as a matter of law an alter ego claim against the defendants. Rather, they contend that the relator is only allowed to include amendments relating to defendant Harbert Corporation ("Harbert"). (*See* Mot. [583] at 2.) In his reply brief supporting his motion [549] for leave to file a Fifth Amended Complaint, the relator argues that no such prejudice will occur, and that the relator may properly add claims and theories that reach all defendants. (*See* Reply Mem. [549].) The Court does not agree with the relator's position, and finds that the defendants' motion should be GRANTED for two reasons.

First, according to the language in this Court's recent Memorandum Opinion & Order [620], the relator was instructed by the Court to limit its amendments solely to cure the Rule 9(b) deficiency as to defendant Harbert. On January 10, 2007, Magistrate Judge Facciola issued a Report and Recommendation [507], in which he found that the relator's Fourth Amended Complaint failed to plead fraud against defendant Harbert with sufficient particularity under Rule 9(b) of the Federal Rules of Civil Procedure. The magistrate judge recommended dismissing the relator's Fourth Amended Complaint without prejudice to the relator re-filing a Fifth Amended Complaint with the specific purpose of curing the 9(b) deficiency. This Court, in its Memorandum Opinion & Order [620], adopted the magistrate judge's recommendation, and ordered that the relator was granted leave to file a Fifth Amended Complaint solely for the purposes of curing the 9(b) deficiency. A necessary conclusion that must be drawn from this Order is that the relator was not granted leave to amend its complaint for any other reason. Naturally, this includes a restriction on amending the complaint with additional theories of liability.

*2 Second, allowing the relator to include a new theory of liability at this late stage is not justified in light of the law surrounding post-discovery amendments to the complaint. Though a plaintiff should be allowed to freely amend a complaint under Rule 15 "when justice so requires," there are some exceptions to this rule. According to the D.C. Circuit, a court is not obligated to grant leave to amend a complaint if there exists "undue delay, bad faith on the part of the moving party, or undue prejudice to the opposing party." *Sinclair v. Kleindienst,* 645 F.2d 1080, 1085 (D.C.Cir.1981) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). Two of those exceptions are implicated in the present case. As the D.C. Circuit noted, allowing a plaintiff to add a new theory of liability imposes a requirement to allow the defendants imputed by this new theory of liability to conduct additional discovery to contest the new theory. *See Sinclair,* 645 F.2d at 1085. Naturally, in light of the complexity of this case and the number of defendants, allowing discovery as to all defendants implicated by the new theory would cause an undue delay. Additionally, there would be an even greater delay on top of discovery to allow the Court to assess whether the relator has successfully pleaded his alter ego theory as a matter of law. To fail to do so would unduly prejudice the defendants because they would not have been given a full opportunity to prepare an adequate defense against an entirely new liability theory brought at the last-minute.

Accordingly, this Court finds that the defendants' motion to preclude the relator from including a theory of alter ego liability as to any defendant is GRANTED.

### B. Sufficiency of Fraud as to Harbert Corporation in Relator's Fifth Amended Complaint

In its recent Memorandum Opinion & Order [620], this Court adopted Magistrate Judge Facciola's finding that the Fourth Amended Complaint failed to plead fraud with particularity as to defendant Harbert, as required by Rule 9(b) of the Federal Rules of Civil Procedure. The Court dismissed the complaint without prejudice so that the relator might cure the 9(b) deficiency. In response, the relator ultimately filed its Fifth Amended Complaint with this Court.[FN3]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3

Slip Copy, 2007 WL 851860 (D.D.C.)
**(Cite as: Slip Copy)**

FN3. The relator's initial attempt at filing a Fifth Amended Complaint occurred on January 31, 2007, when it filed its motion [525] for leave to file the complaint. In compliance with subsequent requests and Orders by this Court and Magistrate Judge Facciola (*See* Feb. 16, 2007 Minute Order; Mem. Op. & Order [620] ), the relator filed a subsequent version of the Fifth Amended Complaint on March 8, 2007. This is the version of the Fifth Amended Complaint that counsel for defendant Harbert referenced in his argument before this Court on March 9, 2007. Finally, the relator filed its final version of the Fifth Amended Complaint on March 9, 2007, in order to comply with the magistrate judge's March 9, 2007, Minute Order requiring the relator to file a revised complaint naming only those parties remaining in the case at present. Other than eliminating the statements within the complaint that reference the now-dismissed parties, the March 9, 2007 Fifth Amended Complaint does not vary in any way from the March 8, 2007 version.

Comparing the two complaints, the relator added a series of paragraphs concerning defendant Harbert, listed below in order, by paragraph number:
12. Defendant Bill L. Harbert was the President, Director, Chief Operating Officer, and Vice Chairman of Defendant Harbert Corporation....
....
14. Defendant Harbert Corporation provided certain office space in the Headquarters Building to Defendant Bill L. Harbert and his staff, without rent.
15. Defendant Harbert Corporation provided material services, such as insurance, personnel, telephone and computer services to Defendant Bilhar f/k/a HIE.
16. Defendant Harbert Corporation had a master insurance program that provided coverage for various Harbert entities, including, but not limited to Defendant Harbert International, Inc. ["HII"] and Defendant Bilhar f/k/a HIE.
*3 17. Defendant Harbert Corporation assumed certain obligations in order to allow Defendant Bilhar f/k/a HIE to perform much of the work in

question. As late as 1993, it was the position of Harbert Corporation that "the bonded obligations on the 'HIE jobs' contracted in HII's name are significant, and each of HII and the Corporation are jointly and severally liable on these bonds."
18. Defendant Harbert Corporation helped arrange and maintain Harbert/Jones Joint Venture bank accounts held in the name of Defendant Bilhar f/k/a HIE. Moreover, Defendant Harbert Corporation's consolidated analysis of bank accounts included at least one SouthTrust bank account for the Harbert/Jones Joint Venture on Contract 20A, and Defendant Bill L. Harbert, a director and officer of Harbert Corporation and Harbert International, Inc., was a signatory on a SouthTrust bank account held by the Harbert/Jones Joint Venture on Contract 20A.
....
34. Defendant Harbert Corporation, through its employees and agents, had knowledge of or recklessly disregarded evidence of acts in furtherance of the conspiracy, including but not limited to, acts of Defendant Bill L. Harbert and Terry Windle; the fact that Defendant Bilhar f/k/a HIE was understating its expected return on Contract 20A; and the fact that Defendant E. Roy Anderson, a co-conspirator, used an allegedly false title when purporting to represent HII in documents submitted to government entities.[FN4]


