# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

.

JAMES MASON                          )
717 Ingraham Street, NW              )
Washington, D.C. 20012,              )
                                     )  Civil Action No. 06-1319 (RMC)
                    Plaintiff,       )
                                     )
          v.                         )
                                     )
DAVITA INC.                          )
601 Hawaii Street                    )
El Segundo, CA 90245,                )
                                     )
                    Defendant.       )
_____)


## DAVITA INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNT I OF THE SECOND AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rules 7 and 56.1,

Defendant DaVita Inc. ("DaVita") moves for summary judgment on Count I of the

Second Amended Complaint which alleges race discrimination in violation of the District

of Columbia Human Rights Act.  The grounds for DaVita's motion are set forth in the

supporting Statement of Undisputed Material Facts, Memorandum of Points and

Authorities, and accompanying Exhibits.


Respectfully submitted,


By:    _____/s/ Minh N. Vu_____

Minh N. Vu (Bar No. 444305)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
Tel: (202) 861-0900
Fax: (202) 296-2882


_____/s/ Joseph T. Ortiz_____

Joseph T. Ortiz
(admitted pro hac vice)
Epstein Becker & Green, P.C.
1875 Century Park East, Suite 500
Los Angeles, CA 90067-2506
(310) 557-9542
(310) 553-2165 (fax)


Dated:  June 25, 2007             Counsel for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of June, 2007, a copy of DaVita Inc.'s

Motion for Summary Judgment on Count I of the Second Amended Complaint was

served through the Court's Electronic Court Filing system to counsel listed below:

> David A. Branch
> Law Office of David A. Branch
> 1825 Connecticut Avenue, NW
> Suite 690
> Washington, D.C. 20009

                              _____/s/ Minh N. Vu_____
                              Minh N. Vu

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

JAMES MASON                                )
717 Ingraham Street, NW                    )
Washington, D.C. 20012,                    )
                                           )  Civil Action No. 06-1319 (RMC)
                       Plaintiff,          )
                                           )
          v.                               )
                                           )
DAVITA INC.                                )
601 Hawaii Street                          )
El Segundo, CA 90245,                      )
                                           )
                       Defendant.          )
_____       )

### DAVITA INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN
### SUPPORT OF SUMMARY JUDGMENT ON COUNT I
### OF THE SECOND AMENDED COMPLAINT

Minh N. Vu (Bar No. 444305)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
Tel: (202) 861-1841
Fax: (202) 861-3541

Joseph T. Ortiz
(admitted pro hac vice)
Epstein Becker & Green, P.C.
1875 Century Park East, Suite 500
Los Angeles, CA 90067-2506
(310) 557-9542
(310) 553-2165 (fax)

Counsel for Defendant DaVita Inc.

June 25, 2007

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT....................................................................................................... 4

    A.    DaVita is entitled to summary judgment on Mr. Mason's claim that his
          non-selection in March 2006 was based on race because the Court
          does not have subject matter jurisdiction under the DCHRA..................... 4

    B.    DaVita is entitled to summary judgment because no reasonable jury
          could conclude from all the evidence that Mr. Mason's non-selection
          for a PSR position in January 2006 and in March 2006 was because of
          his race. ................................................................................................... 6

        1.    The legal framework. ....................................................................... 6

        2.    Analysis............................................................................................. 8

            a.    No reasonable jury could conclude that Mr. Mason's
                  non-selection for the D.C. PSR position in January
                  2006 was because of his race. ............................................. 8

            b.    No reasonable jury could conclude that Mr. Mason's
                  non-selection for a PSR position outside of D.C. in
                  March 2006 was because of his race................................. 15

            c.    There is substantial evidence that DaVita Rx's non-
                  selection decisions regarding Mr. Mason were not
                  based on race.................................................................... 18

III.    CONCLUSION................................................................................................. 21

## I.    INTRODUCTION[1]

This lawsuit concerns the efforts of DaVita Rx, a separate but wholly-owned subsidiary of Defendant DaVita Inc. ("DaVita"), to create a national sales force of Pharmacy Services Representatives ("PSRs") to promote a new pharmacy service that would offer the convenient delivery of prescription drugs to patients at the DaVita dialysis centers where they regularly receive treatment. (Statement of Undisputed Material Facts ("SUMF") ¶¶ 1, 6.)  These new PSRs would be based in specific geographical regions throughout the United States, and for the first several years, be required to travel away from their home base at least 75 percent of the time in order to assist with initial patient enrollments in other parts of the country.  After initial enrollments are completed, Davita Rx expected that its PSRs would travel less and focus their efforts on servicing their respective regions.  (SUMF ¶ 19.)

DaVita Rx's workforce was racially diverse from its inception.  (SUMF ¶¶ 21-25.)  The six-person management team of this start-up enterprise consisted of one Hispanic, one African-American, one person of Middle-Eastern descent, and three Caucasians. (SUMF ¶ 4.)  DaVita Rx also recruited a racially diverse PSR sales force. DaVita Rx's first PSR, Zondra Evans, is African-American.  (SUMF ¶ 21.)  Ms. Evans was promoted to a management position approximately one year after she began her employment.  (SUMF ¶ 21.)  Furthermore, of all the people who received offers to be PSRs between DaVita Rx's inception in 2005 to the middle of December 2006, more than 20 percent are Black – a percentage that, according to DaVita's expert, is double the

---

[1]    The record support for the facts set forth in the Introduction are contained in DaVita Inc.'s Statement of Undisputed Material Facts.

percentage of Blacks in the relevant workforce according to the latest Census data. (SUMF ¶ 23-24.)

Plaintiff James Mason – a resident and native of Washington, D.C. – had worked for DaVita as a Patient Care Technician ("PCT") (i.e. a dialysis technician) since 1996. (SUMF ¶ 27.) In late 2005, Mr. Mason applied and was considered for the only PSR position based in Washington D.C. (SUMF ¶¶ 27, 30.) The hiring manager, Kim Easlon, invited him for an in-person interview in Richmond, but Mr. Mason declined it because of his work schedule. (SUMF ¶¶ 31-33.) In January 2006, when Mr. Mason followed up with Ms. Easlon about the job, Ms. Easlon informed Mr. Mason that the position had been filled. (SUMF ¶¶ 41-42, 44.) The person selected was Christopher Jones, a white co-worker of Mr. Mason's who was an Administrative Assistant at a DaVita facility in Washington, D.C. (SUMF ¶ 36.)

After Mr. Mason learned that Mr. Jones had been selected to fill the D.C. PSR position, Mr. Mason filed an internal complaint of race discrimination with DaVita. (SUMF ¶ 45.) Ms. Easlon's supervisor, Josh Golomb, decided to give Mr. Mason an opportunity to interview for PSR positions outside of D.C. in March 2006. (SUMF ¶¶ 48-49.) After a 45-minute interview – for which Mr. Mason was substantially late due to his alleged misunderstanding about whether the appointed time was Eastern Standard Time or Pacific time – Mr. Golomb had concerns about some of Mr. Mason's responses to questions about how he would handle certain aspects of the job and decided that he would not be advanced to the next stage of the application process. (SUMF ¶¶ 52-63.)

Mr. Mason contends in Count I of the Second Amended Complaint that DaVita Rx did not offer him the PSR positions in question in January 2006 and in March 2006

because he is African-American, in violation of the D.C. Human Rights Act ("DCHRA"). (Second Am. Compl. ¶ 16.) DaVita hereby moves for summary judgment on this Count I because, based on the undisputed facts and all inferences that are to be drawn in Mr. Mason's favor on the disputed facts, no reasonable jury could conclude that race played any role in DaVita Rx's non-selection of Mr. Mason in January 2006 and in March 2006.

As set forth below, the hiring manager, Ms. Easlon, had no knowledge of Mr. Mason's race when she informed Mr. Mason that the D.C. PSR position had been filled in January 2006, and there is no contrary evidence in the record. (SUMF ¶ 46.) Moreover, it is undisputed that Mr. Mason declined an invitation to come for an in-person interview with Ms. Easlon on the one day when Ms. Easlon would be in Richmond, Virginia in December 2005 to conduct interviews for the D.C. position. (SUMF ¶¶ 31-33.) Mr. Jones, on the other hand, did interview with Ms. Easlon on the same day that was offered to Mr. Mason, advanced to the final stage of the PSR interview process in California, and accepted an offer for the D.C. PSR position on December 20, 2005. (SUMF ¶¶ 34-36.) In short, Mr. Mason did not receive further consideration for the D.C. PSR job because he did not accept the in-person interview that was offered to him and the job was offered to the person who did. There is no evidence that this reason is a pretext or that the real reason behind the decision was Mr. Mason's race.

