Page 169

1    Ms. Minh N. Vu
     1227 25th Street, NW
2    Suite 700
     Washington, DC  20037

3

     IN RE:  MASON - V - DAVITA, INC.

4

     Dear Ms. Vu:

5

     Enclosed please find your copy of the deposition of
6    Joshua Matthew Golomb, along with the original
     signature page.   As agreed, you will be responsible
7    for contacting the witness regarding reading and
     signing the transcript.

8

     Within 30 days of receipt, please forward errata
9    sheet and original signature page signed to opposing
     counsel.

10

     If you would like to change this procedure or if you
11   have any questions, please do not hesitate to call.
12   Thank you.
13   Yours,

14

15   Sherry L. Brooks
     Reporter/Notary Public

16

17

18

19

20

21

22

Joshua Golomb

Page 7

1       A.      Davita, RX, D-A-V-I-T-A.

2       Q.      And for the record, what is your race?

3       A.      I am Latino.

4               MS. VU:  Mr. Branch, for the record, I do

5       represent the witness today.  I am his attorney.

6               MR. BRANCH:  I would assume that he's a

7       management witness.

8               MS. VU:  I just want to make that clear.

9               BY MR. BRANCH:

10      Q.      And by Latino, what do you mean?

11      A       I am -- my mother is from Mexico.  She's a

12      Mexican American.

13      Q.      And your father?

14      A.      He is eastern European, so his family

15      hails from the big Poland, Hungary area.

16      Q.      Where were you born?

17      A.      Southern California.

18      Q.      What's your date of birth?

19      A.      1/14/74.

20      Q.      You're employed at Davita in what

21      capacity?

22      A.      My current title is senior director.

Joshua Golomb

Page 10

1       Q.      What major city is that near?

2       A.      Los Angeles.

3       Q.      Prior to working at Davita, where did you

4  work?

5       A.      Where would you like me to start?

6       Q.      Postundergraduate.

7       A.      My first job was called the Stanford

8  Medical Youth Science Program and it was a program

9  through the university, which the aim was to support

10  low-income high school students get into college, and

11  so I directed that program for about six months.  It

12  was a program I had worked through college as well.

13      Q.      What period of time?

14      A.      I started in -- I started actually in the

15  summer of 2004 and I worked through my last year of

16  college and then I stayed with it for the --

17      Q.      2004 or '94?

18      A.      I'm sorry -- '94.  Thank you for

19  clarifying -- and I stayed with that through my whole

20  senior year of undergraduate and then through the

21  next six months of -- after my graduation from

22  Stanford.

Joshua Golomb

1        Q.      Okay.  And what was your next position?

2        A.      It was for a company called Partners in

3   School Innovation, and the company's aim was a

4   nonprofit education consulting firm that worked with

5   public schools in low-income areas, and the title was

6   called A Partner, but it was an education consultant.

7   It was paid for through the AmeriCorp. Program.

8        Q.      How long did you work there?

9        A.      Two years.

10       Q.      And what was your next position after

11  that?

12       A.      It was working for a nonprofit called the

13  Urban Strategies Council in Oakland, California,

14  which is a nonprofit focused on community and

15  economic development in inner cities, and I believe

16  my title -- I was hired as a program assistant, and

17  when I left, I was a program associate.

18       Q.      How long did you work there?

19       A.      Approximately two years.

20       Q.      And where did you work after that?

21       A.      After that, I went to Stanford Business

22  School.

Joshua Golomb

Page 13

1   Davita?

2       A.      My original title was senior manager of

3   special projects.

4       Q.      And what were your duties?

5       A.      It was primarily -- the first six months

6   was to evaluate this pharmacy business to decide

7   whether or not Davita should pilot a program, and

8   then we decided to pilot the Davita RX concept into

9   that point.  I believe it was then that I was

10  promoted to director and over the next approximately

11  two years had various roles within Davita RX as we

12  went from pilot to actually getting the business up

13  and running.

14      Q.      So you started at Davita in -- was it

15  2004?

16      A.      Yes, August of 2004.

17      Q.      And who did you report to when you started

18  work at Davita?

19      A.      His name is Bill Hughson, and the last

20  name is spelled H-U-G-H-S-O-N.

21      Q.      What was his title?

22      A.      I believe his title is Executive at Large

Joshua Golomb

1    at the time.

2         Q.    Where was your work location when you

3    started at Davita?

4         A.    Northern California, specifically in

5    Burlingame, California.

6         Q.    You indicated that at some point you were

7    promoted to director?

8         A.    Yes.

9         Q.    What was your official title, director of

10   what?

11        A.    It became just director, Davita RX.

12        Q.    Were you a director before you became

13   employed at Davita RX or was it only after you became

14   employed at Davita RX?

