**Kimberly L. Easlon**

Page 138

```
1    Ms. Minh N. Vu
     1227 25th Street, N.W.
2    Suite 700
     Washington, D.C. 20037

3

4

5

     IN RE:  Mason vs. Davita, Inc.

6

7

     Dear Ms. Vu:

8

     Enclosed please find your copy of the
9    deposition of KIMBERLY LATHAM EASLON along with
     the original signature page.  As agreed, you
10   will be responsible for contacting the witness
     regarding reading and signing the transcript.

11

     Within 30 days of receipt, please forward
12   errata sheet and original signature page signed
     to opposing counsel.

13

     If you would like to change this procedure or
14   if you have any questions, please do not
     hesitate to call.

15

     Thank you.

16

     Yours,

17

18

19   Bonnie L. Russo

     Bonnie L. Russo
20   Reporter/Notary

21

22
```

Kimberly L. Easlon

Page 7

1        Q.      Who is your employer?

2        A.      Davita Rx.

3        Q.      Davita Rx.  What is your work

4    location?

5        A.      I'm based out of my home.

6        Q.      And where is your home?

7        A.      Edmond, Oklahoma.

8        Q.      What is your address, I'm sorry.

9        A.      16908 Claybridge Circle.  Claybridge

10   is one word.

11       Q.      C-L-A-Y?

12       A.      Yes.

13       Q.      B-R-I-D-G-E?

14       A.      Yes.

15       Q.      Circle?

16       A.      Edmond, Oklahoma.

17       Q.      E-D-M-O-N-D?

18       A.      Yes.

19       Q.      What is the ZIP code?

20       A.      73003.

21       Q.      73003?

22               And what is the official address for

**Kimberly L. Easlon**

Page 14

1      Q.      So you started as a business

2   development specialist at Davita.  This is

3   2007.  You believe it was four years ago.  So

4   approximately 2003?

5      A.      That's correct.

6      Q.      How long were you in that position?

7      A.      About a year and a half.

8      Q.      Who did you report to in that

9   position?

10      A.      I reported to Jane Goeringer.

11      Q.      The last name is spelled?

12      A.      G-O-E-R-I-N-G-E-R.  And I also

13   reported to Janet Slocum Stevens.

14      Q.      When did you become employed at

15   Davita Rx?

16      A.      December of '04.

17      Q.      How did you become employed at

18   Davita Rx?

19      A.      The gentleman that had hired me as a

20   business development specialist was also

21   loosely involved with Davita Rx recommended me

22   to work part-time with Davita Rx to help them

**Kimberly L.  Easlon**

1      Q.      Were you offered the job after this

2  initial interview with Hughson?

3      A.      Yes, I was.  That was not until the

4  end of February.

5      Q.      February of 2005?

6      A.      Yes.

7      Q.      What was your position with

8  Davita Rx when you started?

9      A.      I was hired -- at the time they

10 called it a regional sales manager.

11     Q.      What were your responsibilities?

12     A.      I was involved with everything to do

13 with sales.  I was involved in putting together

14 marketing materials to use in the facilities.

15 I was responsible for hiring and training all

16 pharmacy services reps.

17          I was involved in putting together

18 any training materials for those reps.  And I

19 was also very involved in working with the

20 regional operations directors, the facility

21 administrators to line up facilities ready to

22 enroll in Davita Rx.

**Kimberly L. Easlon**

Page 23

1    is only in Davita Rx.  It's a whole new

2    position.

3            There is no one to train the PSRs

4    except myself.  I am the one that created the

5    position and created the qualifications for it.

6    So there is no one who can train me.  I train

7    everyone else.

8        Q.    How did you come to create the PSR

9    position?

10        A.    I worked in the facilities doing the

11    actual enrollments myself along with

12    Rachel Burgoyne who was working as a facility

13    operations director for Davita Rx.  And I am

14    not certain that is her exact title, but that

15    was what she was responsible for.

