1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

- - - - - - - - - - - - - -x

JAMES MASON,                      :

    Plaintiff,              :    Civil Action No.

  vs.                           :    06-1319(RMC)

DAVITA INC.,                      :

    Defendant.              :

- - - - - - - - - - - - - -x


DEPOSITION OF JAMES L. MASON


Washington, DC

Wednesday, February 1, 2007


REPORTED BY:

    CARMEN SMITH

1  in any other sales activities?
2    A    Sales, no.  Not that I can think of right
3  now.
4    Q    Now, why did you not put your catering
5  activities on your resume?
6    A    I don't know.  Because -- well, I don't
7  know why I -- I didn't want to pile up my resume
8  with a bunch of stuff, because I've done a lot of
9  things just besides dialysis.  And the cater -- it
10 wasn't a requirement in the information that I read
11 in what I got from DaVita's RX program, that wasn't
12 a requirement.  Sales was not a requirement for that
13 position, so that's why I didn't think of putting it
14 in there.
15   Q    You interviewed with Kim Easlon and Josh
16 Golomb of DaVita RX; is that right?
17   A    Yes.
18   Q    In your communications, any
19 communications, with those two individuals, did you
20 talk to them about any other job experiences that
21 you had that were not on this resume?
22   A    No, they didn't ask.

1  each facility, and someone who has gone beyond their
2  job description, beyond their -- the regular jobs of
3  dialysis patient care tech.
4      And I also received a Shining Star award.
5  Q    What is the Shining Star award?
6  A    The Shining Star award is an award DaVita
7  developed where the patients vote on the most -- the
8  technician or nurse or whoever works at the facility
9  who they believe the most capable, most -- most
10 liked, stuff like that.
11 Q    I see. Now, when they're voting for this
12 Shining Star awardee, do they get to choose from
13 everybody in the facility or do they -- are there
14 categories, like you're the PCT who gets the Shining
15 Star award as opposed to like this is just the --
16 A    To the best of my knowledge, everyone in
17 the facility.
18 Q    So they only vote for one person?
19 A    Yes.
20 Q    Okay. And what year did you get that
21 Shining Star award?
22 A    In 2004, I think, and 2005 she told us it

marked as Exhibit Number 1, your fax to Rosalva DePillo over here. Is that the first time that you faxed your resume in to DaVita RX?

A    No.

Q    Okay. When was the first time that you faxed in your resume to DaVita RX? Or sent in your resume to DaVita RX?

A    I don't remember the exact date, but I -- it was the end of the year, of course, maybe November. I don't remember the exact date. Because when I sent it in, they -- and then I didn't hear a reply, I called and they said that they hadn't received it. So I sent it again, waited a while. I called, and they hadn't received it.

And then finally I sent it in, I think, a third time, and then I got a response, an e-mail saying that she received my resume.

Q    Okay. So is it your testimony that you submitted your resume to DaVita RX twice before you submitted your resume on November 30, 2005?

A    Yes, two or three times. I didn't -- one time I sent it from outside of the facility, because

mischaracterizes what's stated in the e-mail.

        BY MS. VU:

    Q    And shoboat222000@yahoo.com is your personal e-mail address?

    A    Yes.

    Q    Did you have any other communications with Ms. DePillo at any time?

    A    I don't know. Maybe by phone, when I called. I don't remember if it was her I spoke to, asking did you receive my resume. I don't know. It may have been her. I believe I spoke to her on the phone, you know, before this call to ask that they receive it. It was probably her too.

    Q    After receiving this e-mail from Ms. DePillo, what was the next communication that you had with somebody from DaVita RX about the PSR position?

    A    As far as my memory, it was Kim Easlon called me.

    Q    Now, before you had a call with Ms. Easlon, I take it that you had not communicated your race to anyone at DaVita RX; correct?

A   No, I didn't have to.

Q   What do you mean you didn't have to?

A   No, I mean, that's in files and they have a copy of my driver's license on file.

Q   All right.

MR. BRANCH: And I wanted to object. You mean in relation to this application or at any time?

BY MS. VU:

Q   That's a really good point. In connection with your application.

A   No.

MS. VU: I think we might go ahead and take our lunch break, because I'm going to get into the whole Easlon and Josh Golomb discussion. We can continue. That's fine.

BY MS. VU:

Q   So you said that you had -- your next communication regarding the PSR position was with Ms. Easlon; correct?

A   Yes, I believe that was.

Q   Why don't you tell me about that communication.

