**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| JAMES MASON | ) | |
| | ) | |
| Plaintiff, | ) | **Civil Action No.:06-1319 (RMC)** |
| | ) | |
| v. | ) | |
| | ) | |
| DAVITA INC. | ) | |
| | ) | |
| | ) | **Jury Trial Demand** |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO FOR SUMMARY JUDGMENT**

Comes now Plaintiff James Mason, by and through counsel, and files Plaintiff's Opposition to Defendant's Motion for Summary Judgment, and in support thereof states as follows.

**Introduction**

Plaintiff James Mason has filed a complaint alleging discrimination under the District of Columbia Human Rights Act arising from the failure of Defendant DaVita to advance his application to an in person interview after he successfully completed a telephone interview and failure to select him for a position as a pharmacy services representative (PSR).  The Defendant has filed a motion for summary judgment arguing that it is entitled to summary judgment because no reasonable jury could conclude that Mr. Mason's non-selection for a PSR position in January and March 2006 was because of his race.  Defendant has not argued that the court should grant summary judgment on his claim that he was discriminated against when DaVita denied him an in-person interview

1

after he advanced beyond the telephone interview.  In a recent decision of the D.C. Circuit Court of Appeals, Salazar v. WMATA, 401 F.3d 504 (D.C. Cir. 2005), the Court made it clear that an employer must provide a "fairly administered selection process" in making hiring decisions.  Here, Mr. Mason interviewed at the same time as a Caucasian employee and both advanced to in-person interviews.  Defendant interviewed in-person the Caucasian employee because he was given time off to attend the interview but failed to interview Mr. Mason because he was employed in a critical patient care position and could not attend an in- person interview on the day it was scheduled.  The Caucasian employee was thereafter advanced to an in-person interview in California and offered the position and Mr. Mason was told he would be contacted for an in-person interview within a few weeks, and Defendant never contacted him.  This was not a fairly administered selection process, when positions were being filled in D.C., Maryland, Virginia and Pennsylvania.

After Mr. Mason filed an internal EEO complaint against, the initial interviewer, Ms. Easlon, she was permitted to involve herself in a selection process which was intended to exclude her and state to the second interviewer, Mr. Golomb, that she would not hire Mr. Mason for any position in her territory.  Her involvement and input influenced the decision not to advance Mr. Mason's application.  These facts are factually and legally similar to the Salazaar case where the Circuit Court of Appeals found that there was an issue which needed to be presented to the jury when the alleged discriminating official was permitted to involve himself in a selection process which was intended to exclude him.  Defendant's motion for summary judgment should be denied.

2

**Background**

1.      Mr. Mason, an African American male, is an eleven year employee of Davita in

Washington, D.C., where he has worked for a number of dialysis centers as a Patient

Care Therapist (PCT).  He normally works 12 to 15 hours shifts three days a week.  Mr.

Mason spends almost all of his time providing treatment to patients, attending to their

needs, and  performing dialysis training and patient education.  Throughout his

employment with Davita, Mr. Mason has been an excellent employee, and has received

the highest award at DaVita, the Shining Star, for being the overall best patient care

therapist.

2.      In September/October 2005, Davita Rx/Star Rx, a subsidiary of DaVita,

announced that it was seeking to hire individuals for pharmacy services representative

(PSR) positions to sell medication to dialysis patients of Davita.  Davita specifically

sought individuals who were working for Davita as patient care technicians.  The

individuals selected would have to be available for reassignment anywhere in the United

States.   A company document announcing the position stated:  "Do you know of an

outstanding PCT [Patient Care Technician] within your area that would love a new and

exciting career development opportunity within DaVita?  We have positions available for

Pharmacy Services Representative across the country!  .  .  . S/he also needs to be willing

to travel extensively, as the Star Rx roll-out process requires being on-site in dialysis

facilities.  Our current PSR's travel 75% of the time."  Ex. A.

3.      Earlier in March 2005, Kim Easlon wrote to Laura Mildenberger and stated:  "I

am hiring new pharmacy service representatives for Star Rx.  We were looking at

Pharmacy Techs for the position, but my gut tells me that PCTs from within the company

would do a great job.  They know dialysis, then know how to approach the patients, they know about problems patients have with their prescriptions and pharmacies."  Ex. C:827. Eighty percent of the PSR job was sitting chairside with patients.  The position also required the PSR to interact with doctors and facility administrators, and staff members. The pharmacy services representative position had income potential of almost twice Mr. Mason's approximate $35,000 per year income.

4.      Mr. Mason worked at a facility with Christopher Jones, a Caucasian male, who was the office administrative assistant.  Jones was given a position announcement for the PSR position by the facility administrator, Gerri McGowen, a Caucasian female, and Jones gave the position announcement to the other staff members who were mostly minorities.  Jones had no experience as a patient care technician in dialysis treatment or education.  His "sales" experience was limited to working in the men's department of a department store for a few months over the holidays, working as a clerk in a coffee show, and filling in as needed to show residences to prospective residents and families at an assisted care facility when the marketing people were not available.

