# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| JAMES MASON | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.:06-1319 (RMC) |
| | ) | |
| v. | ) | |
| | ) | |
| DAVITA INC. | ) | |
| | ) | |
| | ) | Jury Trial Demand |
| Defendant. | ) | |
| | ) | |

**Sworn Declaration of James Mason in Support of Opposition to Motion for Summary Judgment**

I, James Mason, the Plaintiff in this lawsuit, hereby make the following declaration pursuant to the provisions of 28 U.S.C. Sec. 1746. I understand that this declaration is the equivalent of an affidavit. The statements contained herein are based on my personal knowledge.

1. I am an African American male and an eleven year employee of Davita in Washington, D.C., where I have worked for a number of dialysis centers as a Patient Care Therapist (PCT). I normally work 12 to 15 hours shifts three days a week. I spend almost all of my time providing treatment to patients, attending to their needs, and performing dialysis training and patient education. Throughout my employment with Davita, I have been an excellent employee, and have received the highest award at DaVita, the Shining Star, for being the overall best patient care therapist.

2. In September/October 2005, Davita Rx/Star Rx, a subsidiary of DaVita, announced that it was seeking to hire individuals for pharmacy services representative (PSR) positions to sell medication to dialysis patients of Davita. Davita specifically sought individuals who were working for Davita as patient care technicians. The

individuals selected would have to be available for reassignment anywhere in the United States.  A company document announcing the position stated: "Do you know of an outstanding PCT [Patient Care Technician] within your area that would love a new and exciting career development opportunity within DaVita?  We have positions available for Pharmacy Services Representative across the country!  . . . S/he also needs to be willing to travel extensively, as the Star Rx roll-out process requires being on-site in dialysis facilities.  Our current PSR's travel 75% of the time."

3.      The pharmacy services representative position had income potential of almost twice my approximate $35,000 per year income.

4.      I worked at a facility with Christopher Jones, a Caucasian male, who was the office administrative assistant.  Jones was given a position announcement for the PSR position by the facility administrator, Gerri McGowen, a Caucasian female, and Jones gave the position announcement to the other staff members who were mostly minorities.  Jones had no experience as a patient care technician in dialysis treatment or education.  His "sales" experience was limited to working in the men's department of a department store for a few months over the holidays, working as a clerk in a coffee show, and filling in as needed to show residences to prospective residents and families at an assisted care facility when the marketing people were not available.

5.      At least three other minorities from Washington, D.C. applied for the PSR positions, including two other PCT's and an administrative assistant, and none were offered an interview other than me.

6.      There was no written policy at DaVita Rx on how individuals were to be screened for positions.  The practice which was followed was that after an application was

received, Kim Easlon conducted an initial screening and selected some individuals for a telephone interview, and that went well, for an in-person interview with the regional manager, and a final in-person interview in California with a panel.

7. I was selected for a telephone interview by Kim Easlon. I was called at work while I was on the floor attending to patients. Easlon requested that I conduct the telephone interview immediately. I reluctantly agreed to the telephone interview and had to leave my patients to conduct the interview. At the conclusion of the telephone interview, Easlon requested that I come to Richmond in a few days for an in person interview. I could not travel to Richmond on the day requested because I was scheduled to work a fifteen hour shift. I was assured that this was not an issue and I would be rescheduled for an in person interview the first week of January 2006. I was not concerned about rescheduling the interview because I knew that DaVita Rx was attempting to fill several positions around the country. Had I been informed that I would be excluded from positions in the future, I would have made the extraordinary request to take off work to go to Richmond for the in-person interview.

8. I never received a call from Easlon to reschedule, and had to email her to follow up on the selection process.

9. Easlon did not contact me to schedule an in person interview the first week of January as she had previously agreed to do. On January 6, 2006, I received an email indicating the position I sought had been filled and I had not been selected. DaVita Rx continued to advertise for position openings in Maryland, Philadelphia, Pennsylvania, and St. Louis, Missouri. I reported this information to Jones, who had applied for a position at the same time as me. Jones was surprised to hear that the positions were filled

3

because he knew that the individuals selected for the positions could not designate their geographical area and DaVita was still looking to fill positions on the East coast.

10.     I filed an internal complaint with Davita alleging discrimination based on race in the hiring process. An individual in the Davita human resources department interviewed me. During the interview, I asked the human resources staff member if she could determine my ethnic origin based on my voice and manner of speaking, and she said she could easily identify me as African American. The human resources employee discouraged me from pursuing a claim and suggested that Easlon may have assumed that I was not an employee of DaVita. I rejected this excuse and decided to proceed with his internal EEO complaint.

11.     I was later contacted by Easlon's supervisor, Joshua Golomb, after Golomb was notified of the EEO complaint against Easlon.

12.     Golomb informed Easlon of my complaint and Easlon informed Golomb. Before my second interview, Golomb solicited Easlon's opinion of me. Ex. B:153. According the Golomb, Easlon's impression of me was that he was not as strong a candidate as other candidates.

13.     Golomb informed me that Davita was not pleased with Easlon's hiring practices and offered to interview me once again. I agreed to the second interview to give Davita an opportunity to correct a wrong.

14.     Even though applicants normally only had one telephone interview before an in person interview, I was required to participate in a second telephone interview before an in-person interview, even though I had previously advanced beyond the telephone interview. Golomb scheduled the interview for 8:00 am but did not specify which time

4

zone. I assumed it was 8a.m. PST because he was in California. During the interview Golomb told me that I performed well, was creative in my responses and knowledgeable.

15. After the second telephone interview, once again, I was denied an in-person interview. Golomb informed me that I barely missed the cut off for selectees. On March 17, 2006, Golomb wrote an email explaining why he did not advance me in the interview process. Golomb stated: First, as per my discussion with Gail, I personally phone interviewed both James Mason and the other candidate James identified in his call. James is solid overall. Jeff was mediocre. However, neither of them were as strong as other candidates we have been interviewing in terms of the following key areas:

- * Understanding and experience of sales
- Sales effectiveness (in role plays I did with them via phone)
- Thoughtfulness about approach for working with Physicians
- * Flexibility (both voiced some concerns about travel)

16. At no point during or after the interview did Golomb inform me that there was an issue with the mistake over the start time of the interview. Neither was that any issue with my understanding of sales or experience or sales effectiveness. I was never asked about my sales experience. Golomb told me my sales approach was creative. I never expressed any concerns about travel.

17. I communicated with other minority employees at Davita from Washington, D.C., including an African American and an individual of Philipino descent who applied for PSR positions. Neither was hired or even interviewed by Easlon. The Philipino employee was interviewed by Golomb but received a telephone message Golomb with the same language he used in rejecting Mr. Mason for the position.

18. Prior to rejecting me as an applicant and selecting Jones, Davita specifically sought individuals with my background, and Golomb specifically rejected an applicant because he had too much sales experience because he believed that "80%" of the job was related to sitting chair side with the patient to convince the patient to allow Davita to provide their non dialysis medications. Ex. E:1475.

I hereby certify that the statement contained in this sworn declaration are true and correct.

    /s/

_____

James Mason                August 3, 2007