## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

JAMES MASON                           )
717 Ingraham Street, NW               )
Washington, D.C. 20012,               )
                                      )  Civil Action No. 06-1319 (RMC)
                    Plaintiff,        )
                                      )
        v.                            )
                                      )
DAVITA INC.                           )
601 Hawaii Street                     )
El Segundo, CA 90245,                 )
                                      )
                    Defendant.        )
_____)

## DAVITA INC.'S REPLY MEMORANDUM OF POINTS AND
## AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT ON COUNT I
## OF THE SECOND AMENDED COMPLAINT

Minh N. Vu (Bar No. 444305)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
Tel: (202) 861-1841
Fax: (202) 861-3541

Joseph T. Ortiz
(admitted pro hac vice)
Epstein Becker & Green, P.C.
1875 Century Park East, Suite 500
Los Angeles, CA 90067-2506
(310) 557-9542
(310) 553-2165 (fax)

August 21, 2007          Counsel for Defendant DaVita Inc.

TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS ................................. 2

III.   ARGUMENT ...................................................................................................... 5

    A.     No reasonable jury could conclude that DaVita Rx's reason for not pursuing Mr. Mason's application in January 2006 was his race. ...................................................... 5

        1.     There is abundant and uncontroverted evidence that Ms. Easlon did not discriminate against Mr. Mason because of his race. ............................................... 8

            a)     Ms. Easlon did not know Mr. Mason's race when she told him that his application would not receive further consideration on January 9, 2006. ........................................................................................................... 8

            b)     Ms. Easlon's excellent record of hiring African-American PSRs is inconsistent with Mr. Mason's theory race discrimination. ............................... 9

        2.     In the face of DaVita's compelling and uncontroverted evidence that Ms. Easlon did not discriminate against Mr. Mason on the basis of race, Mr. Mason has produced no evidence to the contrary. .................................................. 11

            a)     Ms. Easlon gave Mr. Mason an equal opportunity to compete for the PSR position, and her decision not to delay her hiring process to accommodate his schedule does not give rise to an inference of discrimination. ................................................................................................ 11

            b)     Mr. Mason's claim that he was willing to relocate for a PSR position does not show that Ms. Easlon's reason for not pursuing his application is a pretext. .......................................................................... 14

            c)     Mr. Mason's claim that there were PSR positions open in Maryland when Ms. Easlon told him he was no longer under consideration on January 9, 2006, has no support and is contrary the record. ........................... 15

            d)     Mr. Mason has not shown that his qualifications were significantly superior to Ms. Jones'. ..................................................................................... 16

    B.     No reasonable jury could conclude that Mr. Golomb's decision not to invite Mr. Mason for in-person interviews in California in March 2006 was based on race. ..... 18

        1.     The record evidence rebutting Mr. Mason's claim of race discrimination by Mr. Golomb is strong. ...................................................................................... 18

a)  Mr. Golomb's track record for hiring African-Americans is outstanding. ...................................................................................................18

b)  Mr. Golomb's willingness to give Mr. Mason a second opportunity to interview for a PSR position in response to Mr. Mason's complaint is inconsistent with Mr. Mason's theory of race discrimination. ........................19

2.  Mr. Mason has not produced any evidence from which a reasonable jury could conclude that Mr. Golomb's decision was based on Mr. Mason's race. ......................................................................................................................19

C.  Mr. Golomb's March 2006 decision does not violate the D.C. Human rights Act because it did not concern a job that would be performed in D.C. ............................ 25

IV.  CONCLUSION ................................................................................................................. 25

## I.    INTRODUCTION [1]

Summary judgment on count I of the Complaint is appropriate because, based on the undisputed facts, and drawing all inferences on genuinely disputed material facts in Mr. Mason's favor, no reasonable jury could conclude that DaVita Rx's non-selection of Mr. Mason in January and March 2006 for a Pharmacy Services Representative (PSR) position was because of his race.  Mr. Mason's Opposition Memorandum offers no evidence showing that race had anything to do with these decisions.  In fact, he concedes that Sales Manager Kimberly Easlon had no knowledge of his race when she decided not to pursue his application on January 9, 2006.  Mr. Mason also does not meaningfully dispute that both Ms. Easlon and Mr. Golomb have excellent records for offering PSR positions to African-American applicants that are wholly inconsistent with a theory of race discrimination.

In the absence of  any evidence that Ms. Easlon's and Mr. Golomb's decisions had anything to do with Mr. Mason's race, Mr. Mason now claims that a reasonable jury could conclude that race was the motivating reason because DaVita Rx's hiring process for Mr. Mason was unfair.   He also claims that DaVita's reasons for its actions are a pretext based on factual allegations which, as shown below, have no basis in the record.  There are two fundamental problems with the unfair process argument:  First, the undisputed facts do not reveal that DaVita's hiring process for Mr. Mason was unfair.  If anything, they show that DaVita Rx Director Josh Golomb went out of his way to give Mr. Mason a second opportunity to interview for other PSR positions after he filed an internal complaint, even though Ms. Easlon's  reasons

---

[1]    This memorandum cites to DaVita Inc.'s Statement of Undisputed Material Facts which contains the specific record citations.  However, where a direct citation to the record would be more helpful to the Court in locating documents, DaVita has used that citation.  DaVita's Exhibits are numbered sequentially.  Exhibits 1-9 were filed with DaVita's initial Memorandum in Support of Summary Judgment.  Exhibits 10-14 were filed with this Reply Memorandum.

for not pursuing his application in January 2006 were entirely legitimate (i.e., Mr. Mason

declined the in-person interview with her in Richmond and another candidate who accepted the

Richmond interview was hired).  Furthermore, there is no support for Mr. Mason's claim that

Ms. Easlon influenced Mr. Golomb's decision not to advance Mr. Mason's application.  Second,

the cases make very clear that, to defeat summary judgment, the plaintiff must produce evidence

of a grossly unfair process for which there is no apparent explanation other than discrimination.

There is no such evidence here.

## II.    RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS

Mr. Mason's own Statement of Facts contains numerous assertions that are not supported

by the record or are disputed.  DaVita reserves the right contest every allegation contained in this

Statement at any trial in this matter.  At this juncture, DaVita will only address those alleged

facts which may be considered material to the disposition of this motion that have no basis in the

record or which contradict Mr. Mason's own deposition testimony.

