## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

JAMES MASON                                    )
717 Ingraham Street, NW                        )
Washington, D.C. 20012,                        )
                                               )  Civil Action No. 06-1319 (RMC)
                    Plaintiff**,**             )
                                               )
         v.                                    )
                                               )
DAVITA INC.                                    )
601 Hawaii Street                              )
El Segundo, CA 90245,                          )
                                               )
                    Defendant**.**             )
_____        )

## DAVITA INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNT II OF THE SECOND AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rules 7 and 56.1,

Defendant DaVita Inc. ("DaVita") moves for summary judgment on Count II of the

Second Amended Complaint which alleges retaliation in violation of the District

of Columbia Human Rights Act.  The grounds for DaVita's motion are set forth in the

supporting Statement of Material Facts, Memorandum of Points and Authorities, and

supporting Exhibits 1-24.[1]

---

[1]     The facts pertaining to Mr. Mason's March 2006 retaliation claim were addressed in DaVita's Statement of Material Facts in support of its Motion for Summary Judgment on Count I and supported by Exhibits 1-14 filed in support of the motion on June 25, 2007 and August 21, 2007.  DaVita will cite to such Exhibits in support of this motion but will not refile those Exhibits since they are already on file with the Court.  New exhibits filed with this Motion are labeled Exhibits 15 through 24.

Respectfully submitted,

By:    _____/s/ Minh N. Vu_____

Minh N. Vu (Bar No. 444305)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
Tel: (202) 861-0900
Fax: (202) 296-2882


    ____/s/ Joseph T. Ortiz_____

Joseph T. Ortiz
(admitted pro hac vice)
Epstein Becker & Green, P.C.
1875 Century Park East, Suite 500
Los Angeles, CA 90067-2506
(310) 557-9542
(310) 553-2165 (fax)


Dated:  September 28, 2007         Counsel for Defendant

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

JAMES MASON                              )
717 Ingraham Street, NW                  )
Washington, D.C. 20012,                  )
                                         )  Civil Action No. 06-1319 (RMC)
               Plaintiff,                )
                                         )
      v.                                 )
                                         )
DAVITA INC.                              )
601 Hawaii Street                        )
El Segundo, CA 90245,                    )
                                         )
               Defendant.                )
_____)

## DAVITA INC.'S STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF SUMMARY JUDGMENT ON COUNT II
## OF THE SECOND AMENDED COMPLAINT

Pursuant to LCvR 7(h) and 56.1, Defendant DaVita Inc. ("DaVita") hereby

submits this Statement of Material Facts in Support of its Motion for Summary Judgment

on Count II of the Second Amended Complaint.  The following are either undisputed

material facts, or facts asserted by Plaintiff James Mason that are assumed to be true

solely for purposes of this motion for summary judgment:

## I.    FACTS CONCERNING MR. MASON'S MARCH 2006 RETALIATION CLAIM[1]

1.      The Defendant, DaVita Inc. ("DaVita"), is in the business of owning and operating dialysis facilities throughout the United States.  (Declaration of Josh Golomb dated June 25, 2007 ("Golomb Decl.") ¶ 2 (Ex. 1).)

2.      Plaintiff James Mason has been employed by DaVita as a Patient Care Technician (PCT) at various Washington D.C. locations since 1996.  (Declaration of Janis Bonnet dated September 26, 2007 ("Bonnet Decl.") ¶ 2 (Ex. 15).)  DaVita's PCTs perform hemodialysis therapy and data collection.  (Ex. 15(A) (PCT Job Description).)  In 2006 and continuing to the present time, Mr. Mason has worked as a full-time PCT at the DaVita dialysis facility located at 3223 K Street, N.W., Washington D.C. (the "Georgetown Facility").  (Id. ¶ 3.)

3.      In November 2005, Mr. Mason applied for a Pharmacy Services Representative (PSR) position with DaVita Rx (Deposition of James Mason ("Mason Dep.") 111 (Ex. 8)), a wholly separate company owned by DaVita with its own management team.  (Golomb Decl. ¶ 2 (Ex. 1).)  DaVita Rx was formed in early 2005 for the sole purpose of creating a new pharmacy service business that would deliver oral prescription medications to patients of DaVita's dialysis centers.  (Id. at ¶ 2.)  Patients who participate in this program would get all of their oral prescriptions filled through

---

[1]      The facts pertaining to the March 2006 retaliation claim were addressed in DaVita's Statement of Material Facts in support of its Motion for Summary Judgment on Count I and supported by Exhibits 1-14 filed in support of the motion on June 25, 2007 and August 21, 2007.  DaVita will cite to such Exhibits in support of this motion but will not refile those Exhibits since they are already on file with the Court.  New exhibits filed with this Motion are labeled Exhibits 15 through 24.

DaVita Rx and have them delivered to the DaVita facility where they receive dialysis treatment.  (Id.)

4.      The PSR Job Description states:  "PSR's [sic] are responsible for selling the DaVita Rx service to patients, teammates, and physicians."  (Ex. 2(A) (PSR Job Description)) (emphasis added).

5.      The PSR Job Description lists the following items under "Job qualifications":

> Positive Attitude; Active seller (needs to be able to ask direct questions); Personable; Ability to train facility teammates; Attention to Detail, Patient; Organizational skills; Self-direction; Goal oriented; Time management skills; Some computer skills; Problem Solver; Willingness to learn; High school diploma or GED required.

Under the heading of "Essential Functions", the Job Description states:

> Must be able to travel 75% of their time; Must be willing to work flexible hours. Have to be at the facilities when the patients are there, which typically starts at 6am.  Must have complete integrity.  Must have excellent communication skills, with the ability to communicate with other teammates as well as nurses and physicians.  Must have positive endorsement from manager.  Must be very organized.  Sales experience a plus but not a must, sales training will be provided. Knowledge of more than one language is not required but is a plus.

(Ex. 2(A).)

6.      The PSR Job Description contains no requirement that a PSR have dialysis experience or patient care experience.  (Id.)  Only seven of the 46 PSRs hired by DaVita Rx from its inception to the middle of December 2006 had ever worked as PCTs. (Declaration of Kimberly Easlon dated June 25, 2007 ("Easlon Decl.") ¶ 14 (Ex. 2).) However, at least 22 PSRs hired in this same timeframe had sales experience.  (Id.)  A number of PSRs also had administrative, pharmacy, social work/insurance, and patient care experience.  (Id.)

7.      The PSR position does not require any technical knowledge of the dialysis process or any knowledge about dialysis medications.  (Deposition of Christopher Jones ("Jones Dep.") 67-69 (Ex. 7).)

8.      Obtaining the support of teammates at DaVita's dialysis facilities is an essential part of the PSR's responsibilities and vital to DaVita Rx's success because the teammates must -- without additional compensation -- take on additional responsibilities to support the DaVita Rx pharmacy service.  (Deposition of Kimberly Easlon ("Easlon Dep.") 124-26 (Ex. 6); Deposition of Josh Golomb ("Golomb Dep.") 42-44 (Ex. 5).)

9.      Obtaining support from the physicians at the DaVita facilities is also critical to the success of the DaVita Rx service because physicians have been known to impede the enrollment process by opposing the program.  (Easlon Dep. 124-25 (Ex. 6); Golomb Dep. 109 (Ex.5).)

10.     DaVita Rx hired PSRs by territory.  (Ex. 2(F) (selected postings for PSR positions in specific geographic locations); Easlon Decl. ¶¶ 4-5 (Ex. 2); Easlon Dep. 56-57 (Ex. 6).)

11.     In late 2005 through approximately March 2006, DaVita employed the following process for hiring PSRs:

a.      DaVita Rx identified locations where a PSR was needed (Easlon Dep. 56-57 (Ex. 6)), and the position would be advertised for those locations on the DaVita website as well as on general job search websites.  (Ex. 2(F); Golomb Dep. 33-34 (Ex. 5).)  In September 2005, DaVita Rx also sent a flyer to its Facility Administrators asking them if there were any outstanding PCTs whom they thought would make good PSRs.  (Ex. 2(B).)

     b.     Regional Sales Manager Kim Easlon reviewed all of the resumes submitted and selected candidates for telephone screening interviews.  (Easlon Dep. 42 (Ex. 6).)

     c.     It was DaVita Rx's practice at that time to only interview candidates for positions based in the state where they were living unless the applicant had plans to move to the state where an open PSR position was located.  (Easlon Decl. ¶ 12 (Ex. 2); Easlon Dep. 82 (Ex. 6); Golomb Dep. 82-86, 157 (Ex. 5).)  As of January 9, 2006, DaVita Rx had never hired anyone for a position that was located outside their home state unless the person already had plans to move to the location of the PSR position.  (Easlon Decl. ¶ 12.)

     d.     After the short telephone screening interview, Ms. Easlon would invite a small subset of the applicants for in-person interviews with her.  (Easlon Dep. 45 (Ex. 6).)  Because Ms. Easlon was based in Oklahoma (id. at 7), she would have to fly to various cities to interview PSR candidates.  (Id. at 45.)

     e.     If Ms. Easlon determined that the PSR candidate was qualified and someone that she would recommend for hire, Ms. Easlon scheduled the candidate for in-person interviews in DaVita Rx's offices in California with several other DaVita Rx managers.  (Id. at 45-46.)  After the California interviews, the managers and Ms. Easlon would confer and make a decision on whether to extend an offer to the candidate.  (Id. at 46.)

12.     Following the process described above, DaVita Rx Regional Sales Manager Kim Easlon selected Mr. Mason's resume for an initial telephone interview for

a PSR position in D.C. at the beginning of December 2005.  (Second Am. Compl. ¶ 6; Easlon Dep. 58 (Ex. 5).)

13.    Mr. Mason's resume did not reference his race and listed no work experience in administration, management, or sales.  (Ex. 2(C).)  Mr. Mason never informed any employee of DaVita Rx that he had sales experience.  (Deposition of James Mason ("Mason Dep.") 23 (Ex. 8).)

