**EXHIBIT 19**

355

1           UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3                 CIVIL DIVISION

4

5

6    - - - - - - - - - - - - - -x

7    JAMES MASON,                  :

8          Plaintiff,             :    Civil Action Number

9       vs.                        :    06-1319 (RMC)

10   DAVITA INC.,                  :

11          Defendant.            :

12   - - - - - - - - - - - - - -x

13

14        DEPOSITION OF JAMES MASON, VOLUME III

15

16                        Washington, D.C.

17                        Wednesday, August 1, 2007

18

19

20

21   REPORTED BY:

22       CARMEN SMITH

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700          800-336-6646

1      Q    When she made that suggestion, did she

2    tell you that she was aware that there was a need,

3    or was she just suggesting it because --

4      A    I don't remember.

5      Q    So you don't recall her telling you that

6    there was actually a need?

7      A    She knew that I was looking, and that was

8    one of the suggestions, is the way I remember it.

9      Q    Okay.   Other than this conversation that

10   you had with this nurse from the K Street facility,

11   did you have any other information about what needs

12   the GW Hospital dialysis facility had for PCTs?

13     A    Prior to speaking with the nurse at GW?

14     Q    Prior to contacting GW.

15     A    No.

16     Q    So did you see a position, a PCT position,

17   posted somewhere, like an advertisement for an

18   opening at this facility?

19     A    No, no, that's -- you never see that.

20     Q    Did you see -- was there a job for the GW

21   Hospital dialysis facility on the DaVita Web site?

22     A    I didn't check.

1      Q    Okay.  So you didn't -- so basically,

2    other than this nurse suggesting to you that you

3    should call the GW Hospital facility, you didn't

4    have any knowledge of whether there was a need or

5    not?

6      A    No, that is right.

7      Q    And then you called Ms. Oloyede?

8      A    Yes.

9      Q    You said in your prior answer that you

10   told her that you were available to work Tuesdays,

11   Thursdays, Saturdays and Sundays; is that right?

12     A    Yes.

13     Q    Did Ms. Oloyede at that time tell you

14   those were the days that she needed help?

15     A    No.

16     Q    So you just presented to her the fact that

17   you were available on those days?

18     A    Yes.

19     Q    And what were you looking for when you

20   called her?  Were you looking -- like what kind --

21   how many hours were you looking for or what kind of

22   job arrangement?

1          A     Whatever hours they needed.  Eight hours,

2     10 hours, whatever time they needed me to work on

3     those days.

4          Q     So was the work that you were looking for

5     when you called the GW University Hospital facility

6     going to be in addition to your current work at the

7     Georgetown facility, or was it supposed to take the

8     place of your current employment?

9          A     We discussed -- "we" meaning Wunmi and I,

10    we discussed both, so that it wouldn't run into

11    overtime, the possibility of cutting some of my

12    hours there, meaning at the Georgetown facility, and

13    making up for it at her facility.  And she said

14    maybe at first it will be overtime, and then later

15    on we will work out where I do both, work at both

16    facilities, and it would equal 40 hours.

17         Q     Did this discussion happen on the first

18    call?

19         A     It was in person.

20         Q     Okay.  So that was later?

21         A     Yes.

22         Q     Okay.  Now, in a perfect world, would you

1    experience of working in the OR, that that would

2    allow me to work on the dialysis floor, chairside or

3    bedside with the patients.  So I would need -- she

4    would need me to work the Tuesday, Saturday and

5    Sunday shifts that they have and some on-call days.

6         Q    Was this discussed in the first

7    conversation?

8         A    It was in person, the second conversation.

9         Q    Okay.  Let's focus on just the first

10   telephone conversation to keep everything straight.

11        A    Okay.

12        Q    So on the first conversation, you told

13   Ms. Oloyede that you could -- you were available to

14   work Tuesdays, Thursdays, Saturdays and Sundays;

15   correct?

16        A    Yes, I believe that I told her on the

17   phone of my days that I was available.

18        Q    And on this telephone conversation, did

19   she have a reaction to that?

20        A    No, she really just said -- she said come

21   on in, you know, I know you're -- she said I know

22   you.  She'd known me for about 10 years, and she

1    knew my work ethics and my character.  And she said

2    just come on in, we'll discuss everything.

