**EXHIBIT 23**

Westlaw.

Slip Copy                                                                                                                Page 1

Slip Copy, 2007 WL 2071675 (D.D.C.)
(Cite as: Slip Copy)

Murfree-Fleming v. Billington
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Valda MURFREE-FLEMING, Plaintiff,
v.
James H. BILLINGTON, Defendant.
**Civil Action No. 05-01180 (HHK).**

July 17, 2007.

Bobara Ellen Liles, Mitchellville, MD, for Plaintiff.
John F. Henault, Jr., United States Attorney's
Office, Washington, DC, for Defendant.

HENRY H. KENNEDY, JR., United States District
Judge.
*1 Valda Murfree-Fleming, an employee of the
Library of Congress (the "Library"), brings this
action under Title VII of the Civil Rights Act of
1964, 42 U.S.C. §§ 2000e *et seq,* against James H.
Billington in his official capacity as Librarian of
Congress. Murfree-Fleming claims that the Library
subjected her to unlawful discrimination on the
basis of her gender and race in connection with a
reassignment of personnel and the duties they
performed within the division in which she worked.
Asserting that Murfree-Fleming failed to exhaust
her administrative remedies with respect to her
gender discrimination claim and that she is unable
to establish a prima facie case of race
discrimination, the Library moves for summary
judgment (# 10). Upon consideration of the motion,
the opposition thereto, and the summary-judgment
record, the court concludes that the motion must be
granted.

Murfree-Fleming, a Black female, began working at

the Library in 1991 as a supervisor in the Copyright
Office. In 1994, she was transferred to the Office of
Affirmative Action/Special Programs where she
became a GS-7 Professional Development
Associate. The following year, she was transferred
again, this time to the Library's Contracts &
Logistics Office ("C & L") where she became a
GS-1102-9 Procurement Specialist.
Murfree-Fleming's position as a Procurement
Specialist was a career ladder position that began at
the GS-7 level and progressed to the GS-11 level.
On November 10, 1996, she was promoted to
GS-11.

When Murfree-Fleming joined C & L, the office
was divided into two teams. One team handled "
large purchases," consisting of contracts valued
over $50,000, and the other team handled "small
purchases," consisting of contracts valued under
$50,000. In 1998, as the result of a realignment, the
duties of the large and small purchases teams were
combined although the employees were still divided
into two teams.

In 2001, Martin Contract Management, Inc. ("MCM
") was hired to perform an efficiency study of C &
L. MCM found that approximately 70% of C & L's
work involved contracts over $100,000, and the
remaining 30% involved contracts under $100,000.
In light of its findings, MCM recommended that C
& L be divided into two teams. One team would
handle purchases over $100,000, and the other team
would handle purchases under $100,000.
Subsequently, C & L implemented the
recommendation and hired Catherine Martin of
MCM to oversee the transition. Consistent with
MCM's study and recommendations, Martin divided
the office into two teams and assigned employees to
each. Murfree-Fleming was assigned to the team
handling purchases under $100,000. The team
handling purchases over $100,000 consisted of
three employees, each of them a White female.
Within a year of being hired, Martin left the
Library. In November 2002, C & L was realigned

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2071675 (D.D.C.)
**(Cite as: Slip Copy)**

again. After this realignment, all C & L employees had the opportunity to work on contracts, regardless of their dollar value.

**\*2** On July 3, 2002, Murfree-Fleming filed a complaint with the EEOC alleging that the Library engaged in unlawful discrimination in assigning employees to teams during the realignment in 2001.

### A. Gender Discrimination Claim

Before filing a civil action under Title VII, a federal employee must first exhaust her administrative remedies. A crucial step in the administrative exhaustion process is for the employee to give the agency adequate notice of the matter of which she complains. Indeed, it has been said that "[a]dequacy of notice is the core of Title VII's administrative exhaustion requirements."*Brown v. Marsh,* 777 F.2d 8, 14 (D.C.Cir.1985). The allegations in the administrative complaint must be sufficiently specific in order to "give federal agencies an opportunity to handle matters internally whenever possible."*Id.; see Park v. Howard Univ.,* 71 F.3d 904, 908-09 (D.C.Cir.1995) (holding that the plaintiff's administrative remedies were not exhausted because her EEOC complaint contained nothing that could reasonably be expected upon investigation to lead to the discovery of a hostile work environment). Specificity in a charge is not a " mere technicality" and compliance with all EEOC procedures and deadlines is mandatory. *Park,* 71 F.3d at 907.

Murfree-Fleming's EEOC complaint alleges that she was discriminated against on the basis of race alone. It fails to mention (or even insinuate) a gender discrimination charge that could reasonably be expected to have been encompassed within the Library of Congress' investigation. Therefore, Murfree-Fleming's gender discrimination claim must be dismissed.[FN1]

FN1. On the form provided by the EEOC

for a complainant to indicate the type of discrimination to which she was allegedly subjected, Murfree-Fleming checked the box for race discrimination and not the box for gender discrimination. Pl.'s EEOC Compl. ¶ 9. Murfree-Fleming's uncorroborated assertion that "she [is] confident that she [amended] her [EEOC] complaint to state gender as well," Pl.'s Opp'n ¶ 15, is insufficient to show that she exhausted her administrative remedies. Separate and apart from Murfree-Fleming's failure to exhaust her administrative remedies, her gender discrimination is fatally flawed because it is illogical. How can Murfee-Fleming claim gender discrimination when all of the members on the team that she felt she should have been on were women?

### B. Race Discrimination Claim

#### 1. Prima Facie Case

When, as here, a Title VII plaintiff proffers only indirect evidence of unlawful discrimination, her case is subject to the three-part test set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999). An adverse action requires "a significant change in employment status, such as hiring, firing, failing to promote, *reassignment with significantly different responsibilities,* or a decision causing significant change in benefits."*Brown,* 199 F.3d at 456 (emphasis added). Absent a reduction in pay or benefits, *only* those actions creating "materially adverse consequences affecting the terms, conditions, or privileges of her employment opportunities" amount to adverse actions. *Id.* at 457. "Purely subjective injuries, such as dissatisfaction with a reassignment ... are not adverse actions." *Forkkio v. Powell,* 306 F.3d 1127, 1130-31

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 3

Slip Copy, 2007 WL 2071675 (D.D.C.)
**(Cite as: Slip Copy)**

(D.C.Cir.2002).

**\*3** The library asserts that Murfree-Fleming fails to make out a prima facie case because she did not suffer an adverse employment action. Murfree-Fleming responds that she suffered an adverse employment action when she was placed on the team that only handled contracts under $100,000 "without her permission or input" and the Library "directed its employees to do what ever work it wanted to them [sic]." Pl.'s Opp'n at 10. Also, the reorganization "eliminated [her] potential for promotion." Pl.'s Compl. ¶ 16. Murfree-Fleming's position cannot be sustained.

The failure to give an employee "desirable" or "important" work assignments is not an adverse action as a matter of law. *See Bryant v. Brownlee,* 265 F.Supp.2d 52, 61 (D.D.C.2003) (finding that plaintiff's allegation that she was given unimportant work did not rise to the level of adverse employment action). Murfree-Fleming admits that during the realignment, "everything remained at the same level," Pl.'s Dep. 99:5-100:22, and she does not challenge the Library's assertion that she "retained her GS-11 grade level, maintained her Contract Specialist position, continued to make the same salary, continued to receive cost of living raises, continued to accrue benefits at the same level, continued to work on contracts, and maintained the same supervisor."Pl.'s Opp'n ¶ 13.

Murfree-Fleming's assertion that the realignment eliminated her potential for promotion is particularly unpersuasive. During the realignment, which lasted for approximately one year, Murfree-Fleming was a GS-11, the top grade for her career ladder position. Therefore, in order be promoted, Murfree-Fleming had to apply and compete for a higher grade level position. There are no non-selections at issue here, however, and Murfree-Fleming has not identified any specific promotion that she sought but did not receive (and where the realignment was a factor in the decision not to promote her).[FN2]

> FN2. Although there are no non-selections presently at issue, employment actions

which create "materially adverse consequences affecting ... [an employee's] future employment opportunities" can be considered adverse. *Brown v. Brody,* 199 F.3d 446, 457 (D .C.Cir.1999). In order to make that determination, the Court must have an "objective basis for finding that she was harmed by [the realignment] in [a] tangible way,"*id.,* which it does not. Plaintiff's unsubstantiated allegation that the realignment "resulted in major changes which significantly reduced [her] career prospects," Pl.'s Opp'n to Summ. J. at 11, is not sufficient for a reasonable trier of fact to conclude that she suffered an *objectively tangible harm. Brown,* 199 F.3d at 452.

## 2. The Library's Reason For The Realignment

Even if Murfree-Fleming could establish a prima facie case of racial discrimination, the Library has provided a legitimate, non-discriminatory reason for its actions. Murfree-Fleming's claim rests solely upon the fact that the three-member team assigned to work on contracts over $100,000 during the realignment consisted of all White females. However, it is only "in the absence of a legitimate explanation [that a court should] infer the existence of an illegitimate one."*Aka v. Washington Hosp. Center,* 156 F.3d 1284, 1292-93 (D.C.Cir.1998).

Here, the Library maintains-and Murfree-Fleming agrees-that the realignment was the result of an efficiency study conducted by an outside organization in 2001. The study revealed an uneven distribution of C & L's workload and recommended a realignment where the division would be split into two teams. More specifically, the study found that seventy percent of C & L's work involved contracts under $100,000, while the remaining thirty percent involved contracts over $100,000. The Library points out, without contradiction, that an employee's experience level was taken into consideration when it decided the team to which the employees should be assigned. The three women chosen to work on contracts over $100,000 were all senior in grade-level to everyone assigned to the other team (including Murfree-Fleming).[FN3] Nowhere in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4

Slip Copy, 2007 WL 2071675 (D.D.C.)
**(Cite as: Slip Copy)**

record is there evidence that the Library's stated reason was pretextual and that the true reason was discriminatory.

> FN3. Even if plaintiff was as experienced as the women on the other team, however, " [e]mployers have the discretion to choose among qualified candidates, 'provided that decision is not based upon unlawful criteria.' " *Ramey v. Bowsher*, 915 F.2d 731, 735 (D.C .Cir.1990) (quoting *Texas Dep't of Cmty Affairs v. Burdine*, 450 U .S. 248, 259 (1981)). Moreover, "that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose [the employer] to Title VII liability." *Id.*

**\*4** For the foregoing reasons, the court concludes that the motion to dismiss must be granted. An appropriate order accompanies this memorandum.

D.D.C.,2007.
Murfree-Fleming v. Billington
Slip Copy, 2007 WL 2071675 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                        Page 1

Slip Copy, 2007 WL 1378516 (D.D.C.)
(Cite as: Slip Copy)

**H**

Wada v. Tomlinson
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Hadiza I. WADA, Plaintiff,
v.
Kenneth Y. TOMLINSON, Defendant.
**Civil Action No. 03-1488 (CKK).**

May 9, 2007.

Brian W. Shaughnessy, Washington, DC, for
Plaintiff.
Rhonda C. Fields, United States Attorney's Office,
Washington, DC, for Defendant.

COLLEEN KOLLAR-KOTELLY, United States
District Judge.
**\*1** Pending before the Court is Defendant's Motion
for Summary Judgment. Plaintiff, a former
employee of the Broadcasting Board of Governors (
"BBG")-specifically of the Hausa Service of the
Africa Division of Voice of America ("VOA"
)-brings the above-captioned action against
Defendant Kenneth Y. Tomlinson, in his official
capacity as Chair of the BBG, pursuant to Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,
*et seq.,* as amended ("Title VII"). Plaintiff's
Complaint alleges that Defendant discriminated
against her based on her race, sex, and religion by
not selecting her for a supervisory position (Count
I), refusing to reclassify Plaintiff's position from a
GS-12 to a GS-13 (Count II), and subjecting her to
disparate discipline (Count III). In addition,
Plaintiff alleges that she was subject to retaliatory
discipline as a result of her prior use of the Equal
Employment Opportunity ("EEO") process (Count
IV), and that she was subject to discriminatory and
retaliatory harassment that amounted to a hostile
work environment (Count V). Furthermore, by
Order dated October 14, 2005, the Court effectively

allowed Plaintiff to amend her Complaint to add
allegations of discrimination and retaliation relating
to the termination of her employment.

Defendant has moved for summary judgment as to
all Counts included in Plaintiff's Complaint as well
as Plaintiff's claim that her termination constituted
discrimination and retaliation. Plaintiff opposes
Defendant's motion for summary judgment, which
became ripe on March 19, 2007, when Defendant
filed its reply memorandum in further support of its
motion for summary judgment. Thereafter, on April
4, 2007, Plaintiff filed a motion asking that the
Court disregard as untimely Defendant's motion for
summary judgment and reply. Upon a searching
consideration of the filings currently before the
Court, the attached exhibits, the relevant case law,
and the entire record herein, the Court shall deny
Plaintiff's motion asking the Court to disregard
Defendant's motion for summary judgment and
reply, and shall grant Defendant's motion for
summary judgment in its entirety.

The Court begins its discussion of the facts by
noting that this Court strictly adheres to the text of
Local Civil Rule 56.1 (identical to Local Civil Rule
7(h) (formerly Rule 7.1(h)). The local rules for
summary judgment "assist [ ] the district court to
maintain docket control and to decide motions for
summary judgment efficiently and effectively."
*Jackson v. Finnegan, Henderson, Farabow, Garret
& Dunner,* 101 F.3d 145, 150 (D.C.Cir.1996)."
Requiring strict compliance with the local rule is
justified both by the nature of summary judgment
and by the rule's purposes.... The procedure
contemplated by the rule thus isolates the facts that
the parties assert are material, distinguishes
disputed from undisputed facts, and identifies the
pertinent parts of the record."*Id.* (quoting *Gardels
v. CIA,* 637 F.2d 770, 773 (D.C.Cir.1980))."[A]
district court should not be obliged to sift through

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact."*Id.* (quoting *Twist v. Meese,* 854 F.2d 1421, 1425 (D.C.Cir.1988)).