FN4. (Relator's Fifth Amended Complaint [687] 4-6, 9.)

At issue before the Court is whether these added statements concerning Defendant Harbert sufficiently plead fraud with particularity as to defendant Harbert. Defendant argues that the additional statements of acts by the defendant only establish that Harbert Corporation or its agents knew that they were doing an act. In defendant's view, these statements do not establish that Harbert Corporation knew that these acts were in furtherance of any conspiracy or improper purpose. In essence, defendant argues that the relator has failed to allege the requisite intent by the defendant to act as a part of this conspiracy. It stands to reason, then, that if the relator has sufficiently alleged that defendant Harbert had knowledge of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 4

Slip Copy, 2007 WL 851860 (D.D.C.)
**(Cite as: Slip Copy)**

the conspiracy, the defendant's acts can be deemed in furtherance thereof.

Based upon the additional allegations set forth in the relator's complaint, the Court finds that defendant Harbert allegedly had the requisite knowledge of the conspiracy because its director/officer, Bill L. Harbert knew of the conspiracy. Under general principles of agency law, knowledge by a corporation's officers or agents is generally attributable to the corporation itself. *BCCI Holdings (Luxembourg), S.A. v. Clifford,* 964 F.Supp. 468, 478 (D.D.C.1997). This knowledge is attributable to the corporation regardless of whether the corporate officer actually discloses the information to the corporation. *Id.* (citing Fletcher Cyc. Corp. § 790, at 15-16). This principle is based upon the fact that a corporate officer owes a fiduciary duty of loyalty to the corporation that requires the corporate officer to communicate the officer's knowledge to the corporation. *Id.* (citing Fletcher Cyc. Corp. § 819, at 116).

**\*4** Applying this standard of imputed knowledge to the facts of this case, it is clear that Harbert Corporation had knowledge of the conspiracy by virtue of the knowledge possessed by its corporate officer, Bill L. Harbert. As paragraph 12 of the relator's Fifth Amended Complaint shows, Bill L. Harbert was a corporate officer of defendant Harbert because he was the "President, Director, Chief Executive Officer, and Vice Chairman of Defendant Harbert Corporation." (Relator's Fifth Am. Compl. [687] 4.) The Fifth Amended Complaint also indicates that Bill L. Harbert was a " central player[ ] across this multi-contract conspiracy." Such an averment clearly indicates with particularity that Bill L. Harbert knew of the multi-contract conspiracy. Therefore, Mr. Harbert's knowledge is imputed to defendant Harbert.

An issue still remains, however, as to whether the relator has established with sufficient particularity that defendant Harbert-equipped with the imputed knowledge of the conspiracy-engaged in fraudulent actions in furtherance thereof. Upon a review of the additional statements within the Fifth Amended Complaint, the relator has only pleaded with particularity defendant's involvement as to contract

20A. Specifically, the relator points out that the defendant was involved in arranging and maintaining a SouthTrust bank account for the Harbert/Jones Joint Venture on contract 20A, and that its officer, Bill L. Harbert was a signatory for that bank account. The relator also avers that the defendant knew of Bilhar's understating of its expected returns on contract 20A, creating a reasonable inference that defendant was aware of fraudulent activity as to that contract.

There is no specific allegation, however, that the defendant engaged in any activity as to the remaining two contracts. The remaining additional statements regarding defendant's providing material services, office space, and insurance do not plead any fraudulent acts at all. Even if these acts are viewed in the context that the defendant had knowledge of the conspiracy while engaging in these acts, there is no specific allegation that these acts were done in furtherance of fraud or were engaged in as to any specific contract at issue in this case. Moreover, none of the other references to Bill L. Harbert in the complaint indicate in any way that he engaged in fraudulent activity while in the role as director/officer for defendant Harbert. Rather, the averments merely state that Bill L. Harbert engaged in fraudulent activity, without indicating whether he was acting for a specific company or not. As the complaint notes, Bill L. Harbert was the director of many companies. Rule 9(b) requires more specificity than this in order to impute those actions by Bill L. Harbert to any particular company. Therefore, the Court finds that the relator has not pleaded with sufficient specificity allegations of fraud against defendant Harbert as to contracts 07 and 29. Accordingly, the Court finds that the relator's claims as to contracts 07 and 29 against defendant Harbert Corporation should be DISMISSED.

### III. CONCLUSION

**\*5** For the aforementioned reasons, the Court finds that the defendants' motion [583] is GRANTED, and defendant Harbert Corporation's oral motion to dismiss the relator's Fifth Amended Complaint is GRANTED as to claims on contracts 07 and 29,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5

Slip Copy, 2007 WL 851860 (D.D.C.)
**(Cite as: Slip Copy)**

and DENIED as to claims on contract 20A.

SO ORDERED.

D.D.C.,2007.
U.S., ex rel. Miller v. Bill Harbert Intern. Const., Inc.
Slip Copy, 2007 WL 851860 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.