With regard to Mr. Mason's claim that Mr. Golomb was motivated by Mr. Mason's race when he did not offer Mr. Mason a PSR position <u>outside of Washington, D.C.</u> in March 2006, summary judgment is appropriate because (1) the Court does not have subject matter jurisdiction over this claim which is outside the scope of the

DCHRA; and (2) there is no evidence on which a reasonable jury could conclude that Mr.

Golomb's decision was based on Mr. Mason's race.

## II.     ARGUMENT

### A.     DaVita is entitled to summary judgment on Mr. Mason's claim that his non-selection in March 2006 was based on race because the Court does not have subject matter jurisdiction under the DCHRA.

Mr. Mason bears the burden of establishing that the Court has subject matter

jurisdiction over Mr. Mason's claims. D.C. Ret. Bd. v. U.S., 657 F. Supp. 428, 431

(D.D.C. 1987) (citing KVOS, Inc. v. Associated Press, 299 U.S. 269 (1936)).  Here, the

Court's subject matter jurisdiction to hear this case can only be based on the DCHRA.

DaVita Rx's March 2006 decision not to offer Mr. Mason a PSR position does not fall

within the jurisdiction of the DCHRA because that decision was not made in D.C. and

did not concern a job that would be substantially located or performed in D.C.

The purpose of the DCHRA is to "secure an end in the District of Columbia to

discrimination for any reason other than individual merit. . ."  D.C. Code § 1-2501 (2001)

(emphasis added).  In Matthews v. Automated Bus. Sys. & Servs., 558 A.2d 1175, 1180

(D.C. 1989), the D.C. Court of Appeals held that "the critical factual issue bearing on

jurisdiction [under the DCHRA] is whether the [discriminatory] events took place in the

District."  The court also "assume[d], without deciding, that the District of Columbia

Human Rights Act does not apply to acts occurring outside the District." Id. at 1180 n.8.

Accord Martin v. Holiday Universal, No. JH-90-1188, 1990 WL 209266 (D. Md. Oct. 3,

1990) ("Defendants are correct that the DCHRA does not apply to acts occurring outside

the District of Columbia").[2]  Thus, in Matthews, the court determined that there was

---

[2]     For the Court's convenience, copies of unpublished decisions are provided at Tab 9 of DaVita's Exhibits in Support of Motion for Summary Judgment.

jurisdiction over the plaintiff's claims because forty to sixty percent of the plaintiff's work was performed in the District, many alleged acts of sexual harassment took place in the District, and some terms of employment were negotiated while the parties were physically present in the District. See Matthews, 558 A.2d at 1180.

Consistent with the principles stated in Matthews, the courts that have decided the question of whether they had subject matter jurisdiction over claims asserted under the DCHRA have focused on the following factors: (1) where the allegedly discriminatory employment decision was made; (2) the location of the alleged discriminatory acts; and (3) where the job in question was located and/or performed. See Blake v. Prof'l Travel Corp., 768 A.2d 568, 571 (D.C. 2001) (court had jurisdiction where events of alleged sexual harassment occurred in the District); Grillo v. Lucent Techs., No. 02-0962-JDB, slip op. at 6-7 (D.D.C. July 28, 2004) (Ex. 9) (no jurisdiction where job was performed primarily outside of District and allegedly discriminatory employment decisions took place outside the District); Martin, 1990 WL 209266, at *4 (Ex. 9) (court had jurisdiction where defendant allegedly refused to hire, transfer, or promote plaintiffs into facilities located in the District); see also Green v. Kinney Shoe Corp., 704 F. Supp. 259, 260 (D.D.C. 1988) (court had jurisdiction where plaintiff alleged that he was not hired for two jobs located in the District, even though decisions were made outside of the District).

In all of the cases where the courts found subject matter jurisdiction, there was evidence that some discriminatory action had taken place in the District, or, a minimum, that a substantial portion of the job was or would be performed in the District. No court has ever asserted subject matter jurisdiction under the DCHRA when the job in question was to be performed substantially outside of the District and the employment decisions

were made outside the District.  In fact, the court in <u>Grillo</u> made clear that even the performance of "a few employment assignments" in the District was insufficient to confer subject matter jurisdiction on the court.  <u>Grillo</u>, slip. op. at 7.

Here, it cannot be disputed that the PSR positions for which Mr. Mason interviewed with Mr. Golomb in March 2006 were not located in D.C.  (SUMF ¶ 49.) There is no evidence that any of these non-D.C. positions would be substantially performed in D.C.  Likewise, there is no evidence that any discriminatory acts occurred in D.C.  (SUMF ¶¶ 49, 51, 57-58.)  Mr. Golomb was in Florida when he interviewed Plaintiff on March 9, 2006. (SUMF ¶ 57.)  Mr. Golomb was  in California on March 17, 2006, when he advised Plaintiff that he would not go to the next stage of the PSR application process. (SUMF ¶ 58.)  In short, there are no facts in the record to establish subject matter jurisdiction under the DCHRA.

     **B.**     **DaVita is entitled to summary judgment because no reasonable jury could conclude from all the evidence that Mr. Mason's non-selection for a PSR position in January 2006 and in March 2006 was because of his race.**

          **1.**     **The legal framework.**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986).  To be "material" and "genuine", a factual dispute must be capable

of affecting the substantive outcome of the case. <u>Anderson</u>, 477 U.S. at 247-48;

<u>Laningham v. U.S. Navy</u>, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

Because there is no direct evidence of race discrimination in this case, the

evidence must be analyzed under the burden-shifting framework of <u>McDonnell Douglas</u>

<u>Corp. v. Green</u>, 411 U.S. 792, 802 (1973). <u>See</u> <u>Barnette v. Chertoff</u>, 453 F.3d 513, 515

(D.C. Cir. 2006). This framework also applies to claims brought under the D.C. Human

Rights Act. <u>Mungin v. Katten Munich & Zavis</u>, 116 F.3d 1549, 1553 (D.C. Cir. 1997).

Under this framework, Mr. Mason bears the initial burden of proving by a preponderance

of the evidence that "(1) [he] is a member of a protected class; (2) [he] applied for and

was qualified for an available position; (3) despite his qualifications, [he] was rejected;

and (4) either someone filled the position or it remained open and the employer continued

to seek applicants." <u>See</u> <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006).

If Mr. Mason is able to meet this burden, then the burden shifts to DaVita to

"produce evidence that the plaintiff was rejected for a legitimate, non-discriminatory

reason." <u>Id.</u> at 896. This burden is one of "production, meaning [DaVita] need not

persuade the court that it was actually motivated by the proffered reasons. . . ." <u>Barnette</u>,

453 F.3d at 516 (citations omitted). Once DaVita has met this burden of production, "the

<u>McDonnell Douglas</u> framework – with its presumptions and burdens – disappears, and

the sole remaining issue is discrimination <u>vel non</u>." <u>Holcomb</u>, 433 F.3d at 896. To

survive summary judgment, "the plaintiff must show that a reasonable jury could

conclude from all of the evidence that the adverse employment decision was made for a

discriminatory reason." <u>Id.</u> at 897. The D.C. Circuit stated in <u>Holcomb</u> that "all of the

evidence" includes "any combination of (1) evidence establishing the plaintiff's prima

facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." Id. In AKA v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998), the D.C. Circuit stated that the Court's analysis must also take into account "any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)."

### 2.    Analysis

For purposes of this motion, DaVita will assume that Mr. Mason can meet his initial burden under the McDonnell Douglas framework and will proceed directly to the second step of the analysis:  The production of a non-discriminatory reason for not offering Mr. Mason the D.C. PSR position in January 2006 and for not offering Mr. Mason a PSR position outside of D.C. in March 2006.  As set forth below, DaVita can readily meet this burden of production.  Mr. Mason, on the hand, cannot point to any evidence on which a reasonable jury could conclude that DaVita Rx did not offer him a PSR position because of his race.

### a.    No reasonable jury could conclude that Mr. Mason's non-selection for the D.C. PSR position in January 2006 was because of his race.

Mr. Mason contends that Kim Easlon was motivated by his race when she failed to schedule him for an in-person interview in January 2006.  As set forth below, Ms. Easlon had a legitimate non-discriminatory reason for her decision, and there is no evidence to show that this reason was a pretext for discrimination.