15        A.    I can't remember for certain, and the

16   reason is is Davita RX -- I'm not entirely certain

17   the exact timing when it became an official separate,

18   legal entity.

19        Q.    I believe your testimony was that you were

20   working on a pilot program to determine if Davita RX

21   would be launched?

22        A.    Yes.  So when I started, the first four

Joshua Golomb

1    months up until about January of 2005 was evaluating

2    the business, so doing everything from interviewing

3    patients about their needs for pharmacy business to

4    talking to physicians and our clinic teammates about

5    what they'd want such a business to look like and

6    looking at the financials of what it -- what we

7    thought the business would be if we ran this.

8          And then at the very end of the year,

9    right around the December time frame, we decided to

10   actually purchase a small pharmacy and pilot the

11   service for a couple of clinics to see how everything

12   went and test whether or not our patients signed up,

13   and if they signed up, if they liked the program.

14         And so I would characterize from January

15   to roughly July/August of 2005 as our pilot period

16   where we were testing or finding the model in a very

17   small setting and then around the August time frame

18   is when we went much more aggressively to say that we

19   were going to start this business full force.

20         Q.    And the business that was being started,

21   what type of services were going to be provided by

22   the business?

Page 20

1    over the next -- especially over the next first nine

2    months but after as well had various roles, so I

3    would be very involved in finance; I'd be very

4    involved in sales; I'd be very involved in

5    operations, so there was a relatively small number of

6    us trying to build this business from scratch.

7         Q.    How many people were involved in building

8    this business from scratch?

9         A.    We started with the first six months or so

10   -- I think there were approximately six to seven of

11   us -- and that grew over time.

12        Q.    Who was those people, the six or seven

13   people who started?

14        A.    It was Bill Hughson.

15        Q.    What was his title?

16        A.    Executive at Large.

17        Q.    Who else?

18        A.    A woman named Rachael Burgoyne,

19   B-U-R-G-O-Y-N-E.

20        Q.    What was her title?

21        A.    She was a director.

22        Q.    Was she performing the same duties you

Joshua Golomb

Page 21

1    were performing?

2        A.    No.

3        Q.    What type of duties was she performing?

4        A.    She would do other things, again, a wide

5    gamut of activities because we were a startup, so

6    everything from -- she was involved in those same

7    general areas but doing different types of work

8    within those areas, but I would say that for the

9    majority of people whose names I'll say right now,

10    they played a variety of hats throughout the

11    organization.

12        Q.    Okay.  Who else was involved?

13        A.    A gentleman named Doug Troy, and he was

14    actually a consultant.

15        Q.    And just so that I'm clear, Bill Hughson,

16    what is his race?

17        A.    I believe his race is white.

18        Q.    Caucasian?

19        A.    Yes.

20        Q.    And Rachel Burgoyne?

21        A.    I believe that she's Caucasian.

22        Q.    And Mr. Troy?

Joshua Golomb

Page 22

1    A.    I believe he was Caucasian.

2    Q.    Who else was involved?

3    A.    Cameron -- his official name is Reza,

4    R-E-Z-A, Faili, F-A-I-L-I.

5    Q.    Cameron Reza Faili?

6    A.    Yes.  I believe Cameron is his middle

7    name.  He goes by Cameron.

8    Q.    And what was his position?

9    A.    His title was -- I'm not certain what his

10   title was at the time.  I know right now he's a

11   manager in our business.

12   Q.    What's his race?

13   A.    I'm not positive.  I believe that he's

14   Middle Eastern descent, but I'm not sure how you

15   would characterize it.

16   Q.    Who else was involved?

17   A.    Hughson, Burgoyne, Troy and Faili.  For

18   the first part of that time, Michael Hill.

19   Q.    What was his position?

20   A.    I'm not certain.

21   Q.    What was his race or what is his race?

22   A.    I believe he is African American.

Joshua Golomb

Page 33

```
1         Q.      And continue in the process, please.

2         A.      We hired Zondra Evans.

3         Q.      And when was Zondra Evans hired?

4         A.      I can't give you an exact date, but it was

5    in the February, March time frame of 2005.

6         Q.      How long did you continue to receive

7    candidates from the staffing agency?

8         A.      We received a steady stream of them for

9    the next few months as we grew our sales

10   organization.

11        Q.      At some point, did you terminate your

12   relationship with the staffing agency?

13        A.      Yes.  I don't know if I'd characterize it

14   as terminating our relationship because we've always

15   used them from time to time, but we stopped at some

16   point using them as our primary mechanism for getting

17   PSRs.

18        Q.      And what became the primary mechanism for

19   getting PSRs?

20        A.      We used internal resources.

21        Q.      When you say internal resources, what do

22   you mean?
```

Joshua Golomb

Page 34

1     A.    We've posted our job description on our

2   internal Davita website and on some external sites as

3   well.