16            We worked together to do the

17    enrollments, to decide what type of person

18    would be best suited for this type of a

19    position and what their qualifications would

20    be.  And through putting together our process,

21    we also put together a plan on how to train

22    them.

**Kimberly L. Easlon**

1      Q.     Okay.  What period of time did you

2  work part-time for Davita Rx?

3      A.     From December through the end of

4  February.

5      Q.     Okay.  So you worked part-time for

6  Davita Rx until the end of February, but you

7  were working on this PSR position at that time?

8      A.     Correct.

9      Q.     Was it your idea that there would be

10  a PSR position or did somebody else make that

11  determination?

12      A.     Someone else made that

13  determination.

14      Q.     Is that Bill Hughson?

15      A.     It would have been a combination of

16  people who brainstormed and worked on the

17  actual concept of Davita Rx.

18      Q.     And what is a PSR?  What is a

19  pharmacy services representative?

20      A.     Are you asking me what their

21  responsibilities are?

22      Q.     Yes.  What are the responsibilities

**Kimberly L. Easlon**

Page 26

1    of the PSR or what is this position?

2        A.    The pharmacy services rep is

3    responsible for many things and wears many

4    different hats.

5            They are responsible for working

6    directly with the patients to enroll them in

7    our service.  They are responsible for working

8    with teammates within the facility to make sure

9    they gain teammate buy-in and teammate support.

10            And they are responsible for working

11    with physicians to make sure that the

12    physicians support and understand our program.

13        Q.    What percentage of the PSR's time is

14    expected or what percentage of the PSR's time

15    is spent working with patients, teammates, and

16    doctors?

17        A.    I have to tell you that probably

18    50 percent of the PSR's time is spent doing

19    administrative work alone.  Now, of the

20    remaining 50 percent, about 30 percent of that

21    would be spent with patients, 15 percent with

22    teammates, and 5 percent with physicians.

Kimberly L. Easlon

Page 29

1    different things.

2            Plus there is the regular

3    administrative work they would do for me.  They

4    have a weekly report they fill out.  They have

5    a weekly or monthly budget they fill out.  They

6    have their expense report they do on a monthly

7    basis, et cetera, et cetera.

8            So you can see that there is a lot

9    of administrative work involved.

10       Q.    And these positions would report

11   directly to you?

12       A.    That's correct.

13       Q.    What period of time did the PSRs

14   report directly to you?

15       A.    What do you mean?  When did they

16   begin to work?

17       Q.    Yes.  What period of time?

18       A.    From February of '05.

19       Q.    Until when?

20       A.    Until now.

21       Q.    All the PSRs report to you now?

22       A.    Oh.  Until we divided into three

**Kimberly L. Easlon**

Page 30

1    different regions at which time I ended up with

2    12 PSRs.

3        Q.    And when did that occur?

4        A.    You have already asked me this

5    question.  I'm not exactly sure when we

6    actually divided into regions.  It was when

7    George Seiler started with the company and

8    Zondra Evans was promoted.

9        Q.    You believe that was sometime in the

10   summer of 2006?

11       A.    Yes.  It may have been as early as

12   April.  I am thinking April.

13       Q.    April of 2006; is that correct?

14       A.    (Witness nodding head.)

15       Q.    You have to say yes or no.

16       A.    I am guessing that it was April or

17   later.

18       Q.    So the PSRs reported to you from

19   February 2005 until you believe maybe April of

20   2006?

21       A.    That's correct.  And when George

22   Seiler was let go, we then split his reps in

**Kimberly L. Easlon**

Page 33

1    Q.    February 2005 and April of 2006.

2    A.    Through April?

3    Q.    Yes.

4          MS. VU:  You mean through and

5    including April or to the beginning of April?

6          MR. BRANCH:  To the beginning of

7    April.

8          THE WITNESS:  20.

9          BY MR. BRANCH:

10    Q.    Okay.  And did you have any

11    involvement in the hiring of Zondra Evans?