1  A    She called me at work, at the facility.  I
2 was on the floor working.  And I got the message
3 that she wanted to speak with me.  So I got on -- I
4 got on the telephone and she asked me was I busy,
5 would you be able to talk to me.
6       And I said I needed to go on break,
7 because I was on the floor.  So I went on break and
8 had someone take my place while she spoke to me in
9 the back.
10 Q   How long was your conversation with
11 Ms. Easlon?
12 A   I don't remember how many minutes exactly,
13 maybe between 10, 15, five.  I don't know exactly.
14 Q   It was less than 15 minutes?
15 A   Yes.
16 Q   Okay.  And did you say anything about your
17 race in this conversation?
18 A   No.
19 Q   Okay.  What did you talk about with
20 Ms. Easlon?
21 A   She asked me background, where I'm from,
22 where I live, the Washington area.  She told me a

RX program.

Q    Forgive me if I've already asked you this. Did you tell her your race at any time during the interview?

A    No.

Q    Now, what happened at -- how did this interview end?

A    She told me that -- she asked me if I could, I believe, meet with her on one of the days that I was working, and I told her we were short and I couldn't meet her on that particular day. It was like the day she interviewed me, she said could you come in tomorrow, I believe, she said tomorrow. And I said I'm working tomorrow. It was either tomorrow or the day after, I don't know. And I told her I was working.

And she said well, I'll be back in the area soon and what I'll do is when I come back, you can come in to Richmond, I believe, or wherever she would be. She said I could travel there, and she asked me would I mind traveling to meet her. And I said no, that's not a problem.

        So she -- that's where it ended that she would get back in contact with me for an in-person interview.

    Q    So when she offered to meet you in person, where did she want to meet you?

    A    It wasn't -- it wasn't finalized then.

    Q    No, but I mean like when she said can you meet me tomorrow or the next day.

    A    I believe it was in Richmond, Virginia, which is like three, four hours away maybe.

    Q    Okay.  So she offered to meet you in Richmond?

    A    Yes.

    Q    And you couldn't meet her in Richmond because of your work schedule?

    A    Yes.  It was too short of notice.

    Q    Right.  And then she said that she would contact you for another face-to-face -- for a face-to-face meeting at some point in Richmond?

    A    Yes.  Well, not necessarily in Richmond. She said she would be back here, you know.  I guess she travels, I don't know.  A lot.  And she said she

would be in this area, back in this area. She didn't say when, but she said she would set up an in-person interview with me.

Q   Okay. Now, I think that in your --

A   I think -- yeah.

Q   I think that in either your complaint or your interrogatory responses, you had stated that Ms. Easlon had said she would get back to you after the end -- in the new year?

A   Yes, she said -- they did say she was going on vacation for the holidays, and that she would be back, back in this area.

Q   Okay. Was that everything that you discussed on that call that you can remember now?

A   That she would meet with me -- what I remember is that it was January that I was supposed to have a meeting with her or, you know, schedule something or speak back with her over the phone. And that's -- yeah, that's the only conversation that we had about that.

Q   Okay. And when was the next time that you had any communication with anyone at DaVita RX about

your application?

A    I just -- I gave her a call the first week of January.  I had either her number or Ms. DePillo's number, I don't remember which, and I called and got an answering machine and, you know, left a message on the answering machine, don't remember exactly what I said.

But then after that I received the e-mail from her, Ms. DePillo -- I mean Kim Easlon.

MS. VU:  Let's stop here, because there's an exhibit I want to use, and it's been miscopied.  So let's take our lunch break and we can start with the e-mail.

(Whereupon, at 12:52 p.m., the deposition was recessed, to be reconvened at 1:20 p.m. this same day.)

from her saying that the position in your area had been filled and you then learned that there were other positions elsewhere that hadn't been filled, did you try to talk with Ms. Easlon and tell her that --

   A   No.

   Q   -- you were interested in the other areas?

   A   No.

   Q   So after looking and determining that there were other PSR positions available elsewhere, did you take any further action with regard to your application?

   A   With regards to my application?  I considered -- well, I did actually, I filed a complaint with DaVita's complaint office.

   Q   Now, our record -- DaVita's records say that you filed this complaint on January 27, 2006.  Does that sound right to you?

   A   Yes.

   Q   Why did you file the complaint?

   A   Because I kept a watch on the Web site, and more openings were put on the Web site, and some

interview?

    A    He did.  He suggested a time.

    Q    What time did you set?

    A    He suggested a time of 8:00.  He said 8:00 a.m.  I don't remember the day.  I don't remember if it was the next day or a couple days later, but he said 8:00 a.m.

    Q    Okay.  And when was the next time you communicated with Mr. Golomb?

    A    The date that he told me, specified, that was when we spoke over the phone and had the phone interview.

    Q    Now, who was supposed to initiate the call?

    A    He was going to call me.

    Q    In your interrogatory response, you referenced some confusion about the time of the interview?