5.      At least three other minorities from Washington, D.C. applied for the PSR positions, including two other PCT's and an administrative assistant, and none were offered an interview other than Mr. Mason.

6.      There was no written policy at DaVita Rx on how individuals were to be screened for positions.  The practice which was followed was that after an application was received, Kim Easlon conducted an initial screening and selected some individuals for a telephone interview, and that went well, for an in-person interview with the regional manager, and a final in-person interview in California with a panel.

7.      Mr. Mason was selected for a telephone interview by Kim Easlon. Mr. Mason was called at work while he was on the floor attending to patients.  Easlon requested that he conduct the telephone interview immediately, even though her normal practice was to call and schedule telephone interviews later.  He reluctantly agreed to the telephone interview and had to leave his patients to conduct the interview.  At the conclusion of the telephone interview, Easlon requested that Mr. Mason come to Richmond in a few days for an in person interview.   Mr. Mason could not travel to Richmond on the day requested because he was scheduled to work a fifteen hour shift.  He was assured that this was not an issue and he would be rescheduled for an in person interview the first week of January 2006.  Mr. Mason was not concerned about rescheduling the interview because he knew that DaVita Rx was attempting to fill several positions around the country.  Had he been informed that he would be excluded from positions in the future, he would have made the extraordinary request to take off work to go to Richmond for the in-person interview.

8.       Jones traveled to Richmond for his in-person interview and was offered an in-person interview in California, and later hired as a PSR.  Mr. Jones was previously employed as an administrative assistant making $11/hour, but after his selection into the PCT position, he was paid $45,000 year and eligible for a bonus equal to 40% of his salary.  Ex. C:64-65.  Since being hired, Mr. Jones has also been given additional duties as a trainer.  Ex. C:71-72.   Mr. Mason never received a call from Easlon to reschedule, and had to email her to follow up on the selection process.

9.      Easlon did not contact Mr. Mason to schedule an in person interview the first week of January as she had previously agreed to do.  On January 6, 2006, Mr. Mason

received an email indicating the position he sought had been filled and he had not been selected.  DaVita Rx continued to advertise for position openings in Maryland, Philadelphia, Pennsylvania, and St. Louis, Missouri.  Mr. Mason reported this information to his Caucasian co-worker, Jones, who had applied for a position at the same time as Mr. Mason.  Jones  was surprised to hear that the positions were filled because he knew that the individuals selected for the positions could not designate their geographical area and DaVita was still looking to fill positions on the East coast.

10.    Mr. Mason filed an internal complaint with Davita alleging discrimination based on race in the hiring process.  An individual in the Davita human resources department interviewed Mr. Mason.  During the interview, Mr. Mason asked the human resources staff member if she could determine his ethnic origin based on his voice and his manner of speaking, and she said she could easily identify him as African American.  The human resources employee discouraged Mr. Mason from pursuing a claim and suggested that Easlon may have assumed that Mr. Mason was not an employee of Davita. Mr. Mason rejected this excuse and decided to proceed with his internal EEO complaint.

11.    Mr. Mason was later contacted by Easlon's supervisor,  Joshua Golomb, after Golomb was notified of the EEO complaint against Easlon.  Before speaking to Easlon about her activities, Golomb concluded that Easlon had not discriminated against Mr. Mason.  Ex. E: 1464.

12.    Golomb informed Easlon of Mr. Mason's complaint and Easlon informed Golomb.  Before Mr. Mason's second interview, Golomb solicited Easlon's opinion of Mr. Mason.  153 Golomb.  According the Golomb, Easlon's impression of Mr. Mason was that he was not as strong a candidate as other candidates.  Ex. B

6

13.     Golomb informed Mr. Mason that Davita was not pleased with Easlon's hiring practices and offered to interview Mr. Mason once again.  Mr. Mason agreed to the second interview to give Davita an opportunity to correct a wrong.

14.     Even though applicants normally only had one telephone interview before an in person interview, Mr. Mason was required to participate in a second telephone interview before an in-person interview, even though he had previously advanced beyond the telephone interview.  During the interview Golomb told Mr. Mason that he performed well, was creative in his responses and knowledgeable.

15.     After the second telephone interview, once again, Mr. Mason was denied an in-person interview.  Golomb informed Mr. Mason that he barely missed the cut off for selectees.  On March 17, 2006, Golomb wrote an email explaining why he did not advance Mr. Mason in the interview process.  Golomb stated:  First, as per my discussion with Gail, I personally phone interviewed both James Mason and the other candidate James identified in his call.   James is solid overall.  Jeff was mediocre.  However, neither of them were as strong as other candidates we have been interviewing in terms of the following key areas:

> *   Understanding and experience of sales
>
> •   Sales effectiveness (in role plays I did with them via phone)
>
> •   Thoughtfulness about approach for working with Physicians
>
> *   Flexibility (both voiced some concerns about travel)

16.     At no point during or after the interview  did Golomb inform Mr. Mason that there was an issue with his understanding of sales or experience or sales effectiveness, and Mr. Mason never expressed any concerns about travel.