Paragraph 2.    PSRs sell a pharmacy service, not "medication" to dialysis patients of

DaVita.  (DaVita Ex. 2(A).)  There is no record support for the statement that PSRs "would have

to be available for reassignment anywhere in the United States."  The e-mail cited by Mr. Mason

only states that PSRs would have to travel anywhere in the United States, which is different from

being reassigned anywhere in the United States.  There is ample record evidence that PSRs were

hired for specific geographic locations, but were expected to travel extensively for the first

several years.  (DaVita Ex. 2(F); Easlon Dep. 48, 51-52 (DaVita Ex. 6).)

Paragraph 6.    Mr. Mason's description of the PSR selection process contains no citations

to the record.  An accurate description of the process, supported by record citations, is set forth in

Paragraph 20 of DaVita's Statement of Undisputed Material Facts.

Paragraph 7.  Mr. Mason's claim that, after telling Ms. Easlon that he could not meet her in Richmond for an in-person interview, "[h]e was assured that this was not an issue and that he would be rescheduled for an in-person interview the first week of January 2006" is contained in his new Declaration, but conflicts with his prior deposition testimony.  Mr. Mason was questioned thoroughly about the details of his conversation with Ms. Easlon, and he did not testify about any such assurances, or that Ms. Easlon would schedule an interview for the first week of January 2006.  (Mason Dep. 137-40 (DaVita Ex. 8).)

Paragraph 9.  Mr. Mason's own testimony makes clear that Ms. Easlon did not promise to contact Mr. Mason "the first week of January."  (Mason Dep. 137-40 (DaVita Ex. 8).)  Furthermore, Mr. Mason did not receive an e-mail from Ms. Easlon on January 6, 2006, as he contends.  Mr. Mason sent an e-mail to Ms. Easlon on January 6, 2006, which was full of spelling and grammatical errors.  (DaVita Ex. 2(E).)  Ms. Easlon responded on January 9, 2006, apologized for not getting back to him sooner, and told him that she had filled the position in his area.  Id.

DaVita Rx did not "continue to advertise for position openings in Maryland" after Ms. Easlon informed Mr. Mason that the position in his area (i.e., D.C.) had been filled on January 9, 2006.  The only document Mr. Mason cites does not support this allegation and Mr. Mason's Declaration on this subject is inadmissible because it is not based on personal knowledge.  All of the record evidence shows that DaVita Rx did not advertise or recruit for a PSR position based in Maryland until February 22, 2006.  (Decl. of Randy Larson ("Larson Decl.") ¶ 2 (DaVita Ex.

11); Job Posting Form for Maryland PSR Position (DaVita Ex. 11); Easlon Dep. 73-74 (DaVita Ex. 13); DaVita Ex. 2(F).)[2]

Paragraph 11.  The statement that "[b]efore speaking to Easlon about her activities, Golomb concluded that Easlon had not discriminated against Mr. Mason" is a mischaracterization of Mr. Golomb's e-mail, which speaks for itself.  (Mason Ex. E at 1464.) Upon being informed about Mr. Mason's complaint, Mr. Golomb stated that he was "guessing" that the situation was caused by "poor communications."  Id.

Paragraph 14.  Mr. Mason's claim that he was "required to participate in a second telephone interview before an in-person interview, even though he had previously advanced beyond the telephone interview," is highly misleading for reasons set forth at page 22 of this Reply Memorandum.

Paragraph 15.  The statement that "[a]fter the second interview, once again, Mr. Mason was denied an in-person interview" is not accurate.  Ms. Easlon had invited Mr. Mason for an in-person interview in Richmond, which Mr. Mason declined.  (Second Am. Compl. ¶ 6; Mason Dep. 138 (DaVita Ex. 8).)

Paragraph 16.  While it is true that Mr. Mason did not vocalize any concerns about travel during his interview with Mr. Golomb, Mr. Golomb was concerned about Mr. Mason's "very short, curt response that [the travel] was fine and that he had talked it over with his wife." (Golomb Dep. 113 (DaVita Ex. 5).)  Mr. Golomb explained that "it felt a bit to [him] like [Mr. Mason] was telling him what he wanted to hear as opposed to really demonstrating that he had thought through the implications."  Id. at 113-14.

---

[2]     Unpublished decisions cited are attached at DaVita Exs. 9 and 14 for the Court's convenience.

Paragraph 18.  The statement that "Davita specifically sought people with Mr. Mason's background" is misleading because it suggests that DaVita placed a priority on dialysis experience in recruiting for the PSR position.  The record makes clear that DaVita Rx sought people from many different backgrounds and that <u>dialysis experience was not a requirement for the job</u>.  (SUMF ¶¶ 11-16.)  Sales experience, on the other hand, was considered a plus, and Mr. Mason had no sales experience whatsoever.  (DaVita Ex. 2(A).)  Furthermore, the statement that "Mr. Golomb specifically rejected an applicant because he had too much sales experience" is not supported by the record.  Nowhere in the e-mail referenced by Mr. Mason does Mr. Golomb express concern about the candidate having too much sales experience.  (Mason Ex. E 1475.)

Paragraph 19.  The statement that "Easlon indicated that she did not consider Mr. Mason for a PSR position because he sent an e-mail with grammatical errors," is taken out of context and misleading.  Ms. Easlon testified that she had already decided not to pursue Mr. Mason's application once she hired Mr. Jones for the D.C. PSR position.  However, when she saw Mr. Mason's January 6, 2006, e-mail which was full of errors, she concluded that he lacked the attention to detail required for the position.  (Easlon Dep. 83-84 (DaVita Ex. 6).)

## III.    ARGUMENT

### A.    No reasonable jury could conclude that DaVita Rx's reason for not pursuing Mr. Mason's application in January 2006 was his race.

The following facts are now uncontroverted:

(1)    Ms. Easlon selected Mr. Mason's resume for an initial telephone interview for a PSR position in D.C. (SUMF ¶ 30).[3]

(2)    After her telephone screening interview with Mr. Mason, Ms. Easlon invited Mr. Mason for an in-person in Richmond on December 12, 2005 (SUMF ¶ 31).[4]

---

[3]    Mr. Mason does not contest this fact.  (See Mason Opp'n 11.)

[4]    Mr. Mason does not contest this fact.  (See Mason Opp'n 11.)