14.    At the conclusion of the telephone interview, Ms. Easlon invited Plaintiff for an in-person interview with her in Richmond, Virginia, on December 12, 2005. (Second Am. Compl. ¶ 6; Easlon Dep. 64-66 (Ex. 6).)  Ms. Easlon was only going to be in Richmond for one day to interview PSR candidates for the D.C. and Richmond PSR positions. (Easlon Dep. 66 (Ex. 6).)

15.    Mr. Mason stated that he could not meet Ms. Easlon on this date because of his work schedule.  (Second Am. Compl. ¶ 6; Mason Dep. 138 (Ex. 8.)  Ms. Easlon told Mr. Mason that she was going on vacation but she would get in touch with him in the New Year about a meeting when she was back in the area.  (Mason Dep. 137-40 (Ex. 8).)

16.    Ms. Easlon had also conducted a telephone interview with Christopher Jones, a white Administrative Assistant at Mr. Mason's dialysis facility, and invited him for an in-person interview on December 12, 2005 in Richmond, Virginia for the D.C. PSR position. (Second Am. Compl. ¶ 6; Easlon Dep. 67 (Ex. 6); Jones Dep. 50-51 (Ex.7).)

17.    Mr. Jones went to the interview and met with Ms. Easlon.  This interview lasted forty-five minutes to an hour and included situational questions about how he would handle difficult situations as a PSR.  (Jones Dep. 56, 58 (Ex. 7).)

18.    After the interview, Ms. Easlon invited Mr. Jones for in-person interviews in California. (Second Am. Compl. ¶ 6.)  Following a successful round of interviews in California, Ms. Easlon offered Mr. Jones the D.C. PSR position on December 20, 2006, which he immediately accepted. (Easlon Dep. 61 (Ex. 6); Jones Dep. 63, 70-71, 79-80 (Ex. 7).)  Once Mr. Jones accepted the D.C. position, Ms. Easlon concluded her interviewing process for the D.C. position and no longer considered Mr. Mason a PSR candidate. (Easlon Dep. 61, 73 (Ex. 6).)

19.    Ms. Easlon did not delay filling the D.C. PSR position so that she could reschedule an in-person interview with Mr. Mason because she was under pressure to fill as many PSR positions as quickly as possible.  (Easlon Decl. ¶ 8 (Ex. 2).)

20.    Mr. Jones was qualified for the PSR position.  (Easlon Decl. ¶ 7 (Ex. 2); Ex. 2(D) (Jones Resume); Jones Dep. 29-35, 38-40, 42-45, 56-57 (Ex. 7).)  Mr. Jones had administrative, management, sales, and patient care experience which demonstrated that he had the requisite skills for the PSR position.  (Id.)

21.    On January 6, 2006, Mr. Mason sent the following e-mail to Ms. Easlon:

Re:  Davita Pharmacy enterview [sic]

Ms Easlon [sic] It was very exciting talking with you about the Pharmacy rep. position.  Im [sic] just e-mailing you, to let you know about my work scedule [sic] for Jan.06. [sic] I believe that I would be a great asset in recruting [sic] patients for Davitas [sic] Pharmacy program, and Im [sic] again excited about the posibility [sic].  My work week is Mon.Wed.Fri [sic] 5:00am till [sic] 8:00pmm. [sic]  Again thank you for the opertunity [sic] to join the crew.

(Ex. 2(E).)

22.    When she received this e-mail, Ms. Easlon had already decided not to pursue Mr. Mason's application because she had filled the D.C. position, but this e-mail

made it clear to her that he was not a qualified candidate.  (Id.; Easlon Dep. 83-84 (Ex. 6).)

23.     Ms. Easlon explained in her deposition that a large portion of a PSR's work is administrative, and she did not feel that the e-mail was professional in light of all the misspellings.  (Easlon Dep. 84 (Ex. 6).)  The PSR Job Description specifically lists "attention to detail" as a requirement.  (Ex. 2(A).)

24.     In an e-mail dated January 9, 2006, Ms. Easlon wrote to Mr. Mason:  "I regret that we have filled the position that was available in your area.  Thank you very much for your interest."  (Ex. 2(E).)

25.     After receiving Ms. Easlon's e-mail, Mr. Mason filed an internal complaint with DaVita on January 27, 2006 claiming that he was denied a PSR position by Ms. Easlon because of his race. (Second Am. Compl. ¶ 8.; Mason Dep. 148 (Ex. 8); Declaration of Gail Gardner dated March 30, 2007 ("Gardner Decl.") ¶ 2 (Ex. 3).)  Ms. Easlon (mistakenly referred to as "Eastland") was the only person accused of race discrimination by Mr. Mason in the complaint.  (Ex. 22 (record of complaint by Mr. Mason).)

26.     Ms. Easlon did not know Plaintiff's race prior to his filing of this internal complaint.  (Easlon Dep. 70-72 (Ex. 24); Easlon Decl. ¶ 13 (Ex. 2).)  Mr. Mason had never communicated his race to anyone at DaVita Rx in connection with his PSR job application, nor did he mention his race in his communications with Ms. Easlon.  (Mason Dep. 131-33 (Ex. 8); Easlon Decl. ¶ 13 (Ex. 2).)

27.     On or about February 9, 2006, the Human Resources Manager responsible for interviewing Mr. Mason about his complaint, Gail Gardner, spoke to Josh Golomb

about Mr. Mason's complaint.  (Gardner Decl. ¶ 5 (Ex. 3).)  Josh Golomb was Ms.

Easlon's supervisor and a Director of DaVita Rx.  (Id.)

28.     Mr. Golomb told Ms. Gardner that he would speak to Ms. Easlon to

determine whether there was a basis for Mr. Mason's complaint.  (Id.)  Mr. Golomb also

stated to Ms. Gardner that although it was not DaVita Rx's practice to relocate people to

fill PSR positions, he would be willing to interview Mr. Mason for PSR positions outside

of Washington, D.C.  (Id.)  Neither Ms. Gardner nor anyone else required Mr. Golomb to

conduct this interview.  (Id.)

29.     Mr. Golomb spoke to Ms. Easlon to find out why she had not conducted

an in-person interview with him.  (Golomb Dep. 69-70 (Ex. 12).)  Ms. Easlon explained

that Mr. Mason could not meet with her on the date that she had offered to him and that

Mr. Jones was further along in the process.  Once he had accepted an offer, there was no

position open for Washington, D.C.  (Golomb Dep. 69-70, 75, 81 (Ex. 12).)  Ms. Easlon

also informed Mr. Golomb that Mr. Mason's January 6, 2006 e-mail contained numerous

misspellings and grammatical errors which made it clear to her that he did not pay

enough attention to detail to be qualified for the PSR position.   (Easlon Dep. 84 (Ex. 6);

Easlon Dep. 86-87 (Ex. 13).)

30.     Mr. Golomb told Ms. Easlon that he was going to interview Mr. Mason

and arrive at his own conclusions.  (Easlon Dep. 87 (Ex. 13).)  Mr. Golomb was Ms.

Easlon's supervisor and had the authority to hire Mr. Mason over her objection.  (Id. at

132.)

31.     Mr. Golomb's office was in California in 2006.  (Golomb Decl. ¶ 7 (Ex.

1).)

32.     Mr. Golomb telephoned Plaintiff in early March 2006 and offered to interview him by telephone for PSR positions that were open around the country at the time.  (Golomb Decl. ¶ 4-5 (Ex. 1); Second Am. Compl. ¶ 9.)  There were no D.C. positions available at that time because Mr. Jones had filled this position in late December 2005. (Golomb Decl. ¶ 4 (Ex. 1).)

33.     Had Mr. Mason performed well on this substantive interview with Mr. Golomb, Mr. Golomb would have advanced Mr. Mason to the final round of interviews in California for jobs around the country, but not Washington, D.C.  (Golomb Dep. 163 (Ex. 5); Golomb Decl. ¶ 4 (Ex.1).)

34.     Mr. Golomb and Mr. Mason agreed to conduct the interview on March 9, 2006 at 8:00 a.m.  (Golomb Dep. 92-93 (Ex. 5); Mason Dep. 160 (Ex. 8).)  Due to a misunderstanding about whether the interview time was Eastern Standard Time or Pacific Time (Golomb Dep. 93-94 (Ex. 5); Mason Dep. 160-62 (Ex. 8)), Mr. Mason was not at his home or cell phone numbers when Mr. Golomb called for the interview at 8:00 a.m. Eastern Time.  (Golomb Dep. 95-96 (Ex. 5).)

35.     Mr. Golomb was not pleased about the misunderstanding because he was certain that he had told Mr. Mason that the interview would be at 8:00 a.m. Eastern Standard Time. (Golomb Dep. 93-94, 97-98 (Ex. 5).)  Mr. Golomb proceeded to interview Mr. Mason by telephone when Mr. Mason called him back later on March 9, 2006.  (Golomb Dep. 92-93, 97-98 (Ex. 5); Second Am. Compl. ¶ 9.)  At that point, Mr. Golomb was driving to an appointment, and he had to pull over to conduct his interview of Mr. Mason.  (Golomb Dep. 97-98 (Ex. 5).)  Mr. Golomb was in Florida at the time. (Golomb Decl. ¶ 6 (Ex. 1).)

36.     The interview lasted approximately 45 minutes.  (Golomb Dep. 98 (Ex. 5).)

37.     Mr. Golomb asked Mr. Mason questions about how he would sell the DaVita Rx service to teammates and physicians.  (Id. at 101-02.)  Mr. Golomb had asked Mr. Jones the same kinds of questions in their interview. (Jones Dep. 58-59, 62 (Ex. 7).)

38.     Following the interview, Mr. Golomb did not consult with Ms. Easlon about whether to advance Mr. Mason in the interview process.  (Easlon Dep. 87 (Ex. 13).)

39.     On March 17, 2006, Mr. Golomb advised Mr. Mason that he would not advance to the next stage of the PSR hiring process. (Golomb Dep. 121 (Ex. 5); Mason Dep. 169 (Ex. 8); Second Am. Compl. ¶ 9.)