3         Q    How did Ms. Oloyede know you?

4         A    We worked together at Union Plaza for

5    about three years, four years, and off and on at

6    different facilities from me helping out.

7         Q    What is Ms. Oloyede's race?

8         A    She's from Nigeria, I believe.  She's

9    African.

10        Q    So would it be fair to say that -- well,

11   strike that.

12             Did you on the first conversation, in the

13   first conversation, come to any agreement about what

14   the terms and conditions of your work would be at

15   the GW University Hospital facility?

16        A    I knew what I would be doing there,

17   because I worked in acute dialysis before.  Beyond

18   that, what she wanted me to do was help them to

19   organize the intake of their supplies, because it

20   was in disarray.  And when I went there and looked

21   around, she showed me around the facility and

22   introduced me to the staff and some of the patients,

1    some of the patients who were on dialysis at the

2    time.

3              And she said -- told me that she would

4    need me on Tuesdays mostly and on Thursdays

5    sometimes because a patient care tech who she had

6    there working, that she would need some time off,

7    some vacation time or something like that, because

8    she was working a lot of hours and she needed some

9    backup.

10        Q    Well, let's -- again, I'm just trying to

11   focus on the first conversation, the phone

12   conversation.

13        A    Okay.

14        Q    So would it be fair to say that at the end

15   of the first conversation that you had with

16   Ms. Oloyede, that you had not discussed what hours

17   you would be working or which days?

18        A    No, I don't think so.  I don't think we

19   discussed what days, because it was a quick

20   conversation.

21        Q    How long did it last, the conversation?

22        A    Besides, you know, catching up on a little

1    how do you dos and stuff like that, maybe five, 10

2    minutes maybe, maybe longer.

3        Q    Did Ms. Oloyede tell you on the first

4    conversation that she didn't have any positions open

5    at the facility?

6        A    No.

7        Q    When you -- in your first conversation

8    with Ms. Oloyede, was it the understanding that

9    Georgetown would remain your home base?

10       A    We didn't discuss that.

11       Q    On the first conversation?

12       A    On the phone conversation, no, we didn't

13   discuss that.

14       Q    Okay.  Essentially, you just presented

15   yourself as someone who was available to work extra

16   hours, and she told you to come on in and talk to

17   her.  Is that pretty much a fair description?

18       A    Yes, yes.

19       Q    Okay.  All right.  So when was the next

20   time you spoke with anybody from the GW University

21   Hospital facility?

22       A    She made the schedule -- I mean a day to

1    come by and meet with her.  I don't remember the

2    date, but it was on a Tuesday or Thursday, my day

3    off from the Georgetown facility.

4            Q    Was that in November?

5            A    Yes, I believe early November.

6            Q    When you first reached out to this

7    facility, was that also in November?

8            A    Could have been October.  Could have been.

9    I don't remember exactly.

10           Q    Okay.  So you came by the facility?

11           A    Yes.

12           Q    And why don't you tell me what happened.

13           A    She brought me into her office after I

14   arrived, and we sat down and we talked again about

15   staff that we worked with and patients that, you

16   know, we knew that passed away and stuff like that.

17           And she told me what she needed at her

18   facility and why, about needing me to help out on

19   the floor because they were using GW's nurses to

20   work the dialysis floor, and that cost DaVita a lot

21   of money to do that.

22           And because of my background, I could work

1        A    Yes.

2        Q    You're saying that she said that she

3   thought you could actually work on the dialysis

4   floor where normally only the GW nurses worked

5   because of your background; is that right?

6        A    Yes.

7        Q    Okay.  What else did you discuss?

8        A    I discussed the times.  She told me the

9   times she would need me, from about 7:00 a.m. to

10  about 4:30.  Sometimes it ran over, but about 4:30

11  p.m.

12             And she discussed some weekend work, being

13  on call because of acute patients coming in and

14  emergency situations, they would call me at home or

15  page me, and I would come in.  I'd have to be within

16  30 minutes of getting to the facility to dialyze the

17  patients.