*2 The Court further notes that, in the Court's September 19, 2006 Scheduling and Procedures Order, the parties were advised that "[t]he Court strictly adheres to the dictates of Local Civil Rules 7(h) and 56.1 and may strike pleadings not in conformity with these rules."*Wada v. Tomlinson,* Civil Action No. 03-1488, Order (D.D.C. September 19, 2006 (citing *Burke v. Gould,* 286 F.3d 513, 519 (D.C.Cir.2002)). The Court's Scheduling and Procedures Order also specifically instructed Plaintiff that she should respond to each paragraph in Defendant's statement of material facts with "a correspondingly numbered paragraph, indicating whether that paragraph is admitted or denied," including any information relevant to her response in that paragraph, and furnishing precise citations to the portions of the record on which she relied. *Id.*

In her Response to Issues of Material Facts (hereinafter "Plaintiff's Statement"), Plaintiff complies with the Court's Scheduling and Procedures Order, insofar as she responds to each paragraph of Defendant's Statement of Material Facts (hereinafter "Defendant's Statement") with a correspondingly numbered paragraph. However, many of Plaintiff's responses consist primarily of argument, rather than evidence demonstrating the existence of a genuine issue of material fact. Moreover, in her Statement, Plaintiff cites broadly to her "exhibit," which is in turn divided into sections relating to each of Defendant's numbered factual assertions. Many of these sections include upwards of fifty pages of documents, and Plaintiff does not specify the particular pages of the section on which she relies. The Court has nevertheless undertaken a review of the record evidence submitted by Plaintiff in order to determine whether genuine issues of material fact exist.

As the Court's Scheduling and Procedures Order set forth, pursuant to Local Civil Rule 56.1, in resolving the present summary judgment motion,

this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."LCvR 56.1; 7(h). In accordance with this Rule, the Court has treated as admitted all facts alleged by Defendant in its Statement and not specifically contradicted by Plaintiff in her Statement. The Court has also considered the facts adduced by Plaintiff in her Statement, to the extent that they are supported by record evidence, and cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

*A. The Parties*

Pro se Plaintiff, Hadiza Wada, was born in Nigeria and became a naturalized United States citizen in 2000. Compl. ¶ 8.[FN1] Plaintiff describes herself as a female member of the Islamic faith. *Id.* ¶¶ 4, 8. At the time she filed her Complaint, Plaintiff was an employee of the Broadcasting Board of Governors ("BBG") in the Hausa Service of the Africa Division of Voice of America ("VOA"), at its headquarters in Washington, D.C. *Id.* ¶ 3. BBG is an agency of the United States federal government, and VOA is an international broadcast service, which broadcasts on radio and television in 44 languages.*Id.* ¶ 5; BBG Home Page, http://www.bbg.gov/bbg-aboutus.cfm.. The Hausa Service is one of five (5) language services and two (2) branches in the Africa Division of VOA. 9/27/02 Dillard Decl. ¶ 6.[FN2]

> FN1. Plaintiff is currently proceeding *pro se* in this action; however, the Court notes that she has been represented by counsel at various points throughout the history of this action. When Plaintiff initiated this action she was represented by counsel, who subsequently withdrew after accepting employment with the federal government. *See* Motion to Withdraw as Attorney for Plaintiff, Docket # [13], *Wada v. Tomlinson,* Civil Action No. 03-1488 (D.D.C. May 17, 2004). Thereafter,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

Plaintiff retained new counsel and dismissed that counsel, choosing instead to retain a third attorney, who had previously represented her in proceedings related to her termination by the BBG. *See Wada v. Tomlinson,* Civil Action No. 03-1488, Docket # s [22, 24, 25, 26]. Magistrate Judge Alan Kay subsequently granted Plaintiff's third attorney's motion withdraw as counsel for Plaintiff, in which the attorney asserted that Plaintiff refused to accept his legal advice, refused to disclose material necessary to respond to discovery requests, and insisted on directing all aspects of her legal representation. *See Wada v. Tomlinson,* Civil Action No. 03-1488, Docket # [34], Motion to Withdraw as Attorney (D.D.C. Mar. 2, 2005); Minute Entry Order (D.D.C. Apr. 15, 2005). Finally, Plaintiff retained a fourth attorney while preparing her opposition to Defendant's motion for summary judgment, whose representation she opted to terminate before her opposition was filed. *See Wada v. Tomlinson,* Civil Action No. 03-1488, Docket # [71], Consent Motion to Extend Time (D.D.C. Nov. 9, 2006); Docket # [75] Motion for Order to Release Plaintiff's Counsel (D.D.C. Jan. 22, 2007).

FN2. The Hausa Service broadcasts exclusively in the Hausa language to approximately 180 million people in Africa, with a target audience in Nigeria, Ghana, Chad and Cameroon. 9/27/02 Dillard Decl. ¶ 7. The Hausa language is the fastest growing trade language in most parts of West Africa; as a first language, it is spoken by close to 60 million people, and millions speak the Hausa language as a second language. *Id.*

**\*3** Plaintiff was hired by VOA in 1986 as an International Radio Broadcaster (IRB) at the GG-11 grade level, was promoted to the GG-12 grade level in 1991, and was converted to the GS-12 grade in 2000. Compl. ¶ 9. Plaintiff remained a GS-12 IRB until her termination by VOA, which was effective

September 10, 2004. Def.'s Stmt. ¶ 69.

### B. Plaintiff's Non-Selection as Hausa Service Chief

In approximately June 2000, the then-Hausa Service Chief, Rashida Hasan, was reassigned. *Id.* ¶ 1. The Service Chief position would remain vacant until August 2001. *Id.* During that time, Africa Division Director Gwendolyn Dillard assigned two VOA employees-Diane Butts and Negussie Mengesha-to take on supervisory responsibilities for the Hausa Service. *Id.* ¶ 2.[FN3] On or about July 1, 2000, Plaintiff was officially given a new position description of "Senior Editor" in the Hausa Service. *Id.* ¶ 3; Def.'s Non-Select. Exs. at 1-6 (7/1/00 Request for Personnel Action). In addition to the ordinary duties of an IRB with editorial responsibilities, Plaintiff's duties as Senior Editor included, "[i]n absence of the Service Chief, attends daily Division meetings, and with the assistance of other Service Chiefs and the Africa Division Director, assumes other responsibilities representing the Service," as well as "[p]rovides input to annual performance evaluation of staffers."*Id.* at 3. However, as Defendant points out, Plaintiff's new position description had no effect on her grade or pay because Plaintiff remained an IRB GS-12, step 7. *Id.* at 1. Furthermore, according to the relevant Request for Personnel Action form, the position of Senior Editor was neither supervisory nor managerial. *Id.* at 2 box 11.

FN3. Plaintiff attempts to dispute Defendant's claim that Ms. Butts and Mr. Mengesha were assigned supervisory responsibilities in the absence of a Hausa Service Chief by asserting that Defendant could not produce documents officially assigning them supervisory responsibilities, and further asserting that Defendant refused to provide signed statements from Ms. Butts and Mr. Mengesha regarding the amount of time they spent on supervisory duties for the Hausa Service during the relevant period. Pl.'s Stmt. ¶ 2. However, Plaintiff herself provides no evidence in support of her

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                           Page 4

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

assertion that she bore the burden of supervisory duties while Ms. Butts and Mr. Mengesha spent less than an hour per day in the Hausa Service. *Id.* In contrast, Defendant proffers numerous affidavits, declarations, and deposition transcripts in support of its assertion that Ms. Butts and Mr. Mengesha performed supervisory duties in the absence of a Hausa Service Chief. *See* Def.'s Non-Selection Exs. (hereinafter "Non-Select. Exs.") at 61 (11/20/01 Dillard Aff.); *id.* at 127-28 (1/25/05 Dillard Dep. at 49:1-50:3) (Plaintiff had "some kind of oversight of the service," but Ms. Butts "was asked to step in temporarily and provide some guidance and oversight ... [and] became ... a type of interim service chief," and Mr. Mengesha assumed those responsibilities when Ms. Butts could no longer perform them); *id.* at 83 (11/21/01 Mengesha Aff.). This evidence is more than sufficient to support Defendant's assertion, notwithstanding Plaintiff's preference for additional alternative evidence.

For her part, Plaintiff maintains that she performed supervisory duties on the Hausa Service for extended periods of time, specifically between 1994 and 1998, and between 2000 and 2001, and that she had been a Senior Editor since 1994. Pl.'s Stmt. ¶¶ 2-3. In support of this assertion, Plaintiff points to documents from the 1990s in which Plaintiff is referred to as "senior night shift editor" and described as "one of the senior editors." *See* Pl.'s Exs. for Issue No. 2. Plaintiff also disputes Defendant's assertion that her Senior Editor position was not supervisory or managerial, Def.'s Stmt. ¶ 5, noting that her 2000 position description indicates that she could "assume other responsibilities representing the Service," Pl.'s Stmt. ¶ 5. Nevertheless, it is uncontroverted that Plaintiff was not officially given the position of Senior Editor until July 2000 and that the position of Senior Editor was identified as neither supervisory nor managerial in the relevant appointment paperwork. Def.'s Stmt. ¶ 3; Def.'s Non-Select. Exs. at 1-6 (7/1/00 Request for Personnel Action). Moreover, in his September 26, 2002 Declaration,

Mr. Mengesha averred that Plaintiff "never had any supervisory responsibilities. She was not authorized to rate employees, sign time cards or authorize leave."Def.'s Non-Select. Exs. at 87 (9/26/02 Mengesha Decl.) ¶ 6. Indeed, during her deposition in this matter, Plaintiff testified that prior to Ms. Hasan's appointment in 1998, Plaintiff had managerial responsibilities but did not have supervisory responsibilities such as time attendance sheets, annual leave or performance evaluations. 12/3/04 Wada Dep. at 33:5-11. Plaintiff further testified that, while Ms. Butts oversaw the Hausa Service, Plaintiff ran some division meetings and Ms. Butts handled "bigger issues, that may be managerial or involving discipline."*Id.* at 76:3-11.As such, the evidence in the record supports Defendant's assertions that Plaintiff became Senior Editor in 2000 and that, while this position entailed additional responsibilities, Plaintiff did not perform supervisory duties between 2000 and 2001 in the absence of a Hausa Service Chief.

*4 On July 3, 2000, the BBG announced job vacancy No. PA-00-73 to fill the Hausa Service Chief Position (Supervisory International Radio Broadcaster GS-13), with a closing date of July 31, 2000. Def.'s Stmt. ¶ 7; Def.'s Non-Select. Exs. at 8 (7/3/00 Announcement). Ms. Dillard was the selecting official for the position. 9/27/02 Dillard Decl. ¶ 14. Plaintiff applied for the Service Chief position, Def.'s Stmt. ¶ 8; Compl. ¶ 13, but was not selected for the position, which was re-announced as vacancy No. PA-00-102 on August 21, 2000 and listed as "open until filled." Def.'s Stmt. ¶ 14; Def.'s Non-Select. Exs. at 12 (8/21/00 Announcement). Ms. Dillard avers that the "reason for the change was to increase the applicant base and secure the widest possible pool of outstanding candidates." 9/27/02 Dillard Decl. ¶ 16.

Both vacancy announcements included identical requirements for the position: (1) "Demonstrated potential to lead and supervise a professional staff including the ability to apply EEO principles-MANDATORY;" (2) "Ability to plan and coordinate multi-faceted programming, to implement radio programming and production innovations, and to exploit new broadcast

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

technologies;" (3) "Professional knowledge of broadcast journalistic writing, editing principles and production techniques and skill in applying these in practice;" (4) Understanding of the foreign and domestic policies of the U.S.;" (5) "Thorough familiarity with and understanding of the political, economic, historical and cultural realities of Nigeria and other Hausa speaking areas of Africa;" and (6) " Ability to speak and read in the Hausa language-DESIRABLE."Def.'s Non-Select. Exs. at 8 (7/3/00 Announcement); *id.* at 12 (8/21/00 Announcement). In addition, Ms. Dillard avers that in filling the Hausa Service Chief position, she was specifically looking for a candidate who demonstrated: (1) managerial skills and the ability to work collegially with others; (2) team building skills; (3) understanding of professional journalism practices, including investigative journalism, and a sensitivity to the media climate in Africa; (4) the ability to help the Hausa staff develop new broadcasting skills; (5) fluency in English and Hausa and ability to articulately represent the Hausa Service; (6) current and extensive understanding of Nigeria, as well as United States foreign policy; and (7) ability to carry out Ms. Dillard's directives. 9/27/02 Dillard Decl. ¶ 17.

Ms. Dillard further avers that, as of the time of the vacancy announcements, "a history of contention permeated the Hausa Service due in some measure to the conflicts existing within the target regions in Africa. This ha[d] led to a disintegration of the team effort within the Service and many staffers ha[d] split into 'warring camps.' " *Id.* ¶ 18.As a result, Ms. Dillard asserts, in filling the Hausa Service Chief position, she "was looking for a person who had no involvement in these prior conflicts so that a fresh perspective could be brought into the Service." *Id.* Ms. Dillard's description of the tensions within the Hausa Service at the time are supported by the documentary evidence in this case. On June 14, 2000, Ms. Dillard received an e-mail from a Hausa staff member with the subject "Please intervene directly in the Hausa Service," which stated in relevant part:

*5 It is with humility and respect that I write to you to ask you to please intervene directly in the Hausa service before things completely reach a crises [sic] level ... I have the right to be listen [sic] to and as a

staff of this service asking for a general meeting is not out of the ordinary. For someone to use your name to refuse a general meeting is not fair to you or to the other staff.... But already some of us are bent on creating problems for you and for the rest of us.... Please Ms. Dillard use your good offices to bring sanity to this chaos in the Hausa service....

Def.'s Non-Select. Exs. at 7 (6/14/00 e-mail from S. Kura to G. Dillard); Def.'s Stmt. ¶ 6.

The record evidence also demonstrates that Plaintiff was directly involved in the ongoing disputes within the Hausa Service. On August 5, 2000, Ms. Dillard was copied on an e-mail from the same Hausa staff member, written in response to an e-mail from Plaintiff asking why a program contained dead air, which stated:

you did not do your technology program and [we] had to scramble to fill up the entire back half with something emergency.... You must also forget how sometimes you are late to the studio and another staff had to open the show for you.... You also forgot when you recently leave [sic] the office for 4-5 hours when you are the duty editor ... But since we are not scheming to be the chief through whatever means, we never report you on that.... As late as last two weeks [we] had to complain to acting supervisor Negussie Mengesha about one such instance when you were the editor but was not around up to 4:00 pm.... If you would concentrate on your specified job as an editor and stop running to personnel and your 'friends' in the union to get help to position yourself for the job of chief, things would be smoother in this service.