First and foremost, Ms. Easlon could not have discriminated against Mr. Mason on the basis of his race because she did not know what his race was when she informed

DC:997848v4

8

him that he was no longer under consideration on January 9, 2006. (SUMF ¶ 46.) Ms.
Easlon never met Mr. Mason in person, and it is undisputed that Mr. Mason never
identified his race either on his resume or in his communications with Ms. Easlon.
(SUMF ¶ 46.) It is well-settled that a person cannot intentionally discriminate on the
basis of race if she does not know the race of the applicant or employee. See, e.g. Lamb
v. Boeing, 213 F.App'x 175, 179 (4th Cir. 2007), 2007 WL 98116 (affirming grant of
summary judgment for employer on race discrimination claim where the hiring managers
did not know that the plaintiff was African-American); Holmes v. Potter, 384 F.3d 356,
362 (7th Cir. 2004) ("Usually, an employer's lack of knowledge about a protected
category rings a death knell for discrimination claims." ); Alvarez v. Motorola, No. 97-
17214, 1999 WL 65208, at *2 (9th Cir. Feb. 9, 1999) (summary judgment on
discriminatory hiring claim affirmed because the decision maker did not know the
plaintiff's race, age, or national origin); Sloane v. Shalala, No. 97-2295, 1998 WL
801499, at *4 (4th Cir. Nov. 18, 1998)(holding that the plaintiff could not establish that
the employer's non-discriminatory reason was pretext where the decision makers did not
know the plaintiff's race); Cf. Clark County School Dist. v. Breeden, 532 U.S. 268, 273
(2001) (holding that the district court correctly granted summary judgment for the
employer on plaintiff's retaliation claim where the person engaging in the alleged
retaliation had no knowledge about the plaintiff's protected activities).

   Ms. Easlon's non-discriminatory reason for not following up with Mr. Mason in
January 2006 is as follows:  Mr. Mason had declined her invitation to come interview
with her in-person in Richmond on December 12, 2005 – the only day that she would be
in the D.C. area. (SUMF ¶¶ 31-33.) Ms. Easlon proceeded with her interviews in

Richmond on December 12, 2005, and interviewed another qualified candidate, Christopher Jones, for the D.C. position. (SUMF ¶¶ 34-35.) Mr. Jones was hired on December 20, 2005, after he completed the final round of interviews in California with other DaVita Rx managers. (SUMF ¶ 36.) Having filled the only D.C. PSR position, there was no need for Ms. Easlon to follow up with Mr. Mason for an in-person interview after the first of the year. (SUMF ¶ 36.)

Because DaVita has produced a non-discriminatory reason for Ms. Easlon's actions, the <u>McDonnell Douglas</u> framework "disappears" and Mr. Mason now "must show that a reasonable jury could conclude from all the evidence that the adverse employment decision was made for a discriminatory reason." <u>Holcomb</u>, 433 F.3d at 896-97. Mr. Mason will likely attempt to argue that Ms. Easlon's reason is pretext because (1) Ms. Easlon had told Mr. Mason when he declined the invitation to come to Richmond on December 12, 2005, that she would schedule an interview at the beginning of 2006; (2) Mr. Mason had a good reason for not being able to come to the December 12, 2005 interview (<u>i.e.</u> his work schedule); (3) DaVita Rx continued to look for PSRs in other parts of the country outside of D.C. after Ms. Easlon told Mr. Mason that the position in his area had been filled; and (4) Mr. Jones was not as qualified as Mr. Mason. As set forth below, none of these arguments have merit.

<u>Ms. Easlon's statement concerning the scheduling an in-person interview in January 2006, and Mr. Mason's reason for declining the December 12, 2005 in-person interview.</u>  Ms. Easlon's statement that she would schedule an in-person interview with Mr. Mason in January 2006 and the fact that Mr. Mason might have had a good reason for declining Ms. Easlon's invitation to meet in person with her on December 12, 2005,

cannot reasonably support the conclusion that Mr. Mason's race played any role in Ms. Easlon's decision to not pursue Mr. Mason's application in January 2006. It is undisputed that Ms. Easlon was under pressure to fill PSR positions quickly. (SUMF ¶¶ 26, 37.) Ms. Easlon was only in Richmond on December 12, 2005 for the specific purpose of interviewing for the D.C. and Richmond PSR slots. (SUMF ¶ 32.) Mr. Jones, as discussed above, was a qualified candidate for the D.C. PSR position, he appeared for all of the interviews, and he accepted the job promptly well before the end of 2005. (SUMF ¶ 35, 36.) It was not Ms. Easlon's practice to wait to interview every qualified candidate before making a decision. (SUMF ¶ 37.) Once Ms. Easlon found a qualified candidate for a particular position, she advanced that candidate to the next stage. (SUMF ¶ 37.)

The only adverse conclusion that a reasonable jury might draw from these facts is that Ms. Easlon acted unfairly in deciding not to delay her hiring process in order to accommodate Mr. Mason's schedule, not that Ms. Easlon was motivated by Mr. Mason's race. The possibility that a jury might draw this conclusion is not sufficient to avoid summary judgment, however. The D.C. Circuit has held that "it is not enough for the plaintiff to show that a reason given for a job action is not just, fair, or sensible. He must show that the explanation given is a phony reason." Fischbach v. District of Columbia Dep't Health Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (reversing district court's decision after a bench trial that the employer discriminated against the plaintiff on the basis of race in promoting another employee). The Court explained: "Even if a court suspects that a job applicant was victimized by poor selection procedures it may not second guess an employer's personnel decision absent some demonstrably discriminatory

motive. Once the employer has articulated a non-discriminatory explanation for its action. . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." Id. The Court has also stated that "[w]e have consistently declined to serve as a super-personnel department that reexamines an entity's business decisions." Holcomb, 433 F.3d at 897.

Other PSR posititon in the United States. The fact that DaVita Rx was looking to fill PSR positions in other parts of the country also cannot support the conclusion that Ms. Easlon's reason for not scheduling an in-person interview with Mr. Mason in January 2006 – that the D.C. PSR slot was filled -- is pretext. As of January 2006, it was DaVita Rx's practice to only consider candidates who were located in the state where the PSR position was based, unless the person had plans to relocate to a different state and was looking for jobs in that other state. (SUMF ¶¶ 20(d).) In fact, as of January 2006, DaVita Rx had never hired anyone who had to relocate for a PSR position. (SUMF ¶ 20(e).) Thus, the fact that there were other PSR positions open in other parts of the country in no way calls into question the reason why Ms. Easlon did not pursue Mr. Mason's application after she filled the D.C. PSR position.

Mr. Jones' qualifications. Mr. Mason's claim that he was more qualified than Mr. Jones, the white applicant hired by DaVita for the D.C. position, is a red herring. Ms. Easlon never compared the two candidates' relative qualifications because Mr. Mason never put himself in a position to be compared to Mr. Jones. (SUMF ¶ 36.) It is undisputed that Ms. Easlon offered Mr. Mason and Mr. Jones the same opportunity to interview with her in person when she was in Richmond on December 12, 2006. (SUMF ¶ 31-34.) Because Mr. Mason declined and postponed this invitation, Ms. Easlon did not

have any data from Mr. Mason from an in-person interview that she could compare to Mr. Jones. (SUMF ¶ 36.) However, even if such a post-hoc comparison were appropriate now, DaVita Rx's selection of Mr. Jones would not support an inference of race discrimination because he was plainly qualified for PSR position, and there was no "stark superiority of credentials" between Mr. Mason and Mr. Jones. <u>Stewart v. Ashcroft</u>, 352 F.3d 422, 429 (D.C. Cir. 2004) (requiring a "stark superiority of credentials over those of the successful candidates" to defeat summary judgment in non-selection cases). It is well-settled in this circuit that a "court must respect the employer's unfettered discretion to choose among qualified candidates," <u>Fischbach</u>, 86 F.3d at 1183, and that there must be a "significant qualifications differential to give rise to an inference of discrimination." <u>Barnette</u>, 453 F.3d at 517 (holding that no inference of discrimination could be drawn where the employer chose one qualified candidate over another); <u>Holcomb</u>, 433 F.3d at 898 (noting that although plaintiff's qualifications were "impressive," the evidence failed to establish that those qualifications were "sufficiently superior to those of [the white applicant] to allow a jury to infer discrimination.")