4     Q.    When you say you posted the job

5   description on the Davita internal website, are you

6   talking about Davita RX or is this the main Davita?

7     A.    Main Davita.

8     Q.    Who made the determination that the PSR

9   position would be posted on Davita's main website?

10    A.    I don't recall who made that decision.

11    Q.    When did you start posting the job

12  description on Davita's main website?

13    A.    I don't know an exact date.  I guess

14  somewhere in the --

15          MS. VU:  Don't guess, Mr. Golomb.

16          THE WITNESS:  I don't know an exact date.

17          BY MR. BRANCH:

18    Q.    You can give an approximation, if you

19  know.

20    A.    Sometime in 2005.

21    Q.    Who had responsibility for getting the

22  position or vacancy place on the main Davita website?

Joshua Golomb

1   other medications from Davita; is that correct?

2       A.      Yes, for them to get their oral

3   medications.

4       Q.      And for the time spent with teammates,

5   what would you expect your PSR to be doing?

6       A.      Selling them on why this is good for the

7   clinic and good for Davita.

8       Q.      And by teammates, what do you mean?

9       A.      In Davita, we call employees teammates.

10      Q.      So these are the coworkers?

11      A.      Yes.

12      Q.      And you would expect your PSR to be doing

13  what with the coworkers?

14      A.      First would be selling the Davita RX

15  concept.

16      Q.      What is the Davita RX concept?

17      A.      That we would be providing this service to

18  patients and their clinics.

19      Q.      Okay.  And what else would you expect your

20  PSRs to be doing with the coworkers or teammates?

21      A.      Training on how to -- how the service

22  works within their clinics.

Joshua Golomb

Page 43

1      Q.    You expected the PSRs to train their

2   coworkers?

3      A.    Yes.

4      Q.    What type of training would the PSRs

5   provide?

6      A.    On how to deliver the medications when

7   they arrived at the clinic.

8      Q.    And how is that done?

9      A.    It's a pretty lengthy process.  Do you

10  want me to walk you through the whole thing?

11     Q.    Sure.

12     A.    Okay.  The box shows up on the front

13  doorstep of the clinic from Fed-Ex or from UPS.  The

14  clinic teammate would sign for that.  They would take

15  an inventory of what's in the box and store it in a

16  locked cabinet.

17          There's a set of processes around making

18  sure that the clinic teammate who is responsible for

19  that knows when the patient will be coming to

20  service.

21          They would then go to the locked cabinet,

22  get the patient's medication when they were there for

Joshua Golomb

Page 44

1    service, deliver it to the patient, go over the

2    statement of what was in the pack and have the

3    patient sign that they had received the medications.

4        Q.    And that's it?

5        A.    There's a bit more excruciating detail

6    behind that if you'd like it, but that's --

7        Q.    So your PSRs would train teammates or

8    staff members on how to do that?

9        A.    Yes, amongst other processes too.

10       Q.    And what else did you expect your PSR to

11   do with the teammates or coworkers?

12       A.    I would say those are the two primary

13   responsibilities.

14       Q.    Okay.  And what did you expect your PSRs

15   to do with the doctors?

16       A.    Again, sell them on the value of Davita

17   RX.

18       Q.    Are you familiar with the position Patient

19   Care Technician at Davita?

20       A.    I know what it is, yes.

21       Q.    And what did those folks -- what type of

22   duties do they perform?

Joshua Golomb

Page 50

1    me that as well.

2         A.    Well, I think we always envisioned by the

3    time we had fully built up the business we would end

4    up somewhere between 30 to 40 PSRs, but what's

5    changed and its consistently been influx is how

6    quickly we wanted to add those folks on, how quickly

7    we wanted to grow the business.

8             So at any given point in time, we weren't

9    hiring for all 30 to 40 positions.  At a given point

10   in time, we might have been looking to fill one.  We

11   might have been looking to fill ten.  It all varied.

12        Q.    And can you explain what the

13   responsibilities would be for those PSRs?  Would they

14   have responsibility for particular areas or how would

15   that work?

16        A.    We had envisioned that they would

17   eventually take over a territory that they would be

18   responsible for, but especially during our early

19   stages, they worked very collaboratively.  They

20   worked in teams.

21            We were trying to get as much

22   cross-fertilization of the different skill sets a PSR

Joshua Golomb

1    he passed our screens in person, she saw no -- she

2    was ready to make him a job offer.