12    A.    Yes, I did.

13    Q.    Okay.  Was her hire date February

14    28, 2005?

15    A.    That's correct.

16    Q.    And when did you start at Davita?

17    Davita Rx?

18    A.    With Davita Rx?

19    Q.    Yes.

20    A.    I was officially hired on the same

21    day as a manager.

22    Q.    You were officially hired on the

**Kimberly L. Easlon**

Page 34

1    same day as of -- on what same day?

2        A.    That Zondra was hired.

3        Q.    So you both started on the same day?

4        A.    That's correct.

5        Q.    And how is it that you had any

6    involvement in her hiring?

7        A.    I was still previously working for

8    them in a part-time position, and I interviewed

9    her and hired her.

10       Q.    Okay.  So you interviewed and hired

11   Zondra Evans.  Okay.

12              And after Zondra Evans was hired,

13   did you hire any more African Americans between

14   February of 2005 and January of 2006?

15       A.    Yes.

16       Q.    Who else did you hire?

17       A.    Jessie Mayberry.

18       Q.    Jessie Mayberry?  When was he -- she

19   hired?

20       A.    She was hired in June of '05.

21       Q.    Okay.  Did you hire any other

22   African Americans between February of 2005 and

**Kimberly L. Easlon**

1    January of 2006?

2        A.    January?

3        Q.    Yes.

4        A.    No.  However, I hired several in

5    April.

6        Q.    April of 2006?

7        A.    Yes.

8        Q.    That was after Mr. Mason filed a

9    complaint against Davita?

10       A.    That's correct.

11       Q.    All right.  Okay.  So between the

12   time that you started employment at Davita Rx

13   and when Mr. Mason filed his complaint against

14   Davita Rx, you were involved in the hiring of

15   two African Americans?

16       A.    That's correct.

17       Q.    And how many Davita Rx PSRs were

18   hired between February 2005 and January 2006?

19       A.    17.

20             I would also like to point out that

21   I did hire in that time period three Hispanics.

22       Q.    Okay.  I think you testified that

**Kimberly L. Easlon**

Page 42

1    If they had moved around a lot in different

2    positions.  Those would be reasons that I would

3    not want to talk to them.

4        Q.    Were you the only person responsible

5    for this initial screening of the applicants?

6        A.    Yes.

7        Q.    So Ms. DePillo received all resumes.

8    She sent you all the resumes that she received?

9        A.    That's correct.

10       Q.    What period of time were you the

11   only person responsible for screening resumes?

12       A.    From February of -- I believe we

13   decided it was '05 through the hiring of the

14   regional managers, George and Zondra.  So until

15   that point I was responsible for all hiring.

16       Q.    So you said you would initially

17   receive -- I asked you about the process that

18   was followed in selecting individuals for the

19   PSR positions.

20            You initially received resumes and

21   you screened the resumes.  What was the next

22   step?

**Kimberly L. Easlon**

1    process?

2    A.    Once I would do a phone interview, I

3    would decide out of those people which ones I

4    wanted to meet face-to-face.

5    Q.    What was the next step in the

6    process?

7    A.    Then I would figure out when I was

8    going to be in that town according to my flight

9    arrangements.  What times I had available.  I

10   would call and make appointments or schedule

11   appointments for the face-to-face interviews.

12   Q.    And what was the next step in the

13   process?

14   A.    Once I had completed the

15   face-to-face interviews, I would evaluate

16   everyone I had talked to and I would send my

17   candidate for the position to California to

18   interview with usually three other people.

19   Q.    So you would send your

20   recommendations to California?

21   A.    That's correct.

22   Q.    Okay.  And what would be the next

**Kimberly L. Easlon**

Page 46

1    step in the process?

2        A.    We would make flight arrangements

3    and schedule appointments for the rep or the

4    person, the candidate.   And we would give all

5    that information to them.   They would go out,

6    do the interviews.