    A    Yes.  Mr. Golomb said -- he just said 8:00, so I assumed -- you know, I tried to recalculate in, thinking 8:00 my time, because I go jogging early in the morning.  So I didn't realize

that I think he woke up at 5:00 a.m., I guess, to call me at 8:00 a.m., or something. It was a mix-up in the time zone timing. And I was thinking 8:00 a.m. his time would be about 11:00 here. So I was out jogging in the morning, and when I got back, there was a message. And then I called him back and explained to him, you know, oh, I thought you meant 8:00 a.m. your time, about 11:00 here our time.

So he apologized and said, you know, he was sorry that he didn't make it clear, you know, or tell me that he was going to actually be 8:00 his time but -- I mean 8:00 my time here that he would call, 8:00 a.m. my time here. And he said that wasn't a problem, and, you know, we went on with the interview.

Q    Now, why did you assume that when he said 8:00 a.m. without specifying East Coast or West Coast, that it was going to be West Coast?

A    Because I live on the East Coast. I was thinking my time. I didn't even really think about it. When he said that, I converted the time, thinking 8:00 a.m. there would be 11:00 here. And

he said it wasn't a big deal, so I forgot about it after that.

    Q    Okay. So you did wind up speaking to him on the appointed day?

    A    Yeah, we went ahead and had -- he went ahead and interviewed me after I called him back.

    Q    Okay. When was that?

    A    I don't remember the date.

    Q    Well --

    A    The date that he -- the date that we had set up for the interview, that's when we went ahead and had the interview.

    Q    I mean relative to the time that at least in Mr. Golomb's mind you were supposed to speak, how much of a delay was there?

    A    When I got back in the house, I saw the message, and that's when I called him back. I don't know what time it was. I was out jogging and I don't carry a watch. So when I got back, I saw the message and I called him immediately.

    Q    Okay. Tell me about your interview with Mr. Golomb. What did you all talk about?

1  people in the medical field, being bombarded with
2  people coming, teaching us programs from everywhere,
3  how would I handle that.
4      And I told him that, you know, that this
5  is the DaVita program, and part of the DaVita
6  program is any time that DaVita has a success, it's
7  a success for us.  And sometimes we get profit
8  sharing, and that would help to improve on the
9  profit sharing if this program was successful, and
10  that, you know, it's not just because a lot of
11  people really don't want to hear anything that you
12  have to say from pharmaceutical representatives or
13  anyone, when you have a heavy workload.
14      And I told him that's what I would
15  reassure them, that you're working for a goal, a
16  certain goal.  With the patients.  He asked me the
17  same thing, how would I deal with the patient, who,
18  maybe a senior, who didn't want to switch over
19  because they're used to a pharmacy that they have
20  been dealing with for years.
21      And I told him, you know, that most
22  patients that I'm aware of in dialysis have to use

more than one pharmacy anyhow, because dialysis patients have specific types of medication that the general public don't take. And they have to go to different pharmacies. So I told him that, you know, I would let them know that it's us that would be coming directly from DaVita, we're the ones who are taking care of them, and we're the ones who -- it would be easier for us to monitor which medications clash, which medications they needed, and explaining to them whatever DaVita taught, plus what they taught me about the RX program, to help the patient decide on choosing a program.

    Q    Did Mr. Golomb ask you any scenario questions that pertained to dealing with doctors?

    A    He asked -- he told me that I would need a relationship with the doctors, close relationship with the physicians. And I told him that's not a problem. If you're a nurse or technician in dialysis, that's the first thing that doctors do every week when they make rounds, is they talk to us, to the nurse or dialysis technicians. We are the ones they come to for information, so we have to

have a relationship with the physicians.  And I told him that he can speak with any physician that I have ever worked with, Dr. Wilcox, who is the medical director of our facility, Dr. Yotch, and others, anyone, pick anyone, I told him that he can speak with them and find out what kind of a relationship I have with them and how they know me on a personal basis -- personal relationship.

Q    Did he ask you how you would get the doctors on board with the program to like promote the RX program?

A    I don't remember if he asked me that specifically.  What I remember is that he told me -- you know, he let me talk about my relationship with the physicians and how I would have to -- I think he stressed how we would have to have a relationship with the doctors.  And I told him because of my medical background and I know the terminology, that that's not a problem.  You know, that's my personality.  I've never had any conflicts, I've never been written up for anything in DaVita or any other facility.  I've never been fired, never --

fly me to California to meet with the team and see what they thought, and that would be the final thing.

Q   Have you described to me everything that you talked about on this call with Mr. Golomb?

A   I may have forgotten something. I don't know.

Q   Okay. And when was the next time you communicated with someone at DaVita or DaVita RX about your PSR application?

A   Mr. Golomb called me back and we had a conversation, and he told me that he spoke to a lot of people about me and, you know, heard that I was a nice person, good employee, hard-working person, and that I had just missed the cut, I almost made the team, you know, and that they would keep me -- he would keep me in mind in the future if something came up in the future.

Q   Do you think that Mr. Golomb didn't give you the job because you're black, or African-American?

A   Yes.