17.     Mr. Mason communicated with other minority employees at Davita from Washington, D.C., including an African American and an individual of Philipino descent who applied for PSR positions.  Neither was hired or even interviewed by Easlon.  The Philipino employee was interviewed by Golomb but received a telephone message Golomb with the same language he used in rejecting Mr. Mason for the position.

18.     Prior to rejecting Mr. Mason as an applicant and selecting Jones, Davita specifically sought individuals with Mr. Mason's background, and Golomb specifically rejected an applicant because he had too much sales experience because he believed that "80%" of the job was related to sitting chair side with the patient to convince the patient to allow Davita to provide their non dialysis medications.  Ex. A 1475

19.     Easlon indicated that she did not consider Mr. Mason for a PSR position because he sent an email with grammatical errors.  Both Kim Easlon and Joshua Golomb have sent emails with grammatical and typographical errors.

Easlon sent the following email to Alex Dellon.

"He!y [sic] Alex:
 How is it going?  I hope you/re loving your new job.  I have decided that PCTs' [sic] within the company might be great as PSRs.  It would be a great promotion for them, [sic] they know dialysis, and they know how to deal with out patients.
I was wondering if you knew of anyone one [sic] that might fit within the parameters [sic] of what I am looking for: [sic]
I need someone who is very outgoing and positive, someone who is very organized and can manage themselves, plus, of course, they need to be willing to travel A LOT!  We are currently asking our PSRs to travel three weeks out and one in.  They will be home every weekend.  After about a year and a half, they will settle into territories where the travel will be reduced substantially.

8

What do you think? Do you know of anyone who fits this mold? I know everyone knows down there, but you still need to keep this quiet. Bill has told me that I can contact Linda Lansing and Helen Como. What do you think about them? Trust their judgement [sic]?"

Ex. E:825

Josh Golomb sent the following email.

"I wil[sic] mark it down [sic]

Let me know if there are any specific thigns [sic] you would like me to prove . . . if not, I'll give my standard barrage of questions." Ex. E 832.

### **Defendant's Statement of Material Facts to Which it contends there is no Genuine Dispute**

Plaintiff submits that Defendant's Statement of Material Facts which it contends are not in dispute omits many relevant facts in the record, and there are disputed facts which remain for trial. Only the disputed facts are listed below

3    Dispute. Mr. Golomb's father is Eastern European, from the Poland/ Hungary area. Ex. B:7.

9-12 Dispute. DaVita/Star Rx specifically sought dialysis patient care technicians for the Pharmacy Care Representatives positions and indicated the position was the perfect opportunity for PCTs. Ex. E 827. Golomb indicated that 80 of the PCT job was sitting chairside with dialysis patients. Ex. E 1475.

15-18 Dispute. DaVita/Star Rx specifically sought dialysis patient care technicians for the Pharmacy Care Representatives positions and indicated the position was the perfect opportunity for PCTs. Ex. E 827. Golomb indicated that 80 of the PCT job was sitting chairside with dialysis patients. Ex. E: 1475.

9

19 Dispute.  Christopher Jones was responsible for the territory of Virginia Beach, Southern Virginia, North Carolina and Tampa, Florida.

20 Dispute.  DaVita had no written policy on how hiring was to be done.  Easlon had no experience in hiring or training pharmacy representatives at Davita. Ex. C:19.  She did not receive any training in hiring pharmacy representatives at DaVita when she was hired. Ex. C:20.  DaVita Rx initially looked for people with dialysis experience as PCTs. Ex. E:827.  Easlon believed that Mr. Mason was a good candidate based on the answers at his interview.  Ex. C:59:7-10.

21 Dispute.  Easlon was hired on the same day as Ms. Evans.  Ex. C:33:16-21.

24 Dispute.   Dr. Erath's findings are of no consequence because he concluded that: "I have been asked by counsel for DaVita, Inc. to review available statistical evidence pertinent to the claims of race discrimination in the hiring process for DaVita Rx Pharmacy Services Representative ("PSRs") raised by James Mason.  . . . The most direct way of performing such an analysis would be to collect data on all those who applied for DaVita RX PSR positions and compare the proportion of persons hired whose race is identified as Black to their proportion among applicants.  However, I have been advised that race data exist only on those hired into the DaVita Rx PSR position at DaVita, making such a comparison impossible."

26 Dispute.  DaVita Rx was attempting to fill positions in Washington, DC, Virginia and Maryland in the fall of 2005.

28 Dispute.  The Shining Star Award is given by DaVita for the PCT who provides the best patient care.

10

29 Dispute. Mr. Mason was never asked by anyone at DaVita if he had sales experience.

32 and 33 Dispute. Although Easlon believed that Mr. Mason worked in a critical care position and had a legitimate reason for not being able to met with her on short notice for an out of town in-person interview, Easlon's position was "You can't make the interview, it's not my fault." Ex. C:68:7-9. Easlon promised to schedule Mr. Mason for an in person interview but did not return to Richmond, Ex. C:66-67, and made no other effort to interview him in person.