(3)     Ms. Easlon was only going to be in Richmond interviewing for the D.C. and Richmond, Virginia PSR positions for one day (SUMF ¶ 32).[5]

(4)     Mr. Mason said he could not come to the interview because of his work schedule (SUMF ¶ 33). [6]

(5)     Ms. Easlon told Mr. Mason she would get in touch with Mr. Mason in January 2006 about a meeting when she was back in the area (SUMF ¶ 33).[7]

(6)     Ms. Easlon interviewed Christopher Jones in Richmond, Virginia on the same day that she had offered Mr. Mason an in-person interview (SUMF ¶¶ 31, 34). [8]

(7)     Ms. Easlon had to fill PSR slots as quickly as possible. Her usual practice was to immediately advance qualified candidates to the next level (SUMF ¶ 37).[9]

(8)     Based on his performance at the Richmond interview and subsequent interviews in California, Mr. Jones was offered and accepted a PSR position for the D.C. area on December 20, 2006 (SUMF ¶ 36).[10]

(9)     On January 6, 2006, Mr. Mason sent an 11-line e-mail to Ms. Easlon inquiring about the PSR position which contained at least eleven spelling and grammatical errors (SUMF ¶ 41).[11]

---

[5]     Mr. Mason does not contest this fact. (See Mason Opp'n 11.)

[6]     Although Mr. Mason argues that he had legitimate reasons for not coming to Richmond, he cannot dispute that he did not agree to come to the interview. (See Mason Opp'n 11.)

[7]     Mr. Mason does not dispute this fact. (See Mason Opp'n 11.)

[8]     Mr. Mason does not dispute this fact. (See Mason Opp'n 11.)

[9]     Mr. Mason does not dispute this fact. (See Mason Opp'n 11.)

[10]     Although Mr. Mason claims to dispute this fact, he has cited to no record evidence to contradict the fact that Mr. Jones was offered the D.C./Northern Virginia PSR position on December 20, 2005. Mr. Jones testified that he received his offer from Ms. Easlon on December 20, 2005. (Jones Dep. 80 (DaVita Ex.7).) Mr. Jones also testified that he learned that he would be working in the D.C./Northern Virginia area "when he was hired," not when he started work, as Mr. Mason claims. Id. at 70.

[11]     Mr. Mason does not dispute that he sent this e-mail or that it contained these errors. (See Mason Opp'n 12.)

(10)    When Ms. Easlon saw this e-mail, she had already decided not to pursue Mr. Mason's application because she had filled the D.C. area position, but this e-mail made it clear to her that he was not qualified (SUMF ¶ 42).[12]

(11)    Ms. Easlon informed Mr. Mason on January 9, 2007 that she had already filled the position "that was available in [his] area" (SUMF ¶ 44).[13]

(12)    <u>At no time prior to January 27, 2006 (when Mr. Mason filed his internal complaint of discrimination against her) did Ms. Easlon know that Mr. Mason is African-American.</u>  Furthermore, Plaintiff never communicated his race to anyone at DaVita Rx in connection with his PSR job application or resume, nor did he mention his race in his communications with Ms. Easlon (SUMF ¶¶ 29, 45- 46).[14]

Based on the foregoing undisputed facts, DaVita has amply met its burden of producing a non-discriminatory reason for Ms. Easlon's decision not to pursue Mr. Mason's application in January 2006.  By that time, Ms. Easlon had filled the position that was open in Mr. Mason's area -- namely, the Washington, D.C./Northern Virginia position.  Mr. Mason had been given the exact same opportunity to compete for this position when Ms. Easlon offered him the same in-person interview date as Mr. Jones, but Mr. Mason declined the interview.

Because DaVita has met its burden of production, to resist summary judgment, Mr. Mason "must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason."  <u>Holcomb v. Powell</u>, 433 F.3d 889, 897 (D.C. Cir. 2006).  This analysis must also take into account "<u>any contrary evidence that may be available to the employer</u> (such as evidence of a strong track record in equal opportunity employment)."  <u>AKA v. Washington Hosp. Ctr.</u>, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (emphasis added).  Furthermore, the Supreme Court in <u>Reeves v. Sanderson Plumbing</u>

---

[12]    Mr. Mason does not dispute this fact.  He simply argues that Ms. Easlon also sent one e-mail with errors.  (<u>See</u> Mason Opp'n 12.)

[13]    Plaintiff does not dispute this fact.  (<u>See</u> Mason Opp'n 11.)

[14]    Plaintiff does not dispute any of these facts.  (<u>See</u> Mason Opp'n 11-12.)

Products, Inc., 530 U.S. 133 (2000), stated that even if a plaintiff is able to show that an

employer's stated reason is pretext,

> [a]n employer would be entitled to judgment as a matter of law if the record… revealed some other, nondiscriminatory reason for the employer's decision, <u>or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred</u>.

<u>Id.</u> at 148 (emphasis added).

        **1.**      **There is abundant and uncontroverted evidence that Ms. Easlon did not discriminate against Mr. Mason because of his race.**

            **a)**      **Ms. Easlon did not know Mr. Mason's race when she told him that his application would not receive further consideration on January 9, 2006.**

Mr. Mason does not dispute that Ms. Easlon had no knowledge of his race when she told

him that his application would not receive further consideration on January 9, 2006 (SUMF ¶

46), and he concedes that he did not identify his race on any of his application materials or to

anyone at DaVita Rx in connection with his application. (SUMF ¶¶ 29, 46; <u>see</u> Mason Opp'n

11-12 (not disputing these facts.)) In fact, Mr. Mason's Opposition Memorandum <u>is completely

silent on this subject</u>. To state the obvious, no reasonable jury could conclude that Ms. Easlon

was motivated by Mr. Mason's race when she decided not to pursue his application because she

did not know his race. As discussed in DaVita's opening brief at pages 8-9, many courts have

granted summary judgment to the employer under these circumstances. See <u>Holmes v. Potter</u>,

384 F.3d 356, 362 (7th Cir. 2004); <u>Lamb v. Boeing Co.</u>, 213 F. App'x 175, 179 (4th Cir. 2007);

<u>Alvarez v. Motorola</u>, No. 97-17214, 1999 WL 65208, at *2 (9th Cir. Feb. 9, 1999); <u>Sloane v.

Shalala</u>, No. 97-2295, 1998 WL 801499, at *4 (4th Cir. Nov. 18, 1998); <u>Cf. Clark County School

Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001) (summary judgment for the employer on plaintiff's

retaliation claim was proper where the person engaging in the alleged retaliation had no knowledge about the plaintiff's protected activities).