40.      Mr. Golomb outlined his reasons for not advancing Mr. Mason to the final stage of the PSR process in a follow-up e-mail to Ms. Gardner as follows:

> James Mason was solid overall.  Jeff [another candidate interviewed by Mr. Golomb] was mediocre.  However, neither of them were as strong as other candidates we have been interviewing in terms of the following key areas:
>
> - Understanding and experience of sales
> - Sales effectiveness (in role plays I did with them via phone)
> - Thoughtfulness about approach for working with Physicians
> - Flexibility (both voiced some concerns about travel)

(Ex. 1(A).)

41.     With regard to Mr. Mason's understanding of sales and sales effectiveness, Mr. Golomb was most concerned about Mr. Mason's answers to two situational questions.  First, Mr. Golomb asked Mr. Mason how he would promote the DaVita Rx service to DaVita teammates.  Mr. Mason stated that he would make sure that the teammates understood that DaVita Rx was a part of DaVita and that since many

employees own stock in DaVita, they would be motivated to support a new DaVita

business.  (Golomb Dep. 103 (Ex. 5).)  Mr. Mason confirmed at his deposition that this

was in fact his response.  (Mason Dep. 164 (Ex. 8).)  Mr. Mason described his answer as

follows:

> I told him that, you know, that this is a DaVita program, and part of the DaVita
> program is any time that DaVita has a success, it's a success for us.  And
> sometimes we get <u>profit sharing</u>, and that would help to improve on the profit
> sharing if this program were successful, and that, you know, it's not just because a
> lot of people don't really want to hear anything that you have to say from
> pharmaceutical representatives or anyone, when you have a heavy workload.

(<u>Id.</u>) (emphasis added)

42.    In Mr. Golomb's judgment, Mr. Mason's answer was not good because

the relationship between DaVita's overall performance and an employee's own financial

incentives is not strong.  A good answer would have been that the DaVita Rx pharmacy

service will result in better patient care, and that this will in turn improve the patient care

metrics for which each facility is held accountable.  (Golomb Dep. 106-07 (Ex. 5).)  Ms.

Easlon further explained that these facility-based metrics result in a direct financial

benefit to the teammates because their bonuses are based on these metrics.  (Easlon Dep.

126-27 (Ex. 6).)

43.    Mr. Golomb also found that Mr. Mason's answer regarding how he would

promote the DaVita Rx program to physicians did not demonstrate a strong

understanding of what the physicians care about, and the fact that physicians are very

diverse in their attitudes.  (Golomb Dep. at 109 (Ex. 5).)  In Mr. Golomb's judgment, Mr.

Mason's answer should have, but did not, involve an assessment of what the doctors

cared about and then an explanation of why DaVita Rx's pharmacy programs would help

achieve those goals.  (<u>Id.</u>)  Mr. Mason does not recall what questions Mr. Golomb asked

of him concerning how he would sell the service to physicians, but recalls emphasizing his good personal relationships with the physicians.  (Mason Dep. 165-66 (Ex. 8).)

44.     Mr. Golomb was also concerned with Mr. Mason's response regarding the extensive travel required for the position.  Mr. Mason's answer regarding travel was short.  Mr. Mason merely stated that he had discussed it with his wife and that the travel would be fine.  (Golomb Dep. 113 (Ex. 5).)  Mr. Golomb was concerned by this answer because, in his experience, people who truly understand what 75% travel means will often ask more questions about it and explain how they are going to deal with it.  Mr. Golomb testified that "It felt a bit to me like he was telling me what he thought I wanted to hear as opposed to really demonstrating that he had thought through the implications." (Id. at 113-14.)

## II.     FACTS PERTINENT TO THE 2007 RETALIATION CLAIM

### Plaintiff's Lawsuit against DaVita Rx and his Continued Employment with DaVita at the Georgetown Facility

45.     On May 19, 2006, Plaintiff filed this lawsuit against DaVita Inc. in the Superior Court for the District of Columbia alleging that Davita Rx did not offer him a PSR position because he is African-American.  The Complaint did not allege any adverse actions by any of his supervisors or other employees of DaVita's dialysis facilities.  (See Compl. generally.)  DaVita removed the lawsuit to the U.S. District Court for the District of Columbia on July 26, 2006.

46.     Throughout the pendency of this lawsuit, Mr. Mason has continued to work for DaVita as a PCT at the Georgetown Facility.  (Bonnet Decl. ¶ 3 (Ex. 15).)

47.     In July 2006, the Facility Administrator of the Georgetown Facility, Geraldine McGowan, received an e-mail from DaVita's in-house counsel advising her

that Mr. Mason had filed a lawsuit against DaVita Rx, and requesting that she provide Mr. Mason's personnel file to DaVita's outside defense counsel for that lawsuit.    (Ex. 16(A) (July 18, 2006 e-mail).)  Mr. Cooper made clear in the e-mail that the lawsuit only concerned DaVita Rx (a separate business unit) and had nothing to do with her clinic. (Id.)  Mr. Cooper also reminded Ms. McGowan that it would be a violation of company policy to take any action against Mr. Mason because of the suit.  (Id.)  Ms. McGowan forwarded this e-mail to the Regional Operations Director for the Washington, D.C. Region, Theresa ("Terrie") Jurd, as an "FYI."  (Id.)

48.     In December 2006, Ms. McGowan asked Ms. Jurd for approval to recognize Mr. Mason and one other team mate with a "value award." (Deposition of Geraldine McGowan ("McGowan Dep.") 13-15 (Ex. 18).)  Ms. Jurd approved the request and Mr. Mason received a value award.  (Id.)

49.     At the end of 2006 or the beginning of 2007, Ms. McGowan, recommended that Mr. Mason be sent to DaVita's "preceptor university" in Nashville, Tennessee where he would be trained to teach DaVita teammates how to perform dialysis.  (Id. at 13.)  Ms. Jurd approved Ms. McGowan's request, and Mr. Mason attended this training.  (Id.)

50.     In June 2007, Mr. Mason received a raise from $17.49/hour to $18.01/hour.  (Bonnet Decl. ¶ 4 (Ex. 15).)

51.     In July 2007, Mr. Mason received a positive performance evaluation.  (Id. at ¶ 5.)

52.     Ms. Jurd was the Regional Operations Director for the Washington, D.C. region until the end of July 2007.  (Declaration of Theresa Jurd dated September 27, 2006 ("Jurd Decl.") ¶ 1 (Ex.16).)

<u>Background about DaVita's George Washingon University Hospital acute dialysis facility</u>

53.     In 2006 and continuing to the present, DaVita has operated an acute dialysis facility within the George Washington University Hospital (the "GWUH Facility").  The GWUH Facility provides dialysis and other patient care services for patients of the hospital.  (Declaration of Omowumni Oloyede dated September 27, 2007 ¶ 1 ("Oloyede Decl.") (Ex. 17).)

54.     The hours of operation at the GWUH Facility are 7:00 a.m. to 5:00 p.m., Mondays through Saturday.  Services outside of these hours are provided at the Facility by an on-call Registered Nurse who comes in if called by the hospital.  (<u>Id.</u> at ¶ 2.)

55.     From May 2006 through the present, DaVita has staffed its GWUH Facility with a Facility Administrator (Omowumni Oloyede), one full-time PCT/Administrative Assistant (Shanna McGill), and an average of two to three registered nurses during its hours of operation.  A registered nurse is always on call during evenings and Sundays.  (<u>Id.</u> at ¶ 3.)

56.     The GWUH Facility has a limited need for PCTs because the vast majority of patient care activities performed at the GWUH Facility must be performed there by nurses.  (<u>Id.</u> ¶¶ 4-9; Jurd Decl. ¶¶ 5-9 (Ex. 16).)  The few patient care tasks that can be performed there by a PCT must be done under the direct supervision of a nurse. (Oloyede Decl. ¶¶ 6-8 (Ex. 17); Jurd Decl. ¶¶ 7-8 (Ex. 16); Ex. 15(B) (Acute PCT Job Description).)

57.     Only registered nurses can be on-call during the evenings and Sundays because the person on call must be able to perform all procedures provided by the GWUH Facility if the need arises.  (Oloyede Decl. ¶ 9 (Ex. 17); Jurd Decl. ¶ 9 (Ex. 16).)

58.     Shanna McGill is the only PCT to have worked at the GWUH Facility since May 2006 to the present.  (Oloyede Decl. ¶ 10 (Ex. 17); Bonnet Decl. ¶ 8 (Ex.15).) She splits her full time schedule between PCT and Administrative Assistant duties, and earns $17/hour.  (Oloyede Decl. ¶¶ 3, 10 (Ex. 17); Bonnet Decl. ¶¶ 6, 8 (Ex. 15).)

Mr. Mason's Inquiry at the GWUH Facility

59.     Sometime at the end of October 2006, Mr. Mason telephoned the GWUH facility to inquire about working there.  (Mason Dep. 376-77 (Ex. 19).)  Mr. Mason did not know whether there was a need for the services of a PCT at the GWUH Facility when he placed this call.  (Id. at 369-70.)  This call with the Facility Administrator, Onowumni Oloyede, lasted five to ten minutes.   (Id. at 375-76.)  Because she had known Mr. Mason for ten years when she had worked at another DaVita facility in Washington, D.C., Ms. Oloyede told him to come into the clinic.  (Id. at 373-74.)

60.     At the end of October 2006, there were no PCT positions open at the GWUH Facility and there was no vacancy announcement for a PCT.  (Oloyede Decl. ¶ 11 (Ex. 17); Bonnet Decl. ¶ 9 (Ex. 16).)  In fact, the last time a vacancy was posted for a PCT position at the GWUH Facility was in January 2006.  (Oloyede Decl. ¶ 11 (Ex. 17); Bonnet Decl. ¶ 6 (Ex. 16).)  That position was filled by Shanna McGill who began working full-time at the GWUH Facility in May 2006 and has continuously occupied this position to the present.  (Oloyede Decl. ¶ 10 (Ex. 17); Bonnet Decl. ¶ 6 (Ex. 16).)