18       Q    So if I hear you correctly, you said

19  earlier that you had talked about working on

20  Tuesdays usually and sometimes on Thursdays, and

21  then being on call on the weekends.  Is that fair?

22       A    Yes, yes.

1          Q     Would it be fair to say that Ms. Oloyede

2     was saying that if there was a need for you, she

3     would use your services?

4          A     She said during the times when the other

5     staff member, and I can't remember her name, when

6     she needed to go on vacation, because she told me at

7     the time that the young lady hadn't been on vacation

8     in a long time, working the hours that she worked,

9     that I would cover for her.

10               The particular day we talked about was

11    Thursday, I believe, was the day that the young lady

12    would like to take off, and some Saturdays.

13         Q     Is that why Thursdays was a "sometimes"?

14         A     Yes.

15         Q     Okay.  So what Ms. Oloyede was saying to

16    you, as I understand it, is that Thursdays you might

17    work if Ms. -- the other PCT wanted to take time

18    off -- wanted to take time off; right?

19         A     Yes.  And sometimes they also didn't have

20    as many patients on Thursday, may not have the same

21    amount of patients.

22         Q     So there might not be a need at all?

1     Q     Okay.  So aside from what you've described

2   thus far, did anything else happen during your

3   in-person visit to the GW University Hospital

4   facility?

5     A     She gave me the number for the employee

6   health, and she told me that even though GW -- I

7   mean DaVita has my records for, you know, medical

8   records and stuff like that, and we do blood work at

9   DaVita, she said that GW had their own requirements,

10  even though I was still working for DaVita, and they

11  had a contract with the George Washington Hospital

12  Center, I still had to go through them for my

13  physical.

14           She also told me about GW's orientation,

15  that they have an orientation for all staff members.

16  And she called while I was sitting in the office to

17  see when they had the next orientation.  And she

18  said she would schedule me for that next

19  orientation.  I don't remember when it was supposed

20  to be, I don't remember, if it was January or

21  February.  I think she told me she -- that GW had

22  the orientation, like, every two or three months.

1          Q     It's all right.  My question is, was it

2    your understanding, coming out of this conversation

3    with Ms. Oloyede, that in order for you to start

4    working at the facility, at the GW University

5    Hospital facility, that you would have to complete

6    the medical/health clearance process that is put in

7    place by the hospital?

8          A     She didn't really specify.  I mean, I knew

9    that I would have to take a physical working at

10   other hospitals.  You know, each hospital, they have

11   their own requirements after someone is hired.  So

12   it was kind of -- I knew that I would have to have a

13   physical done and that they would have to check my

14   PPD and my hepatitis status.

15         Q     Now, in your interrogatory answers, you

16   refer to the position that you were allegedly hired

17   for by Ms. Oloyede as a per diem position.  Do you

18   remember that?

19         A     Yes.

20         Q     You also then refer to it as a "PRN

21   position."

22         A     Yes.

1          Q     Is per diem and PRN the same?

2          A     Basically.

3          Q     What do those two terms mean?

4          A     It's like two -- permanent PRN and just

5     PRN, a staff member who they have available to call

6     when it's needed.  Like we were discussing about the

7     other facilities I worked at and that that person is

8     known, you know, that person, his or her name is

9     there and available to help out when needed.

10          And the permanent PRN is a staff member

11     who is -- who has specified days to work, specific

12     days to work, and then other days would fill in when

13     needed.

14          Q     In your interrogatory responses, you said

15     that you were basically hired as a PRN position?

16          A     Yes.

17          Q     Which is to fill in on days where needed?

18          A     Yes, that may have been a mistake.  But I

19     was hired.

20          Q     Well, hired to fill in as needed; correct?

21          A     Yes.

22          Q     Would you agree, Mr. Mason, that if there

1    was no need for your services, that the facility

2    wouldn't call you to work PRN, or per diem?

3        A    Yes.

4        Q    Now, earlier this morning, you said that

5    you and Ms. Oloyede, when you were having this

6    in-person meeting, also talked about how to

7    structure the hours so that you wouldn't go over

8    to -- you wouldn't be into overtime?

9        A    Yes, because the overtime would fall under

10   her budget.

11       Q    Right.  So at the time you were working

12   how many hours at Georgetown on the Potomac?