Def.'s Non-Select. Exs. at 9-10 (8/5/00 e-mail from S. Kura); Def .'s Stmt. ¶ 10. In addition, on September 7, 2000, Plaintiff engaged in a e-mail exchange with another Hausa Service staff member in which Plaintiff and the other staff member accused each other of causing mistakes in VOA's coverage of President William J. Clinton's visit to the Hausa Service's target areas in Africa. *See* Def.'s Non-Select. Exs. at 13-16. Ms. Dillard was copied on the e-mail exchange, and responded by rebuking Plaintiff and the other staffer, stating:I understand the substance of your discussion but the tone of it is unacceptable. In any extended live coverage of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 6

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

major event it is normal the correspondent and the Washington office have misunderstandings about what is filed and what is used. That discussion should be factual, ask for clarification of what happened and be phrased in tones of respect between colleagues. Your two notes moved quickly from raising questions into personal accusations, name calling, and impugning motives. This is not how we work in this division. It is not the sign of people who believe they are suited for higher grades and responsibilities.

**\*6** *Id.* at 13 (9/7/00 e-mail from G. Dillard); Def.'s Stmt. ¶ 15. Plaintiff responded to Ms. Dillard's e-mail by stating that she was "amazed at your reference to it as something between us-how can anyone possibly miss the importance of the visit to our target area by THE UNITED STATES PRESIDENT HIMSELF. Do not try to make it personal again please. It will not work."Def.'s Non-Select. Exs. at 13 (9/7/00 e-mail from H. Wada); Def.'s Stmt. ¶ 16.

On September 8, 2000, Ms. Dillard forwarded the entire e-mail exchange-including her e-mail to Plaintiff and the other staffer and Plaintiff's response-to Myrna Whitworth, VOA Program Director, and Mike Zeitlin, VOA Chief of Staff. Def.'s Non-Select. Exs. at 13 (9/8/00 email from G. Dillard); Def.'s Stmt. ¶ 20. Ms. Dillard's forwarding note read:

I'm forwarding the two notes [Plaintiff] sent (just two, although there have been many more) within 24 hours of her return this week to give you a sense of her interaction with the service and why her becoming chief or even acting chief is not an option. Although the service has been doing remarkably well ... they made the most progress when [Plaintiff] was gone. She has an anger and simmering confrontation with members of the service that just doesn't go away.

*Id.*

Furthermore, on September 11, 2000, Ms. Dillard was copied on an e-mail string in which a Hausa Service staff member wrote:
EFFECTIVE IMMEDIATELY, I WILL NOT ABIDE BY ANYTHING HADIZA DIRECTS IN

THE HAUSA SERVICE UNTIL I RECEIVE A WRITTEN CONFIRMATION FROM THE DIRECTOR OF THE AFRICAN SERVICE OF THE VOA, GWEN DILLARD, INDICATING HADIZA'S APPOINTMENT, AUTHORIZING HER TO DO SO.... A SITUATION IN WHICH SERVAL PEOPLE ARE DIRECTING THE AFFAIRS OF THIS SERVICE AT THE SAME TIME, UNDER THE GUISE OF BEING AN UNOFFICIAL "ACTING CHIEF" IS UNHEALTHY, CONFUSING, AND DOWNRIGHT UNPROFESSIONAL....

Def.'s Non-Select. Exs. at 17-18 (9/11/00 e-mail exchange); Def.'s Stmt. ¶ 17. Another staffer responded to the first e-mail by stating:I write to express my agreement with [the first staffer] ... I'm pleading with whoever is responsible to please intervene in good times [sic] to save not only the sanity and orderliness we have seen during Diane Butts [sic] tenure as the person "in-charge here, but also to bring the Hausa service from its wilderness. Whenever we work together we always reach a consensus ... Now suddenly, since [Plaintiff's] return we started with yet another problem .... we need someone to work with us who will understand our problems and predicament. Someone neutral, someone who is not part to the problems of the past. Someone who has good management experience. Just like Ms. Butts.

Def.'s Non-Select. Exs. at 17; Def.'s Stmt. ¶ 18.

Plaintiff does not dispute that these e-mails were sent or that Ms. Dillard was copied on the various e-mails. *See* Pl.'s Stmt. ¶¶ 6, 10, 15-18. Instead, Plaintiff defends her participation in the various e-mail exchanges. *Id.* In addition, Plaintiff asserts that the e-mails sent by various Hausa Service staffers should not be relied upon because the staffers had been previously found to have " incit[ed] and stirr[ed] up problems in Hausa Service including **making false accusations without supporting facts** against" Ms. Hasan, *id.* ¶ 6 (emphasis in original), and were reprimanded for their involvement in circulating a petition advocating Ms. Hasan's removal, *id.* ¶¶ 6, 10.Plaintiff further suggests that one of the staffer's e-mails are not credible because he was also an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 7

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

applicant for the Hausa Service Chief position, and because he was later found to have misused a government credit card. *Id.* ¶ 17.However, regardless of whether the e-mails sent by other Hausa staffers are accurate accounts of Plaintiff's behavior, they nevertheless corroborate Ms. Dillard's assertion that significant conflicts existed within the Hausa Service and that Plaintiff was directly involved in those conflicts. Furthermore, Plaintiff's own e-mails, in and of themselves, constitute evidence of her involvement in the ongoing conflicts within the Hausa Service.

**\*7** The record evidence also reveals another issue involving Plaintiff during the period when the Hausa Service Chief position was vacant. On August 17, 2000, Plaintiff sent Ms. Dillard an e-mail regarding Plaintiff's efforts to obtain press credentials for President Clinton's visit to Nigeria on August 25-27, 2000. Def.'s Non-Select. Exs. at 11 (8/17/00 e-mail from H. Wada); Def.'s Stmt. ¶ 11. In her e-mail, Plaintiff stated, "[a]mong information they need to process the request is, what is my designation (title). What better opportunity can we get as a service than this to close the chapter on the supervisory position. The position has been closed since July 31st."*Id.* Ms. Dillard responded by telling Plaintiff that her " designation and title [was] Senior Editor in the Hausa service" and that the "posting for Hausa chief did not close on July 31. It remains open until filled."Def.'s Non-Select. Exs. at 11 (8/17/00 e-mail from G. Dillard); Def.'s Stmt. ¶ 12. Ms. Dillard further stated:
I have also noticed some inaccuracies in the Hausa webpage. Your [sic] are referred to in the page as the Managing Editor/Acting chief of the service. This is incorrect. You are the Senior Editor of the service. In your message on the webpage you stated that you were the Deputy Chief of the service until June. This is not correct. You were the Senior Editor of the service and continue to be. Please make the necessary corrections on your webpage ...

*Id.*Plaintiff's response to Ms. Dillard's e-mail was, " Time is on my side Ms. Dillard. I have never for a moment doubted by abilities. I have never backed down from a position I take with full knowledge of what is required of me. I am ready. I will take the

appropriate steps, the appropriate way."Def.'s Non-Select. Exs. at 11 (8/17/00 e-mail from H. Wada); Def.'s Stmt. ¶ 13. Again, Plaintiff does not dispute that these e-mails were sent, but rather defends her own conduct. See Pl.'s Stmt. ¶¶ 11-13. Furthermore, Plaintiff asserts that Ms. Dillard orally "conferred Supervisory responsibilities [on Plaintiff] including scheduling and signing leave statements, and familiarizing herself with writing performance appraisals."Pl.'s Stmt. ¶ 12. Plaintiff offers only her own deposition testimony in support of this assertion, see Pl.'s Exs. for Issue No. 12, and Plaintiff's testimony as to Ms. Dillard's alleged oral representations is, of course, impermissible hearsay evidence. In any event, even if a factual question exists as to whether Ms. Dillard orally conferred supervisory responsibilities on Plaintiff at some point in time, Plaintiff cannot controvert the documentary evidence that Ms. Dillard conveyed to Plaintiff that Plaintiff had improperly designated herself as Managing Editor, Acting Chief, and/or Deputy Chief on the Hausa web page and asked Plaintiff to correct the web page descriptions. Therefore, it is clear that as of the time of Ms. Dillard's e-mail to Plaintiff, Plaintiff was not authorized to act as Acting Hausa Service Chief.

**\*8** Plaintiff was one of three employees listed on a September 13, 2000 certificate of internal status candidates eligible for promotion to the GS-13 Hausa Service Chief position; however, Ms. Dillard returned the certificate without selecting any of the internal candidates. Def.'s Non-Select. Exs. at 19 (9/13/00 Certificate, including notation "Returned by G. Dillard, No Selection, Sep. 26, 2000); Def.'s Stmt. ¶ 19. Ms. Dillard avers that she did not interview any of the internal candidates because she had observed them all first-hand and reviewed their applications. 9/27/02 Dillard Decl. ¶ 20. Ms. Dillard received another certificate of internal status candidates eligible for promotion to the Hausa Service Chief position, dated February 9, 2001, which included the same three candidates; however, Ms. Dillard again did not select any of the internal candidates. Def.'s Non-Select. Exs. at 21 (2/9/01 Certificate); Def.'s Stmt. ¶ 22.

A third certificate-this one listing non-citizens

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

eligible for the Hausa Service Chief position-was prepared on February 16, 2001, and included Sunday Dare, an applicant from outside of the BBG. Def.'s Non-Select. Exs. at 22 (2/16/01 Certificate); Def.'s Stmnt. ¶ 23. Ms. Dillard selected Mr. Dare for the Hausa Service Chief position on March 9, 2001. Def.'s Non-Select. Exs. at 22 (2/16/01 Certificate); Def.'s Stmt. ¶ 24; 9/27/02 Dillard Decl. ¶ 25. In her September 27, 2002 Declaration, Ms. Dillard avers that she met Mr. Dare on three separate occasions prior to his applying for the Hausa Service Chief position, 9/27/02 Dillard Decl. ¶ 25, and describes in detail her reasons for selecting Mr. Dare for the Hausa Service Chief position, *id.* ¶¶ 27-29.Because Mr. Dare was a non-citizen, on March 7, 2001, as required by BBG policy, Ms. Dillard wrote a detailed memo to the VOA Director of Personnel, requesting permission to select and hire Mr. Dare as Hausa Service Chief. 9/27/02 Dillard Decl. ¶ 26; Ex. 3 (3/7/01 Memo from G. Dillard re: Selection of Non-U.S. citizen for Hausa Chief position).

The reasons that Ms. Dillard proffers for selecting Mr. Dare in her memo are supported by Mr. Dare's application materials. According to these materials, Mr. Dare is an ethnic Yoruba (a Nigerian ethnic group), was born in Jos, Nigeria, and speaks Hausa, Yoruba, and English fluently. Def.'s Non-Select. Exs. at 23-25 (3/7/01 Memo from G. Dillard), *id.* at 34-41 (Dare Applic. Mat'ls). Mr. Dare holds a Bachelor of Science degree in International Studies from Ahmadu Bello University in Nigeria, a Masters degree in International Law and Diplomacy from the University of Jos in Nigeria and, at the time that he applied for the Hausa Service Chief position, was a Fellow in the Nieman Fellowship Program at Harvard University. *Id.* Mr. Dare's previous experience includes work as a correspondent, general editor, on-line editor, and head of the Abuja Bureau of the independent communications network in Lagos, Nigeria, where he was responsible for supervising and coordinating the work of 22 correspondents around Nigeria. *Id.* In addition, according to Ms. Dillard, Mr. Dare's co-workers indicated that he possessed effective management skills including team-building skills, and an ability to promote gender and ethnic diversity. *Id.* In her memo, Ms. Dillard specifically

notes that Mr. Dare's "demonstrated skills in this critically important area, i.e., planning, directing, and managing the work of others, substantially exceed those of any other candidate."*Id.* at 24.Mr. Dare also worked with radio and television programs in Nigeria and in the United States. *Id.* at 25.

*\*9 For her part, Plaintiff's application materials demonstrate that she holds a Bachelor of Arts in Mass Communications from Bayero University in Nigeria, as well as a Masters of Arts in Theater and Media Arts from the University of Kansas and, at the time she applied for the Hausa Service Chief position, had completed 27 credit hours towards a Ph.D. in Management from California Coast University, a correspondence school. Def.'s Non-Select. Exs. at 26-33 (Wada Applic. Mat'ls). In her application materials, Plaintiff describes her employment experience with VOA as including work as a Translator/Adaptor, an Editor/Writer, and Senior/Managing Editor. *Id.*

Ms. Dillard's request to select and hire Mr. Dare was approved, 9/27/02 Dillard Decl. Ex. 3 (3/7/01 Memo from G. Dillard), and Mr. Dare began working as Hausa Service Chief effective August 3, 2001, Def.'s Stmt. ¶ 29; Def.'s Non-Select. Exs. at 34. In November, 2001, an article appeared in The Weekly Standard (not a VOA publication) entitled " First, Do No Harm" and subtitled "In Nigeria the Voice of America has been condemned for being pro-Muslim, anti-Christian, and anti-American. VOA Director Robert Reilly has his hands full reforming this important service."Def.'s Non-Select. Exs. at 46-48 (11/21/01 Weekly Standard Article). In relevant part, the article quotes VOA Director Reilly as stating " 'We are aware of problems' and are 'paying very special attention' to the Hausa-language operations."*Id.* at 47.The article continues to state "[t]his past August, Sunday Dare, an impressively credentialed Nigerian journalist and a Christian, was made chief of the Hausa-language service (before his appointment, the bureau chief position had long sat unfilled). Dare and Reilly are now overseeing the Hausa broadcasts."*Id.*

Plaintiff's initial contact with the BBG's Office of Civil Rights ("OCR") was on September 7, 2000.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                   Page 9

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

FN4Def.'s Non-Select. Exs. at 98 (9/24/02 Johnson Decl.) ¶ 10, *id.* at 100

> FN4. Plaintiff asserts that her "recollection of her first contact in person with OCR was the day a second vacancy announcement for the same Hausa Supervisory Position was posted," or August 21, 2000. Pl.'s Stmt. ¶ 21. However, Plaintiff provides no evidence of this contact, all of the OCR records in evidence indicate that Plaintiff's initial contact with the OCR occurred on September 7, 2000, and Plaintiff admits that "[t]he day of contact ... is usually determined by OCR."*Id.* Plaintiff also asserts that "[t]he whole investigative process in relation to the complaint in the year 2000 was flawed and unsatisfactory, due to the assigning of a Counselor with no prior experience (counselor in training) by the Office of Civil Rights."*Id.* Plaintiff's claims regarding the nature of the OCR investigation are immaterial, however, to the instant case because Plaintiff does not allege that the investigation was in any way discriminatory or retaliatory.