    The PSR Job Description lists the following items under "Job qualifications":

> Positive Attitude, Active seller (needs to be able to ask direct questions); Personable; Ability to train facility teammates; Attention to Detail, Patient; Organization skills; Self-direction; Goal oriented; Time management skills; Some computer skills; Problem Solver; Willingness to learn; High school diploma or GED required.

(SUMF ¶ 11.) Under the heading "Essential Functions", the Job Description states:

> Must be able to travel 75% of their time; Must be willing to work flexible hours. Have to be at the facilities when the patients are there, which typically starts at 6am. Must have complete integrity. Must have excellent communication skills, with the ability to communicate with other teammates as well as nurses and physicians. Must have positive endorsement from manager. Must be very

organized. Sales experience a plus but not a must, sales training will be provided. Knowledge of more than one language is not required by is a plus.

(SUMF ¶ 11.)

Mr. Jones possessed all of these qualifications. He eagerly embraced the prospect of travel. (SUMF ¶ 38.) He had been an Administrative Assistant at DaVita's facility in D.C., and a clerk and technician in a physician's office. (SUMF ¶ 38.) These jobs required attention to detail, organization skills, computer skills, and time management skills. Mr. Jones's management positions for a number of group homes for the disabled and at an assisted living facility for many years also required organization skills, the ability to train staff, and the ability to self-motivate. (SUMF ¶ 38.) Having worked at DaVita, Mr. Jones had demonstrated the ability to communicate with patients, teammates, and physicians. Mr. Jones had also demonstrated the ability to interact with patients in his jobs as a case manager for disabled patients in group homes and in working at an assisted living facility. (SUMF ¶ 38.) Mr. Jones also had some sales experience in working at Nordstrom's for almost a year, managing a retail coffee shop for several years, and marketing the assisted living community where he worked as a manager. (SUMF ¶ 38.)

Mr. Mason's qualifications can hardly be considered superior to Mr. Jones. Although Mr. Mason had experience caring for dialysis patients, Mr. Mason had no sales or administrative experience, and he had never been a manager. (SUMF ¶ 29.).

Throughout this litigation, Mr. Mason has made much of the fact that he had ten years of experience as a PCT, and claims that DaVita Rx was targeting PCTs for the PSR position. While it is true that DaVita Rx did in the Fall of 2005 send out a flyer to facility administrators requesting that they recommend outstanding PCTs who might be

interested in applying for a PSR position, the PSR positions were also advertised on the DaVita job website available to all DaVita employees, as well as general career websites. (SUMF ¶¶ 20(a)-(b).) Dialysis experience is not identified anywhere on the Job Description. (SUMF ¶ 12.) In contrast, sales skills are listed on the job description twice. (SUMF ¶ 11.) That DaVita did not consider dialysis experience to be necessary for the PSR position is confirmed by the fact that of the 46 people who were hired for PSR positions in 2005 and 2006, only seven had worked as PCTs. (SUMF ¶ 14.) Only one of the nine African-American PSRs hired by DaVita had any dialysis experience. (SUMF ¶ 13.) On the other hand, at least 22 of these people had sales experience listed on their resumes. (SUMF ¶ 14.) DaVita Rx also hired people with administrative backgrounds, social work/insurance backgrounds, patient care backgrounds, and pharmacy backgrounds for PSR positions (SUMF ¶ 14.)

In short, Mr. Jones was clearly qualified for the position, and Mr. Mason's credentials were not superior, let alone "stark[ly] superior", to those of Mr. Jones. Under these circumstances, no inference of discrimination can be drawn from DaVita Rx's hiring of Mr. Jones. See cases cited supra, at 13.

> **b.  No reasonable jury could conclude that Mr. Mason's non-selection for a PSR position outside of D.C. in March 2006 was because of his race.**

Mr. Mason also alleges that Josh Golomb's decision not to offer him a PSR position in March 2006 was also based on his race. As previously discussed, this decision is not covered by the DCHRA and, as a result, the Court has no jurisdiction over this claim. Assuming solely for the sake or argument that the Court finds that it has jurisdiction, summary judgment for DaVita would still be appropriate because, based on

this record, no reasonable jury could conclude that Mr. Golomb's decision was racially-motivated.

Consistent with the <u>McDonnell Douglas</u> framework, DaVita has plainly shown a non-discriminatory reason for Mr. Golomb's decision. The undisputed facts show that although Mr. Golomb regarded Mr. Mason as a "solid" middle of the road candidate, Mr. Golomb was concerned about Mr. Mason's answers to situational questions that he posed about how he would sell the DaVita Rx service to Davita teammates and physicians. (SUMF ¶¶ 59-63.) Mr. Golomb had posed the same questions to Mr. Jones. (SUMF ¶ 56.) As described in detail in the Statement of Material Facts, the answers that Mr. Mason provided (none of which are in dispute) were, in Mr. Golomb's judgment, not good answers, and did not demonstrate an understanding of the sales process. (SUMF ¶¶ 59-63.) Mr. Golomb was also not pleased by the fact that Mr. Mason was substantially late for the interview because of an alleged misunderstanding about whether the time for the interview as Eastern Standard Time or Pacific time. (SUMF ¶¶ 52-53.)

Mr. Mason will probably try to argue that, by focusing on Mr. Mason's lack of sales ability, Mr. Golomb somehow changed the job requirements in considering Mr. Mason. This is simply not supported by the record. The first sentence of the PSR job description makes clear that the PSR's function is "<u>selling</u> the DaVita Rx service to patients, teammates and physicians." (SUMF ¶ 10.) The job description lists "Active seller" as one of the job qualifications, and states under the "Essential Job Functions": "Sales experience a plus but not a must." (SUMF ¶ 11.) Thus, the ability to sell (not necessarily sales experience) has always been an important criteria for the selection of PSRs.

Mr. Mason will also likely claim that Mr. Golomb's concern about Mr. Mason's sales ability was pretext because, according to Mr. Mason, "Davita specifically sought individuals with Mr. Mason's background" and "the selectee, Christopher Jones, did not have any significant sales experience." (Second Am. Compl. ¶ 10.)

Mr. Mason's suggestion that his work as a dialysis technician somehow made him more qualified than Mr. Jones and all other candidates without such experience is not supported by the record. The record is quite clear that DaVita Rx considered other types of backgrounds equally important, and that ultimately, the question was whether the candidate would be an effective salesperson for the DaVita Rx program. (SUMF ¶¶ 10-12.) Indeed, eight of the nine Black PSRs hired by DaVita Rx had never worked as dialysis technicians, just like Mr. Jones. (SUMF ¶ 13.)

Furthermore, DaVita Rx's selection of Mr. Jones for a PSR position is not inconsistent with the fact that DaVita Rx was looking for people with sales ability. Although Mr. Mason would like to downplay Mr. Jones' sales experience, the record makes clear that he certainly had more sales experience than Mr. Mason. Mr. Jones was the manager of the Alzheimer's and assisted living ward of Sunrise Assisted Living for two and a half years. (SUMF ¶ 38.) In this position, Mr. Jones marketed the facility to families and prospective residents whenever the marketing person was not available. (SUMF ¶ 38.) He also worked in retail sales for Nordstrom's for a total of 10 months. (SUMF ¶ 38.)

More importantly, Mr. Golomb explained that Mr. Jones "had a much higher quality answer" to his situational questions. (SUMF ¶ 40.) Mr. Golomb testified that Mr. Jones "demonstrated a greater knowledge of what motivates teammates and physicians,

and he demonstrated a better understanding of the sales process in general, which is to understand your customer and what they care about and then tailor your message to them as opposed to deciding yourself what you think they should care about and pushing that message." (SUMF ¶ 40.)

        c.      **There is substantial evidence that DaVita Rx's non-selection decisions regarding Mr. Mason were not based on race.**

Even assuming for the sake of argument that Mr. Mason were able to raise some material questions about DaVita's reasons for not pursuing Mr. Mason's application in January 2006 and March 2006, this would not be sufficient to defeat summary judgment. As the D.C. Circuit stated in <u>AKA</u>, "[t]he plaintiff's attack on the employer's explanation must always be assessed in light of the total circumstances of the case; in some instances. . . the fact that there are material questions as to whether the employer has given the real explanation will not suffice to support an inference of discrimination." <u>AKA</u>, 156 F.3d at 1292. For example, "[w]here an employer has a strong record of equal opportunity employment, any inference of discrimination arising from the discrediting of the employer's explanation may be a weak one, and in some cases not strong enough to let a reasonable factfinder conclude that discrimination has occurred at all." <u>Id.</u> (emphasis added).