3        Q.    How was Mr. Jones farther along in the

4    process when she conducted the telephone interviews

5    of Mr. Jones and Mr. Mason roughly at the same period

6    of time?

7             MS. VU:  Objection.  Assumes facts not

8    previously testified to.

9             THE WITNESS:  When I say farther along in

10   the process, she had met with Mr. Jones and he had

11   been able to meet with us live.

12            BY MR. BRANCH:

13       Q.    But Mr. Jones and Mr. Mason both had their

14   initial telephone interviews within a week or so of

15   each other, correct?

16       A.    I have no idea.

17       Q.    Now, as of December 2005, were you still

18   -- was Davita RX still looking to fill PSR positions

19   elsewhere outside of D.C.?

20       A.    Yes.

21       Q.    Okay.  And on other occasions, has Davita

22   RX interviewed people for positions outside of their

Joshua Golomb

Page 83

-- where they lived?

A.    Our standard practice was to interview

people for positions where either they were living

today or where they were planning to move to already.

Q.    But were there occasions where you

considered applicants for positions outside of where

they were living or applicants basically who were

willing to relocate?

MS. VU:  Asked and answered.  Objection.

THE WITNESS:  I think I told you what the

process -- our standard practice was.

BY MR. BRANCH:

Q.    I understand what the standard practice

was, but were there occasions when you deviated from

the standard practice and you considered folks for

positions other than where they live?

A.    If someone was planning to move already,

we would talk to them about a position in a place

where they were looking to move to.

Q.    Okay.  Did you ever have this come up as a

question or as an issue, the fact that we're

considering somebody for an area other than where

Page 84

1    they live?

2         A.    Again, we would talk to folks about places

3    either where they lived or where they were planning

4    to move to.

5         Q.    Let's turn to Bates Number 1468.

6         A.    1468?

7         Q.    Yes.

8         A.    Okay.

9         Q.    Can you identify this document?  Is this

10   an E-mail that you sent to Rachael Burgoyne and Bruce

11   Kraus?

12        A.    Yes.

13        Q.    Can you read the first sentence?

14        A.    Was other candidate strong also.

15        Q.    And the second sentence there as well?

16        A.    Unconscious that some candidates may be

17   open to moving.  If he's good, just not as good as

18   Ian, it may be worth a conversation.

19        Q.    What were you attempting to convey here?

20        A.    I think this is post everything that

21   happened with Mr. Mason and so this was highlighted

22   that at that point was willing to talk to a

Joshua Golomb

1   candidate.  If someone was really strong that was

2   planning to move already that there might be other

3   opportunities for them.

4          Q.    And just so that I'm clear here, you were

5   suggesting that you would consider hiring someone who

6   was willing to move to another location outside of

7   where they live?

8          A.    Again, if someone was planning to move,

9   which was consistent with what I said earlier, that

10  we would look to somewhere where they were thinking

11  about moving to.

12         Q.    But here you say I'm conscious that some

13  candidates may be open to moving?

14         A.    Yes.

15         Q.    That's not suggesting that the candidate

16  was already planning on moving.  Isn't that

17  suggesting that someone would move to accept a

18  position in another location?

19         A.    I guess what I would say is that there's

20  some candidates that we have talked to that were

21  planning to move as part of their -- they were

22  between places or looking to move, and if there was

1    someone who was willing to move -- that was looking

2    to move to another place, that was something that we

3    would consider.

4              Again, this was after the Mr. Mason

5    incident and had flagged that as something we had not

6    thought through thoroughly up to that point.

7         Q.    So you believe this was after the Mason

8    incident?

9         A.    Well, this is Sunday, March 12th, 2006,

10   and I believe --

11        Q.    You believe what?

12        A.    And I believe the document you just showed

13   me was from January of 2006.

14        Q.    All right.  And turn, if you will, to

15   exhibit or Bates Number 1465.

16        A.    I don't know if I have that in here.

17   They're out of order, if they are.

18        Q.    Are you there?

19        A.    Yes.

20        Q.    Can you identify this document?

21        A.    Yes.

22        Q.    What is it?

Joshua Golomb

MS. VU:  Objection.  Misstates prior

testimony.

THE WITNESS:  No.

BY MR. BRANCH:

Q.    Why did you interview Mr. Todaro?

A.    He was recommended as a good candidate.

Q.    By whom?

A.    By the vice president of finance.

Q.    Okay.  That's what I wanted to establish.

All right.  So you agreed to interview Mr. Mason in

person -- I'm sorry -- over the telephone?

A.    Yes.

Q.    After your initial telephone call with Mr.

Mason, how long did it take before you scheduled a

telephone interview of Mr. Mason?

A.    We scheduled the telephone interview

during that conversation.