7            And at the end of the day I would

8    call and we would do a conference call and

9    discuss what each person thought of that

10   candidate and if we were going to move forward

11   with offering a position to that candidate or

12   if we were going to continue looking.

13       Q.    And what was the next step in the

14   process?

15       A.    If we all agreed that the candidate

16   was someone we wanted to hire, I would call

17   that person and offer them the position.

18           If we did not agree that it was

19   someone that we wanted to hire, then I would

20   call the person and tell them that we were not

21   going to be offering them a position at this

22   time.

**Kimberly L. Easlon**

Page 48

1    take up 10 to 15 minutes.  And I ask them at

2    that time if they are still interested.

3        Q.    Can you tell me what you would

4    discuss in terms of the travel and what the

5    position entailed?  What would you tell them?

6        A.    Sure.  What I would say is we travel

7    75 percent of the time.  And what that means is

8    three weeks out, one week in.  Often we have to

9    leave on Sunday because we have to be in a

10   facility first thing Monday morning.

11           When we are doing an enrollment, we

12   will work Monday through Friday in a facility,

13   and then we will come home Friday evening.  In

14   many cases, we will be required then to leave

15   again Sunday to go complete the enrollment in

16   that facility of the next week.

17           There are other times where we will

18   be doing kickoff presentations where we are

19   getting a facility ready, or circle backs where

20   we are going to a facility that is already

21   enrolled.

22           So we may spend two days in one

**Kimberly L. Easlon**

1    May, but ten of them are in California so I

2    would have reps from different areas that would

3    have to travel to California because we are not

4    necessarily opening facilities within driving

5    distance.

6        Q.    So the PSRs who were employed or who

7    lived all over the country, they would be

8    required to travel to different states?

9        A.    Yes.  They are required to work

10   within their own state as far as beginning to

11   develop relationships and with the physicians,

12   with social workers, with the facility

13   administrators.  But then they would also be

14   required to go to other states and do the

15   actual enrollments.

16       Q.    So why was it necessary for you to

17   place a particular person or try to hire a

18   particular person in a particular state if the

19   PSR were going all over the place?

20       A.    Well, our long-term vision is that

21   we are going to have reps working within their

22   specific territories.  Once we finish the

**Kimberly L. Easlon**

Page 52

1    enrollments, they are going to be doing

2    additional work with physicians for pre ESRD

3    patients, that is patients that are not yet on

4    dialysis.

5            Currently we have the patients or

6    their PSRs working within their territories

7    developing relationships getting to know

8    everyone within their territory, yet they are

9    also doing enrollments in other states.

10    Q.    So for this telephone interview you

11   would take ten minutes or so explaining the

12   travel requirements?

13    A.    That's correct.

14    Q.    What else would you ask during the

15   telephone interview?

16    A.    Usually I would ask if there were

17   any red flags that I saw right off the bat.

18   Where there were lapses in employment.  Where

19   maybe they have jumped from one job to another

20   to another that looks like they don't have

21   stability, I would ask specific questions

22   regarding that.

**Kimberly L. Easlon**

Page 56

1      A.      That's correct.

2      Q.      Okay.  Did you work in Richmond,

3  Virginia?

4      A.      Kentucky.

5      Q.      Oh, Richmond, Kentucky?

6      A.      Yes.

7      Q.      Did you work in Richmond, Virginia

8  or did you have an office in Richmond,

9  Virginia?

10      A.      No.

11      Q.      Okay.  Did you schedule any

12  interviews in Richmond, Virginia?

13      A.      Yes.

14      Q.      And how did you come to schedule

15  interviews in Richmond, Virginia?

16      A.      At the time we were taking the areas

17  that had high concentration of patients, and we

18  were deciding okay, this is an area where we

19  want a rep.  We have since changed it to a much

20  more sophisticated methodology.

21              But at the time that was the way we

22  did it.  And I would get approval from Josh.

**Kimberly L. Easlon**

Page 57

1    Here is areas we are ready to hire a rep in, so

2    you need to post it.  Then you need to

3    interview people.