36 Dispute. Jones never discussed where he would work and did not know of his work assignment until he reported to work. Jones is now assigned Virginia Beach, Southern Virginia, North Carolina and Tampa, Florida.

38 and 39 Dispute. Jones was not minimally qualified for the position.

40 Dispute. Golomb had no notes from his interview questions of Jones and having interviewed hundreds of individuals, it is unlikely that he specifically remembered how Jones and Mason answered interview questions.

41 and 42 Dispute. Easlon has sent emails with typographical errors. Ex. E:825. The PSR job was 80% chairside.

48 and 49 Dispute. Mr. Mason understood from his application that he was not applying for a specific location and he could be placed anywhere around the country and no one told him otherwise. In March 2006, there were positions in Maryland and Philadelphia.

50 Dispute. Golomb had no intention of advancing Mr. Mason to the final round of interviews because Mr. Mason had already advanced to an in-person interview and

DaVita would not provide one to him, and Easlon had already told Golomb she would

not consider Mr. Mason for any position.  If hired, there was nothing to prevent

Golomb from placing Mr. Mason in Washington, D.C.   The Washington, D.C.

position was vacated by Jones in December 2006.

 52 Dispute.  Mr. Mason and Golomb agreed the interview would be at 8:00 am.

Golomb did not state that the interview would take place at 8:00 am Eastern Standard

time, which would have been before the 9:00 a.m. regular start of the work day.

53 Dispute.  Golomb did not state to Mr. Mason that he was not pleased with the

miscommunication on the start time of the interview and did not state that being

timely and attention to detail was important.  Golomb apologized for the

misunderstanding.

57 Dispute. Golomb conducted the interview on his cell phone from a Dunkin Donuts

parking lot in Florida.

59 Dispute.  Sales experience was not a requirement for the position.  Golomb

commented to Mr. Mason that his sales approach was creative.  Mr. Mason had

worked directly with doctors for many years and was well respected for his

performance.  Mr. Mason did not express any concern about travel.

60-62 Dispute.   Easlon confirmed that an effective way to promote the program to

teammates was to get them to see that there might be a financial incentive for their

participation and this is exactly what Mr. Mason stated.    Golomb has no records of

what Mr. Mason's responses were to the questions.  The questions asked of Mr.

Mason at the initial telephone interview were generally asked of applicants at the in-

person interview in California, and not of applicants who were being screened for an

in-person interview

63 Dispute.  Mr. Mason indicated that he was willing to travel.


## ARGUMENT

### A.      Employment Discrimination–Disparate Treatment

Mr. Mason's claim is that he was individually discriminated against by the

Defendant on the basis of his race.  His claim is one of disparate treatment.[1]

A disparate treatment claim is analyzed under the three-stage framework set forth

in McDonnell-Douglas Corp. v. Green.[2]  "Under the McDonnell-Douglas framework,

the complainant must first establish a prima facie case of prohibited discrimination.  Once

he has done so, the burden then shifts to the employer to articulate legitimate,

nondiscriminatory reasons for the challenged employment decisions.  Should the

employer succeed in presenting such reasons, the burden then shifts back to the

complainant, who then has an opportunity to discredit the employer's explanation."[3]

---

[1]Most claims of racial discrimination may be classified as either claims of disparate treatment (i.e., a claim that a person was treated adversely because of his membership in a protected class) or disparate impact (i.e., a claim that an employer's use of a race-neutral rule has a disproportionately negative impact on members of a protected class).  The legal standard and burdens of proof for a disparate treatment claim under Title VII are articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, S.Ct. 1817, 36 L.Ed.2d 668 (1973).  For a disparate treatment claim, see Griggs v. Duke Power Co., 401 U.S. 424 (1971).

[2]411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

[3]Aka v. Washington Hosp. Center, 156 F.3d 1284, 1288 (D.C.Cir. 1998) (internal citations omitted).  The rationale for this three-part back-and-forth analysis is that once the plaintiff establishes a prima facie case of discrimination, the presumption arises that

Throughout this analysis, the burden of proof never shifts to the employer, but always remains with the employee.4

Thus, in this matter, Mr. Mason has the initial burden to make out a prima facie case that the Defendant discriminated against him on the basis of his race.  Once he has done so, the burden of production–but not of persuasion–shifts to the Defendant, and the Defendant must articulate a legitimate, nondiscriminatory reason for the adverse actions it took against Mr. Mason.  If the Defendant does so, Mr. Mason must then make a showing that the reasons articulate by the Defendant are not the true reasons, but are rather a pretext.