> **b)** **Ms. Easlon's excellent record of hiring African-American PSRs is inconsistent with Mr. Mason's theory race discrimination.**

First, it is undisputed that the first PSR hired by Ms. Easlon, Zondra Evans, is African-American.  (SUMF ¶ 21.)[15]  Second, Mr. Mason does not dispute DaVita's labor economics expert's conclusion that "Blacks were hired at a greater rate than expected based on the underlying workforce" by DaVita Rx as a whole, as well as by Ms. Easlon individually.  (Expert Report prepared for DaVita Inc. by Dr. Christopher Erath of National Economic Research Associates dated February 12, 2007 ("Expert Report") (DaVita Ex. 4) at 3.)

Mr. Mason argues that the Court should not examine the offeree data after Mr. Mason filed his internal complaint on the dubious theory that DaVita Rx started hiring more African-Americans after he complained.  However, Ms. Easlon's record before Mr. Mason filed his complaint on January 27, 2006 is also excellent.  Dr. Erath stated in his report that, based on his analysis of the relevant labor market Census, "Blacks make up slightly less than 10 percent of the workforce in this field.  This figure can then be compared to DaVita's hiring decisions to learn whether there is statistical evidence to support Mr. Mason's claims."  Id. at 3.  From the beginning of the PSR recruiting process to January 27, 2006 (when Mr. Mason filed his complaint of discrimination), Ms. Easlon offered positions to 17 PSRs, two or 11.7 percent of whom are Black.  (See DaVita Ex. 2(H).)  This number exceeds the percentage of Black

---

[15]    Mr. Mason attempts to dispute this fact by stating that "Easlon was hired on the same day as Ms. Evans,"  (Mason Opp'n 10), but the record plainly shows that Ms. Easlon had already been working for DaVita Rx on a part-time basis and did in fact interview and hire Ms. Evans. (Easlon Dep. 33-34 (DaVita Ex. 6).)

individuals in the relevant labor force (i.e., less than 10%) as determined by DaVita's labor economics expert.[16]

Mr. Mason's argument that DaVita's expert report "would not be admissible because it is not reliable" has no merit. (Mason Opp'n 26.) Mr. Mason presents no expert testimony about why the report is "not reliable," or any precedent to suggest that his type of analysis (i.e., comparing the percentage of Black individuals in the relevant work force with the percentage of Black individuals who were offered PSR positions) is not reliable. D.C. Circuit precedent makes clear that this type of analysis is highly relevant to the question of whether an employer engaged in intentional discrimination based on race. See, e.g., AKA, 156 F.3d at 1291 (observing that the Supreme Court in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 513 (1993), found relevant the fact that the minority group in question comprised 40 percent of the work force even though the same group only comprised 10 percent of the relevant labor market); DeMedina v. Reinhardt, 686 F.2d 997, 1010-11 (D.C. Cir. 1982) (labor force statistics are relevant to claims of intentional discrimination in hiring)). Mr. Mason cites no authority to the contrary and does not even attempt to distinguish these precedents.

The unremarkable statement in Dr. Erath's report that the most direct way to conduct the analysis would have been to conduct an applicant flow analysis in no way suggests that there is no other way reliable way to conduct a statistical analysis of DaVita Rx's PSR hiring practices. Dr. Erath explicitly stated: "Fortunately, it is possible to turn to data collected by the U.S. Census Bureau to learn about the racial composition of those in the same type of job as a DaVita

---

[16]     In an attempt to skew the percentages in his favor, Mr. Mason claims that "[t]he relevant period is from 2005 through March 2006, "when Mr. Mason made his complaint of discrimination." But the record is crystal clear that Mr. Mason's complaint was filed on January 27, 2006, not March 2006. (Mason Dep. 148 (DaVita Ex. 8); Mason Ex. E 7-9 (copy of complaint intake form).)

Rx PSR, and these data can be compared to DaVita's hiring decisions to learn if those decisions are consistent with a hypothesis of race discrimination." Expert Report (DaVita Ex. 4) at 2.

> **2.    In the face of DaVita's compelling and uncontroverted evidence that Ms. Easlon did not discriminate against Mr. Mason on the basis of race, Mr. Mason has produced no evidence to the contrary.**
>
> > **a)    Ms. Easlon gave Mr. Mason an equal opportunity to compete for the PSR position, and her decision not to delay her hiring process to accommodate his schedule does not give rise to an inference of discrimination.**

Mr. Mason argues that a reasonable jury could find that Ms. Easlon discriminated against Mr. Mason on the basis of race because he was allegedly not given a fair opportunity to compete for the PSR position. (See Mason Opp'n 19-20.) The fundamental problem with this argument is that the undisputed facts do not support it.

Mr. Mason does not dispute that in December 2005, the PSR hiring process was as follows: (1) DaVita Rx identified locations where PSRs were needed; (2) DaVita Rx posted the positions on the DaVita and other job websites; (3); Ms. Easlon reviewed all the resumes submitted and selected candidates for telephone screening interviews; (4) after the screening interview, Ms. Easlon invited some candidates to meet with her in person for a substantive interview; and (5) if Ms. Easlon determined that the PSR candidate was qualified and someone she would recommend for hire, she would schedule the candidate for in-person interviews in California with other DaVita Rx managers. (SUMF ¶ 20.)[17] It was not Ms. Easlon's practice to talk to as many candidates as possible for each position. If she found a good candidate, that candidate would be advanced to the next level. (SUMF ¶ 37.)[18]

---

[17]    Although Mason complains that the process described above was not in writing and asserts that Ms. Easlon did not have the requisite training and experience to conduct the hiring,[17] he does not dispute that this was in fact the process. (See Mason Opp'n 10.)

[18]    Mr. Mason does not dispute this fact. (See Mason Opp'n 11.)

Consistent with this process, Ms. Easlon conducted a telephone screening interview with Mr. Mason. (See Mason Opp'n 5.) At the end of the screening interview, Ms. Easlon invited him to advance to the next step: An in-person interview with her in Richmond on December 12, 2006. Id. (SUMF ¶¶ 30-31.)[19] This is exactly the same opportunity that Ms. Easlon gave to Mr. Jones. (SUMF ¶ 34.) However, Mr. Mason told Ms. Easlon that he could not meet her because of his work obligations. (SUMF ¶ 33.) Ms. Easlon went ahead with her process and met with Mr. Jones. (SUMF ¶ 35.)[20] Finding him to be a qualified candidate, she invited Mr. Jones for interviews in California, after which she made him an offer on December 20, 2005. (SUMF ¶¶ 35-36.)