61.     Mr. Mason met with Ms. Oloyede in person on November 2, 2006. (Oloyede Decl. ¶ 12 (Ex. 17).)  According to Mr. Mason, Ms. Oloyede and he discussed his working on a "per diem" or "PRN" basis from 7:00 a.m. to 4:30 p.m. on Tuesdays, sometimes on Thursdays when the other PCT needed to go on vacation, and "some Saturdays."  (Mason Dep. 381-82, 388-89 (Ex. 19).)

62.     When asked what the terms "per diem" and "PRN" meant to him, Mr. Mason stated:  "It's like two –permanent PRN and just PRN, a staff member who they have available to call when it's needed.  Like we were discussing about the other facilities I worked at and that that person is known, you know, that person, his or her name is there and available to help out when needed."  (Id. at 389.)  Mr. Mason conceded that he was "hired to fill in as needed."  (Id. at 389-90.)

63.     Mr. Mason says that he and Ms. Oloyede discussed his working at both the Georgetown Facility and the GWUH Facility.  (Id. at 371.)  He testified that because Ms. Oloyede was concerned about paying him overtime rates (id. at 390), he would have to cut back his hours at the Georgetown Facility so that his total hours would not exceed forty hours a week.  (Id. at 371, 390-92.)   Mason speculated that there would be some overtime in January 2006.  (Id. at 392.)

64.     Ms. Oloyede never agreed to pay Mr. Mason an hourly rate that was higher than the rate he was already being paid by DaVita.  (Oloyede Decl.  ¶ 12 (Ex. 17).)

65.     Mr. Mason's benefits would not have changed if he worked at the GWUH Facility because he was already a full-time employee of DaVita with full benefits. (Bonnet Decl. ¶ 10 (Ex. 15).)

66.     During the November 2, 2006 meeting, Ms. Oloyede informed Mr. Mason that he would have to contact the GWUH's Employee Health Service to go through the medical clearance process for persons working at the hospital with patient care duties. (Mason Dep. 386 (Ex. 19).)

67.     The GWUH medical clearance process is mandatory for all persons who wish to engage in patient care activities at GWUH.  (Declaration of Katherine Hulick dated Aug. 9, 2007 ("Hulick Decl.") ¶ 3 (Ex. 21).)

68.     According to Mr. Mason, Ms. Oloyede stated that she would have to discuss his working at the GWUH Facility with her Regional Operations Director, Terri Jurd.  (Mason Dep. 413-14 (Ex. 19).)

69.     Sometime thereafter, Ms. Oloyede informed Ms. Jurd that she wanted to use Mr. Mason's services on an as needed basis, and Ms. Jurd said this would be "okay". (Oloyede Decl. ¶ 13 (Ex. 17).)

70.     In November and December 2006, Mr. Mason went to the GWUH Employee Health Service to undergo the medical clearance process.  However, he never received clearance from the Service to work at the Hospital because he did not complete the second PPD test required by the hospital or provide his immunization record.  (Hulick Decl. ¶ 11 (Ex. 21).)  In fact, the records show that Mr. Mason did not send in the first PPD test results until January 12, 2007. (Id. at ¶ 8.)

71.     Mr. Mason claims that he tried contacting Ms. Oloyede at least two to three times in January or February 2007 to see when he could start working.  (Mason Dep. 420-23 (Ex. 19).)  He claims that the last time, Ms. Oloyede returned his call and allegedly told him "I can't use you" without further explanation.  (Id. 419-20.)  Although

Ms. Oloyede denies that she said "I can't use you," she states that her last conversation

with Mr. Mason was on February 21, 2007, and that she told him at that time that the

[patient] census was low.  (Oloyede Decl. ¶ 14 (Ex. 17); Deposition of Omowumni

Oloyede 82-83 (Ex. 20).)

72.     DaVita did not use Mr. Mason's services at the GWUH Facility because

the Facility did not have a need for the services of another PCT at any time after Mr.

Mason's meeting with Ms. Oloyede on November 2, 2006.  From November 2, 2006 to

the present, DaVita (1) did not advertise for or interview any applicants for a PCT

position of any kind (full-time, part-time, PRN or per diem) at the GWUH Facility

(Oloyede Decl. ¶ 13 (Ex. 17); Bonnet Decl. ¶¶ 6, 9 (Ex. 15)), or (2) use the services of

any PCT (in any capacity) at the GWUH Facility other than Shanna McGill who had

been working at the Facility since May 2006.  (Oloyede Decl. ¶ 13 (Ex. 17); Bonnet Decl.

¶ 8 (Ex. 15).)

73.     For February 2007 -- when Ms. Oloyede allegedly told Mr. Mason that she

could not use him -- the total number of patient procedures performed by the GWUH

Facility was 179, the lowest number in the preceding 12 months.  (Jurd. Decl. ¶ 15 and

Tab C thereto (Ex. 16, 16(c).)  The average number of patient procedures per month

performed by the GWUH Facility in the 12 months preceding February 2007 was 243.

(Id.)

74.     In March 2006, Ms. Oloyede learned from the GWUH Employee Health

Service that Mr. Mason had not completed the medical clearance process.  However,

there was no need to follow up on this because there was no need for his services.

(Oloyede Decl. ¶ 15 (Ex. 17).)

75.     Mr. Mason sought leave to file an Amended Complaint regarding the GWUH Facility for the first time on April 3, 2007.  (Motion to File First Am. Compl., April 3, 2007.)  Ms. Oloyede first found out that Mr. Mason had filed a lawsuit against DaVita in the Summer of 2007.  (Oloyede Decl. ¶ 16 (Ex. 17).)  Prior to this time, she had no knowledge of any complaints that Mr. Mason had against DaVita or DaVita Rx.  (Id.)

Respectfully submitted,

By:  _____/s/ Minh N. Vu_____
Minh N. Vu (Bar No. 444305)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
Tel: (202) 861-0900
Fax: (202) 296-2882

_____/s/ Joseph T. Ortiz_____
Joseph T. Ortiz
(admitted pro hac vice)
Epstein Becker & Green, P.C.
1875 Century Park East, Suite 500
Los Angeles, CA 90067-2506
(310) 557-9542
(310) 553-2165 (fax)

Dated:  September 28, 2007          Counsel for Defendant

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES MASON<br>717 Ingraham Street, NW<br>Washington, D.C. 20012,<br><br>        Plaintiff,<br><br>    v.<br><br>DAVITA INC.<br>601 Hawaii Street<br>El Segundo, CA 90245,<br><br>        Defendant. | )<br>)<br>)<br>)  Civil Action No. 06-1319 (RMC)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DAVITA INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN
## SUPPORT OF SUMMARY JUDGMENT ON COUNT II
## OF THE SECOND AMENDED COMPLAINT

Minh N. Vu (Bar No. 444305)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
Tel: (202) 861-1841
Fax: (202) 861-3541

Joseph T. Ortiz
(admitted pro hac vice)
Epstein Becker & Green, P.C.
1875 Century Park East, Suite 500
Los Angeles, CA 90067-2506
(310) 557-9542
(310) 553-2165 (fax)

Counsel for Defendant DaVita Inc.

September 28, 2007

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   SYNOPSIS OF MATERIAL FACTS ................................................................ 4

III.  ARGUMENT ...................................................................................................... 8

      A.    DaVita is entitled to summary judgment on Mr. Mason's claim that his non-selection in March 2006 constituted prohibited retaliation  because the Court does not have subject matter jurisdiction under the DCHRA..... 8

      B.    DaVita is entitled to Summary Judgment on Count II (Retaliation). ......... 8

            1.    The legal framework for summary judgment and retaliation claims. ............................................................................................ 8

            2.    Mr. Mason cannot establish a case of retaliation based on his non-selection for a PSR position in March 2006. ......................... 10

            3.    Mr. Mason cannot establish a case of retaliation based on DaVita's failure to use his services at the GWUH Facility in 2007 ........................................................................................... 16

                  a.    Mr. Mason did not suffer a materially adverse action. ..... 16

                  b.    There is no evidence that Mr. Mason applied for an "available job." .............................................................. 19

                  c.    There is no evidence of a causal link between Mr. Mason's protected activity and the allegedly retaliatory act. .................................................................................. 21

                  d.    Plaintiff was not qualified to work at the GWUH Facility ........................................................................... 23

                  e.    Even if Mr. Mason could establish a prima facie case of retaliation, he cannot show that DaVita's non-retaliatory reason for not using his services is a pretext for retaliation.................................................................. 24

IV.   CONCLUSION.................................................................................................. 24

I.    **INTRODUCTION**[1]

As set forth in DaVita Inc.'s ("DaVita") pending Motion for Summary Judgment on Count I of the Second Amended Complaint, this lawsuit originally concerned Plaintiff James Mason's claim under the D.C. Human Rights Act ("DCHRA") that DaVita Rx, a separate but wholly-owned company of Defendant DaVita, did not offer him a Pharmacy Services Representative ("PSR") position because of his race (African-American). (Compl. ¶ 12.)  In May 2007, Mr. Mason filed a Second Amended Complaint to add a second count: retaliation in violation of the DCHRA.  The retaliation count is based on two events:  (1) his non-selection for a DaVita Rx PSR position in March 2006 after he was given a second chance to apply for such a position in response to his filing of an internal complaint of race discrimination regarding his first non-selection in January 2006; and (2) DaVita's failure to use his services as a Patient Care Technician ("PCT") at its acute dialysis facility at the George Washington University Hospital (the "GWUH Facility") in February 2007 and thereafter.  (Second Am. Compl. ¶ 21.)  Mr. Mason claims that he was not allowed to work at the GWUH Facility because he filed this lawsuit in May 2006 about his non-selection for a PSR position by DaVita Rx.  (Id.)

The Court should grant summary judgment on Count II because, based on the undisputed facts and with the benefit of all reasonable inferences on the material disputed facts, Mr. Mason cannot establish a claim of retaliation.