13       A    40 hours per week, unless the week fell on

14   one of the days where they cut my hours short.

15       Q    Okay.  So you were working basically a

16   40-hour week schedule -- 30 to 40 hours a week

17   already at Georgetown?

18       A    Yes.

19       Q    So then was the expectation with

20   Ms. Oloyede that you would only work a maximum of 10

21   more hours -- I mean, you know, of -- a maximum of

22   10 hours at her facility, so as to avoid her having

1    to pay OT?

2         A    Well, it would be about -- about 16 hours,

3    I guess, from -- on Tuesdays and Saturdays, working

4    an eight-hour day would be about 16 hours.

5         Q    Okay.  But that would put you over 40

6    hours a week.

7         A    Yes, it would.

8         Q    Wasn't that a concern that Ms. Oloyede had

9    expressed to you?

10        A    We discussed the fact that acute dialysis

11   techs and nurses make a lot more money than a

12   regular PCT and regular nurse on the regular

13   dialysis floor or in a chronic hemodialysis floor.

14   So that would compensate for that.

15             And also she said in the future, it would

16   cut -- we would talk about cutting my hours at

17   Georgetown and to make up -- to adjust to 40 hours a

18   week.

19        Q    So you're saying that the plan that you

20   discussed included essentially cutting your hours

21   back so that you would not work more than 40 hours a

22   week eventually?

1       A    Yes.  In the beginning she needed me right

2   away.  In January she told me she needed me right

3   away, she would need me in January.  And later on,

4   we could scale back my hours at Georgetown and make

5   up those hours at GW.

6       Q    Isn't that something that your current

7   facility administrator would have to sign off on?

8       A    I don't think so.  I don't know.  I don't

9   know.  We have -- we have a lot of staff at

10  Georgetown right now.  I just trained a young lady,

11  and I trained another young gentleman, Roger.  And

12  so we had enough staff at our facility, and that's

13  why our days had been shifted around.

14          We also had someone who was working

15  permanent PRN at our facility.

16      Q    At Georgetown?

17      A    Yes, at Georgetown.

18      Q    Now, Mr. Mason, you are not a registered

19  nurse; correct?

20      A    No.

21      Q    Is it your understanding that the GW

22  University Hospital does not allow people who are

1    which particular day she wanted me to work -- to

2    start on.

3        Q    Now, in your -- I want to clarify

4    something.  In your interrogatory number 11, you

5    said that when you --

6            MR. BRANCH:  What page are you on?

7            MS. VU:  Page 5.

8            BY MS. VU:

9        Q    You see where it says "I was told by

10   Ms. Oloyede that I would be starting my position

11   after the holidays in January 2007.  I was told she

12   needed to speak with my current supervisors."

13       A    Uh-huh, yes.

14       Q    Was that -- did that conversation happen

15   during your face-to-face meeting with Ms. Oloyede?

16       A    Yes.

17       Q    In your amended complaint, you say -- you

18   said that Ms. Oloyede said that she needed to speak

19   with her supervisor, the regional operations

20   director, not your current supervisors, as it is

21   stated here in interrogatory number 11.  So I'm

22   trying to reconcile this seeming conflict.

1        A    I may have worded it wrong, but the

2    regional -- she's still my boss also, the regional

3    administrator.  She's over our -- the eastern --

4    part of the Eastern Shore region of DaVita

5    facilities, and that's who I was referring to.

6        Q    So in your interrogatory number 11, when

7    you refer to -- when you say "I was told she needed

8    to speak with my current supervisors," who were you

9    referring to when you said this?

10       A    To the regional administrator.

11       Q    Anybody else?

12       A    No.

13       Q    Okay.  Who is the regional operations

14   director?

15       A    It was -- what's her name, she just -- she

16   is no longer with DaVita right now.  Her name

17   just -- I can't think of her name.

18       Q    Is it Theresa Jurd?

19       A    Yes, that's right.

20       Q    So it's really not current supervisors,

21   plural; it's really Terry Jurd?

22       A    Terry Jurd, yes.  Terry Jurd.

1       A    Sometime in January.

2       Q    So she didn't tell you at that time

3 anything substantive about when you might be working

4 or whether you would not be working or anything like

5 that?