(9/7/00 Initial Contact Sheet); Def.'s Stmt. ¶ 21. Plaintiff complained that she applied for, but had not received any information regarding her eligibility for, the Hausa Service Chief position. Def.'s Non-Select. Exs. at 100 (9/7/00 Initial Contact Sheet). Plaintiff also complained about promotions and salaries within the Hausa Service, alleging gender and equal pay as bases of discrimination. *Id.* Plaintiff's informal complaint was assigned to an EEO counselor, who interviewed Plaintiff on September 29, 2000. Def.'s Non-Select. Exs. at 98 (9/24/02 Johnson Decl.) ¶¶ 10-12; *id.* at 100-08 (Documents re: 9/00 OCR Contact); Def.'s Stmt. ¶ 21. Plaintiff received a Notice of Right to File a Discrimination Complaint on December 14, 2000; however, Plaintiff did not file a formal Complaint of discrimination. Def.'s Non-Select. Exs. at 98(9/24/02 Johnson Decl.) ¶ 12; *id.* at 102-03 (12/14/00 Notice of Right to File); Def.'s Disc. Exs. at 78 (8/14/02 Wada Dep. at

196:8-197:4). According to Ms. Johnson, the BBG OCR Director, "the EEO Counselor would have no basis upon which to contact [Plaintiff's] supervisor or any other persons who may have an involvement in the matter" until after interviewing Plaintiff on September 29, 2000. Def.'s Non-Select. Exs. at 98-99 (9/24/02 Johnson Decl.) ¶ 14.

### C. Denial of Plaintiff's Reclassification Request

**\*10** On June 18, 2001, Plaintiff sent a memo to Ms. Dillard, Mr. Mengesha, and the VOA Personnel Management Specialist requesting that her position be reclassified and that she be promoted to a GS-13. Def.'s Stmt. ¶ 25; Def.'s Classification Exs. (hereinafter "Class. Exs.") at 1 (6/18/01 Memo from H. Wada). As explained in the Declaration of Barbara Diane Sellers, a Human Resources Specialist in the Office of Personnel, Operations and Benefits Division, of the BBG, Plaintiff's request was one for a non-competitive promotion based on accretion of duties, which required a classification specialist to conduct an evaluation of Plaintiff's position ("desk audit") "to determine whether [Plaintiff's] duties ha[d] increased significantly beyond the original classified duties of the position to such an extent that a promotion [was] warranted."Def.'s Class Exs. at 31 (9/27/02 Sellers Decl.) ¶ 37. In accordance with the standard practice for reclassification promotions in the Hausa Service, Plaintiff's request included a memo explaining why she believed her position was properly classified as a grade 13 position. Def.'s Class. Exs. at 2-3; *id.* at 32 (9/27/02 Sellers Decl.) ¶ 43. Subsequently, on June 20, 2001, Ms. Dillard was asked to complete a reclassification questionnaire, which was formatted for Plaintiff's specific request and asked whether Plaintiff was satisfying the key indicators for a GS-13 position. 9/27/02 Dillard Decl. ¶ 30; Def.'s Class. Exs. at 7 (7/5/01 Reclassification Form); *id.* at 32-33 (9/27/02 Sellers Decl.) ¶ 44. However, as Ms. Dillard "had no direct knowledge of [Plaintiff's] day-to-day activities as a senior editor in the Service," she indicated as much on the form and further indicated that she would "support the views of [Plaintiff's] immediate supervisor, Negussie Mengesha." 9/27/02 Dillard Decl. ¶ 30; Def.'s

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 10

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

Class. Exs. at 7 (7/5/01 Reclassification Form).[FN5]

> FN5. In her Statement, Plaintiff asserts that both "Dillard Division Director and Mengesha Program Manager filled in the questionnaire, though the process specifically called for Dillard to do it."Pl.'s Stmt. ¶ 26. Plaintiff does not present any evidence in support of this statement, other than the fact that both Dillard and Mengesha signed the questionnaire. However, as discussed above, the record evidence-including Dillard and Mengesha's declarations-indicates that Dillard deferred to and supported Mengesha's completion of the questionnaire, but did not provide her own input on the questionnaire.

Mr. Mengesha completed the form and returned it to the Office of Personnel. Def.'s Class. Exs. at 20 ¶ 11 (9/26/02 Mengesha Decl.); 9/27/02 Dillard Decl. ¶ 30. The form solicited Mr. Mengesha's opinion of Plaintiff's involvement in various aspects of "Script Preparation," and "Program Preparation," as well as three key "Indicators." Def.'s Class. Exs. at 7-10. Mr. Mengesha indicated that, although Plaintiff was involved in "Script Preparation" work, others within the Hausa Service conducted the same work, and further indicated that Plaintiff was not involved in Program Preparation" work. *Id.* As to the three key Indicators, Mr. Mengesha responded that Plaintiff "demonstrate[d] a mastery of radio broadcasting principles, practices, and techniques," but did not have "full editorial responsibility for directing the development and production of a substantial block of complex programming of major importance to VOA," and did not develop new approaches to programming. *Id.* The form was signed by both Mr. Mengesha and Ms. Dillard. *Id.*

**\*11** The form was then forwarded to Myrna Whitworth, VOA Acting Director, for a decision on Plaintiff's reclassification request. Def.'s Stmt. ¶ 26; Def.'s Class. Exs. at 5 (7/10/01 Memo from M. Conboy). In her Declaration, Ms. Sellers avers that she prepared the forwarding memo submitted to Mr. Conboy for his signature, and that the "letter incorrectly stated that [Plaintiff] met all key

indicators for a promotion to the GS-13 level .... it is clear from [Plaintiff's] reclassification questionnaire that she did not meet all the key indicators for a promotion."Def.'s Class. Exs. at 33-34 (9/27/02 Sellers Decl.) ¶ 50. As such, while the forwarding memo sent to Ms. Whitworth stated that Plaintiff's supervisors' view was "that [Plaintiff] meets all the key indicators for promotion to the GS-13 level," Def.'s Class. Exs. at 5 (7/10/01 Memo from M. Conboy), "[t]he questionnaire attached to the [classification] appeal clearly demonstrated that [Plaintiff] did not meet the requirements for the GS-13 level," Def.'s Class. Exs. at 13 ¶ 6 (9/17/02 Whitworth Decl.). As a result, Ms. Whitworth disapproved Plaintiff's promotion to the GS-13 level. Def's Class. Exs. at 6 (7/10/01 Memo from M. Conboy indicating Whitworth 8/14/01 disapproval), *id.* at 13 (9/17/02 Whitworth Decl.) ¶ 5.[FN6]

> FN6. In her Declaration, Ms. Sellers states that Plaintiff was the only employee in the Hausa Service to request a reclassification between January 2000 and September 2002. Def.'s Class. Exs. at 34 (9/27/02 Sellers Decl.) ¶ 54. Ms. Sellers further notes, however, that during that time period two other employees in the Africa Division-a Black female and a White female-requested and were denied promotions from a GS-12 to a GS-13 because they also failed to meet all of the key indicators for the GS-13 IRB position. *Id.* ¶¶ 55-61.

In her declaration, Ms. Whitworth further avers that the Hausa Service Chief is ordinarily the only GS-13 employee in the Hausa Service, and that " there was no justification for having two GS-13 level employees in a service as small as the Hausa service."*Id.* ¶ 7.[FN7] By memo dated August 14, 2001, Plaintiff was advised that her reclassification request had been denied; Plaintiff was further advised:

> FN7. In her Statement, Plaintiff asserts that there is no rule preventing the Hausa

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

Service from having more than one GS-13 employee, and states that "[t]here are many non-supervisory employees of Africa Division [sic] on grade level 13."Pl.'s Stmt. ¶ 8. As examples, Plaintiff points to individuals employed in the English to Africa service, *id.;* however, in her Declaration, Ms. Whitworth clearly explains that the services in the Africa Division that have GS-13 employees other than the Service Chief are the English to Africa Branch and the French to Africa Branch, larger services with more full-time staff members (20 and18 full-time staff members, respectively) than the Hausa Service (11 staff members), Def.'s Class. Exs. at 14 (9/17/02 Whitworth Decl.) ¶ 7. Plaintiff's mere speculation that the Hausa Service might have been able to support an additional GS-13, which is directly contradicted by record evidence, therefore does not demonstrate a genuine issue of material fact.

it was determined that your position does not meet all the key indicators for work at the GS-13 level. Specifically, your position does not have full editorial responsibility for directing the development and production of a substantial block of complex programming of major importance to VOA including responsibility for the content, style and tone of the program at least 25% of your time on a weekly basis. Therefore, your position is appropriately classified at the GS-12 level.
Def.'s Class Exs. at 11 (8/14/01 Memo from M. Conboy).[FN8] Plaintiff was also advised of her right to appeal the decision to the Office of Personnel Management. *Id.*

> FN8. At the time that Plaintiff requested a reclassification of her position, she was one of six IRBs with editorial responsibilities on the Hausa staff. *See* Def.'s Disc. Exs. at 43 (9/19/02 Dare Decl.) ¶¶ 8, 13. As a result, each editor performed editorial duties no more than twice per week, spending approximately 2-3 hours per week on his or her editorial

duties. *Id.* ¶ 13.

In her Statement, Plaintiff argues that her position, in fact, merited classification as a GS-13 position and that Ms. Whitworth improperly denied her reclassification request because "[t]wo independent determinations"-one by the office of personnel and the other an independent EEOC investigation-" determined that Plaintiff 'met all key indicators for a promotion to the GS-13 level.'" Pl.'s Stmt. ¶¶ 25-28. Plaintiff does not, however, provide precise record citations in support of these assertions. *Id.* The Court's review of Plaintiff's exhibits does not reveal any evidence of independent determinations that Plaintiff met all key indicators for a promotion to the GS-13 level, other than Mr. Conboy's forwarding memorandum to Ms. Whitworth which, as discussed above, erroneously indicated such a conclusion.[FN9]

> FN9. The Court notes that Plaintiff's exhibits appear to skip pages (e.g., a December 17, 2001 memo from EEOC Investigator Haywood L. Perry included in Plaintiff's Exhibits for Issue No. 27 appears to include only four of fifteen pages and skips directly from page 11 to page 14); however, as Plaintiff has not provided specific citations to the record evidence on which she purports to rely, the Court cannot determine whether the pages were intentionally or inadvertently omitted from Plaintiff's exhibits.

**\*12** Plaintiff contacted the OCR on August 9, 2001, asserting that she received notice of Mr. Dare's selection as Hausa Service Chief on August 6, 2001, and that she had never received a response to her application for the position. Def.'s Stmt. ¶ 30; 10/22/06 Johnson Decl. Attach. 1 (8/9/01 Initial Contact Sheet and 10/10/01 EEO Counselor's Report). Plaintiff further complained that her reclassification request had been denied, and indicated that she intended to appeal that denial through the Office of Personnel Management. *Id.* Plaintiff alleged discrimination on the bases of race and sex, as well as reprisal. *Id.* On September 21, 2001, Plaintiff was issued a Notice of Right to File

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

a Discrimination Complaint, and it appears from the record that Plaintiff filed a formal discrimination complaint on these charges on September 26, 2001. Pl.'s Stmt. ¶ 31; 10/22/06 Johnson Decl. ¶ 8; *id.* Attach. 1 (9/21/01 Notice of Right to File).[FN10]

> FN10. In her Statement, Plaintiff asserts-without providing factual support-that she appealed the denial of her reclassification request to the Office of Personnel Management and that the appeal process was suspended in light of her pending EEOC complaint (which is now her Complaint before this Court), with the option to reopen the appeal in the event her EEOC complaint was not resolved to her satisfaction. Pl.'s Stmt. ¶ 28. The status of Plaintiff's OPM appeal, however, is of no consequence in the instant action.

*D. Events Surrounding the Hausa Service October 3, 2001 Broadcast*

*1. Mr. Dare's E-mails Prior to the Hausa Service October 3, 2001 Broadcast*

Mr. Dare assumed the position of Hausa Service Chief effective August 3, 2001. Def.'s Stmt. ¶ 29; Def.'s Non-Select. Exs. at 34. On August 21, 2001, Mr. Dare sent an e-mail to the Hausa Service staff, in which he stated:
the editor and mc-cr for each show must collaborate towards putting together a professional show. while the editor should be on top of all that is meant for the show, this should not prejudice the support of the mc-cr .... it is a joint responsibility.... I will count largely on the news judgment of the editors to decide which story/report is okay to be aired...."

Def.'s Discipline Exs. (hereinafter "Disc. Exs.") at 1 (8/21/01 e-mail from S. Dare). On August 27, 2001, Mr. Dare sent another e-mail to his staff, summarizing his impressions from his first three weeks as Hausa Service Chief.*Id.* at 2-3 (8/27/01 e-mail from S. Dare); Def.'s Stmt. ¶ 31. In relevant part, Mr. Dare's August 27, 2001 e-mail stated:With the benefit of the last three weeks, I have also

noticed a few lapses and other areas that we must pay attention to. The lapses I have noticed range from:-arriving late to the studio for our shows-non-translation of English scripts before the show-non-proper edit of translated scripts ...-not making available story insights for the Chief before the shows .... here are a few reminders on newsroom collaboration and teamwork, copy flow, enhancement, editorial responsibilities et al ... -editor and mc-cr for each show will work together to make good news judgement [sic] and put together the show. The bulk [sic] stops at the editor's. Lapses will not be excused for failure to collaborate ...-report usage is not automatic. I will trust the judgment of the editors and mc-crs largely. some reports may however need to be discussed at the editorial meeting if the need arises.