DaVita Rx's overall track record of offering PSR positions to Black applicants is very strong. During the relevant time from the inception of DaVita Rx to the middle of December of 2006, DaVita made offers to 49 people for PSR positions for whom race data was available.[3] Of those 49 people, 10 or 20.4 percent, are Black. This percentage

---

[3]      There was one offeree for whom race data was not available and was not considered in the analysis.

is <u>double</u> the percentage of Blacks in the relevant labor market, according to Dr. Christopher Erath, DaVita's labor economics expert. (SUMF ¶¶ 23-25.) It is also worth noting that the percentage of all persons in the United States who are "Black or African-American" is 13 percent, according to the most recent Census data, and the percentage of Black offerees clearly exceeds this number as well. <u>See</u> Table 4: Estimates of the Population by Race and Hispanic or Latino Origin for the United States and States: July 1, 2006, *available at* (http://www.census.gov/popest/states/asrh/SC-EST2006-04.html).

Moreover, the percentage of Black PSRs hired by Ms. Easlon and Mr. Golomb also exceed the percentage of Black persons in the relevant labor market. As stated, DaVita's labor statistics expert, Christopher Erath, had concluded that Blacks make up slightly less than 10 percent of the relevant labor market. (SUMF ¶ 24.) In 2005 – her first year of recruiting PSR candidates -- Ms. Easlon hired two Black PSRs out of 17, or 11 percent. (SUMF ¶ 22.) Her overall record is even better. Of the 31 people whom she interviewed and were offered PSR positions, six or 19.3 percent, are Black. (SUMF ¶ 23.) In this same period, Mr. Golomb interviewed and was involved with the hiring decisions for 26 offerees, seven or 26.9% of whom are Black. (SUMF ¶ 23.) Based on this analysis, Dr. Erath concluded:

> There is no statistical evidence to support an allegation of race discrimination against African-Americans. Whether I examine all PSR job offers extended or those made by the challenged decision makers, Mr. Golomb and Ms. Easlon, I find that <u>the rate at which those listed as Black were offered PSR positions is far greater than their expected representation among applicants based on the Census data discussed above</u>. This conclusion remains unchanged across the different industry/occupation classifications I analyze.

(SUMF ¶ 24.)

DC:997848v4

Courts have considered this type of analysis to be highly relevant to the question of whether an employer engaged in intentional discrimination based on race. See, e.g., AKA, 156 F.3d at 1291 (observing that the Supreme Court in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 513 (1993), found relevant the fact that the minority group in question comprised 40 percent of the work force even though the same group only comprised 10 percent of the relevant labor market); DeMedina v. Reinhardt, 686 F.2d 997, 1010-11 (D.C. Cir. 1982) (finding labor force statistics relevant to claims of intentional discrimination in hiring)).

It is also undisputed that, in the month after Mr. Golomb advised Mr. Mason of his non-selection, DaVita Rx hired eight PSRs, three or 38% of whom are Black. (SUMF ¶ 64.)

In the face of this data, Mr. Mason will try to argue that the number of Blacks offered PSR positions did not improve until after Mr. Mason filed an internal complaint charging Ms. Easlon with discrimination at the end of January 2006. However, as stated above, 11 percent of Ms. Easlon's hires in 2005 (before any complaint was filed by Mr. Mason), are Black -- a number that is consistent with and higher than the percentage of Blacks in the relevant labor market. (SUMF ¶¶ 22, 24.) Furthermore, the first PSR ever hired by Ms. Easlon, Zondra Evans, is African-American. (SUMF ¶ 21.) Under Ms. Easlon's supervision, Ms. Evans was promoted to a management position within a year and a half of starting with DaVita Rx. (SUMF ¶ 21.) Ms. Easlon's hiring and promotion of Ms. Evans are wholly inconsistent with Mr. Mason's claim that Ms. Easlon harbored discriminatory animus against Mr. Mason because he is African-American. Cf. Waterhouse v. District of Columbia, 298 F.3d 989, 996 (D.C. Cir. 2002) (holding that a

manager who hired a person of a certain class is unlikely to fire that person because they are a member of that class).

## III.    CONCLUSION

The bottom line is that there is no evidence on which a reasonable jury could conclude that DaVita Rx did not offer Mr. Mason a PSR position because of his race. DaVita's outstanding track record of hiring African-American PSRs supports just the opposite conclusion.  Mr. Mason was given two chances to interview for a PSR position. He missed out on  the first opportunity with Ms. Easlon because he declined the in-person interview that she offered to him.  Ms. Easlon's decision to move forward with the D.C. PSR hiring process in the face of this undisputed fact cannot give rise to any inference that she was motivated by Mr. Mason's race, <u>particularly since she did not know Mr. Mason's race</u>.

The fact that DaVita Rx gave Mr. Mason a second opportunity to interview for a PSR position after he filed an internal complaint of discrimination – this time for a position outside of the D.C. area – also undermines any suggestion that DaVita had discriminatory animus against Mr. Mason.  Mr. Golomb gave meaningful consideration to Mr. Mason's candidacy but decided not to proceed further because he had very specific and documented concerns about Mr. Mason's answers to situational questions which he had also posed to the white candidate, Christopher Jones.  In the face of this legitimate, non-discriminatory reason for Mr. Golomb's non-selection decision, there is no evidence showing that the reason is pretext, let alone that Mr. Golomb was motivated by Mr. Mason's race.   Furthermore, the Court lacks subject matter jurisdiction over Mr.

Golomb's decision which was not made in D.C. and did not concern a job that would be performed in D.C.

For all the foregoing reasons, DaVita respectfully requests the Court to grant its motion for summary judgment.


Respectfully submitted,


By:      ____/s/ Minh N. Vu_____
         Minh N. Vu (Bar No. 444305)
         EPSTEIN BECKER & GREEN, P.C.
         1227 25th Street, N.W.
         Washington, D.C. 20037
         Tel: (202) 861-0900
         Fax: (202) 296-2882


         ____/s/ Joseph T. Ortiz_____
         Joseph T. Ortiz
         (admitted pro hac vice)
         Epstein Becker & Green, P.C.
         1875 Century Park East, Suite 500
         Los Angeles, CA 90067-2506
         (310) 557-9542
         (310) 553-2165 (fax)


Dated:  June 25, 2007          Counsel for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of June, 2007, a copy of DaVita Inc.'s

Memorandum of Points and Authorities in Support of Summary Judgment was served

through the Court's Electronic Court Filing system to counsel listed below:

> David A. Branch
> Law Office of David A. Branch
> 1825 Connecticut Avenue, NW
> Suite 690
> Washington, D.C. 20009

_____/s/ Minh N. Vu_____
Minh N. Vu

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES MASON<br>717 Ingraham Street, NW<br>Washington, D.C. 20012, | ) )<br>) )<br>) ) | |
| Plaintiff, | ) )<br>) ) | Civil Action No. 06-1319 (RMC) |
| v. | ) )<br>) ) | |
| DAVITA INC.<br>601 Hawaii Street<br>El Segundo, CA 90245, | ) )<br>) )<br>) ) | |
| Defendant. | ) )<br>) ) | |

_____

**DAVITA INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF SUMMARY JUDGMENT ON COUNT I
OF THE SECOND AMENDED COMPLAINT**

Pursuant to LCvR 7(h) and 56.1, Defendant DaVita Inc. hereby submits this State

of Material Facts in Support of its Motion for Summary Judgment. The following are

either undisputed material facts, or facts asserted by Plaintiff that are assumed to be true

solely for purposes of this motion for summary judgment:

Background concerning DaVita Rx

1.      The Defendant, DaVita Inc. ("DaVita"), is in the business of owning and

operating dialysis facilities throughout the United States. DaVita owns and operates a

number of dialysis centers in Washington, D.C. (Declaration of Josh Golomb ("Golomb

Decl.") ¶ 2 (Ex. 1).) DaVita Rx, a Delaware limited liability company owned by DaVita,

was formed in early 2005 for the sole purpose of creating a new pharmacy service

business that would deliver oral prescription medications to patients of DaVita's dialysis

centers. Id. Patients who participate in this program would get all of their oral prescriptions filled through DaVita Rx and have them delivered to the DaVita facility where they receive dialysis treatment. Id.

2.      In August 2004, DaVita hired Josh Golomb as a Senior Manager of Special Projects to evaluate the possibility and viability of a pharmacy business. (Deposition of Josh Golomb ("Golomb Dep.") attached as Ex. 5 at 13-15.) Mr. Golomb thereafter became a Director of DaVita Rx thereafter. Id. at 14.