Q.    And when was the telephone interview to

take place?

A.    I believe March 9th.

Q.    March 9th, 2006?

A.    Yes.

Joshua Golomb

Page 93

1     Q.     What time was it scheduled for?

2     A.     I believe 8:00 Eastern Time.

3     Q.     You scheduled an interview for 8:00

4  Eastern Standard Time?

5     A.     Yes.

6     Q.     And where were you?

7     A.     Where was I that day?

8     Q.     Yes, physically, where were you?

9     A.     I was going to be in Orlando, Florida that

10  day.

11     Q.     Where were you when you scheduled the --

12  when you spoke to Mr. Mason on the phone for the

13  first time?

14     A.     I believe I was in Dallas, Texas.

15     Q.     And where was your work location,

16  workstation, your permanent workstation at the time?

17     A.     My office is in Northern California, but I

18  travel quite frequently for my job.

19     Q.     Did you tell Mr. Mason that the interview

20  will be at 8:00 a.m. Eastern Standard Time?

21     A.     I remember spending quite a bit of time

22  clarifying the time because I have meetings with

Joshua Golomb

1  folks from all different time zones and it is very

2  common for folks to misunderstand when their times

3  are if you don't clarify those facts.

4       Q.    Did you tell Mr. Mason that his telephone

5  interview would be at 8:00 a.m. Eastern Standard

6  Time?

7       A.    Yes.

8       Q.    Okay.  And how was the telephone interview

9  to -- how was it to be initiated?

10      A.    He gave me his home telephone number and

11  his cell phone number and told me to call him at

12  home.

13      Q.    Okay.  And did you call him at home?

14      A.    Yes, I did.

15      Q.    And what time did you call him?

16      A.    It would have been right around 8:00 a.m.

17  Pacific -- I'm sorry -- Eastern Time that day.

18      Q.    Well, you almost said 8:00 a.m. Pacific

19  time, but you clarified that and you said 8:00 a.m.

20  Eastern Time.  Are you certain you didn't tell him

21  8:00 a.m. Pacific time as you've just stated here?

22      A.    If you'd like me to state it again, I

Joshua Golomb

Page 95

1    clarified many times with him that it would be 8:00

2    Eastern Time because I know the time zones are very

3    challenging for folks, and if you don't make it very

4    clear, people often mistake it.

5        Q.    And where were you when you called Mr.

6    Mason?

7        A.    Again, I was in Orlando, Florida.

8        Q.    And what happened when you called him at

9    8:00 a.m.?

10       A.    I called him -- I believe I called him

11   first on his home phone and talked to someone who I

12   assumed to be his wife who told me that he was not

13   home at the moment.  I called him on his cell phone a

14   couple of times and left messages there, so I left

15   messages in both places and that's what happened.

16       Q.    Okay.  Were you able to reach Mr. Mason

17   later that day?

18       A.    So I waited -- I had specifically set

19   aside the time myself because I knew I was going to

20   be one place from 8:00 to 9:00 to do the phone

21   interview and I needed to go into our pharmacy, and

22   so I waited for probably about a half an hour hoping

Joshua Golomb

Page 96

1    that he would call back, and when he didn't, I left

2    where I was and eventually he called me.

3         Q.    Do you have a Daytimer for that day?

4         A.    Do I have a Daytimer?

5         Q.    Yes, something which -- I saw in some of

6    your notes that you provided the Daytimer for

7    December of 2005.  Do you have your Daytimer for

8    March 9, 2006?

9         A.    If I -- whatever I -- I produced all the

10   documents I had from my system, so if I had that

11   information, I would have provided it.

12        Q.    Okay.  But do you have a Day Planner?  How

13   did you record your meetings?

14        A.    I typically use Outlook.

15        Q.    Are you able to print that out?  You

16   printed out some of the documents from December.  Are

17   you able to print out the documents from March?

18        A.    Yes.

19        Q.    2006?

20        A.    I printed out everything that I had for

21   March --

22        Q.    You provided March 2006?

Page 97

1    A.    Anything that I had related to PSR and it

2  was in agreement with what was asked for, I printed

3  out.

4    Q.    Okay.  I'm going to ask you to take

5  another look at that because I haven't seen the March

6  2006 Day Planner.  If you have it, obviously it's

7  relevant.  You'll need to produce it.

8    A.    Sure.

9    Q.    Okay.  So you spoke to Mr. Mason later

10  that day?

11    A.    Yes.  He called me while I was en route

12  driving to the next location.

13    Q.    And what did Mr. Mason tell you when you

14  called him?

15    A.    He apologized and said there must have

16  been a confusion -- he was confused about the time,

17  and I accepted his apology and we proceeded with the

18  interview.