4         Q.    Did you have a facility or a

5    location in Richmond to interview folks?

6         A.    I interview out of hotels that I am

7    staying in.

8              MR. BRANCH:  Let's take a short

9    break and come back.

10             (A short recess was taken.)

11             BY MR. BRANCH:

12        Q.    Ms. Easlon, at some point did you

13   receive the resume of James Mason?

14        A.    Yes, I did.

15        Q.    And did you receive that from

16   Ms. DePillo?

17        A.    Yes.

18        Q.    What period of time was it that you

19   received his resume?

20        A.    It was early December.

21        Q.    Of what year?

22        A.    Of '05.

**Kimberly L. Easlon**

Page 58

1       Q.      Did you decide that you wanted to

2   conduct a telephone interview of Mr. Mason?

3       A.      Yes.

4       Q.      Why did you decide you wanted to

5   interview him on the telephone?

6       A.      Based on the things he had listed on

7   his resume, I was interested in asking him more

8   questions.

9       Q.      Did you make contact with Mr. Mason

10  at some point?

11      A.      Yes.

12      Q.      When did you first speak to

13  Mr. Mason?

14      A.      Are you asking me for a date?

15      Q.      Well, approximately when did you

16  first speak to Mr. Mason about the PSR

17  position?

18      A.      I am sure I called him around the

19  1st of December.

20      Q.      Did you call him for this initial

21  telephone interview?

22      A.      Yes.

**Kimberly L. Easlon**

Page 61

1    of those notes.  If we had talked about

2    arranging a face-to-face interview later, I

3    would have held onto his notes.

4        Q.    When did you toss your notes related

5    to Mr. Mason?

6        A.    That would be after I had filled the

7    position for Washington, D.C.

8        Q.    Why did you toss your notes related

9    to Mr. Mason after you filled the position for

10   Washington, D.C.?

11       A.    Because he was no longer a

12   candidate.

13       Q.    But your intention was to meet -- to

14   have a face-to-face interview with him,

15   correct?

16       A.    Not once I had filled the position,

17   no.

18       Q.    When did you decide that you would

19   no longer consider Mr. Mason for this position?

20       A.    When Mr. Jones accepted.

21       Q.    Just so I am clear, you had this

22   interview with Mr. Mason and you told him you

**Kimberly L. Easlon**

Page 64

1    Mr. Mason?

2       A.    I asked him to come to a meeting in

3    Richmond, Virginia.  I was going to be there

4    interviewing on a Monday.  I asked him if he

5    could come.  He said no.  That he had work.

6            And so I told him I was going on

7    vacation and I would call him after the first

8    of the year.

9       Q.    Now, you produced today your

10   calendar for the end of 2005 and 2006.

11           MS. VU:  I don't -- okay.  Well, the

12   document is the document.

13           MR. BRANCH:  Okay.

14           BY MR. BRANCH:

15      Q.    This is your calendar for the last

16   week of 2005 and 2006?

17      A.    Yes.

18      Q.    Let's just take a look at that

19   calendar for 2005, December of 2005.

20           Do you recall when you wanted to

21   meet with Mr. Mason in Richmond?  You said it

22   was a Monday?

**Kimberly L. Easlon**

Page 65

1       A.      The 12th.

2       Q.      When did you actually -- when did

3   you have your telephone interview with

4   Mr. Mason?

5       A.      I don't remember.  Prior to the

6   12th.

7       Q.      Was it a week prior or a few days

8   before?

9       A.      I don't remember.

10       Q.      When you interviewed Mr. Mason, did

11   you understand the responsibilities of the

12   patience care technician?

13       A.      Yes.

14       Q.      Did you understand that they worked

15   12-hour shifts?

16       A.      Yes.

17       Q.      Did you understand that it was a

18   very difficult thing to change your workday?

19       A.      No.

20       Q.      Okay.  And when you say you didn't

21   understand that, did you have any understanding

22   of whether it would be difficult to change your

**Kimberly L. Easlon**

Page 66

1    workday?