---

the defendant's adverse employment actions against the plaintiff were caused by illegal discrimination, which "compels the employer to 'produc[e] evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'"  If the defendant does articulate such a legitimate, nondiscriminatory reason for the adverse employment actions, "'the presumption [of discrimination] raised by the prima facie case is rebutted' and 'drops from the case.'"  Id. at 1289, quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

After the defendant-employer has articulated legitimate, nondiscriminatory reasons for its adverse employment actions, "the plaintiff has 'the full and fair opportunity to demonstrate, through presentation of his own case and through cross-examination of the defendant's witnesses, that the proffered reason was not the true reason for the employment decision, and that race [or some other discriminatory basis] was."  Aka v. Washington Hosp. Center, 156 F.3d 1284, 1289 (D.C.Cir. 1998), quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), quoting Texas Department of Community Afairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

4Aka v. Washington Hosp. Center, 156 F.3d 1284, 1288-89 (D.C.Cir. 1998) (citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 102 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The Supreme Court has held that the plaintiff may make a prima facie case of non-promotion by showing:   (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas Corp. v. Green,* *411 U.S. 792*, 802, 93 S.Ct. 817, 1824, 36 L.Ed.2d 668 (1973). These criteria are "flexible," and must be adjusted to the facts of the case at hand. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. "The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected *under circumstances which give rise to an inference of discrimination.*" *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094 (emphasis added). This standard is "not onerous"; it serves only to "eliminate[] the most common nondiscriminatory reasons for the plaintiff's rejection," thus justifying a requirement that the employer come forward with an explanation. *Id.* at 253-54, 101 S.Ct. at 1093-94. Thus, in an ordinary discrimination case, in which the plaintiff is a member of a minority group, an "inference of discrimination" arises when the employer simply passes over the plaintiff for a promotion to a position for which he is qualified. *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. at 1824.

The standard for reviewing a motion for summary judgment requires the court to view the evidence in the light most favorable to the non-moving party.  To decide a motion for summary judgment in an employment discrimination case, "assuming ... that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus ... will be on whether the jury could infer discrimination from the combination

of (1) the plaintiff's <u>prima facie</u> case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation of its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)."5

### B. The Court has Jurisdiction over All Acts of Discrimination Alleged by Mr. Mason.

Defendant first claims that the court does not have jurisdiction over certain allegations in the complaint because the positions that Mr. Mason interviewed for in March 2006 were not located in Washington, D.C.   Defendant seems to be arguing that the court has jurisdiction over a claim if a D.C. resident is denied a position in the District of Columbia, but if the employer decides to re-interview the employee for an unspecified position at an undetermined location somewhere in the U.S. and denies the employee a position again, the court does not have jurisdiction.  This claim is illogical.  That is especially so here, where Defendant claims Mr. Mason was being considered for an unspecified position in the United States following his non-selection in D.C.  Following Defendant's logic, Mr. Mason could not bring his claim in any jurisdiction because it is not clear what state law would apply.

In fact, the undisputed evidence is that PSR applicants were informed that they had to be willing to travel and could not specify where they would work.  According to

---

5<u>Aka v. Washington Hosp. Center</u>, 156 F.3d 1284, 1289 (D.C.Cir. 1998).

Mr. Mason, he did not request a specific work location and submitted his application with knowledge that he may have to relocate if he was selected for the position.  Further, at the time of Mr. Mason's interview with DaVita, there was no DaVita policy which limited applicants to areas where they resided.  In an email dated March 12, 2006, Rachel Burgoyne recommended a patient services representative candidate for a position in Los Angelos to Josh Golomb after meeting with three candidates.  Golomb responded by inquiring if the one of the other candidates was strong, and indicated that a candidate was open to moving, a conversation should be held on considering the candidate.  Ex. E:1468.

Defendant next argues that there is no evidence that any of the non- D.C. positions would be substantially performed in D.C. or that any discriminatory acts occurred in Washington, D.C.  Defendant can not definitively state that non-D.C. positions would not have substantively performed in D.C.  There is evidence that non-D.C. positions would be substantially performed in D.C.  Jones was selected for Northern Virginia even though he was designated as the D.C. representative and he performed work in Washington, D.C.   At the time Mr. Mason was rejected by Golomb, there was a position available in Philadelphia and there were two positions being filled in Maryland. Two individuals were hired for the Maryland positions within two weeks of Mr. Mason being rejected as an applicant.  Had Mr. Mason been selected for D.C., Virginia, Maryland or Pennsylvania, given the nature of the PSR work of traveling to different facilities, his home in D.C. would likely have become his virtual/home office where he would have performed most of his work.    In the Grillo case cited by the Defendant, the court found that Ms. Grillo worked in Maryland because she had a home/virtual office in Maryland and she serviced accounts in Maryland, D.C. and Virginia and elsewhere.

17

In November 2005, Golomb indicated that "The Pharmacy Services Representative (PSR) position travels throughout an area to meet with teammates and patients to tell them about the program, and sign up patients if they are interested. This position is 75% travel." Ex. E:1547.