Although Mr. Mason tries to justify his reasons for declining the in-person interview in Richmond, he cannot dispute the only critical fact – he was given the opportunity and he did not accept it. In fact, he concedes that he declined the interview immediately, without even trying to see if he could rearrange his schedule. (Mason Dep. 137 (DaVita Ex. 8).) Mr. Mason now complains that the process was unfair because Ms. Easlon said that she would contact him in January 2006 to schedule another time to meet and did not delay her hiring process for the D.C. position for a month so that she could also interview him. However, Ms. Easlon made clear at her deposition that it was her practice to fill positions as soon as she found a qualified candidate, and that is precisely what she did in this case. (SUMF ¶ 37.)

Even if a jury were to conclude that Ms. Easlon's actions were unfair, it could not conclude that they were based on race because it is uncontroverted that Ms. Easlon did not know Mr. Mason's race. In addition, "[i]t is not enough for the plaintiff to show that a reason given for

---

[19]    Mr. Mason does not dispute this fact. (See Mason Opp'n 11.)

[20]    Mr. Mason does not dispute this fact. (See Mason Opp'n 11.)

a job action is not just, or fair, or sensible.  <u>He must show that the explanation given is a phony</u>

<u>reason</u>."  <u>Fischbach v. District of Columbia Dep't Health Corrections</u>, 86 F.3d 1180, 1183 (D.C.

Cir. 1996) (emphasis added).  "Even if a court suspects that a job applicant was victimized by []

poor selection procedures it may not second guess an employer's personnel decision absent some

demonstrably discriminatory motive.  Once the employer has articulated a non-discriminatory

explanation for its action. . . the issue is not the correctness or desirability of [the] reasons

offered [but] whether the employer honestly believes in the reasons it offers."  <u>Id.</u> (internal

quotations and citation omitted).

      None of the cases cited by Mr. Mason even remotely suggest that Ms. Easlon's failure to

delay the hiring process to some later date to meet Mr. Mason can be the basis for an inference of

pretext.  <u>Cones v. Shalala</u>, 199 F.3d 512 (D.C. Cir. 2000), is plainly distinguishable because the

employer there refused to open up a vacant position for competition, and instead filled it with a

white employee who was a lateral transfer.  <u>Id.</u> at 515, 518.  Thus, unlike Mr. Mason, the

plaintiff in <u>Cones</u> was not even given the opportunity to be considered.  Moreover, the evidence

in <u>Cones</u> showing that the employer's proffered reasons for the employment action was pretext

was very strong.  The federal employer claimed that it did not post the vacancy for competition

because it was in the midst of downsizing pursuant to an Executive Order.  <u>Id.</u> at 518.  However,

the plaintiff produced evidence that the employer had promoted three white employees to higher

level positions in apparent contravention of the Executive Order, and that promoting the plaintiff

to the position in question would not have been inconsistent with the downsizing directives of

the Executive Order.  <u>Id.</u> at 519-20.  Here, as discussed <u>infra</u>, Mr. Mason has advanced no

evidence that Ms. Easlon's reason for not following up with him – her hire of Mr. Jones for the

D.C. position -- was pretextual.

Krodel v. Young, 748 F.2d 701 (D.C. Cir. 1984), is also plainly distinguishable.  In affirming the district court's judgment for the plaintiff in an age discrimination action, the Court of Appeals found that "the government's version of the selection process was a virtual sham" because the person hired for the job had been pre-selected.  Id. at 708.  The original vacancy announcement to which the plaintiff had responded was cancelled and replaced with another announcement with requirements that appeared to be tailored for the younger selectee, and the selectee had been erroneously overrated by the screening committee to place her on the best-qualified list of candidates to be considered in the final round.  Id.  Furthermore, there was statistical evidence to support a theory of age discrimination by the agency, evidence that one administrator had expressed a preference for younger employees, and testimony by witnesses that the agency favored younger employees.  Id. at 709.

In contrast the situation in Krodel, there is nothing in this record to suggest that Ms. Easlon's hiring process was sham or that Mr. Jones was pre-selected.  Furthermore, the statistical evidence here -- rather than supporting a theory of discrimination -- is totally inconsistent with any such theory.  There is also absolutely no other evidence that Ms. Easlon had a preference for non-African-American applicants.

In sum, Mr. Mason has not cited to a single case with facts that are even remotely analogous or comparable to those in this case where a court concluded that there was sufficient evidence of discrimination on which a reasonable jury could conclude that the employer was motivated by the plaintiff's race.

> **b)**  **Mr. Mason's claim that he was willing to relocate for a PSR position does not show that Ms. Easlon's reason for not pursuing his application is a pretext.**

Mr. Mason suggests that Ms. Easlon's reason for not pursuing his application – that she had already filled the D.C. position with Mr. Jones – is pretext because Mr. Mason was willing

to relocate outside of D.C., and there were positions outside of D.C. still open after Mr. Jones was hired.  This argument fails because there is no genuine dispute about the fact that DaVita Rx's practice was to only consider candidates who were located in the state where the position was based, unless the candidate had plans to relocate to a different state and was looking for jobs in that state.  (SUMF ¶ 20(d).)  DaVita submitted sworn testimony from Ms. Easlon and Mr. Golomb to support this fact.  Id.  DaVita also submitted evidence that as of January 9, 2006, DaVita Rx had never hired anyone for a position that was located outside of their home state unless the person already had plans to move to the location of the vacant PSR position.  (SUMF ¶ 20(e).)  Mr. Mason has submitted no record evidence to dispute this practice.  (See Mason Opp'n 10, 20.)  Instead, Mr. Mason claims that "in March 2006, Golomb indicated that he would consider hiring an applicant for a location other than his home state and did not indicate that it was DaVita's policy or practice to hire only in a home state."  Id. at 20.  Even assuming solely for the sake of argument that this assertion were true, it in no way creates a genuine dispute about what the policy was as of January 9, 2006, when Ms. Easlon told Mr. Mason that she had filled the position that was in his area (i.e., Washington, D.C.).