There is simply no evidence in the record that DaVita Rx's March 2006 non-selection decision was motivated by a desire to retaliate against Mr. Mason for filing an internal complaint.  Even assuming solely for the sake of argument that Mr. Mason can

---

[1]    The record support for the facts set forth in this Memorandum are contained in DaVita Inc.'s Statement of Material Facts ("SMF"), and all citations will be to the SMF.

establish a prima facie case of retaliation, DaVita has produced a non-discriminatory reason for its action.  DaVita Rx's Director, Josh Golomb, had specific and documented concerns about Mr. Mason's sales ability, as evidenced by his answers to hypothetical questions about how Mr. Mason would promote the DaVita Rx service to team mates and physicians.  (SMF ¶¶ 40-44.)  There is no evidence on which a reasonable jury could conclude that this reason is a pretext for retaliation.  Indeed, the fact that Mr. Golomb insisted on giving Mr. Mason a second opportunity to interview for a PSR position is wholly inconsistent with Mr. Mason's claim that Mr. Golomb had a retaliatory motive.[2] (SMF ¶¶ 28-30.)

Mr. Mason also cannot establish a retaliation claim based on DaVita's failure to use his services as a PCT at its GWUH Facility in 2007.  First, he cannot show that he suffered a materially adverse action.  Simply put, there was no need for his services, or the services of any other PCT.  It is undisputed that from November 2, 2006 when Mr. Mason inquired about working at the GWUH Facility to the present, there was no posted PCT job vacancy and -- other than the PCT who had already been working there full-time for six months before Mr. Mason's inquiry -- DaVita did not use any PCT's services at the GWUH Facility on any basis.  (SMF ¶¶ 60, 72.)  During this same period, DaVita also did not seek or interview any PCT applicants.  (SMF ¶ 72.)  Because there was no work for an additional PCT at the GWUH Facility, Mr. Mason was not denied any work and was not harmed.

---

[2]     For reasons set forth in DaVita's Motion for Summary Judgment on Count I of the Second Amended Complaint, Mr. Golomb's decision also is not governed by the DCHRA and this Court does not have jurisdiction over this part of the claim.

DC:1104168v4

Furthermore, even if such work existed, the work arrangement that he claims was discussed amounted to nothing more than a lateral transfer with no change in benefits, pay, or rank.  (SMF ¶¶ 63-65.)  Under well-established D.C. Circuit precedent, the denial of such a lateral transfer does not constitute the materially adverse action required for a retaliation claim.

Second, the fact that there was no PCT position of any kind open at the GWUH Facility means that Mr. Mason cannot make out the additional prima facie requirement for retaliation cases involving a failure to hire: that he applied for an "available job."

Third, there is no evidence to establish the required causal connection between this lawsuit and DaVita's failure to use Mr. Mason's services.  Neither of the two DaVita managers implicated in Mr. Mason's GWUH Facility allegations -- Teresa Jurd and Omowunmi Oloyede -- had anything to do with Mr. Mason's prior complaints of discrimination against DaVita Rx, a wholly separate business unit.  (Second Am. Compl. ¶ 12; SMF ¶ 25 (internal complaint was about Kim Easlon of DaVita Rx); SMF ¶ 3 (DaVita Rx is a separate company.)  Ms. Oloyede did not even have knowledge of Mr. Mason's prior complaint or lawsuit against DaVita Rx until <u>after</u> Mr. Mason amended this lawsuit to include the GWUH Facility.  (SMF ¶ 75.)  Moreover, Mr. Mason cannot rely on temporal proximity to establish causation because a seven-month period is not close enough in time to support an inference of causation.

Fourth, even assuming for the sake of argument that Mr. Mason could establish a prima facie case of retaliation, there is ample evidence of DaVita's non-retaliatory reason for not using Mr. Mason's services:  There was no need for such services.  There is not a scintilla of evidence in the record to show that this reason is a pretext for retaliation.

II.    **SYNOPSIS OF MATERIAL FACTS**

DaVita's full Statement of Material Facts is set forth in a separate document which DaVita incorporates by reference.  However, for the Court's convenience, the following is a synopsis of the key facts relevant to this motion.

Plaintiff James Mason had worked for DaVita as a Patient Care Technician ("PCT") (i.e. a dialysis technician) since 1996 in Washington, D.C.  (SMF ¶ 2.)  In late 2005, Mr. Mason applied and was considered for a D.C.-based PSR position with DaVita Rx, a separate company owned by DaVita.  (SMF ¶ 3.)  The hiring manager, Kim Easlon, invited him for an in-person interview in Richmond, Virginia on December 12, 2006, but Mr. Mason declined it because of his work schedule.  (SMF ¶¶ 12, 14, 15.)  In January 2006, when Mr. Mason followed up with Ms. Easlon about the job, Ms. Easlon informed Mr. Mason that the position had been filled.  (SMF ¶¶ 21-24.)  The person selected was Christopher Jones, a white co-worker of Mr. Mason's who was an Administrative Assistant at a DaVita facility in Washington, D.C.  (SMF ¶ 16-18.)

Mr. Mason filed an internal complaint of race discrimination with DaVita on January 27, 2006 against Ms. Easlon.  (SMF ¶ 25.)  No one else was named in the Complaint.  (SMF ¶ 25.)  It is undisputed that Ms. Easlon did not know, and had no basis to know, Mr. Mason's race at any time before Mr. Mason filed his complaint against her. (SMF ¶ 26.)

A DaVita human resources representative, Gail Gardner, contacted Ms. Easlon's supervisor, DaVita Rx Director Josh Golomb, to advise him of the complaint in early February 2006.  (SMF ¶ 27.)  In response, Mr. Golomb spoke to Ms. Easlon to find out why she did not advance him in the interview process.  (SMF ¶¶ 28-29.)  She explained to him that Mr. Mason was not able to come to the in-person interview.  (SMF ¶ 29.)

Christopher Jones had come to the in-person interview on the same date offered to Plaintiff and was further along in the process and was hired for the Washington, D.C. position.  (SMF ¶¶ 14, 16, 29.)  Although she had already decided not to pursue Mr. Mason's application at this point because the position had been filled, Ms. Easlon also expressed her opinion that Mr. Mason was not a qualified candidate, based on the number of grammatical and spelling errors that were in an e-mail he wrote to her to follow up on the position.  (SMF ¶¶ 21, 29.)

Despite Ms. Easlon's concerns, Mr. Golomb decided to give Mr. Mason another chance and conducted a substantive, 45-minute telephonic interview of him for PSR positions outside of D.C.  (SMF ¶¶ 30, 32-37.)  Mr. Mason could not be reached by Mr. Golomb when he called for the scheduled interview because of a misunderstanding about whether the interview time was Eastern Standard Time or Pacific.  (SMF ¶ 34.)  Mr. Golomb had very specific and documented concerns about some of Mr. Mason's responses to questions about how he would handle certain aspects of the job, and decided that Mr. Mason would not be advanced to the next stage of the application process. (SMF ¶¶ 40-44.)

Mr. Mason filed this lawsuit on May 19, 2006.  The Complaint only concerned DaVita Rx's non-selection of him for a PSR position which he claimed was based on race.  (See Compl. generally.)  While this lawsuit has been pending, Mr. Mason has continued to work for DaVita as a PCT at its dialysis facility located at 3223 K Street, N.W., Washington, D.C. (the "Georgetown Facility").  (SMF ¶ 46.)

In July 2006, the Facility Administrator of the Georgetown Facility, Geraldine McGowan, received an e-mail from DaVita's in-house counsel advising that her that Mr.

Mason had filed a lawsuit against DaVita Rx, and requesting that she provide Mr.

Mason's personnel file to DaVita's outside defense counsel for that lawsuit.  (SMF ¶ 47.)

Mr. Cooper made clear in the e-mail that the lawsuit only concerned DaVita Rx (a

separate business unit) and had nothing to do with her clinic.  Mr. Cooper also reminded

Ms. McGowan that it would be a violation of company policy to take any action against

Mr. Mason because of the suit.  (SMF ¶ 47.)  Ms. McGowan forwarded this e-mail to the

Regional Operations Director for the Washington, D.C. Region, Theresa ("Terrie") Jurd,

as an "FYI."  (SMF ¶ 47.)

At the end of 2006, Ms. Jurd approved Mr. Mason for a value award

recommended by his Facility Administrator.  (SMF ¶ 48.)  Shortly thereafter, she

approved his attendance at DaVita's training program in Tennessee to become a

preceptor.  (SMF ¶ 49.)  In June 2007, Mr. Mason received a raise.  (SMF ¶ 50.)  In July

2007, he received a favorable performance evaluation.  (SMF ¶ 51.)  All of these actions

took place while Mr. Mason was in Ms. Jurd's chain of command.  (SMF ¶ 52.)

At the end of October 2006, Mr. Mason called the DaVita acute dialysis facility

located within the George Washington University Hospital (the "GWUH Facility") to see

if the Facility had a need for his services.  (SMF ¶ 59.)  There was no PCT job vacancy

posted for this Facility at this time or at any time thereafter to the present.  (SMF ¶ 60.)

In fact, the last time a PCT vacancy was posted was in January 2006 and that position

was filled, and remains filled, by the same person to the present time.  (SMF ¶ 60.)

The GWUH Facility Administrator, Omowumni Oloyede, knew Mr. Mason from

their work at another DaVita facility and told him to come in and meet with her.  (SMF ¶

59.)  Although the specifics of this meeting are disputed, even Mr. Mason had to admit

that the only work arrangement that was discussed was one where Mr. Mason would be asked to work on an as needed basis. (SMF ¶¶ 61-62.) Mr. Mason was also told to go get his medical clearance from the GWU Hospital so that he would be eligible to work. (SMF ¶ 66.) (As attested to by GWU Hospital's Employee Health Service, Mr. Mason never did so and thus was not eligible to work at the GWUH Facility). (SMF ¶ 70.) Mr. Mason says that the ultimate work arrangement that was discussed would have involved him cutting back his full-time schedule at the Georgetown Facility where he had been working so that he could work at the GWUH Facility without going over forty hours per week. (SMF ¶ 63.)