6       A    She was busy.  I could hear the noise in

7 the background of the -- it was very noisy, and she

8 could barely hear me, so she said "I'll call you

9 back."

10      Q    Okay.  And then did she call you back?

11      A    Yes.  When -- I don't remember if it was

12 the same day, or a couple days later it could have

13 been.

14      Q    But within a couple days for sure?

15      A    Yes.

16      Q    Okay.  And what was the substance of that

17 conversation?

18      A    She called -- when she called me, I think

19 I was -- I don't remember where I was, but when

20 she -- when I spoke with her, she told me that "I

21 can't use you."  And I just got quiet on the other

22 end of the phone.  And I said, "you can't use me?"

1    And she said, "no, I can't use you."  And then she

2    hung up.

3        Q    So this conversation was -- this

4    conversation had to have been in February; correct?

5    Because --

6        A    Could be right, I don't know.  Because I

7    kept calling her, and I didn't receive any response

8    for a while.  And I don't remember how long it took

9    for me to get a response.  I don't remember exactly.

10       Q    Well, when I deposed you on February 1,

11   2007, you had actually talked about the possibility

12   of coming to work at the GW University Hospital

13   facility.  So at that point -- do you remember your

14   testimony on the subject?

15       A    No, no.

16       Q    Okay.  Well -- well, I will represent to

17   you that you discussed it and said it was a

18   possibility that you were going to go work there.

19   And there was no discussion at that point in time

20   about you having been told that you weren't going

21   there.

22       A    Uh-huh.

1          Q     So -- and I can show you the transcript if

2     you want to see it.

3          A     No, that's fine.  I may have got the month

4     wrong when I said February.  That may have been

5     wrong.  I'm not sure --

6          Q     You mean January?

7          A     No, February, when you said that I told

8     you that everything was fine up until February at

9     the last deposition.  It may have been January when

10    she told me that, is what I'm trying to say, or it

11    may have been February.  I can't remember right now.

12              MR. BRANCH:  What's the question, Minh?

13              MS. VU:  I'm trying to get -- I believe

14    that Mr. Mason is incorrect in saying that in

15    January, he was told that he can't be -- he wasn't

16    going to be used.

17              MR. BRANCH:  He said it may be January or

18    February.

19              MS. VU:  Right.  But I want to help him --

20    I want to get the right testimony out today, and I

21    can show him that on February 1, when I deposed him,

22    he was speaking about this opportunity at the

1    hospital in a way that clearly showed that he had

2    not gotten bad news about it.  And I'm hoping that

3    that will refresh his recollection.

4           And I'm entitled to show him that, to see

5    if it will refresh his recollection as to when he

6    got the word from Ms. Oloyede that he wasn't going

7    to be working at the facility.

8           BY MS. VU:

9    Q    If it doesn't refresh your recollection,

10   that's fine, but I want to show you the transcript

11   so that you can see that at that point on February

12   1, you seemed rather optimistic about your prospects

13   of working there and that that would be inconsistent

14   with any concept that you were told you weren't

15   working there in January.

16   A    What I'm saying is I don't remember.

17   It -- it could have been January and I could be

18   wrong now about the time --

19   Q    No, you said January.  I'm saying it could

20   be February.  It should be February.

21   A    It could be.  It could be February, I

22   don't know.  I had spoke with her -- I kept trying

1    to call her, kept trying to get in contact with her.

2    And when I actually spoke to her, I don't even

3    remember what day that was.  It could have been

4    February when I actually spoke to her and she was at

5    the convention.  I don't know.

6         Q    Okay.  Well, so you don't remember when?

7         A    No.

8         Q    All right.

9              MR. BRANCH:  Which he said at least two or

10   three times.  He says it could have been January or

11   February.

12             MS. VU:  Well, I'm hoping that I can

13   actually refresh his memory when he sees what he

14   said about this on February 1, that clearly he could

15   not have been told that he wasn't getting the job,

16   because he was very optimistic about it in February,

17   in his testimony.

18             BY MS. VU:

19        Q    But it's fine, you don't have a

20   recollection?

21        A    What I do remember is that I was told that

22   she couldn't use me.