**\*13** Def.'s Disc. Exs. at 2-3 (8/27/01 e-mail from S. Dare).

Following the September 11, 2001 attacks on the United States, Ms. Dillard instructed the Chiefs of the services in the Africa Division to implement oversight measures for broadcasting news and stringer reports, in order to ensure balanced news coverage. 9/27/02 Dillard Decl. ¶ 31. Eight days later, Mr. Dare sent an e-mail to his staff advising them:
please if you plan to or have interviewed any expert/analyst/academic/cleric on the U.S. crisis, it is important that you let me know, hear it and okay it before it is used. this also applies to stringer reports. this is a measure aimed at ensuring balance and avoiding extremist views. this is an important notice.

Def.'s Stmt. ¶ 32; Def.'s Disc. Exs. at 4 (9/19/01 e-mail from S. Dare). The same day, Mr. Dare sent another e-mail to the Hausa Service staff stating, in relevant part:As we continue the coverage of the crisis, certain issues are pertinent and need to be brought to our attention-all materials generated for crisis coverage i.e. stringer reports, taped interviews conducted here or from stringers should be brought to my notice or an editor before they are aired .... stringer reports on the crisis will have to be screened objectively on the whole let us be alert.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

Def.'s Stmt. ¶ 33; Def.'s Disc. Exs. at 5 (9/19/01 e-mail from S. Dare). Finally, on October 2, 2001, Mr. Dare sent another e-mail to the Hausa Service staff asking:please any interviews, stringer reports or related materials relating to the attacks on the U.S. will have to be brought to my notice before it is aired. Two editors may also need to listen to any tape on this issue and decide .... we must also pay attention to the profile, affiliation and qualification of the person we are talking to. the individual must have the credential/expertise to comment on this issue.

Def.'s Stmt. ¶ 34; Def.'s Disc. Exs. at 6 (10/2/01 e-mail from S. Dare). Plaintiff asserts that Mr. Dare's e-mails were "contradictory and confusing," citing a Union Grievance filed on her behalf that argues that Mr. Dare's various e-mails did not clearly indicate who bore responsibility for reviewing stringer reports. Pl.'s Stmt. ¶¶ 31-34; Pl.'s Exs. for Issue No. 27 (4/30/01 Union Grievance).[FN11] However, while Mr. Dare's e-mails variously indicate that stringer reports and live interviews should be reviewed by the editor and/or Mr. Dare himself, the e-mails make clear that-at a minimum-someone other than the MC was required to review stringer reports and live interviews. Plaintiff does not deny receiving these e-mails. Pl.'s Stmt. ¶¶ 31-34.[FN12]

FN11. While Plaintiff identifies the Union Grievance and Mr. Dare's various e-mails as related to her response to Defendant's Statement paragraph 27, the exhibits in fact appear related to paragraphs 31 through 34 of Defendant's Statement. *See* Pl.'s Exs. for Issue No. 27. Furthermore, the Court notes that the Union Grievance that Plaintiff cites appears to be improperly dated April 30, 2001, as it describes events occurring through the end of April 2002.

FN12. Plaintiff also responds to Defendant's Statement of Material Facts regarding Mr. Dare's e-mails by citing portions of a petition against Mr. Dare signed by members of the Hausa Service staff (including Plaintiff).*See* Pl.'s Stmt. ¶

31; Pl.'s Exs. for Issue No. 24 (4/26/04 Petition). Plaintiff quotes only that portion of the petition that states "Mr. Dare excells [sic] is in causing divisions and animosity between the members of the Hausa Service. This he achieves by sending conflicting emails.... Other times he would call staffers, especially on the night shift and give them conflicting directives, leaving them to sort it out."Pl.'s Stmt. ¶ 31 (citing Pl.'s Exs. for Issue No. 24 (4/26/04 Petition) at 10). However, when read in context, the portion of the April 2004 petition that Plaintiff cites in fact alleges that Mr. Dare sent "conflicting e-mails individually to staffers," and thus clearly does not describe the e-mails sent by Mr. Dare to the entire Hausa Service staff in August through October 2001. Pl.'s Exs. for Issue No. 24 at 10 (4/26/04 Petition) at 10. In any event, the existence of the petition fails to demonstrate a genuine question of material fact as to whether Mr. Dare sent the e-mails described above between August and October 2001.

*2. The Hausa Service October 3, 2001 Broadcast*

On October 3, 2001, Plaintiff was the assigned editor of the 1500 UTC Hausa Service radio program, a daily air show broadcast from Washington D.C. (hereinafter the "October 3 Broadcast"). Def.'s Stmt. ¶ 25; Pl.'s Stmt. ¶ 25; Def.'s Disc. Exs. at 43 (9/19/02 Dare Decl.) ¶ 8. [FN13] A male IRB, Aliyu Mustapha, was the MC for the program. Def.'s Stmt. ¶ 36.[FN14]During the October 3 Broadcast, a stringer report containing an interview with an Islamic cleric in Nigeria, Sheikh Bauchi, was broadcast. Def.'s Stmt. ¶ 39-40; Def.'s Disc. Exs. at 47 (9/19/02 Dare Decl.) ¶ 22. During the interview, Sheikh Bauchi stated:

FN13. The Hausa Service staff is comprised mostly of IRBs and, as of October 2001, six (6) of the IRBs were also editors. Def.'s Disc. Exs. at 43 (9/19/02 Dare Decl.) ¶ 8. For each air

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 14

**Slip Copy, 2007 WL 1378516 (D.D.C.)**
**(Cite as: Slip Copy)**

show, a master of ceremonies ("MC"), an editor, and a producer is assigned on a rotational basis. *Id.* at 44 ¶ 12.Prior to each show, the assigned editor reviews all news pieces, including stringer reports, staff reports, and features, selects the pieces to be broadcast, and times the show to ensure that the entire 30-minute show is filed with material. *Id.* at 45 ¶ 14; Def.'s Disc. Exs. at 73 (8/14/02 Wada Dep. at 145:4-21).

FN14. Plaintiff does not dispute this statement, but cites to an "EEOC investigative report" she claims is located at "item 21 page 14." Pl.'s Stmt. ¶ 36. Plaintiff's Exhibits for Issue No. 21 include her application materials for the Hausa Service Chief position and Mr. Dare's application materials, but do not include an "EEOC investigative report." Included with Plaintiff's Exhibits for Issue No. 27 is what appears to be four pages of a 15-page investigative report completed by EEOC investigator Haywood L. Perry; however, that document simply confirms that Mr. Mustapha was the MC assigned to the October 3 Broadcast. *See* Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report).

**\*14** If the U.S. thinks rationally of most of the global problems, the United States is responsible.... We are warning America, I swear if she decides to declare war on Afghanistan she will see will confront the unexpected. Therefore, we are warning her if she declares war on Afghanistan then the curtain that she is using to say she is not fighting Islam and Muslims would have been torn .... if she decides to go to war with Afghanistan, then the curtain has been removed and she is at war with Muslims and Islam.
Def.'s Stmt. ¶ 40; Def.'s Disc. Exs. at 16-18 (Transl. of 10/3/01 Stringer Report). The report did not include any rebuttal of Sheikh Bauchi's charges. *Id.*

The parties dispute whether Plaintiff bore sole responsibility for reviewing the stringer report containing Sheikh Bauchi's interview before it

aired; however, the record evidence is clear that Plaintiff was the assigned editor for the October 3 Broadcast, and that she did not review the tape of the stringer report before it aired. Def.'s Stmt. ¶ 38; Pl.'s Stmt. ¶ 38; Def.'s Disc. Exs. at 12 (11/28/01 Memo from H. Wada to S. Dare) ("I did not take the report ... I never handled it before it went on the air."); Def.'s Disc. Exs. at 9 (12/16/01 Mustapha Aff.) ("I reviewed the tape and felt that it was editorially balanced. I did not give the tape to either Wada or Dare for their review before broadcasting it."); Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report) ¶¶ 21-22 ("the Complainant did not see or hear the tape that was broadcast on October 3, 2001 ... Mr. Mustapha did not give it to Complainant or Mr. Dare for their review ...").FN15 In addition, in deposition testimony, Plaintiff acknowledged that she was aware one-half hour before air time that there were three minutes of unfilled air time in the Broadcast and that Mr. Mustapha told her that he had three stringer reports for the Broadcast. Def.'s Disc. Exs. at 73-74 (8/14/02 Wada Dep. at 146:9-152:24). Plaintiff further testified that she told Mr. Mustapha to let her know if he intended to use a stringer report, *id.*, and thus appears to argue that Mr. Mustapha was responsible for making sure that Plaintiff reviewed the stringer report before it aired. Pl.'s Stmt. ¶ 38. To the contrary, Mr. Dare's e-mails make clear that Plaintiff, as editor, bore the ultimate responsibility for the October 3 Broadcast. Therefore, based on the totality of the record evidence, it appears Plaintiff was aware that the Broadcast might include a stringer report, that she bore responsibility for reviewing it before it aired, and that she failed to review that report before it aired.

FN15. Plaintiff disputes Defendant's assertion that she came in late to work on October 3, 2001, asserting that she was scheduled to work from 9:00 a.m. to 5:00 p.m. and arrived to work at 9:10 a.m. Def.'s Stmt. ¶ 37 (citing Def.'s Disc. Exs. at 8 (12/5/01 e-mail from S. Aliyu)); Pl.'s Stmt. ¶ 37; Pl.'s Exs. for No. 27 (10/3/01 Timesheet). However, this dispute is immaterial to the fact that Plaintiff did not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 15

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

review the stringer report containing the Sheikh Bauchi interview before it aired.

The October 3 Broadcast caused dissatisfaction inside and outside of VOA. 9/27/02 Dillard Decl. ¶ 34; Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report) ¶ 24 ("The broadcast was not editorially balanced and it created an embarrassment to the Agency."). On October 25, 2001, Congressman Dave Weldon wrote a letter to VOA Director Robert Reilly, expressing that "[c]oncerns over Hausa language Voice of America (VOA) broadcasts in Nigeria were recently brought to my attention by Americans living and working in Nigeria...." Def.'s Stmt. ¶ 41; Def.'s Disc. Exs. at 19-20 (10/25/01 Letter from D. Weldon). Congressman Weldon's letter specifically referred to the interview with Sheikh Bauchi and asked that he be provided with an English transcript of the interview. *Id.* On November 16, 2001, Congressman Vernon J. Ehlers wrote a similar letter to Director Reilly, "with deep concern regarding alleged pro-Muslim, Anti-American reporting by the VOA's Hausa-language programming in Nigeria. "Def.'s Disc. Exs. at 21-22 (11/16/01 Letter from V. Ehlers).

*15 Both of the Congressmen's letters refer to statements allegedly made by Sheikh Bauchi and included in the Hausa Service's broadcast on October 15, 2001. *See* Def.'s Disc. Exs. at 19-22. Plaintiff seizes on this date discrepancy in her Statement and asserts that the "story from the 15th referred to by congress correspondence was assigned by Sunday Dare (supervisor) and listened to by him before it went on air," broadly citing her " exhibit" in support of this statement. Pl.'s Stmt. ¶ 41. However, none of the documents provided by Plaintiff in any way suggest that a second interview with Sheikh Bauchi aired on the Hausa Service on October 15, 2001. To the contrary, both Mr. Dare and Ms. Dillard testified during their depositions in this matter that the Congressmen were mistaken as to the broadcast date of the Sheikh Bauchi interview, and that the only interview with Sheikh Bauchi that aired on the Hausa Service aired during the October 3 Broadcast. *See* Def.'s Disc. Exs. at 87-93 (1/25/05 Dillard Dep. at 104:1-110:11); *id.* at 95-96 (11/29/04 Dare Dep. at 160:8-162:11). As

such, there is no evidence in the record that a second interview with Sheikh Bauchi aired on October 15, for which Mr. Dare bore responsibility.

Following the October 3 Broadcast, VOA Director Reilly and Ms. Dillard were asked to attend meetings with members of Congress, during which the members spoke of closing the Hausa Service permanently. Def.'s Stmt. ¶¶ 42-43; 9/27/02 Dillard Decl. ¶ 34; Def.'s Disc. Exs. at 23 (11/29/01 e-mail from R. Reilly). In addition, the October 3 Broadcast was mentioned in various media outlets.*Id.*

### 3. Discipline Resulting from the October 3 Broadcast-Plaintiff's Reassignment, Proposed Suspension, and Letter of Reprimand

The record is not clear as to the steps taken by Mr. Dare in the immediate wake of the October 3 Broadcast. Mr. Dare avers that after the Broadcast, he "immediately called a staff meeting to discover if the editor had reviewed the clip before it was broadcast and why the interview was broadcast." Def.'s Disc. Exs. at 47 (9/19/02 Dare Decl.) ¶ 23. Mr. Dare further avers that after that meeting he called Plaintiff into his office "and verbally questioned her as to why the interview was broadcast," and that in both instances Plaintiff stated that she did not have enough time to review the tape before it aired. *Id.* ¶ 24.Plaintiff and Mr. Mustapha deny that Mr. Dare spoke to them individually about the incident. Def.'s Disc. Exs. at 75 (8/14/02 Wada Dep. at 155:1-6); *id.* at 9 (12/16/01 Mustapha Aff.); Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report) ¶ 25.

In any event, in early October 2001, Mr. Dare and Ms. Dillard met with Africa Division Labor Relations Specialist, Donna Grace, to discuss appropriate discipline for Plaintiff based on the October 3 Broadcast. *See* Def.'s Disc. Exs. at 48 (9/19/02 Dare Decl.) ¶¶ 27-28; *id.* at 52-53 (9/27/02 Grace Decl.) ¶¶ 5-12; 9/27/02 Dillard Decl. ¶¶ 35-36; Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report) ¶¶ 26-27. On November 27, 2001, Plaintiff was reassigned to an IRB position without editorial responsibility. Def.'s Stmt.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 16

Slip Copy, 2007 WL 1378516 (D.D.C.)
(Cite as: Slip Copy)

¶ 44; Def.'s Disc. Exs. at 26-32 (Reassignment Documents). Plaintiff received a letter from Mr. Dare informing her of her reassignment, and specifically advising Plaintiff that her "grade, pay, and benefits [would] not be affected."Def.'s Disc. Exs. at 26 (11/27/01 Reassignment Letter from S. Dare). On the same day, Plaintiff received a second letter from Mr. Dare, which proposed a five-day suspension for "failure to follow instructions" in not reviewing the stringer report containing the Sheikh Bauchi interview or sending it to Mr. Dare to be reviewed prior to airing it. Def.'s Stmt. ¶ 44; Def.'s Disc. Exs. at 33-37 (11/27/01 Suspension Letter from S. Dare).