3.      Mr. Golomb is Hispanic. Id. at 7. Prior to coming to work for DaVita, Mr. Golomb worked for more than four years with three non-profit organizations whose missions were to improve public schools in low-income areas and/or to promote community and economic development in inner cities. Id. at 10-11.

4.      For most of 2004, there were six people on the DaVita Rx management team, including one African-American (Michael Hill), a Hispanic (Mr. Golomb), and a person of Middle-Eastern descent (Reza Faili). Id. at 20-22.

5.      In December 2004, Kim Easlon, a Business Development Specialist with Davita, began working part-time for DaVita Rx. (Deposition of Kim Easlon ("Easlon Dep.") attached as Ex. 6 at 14.) Ms. Easlon is Caucasian. In February 2005, DaVita Rx hired Ms. Easlon to be the full-time Regional Sales Manager. Id. at 16.

6.      DaVita Rx determined that it needed a national sales force consisting of PSRs to promote the DaVita Rx service to patients, teammates, and physicians. Id. at 25-26; (Golomb Decl. ¶ 3.) DaVita expected to have 30 to 40 PSRs by the time the DaVita Rx business was fully developed. (Golomb Dep. 50.)

7.      Ms. Easlon, with the assistance of another DaVita employee who was responsible for facility operations, Rachel Burgoyne, created the PSR position by working in several DaVita facilities to enroll patients into the program.  Through this process, Ms. Easlon and Ms. Burgoyne determined the skills and work experience required for the position and drafted the PSR job description.  (Easlon Dep. 23.)

8.      Ms. Easlon was responsible for hiring and training all PSRs from February 2005 to approximately April 2006.  Id. at 29-30.

PSR Responsibilities

9.      PSRs are responsible for working directly with DaVita's dialysis patients to enroll them in the DaVita Rx service, with teammates in the DaVita facilities to make sure that they support the service, and with physicians to make sure that the physicians support and understand the program.  Id. at 26.

10.     The PSR Job Description states:  "PSR's [sic] are responsible for selling the DaVita Rx service to patients, teammates, and physicians."  (Ex. 2(A) (PSR Job Description)) (emphasis added).

11.     The PSR Job Description lists the following items under "Job qualifications":

> Positive Attitude; Active seller (needs to be able to ask direct questions); Personable; Ability to train facility teammates; Attention to Detail, Patient; Organization skills; Self-direction; Goal oriented; Time management skills; Some computer skills; Problem Solver; Willingness to learn; High school diploma or GED required.

Under the heading of "Essential Functions", the Job Description states:

> Must be able to travel 75% of their time; Must be willing to work flexible hours. Have to be at the facilities when the patients are there, which typically starts at 6am.  Must have complete integrity.  Must have excellent communication skills, with the ability to communicate with other teammates as well as nurses and

physicians. Must have positive endorsement from manager. Must be very organized. Sales experience a plus but not a must, sales training will be provided. Knowledge of more than one language is not required by is a plus.

(Ex. 2(A).)

12.     The PSR Job Description contains no requirement that a PSR have dialysis experience or patient care experience. Id. However, DaVita Rx did consider dialysis experience to be helpful to the PSR job to the same extent that administrative, patient care, social work, and pharmacy experience were considered relevant. (Declaration of Kim Easlon ("Easlon Decl.") ¶ 15.)

13.     Only one of the nine African-Americans who were hired by DaVita Rx as PRS from its inception to December 18, 2006, had dialysis experience. (Easlon Decl. ¶ 14.)

14.     Only seven of the 46 PSRs hired by DaVita Rx from its inception to the middle of December 2006 had worked as a Patient Care Technician ("PCT") (DaVita's title for dialysis technicians). Id. However, at least 22 PSRs hired in this same timeframe had sales experience. Id. (Ex. 2(G) (resumes of PSRs with sales experience.)). A number of PSRs also had administrative, pharmacy, social work/ insurance, and patient care experience. (Easlon Decl. ¶ 14.)

15.     The PSR position does not require any technical knowledge of the dialysis process or any knowledge about dialysis medications. (Deposition of Christopher Jones ("Jones Dep.") attached as Ex. 7 at 67-69).

16.     The PSR job consists of administrative work, interaction with dialysis patients to sell them the service, and interaction with teammates and physicians to obtain their support for the service. (Easlon Dep. 26.)

17.     Obtaining the support from teammates is an essential part of the PSR's responsibilities and vital to DaVita Rx's success because teammates at the facilities must -- without additional compensation -- take on additional responsibilities to support the DaVita Rx pharmacy service. Id. at 124-25. After a PSR enrolls patients into the DaVita Rx pharmacy service, the teammates at the facility must receive and distribute the medications to the patients. Id.; (Golomb Dep. 42-44.) DaVita Rx also relies on teammates to try to sign up new dialysis patients who come into the facility after the PSRs have completed the initial enrollments. (Easlon Dep. 124-26.)

18.     Obtaining support from the physicians at the DaVita facilities is also very critical to the success of the DaVita Rx service because physicians have been known to impede the enrollment process by opposing the program. (Easlon Dep. 124-25.) Thus, it is extremely important for a PSR to be able to persuade physicians that the service helps them meet their objectives, whatever those might be. Id.; (Golomb Dep. at 109.)

19.     DaVita Rx hired PSRs by territory. (Ex. 2(F)(selected postings for PSR positions in specific geographic locations).) Each PSR was assigned a territory for which he or she would have primary responsibility. However, all PSRs were expected to be away from home at least 75% of the time for the first several years in order to assist with the enrollment process in other territories where DaVita Rx was rolling out the service for the first time. (Easlon Dep. 48). After initial enrollments are completed, Davita Rx expected that its PSRs would travel less and focus their efforts on servicing their respective regions. (Easlon Dep. 51-52).

PSR Hiring Process

20.     In late 2005 through approximately March 2006, DaVita employed the following process for hiring PSRs:

        a.     DaVita Rx identified locations where a PSR was needed (Easlon Dep. 56-57), and the position would be advertised for those locations on the DaVita website as well as on general job search websites. (Ex. 2(F); Golomb Dep. 33-34.)

        b.     In addition to posting the positions on the DaVita websites and general career websites, in September 2005, DaVita Rx also sent a flyer to its Facility Administrators asking them if there were any outstanding PCTs whom they thought would make good PSRs. (Ex. 2(B).)

        c.     Kim Easlon reviewed all of the resumes submitted and selected candidates for telephone screening interviews. (Easlon Dep. 42).

        d.     It was DaVita Rx's practice at that time to only interview candidates for positions based in the state where they were living unless the applicant had plans to move to the state where the PSR position was located. (Easlon Decl. ¶ 12; Easlon Dep. 82; Golomb Dep. 82-86, 157.)

        e.     As of January 9, 2006, when Ms. Easlon informed Mr. Mason that the D.C. PSR position had been filled, DaVita Rx had never hired anyone for a position that was located outside their home state unless the person already had plans to move to the location of the PSR position. (Easlon Decl. ¶ 12.)

        f.     After the short telephone screening interview, Ms. Easlon would invite a small subset of the applicants for in-person interviews with her. (Easlon Dep.

45.)  Since Ms. Easlon was based in Oklahoma (id. at 7), she would have to fly to various cities to interview PSR candidates. Id. at 45.

g.      If Ms. Easlon determined that the PSR candidate was qualified and someone that she would recommend for hire, Ms. Easlon scheduled the candidate for in-person interviews in DaVita Rx's offices in California with several other DaVita Rx managers. Id. at 45-46.  After the California interviews, the managers and Ms. Easlon would confer and make a decision on whether to extend an offer to the candidate. Id. at 46.

### Racial Composition of PSR Offeree Group

21.      The first PSR hired by Ms. Easlon was Zondra Evans, an African-American.  (Easlon Dep. 33-34.)  Ms. Evans was promoted in approximately a year and a half to a management position.  (Easlon Dep. 30, 33.)

22.      In June 2005, Ms. Easlon hired another African-American PSR named Jessie Mayberry.  Id. at 34.  In 2005, Ms. Easlon hired a total of 17 PSRs, two of whom are African-American, and three of whom are Hispanic.  Id. at 35.