19    Q.    And did you tell Mr. Mason that it was not

20  an issue?

21    A.    I did not say it was not an issue.  I said

22  that folks get confused.  I don't remember the exact

Joshua Golomb

1   wording I said, but I think the gist of what I tried

2   to communicate to him was being timely and attention

3   to detail is very important, but I was still going to

4   proceed with the interview.

5       Q.    And where were you headed when you spoke

6   to him?

7       A.    We have a pharmacy in Orlando, and I was

8   heading to that site.

9       Q.    And did you conduct this telephone

10  interview?

11      A.    Yes.

12      Q.    And where were you when you conducted the

13  telephone interview?

14      A.    Well, we started while I was in the car

15  and then -- I wasn't in the car the whole time.  I

16  pulled off.  I was halfway between destinations, so I

17  pulled off the road and finished the phone interview

18  from my car.

19      Q.    How long did this phone interview last?

20      A.    I would estimate probably around 45

21  minutes.

22      Q.    Okay.  So you -- Mr. Mason called you and

Joshua Golomb

Page 101

1    asked him or were you just asking him questions off

2    the top of your head?

3         A    I had done enough second-round interviews

4    that I was asking questions off the top of my head,

5    similar to what you're doing now I think.

6         Q.    Okay.  So you asked him about experience

7    as a PCT and his shining star award?

8         A.    Um-hum.

9         Q.    Is that a yes?

10        A.    Yes.  Sorry.

11        Q.    Okay.  Do you recall any other questions

12   that you asked him?

13        A.    I asked him about his understanding of

14   patient's pharmacy needs from a PCT perspective, what

15   he thought about the Davita RX service, why he was

16   applying to get this position, and then we went

17   through a number of situational -- what I call

18   situational questions of how he would deal -- what he

19   would do in various situations that a typical PSR

20   might encounter.

21        Q.    What were those situational questions?

22        A.    It was set around patients, so how would

Joshua Golomb

Page 102

1    he approach selling the concept to patients, how he

2    would approach selling the concept to teammates, and

3    how he would approach selling the concept to

4    physicians.

5        Q.    Did you take any notes from this

6    interview?

7        A.    No, unfortunately because of him being

8    late and me having to do this in the car, I did not

9    take notes.

10       Q.    You didn't have a note pad or anything in

11   the car with you?

12       A.    I had one in the trunk, but I did not go

13   to get it out.

14       Q.    Did you stop at a rest stop?

15       A.    I believe it was a Dunkin' Donuts parking

16   lot in Orlando.

17       Q.    What was Mr. -- strike that.

18             Did you ask him any other questions?

19       A.    Those are the ones that are the top of

20   mind for me today that I remember asking him.

21       Q.    And how did he respond to the question of

22   how he would sell to the patients?

Joshua Golomb

Page 103

1    A.    I remember him telling me about the

2    convenience factor emphasizing how great it would be

3    to not have to worry about getting a ride to the

4    pharmacy or wait in line or really emphasizing that

5    aspect of the service to patients.

6    Q.    And how did he respond to the question of

7    how he would sell it to his teammates?

8    A.    He focused on the financial aspect and

9    said that he would make sure that teammates knew that

10   this was -- they were all part of Davita and I

11   believe -- I won't get the exact wording right here,

12   but that a lot of them owned stock in Davita, a lot

13   of them are a part of Davita's incentive compensation

14   programs and so them supporting a new business within

15   Davita could have financial awards to them.

16   Q.    And how did he say he would sell it to

17   doctors?

18   A.    I believe he talked about emphasizing that

19   this is good for patients.

20   Q.    Did you ask him any other questions?

21   A.    I think I've answered that already.  These

22   are the ones that I remember being top of mind as

Joshua Golomb

Page 106

1    he performed during the interview?

2        A.    Yes.

3        Q.    What were those concerns?

4        A.    Well, we'll start with the situational

5    questions.  I would say he gave decent but not

6    particularly strong answers.

7        Q.    By situational questions, you mean how he

8    would respond to patients, teammates, or doctors?

9        A.    Yes.

10       Q.    What answer were you looking for for

11   those?

12       A.    A strong answer for those questions shows

13   a thoughtfulness and an empathy to understand where

14   the person is coming from and to tailor your answer.

15            So when someone is thinking about

16   teammates or physicians especially, I would -- well,

17   first financial incentives is not a very strong

18   answer because it's not a -- for our clinic

19   teammates, A) the relationship between Davita RX and

20   driving those financial incentives -- financial

21   performance of Davita is relatively low, but B) that

22   didn't demonstrate a strong understanding of what our

Page 107

1  teammates in the clinic actually care about, what

2  would motivate them.