2        A.      I have had other Davita employees

3    that I have asked to come for interviews, and

4    they were able to rearrange their schedules.

5        Q.      Patient care technicians?

6        A.      Yes.

7        Q.      Okay.  Did you ask Mr. Mason why he

8    was not able to change his schedule?

9        A.      No.

10        Q.      Did he tell you there was a shortage

11    of workers in Washington and it would be

12    impossible to change his schedule?

13        A.      I don't remember this.

14        Q.      Okay.  So you asked Mr. Mason to

15    come to Richmond on December 12, and he told

16    you he was not able to do that because of his

17    work schedule; is that correct?

18        A.      Yes.

19        Q.      How many days were you in Richmond?

20        A.      One.

21        Q.      When was the next day you were in

22    Richmond?

**Kimberly L. Easlon**

Page 67

1      A.    I was not in Richmond again.

2      Q.    And after Mr. Mason told you he had

3    to work on Monday, did you take any other steps

4    to interview him in person?

5      A.    No.

6      Q.    And why not?

7      A.    It's my practice to interview people

8    during the day I'm going to be there.  I

9    interviewed Chris.  He did a very good job.  I

10   selected him as my candidate to move forward.

11     Q.    And you selected Chris without

12   meeting Mr. Mason in person, correct?

13     A.    Yes.

14     Q.    Why did you select Chris without

15   giving Mr. Mason an opportunity to meet with

16   you in person?

17     A.    It isn't my -- it wasn't my practice

18   to compare as many and talk to as many

19   different people as I could.  I was under a

20   specific time line to hire people as quickly as

21   possible.

22          I found a candidate that I thought

**Kimberly L. Easlon**

Page 68

1     was a good candidate, so I advanced him to the

2     next level.

3          Q.     But did you believe that was fair to

4     Mr. Mason to not allow him to even meet with

5     you in person for this position when you were

6     trying to hire someone for the position?

7          A.     To me I thought it was completely

8     fair.  You can't make the interview, it's not

9     my fault.

10          Q.     And you only gave him one day for

11     the interview?

12          A.     Yes, sir, because then I was moving

13     on to the next location to interview more

14     people.

15          Q.     And he provided a legitimate reason

16     why he could not interview on that day, because

17     he had to work and he had specific

18     responsibility for patients on that day?

19               MS. VU:  Objection.  Asked and

20     answered.

21               BY MR. BRANCH:

22          Q.     Did he provide a legitimate

**Kimberly L. Easlon**

Page 71

1    he filed the complaint?

2        A.    That's correct.

3        Q.    How did you learn Mr. Mason filed

4    the complaint?

5        A.    Josh Golomb told me there had been a

6    complaint filed.

7        Q.    And what did Josh Golomb tell you?

8        A.    He told me that Mr. Mason had filed

9    a complaint saying that he was not hired

10    because he was African American.

11        Q.    When did Josh Golomb tell you this?

12        A.    In January.

13        Q.    When was Mr. Jones offered the

14    position of PSR?

15        A.    In December.

16        Q.    Did he accept it?

17        A.    Yes.

18        Q.    Did you correspond with Mr. Mason

19    after Jones accepted the position?

20        A.    After Mr. Mason sent me an e-mail.

21        Q.    And why didn't you correspond with

22    Mr. Mason before he sent you an e-mail?

**Kimberly L. Easlon**

1       A.      I don't have a good reason for that.

2    I should have.

3               I hired Mr. Jones.  I went on

4    vacation.  As soon as I came back from

5    vacation, I was teaching a training class.

6               Honestly it slipped my mind.  I

7    should have let him know the position had been

8    filled earlier.  As soon as I received an

9    e-mail from him, I let him know that the

10   position had been filled.

11      Q.      When you spoke to Mr. Mason and he

12   told you that he could not come to Richmond for

13   the in-person interview, did you tell him that

14   you would set up an interview with him later?