According to Mr. Jones, he did not specifically request a position in D.C. and he was hired by DaVita and was initially assigned to Washington, D.C. and Northern Virginia. Ex. D:23. Less than one year after he was hired, he was assigned to Virginia Beach, Southern Virginia, North Carolina, and Tampa, Florida. Ex. D:21.

## C.     Mr. Mason has Presented Sufficient Evidence to Raise an Inference of Discrimination on his Non Selection for the PSR Position.

Defendant does not argue that Mr. Mason cannot make out a prima facie case, but rather claims that no reasonable jury could conclude that Mr. Mason's non-selection for the D.C. PSR position in January 2006 was because of his race.

Mr. Mason's contention is that Defendant discriminated against him when it failed to schedule an in person interview to advance his application after he was told it would do so, and did not select him. Defendants claim that there was no reason to follow up with Mr. Mason for an in person interview after it hired Christopher Jones for the D.C. position. First, Mr. Mason has a right to have his application considered in the same manner as other applicants. DaVita may not subject his application to one process, and treat other applicants differently. An employer's selection of a job candidate, in violation of its own procedures requiring fair consideration of qualified applicants, is "undeniably relevant to the question of discriminatory intent," and "operates to discredit the employer's preferred explanation for its employment decision." See Krodel v. Young,

18

748 F.2d 701, 709 (D.C. Cir. 1984); Goostree v. State of Tenn., 796 F.2d 854, 861 (6th Cir. 1986).

The District of Columbia Court of Appeals for the District of Columbia Circuit addressed this exact issue in Cones v. Shalala, 199 F.3d 512, 518 (D.C. Cir. 2000). In Cones, an African American employee at the Department of Health and Human Services applied for a GS-15 position within the department. The Agency closed the competition or did not open the position for competition but filled the position with a lateral transfer of a white female employee. Cones filed a complaint alleging discrimination and retaliation based on failure to consider him for the position. The district court granted summary judgment to the Agency, concluding that Cones could not establish a prima facie case of discrimination or retaliation because the position was not open for competition. The Court of Appeals reversed. In Cones, the Court of Appeals rejected a claim that a protected applicant did not apply for a position when the applicant applied in the same manner as the selectee. Id. at 518. The Court held that failure to allow a qualified protected applicant to compete for a vacant position was prima facie evidence of race discrimination and retaliation.

Here, Mr. Mason applied in the same manner as other candidates and was entitled to the same consideration as other candidates.

Further, Mr. Mason did not decline an interview. Mr. Mason was in a direct patient care position, and it would have been gross dereliction of his duties to fail to appear at work on short notice. Further, even if the position was filled in D.C., Defendant was attempting to fill positions in Maryland and Pennsylvania and refused to consider Mr. Mason. According to Jones, he did not apply for a specific position, and

19

only learned of his assignment after he was hired.  Jones serviced not only D.C. but also Northern Virginia.  Less than one year after he began employment, Jones was permitted to transfer and worked in Virginia Beach, and Southern Virginia, North Carolina and Tampa, Florida.

Defendant argues that as of January 2006, it was DaVita's practice to only consider candidates who were located in the state where the PSR position was based, unless the person had plans to relocate to a different state and was looking for jobs in that state.  Mr. Mason made it clear that he was willing to accept a PSR position in the U.S. and relocate.  Further, there is nothing in the record to suggest that this was DaVita's official policy.  The only evidence that this was DaVita's practice is the self serving declarations of Easlon and Golomb.  However, in March 2006, Golomb indicated that he would consider hiring an applicant for a location other than his home state and did not indicate that it was DaVita's policy or practice to hire only in a home state.   As early as October 2005 and continuing through April 2006, DaVita was also attempting to hire individuals in Maryland.

### C.    Mr. Mason had vastly Superior Qualifications for the PSR Position in Comparison to Jones

DaVita argues that it did not compare Mr. Mason's qualifications with Mr. Jones but contends that a post hoc comparison of their qualifications would not raise an inference of discrimination because there was no "stark superiority of credentials" between Mr. Mason and Mr. Jones.  An objective comparison of their qualification reveals that Mr. Mason's qualifications were vastly superior to Mr. Jones.  DaVita simply ignores the fact that to sell the service, the chief requirement was that the PSR  meet with

dialysis patients and convince them to order their medications from DaVita Rx. Golomb

acknowledged that eighty percent of the job was spent chairside with the patients.

The Summary of the Basic Job Function was as follows:

PSR's are responsible for selling the Star Rx service to patients, teammates and
physicians. This involves working with Regional Directors and Facility Administrators
to explain Star Rx and to plan for facility implementation.

      The first step in an implementation is to meet with the facility team, including the
Medical Director who is affiliated with the facility, the Facility Administrator, and key
clinical staff in the facility. The second step is to work with the Facility Administrator to
select one to three key teammates in the facility that wills support the ongoing pharmacy
service and serve as liaisons to the facility. The third step is to meet with each individual
patient to explain the Star Rx service and to determine their interest in Star Rx. This step
is often complicated by the fact that many patients depend on caregivers – which may be
a professional or a family member -  to help coordinate their care. The fourth step is to
help interested patients with the sign-up process. Last, PSR's are responsible for circling
back to the facility to ensure that the implementation was successful.