> **c)** **Mr. Mason's claim that there were PSR positions open in Maryland when Ms. Easlon told him he was no longer under consideration on January 9, 2006, has no support and is contrary the record.**

The fact that DaVita Rx was not recruiting for PSRs in Maryland when Ms. Easlon informed Mr. Mason that he was no longer under consideration on January 9, 2006, is well-established and uncontroverted.  Despite Mr. Mason's claims to the contrary, Ms. Easlon testified under oath that there was no opening in Maryland when she was recruiting for the D.C. position.  (Easlon Dep. 73-74 (DaVita Ex. 13).)  Furthermore, Ms. Easlon's testimony is corroborated by DaVita's national database of job postings which shows that the first posting for

a PSR position in Maryland was published on February 23, 2006. (See Larson Decl. ¶ 2 (DaVita Ex. 10.)) In addition, DaVita produced to Mr. Mason a copy of the Job Posting Form for the Maryland PSR position dated February 22, 2006, as well as the February 22, 2006, transmittal e-mail from DaVita Rx's recruiting administrator submitting the Form to DaVita's national recruitment center for publication. (DaVita Ex. 11.) Furthermore, a January 16, 2006 print-out of all PSR positions posted on DaVita's website produced by Mr. Mason in discovery shows no open positions for Maryland (DaVita Ex. 2(F)). These positions were not filled until the end of April 3, 2006. (DaVita Ex. 2(H).) [21]

Mr. Mason cannot create a dispute of fact on the question of whether there was a position open in Maryland as of January 9, 2006, by simply asserting in his declaration that "DaVita continued to advertise for position openings in Maryland" after this date. Federal Rule of Civil Procedure 56(e) requires that "[s]upporting and opposing affidavits shall be made on personal knowledge . . . and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Mr. Mason was not in a position to know whether DaVita Rx continued to advertise for openings in Maryland. His declaration does not state how he knows this information and provides no independent proof of this information.

> **d)     Mr. Mason has not shown that his qualifications were significantly superior to Ms. Jones'.**

DaVita's opening brief contains an extensive discussion of the Job Description for the PSR position, the undisputed facts of which make clear that Mr. Jones was eminently qualified

---

[21]     The fact that a PSR position in Maryland was posted more than a month after Ms. Easlon informed Mr. Mason that she was no longer considering his application does not render Ms. Easlon's reason for not interviewing Mr. Mason in person pretext because by the time DaVita Rx posted the Maryland position, Ms. Easlon had seen Mr. Mason's January 6, 2006 e-mail with all of the spelling and grammatical errors, and had concluded based on that e-mail that he was not qualified for the PSR position. (SUMF ¶¶ 41-42.)

for the PSR position, and why Mr. Mason's experience as a dialysis technician did not make him

a significantly superior candidate to Mr. Jones.  (See DaVita Mem. 12-15.)  DaVita will not

repeat this discussion here, although Mr. Mason's arguments merit a few observations.  First,

Mr. Mason does not dispute that under the D.C. Circuit's precedents, Mr. Mason must

demonstrate "a sufficiently significant qualifications differential" between himself and Mr. Jones

to support an inference of discrimination.  Barnette v. Chertoff, 453 F.3d 513, 517 (D.C. Cir.

2006); (see Mason Opp'n 20-21.)   Second, Mr. Mason does not seriously dispute that DaVita Rx

never actually engaged in a comparison of Mr. Jones to Mr. Mason before Mr. Jones was hired

because – by not accepting the in-person interview that Ms. Easlon offered -- Mr. Mason never

put himself in a position to be compared to Mr. Jones.  (See Mason Opp'n 20-21.)  Thus, a

comparison of these two individuals' qualifications for the PSR positions is not germane to the

issue of pretext in this case.

    Third, Mr. Mason continues to insist that his experience as a dialysis technician made

him more qualified than anyone without such experience, but offers nothing more than snippets

of e-mails and other documents taken out of context to support his claim.  However, he cannot

dispute that dialysis experience is nowhere mentioned on the PSR Job Description as a

requirement or even a plus, whereas attention to detail, organization skills, computer skills, and

time management skills are stated requirements.  The paragraphs that he quotes from the Job

Description also do not help his case, as they make abundantly clear that working with patients is

only one aspect of the job.  (See Mason Opp'n 21.)  Mr. Mason also does not dispute that --

consistent with DaVita Rx's view that dialysis experience was not necessary for the PSR position

– only seven of the 46 people who were hired for PSR positions in 2005 and 2006, had ever

worked as dialysis technicians. In short, the record evidence makes clear that dialysis experience was neither a requirement nor a priority for the PSR position in practice or on paper.

Fourth, Mr. Mason does not dispute that Mr. Jones held management, clerical, and direct care positions for many years before coming to work for DaVita (SUMF ¶ 38), giving him the patient care, administrative, organizational, time management and computer skills that were necessary for the PSR job.

In sum, there are no facts in the record that could support a conclusion that Ms. Easlon's reason not to pursue Mr. Mason's application was a pretext, or that it was because of his race.

**B.      No reasonable jury could conclude that Mr. Golomb's decision not to invite Mr. Mason for in-person interviews in California in March 2006 was based on race.**

          **1.      The record evidence rebutting Mr. Mason's claim of race discrimination by Mr. Golomb is strong.**

                    **a)      Mr. Golomb's track record for hiring African-Americans is outstanding.**

As previously discussed in DaVita's Statement of Undisputed Material Facts ¶¶ 21-25, its opening brief at pages 18-20, and pages 9-11 of this brief, DaVita Rx's overall record for making PSR offers to Black applicants is outstanding, reliable, and admissible. DaVita's labor economics expert also examined the hiring record of Mr. Golomb and determined that in this same period, he was involved with the hiring decisions for 26 offerees, seven or 26.9% of whom are Black. (Expert Report (DaVita Ex. 4) at 4.) DaVita's expert concluded that this number of Black offerees was "a far greater percentage than the Census data show" exists in the relevant labor force. Id.

Mr. Mason's argument that Mr. Golomb should not get credit for the offers that were made after he learned of Mr. Mason's complaint does not help his case because Mr. Golomb's track record before he learned of the complaint was also excellent. As of February 9, 2006,

when Mr. Golomb learned of Mr. Mason's complaint (DaVita Ex. 1 ¶ 4), Mr. Golomb had been involved in the hiring decisions of 14 offerees, of which two, or 14.3% are Black.  (DaVita Ex. 2(H).)  This percentage also exceeds the percentage of Black individuals in the relevant labor force which DaVita's expert had determined was less than ten percent.  See Expert Report (DaVita Ex. 4) at 3.

> **b)      Mr. Golomb's willingness to give Mr. Mason a second opportunity to interview for a PSR position in response to Mr. Mason's complaint is inconsistent with Mr. Mason's theory of race discrimination.**

Mr. Mason does not dispute that after being informed of Mr. Mason's internal complaint of race discrimination, Mr. Golomb decided to interview him for positions outside of D.C. (SUMF ¶ 48.)  Mr. Mason also does not dispute that no one required Mr. Golomb to take this action.  (Id.; see Mason Opp'n 12.)  The fact that Mr. Golomb decided to give Mr. Mason a second chance to interview for a PSR position cannot be reconciled with Mr. Mason's theory that Mr. Golomb harbored racial animus.