After Ms. Oloyede's meeting with Mr. Mason on November 2, 2006, Ms. Oloyede spoke to Ms. Jurd about using Mr. Mason on an as needed basis and Mr. Jurd stated that this would be "okay." (SMF ¶ 69.) However, it turned out that DaVita had no need for the services of an additional PCT at the GWUH Facility and Ms. Oloyede never used Mr. Mason's services. (SMF ¶ 72.) Specifically, <u>DaVita did not use the services of any PCT (in any capacity) at the GWUH Facility after November 2, 2006</u>, other than the one PCT, Shanna McGill, who had already been working there full time since May 2006. (SMF ¶ 72.) DaVita did not post any vacancies for a PCT position or interview any applicants at any time after this date. (SMF ¶ 72.) In addition, in February 2007 -- the month in which Mr. Mason last inquired about working at the GWUH Facility -- the number of patient procedures was the lowest that it had been for the preceding twelve months. (SMF ¶ 73.) It is also undisputed that Ms. Oloyede had no knowledge of Mr. Mason's lawsuit against DaVita or his internal complaint that he filed with DaVita until after he amended it to include claims relating to the GWUH Facility. (SMF ¶ 75.)

### III.    ARGUMENT

#### A.    DaVita is entitled to summary judgment on Mr. Mason's claim that his non-selection in March 2006 constituted prohibited retaliation because the Court does not have subject matter jurisdiction under the DCHRA.

As set forth in DaVita's opening and reply memoranda in support of its Motion for Summary Judgment on Count I of the Second Amended Complaint, the Court does not have subject matter jurisdiction under the DCHRA over DaVita Rx's non-selection of Mr. Mason for a PSR position in March 2006 because no discriminatory acts took place in Washington, D.C. and the PSR positions for which Mr. Mason interviewed were all located outside of Washington, D.C.  Because this issue has been fully briefed, DaVita incorporates by reference all of its prior submissions on this subject into this Memorandum.[3]

#### B.    DaVita is entitled to Summary Judgment on Count II (Retaliation).

##### 1.    The legal framework for summary judgment and retaliation claims.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).  To be "material" and "genuine", a factual dispute must be capable

---

[3]    See DaVita Inc.'s Mem. of Points and Authorities in Support of Summ. J. on Count I of the Second Am. Compl. (June 25, 2007) at 4-6; DaVita Inc.'s Reply Mem. of Points and Authorities in Support of Summ. J. on Count I of the Second Am. Compl. Aug. 21, 2007, at 25.

of affecting the substantive outcome of the case.  Anderson, 477 U.S. at 247-48;

Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

In order to establish a prima facie case of retaliation, Mr. Mason must show that

(1) he engaged in a statutorily protected activity; (2) that the employer took a "materially

adverse action" against him; and (3) a causal connection existed between the two.

Weber v. Battista, 494 F.3d 179, 184 (D.C. Cir. 2007); Brown v. Brody, 199 F.3d 446,

452 (D.C. Cir. 1999); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. __, 126 S. Ct.

2405, 2415 (2006) (holding that actionable retaliation must be based on conduct that

causes "material adversity.")  In addition, "where the plaintiff claims that the retaliation

took the form of a failure to hire, the plaintiff must also show [(1)] that he applied for an

available job, and [(2)] that he was qualified for the position."  See Morgan v. Fed. Home

Loan Mortgage Corp., 328 F.3d 647, 651  (D.C. Cir. 2003).[4]

If Mr. Mason establishes these elements, "the burden of production shifts to the

defendant, who must articulate some legitimate, non-retaliatory reason for the adverse

action, but the ultimate burden or persuasion remains always with the plaintiff.  Once the

defendant proffers the requisite explanation, the plaintiff must prove by a preponderance

of the evidence that the legitimate reasons offered by the defendant were not its true

reasons, but were a pretext for retaliation."  Woodruff v. Peters, 482 F.3d 521, 529 (D.C.

Cir. 2007) (internal citations and quotations omitted).

---

[4]      The McDonnell-Douglas analytical framework for discrimination and retaliation
cases also applies to cases brought under the DCHRA.  See Mungin v. Katten Muchin &
Zavis, 116 F.3d, 1549, 1553 (D.C. Cir. 1997).

###### 2.    Mr. Mason cannot establish a case of retaliation based on his non-selection for a PSR position in March 2006.

Mr. Mason alleges that DaVita Rx's Director Josh Golomb did not offer him a PSR position in March 2006 because Mr. Mason had filed an internal complaint of race discrimination in January 2006 against Kim Easlon, Davita Rx's Regional Sales Director. Summary judgment for DaVita is appropriate because, based on the evidence in this record, no reasonable jury could conclude that Mr. Golomb's decision was in retaliation for Mr. Mason's complaint against Ms. Easlon.

Mr. Golomb outlined his reasons for not advancing Mr. Mason to the final stage of the PSR process in a follow-up e-mail to the human resources representative, Gail Gardner as follows:

> James Mason was solid overall.  Jeff [another candidate interviewed by Mr. Golomb] was mediocre.  However, neither of them were as strong as other candidates we have been interviewing in terms of the following key areas:
>
> - Understanding and experience of sales
> - Sales effectiveness (in role plays I did with them via phone)
> - Thoughtfulness about approach for working with Physicians
> - Flexibility (both voiced some concerns about travel)

(SMF ¶ 40.)

With regard to Mr. Mason's understanding of sales and sales effectiveness, Mr. Golomb was most concerned about Mr. Mason's answers to two situational questions. First, Mr. Golomb asked Mr. Mason how he would promote the DaVita Rx service to DaVita teammates.  Mr. Mason stated that he would make sure that the teammates understood that DaVita Rx was a part of DaVita and that because many employees own stock in DaVita, they would be motivated to support a new DaVita business.  (SMF ¶ 41.) Mr. Mason confirmed at his deposition that this was in fact his response.  (SMF ¶ 41.) Mr. Mason described his answer as follows:

> I told him that, you know, that this is a DaVita program, and part of the DaVita program is any time that DaVita has a success, it's a success for us. And sometimes we get <u>profit sharing</u>, and that would help to improve on the profit sharing if this program were successful, and that, you know, it's not just because a lot of people don't really want to hear anything that you have to say from pharmaceutical representatives or anyone, when you have a heavy workload.

(SMF ¶ 41.) (emphasis added).

In Mr. Golomb's judgment, Mr. Mason's answer was not good because the relationship between DaVita's overall performance and an employee's own financial incentives is not strong. A good answer would have been that the DaVita Rx pharmacy service will result in better patient care, and that this will in turn improve the patient care metrics for which each facility is held accountable. (SMF ¶ 42.) Ms. Easlon further explained that these facility-based metrics result in a direct financial benefit to the teammates because their bonuses are based on these metrics. (SMF ¶ 42.)

Mr. Golomb also found that Mr. Mason's answer regarding how he would promote the DaVita Rx program to physicians did not demonstrate a strong understanding of what the physicians care about, and the fact that physicians are very diverse in their attitudes. (SMF ¶ 43.) In Mr. Golomb's judgment, Mr. Mason's answer should have, but did not, involve an assessment of what the doctors cared about and then an explanation of why DaVita Rx's pharmacy programs would help achieve those goals. (SMF ¶ 43.) Mr. Mason does not recall what questions Mr. Mason asked of him concerning how he would sell the service to physicians, but recalls emphasizing his good personal relationships with the physicians. (SMF ¶ 43.)

Mr. Golomb was also concerned with Mr. Mason's response regarding the extensive travel required for the position. (SMF ¶ 44.) Mr. Mason's answer regarding travel was short. Mr. Mason merely stated that he had discussed it with his wife and that

the travel would be fine. Mr. Golomb was concerned by this answer because, in his experience, people who truly understand what 75% travel means will often ask more questions about it and explain how they are going to deal with it. Mr. Golomb testified that "It felt a bit to me like he was telling me what he thought I wanted to hear as opposed to really demonstrating that he had thought through the implications." (SMF ¶ 44.)

Because DaVita has produced a non-discriminatory reason for its actions, the Court must decide whether, looking at all the evidence, there is sufficient evidence on which a reasonable jury could conclude that the reason is a pretext for retaliation. Brown, 199 F.3d at 458. This examination must include the inescapable fact that Mr. Golomb took it upon himself to give Mr. Mason a second chance at a PSR position even though no one required him to do so. See Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (Court's analysis must include evidence that contradicts plaintiff's theory that the challenged action was based on an illegal motive). When Mr. Golomb decided to interview Mr. Mason, he was fully aware of Mr. Mason's complaint against Ms. Easlon. (SMF ¶¶ 27, 32.) He was under no obligation to interview Mr. Mason. (SMF ¶ 28.) If he had a retaliatory motive, he could have taken no action at all. Ironically, had he not given Mr. Mason a second chance, Mr. Mason would not be asserting retaliation claim. This is a classic example of the old adage: "No good deed goes unpunished."

In his Opposition to DaVita's Motion for Summary Judgment on Count I, Mr. Mason has made the following arguments in an attempt to show that Mr. Golomb's decision was based on an illegal motive: (1) Mr. Golomb allegedly allowed Ms. Easlon to interfere with his decision-making process; (2) Mr. Golomb's use of the telephone to

interview Mr. Mason, instead of meeting him in person, deviated from the usual interview procedure; (3) Mr. Golomb unfairly focused on Mr. Mason's sales abilities when, in Mr. Mason's view, the job is really about patient service; (4); Mr. Mason was more qualified than Mr. Jones who was hired for the Washington, D.C. position because he had dialysis experience.  As previously set forth in greater detail in DaVita's briefs in support of its Motion for Summary Judgment on Count I of the Second Amended Complaint,[5] none of these arguments have any merit.

1.     There are no facts to support Mr. Mason's claim that Ms. Easlon interfered with Mr. Golomb's decision making process.  (SMF ¶ 29.)  Because Mr. Mason had complained about Ms. Easlon's actions, Mr. Golomb naturally had to ask Ms. Easlon what had happened.  There was also nothing inappropriate about Ms. Easlon advising Mr. Golomb about Mr. Mason's lack of attention to detail as evidenced by his very sloppy e-mail, as that was one of the job requirements.  (SMF ¶ 29.)  In any event, Mr. Golomb decided to interview Mr. Mason to conduct his own assessment.  (SMF ¶ 30.)  There is no evidence that Mr. Golomb consulted with Ms. Easlon in making his decision on Mr. Mason.  (SMF ¶ 38.)