*16 A decision letter for the November proposed suspension was issued on January 30, 2002, Def.'s Stmt. ¶ 45; Def.'s Disc. Exs. at 53 (9/27/02 Grace Decl.) ¶ 12; however, the November proposed suspension letter erroneously stated that Plaintiff had received the tape of the stringer report and given it to the MC without reviewing it, see Def.'s Disc. Exs. at 33-37 (11/27/01 Suspension Letter from S. Dare). As a result, the November proposed suspension letter was rescinded and a new proposed suspension letter was issued on March 5, 2002, reflecting that Plaintiff never handled the tapes in question. 9/27/02 Dillard Decl. ¶ 39; Def.'s Disc. Exs. at 49 (9/19/02 Dare Decl.) ¶ 31, 53-54 (9/27/02 Grace Decl.) ¶¶ 13-14. A decision letter for the second proposed suspension was issued on April 8, 2002. Id. Def.'s Disc. Exs. at 54 (9/27/02 Grace Decl.) ¶¶ 14-15; 9/27/02 Dillard Decl. ¶ 37. Before Plaintiff's suspension could be implemented, the then-VOA Chief of Staff, Horace Cooper, ordered that all action on Plaintiff's suspension be held in abeyance. Def.'s Disc. Exs. at 54 (9/27/02 Grace Decl.) ¶¶ 14-15; 9/27/02 Dillard Decl. ¶ 37.

Mr. Cooper resigned before reaching a decision on Plaintiff's proposed suspension, and a new Acting Chief of Staff, Marie Skiba, was appointed. 9/27/02 Dillard Decl. ¶ 40; Def.'s Disc. Exs. at 54 (9/27/02 Grace Decl.) ¶ 16. On September 25, 2002, Ms. Skiba issued a letter sustaining the charge contained in Plaintiff's proposed suspension letter, and further indicating that she had decided to reduce Plaintiff's penalty to a reprimand because the offense was

almost a year old and Plaintiff showed "no indication of a pattern of this type of offense."Id.; Def.'s Disc. Exs. at 38 (9/25/02 Letter from M. Skiba). The same day, Mr. Dare issued an official letter of reprimand to Plaintiff, which was placed in her official personnel file. Def.'s Stmt. ¶ 46; Def.'s Disc. Exs. at 39-40 (9/25/02 Letter from S. Dare). Plaintiff asserts that Ms. Skiba improperly approved the letter of reprimand because she "did not speak with Plaintiff or the former VOA chief of staff before making her decision."Pl.'s Stmt. ¶ 46. To that end, Plaintiff cites to a union memorandum requesting that Plaintiff's letter of reprimand be removed from her file in the event that Ms. Skiba did not speak with Plaintiff, Mr. Mustapha, or Mr. Cooper before issuing the letter of reprimand, Pl.'s Exs. for Issue No. 46 (10/24/03 memo from V. Wiley), as well as e-mails indicating that Ms. Grace and Ms. Dillard discussed how to incorporate Plaintiff's oral reply to Mr. Cooper into a revised decision letter regarding Plaintiff's proposed suspension, id. (7/12/02 and 7/14/02 e-mails between D. Grace and G. Dillard). The record does not contain evidence indicating whether or not Ms. Skiba spoke to Plaintiff, Mr. Mustapha, or Mr. Cooper before issuing the letter of reprimand.

In addition to the discipline administered to Plaintiff, the MC for the October 3 Broadcast, Mr. Mustapha, received a written admonishment for his actions. Def.'s Disc. Exs. at 48 (9/19/02 Dare Decl.) ¶ 29; Pl.'s Exs. for Issue No. 17 (8/27/02 Admonishment). In her Statement, Plaintiff argues that this discipline is "lopsided" because "Plaintiff is held responsible for not knowing that a tape existed that was not brought to her attention, while the Editor who made the judgment unilaterally to put the tape on air was just admonished, and the Supervisor [Mr. Dare] who was also not aware of the tape until after it was aired was never held responsible."Pl.'s Stmt. ¶ 32. Plaintiff does not provide factual support for her argument and, in any event, her argument is unavailing because even if Mr. Mustapha was also an IRB with editorial responsibilities, the record is clear that Plaintiff was the editor responsible for the particular October 3 Broadcast. Furthermore, Plaintiff's proposed suspension was never carried out, and Plaintiff has provided no evidence that Mr. Mustapha's written

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

admonishment and Plaintiff's letter of reprimand actually represented disparate discipline.

### E. Other Allegedly Discriminatory and Retaliatory Events

**\*17** In addition to the events described above, which form the basis of Counts I through IV of Plaintiff's Complaint, Plaintiff's Complaint and Opposition to Defendant's motion for summary judgment devote attention to a number of other incidents. As discussed in Section II.A., below, because Plaintiff has failed to exhaust her administrative remedies as to these incidents, she cannot claim that they constitute discrete acts of discrimination or retaliation. Instead, Plaintiff contends that these incidents support her claim for hostile work environment, asserted in Count V of her Complaint, and they are therefore only relevant insofar as they relate to that claim. Nevertheless, the Court has considered and will set forth below the various arguments that Plaintiff raises with respect to these incidents. Ultimately, the Court concludes that none of these incidents is indicative of a hostile work environment based on race, sex, or religion.

### 1. Plaintiff's 2001-2002 Performance Evaluation

In June 2002, Plaintiff received her performance evaluation for the period May 1, 2001 to April 30, 2002 from Mr. Dare. Def.'s Stmt. ¶ 47; Def.'s Evaluation & AWOL Exs. (hereinafter "Eval. Exs." ) at 1-10 (6/14/02 Wada Eval.). Plaintiff was evaluated on six different "Performance Requirements" on a five-level scale from Unsuccessful to Outstanding, and was rated Fully Successful on two Requirements, Highly Successful on two Requirements, and Outstanding on two Requirements. *Id.* Plaintiff received an overall summary rating of Fully Successful, and Ms. Dillard concurred in Mr. Dare's evaluation of Plaintiff.*Id.* Plaintiff does not dispute these facts; however, she argues that her 2001-2002 evaluation was retaliatory, apparently because it followed upon Mr. Dare making changes to Plaintiff's work schedule that she was unhappy with and because " [s]ince 1986, no supervisor of the Hausa Service

rated Plaintiff below highly successful."*See* Pl.'s Stmt. ¶ 47. Plaintiff fails, however, to present any evidence of a causal connection between her 2001-2002 performance evaluation and any prior protected EEOC activity, and the Court cannot conclude that Plaintiff's 2001-2002 performance evaluation was retaliatory simply because it was lower than her previous evaluations.

Plaintiff also argues that Mr. Dare was not authorized to complete Plaintiff's performance evaluation because he was a non-citizen. Pl.'s Stmt. ¶ 47. In support of this assertion, Plaintiff cites to an e-mail in which Ms. Grace informed Ms. Dillard that generally, "[b]ecause non-citizens cannot be supervisors, they cannot rate employees, neither citizens nor non-citizens."*See* Pl.'s Exs. for Issues No. 49-55 (5/3/00 e-mail from D. Grace). As explained by Ms. Grace in her Reply Declaration, however, her e-mail "dealt with a specific and unique situation within the French to Africa Service" where Ms. Dillard requested that a non-citizen complete performance evaluations. Grace Reply Decl. ¶ 5. As discussed in greater detail below and as explained by Ms. Grace in her Reply Declaration, in Mr. Dare's case, Ms. Dillard had sought and obtained an exception that allowed Mr. Dare to take on a supervisory position, and therefore to rate employees. *Id.* Such an exception had not been obtained in the case of the French to Africa Service evaluations. *Id.*

### 2. Office of Security Interview

**\*18** On October 9, 2002, Plaintiff was interviewed by the International Broadcasting Bureau's ("IBB") Office of Security. Def.'s Stmt. ¶ 48; Def.'s Garnish & Investigation Exs. (hereinafter "Garnish. Exs.") at 9 (11/18/02 Letter from C. Booker). Plaintiff does not explain how this interview was in any way retaliatory or discriminatory. Furthermore, the Court notes that the only evidence in the record regarding the interview indicates that Plaintiff "was not the subject of an investigation when she was interviewed" and that Plaintiff, "her attorney, and her AFGE union representative were all informed that [Plaintiff] was not the subject of any investigation and that the interview was completely

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy Page 18

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

voluntary."*Id.*

*3. Plaintiff's AWOL Charge*

On June 4, 2003, Plaintiff verbally requested permission to be away from the office to take care of an emergency situation. Def.'s Stmt. ¶ 49; Def.'s Eval. Exs. at 53 (3/29/05 Dare Decl.) ¶ 10, *id.* at 71 (2/10/05 Wada Dep. at 11:4-14:3).[FN16] Mr. Dare granted Plaintiff verbal permission to be absent, but reminded her that she was scheduled as the first newsreader for the 4:30 p.m. live radio broadcast. Def.'s Stmt. ¶ 50; Def.'s Eval. Exs. at 53 (3/29/05 Dare Decl.) ¶ 10; *id.* at 71 (2/10/05 Wada Dep. at 11:4-12:1). Defendant maintains that Plaintiff was away from the studio from approximately 2:00 p.m. until 4:20 p.m., citing Mr. Dare's declaration to that effect, as well as e-mails that Mr. Dare sent himself at 4:02 p.m. and 4:25 p.m. on the date in question noting that Plaintiff did not return to the studio until 4:20 p.m. Def.'s Stmt. ¶ 51; Def.'s Eval. Exs. at 53 (3/29/05 Dare Decl.) ¶ 12; *id.* at 58-59 (6/4/03 e-mails from S. Dare). In her EEOC Opposition, Plaintiff asserts that she left the office at approximately 1:30 p.m. and returned at approximately 4:00 p.m.; however Plaintiff does not appear to have provided any factual support for this assertion. Pl.'s Exs. for Issues No. 49-55 (EEOC Opp'n at 4). In any event, the parties agree that Plaintiff was away from the studio for approximately two and one-half hours. In light of Plaintiff's absence, Mr. Dare assigned another IRB to cover the 4:30 p.m. live radio broadcast, and so informed Plaintiff when she returned to the studio. Def.'s Eval. Exs. at 54 (3/29/05 Dare Decl.) ¶ 14; *id.* at 72 (2/10/05 Wada Dep. at 16:9-16).

FN16. Plaintiff responds to paragraphs 49 through 55 of Defendant's Statement by referring the Court to specific pages of her opposition to Defendant's motion for summary judgment in EEOC case number 100-2004-00943X (hereinafter Plaintiff's " EEOC Opposition"), as well as her "whole motion and exhibits." Pl.'s Stmt. ¶¶ 49-55. Defendant erroneously asserts in its Reply that Plaintiff has not provided the Court with the relevant EEOC Opposition. Plaintiff has, in fact, provided her EEOC Opposition along with her Exhibits for Issues No. 49-55, and to the extent that Plaintiff has provided precise citations to that Opposition in response to Defendant's Statement, the Court has considered those materials. The Court has also reviewed the entirety of her EEOC Opposition in an attempt to discern whether genuine questions of material fact exist. However, insofar as Plaintiff generally cites the Court to her "whole motion and exhibits," she fails to carry her burden of responding to Defendant's Statement by providing precise citations to those portions of the factual record on which she relies. Indeed, while Plaintiff's EEOC Opposition appears to cite to exhibits, Plaintiff has not clearly identified those exhibits among the multiple hundreds of pages of documents she provides in connection with her opposition to the instant motion. As such, Plaintiff is left with the Court's interpretation of the factual record she provides.

Mr. Dare avers that Plaintiff's "absence greatly exceeded the amount of time that she had requested . .. and could have seriously harmed the air show." Def.'s Eval. Exs. at 54 (3/29/05 Dare Decl.) ¶ 15. Mr. Dare further avers that he consulted with the BBG's Office of Labor Relations to seek advice on how to handle the issue and, based on Plaintiff's June 4, 2003 absence as well as other time management and tardiness problems, determined to grant Plaintiff one hour of administrative leave and record her additional absence as AWOL. *Id.* ¶¶ 15-17.Plaintiff asserts in her EEOC Opposition that she requested annual leave, rather than administrative leave. Pl.'s Exs. for Issues No. 49-55 (EEOC Opp'n at 4-6); *see also* Def.'s Eval. Exs. at 71 (2/10/05 Wada Dep. at 12:12-11) ("I didn't ask for administrative leave, no."). Nevertheless, Plaintiff does not dispute that she was ultimately charged one hour of administrative leave and one and one-half hours of AWOL for her June 4, 2003 absence.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

**\*19** Plaintiff does not indicate how her being charged AWOL shows either discrimination or retaliation. Moreover, the Court notes that Plaintiff ultimately appears not to have been harmed financially from being charged one hour of administrative leave and one and one-half hours of AWOL relating to her June 4, 2003 absence, rather than being charged two and one-half hours of annual leave. *See* Def.'s Election Overtime Exs. (hereinafter "OT Exs.") at 2-3 (10/17/06 Grace Decl.) ¶¶ 5-10. When Plaintiff was terminated by VOA in 2004, her lump sum annual leave payment was calculated using her 2004 salary level. Had Plaintiff been charged two and a half hours of annual leave in 2003, those hours would have been compensated at her 2003 salary level, *id.* ¶¶ 6-7; however, because she was charged AWOL and administrative leave, rather than annual leave, Plaintiff ultimately received $38.07 more in compensation, *id.* ¶ 10.