23.      From February 2005 to December 18, 2006, DaVita Rx made PSR offers to 50 people.  (Ex. 2(H).)  DaVita has race data for 49 of those people.  Of these 49 offerees, ten or 20.4% are Black.  (Expert Report of Dr. Erath, Ex. 4 at 4 and Attachment 3 thereto.)  In this same timeframe, Ms. Easlon interviewed and was involved with the hiring decisions for 31 PSR offerees, of whom six or 19.3% are Black.  Id.  In this same period, Mr. Golomb interviewed and was involved with the hiring decisions for 26 offerees, seven or 26.9% of whom are Black.  Id.

24.    DaVita submitted this data for analysis by Dr. Christopher Erath, an expert in the field of labor economics. Dr. Erath determined that Blacks make up "slightly less than 10 percent of the workforce" in the census industry and occupation codes that are most relevant to the PSR position. Id. at 3. Based on this percentage, Dr. Erath drew the following conclusion: "There is no statistical evidence to support an allegation of race discrimination against African-Americans. Whether I examine all PSR job offers extended or those made by the challenged decision makers, Mr. Golomb and Ms. Easlon, I find that the rate at which those listed as Black were offered PSR positions is far greater than their expected representation among applicants based on the Census data discussed above. This conclusion remains unchanged across the different industry/occupation classifications I analyze." Id. at 4 (emphasis added).

25.    The percentage of all persons in the United States who are "Black or African-American" is 13 percent, according to the most recent Census data. See Table 4: Estimates of the Population by Race and Hispanic or Latino Origin for the United States and States: July 1, 2006, available at http://www.census.gov/popest/states/asrh/SC-EST2006-04.html.

Mr. Mason's application for a PSR position

26.    In the fall of 2005, DaVita Rx was in the process of staffing its PSR sales force. DaVita Rx had a number of PSR positions to fill throughout the country, including one in Washington, D.C. (Golomb Decl. ¶ 3.) Ms. Easlon was under significant pressure to fill PSR positions as quickly as possible. (Easlon Decl. ¶ 8; Easlon Dep. 67; Golomb Dep. 164-65.)

DC:1016443v3

8

27.     Mr. Mason – a PCT working at a DaVita dialysis facility in Washington, D.C. – applied for a PSR position with DaVita Rx by sending in his resume in November 2005. (Mason Dep. 111.)

28.     Mr. Mason's resume states that Mr. Mason had been a PCT for DaVita in Washington D.C. since 1996. (Ex. 2(C).)  As a PCT, Mr. Mason performed hemodialysis therapy and data collection. Id. He had also served as the unit access coordinator and had received a Shining Star Award in 2005. Id. Mr. Mason explained that the Shining Star Award is an award given to one employee at each DaVita dialysis facility who receives the most votes from patients. (Mason Dep. 46.)

29.     Mr. Mason's resume did not reference his race and listed no work experience in administration, management, or sales. (Ex. 2(C).)  Mr. Mason never informed any employee of DaVita Rx that he had sales experience. (Mason Dep. 23.)

30.     Kim Easlon selected Mr. Mason's resume for an initial telephone interview for a PSR position in D.C. at the beginning of December 2005. (Second Am. Compl. ¶ 6; Easlon Dep. 58.)

31.     At the conclusion of the telephone interview, Ms. Easlon invited Plaintiff for an in-person interview with her in Richmond, Virginia, on December 12, 2005. (Second Am. Compl. ¶ 6; Easlon Dep. 64-66.)

32.     Ms. Easlon was only going to be in Richmond for one day to interview PSR candidates for the D.C. and Richmond PSR positions. (Easlon Dep. 66.)

33.     Mr. Mason stated that he could not meet Ms. Easlon on this date because of his work schedule. (Second Am. Compl. ¶ 6; Mason Dep. 138.)  Ms. Easlon told Mr.

Mason that she was going on vacation but she would get in touch with him in the New Year about a meeting when she was back in the area.  (Mason Dep. 137-40.)

34.    Ms. Easlon had also conducted a telephone interview with Christopher Jones, a white colleague of Mr. Mason's, and invited him for an in-person interview on December 12, 2005 in Richmond, Virginia for the D.C. PSR position. (Second Am. Compl. ¶ 6; Easlon Dep. 67; Jones Dep. 50-51.)

35.    Mr. Jones went to the interview and met with Ms. Easlon.  After the interview, Ms. Easlon invited Mr. Jones for in-person interviews in California. (Second Am. Compl. ¶ 6.)

36.    Following a successful round of interviews in California, Ms. Easlon offered Mr. Jones the D.C. PSR position on December 20, 2006, which he immediately accepted. (Easlon Dep. 61; Jones Dep. 63, 70-71, 79-80.)  Once Mr. Jones accepted the D.C. position, Ms. Easlon concluded her interviewing process for the D.C. position and no longer considered Mr. Mason a PSR candidate. (Easlon Dep. 61, 73.)  Ms. Easlon never compared Mr. Mason to Mr. Jones with regard to their qualifications because Mr. Mason declined the invitation for an in-person interview.  (Easlon Dep. 100.)

37.    Because Ms. Easlon had to fill PSR slots as quickly as possible, it was not Ms. Easlon's practice to talk to as many candidates as possible for each position (Easlon Dep. 67-68.)  If she found a good candidate, that candidate would be advanced to the next level. Id.

38.    Mr. Jones was qualified for the PSR position.  Mr. Jones was enthusiastic about 75% travel requirement.  (Easlon Decl. ¶ 7.)  He had been an Administrative Assistant at DaVita's facility in D.C., and a clerk and technician in physician's office.

(Ex. 2(D); Jones Dep. 35, 42-45.) These jobs required attention to detail, organization skills, computer skills, and time management skills. Mr. Jones's supervisory positions for a number of group homes at an assisted living facility for many years also required organization skills, the ability to train staff, and the ability to self-motivate. (Jones Dep. 30-35.) Having worked at DaVita, Mr. Jones had demonstrated the ability to communicate with patients, teammates, and physicians. Mr. Jones had also demonstrated the ability to interact with patients in his jobs as a case manager for disabled patients in group homes and in working at an assisted living facility. (Jones Dep. 29-34.)  Mr. Jones also had some sales experience in working at Nordstrom's for almost a year, managing a retail coffee shop for several years, and marketing the assisted living community where he worked as a manager. (Ex. 2(D); Jones Dep. 38-40.)

39.     Mr. Jones discussed his sales experience with Ms. Easlon during his in-person interview with her. (Jones Dep. 56-57.)

40.     Mr. Golomb had interviewed Mr. Jones when he came to California. Mr. Golomb noted at his deposition that Mr. Jones "had a much higher quality answer" to Mr. Golomb's situational questions. (Golomb Dep. 108-09.) Mr. Golomb testified that Mr. Jones "demonstrated a greater knowledge of what motivates teammates and physicians, and he demonstrated a better understanding of the sales process in general, which is to understand your customer and what they care about and then tailor your message to them as opposed to deciding yourself what you think they should care about and pushing that message." Id.

41.     On January 6, 2006, Mr. Mason sent the following e-mail to Ms. Easlon:

Re:  Davita Pharmacy enterview [sic]

> Ms Easlon [sic] It was very exciting talking with you about the Pharmacy rep.
> position. Im [sic] just e-mailing you, to let you know about my work scedule [sic]
> for Jan.06. [sic] I believe that I would be a great asset in recruting [sic] patients
> for Davitas [sic] Pharmacy program, and Im [sic] again excited about the
> posibility [sic]. My work week is Mon.Wed.Fri [sic] 5:00am till [sic] 8:00pmm.
> [sic] Again thank you for the opertunity [sic] to join the crew.

(Ex. 2(E).)

42.    Ms. Easlon testified that when she received this e-mail, she had already

decided not to pursue Mr. Mason's application because she had filled the D.C. position,

but this e-mail made it clear to her that he was not a qualified candidate. (Id.; Easlon

Dep. 83-84.)

43.    Ms. Easlon explained in her deposition that a large portion of a PSR's

work is administrative, and she did not feel that the e-mail was professional in light of all

the misspellings. (Easlon Dep. 84.) The PSR Job Description lists "attention to detail" as

a requirement. (Ex. 2(A).)

44.    In an e-mail dated January 9, 2006, Ms. Easlon wrote to Mr. Mason: "I'm

sorry that I haven't gotten back with you earlier. I have been on vacation for a few weeks

and then immediately had training to do for my new hires. I regret that we have filled the

position that was available in your area. Thank you very much for your interest." (Ex.

2(E).)