3      Q.    What does motivate the teammates?

4      A.    The aspect that gets them excited about

5  Davita RX is that this supports patient care, that

6  this supports some of the metrics they're held

7  accountable to around patient quality.

8          So as a general answer, that would be much

9  more in line with what I would expect someone who

10  knew a clinic well and could sell this, but more

11  genuinely speaking an excellent answer and the type

12  of answer that Mr. Jones had given is understanding

13  first what to do is we don't go into a clinic --

14  understand where that clinic is coming from,

15  understand how they're performing on key metrics

16  related to patient care, and to try to tie Davita RX

17  back into those clinical metrics.

18          So for example, if a clinic has performed

19  poorly on a metric around bone and mineral

20  metabolism, which is one of our key metrics, then

21  there are a few drugs that we provide that we think

22  we drive greater adherence to and to emphasize that

Joshua Golomb

1    patients using Davita RX will more likely take those

2    drugs that are needed for that condition and have

3    better outcomes over time.  That's just one example.

4        Q.    Isn't it true that Mr. Jones was working

5    as an administrative assistant at Davita?

6        A.    Yes.

7        Q.    And he had not worked as a patient care

8    technician for Davita at any time, correct?

9        A.    No.

10       Q.    And Mr. Mason had worked for Davita as a

11   patient care technician for more than ten years,

12   correct?

13       A.    Yes.

14       Q.    Okay.  And you believe Mr. Jones was a

15   better candidate based on -- I'm sorry.  Why did you

16   believe his response was better?

17       A.    He had a much more higher quality answer.

18   So that question specifically, he demonstrated a

19   greater knowledge of what motivates teammates and

20   physicians, and he demonstrated a better

21   understanding of the sales process in general, which

22   is to understand your customer and what they care

Joshua Golomb

Page 109

1  about and then tailor your message to them as opposed

2  to deciding yourself what you think they should care

3  about and pushing that message.

4       Q.    And Mr. Jones's response was in his

5  in-person interview with you in California?

6       A.    Yes.

7       Q.    And Mr. Mason's response was over the

8  telephone when you were in the Dunkin' Donuts parking

9  lot?

10      A.    Yes.

11      Q.    Okay.  What other concerns did you have

12  with Mr. Mason's response?

13      A.    So those on the physician side, just,

14  again, didn't demonstrate a strong understanding of

15  what our physicians care about and I think probably

16  more importantly that physicians are much more

17  diverse in their attitudes about this program or any

18  program within Davita and did not seem to demonstrate

19  as thoughtful of a response to, again, assess what

20  the doctor cared about, why Davita RX might be able

21  to match what their specific goals would be.

22      Q.    Well, I thought your testimony today was

Joshua Golomb

Page 113

1    A.    Yes.

2    Q.    Okay.  Did you have any other concerns

3  with Mr. Mason?

4    A.    Yes.  I don't know if I can finish the

5  part that you cut me off on the travel part earlier.

6  The concern about the travel, if I can finish, was

7  that he had a very short, curt response that it was

8  fine and that he had talked it over with his wife.

9        My experience has been, both in this

10  position and other positions throughout my career,

11  that travel is very challenging and draining on

12  anyone, especially someone who doesn't travel quite

13  extensively.

14        And it was a concern for me that he had

15  not -- a typical answer of someone who has thought it

16  through more thoroughly would be I have to talk with

17  my wife; this is how we're going to deal with that,

18  have more questions about kind of what that actually

19  means in terms of nights away.

20        It felt a bit to me like he was telling me

21  what he thought I wanted to hear as opposed to really

22  demonstrating that he had thought through the

Joshua Golomb

1    implications.

2        Q.    Any other concerns?

3        A.    I think those were the primary ones.

4        Q.    Now, in your E-mail, you mention

5    understanding and experience in sales.  Was that a

6    concern?

7        A.    Yes.  I think I -- sorry.  I thought that

8    I was making that clear when I -- how he was in the

9    role plays, his inability -- when I said earlier the

10   fact that he went to folks with a clear -- when I

11   asked him in these role plays about how he'd approach

12   different groups, he started with here's what I would

13   tell them and didn't start with here's the kinds of

14   questions I would ask, here's how I would figure out

15   what matters to them, which to me is the sales

16   process.

17            I think some people can have experience in

18   it and some people can have an innate ability to do

19   this, and he didn't seem to have either in a strong

20   way.

21       Q.    Now, you mentioned that James was solid

22   overall.  What did you mean by that?

Joshua Golomb

Page 121

1    area, yes.

2          Q.    Okay.  Did you interview -- well, after

3    you spoke to Mr. Mason, did you tell him how he

4    performed at the interview?