15              MS. VU:  Asked and answered.

16   Objection.

17              THE WITNESS:  I believe what I told

18   him was we would talk at the first of the year.

19              BY MR. BRANCH:

20      Q.      That you would talk to Mr. Mason at

21   the first of the year?

22      A.      Sure.

**Kimberly L. Easlon**

Page 73

1    Q.    And what did you mean by that, you

2    would talk to him at the first of the year?

3    A.    I'm sure what I meant at the time is

4    we would look into this further.

5    Q.    When you said that we would talk at

6    the first of the year, did you mean that you

7    would conduct an in-person interview with him

8    at the first of the year?

9    A.    That was my intent.

10    Q.    You did not conduct an in-person

11    interview with Mr. Mason at any point, correct?

12    A.    That's correct.  The position had

13    been filled.

14    Q.    Were there other positions available

15    on the East Coast as of January 2006, other PSR

16    positions available on the East Coast as of

17    January 2006?

18    A.    I was only considering Mr. Mason for

19    the Washington, D.C. post.

20    Q.    But were there other positions,

21    other PSR positions available on the East Coast

22    in January of 2006?

**Kimberly L. Easlon**

Page 82

1    referred to California?

2        A.    Correct.

3        Q.    Have you interviewed any applicants

4    for the positions outside of the state where

5    they live?

6            MS. VU:  Objection.  Vague and

7    ambiguous.

8            THE WITNESS:  I have interviewed

9    people who are outside of the state for a

10   position outside of the state in which they

11   live.  However, they told me that they were

12   moving.

13           An example would be Jackie

14   Jellison who lived in Colorado, but was moving

15   to South Carolina and interviewed for the South

16   Carolina position.

17           BY MR. BRANCH:

18       Q.    Did you offer to Mr. Mason an

19   opportunity to interview for a position outside

20   of Washington, D.C.?

21       A.    No, I didn't.

22       Q.    And why not?

**Kimberly L. Easlon**

Page 83

1      A.      After I received Mr. Mason's e-mail,

2   it had many errors in it.  He was no longer a

3   candidate.

4      Q.      What errors did he have in his

5   e-mail?

6      A.      Spelling, punctuation.  Several

7   errors.

8      Q.      Which e-mail are you referring to?

9      A.      The one that he sent me in the first

10  of January telling me when he would be

11  available for interviews.

12     Q.      So you received this e-mail and you

13  believe at this point based on his e-mail, he

14  was no longer a candidate?

15     A.      Actually, he was no longer a

16  candidate once Chris was hired.  Chris accepted

17  the job.  But when Mr. Mason sent me the

18  e-mail, it solidified it.

19     Q.      Did you tell Mr. Mason that he was

20  no longer a candidate because you believe there

21  were errors in his e-mail?

22     A.      No, sir.  I told him he was no

**Kimberly L. Easlon**

Page 84

1    longer a candidate because the position had

2    been filled.

3        Q.    Did you tell anyone else that

4    Mr. Mason's e-mail had errors in it?

5        A.    When Josh Golomb was interviewing

6    Mr. Mason or decided to interview him, I sent

7    him the e-mail.

8        Q.    Why did you send Josh Golomb e-mail?

9        A.    Because I didn't feel Mr. Mason was

10   a qualified candidate.

11       Q.    And why was he not a qualified

12   candidate?

13       A.    Based on the fact that a large

14   portion of our work is administrative, I didn't

15   feel the e-mail was professional.

16       Q.    Was it not professional because it

17   was not formal enough or was there some other

18   issue?

19       A.    Because of all the misspellings.

20       Q.    You believe there were a number of

21   misspellings in the e-mail?

22       A.    Yes.

Kimberly L. Easlon

Page 100

1          I would also ask teammate-related

2   questions.  Have you ever had a situation where

3   there was a really difficult teammate to work

4   with?  What did you do?  How did you overcome

5   that?