      Mr. Mason is the main point of contact for the dialysis patients and most of the

duties of the position were tasks he does everyday. He had worked at the DaVita

facilities in Washington, D.C. for eleven years and knew most of the staff and many of

the patients at his facility. He spends virtually all of his time in patient care and training,

and he received DaVita's highest award in patient care in 2005, the year of his

application for the PSR position. His job required that he work with patients, doctors and

staff members. Mr. Jones has no experience whatsoever in dialysis or working in dialysis

patient care prior to working at DaVita. Ex. C:37. He was a fairly new hire at DaVita

who served as the receptionist and administrative assistant and completed filing, ordered

supplies and greeted patients and answered patient questions about transportation. Ex. D:

42-44. Further, his sales experience was limited to seasonal part-time work at

Nordstroms for two holiday seasons, showing units at an assisted care facility, and

working at a coffee shop as a clerk.  Ex. D 38-41.  While Jones may have may have met

the minimum educational requirements for the position of a high school diploma, he had

no substantive experience to speak of which would have in any way made him a

comparable candidate, and he certainly not as qualified as Mr. Mason.  The disparity in

their qualifications alone raises an inference of discrimination.

The purpose of the PSR position was to convince patients to order their

medications through DaVita Rx.  At his interview with Easlon, Mr. Mason demonstrated

that he was worthy of an in-person interview and Golomb described him as a "solid"

candidate.  It is impossible to compare the qualifications of Mr. Mason and Mr. Jones for

the PSR position and conclude that Jones was equally or better qualified for the position.


**D.      A Jury Could Conclude that Golomb's Rejection of Mr. Mason was Racially
Motivated.**

After the Court of Appeals' decision in <u>Salazar</u>, it is now clear that an inference of

discrimination may arise if there is not a fairly administered selection process, and in

particular, if the alleged discriminating official is permitted to involve him/herself in a

selection process which was intended to exclude him/her.

Defendant claims that no jury could conclude that Golomb's decision was racially

motivated.  A jury could draw this inference based on the falsity of the reasons offered

for denying Mr. Mason an in-person interview and the false reasons for rejecting his

application.  First, unlike any other applicant, Mr. Mason was denied an in person

interview after completion of the initial telephone interview, and required to undergo a

second extensive 45 minute interview over the telephone, where he was asked questions

that were normally reserved for in-person interviews with a panel. Further, it is disputed that Golomb considered Mr. Mason as a middle of the road candidate. Golomb, himself, described Mr. Mason as "solid." Golomb did not indicate at any time prior to the filing of this lawsuit that Mr. Mason was a middle of the road candidate, and did not retain notes or in any other way specify how Mr. Mason's answers to situational questions raised concerns. Moreover, Golomb admitted at his deposition that his decision to reject Mr. Mason was influenced by Kim Easlon.

Question. You said you provided some type of feedback to Ms. Easlon on the process that she was following. Did you find any fault in the way that she handled these interviews?

Answer: Well, I did not review the questions she asked during the interviews. I had a similar assessment that Ms. Easlon had of Mr. Mason.

Question: You had a similar assessment?

Answer: I'd say that he was – when I say similar, I didn't fee strongly enough about him to bring him on to - - bring him in person for an in-person interview. Ex. B:150-151.

Easlon's assessment of Mr. Mason came only after he filed a complaint against her. Her initial complaint was that he should be given an in person interview.

Defendant claims that Defendant posed the same questions to Mr. Jones that it posed to Mr. Mason. This is not true. Jones was not interviewed by Golomb until he reached the final in-person interview in California. Mr. Mason got Golomb's final interview questions during the 45 minute telephone interview. This deviated from the normal practice, and that alone is evidence of discrimination. Had Mr. Mason proceeded

23

to a final in-person interview, Mr. Mason would have had an opportunity to interview with an unbiased panel, which would have included individuals whom he had not charged with discrimination, or individuals who had not been influenced by people whom he had charged with discrimination.

Defendant claims that the answers that Mr. Mason provided at the interview are not in dispute and did not demonstrate an understanding of the sales process.  To the contrary, the answers that Mr. Mason provided did demonstrate an understanding of the sales process.  Mr. Mason and Easlon both testified that one method of getting teammates to support the Rx program would be to get them to see that they had a financial incentive in supporting the program.  According to Mr. Mason, Golomb told him he was intelligent and had provided innovative responses to the questions at the interview and Golomb would implement some of his responses in the future.

In addition, Defendant claims that the ability to sale was always an important criteria for the selection of PSRs.  This is disputed because when an employee with extensive sales experience applied for the job, Golomb responded that 80% of the job was sitting chairside with patients.