> **2.      Mr. Mason has not produced any evidence from which a reasonable jury could conclude that Mr. Golomb's decision was based on Mr. Mason's race.**

Mr. Mason argues that a reasonable jury could infer that Mr. Golomb's decision not to advance Mr. Mason to in-person interviews in California was based on race because Mr. Golomb's process was allegedly not fairly administered and Ms. Easlon allegedly influenced Mr. Golomb's decision-making process.  (Mason Opp'n 22-23.)  Mr. Mason's argument rests almost exclusively on the D.C. Circuit's decision in Salazar v. Washington Metropolitan Area Transit Authority ("WMATA"), 401 F.3d 504 (D.C. Cir. 2005), which actually supports the grant of summary judgment for DaVita.  Furthermore, the undisputed facts show that there was nothing

unfair about Mr. Golomb's process for interviewing Mr. Mason and Ms. Easlon had no influence on Mr. Golomb's decision regarding Mr. Mason.

The plaintiff in Salazar had unsuccessfully applied for four promotions within WMATA. Id. at 506. The fifth time that he applied for a promotion, the plaintiff complained to high level management that the Superintendent for plant equipment maintenance discriminated against Latinos and asked that this person not be allowed to select the members of the interview panel. Id. The plaintiff received assurances that the Superintendent would not be involved in the interview panel selection process. Id. Notwithstanding these assurances, the superintendent selected the chair of the panel who happened to be a friend of the Superintendent. The panel chair created all of the questions for the panel interview and assigned the point values for each question in consultation with the Superintendent. Id. at 509. This resulted in the assignment of only marginal value to the candidates' experience and education, which were the plaintiff's strengths. Id. A non-Latino was selected for the job, but he never actually held the job for which he competed, and was instead transferred to a less difficult job. Id. Based on this evidence, a majority of the D.C. Circuit panel concluded that "a reasonable jury could infer that [the successful candidate] was unsuited for the Metro Center job and that the selection process was geared not to finding the best person for the position, but rather to keeping [the plaintiff] from advancing." Id. The court described its decision as "a close call," but found "fishy" the fact that the Superintendent had placed himself squarely in the middle of a process that was designed to exclude him. Id. Judge Williams submitted a vigorous dissent.[22] Id. at 512.

---

[22] Mr. Mason also cites to several cases in passing which are readily distinguishable. (See Mason Opp'n 26.) Kolstad v. American Dental Ass'n, 108 F.3d 1431 (D.C. Cir. 1997), does not help Mr. Mason's case because there, the employer engaged in a blatant violation of its own procedures to pre-select another candidate for the job. Id. at 1436. The decision maker did not bother to review the plaintiff's performance evaluations or resume, did not interview the plaintiff

If a divided panel of the Court of Appeals found the highly egregious facts of Salazar to be a "close call," then the facts of Mr. Mason's case clearly support the grant of summary judgment for DaVita.  First, Ms. Easlon's discussions with Mr. Golomb about Mr. Mason took place in the context of Mr. Golomb's investigation of Mr. Mason's complaint of discrimination against her.  After receiving Mr. Mason's complaint of discrimination, Mr. Golomb naturally had to ask Ms. Easlon why she did not conduct an in-person interview him, and Ms. Easlon provided an explanation.  (Golomb Dep. 69-70, 75, 81 (DaVita Ex. 12).)  She also informed Mr. Golomb that Mr. Mason's January 6, 2006 e-mail contained numerous spelling and grammatical errors which made it clear to her that Mr. Mason did not pay enough attention to detail to be qualified for the PSR position.  (Easlon Dep. 86-87 (DaVita Ex. 13).)  Although Ms. Easlon expressed her view that she would not hire Mr. Mason as a PSR after seeing this e-mail, she testified at her deposition that Mr. Golomb was her "boss" and had the authority to hire Mr. Mason over her objection.  (Easlon Dep. 132 (DaVita Ex. 13).)  Ms. Easlon further testified that Mr. Golomb went ahead with his interview of Mr. Mason because he wanted "to arrive at his own conclusion."  Id. at 87 (DaVita Ex. 13).)  Mr. Mason has cited to no evidence showing that -- after he interviewed Mr. Mason -- Mr. Golomb consulted with Ms. Easlon about whether to advance Mr. Mason to interviews in California.

These facts, which are not disputed, do not evidence a "fishy" process, nor do they establish that Ms. Easlon injected herself into Mr. Golomb's decision making process.  Salazar,

---

for the position, and gave the plaintiff a different explanation for her rejection than the one the employer subsequently offered.  Id.  In addition, there was evidence that the decision maker told sexually offensive jokes at staff meetings and referred to several professional women as "bitches" or "battleaxes."  Id. at 1437.  No such extreme facts exist in Mr. Mason's case.

Vitarelli v. Seaton, 359 U.S. 535 (1959), has absolutely no bearing on Mr. Mason's case because it does not concern discrimination and does not stand for the proposition that an agency's failure to follow its own regulations is evidence of discrimination.

401 F.3d at 509. The facts presented here are a far cry from those in <u>Salazar</u> where there was no explanation of why the alleged discriminator was allowed to select the chair of the interviewing panel who then created the questions and assigned points for the interview in consultation with the alleged discriminator. <u>Id.</u> at 506-09.

Mr. Mason's argument that Mr. Golomb's use of the telephone to conduct Mr. Mason's second interview (as opposed to meeting with him in person) is evidence of race discrimination because it deviates from the normal practice elevates form over substance. (Mason Opp'n 23.) As discussed, the usual second step of the interview process would have been for Mr. Mason to meet Ms. Easlon for a 45-minute to an hour long in-person interview.[23] If Ms. Easlon had found Mr. Mason to be qualified, Mr. Mason would have been invited to California for interviews with other DaVita Rx managers. (SUMF ¶ 20.)

Because Mr. Mason had complained of discrimination against Ms. Easlon, Mr. Golomb conducted the equivalent of the second step of the process himself. Although this more substantive 45-minute interview (Mason Opp'n 23)[24] would normally have been in person, Mr. Golomb interviewed Mr. Mason by telephone because he was not located anywhere near the D.C. area. (Golomb Decl. ¶ 7 (DaVita Ex. 1)) (explaining that Mr. Golomb's office is in California). Mr. Mason does not dispute the fact that Mr. Golomb asked him essentially the same questions that he posed to Mr. Jones. (SUMF ¶ 56; Mason Opp'n 12) (not disputing this fact). Mr. Golomb specifically explained at his deposition that had Mr. Mason performed well

---

[23] Mr. Jones testified that the second step in his interview process -- his in-person with Ms. Easlon -- lasted about 45 minutes to an hour. (Jones Dep. 56 (DaVita Ex. 7).) He also testified that Mr. Easlon asked him situational questions about how he would deal with difficult situations as a PSR. <u>Id.</u> at 58.