2.     The fact that Mr. Golomb used the telephone to conduct the second step of the interview process (a substantive 45-minute interview), as opposed to meeting Mr. Mason in person, is hardly evidence of pretext or retaliation under the circumstances. The usual second step of the interview process would have been for Mr. Mason to meet

---

[5]     See DaVita Inc.'s Mem. of Points and Authorities in Support of Summ. J. on Count I of the Second Am. Compl. at 16-18 and Davita Inc's Reply Mem. at 19-24.

Ms. Easlon for a 45-minute to an hour long in-person interview.[6]  (SMF ¶¶ 11(d), 17.)

Because Mr. Mason had complained of discrimination by Ms. Easlon, Mr. Golomb

conducted the equivalent of the second step of the process himself.  (SMF ¶¶ 28, 36.)

Although this more substantive 45-minute interview would normally have been in person,

Mr. Golomb interviewed Mr. Mason by telephone because he was not located anywhere

near the D.C. area.  (SMF ¶ 31.)  Mr. Mason cannot dispute the fact that Mr. Golomb

asked him essentially the same questions that he posed to Mr. Jones.  (SMF ¶ 37.)  Mr.

Golomb specifically explained at his deposition that had Mr. Mason performed well in

the telephone interview with him, he would have been invited to California to meet the

other managers (i.e., the third and final step of the process).  (SMF ¶ 33.)  Thus, the only

difference in Mr. Mason's process was that the second interview was conducted by

telephone, not that it was substantively any different from the usual second interview

where situational questions are posed by a manager.  This difference was a product of the

unique situation created by Mr. Mason's filing of his internal complaint.  In Salazar v.

Washington Metropolitan Transit Authority, 401 F.3d 504, 508 (D.C. Cir. 2005), the

D.C. Circuit specifically held that the employer's deviation "from its normal appointment

process in response to [the plaintiff's] concerns" was "not all that probative" on the issue

of discrimination.

      3.    There is no support for Mr. Mason's claim that that, by focusing on Mr.

Mason's lack of sales ability, Mr. Golomb somehow changed the job requirements.  The

first sentence of the PSR job description makes clear that the PSR's function is "selling

---

[6]    Mr. Jones testified that the second step in his interview process -- his in-person
with Ms. Easlon -- lasted about 45 minutes to an hour and that Ms. Easlon asked him
situational questions about how he would deal with difficult situations as a PSR.  (SMF ¶
17.)

the DaVita Rx service to patients, teammates and physicians." (SMF ¶ 4.) The job description lists "Active seller" as one of the job qualifications, and states under the "Essential Job Functions": "Sales experience a plus but not a must." (SMF ¶ 5.) Thus, the ability to sell (not necessarily sales experience) is a key criteria for the selection of PSRs.

4.    Finally, Mr. Mason will likely argue his experience as a PCT made him more qualified than other PSR offerees such as Mr. Jones who had no dialysis experience. There is ample evidence in the record establishing that Mr. Jones was a qualified candidate. (SMF ¶ 20.) Mr. Jones had administrative, management, sales, and patient care experience which demonstrated that he had the requisite skills for the PSR position. (SMF ¶ 20.) Furthermore, the argument misses the mark because Mr. Mason was not competing against Mr. Jones who had already been hired in December 2006. (SMF ¶ 18.) Finally, Mr. Mason's dialysis experience did not make him any more qualified than other candidates without such experience because dialysis experience is not identified anywhere on the Job Description as required or even a "plus." (SMF ¶¶ 5-6.) In contrast, sales skills are listed on the job description twice. (SMF ¶ 5.) That DaVita did not consider dialysis experience to be necessary for the PSR position is confirmed by the fact that of the 46 people who were hired for PSR positions in 2005 and 2006, only seven had worked as PCTs. (SMF ¶ 6.) On the other hand, at least 22 of these people had sales experience listed on their resumes. (SMF ¶ 6.) DaVita Rx also hired people with administrative backgrounds, social work/insurance backgrounds, patient care backgrounds, and pharmacy backgrounds for PSR positions (SMF ¶ 6.)

In short, Mr. Mason cannot marshal any evidence on which a jury could conclude that Mr. Golomb's reason for his decision is a pretext for retaliation.  The D.C. Circuit has held that "it may not second guess an employer's personnel decision absent [a] demonstrably discriminatory motive.  Once the employer has articulated a non-discriminatory reason for its action, the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." Fischbach v. D.C. Dep't Health Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1986). Accordingly, summary judgment for DaVita is appropriate with regard to DaVita Rx's March 2006 non-selection of Mr. Mason.

> ### 3.    Mr. Mason cannot establish a case of retaliation based on DaVita's failure to use his services at the GWUH Facility in 2007.

> #### a.    Mr. Mason did not suffer a materially adverse action.

In Burlington N., 126 S. Ct. at 2414, the Supreme Court held that "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  (emphasis added).  The Court stated that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," and cited with approval the D.C. Circuit's decision in Rochon v. Gonzales, 438 F.3d 1211 (D.C. Cir. 2006).  Id. at 2415.  In Rochon, the D.C. Circuit stated that a plaintiff must "demonstrate materially adverse consequences . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." Rochon, 438 F.3d at 1219.

It is undisputed that after Mr. Mason spoke to Ms. Oloyede about working extra hours at the GWUH Facility on November 2, 2006, DaVita had no need for the services of another PCT at the GWUH Facility.  (SMF ¶ 72.)  Specifically, from November 2,

2006 to the present, (1) other than Shanna McGill -- the full-time PCT who had worked at the GWUH Facility for six months prior to Mr. Mason's initial inquiry about working there -- no other PCT worked at this Facility in any capacity; (2) DaVita did not seek or interview any applicants for PCT positions at the GWUH Facility; and (3) DaVita did not advertise any PCT job openings for this Facility. (SMF ¶¶ 60,72.) In fact, DaVita had not advertised any PCT job openings for this facility since it hired Ms. McGill in May 2006. (SMF ¶ 60.) The foregoing undisputed facts demonstrate that DaVita did not have a need for an additional PCT at the GWUH Facility. Thus, Mr. Mason was not denied a any work opportunities and could not suffer any injury as a result.

Even assuming for the sake of argument that there was a need for the services of a PCT at the GWUH Facility after November 2, 2006, DaVita's failure to use Mr. Mason to fill that hypothetical need did not result in an objectively tangible harm to him because the work in question constituted nothing more than a lateral transfer. In Brown v. Brody, 199 F.3d 446 (D.C. Cir. 1999), the D.C. Circuit held that denial of a lateral move is not a tangible harm:

> [A] plaintiff who is made to undertake or who is denied a lateral transfer -- that is, one in which she suffers no diminution in pay or benefits -- does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere indiosyncracies of personal preference are not sufficient to state an injury.

Id. at 457 (holding that the plaintiff's non-selection for a lateral position that she found desirable did not result in objectively tangible harm because the rank, benefits, and pay associated with this position were the same as the job she held).

In this case, the ultimate work arrangement for which Mr. Mason claims to have been hired was a total of forty hours a week allocated between the DaVita Georgetown Facility (where he had been working a forty-hour week) and the GWUH Facility. (SMF ¶ 63.) Mr. Mason testified that to avoid charging overtime -- a concern for the GWUH Facility's Administrator -- he would have to reduce his hours at Georgetown Facility. (SMF ¶ 63.) He thought that there would be some overtime in January 2007 during a transition period, but that there would no overtime thereafter. (SMF ¶ 63.)[7]

There also is no evidence that DaVita would have increased Mr. Mason's hourly rate of pay for working at the GWUH Facility which was already $17.49/hour in February 2007 and raised to $18.01/hour in June 2007. (SMF ¶ 50.) (The hourly rate of the other PCT who had been working at the GWUH Facility is $17/hour) (SMF ¶ 58.) Likewise, Mr. Mason would not have enjoyed any change in benefits as he already received all DaVita benefits available to a full-time PCT. (SMF ¶ 65.) Mr. Mason would have continued to have the title of Patient Care Technician if he had worked at the GWUH Facility, but his responsibilities would have actually diminished because PCTs working in an acute setting are limited in the patient care activities in which they can engage. (SMF ¶ 56.) In short, the work that Mr. Mason claims he was denied would have resulted in no additional hours or pay, no change in benefits, and decreased responsibilities. Under these circumstances, the alleged denial of a work opportunity at the GWUH Facility – assuming there was one (which there was not) – did not result in an "objectively tangible harm." Brown, 199 F.3d at 457; Burlington N., 126 S. Ct. ("a

---

[7]    Mr. Mason's speculation about working in January 2007 is put to rest by the undisputable fact that he did not send in his first PPD test result for the mandatory medical clearance until January 12, 2007, and then never provided the rest of the required information to obtain a clearance from GWUH. (SMF ¶ 70.)

plaintiff must show that a reasonable employee would have found the challenged action materially adverse"); <u>Murfree-Fleming v. Billington</u>, No. 05-01180, 2007 WL 2071675, at *3 (D.D.C. July 17, 2007) ("[f]ailure to give an employee desirable . . . work assignments is not an adverse action as a matter of law" where there was no change in pay, rank, or benefits).

**b.     There is no evidence that Mr. Mason applied for an "available job."**

It is undisputed that, at no time after Mr. Mason's inquiry, was there a PCT position open at the GWUH Facility or a need for an additional PCT to work there even on a per diem basis.  (SMF ¶ 72.)   Accordingly, Mr. Mason also cannot make out the fourth element of his prima facie case: "That he applied for an <u>available</u> job."  <u>Morgan</u>, 328 F.3d at 651 (holding that the plaintiff could not meet this requirement of his retaliation claim where the employer had suspended recruitment and never filled the position) (emphasis added).  Indeed, there is a wealth of failure to hire cases in the D.C. Circuit holding that a prima facie case of discrimination cannot be established where there was no evidence that a position remained open and the employer continued to seek applicants.  <u>See</u> <u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1152 (D.C. Cir. 2004) (plaintiff failed to make out prima facie case of discrimination absent evidence that "position remained open after [she] was turned away and that [employer] continued to seek applicants of her qualifications" ); <u>Williams v. Nicholson</u>, No. 06-0845, 2007 WL 744727 (D.D.C. March 6, 2007) (prima facie case of discriminatory hiring not established where employer originally had vacancy for which the plaintiff applied, another candidate was selected who turned down job, and the employer decided not to fill the position with anyone); <u>Henderson v. Rice,</u> 407 F. Supp. 2d 47, 51 (D.D.C. 2005) (plaintiff did not

make out prima facie case where employer selected more qualified applicant who turned down the job, and chose to leave position vacant); Hayslett v. Perry, 332 F. Supp. 2d 93, 100 (D.D.C. 2004) (plaintiff "falls short of establishing a prima facie case of discrimination" for lack of evidence that defendant "continued to seek applicants after plaintiff was allegedly passed over for the promotion").