### 4. Plaintiff's 2002-2003 Performance Evaluation

In June 2003, Plaintiff received her performance evaluation for the period May 1, 2002 to April 30, 2003 from Mr. Dare. Def.'s Stmt. ¶ 53; Def.'s Eval. Exs. at 20-28 (6/11/03 Wada Eval.). Plaintiff was evaluated on five different "Performance Requirements" on the same five-level scale, and was rated "Highly Successful" on two Requirements, "Fully Successful" on two Requirements, and "Minimally Successful" on Requirement 4-"Manages time productively and efficiently." Def.'s Stmt. ¶ 54; Def.'s Eval. Exs. at 20-28 (6/11/03 Wada Eval.). Because Requirement 4 was a "critical" Requirement, Plaintiff's overall summary rating could not exceed "Minimally Successful," and Plaintiff in fact received that summary rating. Def.'s Stmt. ¶ 55; Def.'s Stmt. Eval Exs. at 28 (6/11/03 Wada Eval.). Plaintiff does not dispute these facts; instead, she "strongly disagrees with Mr. Dare's rating of her performance," citing the Court to her EEOC Opposition, which discusses her 2002-2003 evaluation. Pl.'s Stmt. ¶¶ 53-55. In her EEOC Opposition, Plaintiff argues that Mr. Dare was required to, but failed to, establish standards of performance and warn Plaintiff that she was headed towards a "Minimally Successful" rating. *See* Pl.'s Exs. for Issues No. 49-55 (EEOC Opp'n at 5-10). Defendant does not address this assertion, thus a factual question appears to exist as to whether Mr. Dare followed proper procedures with respect to Plaintiff's 2002-2003 performance evaluation. However, such a procedural irregularity would not be evidence of discrimination or retaliation, and Plaintiff proffers no other evidence to that effect.

On July 8, 2003, Plaintiff contacted the OCR alleging that her "Minimally Successful" performance evaluation and Mr. Dare's charging her AWOL constituted "ongoing retaliation." 10/22/06 Johnson Decl. Attach. 1 (7/8/03 Initial Contact Sheet). Plaintiff also alleged "ongoing retaliation" in the form of improper procedures resulting in a wage garnishment against her, discussed in greater detail below. *Id.* Plaintiff engaged in settlement discussions with the BBG regarding this charge; however, Plaintiff ultimately rejected the BBG's settlement offer and received a Notice of Right to File on December 22, 2003. *Id.* (Documents regarding 7/8/03 OCR contact). Plaintiff filed a formal complaint of discrimination on January 2, 2004. Def.'s Garnish. Exs. at 1-3.

### 5. April 19-20, 2003 Overtime and Mr. Dare's Alleged Verbal Abuse

**\*20** Nigerian presidential elections were scheduled to occur during the weekend of April 18-19, 2003, with parliamentary elections to occur the prior weekend. Def.'s OT Exs. at 2 (10/18/06 Dillard Decl.) ¶ 6; *id.* at 12-13, 36-37 (Undated Wada Dep. at 25:7-26:10, 49:3-50:21). As a result, the Hausa Service expanded its weekend radio shows to one hour in order to cover the elections. *Id.* at 36-37 (Undated Wada Dep. at 49:3-50:21). On April 15, 2003, the Tuesday prior to the presidential elections, Mr. Dare approached Plaintiff to discuss the possibility of Plaintiff working overtime during the weekend to cover the elections. *Id.* at 13 (Undated Wada Dep. at 26:11-21). Plaintiff responded, "that's interesting, but I have to check my schedule."*Id.* On the afternoon of Thursday, April 17, 2003, Mr. Dare e-mailed Plaintiff assigning her to work on Sunday, April 20, 2003. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

at 15-16 (Undated Wada Dep. at 28:11-29:9). Plaintiff responded to Mr. Dare's on April 18, 2003, stating, "Due to other commitment, I would not be able to work the weekend 1500 as scheduled."*Id.* at 16-17 (Undated Wada Dep. at 29:10-31:15).

Mr. Dare responded to Plaintiff's e-mail on the afternoon of Friday, April 18, 2003, informing Plaintiff that the Hausa Service "has an important one hour show to put on, and you will have to come to work on Sunday, April 20th, for the 1500 show as per my 17th April e-mail. You will be paid overtime for four hours. This is not a voluntary assignment."*Id.* at 19 (Undated Wada Dep. at 32:2-20); Def.'s Stmt. ¶ 56. Mr. Dare consulted with Ms. Dillard about the overtime schedule for the weekend, and Ms. Dillard sent an e-mail to Plaintiff on the evening of April 18, 2003, confirming that Plaintiff was scheduled to work over the weekend; however, her e-mail mistakenly directed Plaintiff to work on Saturday, April 19, rather than Sunday, April 20, 2003. Def.'s Stmt. ¶ ¶ 57-58; Def.'s OT Exs. at 2 (10/18/06 Dillard Decl.) ¶¶ 7-8. Plaintiff reported to work on the morning of Saturday, April 19, 2003. Def.'s Stmt. ¶ 59; Def.'s OT Exs. at 22 (Undated Wada Dep. at 35:4-8). Plaintiff asserts that she was working on the morning broadcast when Mr. Dare came up behind her and shouted "Hadiza ... who told you you were going to be MC? I've already chosen my MC." 12/3/04 Wada Dep. at 191:16-192:1; Def.'s Stmt. ¶ 60. Later in the day, Mr. Dare told Plaintiff that she did not have to report to work on Sunday, April 20, 2003, and Plaintiff did not report to work that day. Def.'s Stmt. ¶ 21; Def.'s OT Exs. at 24 (Undated Wada Dep. at 37:6-17).

Plaintiff's Union filed a grievance on her behalf, alleging that BBG "violated law or contract by failing to provide [Plaintiff] with sufficient notice" of her overtime assignment for the April 19-20, 2003 weekend. Def.'s Stmt. ¶ 62; Def.'s OT Exs. at 60-79 (8/25/04 Opinion and Award). In an August 25, 2004 Opinion, an impartial arbitrator found that Mr. Dare assigned Plaintiff to work overtime in compliance with the relevant union agreement, but that Ms. Dillard failed to adhere to the union agreement by not providing Plaintiff with as much advance notice as possible. Def.'s Stmt. ¶ 63;

Def.'s OT Exs. at 79 (8/25/04 Award). The arbitrator therefore directed BBG "to cease and desist from such conduct;" however, because the violation appeared to be an aberration and because Plaintiff had already received overtime pay for her work on April 19, 2003, the arbitrator did not require BBG to post a notice of the violation to employees or pay Plaintiff backpay. *Id.*

**\*21** Plaintiff does not dispute any of the foregoing facts. Instead, Plaintiff asserts that she was forced to work over the April 19-20, 2003 weekend after Mr. Dare's "entire staff unanimously decided to stop volunteering" to work overtime. Pl.'s Stmt. ¶ 56 (citing 4/26/04 Petition at 9 ("During the Nigerian presidential elections of 2003, staff in the Hausa Service turned down opportunities to work overtime, and the Africa Division director, Gwen Dillard had to step in to force the staff to work extra hours. Ordinarily, staff jumped at any opportunity to contribute, but presently, we are reluctant to do anything more than required.")). While Defendant does not address this assertion, it is ultimately irrelevant because it does not demonstrate that Plaintiff's overtime assignment was in any way discriminatory or retaliatory. Furthermore, Plaintiff speculates that "probably to set Plaintiff up for another disciplinary action for failing to show up for an important assignment, a confusing directive was issued to Plaintiff by Dare, and another by Dillard." Pl.'s Stmt. ¶ 56. Plaintiff offers no evidentiary support for this speculation.

In addition to her allegations regarding her overtime assignment on the weekend of April 19-20, 2003, Plaintiff's Opposition contains a vague reference to Mr. Dare "forcing a weekend schedule on Plaintiff to run for weeks, and later a four months night shift schedule that keeps Plaintiff from performing her assigned official duties as Senior Editor."Pl.'s Opp'n at 16. The documents Plaintiff proffers in her exhibits appear to suggest that, at some point in 2001, Mr. Dare required Plaintiff to switch to a weekend schedule, followed by a night shift schedule, notwithstanding Plaintiff's assertion that her Senior Editor duties required her to work a weekday schedule. *See* Pl.'s Arg. Exs. (11/10/03 Memo from H. Wada); (11/1/01 e-mail from S. Dare). In addition, Plaintiff's deposition testimony

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

suggests that, at some point in 2003, Mr. Dare switched her work schedule so that she was forced to work more than five days consecutively. *See* 12/3/04 Wada Dep. at 194:7-198:5, 210:22-214:14; *see also* Pl.'s Arg. Exs. (2/9/03 e-mail from H. Wada). Plaintiff does not specify how she believes these schedule changes to have been discriminatory or retaliatory.

### 6. Garnishment Action Against Plaintiff

As noted above, in contacting the OCR on July 8, 2003, Plaintiff asserted, *inter alia,* that she had experienced "ongoing retaliation" "due to management following improper procedures and resulting in a wage garnishment against her." 10/22/06 Johnson Decl. Attach. 1 (7/8/03 Initial Contact Sheet). In a memo dated the same day, Plaintiff explained:

I am also asking OCR to investigate procedures in which it appears that the agency did not follow the proper channels to implement a wage garnishment against me. The agency violated the process by handling it solely from the State Department's Payroll Office without informing neither the IBB Payroll Office, the IBB General Counsel's Office, nor the Charleston Financial Center....

**\*22** *Id.*(7/8/03 Memo from H. Wada). The OCR subsequently dismissed Plaintiff's allegations regarding the garnishment action against her in a letter dated February 4, 2004, which stated, "[y]our statements underscore your understanding that the responsibility of implementing the garnishment order was entirely with the Department of State, and not BBG. Per your own admissions, you are not an aggrieved individual as defined under the law."Def .'s Garnish. Exs. at 3 (2/4/04 Letter from D. Johnson). In her Statement, Plaintiff asserts that she wanted an objective investigation into the garnishment action and states that she believes the garnishment action was retaliatory, speculating that VOA Labor Relations Specialist Donna Grace "may be the person who set up the garnishment."Pl.'s Stmt. ¶ 64. However, Plaintiff offers absolutely no evidence that Ms. Grace was in any way involved in the garnishment action, and her mere speculation does not controvert the record evidence indicating

that BBG had no involvement in the garnishment action. Moreover, the garnishment action appears to be irrelevant to Plaintiff's claims in the instant litigation, as it is not referenced in Plaintiff's Complaint or Opposition.

### F. Plaintiff's Termination

By e-mail dated May 11, 2004, Ms. Dillard was asked to investigate phone calls placed to Nigeria on Sunday, May 9, 2004 from a phone located in Studio 42 of the VOA studios. Def.'s Termination Exs. (hereinafter "Term. Exs.") at 1 (5/11/04 e-mail from J. Brooks).

On July 15, 2004, Ms. Dillard issued a letter to Plaintiff proposing to remove her for improper conduct. Def.'s Term. Exs. at 4-10 (7/15/04 Letter from G. Dillard). Ms. Dillard charged Plaintiff with making, or allowing others to make, unauthorized phone calls to Nigeria at a cost to the agency of $2,695.12. *Id.* at 7; Def.'s Stmt. ¶ 67. In her letter, Ms. Dillard explained that the visitors log for the VOA building for May 9, 2004 indicated that Plaintiff signed her husband into the building at 7:30 a.m., and that security cameras recorded Plaintiff's husband entering Studio 42 at 7:45 a.m. and exiting at 1:42 p.m. Def.'s Term. Exs. at 4 (7/15/04 Letter from G. Dillard). Ms. Dillard further noted that during the time period that Plaintiff's husband was in Studio 42, 31 unauthorized phone calls were made to a total of 14 phone numbers in Nigeria from that Studio, including five calls to a phone number listed to an M. Wada. *Id.; see also* Def.'s Term. Exs. at 1-3 (5/11/04 e-mail from J. Brooks and pages from Nigerian telephone book). According to Ms. Dillard, the number registered to M. Wada was also called from Studio 42 on Saturday, May 15, 2004 and Saturday, May 22, 2004, during times when the visitors log indicated that Plaintiff and her husband were present in the VOA building. Def.'s Term. Exs. at 5 (7/15/04 Letter from G. Dillard). Furthermore, Ms. Dillard noted, Plaintiff's son was also present in the VOA building on Saturday, May 22, 2004 when the unauthorized phone calls were made. *Id.* In determining the appropriate penalty, Ms. Dillard specifically noted, "[t]his is not your

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

first offense. On September 25, 2002, you were issued a Letter of Reprimand for your failure to follow instructions."*Id.* at 8. Ms. Dillard continued to state, however, "[e]ven if this were your first offense, the serious nature of your misconduct relating to this proposal supports your removal from the Federal Service."*Id.*

**\*23** Plaintiff was placed on paid, non-duty status (administrative leave) while the termination proposal was pending. *Id.* at 10; Def.'s Stmt. ¶ 68. Plaintiff's pay and benefits continued, but her access to BBG buildings was restricted and she was required to turn in her security badge. Def.'s Term. Exs. at 10 (7/15/04 Letter from G. Dillard). Ms. Dillard's letter advised Plaintiff that she could arrange to visit the building if needed by getting a visitor's pass and being escorted at all times. *Id.* On August 20, 2004, Plaintiff's counsel submitted a written response to Ms. Dillard's letter. Def.'s Term. Exs. at 11-17 (Pl.'s 8/20/04 Written Response). In her written response, Plaintiff asserted that she did not make any of the telephone calls in question or permit another individual to make such calls, and that she was working in the building on the dates in question. *Id.* Plaintiff also challenged the manner in which VOA proceeded in removing her from its offices as well as her opportunities to be heard on the issue of her proposed termination.