45.    After receiving Ms. Easlon's e-mail, Mr. Mason filed an internal

complaint with DaVita on January 27, 2006 concerning the denial of his application by

Ms. Easlon. (Second Am. Compl. ¶ 8.; Mason Dep. 148.)

46.    Ms. Easlon did not know Plaintiff's race prior to his filing of this internal

complaint. (Easlon Dep. 70-72.) Plaintiff never communicated his race to anyone at

DaVita Rx in connection with his PSR job application, nor did he mention his race in his communications with Ms. Easlon. (Mason Dep. 131-33; Easlon Decl. ¶ 13.)

47.     On or about February 9, 2006, the Human Resources Manager responsible for interviewing Mr. Mason about his complaint, Gail Gardner, spoke to Josh Golomb about Mr. Mason's complaint.  (Declaration of Gail Gardner ("Gardner Decl.") attached as Ex. 3 at ¶ 5.)

48.     Mr. Golomb told Ms. Gardner that he would speak to Ms. Easlon to determine whether there was a basis for Mr. Mason's complaint.  Id.  Mr. Golomb also stated to Ms. Gardner that although it was not DaVita Rx's practice to relocate people to fill PSR positions, he would be willing to interview Mr. Mason for PSR positions outside of D.C.  Id.  Neither Ms. Gardner nor anyone else required Mr. Golomb to conduct this interview.  Id.

49.     In early March 2006, Mr. Golomb telephoned Plaintiff and offered to interview him by telephone for PSR positions that were open around the country at the time.  (Golomb Decl. ¶ 4; Second Am. Compl. ¶ 9.)  There were no D.C. positions available at that time because Mr. Jones had filled this position in late December 2005. (Golomb Decl. ¶ 4.)

50.     Had Mr. Mason performed well on this substantive interview with Mr. Golomb, Mr. Golomb would have advanced Mr. Mason to the final round of interviews in California for jobs around the country, but not Washington, D.C.  Id.  (Golomb Dep. 163; Golomb Decl. ¶ 4)

51.     Mr. Golomb was in Texas when he called Mr. Mason to set up this interview.  (Golomb Decl. ¶ 5.)

52.    Mr. Golomb and Mr. Mason agreed to conduct the interview on March 9, 2006 at 8:00 a.m. (Golomb Dep. 92-93; Mason Dep. 160.) Mr. Golomb firmly believes that he specified 8:00 Eastern Standard Time. (Golomb Dep. 93-94.) However, Mr. Mason thought Mr. Golomb meant Pacific Time. (Mason Dep. 160-62.) As a result, Mr. Mason was not at his home or cell phone numbers when Mr. Golomb called for the interview, and the interview started late. (Golomb Dep. 95-96.)

53.    Mr. Golomb was not pleased with the miscommunication and informed Mr. Mason at the beginning of the interview that being timely and attention to detail was important. Id. at 97-98.

54.    Notwithstanding the alleged miscommunication, Mr. Golomb proceeded to interview Mr. Mason by telephone when Mr. Mason called him back later on March 9, 2006. (Golomb Dep. 93-92; Second Am. Compl. ¶ 9.)

55.    The interview lasted approximately 45 minutes. (Golomb Dep. 98.)

56.    Mr. Golomb asked Mr. Mason questions about how he would sell the DaVita Rx service to teammates and physicians. (Golomb Dep. 101-02.) Mr. Golomb had asked Mr. Jones the same kinds of questions in their interview. (Jones Dep. 58-59, 62.)

57.    Mr. Golomb conducted his interview of Mr. Mason from Florida. (Golomb Decl. ¶ 6.)

58.    On March 17, 2006, Mr. Golomb advised Mr. Mason that he would not advance to the next stage of the PSR hiring process. (Golomb Dep. 121; Mason Dep. 169; Second Am. Compl. ¶ 9.) Mr. Golomb was in California when he had this discussion with Mr. Mason (Golomb Decl. ¶ 7.)

59.     Mr. Golomb outlined his reasons for not advancing Mr. Mason to the

final stage of the PSR process in an e-mail to Ms. Gardner as follows:

> James Mason was solid overall. Jeff [another candidate interviewed by Mr.
> Golomb] was mediocre. However, neither of them were as strong as other
> candidates we have been interviewing in terms of the following key areas:
>
> - Understanding and experience of sales
> - Sales effectiveness (in role plays I did with them via phone)
> - Thoughtfulness about approach for working with Physicians
> - Flexibility (both voiced some concerns about travel)

(Ex. 1(A).)

60.     With regard to Mr. Mason's understanding of sales and sales

effectiveness, Mr. Golomb was most concerned about Mr. Mason's answers to two

situational questions. First, Mr. Golomb asked Mr. Mason how he would promote the

DaVita Rx service to DaVita teammates. Mr. Mason stated that he would make sure that

the teammates understood that DaVita Rx was a part of DaVita and that since many

employees own stock in DaVita, they would be motivated to support a new DaVita

business. (Golomb Dep. 103.) Mr. Mason confirmed at his deposition that this was in

fact his response. (Mason Dep. 164.) Mr. Mason described his answer as follows:

> I told him that, you know, that this is a DaVita program, and part of the DaVita
> program is any time that DaVita has a success, it's a success for us. And
> sometimes we get profit sharing, and that would help to improve on the profit
> sharing if this program were successful, and that, you know, it's not just because a
> lot of people don't really want to hear anything that you have to say from
> pharmaceutical representatives or anyone, when you have a heavy workload.

Id.

61.     Mr. Mason's response was not how Mr. Golomb would have promoted the

DaVita Rx to teammates. In Mr. Golomb's judgment, Mr. Mason's answer was not good

because the relationship between DaVita's overall performance and an employee's own

financial incentives is not strong. A good answer would have been that the DaVita

DC:1016443v3

15

pharmacy service will result in better patient care, and that this will in turn improve the patient care metrics for which each facility is held accountable. (Golomb Dep. 106-07.) Ms. Easlon further explained that these metrics result in a direct financial benefit to the teammates because their bonuses are based on these metrics. (Easlon Dep. 126-27.)

62.    Mr. Golomb also found that Mr. Mason's answer regarding how he would promote the DaVita Rx program to physicians did not demonstrate a strong understanding of what the physicians care about, and the fact that physicians are very diverse in their attitudes. (Golomb Dep. at 109.) In Mr. Golomb's judgment, Mr. Mason's answer should have, but did not, involve an assessment of what the doctors cared about and then an explanation of why DaVita Rx's pharmacy programs would help achieve those goals. Id. Mr. Mason does not recall what questions Mr. Mason asked of him concerning how he would sell the service to physicians, but recalls emphasizing his good personal relationships with the physicians. (Mason Dep. 165-66.)

63.    Mr. Golomb was also concerned with Mr. Mason's response regarding the extensive travel required for the position. Mr. Mason's answer regarding travel was short. Mr. Mason merely stated that he had discussed it with his wife and that the travel would be fine. (Golomb Dep. 113.) Mr. Golomb was concerned by this answer because, in his experience, people who truly understand what 75% travel means will often ask more questions about it and explain how they are going to deal with it. Mr. Golomb testified that "It felt a bit to me like he was telling me what he thought I wanted to hear as opposed to really demonstrating that he had thought through the implications." (Golomb Dep. 113-14.)

64.    Of the eight PSRs hired by DaVita Rx within a month after Mr. Golomb

declined to proceed further with Plaintiff's application on March 17, 2006, three are

African-American.  (Ex. 2(H).)


                              Respectfully submitted,


                    By:        /s/ Minh N. Vu
                              Minh N. Vu (Bar No. 444305)
                              EPSTEIN BECKER & GREEN, P.C.
                              1227 25th Street, N.W.
                              Washington, D.C. 20037
                              Tel: (202) 861-0900
                              Fax: (202) 296-2882


                                /s/ Joseph T. Ortiz
                              Joseph T. Ortiz
                              (admitted pro hac vice)
                              Epstein Becker & Green, P.C.
                              1875 Century Park East, Suite 500
                              Los Angeles, CA 90067-2506
                              (310) 557-9542
                              (310) 553-2165 (fax)


Dated:  June 25, 2007         Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of June, 2007, a copy of DaVita Inc.'s

Statement of Undisputed Material Facts in Support of Summary Judgment was served

through the Court's Electronic Court Filing system to counsel listed below:

> David A. Branch
> Law Office of David A. Branch
> 1825 Connecticut Avenue, NW
> Suite 690
> Washington, D.C. 20009

_____/s/ Minh N. Vu_____
Minh N. Vu