5          A.    I called him.

6          Q.    How long after the -- that interview?

7          A.    I believe it was March 17th.

8          Q.    So you called Mr. Mason on March 17th?

9          A.    And let him know that while he was -- had

10   a lot of great qualities, while he was clearly an

11   excellent PCT and a value to Davita, we would not be

12   pursuing going further in the interview process.

13         Q.    And did you tell him why?

14         A.    I told him that he was not as strong as

15   some of our other candidates, that he didn't quite

16   meet the bar, but that he was still very good.  Mr.

17   Mason had performed solid.  A three out of five isn't

18   bad.  We just had the luxury of having a lot of fours

19   and fives applying for our positions.

20         Q.    Did you tell Mr. Mason words to the effect

21   that you just missed the team?

22         A.    I don't believe I would have communicated

Joshua Golomb

Page 157

1    were filled before January 2006?  And that is between

2    September 2006 -- September 2005 and January 2006.

3         A.    Well, again, I don't know what the

4    territory -- I don't believe we had any PSRs based in

5    Maryland, but I'm not sure what our territory

6    alignment was as of September 2005.

7         Q.    Was there any consideration given to

8    placing Mr. Mason in Maryland?

9         A.    I believe, as I stated earlier, our

10   standard practice was to look for candidates in the

11   -- who lived within the territory that we were hiring

12   for or that were planning to move to that territory

13   that we were hiring for.

14        Q.    Was there any consideration given to

15   placing Mr. Mason in Maryland?

16        A.    I don't believe for any candidate we ever

17   looked outside the territory that they lived in to

18   see whether or not they might be a good candidate for

19   another territory that was not where they lived.

20             MR. BRANCH:  Okay.  I think that's all the

21   questions I have for you today.

22             MS. VU:  Will you give me a moment?  Let's

Joshua Golomb

Page 163

1   one-to-five scale, which was a way to translate that

2   scale that I use with all of my interviewees into

3   something that had meaning for a different audience.

4               That wasn't a part of Davita RX.  That was

5   part of Greater Davita, so I hadn't used that

6   specific language, but that's the same set of

7   criteria that I use for all candidates.

8        Q.    When you say you used that criteria for

9   all candidates, is this something you used in writing

10  or in your mental process?

11       A.    I think its in my mental process.

12       Q.    Now, if Mr. Mason had -- strike that.

13              Did you have a plan about what the next

14  step for Mr. Mason would be in the application

15  process if he had faired well in his telephonic

16  interview with you?

17       A.    Yes.  If he had faired well, the next step

18  would have been for him to come to California to meet

19  live and in person with the broader set of folks.

20       Q.    Now, earlier today Mr. Branch asked you if

21  -- well, he asked you how many people you had

22  reinterviewed who had interviewed with Ms. Easlon.

Joshua Golomb

Page 164

1    Do you remember that?

2        A.    Yes.

3        Q.    And you stated that it was Mr. SanJuan and

4    Mr. Mason?

5        A.    Yes.

6        Q.    Do you know whether Ms. Easlon had ever

7    interviewed Mr. SanJuan?

8        A.    I don't believe she had actually.  I'm not

9    positive, but I don't believe she had ever -- that he

10   had made it to the point of having a phone screen,

11   but I'm not certain.

12       Q.    Can you explain what you meant when you

13   said that Mr. Jones was further along in the process

14   of applying for the position?

15       A.    Sure.  Growing this business quite

16   quickly, Kim had to fill a number of positions very

17   fast.

18            We were behind at this point in time --

19   behind the eight ball in our growth trajectory and a

20   lot of that was because we didn't have enough sales

21   representatives to be out there, and so as Kim went

22   to a new area, my understanding is that Mr. Mason had

Joshua Colomb

Page 165

1    not been able to meet with Ms. Easlon.

2             She interviewed Mr. Jones.  I'm not sure

3    if she interviewed anyone else during that process.

4    She felt strong enough to send him to us to

5    California, and because he passed with flying colors,

6    she filled that position and moved along into filling

7    positions for other territories, but she was under a

8    very tight time line and did not have the luxury of

9    waiting until a time that was convenient for all the

10   candidates.

11       Q.    When you interviewed Mr. Mason on March 9,

12   2006 which territories were you considering Mr. Mason

13   for?

14       A.    Up until that point, we had never done

15   anything other than our standard practice, which was

16   to talk to someone about the territory where they

17   would live today or a territory where they were

18   imagining moving to, and with Mr. Mason, we had just

19   a general discussion.

20            I was interviewing him to see whether or

21   not he would be a good candidate for a PSR

22   essentially for any territory because he had