6          I would ask them to give me some

7   brief information about how they would talk to

8   a patient about our service to see if they had

9   any innate selling skills.

10      Q.    Did you believe that Mr. Jones was a

11  better qualified applicant than Mr. Mason?

12      A.    I wasn't comparing Mr. Jones to

13  Mr. Mason.  I was strictly looking at each

14  person I was speaking to individually.

15      Q.    Were you comparing Mr. Jones to

16  anyone else?

17      A.    Only people that I was meeting

18  face-to-face for the Washington, D.C. slot.

19      Q.    Now, this position was pharmacy

20  services representative that you were

21  interviewing for?

22      A.    Yes.

**Kimberly L. Easlon**

Page 124

1    I would look for in interview.

2        Q.    Do you recall any of the answers

3    that Mr. Jones gave to the situational

4    questions that you posed?

5        A.    I don't recall the answers per se.

6    What I remember was my overall feeling about

7    how he had done during interview and how well

8    he had handled situational questions which was

9    that he was a very strong candidate.

10       Q.    Ms. Easlon, why is it important for

11   a PSR to know how to communicate with teammates

12   and physicians?

13       A.    We have come across situations --

14   you would assume that because this is something

15   that is -- by Davita that everyone would kind

16   of greet it with open arms.  But that's not the

17   case.

18            We have come across regional

19   operations directors who do not want us to

20   enroll patients within their facilities.  We

21   have come across physicians who have said I

22   don't want you to enroll any more of my

**Kimberly L. Easlon**

Page 125

1    patients within your program.  And so we come

2    across some very difficult situations.

3              There is resistance from teammates

4    who feel this is extra work for them, and they

5    want to know why don't we get paid more for

6    them.  So the PSR on a regular basis has to

7    handle difficult situations, not only with

8    patients who are maybe hard to work with, but

9    with teammates and with physicians as well.

10   Q.    You mentioned that there is a

11   perception that the Davita Rx program means

12   extra work for teammates.  What do you mean by

13   that?

14   A.    The -- as we are implementing this

15   program into the clinics, it's our job then to

16   train the teammates on how to keep this program

17   working.  Not only how to deliver the

18   medications, but how to enroll new patients

19   into the service.

20             And so there is more work for each

21   of the teammates.  And it's part of our job

22   then to train these teammates on how to do this

**Kimberly L. Easlon**

1  and incorporate it into their current position.

2      Q.    Do the teammates get any extra

3  compensation for any work that they do in

4  connection with the Davita Rx pharmacy service

5  program?

6      A.    No.

7      Q.    So how do you get these teammates to

8  do the extra work?

9      A.    That is where we need selling skills

10 because we have to convince the teammates that

11 this is good for them as well.  That not only

12 does it help improve the patients, but you have

13 to ask questions of the teammates to find out

14 what is most important to them.

15         Is it -- for most of our teammates,

16 what is important is that the patients do well

17 within the facility.  And so you would tell

18 them that with this service we are going to be

19 able to help the patients with their medication

20 management and it's going to improve their

21 quality of life.

22         But you also have to look at what is

**Kimberly L. Easlon**

Page 127

1    the bottom line for a teammate. It would be

2    their bonus at the end of the year. And by

3    improving medication management, it's going to

4    improve outcomes within the facility which

5    means it raises their DQI, which is what they

6    are evaluated on for bonus within their

7    facilities.

8              So there is that aspect as well.

9              MS. VU:  That's all I have.

10   FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

11             BY MR. BRANCH:

12       Q.    Ms. Easlon, would that be a selling

13   point for the teammates with respect to your

14   PSRs to say to the teammates, look, here is an

15   incentive for you to get on board with this

16   program. It would affect your bonus -- it

17   could affect your bonus at the end of the year?

18       A.    I would say that a more accurate way

19   to present it would be it's going to improve

20   outcomes. And they understand that it's

21   implied that if it improves outcomes, then it

22   may affect their bonus.