In support of its claim that Jones had sales experience, Defendant claims that Mr. Jones was the manager of the Alzheimer's and assisted living ward of Sunrise Assisted Living and he marketed the facility to families and prospective residents when the marketing person was not available.  Mr. Jones testified that he worked at this facility and the facility trained people on how to care for elderly patients, and on occasion she would show residences to prospective patients and families when the marketing person was not available.  He did not include this task on his resume.

24

Finally, Defendant claims that, according to Golomb, Jones had a higher quality answer to his situational questions.  Golomb interviewed Jones in person in California.  Jones interviewed Mr. Mason on his cell phone while he parked at a Dunkin Donuts parking lot. Golomb did not retain any notes from the interviews.  His evaluation of Mr. Mason and Jones cannot carry any weight because it is self serving and not credible.

Finally, Defendant claims that its overall track record of offering PSR positions to Black applicants is very strong.  Defendant asserts that during the relevant period, which it claims to be from 2005 through December 2006, 20% of PSR positions were offered to African Americans.  The relevant period is from 2005 through March 2006, when Mr. Mason made his complaint of discrimination.  During this period, DaVita hired 21 PSRs and only two were African American, which is less than 10%.  It was only after Mr. Mason filed his complaint, that DaVita began hiring more African American PSRs.  Similarly, Defendant's expert report would not be admissible because it is not reliable.  By his own admission, his findings are inconclusive and unreliable because he does not know who applied for the PSR positions.  ("I have been asked by counsel for DaVita, Inc. to review available statistical evidence pertinent to the claims of race discrimination in the hiring process for DavVita Rx Pharmacy Services Representative ("PSRs") raised by James Mason.  . . . The most direct way of performing such an analysis would be to collect data on all those who applied for DaVita RX PSR positions and compare the proportion of persons hired whose race is identified as Black to their proportion among applicants.  However, I have been advised that race data exist only on those hired into the DaVita Rx PSR position at DaVita, making such a comparison impossible.")

An inference of discrimination is raised when an employer violates its own personnel regulations in making employment decisions. It is generally recognized that an employer's failure for follow personnel regulations is evidence of pretext. See Kolstad v. American Dental Association, 108 F.3d 1431 (D.C. Cir. 1997), rev'd on other ground, 139 F.3d 958 (D.C. Cir. 1998); Vitarelli v. Seaton, 359 U.S. 535, 539-40 (1959); Watson v. National Linen Service, 686 F.2d 877 (11th Cir. 1962).

Here, Defendant's policy was to conduct in person interviews after an applicant successfully completed the telephone interview. Although Mr. Mason successfully completed the telephone interview with Easlon, Defendant refused to schedule him for an in person interview.

Given this evidence, it certainly cannot be held, as a matter of law, that no reasonable jury could find that the Defendant's action against Mr. Mason was not a pretext for discrimination. The Defendant has not established that no reasonable fact finder could find that its proffered, legitimate, non-discriminatory reasons for the actions against Mr. Mason are a pretext for discrimination. The fact that the Defendant did not follow the normal process when it "normally" would have done so—and thus did not follow its own usual, "normal" procedures in denying Mr. Mason an in person interview, advancing his application and selecting him for a PSR position--is itself evidence that can also support an inference that the legitimate, non-discriminatory reasons articulated by the Defendant are pretext or are unworthy of belief, especially if the decision was made or influenced by a discriminating official.[6]

---

[6] See, e.g., Salazar v. Wash. Metro. Area Transit Auth., 401 F.3d 504, 509 (D.C. Cir. 2005) (appeal after remand, motion granted, Salazar v. Wash. Metro.

<u>Area Transit Auth.</u>, 2006 U.S. Appl LEXIS 14792 (D.C. Cir., June 13, 2006)), citing <u>Latham v. Snow</u>, 336 F.3d 1085, 1093-94 (D.C. Cir. 2003) (holding that a jury could infer discrimination when the agency departed from its normal procedures without justification); <u>Johnson v. Lehman</u>, 679 F.2d 918, 922 (D.C. Cir. 1982) (noting that an employer's failure to follow its normal procedures, standing alone, may not be sufficient to support a finding of discrimination, but an employer's failure to follow its procedures "is a factor that the trier of fact may deem probative ... in determining the true motivation behind the hiring decision of the prospective employer").

The Defendant's motion for summary judgment should be denied.

Respectfully submitted,

_____/s/_____
David A. Branch #438764
Law Offices of David A. Branch
1825 Connecticut Avenue, NW
Suite 690
Washington, D.C. 20009
(202) 785-2805

## Certificate of Service

I hereby certify this 3rd day of August 2007 that a copy of the foregoing Plaintiff's Opposition to Defendant's Motion for Summary Judgment was sent to Defendants' counsel listed below.

Minh N. Vu
Epstein Becker & Green, P.C.
1227 25th Street, NW, Suite 700
Washington, D.C. 20037-3541

/s/

_____
David A. Branch