[24] Mr. Mason describes his interview with Mr. Golomb as an "extensive 45 minute interview"(Mason Opp'n 23), which is the same length of time as Mr. Jones' second interview with Ms. Easlon. (Jones Dep. 56 (DaVita Ex. 7).)

in the telephone interview with him, he would have been invited to California to meet the other managers (i.e., the third and final step of the process).  (Golomb Dep. 163 (DaVita Ex. 5).)  Thus, the only difference in Mr. Mason's process was that the second interview was conducted by telephone, not that it was substantively any different from the usual second interview where situational questions are posed by a manager.  This difference was a product of the unique situation created by Mr. Mason's filing of his internal complaint.  In Salazar, the D.C. Circuit specifically held that the employer's deviation "from its normal appointment process in response to [the plaintiff's] concerns" was "not all that probative" on the issue of discrimination.  Id. at 508.[25]

Mr. Mason seems to suggest that he should have just been allowed to skip the second step of the process (i.e., a substantive interview with a manager before being invited to California) and flown directly to California where he claims he would have "had an opportunity to interview with an unbiased panel."  (Mason Opp'n 24.)  However, there is no evidence that any other PSR candidate (including Mr. Jones) was ever invited directly to California without having had a substantive interview with a manager after the telephone screen.  DaVita's adherence to the normal process for Mr. Mason by requiring such a substantive interview before incurring the time and expense of flying Mr. Mason to California can hardly be evidence of race discrimination.

---

[25]    Mr. Mason's case is clearly different from the situation in Lathram v. Snow, 336 F.3d 1085 (D.C. Cir. 2003), where the employer offered no explanation of why it decided to structure the job application process in a way that would make the selectee's veteran preference applicable, when the process for other jobs had not been structured in the same manner.  Id. at 1093.  In Mr. Mason's case, DaVita had to modify slightly its normal process as a result of Mr. Mason's internal complaint of discrimination.

Mr. Mason also claims that his answer to the question of how he would obtain teammate support for the DaVita Rx service "did demonstrate an understanding of the sales process," claiming that Ms. Easlon thought that financial incentives were the best selling point for teammates. (Mason Opp'n 24.) However, the financial incentive that Mr. Mason said he would promote was "profit sharing" (Mason Dep. 164 (DaVita Ex. 8).) Ms. Easlon explained that the financial incentive she would promote was the end of year teammate <u>bonuses</u> which were based on patient outcomes in each clinic, not "profit sharing." (Easlon Dep. 126-127.) Bonuses, which directly benefit teammates, are a very different type of financial incentive than "profit sharing."

Mr. Mason also insists that Mr. Golomb unfairly focused on his sales ability and experience (or lack thereof), arguing that the job is about patients, not sales. (Mason Opp'n 24.) However, Mr. Mason cannot dispute that a PSR job is about "selling" a service (DaVita Ex. 2(A)), and that Mr. Golomb's focus on Mr. Mason's sales ability, therefore, cannot support an inference of discrimination.

Finally, Mr. Mason claims that Mr. Golomb's evaluation of Mr. Mason "cannot carry any weight" because the interview was conducted on a cell phone while he parked at a Dunkin Donuts parking lot and Mr. Golomb did not retain any notes from his interviews.[26] Mr. Mason cites to no authority for this proposition. Mr. Golomb memorialized his concerns about Mr. Mason in an e-mail within eight days of the interview. (DaVita Ex. 1(A).) Furthermore, with regard to Mr. Mason's poor answer on how to motivate teammates, Mr. Golomb's and Mr. Mason's recollections are the same. Mr. Mason testified that he would emphasize "profit

---

[26]    Mr. Golomb had to conduct the interview in his car because Mr. Mason was not there when Mr. Golomb called him for the scheduled interview. (Mason Dep. 161 (DaVita Ex. 8).) When Mr. Mason finally called back, Mr. Golomb was driving and had to pull over to conduct the interview. (Golomb Dep. 98 (DaVita Ex. 5).)

sharing" – exactly what Mr. Golomb recalled.  (Mason Dep. 164 (DaVita Ex. 8); Golomb Dep. 103 (DaVita Ex. 5).)

### C.    Mr. Golomb's March 2006 decision does not violate the D.C. Human rights Act because it did not concern a job that would be performed in D.C.

The purpose of the D.C. Human Rights Act is to "secure an end in the District of Columbia to discrimination."  D.C. Code § 2-1401.01 (2001).[27]  Notwithstanding Mr. Mason's speculative arguments about where he might have worked or where his home office might have been had Mr. Golomb offered him a position following the March 9, 2006 interview, the bottom line is that there is no evidence in the record that Mr. Golomb was considering Mr. Mason for a job that would have been performed in D.C.  As of March 9, 2006, Mr. Jones had accepted the only D.C. position and held it until December 2006.  (Jones Dep. 70 (DaVita Ex. 7).)

## IV.    CONCLUSION

For all the foregoing reasons, DaVita respectfully requests the Court to grant its motion for summary judgment.

Respectfully submitted,

By:    _____/s/ Minh N. Vu_____
Minh N. Vu (Bar No. 444305)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
Tel: (202) 861-0900; Fax: (202) 296-2882

_____/s/ Joseph T. Ortiz_____
Joseph T. Ortiz, (admitted pro hac vice)
Epstein Becker & Green, P.C.
1875 Century Park East, Suite 500
Los Angeles, CA 90067-2506
Tel: (310) 557-9542; (310) 553-2165 (fax)

Dated:  August 21, 2007          Counsel for Defendant

---

[27]    DaVita's opening brief cited this same language which was previously codified at D.C. Code § 1-2501 in the 1981 edition.

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of August 2007, a copy of DaVita Inc.'s Reply

Memorandum of Points and Authorities in Support of Summary Judgment was served through

the Court's Electronic Court Filing system to counsel listed below:

David A. Branch
Law Office of David A. Branch
1825 Connecticut Avenue, NW
Suite 690
Washington, D.C. 20009


_____/s/ Minh N. Vu_____
Minh N. Vu