The facts alleged by Mr. Mason are very similar to those in Teneyck, 365 F.3d at 1147. In Teneyck, the plaintiff inquired about a housekeeper position and was directed to a vacancy notice for a part-time position by the personnel office. (In Mr. Mason's case, there was not even a posted vacancy). The Executive Housekeeper interviewed her and discussed work hours and wages. The Executive Housekeeper told her to call her back the next day to find out when to start. When the plaintiff called the next day, the Executive Housekeeper allegedly hung up and later refused to speak with her. Id.

On these facts, the D.C. Circuit affirmed the grant of judgment as matter of law to the employer because the plaintiff had failed to establish "that the position remained open after [the plaintiff] was turned away and that [the employer] continued to seek applicants of her qualifications." Id. at 1152. The Court stated that by not offering this evidence, the plaintiff had "failed to eliminate one of the most common legitimate nondiscriminatory reasons for a failure to hire: the absence of a vacancy." Id. The Court so held even though there had been a posted vacancy and the plaintiff had an interview for the position.

Here, there is overwhelming and uncontroverted evidence that DaVita had no vacancy for a PCT at the GWUH Facility from when Mr. Mason inquired about working there and through the present time. (SMF ¶¶ 60, 72.)

          **c.**    **There is no evidence of a causal link between Mr. Mason's protected activity and the allegedly retaliatory act.**

Mr. Mason also cannot establish a causal link between the filing of this lawsuit and DaVita's failure to use his services as the GWUH Facility.  Up until April 2007 when Mr. Mason sought to add a retaliation count that mentioned the GWUH Facility for the first time, this lawsuit only concerned the actions of DaVita Rx managers and had nothing to do with anyone involved with DaVita's dialysis clinics.  (See Compl. generally.)  Although owned by DaVita, DaVita Rx's management and operations are completely separate from the management and operations of DaVita's dialysis facilities. (SMF ¶ 3.)  The two DaVita managers implicated in the GWUH Facility allegations are Terrie Jurd and Olowumni Oloyede.  (Second Am. Compl. ¶ 12 (referring to the GWUH Facility Administrator and the "regional administrator"); SMF ¶ 52 (Terrie Jurd was the Regional Operations Director in 2006 and 2007); SMF ¶ 55 (Omowumni Oloyede was the Facility Administrator).)  Neither of them nor any facility under their jurisdiction was involved in this lawsuit or other complaint filed by Mr. Mason prior to April 2007.  (See Compl. generally.)  Under these circumstances, Mr. Mason cannot establish the requisite causal connection.  See Wada v. Tomlinson, No. 03-1488, 2007 WL 1378516 (D.D.C. May 9, 2007) (no causal connection where person who engaged in allegedly retaliatory action was not involved with the events prompting the EEO complaint); Bieber v. Runyan, No. 93-1391, 1996 WL 525372, at *11 (D.D.C. Sept. 9, 1996) (no prima facie case of retaliation where alleged retaliatory action taken by person not implicated in plaintiff's earlier EEOC complaint).[8]

---

[8]      For the Court's convenience, unpublished decisions are attached at Exhibit 23.

Mr. Mason also cannot dispute that Ms. Oloyede did not know about his lawsuit or his internal complaint against DaVita Rx until the Summer of 2007, <u>after he amended the Complaint to name the GWUH Facility</u>.  (SMF ¶ 75.)  Thus, Ms. Oloyede could not have had a retaliatory motive at any time relevant to Mr. Mason's claim.  <u>See</u> <u>Clark County School Dist. v. Breeden</u>, 532 U.S. 268, 273 (no causal connection where person engaging in alleged retaliation had no knowledge about plaintiff's protected activities.)

Unable to avoid this serious problem in his case, Mr. Mason speculates that the Regional Operations Director, Terry Jurd, vetoed Mr. Mason's working at the Facility.  (Second Am. Compl. ¶ 12.)  However, Ms. Oloyede testified that Ms. Jurd said it would be "okay" for Mr. Mason to work at the GWUH Facility if a need arose and there are no facts to the contrary.  (SMF ¶ 69.)  Moreover, there is ample evidence that rebuts any claim of a retaliatory motive by Ms. Jurd.  Ms. Jurd, after being advised of Mr. Mason's lawsuit in July 2006, approved his being sent to training to become a preceptor and the granting of a value award to him at the end of 2006.  (SMF ¶¶ 48, 49.)  DaVita also gave Mr. Mason a pay raise and very favorable performance review in June and July 2007, respectively, all while Mr. Mason was under Ms. Jurd's chain of command.  (SMF ¶¶ 50, 51.)

Nor can Mr. Mason rely on temporal proximity to establish the element of causation because the Supreme Court and the D.C. Circuit have made clear that the temporal proximity must be "very close."  In <u>Clark</u>, the Supreme Court cited with approval cases holding that gaps of three and four months between the protected activity and the retaliatory action were too far apart to support an inference of causation.  532 U.S. at 273-274; <u>see also</u> <u>Mayers Laborers' Health & Safety Fund of N. Am.</u>, 478 F.3d

364, 369 (D.C. Cir. 2007) (acknowledging <u>Clark</u>'s holding and finding that eight to nine

month gap could not establish causation).   Mr. Mason filed his lawsuit against DaVita in

May 2006, and Ms. Jurd was advised of it about it July 2006.  (SMF ¶ 47.)  Mr. Mason

continued to work without incident for DaVita under Ms. Jurd's chain of command at all

times up to and including February 21, 2007 when he was allegedly told by Ms. Oloyede

that his services could not be used at the GWUH Facility.  (SMF ¶¶ 48-52.)  A lapse of

seven months under these circumstances cannot establish the requisite element of

causation.

> **d.    Plaintiff was not qualified to work at the GWUH Facility**

In a case where the alleged retaliation is a failure-to-hire, a plaintiff must also

show that he was qualified for the position as part of his prima facie case.  <u>See</u> <u>Fed.</u>

<u>Home Loan Mortgage Corp.</u>, 328 F.3d at 651.  It is undisputed that Mr. Mason had to

receive a medical clearance from the George Washington University Hospital Employee

Health Service before he could work at the GWUH Facility.  (SMF ¶ 67.)  DaVita has

submitted a sworn declaration from the GWUH Director of the Employee Health Service

stating that Mr. Mason never completed the screening process.  (SMF ¶ 70.)  Although

Ms. Oloyede did not learn about Mr. Mason's failure to obtain the clearance until March

2007 and the lack of a clearance ultimately made no difference because there was no

need for Mr. Mason's services, the lack of a clearance made Mr. Mason unqualified to

work at the GWUH Facility.  (SMF ¶¶ 70, 74.)

       e.       **Even if Mr. Mason could establish a prima facie case of retaliation, he cannot show that DaVita's non-retaliatory reason for not using his services is a pretext for retaliation.**

As stated above, DaVita has produced ample evidence showing that DaVita did not have a need for the services of an additional PCT (in any capacity) at the GWUH Facility at any time from November 2006 to the present.  (SMF ¶¶ 60, 72.)  Thus, Mr. Mason must marshal sufficient evidence on which a jury could conclude that this reason is a pretext for retaliation to defeat summary judgment.  Brown, 199 F.3d at 458.

Mr. Mason may argue that Ms. Oloyede's alleged conduct and statements during his meeting with her on November 2, 2006, show that there was a need for his services and that DaVita's claim that there was no need for his services is pretext.   This argument has no merit because, even if Ms. Oloyede thought there was a need at the time she met with Mr. Mason, it is undisputed that Ms. Oloyede did not use the services of any other PCT at her Facility thereafter.  (SMF ¶ 72.)  Furthermore, the number of procedures that had been performed at the GWUH Facility in February 2007 – the month in which Ms. Oloyede allegedly told Mr. Mason – "I cannot use you" – was the lowest of the preceding 12 months.  (SMF ¶ 73.)  The number of patient procedures was 179.  The monthly average for the preceding 12 months was 243 procedures.  (SMF ¶ 73.)

In short, there is no evidence whatsoever to establish that DaVita's reason for not using Mr. Mason's services – the lack of a need for a PCT at the GWUH Facility, is a pretext for retaliation.

## IV.    CONCLUSION

For all the foregoing reasons, DaVita respectfully requests the Court to grant its Motion for Summary Judgment on Count II of the Second Amended Complaint.

Respectfully submitted,

By:     _____/s/ Minh N. Vu_____
Minh N. Vu (Bar No. 444305)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
Tel: (202) 861-0900
Fax: (202) 296-2882

_____/s/ Joseph T. Ortiz_____
Joseph T. Ortiz
(admitted pro hac vice)
Epstein Becker & Green, P.C.
1875 Century Park East, Suite 500
Los Angeles, CA 90067-2506
(310) 557-9542
(310) 553-2165 (fax)

Dated:  September 28, 2007          Counsel for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of September, 2007, a copy of DaVita Inc.'s Motion and Memorandum of Points and Authorities in Support of Summary Judgment on Count II of the Second Amended Complaint, along with all exhibits and the proposed order, were served through the Court's Electronic Court Filing system to counsel listed below:

> David A. Branch
> Law Office of David A. Branch
> 1825 Connecticut Avenue, NW
> Suite 690
> Washington, D.C. 20009

> _____/s/ Minh N. Vu_____
> Minh N. Vu