Also on August 20, 2004, Plaintiff and her counsel were scheduled to make an Oral Reply to her proposed termination at 11:00 a.m. before VOA Director David Jackson. Def.'s Term. Exs. at 18 (Lutz Notes of 8/20/04 Oral Reply). It appears that Plaintiff and her counsel did not arrive until 11:40 a.m., at which point Director Jackson informed them that he would be unable to extend the time for the Oral Reply because he had another meeting at noon. *Id.* It further appears that, during the Oral Reply, Plaintiff's counsel asserted that Plaintiff's husband made the phone calls in question, *see id.* at 20; however, when Director Jackson attempted to confirm that assertion, Plaintiff's counsel stated only that Plaintiff was "not responsible for making the calls" and "didn't tell anyone to make the calls,"*id.* Plaintiff's counsel appears to have argued that Plaintiff was improperly being held vicariously liable for the phone calls being made and asserted

that if Plaintiff's husband made the phone calls, Plaintiff could not be held liable for his actions. *Id.* at 20-21.In addition, it appears that Director Jackson asked Plaintiff's counsel whether Plaintiff had made any effort to pay BBG for the phone calls, to which Plaintiff's counsel responded that Plaintiff's Union offered to reimburse BBG after Plaintiff received Ms. Dillard's termination proposal. *Id.* at 21-22.

In a letter dated September 9, 2004, VOA Director Jackson found that the charge of improper conduct was supported by a preponderance of the evidence and that, based on consideration of "all relevant factors relating to the penalty selection," removal was the appropriate penalty. Def.'s Term. Exs. at 23-32 (9/9/04 Letter from D. Jackson). Director Jackson noted that in arriving at his decision, he fully considered Plaintiff's oral and written replies, as well as Ms. Dillard's proposal letter and its supporting materials. *Id.* at 23.Regarding the charge, Director Jackson stated that Plaintiff did not dispute that she and her husband were present in the VOA building when the phone calls were made (and that Plaintiff's son was also present on May 22, 2004), and that Plaintiff could not contest this fact because a security tape showed Plaintiff visiting her husband in Studio 42 several times between 9:58 a.m. and 1:27 p.m. *Id.*Director Jackson further noted that Plaintiff had not asserted that she did not know the M. Wada to whom many of the phone calls were placed.*Id.* at 24.

**\*24** Noting that Plaintiff had offered contradictory accounts as to who made the phone calls in question, Director Jackson stated that because no one else was present in Studio 42 at the times in question, "[e]ven if I accept your statement that you, yourself did not make the calls, I would still be left with the conclusion that your husband made the calls on May 9 and May 15 and either your husband or your son made the calls on May 22."*Id.* Director Jackson dismissed Plaintiff's assertion that the calls were made without her knowledge, finding that because Plaintiff had been in Studio 42 at times when the calls were made, it appeared that she had not taken steps to prevent the calls from being made. *Id.* at 25-32.Director Jackson also found to be false Plaintiff's statement that she came to work

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 23

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

on May 22, 2004 to work on her performance appraisal, noting that no relevant computer activity was recorded on Plaintiff's computer on May 22, 2004 and that the Microsoft Word documents relating to Plaintiff's performance appraisal were not created until the following Monday. *Id.* at 25.Director Jackson similarly concluded that, although Plaintiff had stated that her husband and son came to the VOA office because they had business to take care of downtown, that explanation was inconsistent with the fact that they were in the VOA office for a number of hours. *Id.*

Director Jackson also considered "Other Issues" in his letter, including Plaintiff's allegation that the charge against her constituted retaliation for the lawsuit that she had initiated against the BBG, and found no evidence of this "serious claim." *Id.* at 26-29.Director Jackson addressed and rejected Plaintiff's argument that she was being treated differently from other employees who had been found to have improperly used BBG's telephone service.*Id.* at 30-32.Stating that, "no other Agency employee has been found to have signed in a family member who placed unauthorized telephone calls. There simply is no parallel case," Director Jackson nevertheless continued to distinguish Plaintiff's alleged comparators on various grounds. *Id.* Finally, Director Jackson noted that he might:
have taken a different view of this matter had you readily acknowledged that your husband made the calls and acknowledged your own misconduct in allowing him to make them and had you made prompt restitution to the Agency. However, you have denied your culpability for the charges and, instead, blame Agency officials for discovering and trying to correct your misconduct.... You have failed to accept responsibility for your actions and you tried to cover them up.

*Id.* at 31.As such, Director Jackson ordered Plaintiff's removal, effective September 10, 2004. *Id.* at 23.

In her Statement, "Plaintiff categorically denies all statements of Defendant in relation to the termination of her employment as legally questionable by all standards of universal legal practice including in the United States."Pl.'s Stmt.

¶ 67. Plaintiff argues that her termination was not justified because "punishing any individual with certainty for a conduct that cannot be pinned with certainty on the person charged, is questionable."*Id.* Plaintiff does not, however, actually deny that she allowed her husband to make the phone calls in question, or provide factual evidence that she did not allow the phone calls to be made. *Id.* Moreover, Director Jackson's letter makes clear that Defendant decided to terminate Plaintiff largely because she steadfastly refused to assume responsibility for the phone calls, despite the fact that they appeared to have been made on multiple occasions with, at a minimum, her knowledge and acquiescence. Def.'s Term. Exs. at 31 (9/9/04 Letter from D. Jackson). In addition, as Ms. Dillard expressed in her letter, Plaintiff's "position require[d] shift work and the ability to work independently without supervision," and Plaintiff's actions-allowing the phone calls to be made and refusing to accept responsibility thereafter-"violated [Ms. Dillard's] trust in [Plaintiff] and [Ms. Dillard's] confidence in [Plaintiff's] integrity. Def.' s Term. Exs. at 8 (7/15/04 Letter from G. Dillard). Defendant's conclusions regarding the phone calls and her subsequent refusal to accept responsibility appear to be supported by significant circumstantial evidence, and the Court's role is not to second-guess Defendant's employment decisions. In addition, as discussed in greater detail below, the ultimate issue the Court must address in resolving the instant motion is not whether VOA was justified in terminating Plaintiff, but rather whether Plaintiff's termination constituted discrimination or retaliation.

*25 To that end, the Court notes that in her Statement Plaintiff asserts that, prior to her termination, BBG had never fired an employee over unauthorized telephone calls. *Id.* Although Plaintiff does not explicitly state as much in her Statement, it appears that Plaintiff is referring to the various alleged comparators on which she relied in arguing against her termination before Director Jackson. As such, the Court will briefly address those comparators at this point. In so doing, the Court notes that Plaintiff does not indicate the race, sex, or religion of any of these alleged comparators.

As described in Director Jackson's September 9,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

2004 letter, "during FY 03 and FY 04, nine Office of Cuba Broadcasting employees, located in Miami, Florida, and one VOA employee in Washington reimbursed the Agency for the cost of unauthorized telephone calls that they made and they were not removed or otherwise disciplined for their misconduct."Def.'s Term. Exs. at 30 (9/9/04 Letter from D. Jackson). The only additional information in the record that appears to relate to the Office of Cuba Broadcasting employees is an October 29, 2001 letter submitted by Plaintiff, indicating that employees who made personal phone calls from their government-issued cellular phones were required to self-identify personal phone calls on their bills and submit a reimbursement check to the government, along with a $10 administrative fee. Pl.'s Exs. for Issue No. 67 (10/29/01 Letter from K. Sutton, 11/29/06 list of Unauthorized Personal Calls for BBG). As to the VOA employee, in his letter, Director Jackson noted that "the employee called an 800-toll free number from his/her calling card and assumed that it was free. It appears that this was an honest mistake and the employee admitted the conduct and paid the Agency back."Def.'s Term. Exs. at 30 (9/9/04 Letter from D. Jackson). Director Jackson further noted that the largest amount owed to the BBG by any of these ten employees was $300, and that the total of all of the unauthorized calls placed by these employees was $1,022.50, or $1,672.62 less than the total cost of the phone calls Plaintiff allegedly allowed to be made to Nigeria. *Id.*

Plaintiff also points to a 1999 agreement in which the Audio Services Branch allowed an employee to repay $2,127.18 in unauthorized phone calls via a payroll deduction. Def.'s Term. Exs. at 33-34 (11/30/99 Agreement); Pl.'s Exs. for Issue No. 67. The employee in question received a letter of admonishment that was not filed in her official personnel folder, *id.;* however, Defendant notes that neither Ms. Dillard nor VOA Director Jackson were in any way involved in administering discipline to the employee in question in 1999, Def.'s Reply at 14. The Court lacks any additional information as to this situation. Finally, Plaintiff notes that Aliyu Mustapha, the IRB who served as the MC for the October 3 Broadcast, misused a government-issued credit card by incurring approximately $32,000 worth of charges for personal purchases and cash

advances. *See* Pl.'s Stmt. ¶ 17. However, as Ms. Grace explains in her Declaration submitted in support of Defendant's Reply, it appears that Mr. Mustapha was one of many BBG employees who misused the credit cards in question and that "the agency did not have a program in place to educate employees on their financial obligations under the Government Travel Card Program at the time the misuse occurred."Grace Reply Decl. ¶ 10. As a result, "the agency decided to allow employees to repay Citibank without pursuing formal disciplinary action."*Id.* Ms. Grace distinguishes Mr. Mustapha's situation from Plaintiff's by noting that "[w]hen notified of his misuse, Mr. Mustapha agreed immediately" to repay his debt, and further noting that the government did not incur any debt in Mr. Mustapha's case because all monies were owed to Citibank. *Id.* ¶¶ 11-12.

**\*26** For its part, as a comparator, Defendant points to a Hausa Service IRB who incurred $12,476.38 in unauthorized phone calls between March 28 and June 28, 2004, and whose employment Ms. Dillard recommended be terminated. Def.'s Term. Exs. at 35-50 (1/31/05 Memo from G. Dillard; 2/3/05 Letter from J. Welch). That individual resigned by letter dated March 4, 2005, the day before his termination would have become effective. Def.'s Term. Exs. at 51 (3/4/05 Letter to J. Welch). In her Opposition, Plaintiff insinuates that Defendant only proposed to terminate the individual in question in order to provide a comparator for Plaintiff. Pl.'s Opp'n at 19-20. Plaintiff provides no factual support for this assertion, and the Court therefore cannot credit Plaintiff's speculation. In any event, however, the Court notes that Defendant's proposed comparator does not rebut Plaintiff's assertion that the BBG had never previously fired an employee for unauthorized phone calls, *see* Pl.'s Opp'n at 17, as Defendant proposed to terminate the alleged comparator *after* Plaintiff was terminated.

Plaintiff initially contacted the OCR on July 26, 2004 alleging that Ms. Dillard's termination proposal constituted reprisal. 10/22/06 Johnson Decl. Attach. 1 (7/26/04 Initial Contact Sheet). It appears that Plaintiff again contacted the OCR after she was terminated by the VOA, alleging discrimination on the basis of race, sex, religion,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 25

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

age, and national origin, as well as reprisal, and requested that EEO counseling be waived. 10/22/06 Johnson Decl. Attach. 1 (EEO Counselor Report). Plaintiff was issued an immediate Notice of Right to File a Discrimination Complaint. *Id.*

### G. Other Issues Raised by Plaintiff

In her Statement, Plaintiff asserts that "[a] woman at VOA irrespective of qualification and performance is supposed to act subdued even in a position of leadership (exhib); male employees readily gain management support in doing so as clearly demonstrated by defendant's email exhibits." Pl.'s Stmt. ¶ 15. Plaintiff further asserts that "VOA management has been notorious for gender discrimination, Hartman case (exhib). with the largest award to a class action suit against any Agency of the federal Government."*Id.* These assertions bear no relation to the paragraph of Defendant's Statement to which they purport to respond. *See* Def.'s Stmt. ¶ 15. Nevertheless, the Court has reviewed the exhibits submitted by Plaintiff in support of these assertions, insofar as Plaintiff may be attempting to argue that VOA, on the agency level, discriminated against women.

Plaintiff's Exhibits for Issue No. 15 include a Memorandum for the File written by Debbie Young of the OCR regarding a March 25, 1999 meeting related to the situation, described above, where members of the Hausa Service made false accusations against the former Service Chief, Ms. Hasan. In that Memorandum, Ms. Young includes a "Personal Observation: There appears to be much resistance to change by some of the members of the Hausa Service and a feeling that due to their culture, things should be handled in a certain way and supervision/leadership should not be provided by a female."Pl.'s Exs. for Issue No. 15 (Young Memo for File). This statement, of course, does not demonstrate discrimination on the part of VOA management, but rather suggests discrimination among Hausa Service staff members.

**\*27** Plaintiff also proffers a memo written by English-to-Africa Branch IRB Verla Wiley to VOA Director Robert Reilly entitled "African and African-American Women for a Just Workplace." Pl.'s Exs. for Issue No. 15 (2/15/02 Memo from V. Wiley). In her memo, Ms. Wiley asserts:

Over the past several years, Rashidah Hasan, Kemi Southey-Cole, Hadiza Wada, Darlene Jones-Robinson, and I, have filed complaints/lawsuits, against the Africa Division. As a result of our filings, vicious and retaliatory attacks are being waged by Africa Division Chief, Gwen Dillard-English to Africa Branch Chief, Rebecca McMenamin-and, Labor Relations Specialist, Donna Grace. Their main objective: to retaliate by establishing paper trails, which make it easier to remove Black females from their positions. Many Black VOA employees feel that Gwen Dillard, an African-American, is being used by management to carry out their abusive personnel practices.

*Id.* Ms. Wiley continues to describe the allegedly discriminatory and retaliatory actions taken against Plaintiff and other African and African-American women at VOA, all of which ultimately amount to unproven allegations. Moreover, Ms. Wiley's memorandum is, itself, hearsay, as it describes the alleged discrimination and retaliation experienced by various women rather than proffering the individuals' first-hand accounts. In addition, Plaintiff proffers a May 2000 letter regarding an EEOC complaint filed by Ms. Hasan; however, without further information regarding the charges included in that complaint and the disposition of the complaint, the Court cannot consider it as anything other than an unproven allegation. Pl.'s Exs. for Issue No. 15 (5/10/00 Letter re: Hasan Compl.)

Finally, Plaintiff includes in her exhibits a news article and a description from a law firm's website of the March 2000 $508 million settlement in *Hartman v. Powell,* the largest sex discrimination in hiring case ever launched under the Civil Rights Act. Pl.'s Exs. for Issue No. 15 (3/23/00 GovExec.com Article; Webster, Fredrickson & Brackshaw Website). However, per Plaintiff's own materials, that settlement affected "1,100 women who applied for jobs at the U.S. Information Agency and the Voice of America between Oct. 8, 1974 and Nov. 16, 1984," who "alleged discriminatory hiring practices at the now-defunct USIA," including that "qualifying examination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.