Slip Copy                                                                                    Page 26

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

scores were rigged to favor male applicants," and that "hiring officials told women that the agency was 'looking for male voices.' " *Id.* The allegations in the *Hartman* case are thus entirely unrelated to Plaintiff's allegations in the instant action and, moreover, "the government admit[ted] no wrongdoing in the settlement." *Id.* Plaintiff's factual evidence thus fails to support her claims that VOA management was notorious for gender discrimination and preferred male employees over female employees at the agency level.

### H. Procedural History

Plaintiff filed her original five-Count Complaint in this action on July 8, 2003. In Count I of Plaintiff's Complaint alleges that Plaintiff's non-selection for the Hausa Service Chief position constituted discrimination based on Plaintiff's race, sex, and religion; Count II alleges that Defendant's refusal to reclassify Plaintiff's position from a GS-12 to a GS-13 constituted discrimination on the basis of Plaintiff's race, sex, and religion; Count III alleges that Plaintiff experienced discriminatory disparate discipline on the basis of her race, sex, and religion; Count IV alleges that Plaintiff was subjected to retaliatory discipline for her prior use of the Equal Employment Opportunity ("EEO") process; and Count V alleges that Plaintiff was subject to discriminatory and retaliatory harassment that amounted to a hostile work environment. Compl. ¶ ¶ 29-43. Plaintiff's employment was subsequently terminated by the VOA, effective September 10, 2004. On October 14, 2005, the Court issued an Order allowing Plaintiff to amend her complaint to include the allegations raised in EEOC Complaint No. 100-2004-00943 and OCR Complaint No. OCV-04-24. *Wada v. Tomlinson,* Civil Action No. 03-1488, Order (D.D.C. Oct. 14, 2005). As such, Plaintiff essentially amended her Complaint to include allegations that her termination constituted discrimination and retaliation.*Id.*

**\*28** Defendant filed its Motion for Summary Judgment in this matter on October 24, 2006, after requesting and being granted a one-day extension of time in which to file, due to technical difficulties Defendant experienced in filing its Motion. *Wada v.*

*Tomlinson,* Civil Action No. 03-1488, Minute Entry Order (D.D.C. Oct. 24, 2006). Plaintiff's Opposition was initially due on November 13, 2006; however, Plaintiff retained counsel in this matter on November 9, 2006 and the Court therefore granted Plaintiff's motion to extend her time to oppose Defendant's Motion for Summary Judgment through and including November 30, 2006. *Wada v. Tomlinson,* Civil Action No. 03-1488, Minute Entry Order (D.D.C. Nov. 13, 2006). The Court subsequently granted Plaintiff two additional extensions of time in which to file her Opposition, such that her Opposition was ultimately due on January 25, 2007. *Wada v. Tomlinson,* Civil Action No. 03-1488, Minute Entry Orders (D.D.C. Dec. 5, 2006 and Jan. 16, 2007). On January 22, 2007, Plaintiff filed a motion for an order to release her counsel and allow her a further extension of time in which to file her Opposition *pro se. Wada v. Tomlinson,* Civil Action No. 03-1488, Docket # [75], Motion for Order to Release Counsel, (D.D.C. Jan. 22, 2007). On January 25, 2007, the Court granted Plaintiff's motion to release her counsel and extended Plaintiff's time in which to file her Opposition through and including February 8, 2007. *Wada v. Tomlinson,* Civil Action No. 03-1488, Order (D.D.C. Jan. 25, 2007).

Plaintiff filed her Opposition to Defendant's Motion for Summary Judgment on February 8, 2007, along with a Notice indicating that she had filed a supporting bulky exhibit. On March 19, 2007, Defendant filed a motion for extension of time in which to file its Reply in further support of its motion for summary judgment, asserting that Defendant did not receive the package containing Plaintiff's bulky exhibit until February 21, 2007. Def.'s 3/19/07 Consent Mot. for Extens. of Time. Defendant filed its Reply the same day, and the Court granted Defendant's motion for extension of time, *nunc pro tunc,* on March 21, 2007. *Wada v. Tomlinson,* Civil Action No. 03-1488, Minute Entry Order (D.D.C. Mar. 21, 2007).

On April 4, 2007, Plaintiff filed a motion asking the Court to declare Defendant's Motion for Summary Judgment untimely because it was filed one day after it was due, and further requesting that the Court declare Defendant's Reply "inadmissible for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

being grossly untimely." Pl.'s Mot. in Support of Order to Rule Def.'s Summ. J. Mots. Untimely (hereinafter "Pl.'s Timeliness Mot."). Defendant opposed this motion on April 9, 2007.

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendant's motion, must "go beyond the pleadings and by her own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate ' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

**\*29** Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242-43 (D.C.Cir.1987); *Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently

probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan,* 938 F.Supp. 46, 49 (D.D.C.1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.' " Id* . at 587, 106 S.Ct. 1348 (citing Fed.R.Civ.P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.,* 172 F.Supp.2d 98, 104 (D.D.C.2001), *aff'd,* 328 F.3d 647 (D.C.Cir.2003) (quoting *Calhoun v. Johnson,* No. 95-2397, 1998 WL 164780, at \*3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd,* No. 99-5126, 1999 WL 825425, at \*1 (D.C.Cir. Sept. 27, 2000)); *see also Marshall v. James,* 276 F.Supp.2d 41, 47 (D.D.C.2003) (special caution "does not eliminate the use of summary judgment in discrimination cases ") (citing cases). "Summary judgment is not a ' disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall,* 276 F.Supp.2d at 47 (quoting *Celotex Corp.,* 477 U.S. at 327). Accordingly, the Court reviews Defendant's motion for summary judgment under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879 (D.C.Cir.1997) (internal quotations omitted), *overturned on other grounds,* 156 F.3d 1284 (D.C.Cir.1998) (en banc). Nonetheless, while this special standard is more exacting, it is not inherently preclusive. Although more circumspect,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                        Page 28

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

the Court will continue to grant a motion for summary judgment in which the nonmoving party has failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

**\*30** As noted above, Plaintiff alleges that Defendant discriminated against her on the basis of race, sex, and religion by (1) not selecting her as Hausa Service Chief; (2) refusing to reclassify her position from a GS-12 to a GS-13; (3) disparately disciplining her in connection with the October 3 Broadcast by removing her editorial duties, proposing to suspend her, and issuing the letter of reprimand; and (4) terminating her employment with the VOA. Plaintiff further alleges that Defendant retaliated against her for her protected EEOC activity by (1) disciplining her; and (2) terminating her employment with the VOA. Finally, Plaintiff alleges that she was subjected to retaliatory and discriminating harassment constituting a hostile work environment. Defendant has moved for summary judgment as to all of Plaintiff's allegations, and the Court shall address each set of allegations in turn. Initially, however, the Court shall address Plaintiff's motion asking the Court to disregard Defendant's motion for summary judgment and reply in support of that motion.

*A. Plaintiff's Motion to Rule Defendant's Summary Judgment Motions Untimely*

In her motion filed on April 4, 2007, Plaintiff "asks the court to declare Defendant's Summary Judgment Motion of October 24, 2006 as inadmissible for being untimely and also the reply motion filed on March 19, 2007 as inadmissible for being grossly untimely."Pl.'s Timeliness Mot. at 1. Plaintiff argues that Defendant's motion for summary judgment was untimely because it was filed a day after the October 23, 2006 due date, along with a motion seeking to extend Defendant's time to file that motion by one day, for which Defendant did not seek Plaintiff's consent. *Id.* at 2. However, Defendant's motion for extension of time indicated

that Defendant had encountered technical difficulties in filing its motion for summary judgment on October 23, 2006. *See Wada v. Tomlinson*, Civil Action No. 03-1488, Docket # [69], Motion for Extension of Time (D.D.C. Oct. 24, 2006). The Court therefore granted Defendant's motion for extension of time *nunc pro tunc*, such that Defendant's motion for summary judgment was not, in fact, untimely. *Wada v. Tomlinson*, Civil Action No. 03-1488, Minute Entry Order (D.D.C. Oct. 24, 2006).

Plaintiff also argues that Defendant's reply memorandum in support of its motion for summary judgment was untimely because it was not filed until March 19, 2007, despite the fact that Plaintiff filed her Opposition on February 8, 2007. Pl.'s Timeliness Mot. at 1-2. However, as Defendant points out in response to Plaintiff's argument, Plaintiff was granted a total of four extensions of time in which to file her Opposition, which was initially due on November 13, 2006. Def.'s Opp'n at 2. *See also Wada v. Tomlinson*, Civil Action No. 03-1488, Minute Entry Orders (D.D.C. Nov. 13, 2006, Dec. 5, 2006, Jan. 16, 2007, and Jan. 25, 2007). When Plaintiff filed her Opposition *pro se* on February 8, 2007, she attached a Notice indicating that she had filed a supporting bulky exhibit. As Defendant explains in its Opposition, Plaintiff's bulky exhibit was not received by the correct attorneys until February 21, 2007. Def.'s Opp'n at 2-3. Furthermore, on February 23, 2007, Plaintiff herself indicated to Defendant that she had "no objection" to Defendant asking for an extension of time in which to file its Reply. *See* Pl.'s Timeliness Mot. at 6 (2/23/07 e-mail from H. Wada). Defendant reported the delay in its receipt of Plaintiff's bulky exhibit, as well as Plaintiff's consent to an extension, to the Court in its motion for an extension of time to file its reply memorandum, which it filed along with its reply memorandum on March 19, 2007. On March 21, 2007, the Court granted Defendant's motion for extension of time, *nunc pro tunc*, such that Defendant's reply was also not, in fact, untimely. *Wada v. Tomlinson*, Civil Action No. 03-1488, Minute Entry Order (D.D.C. Mar. 21, 2007).

**\*31** In light of the foregoing, the Court shall deny

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 29

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

Plaintiff's motion to rule Defendant's summary judgment motions untimely.

### B. Failure to Exhaust Administrative Remedies

As an initial matter, Defendant argues that Plaintiff has failed to exhaust the administrative remedies available to her with respect to a number of her allegations because she did not contact the OCR or file a formal EEO complaint regarding those allegations. Specifically, Defendant argues that Plaintiff did not contact the OCR or file a formal EEO complaint regarding: (1) the Office of Security investigation; (2) the assignment of overtime on the weekend of April 19-20, 2003; (3) her 2001-2002 performance review; or (4) her assignment resulting in her working more than five days consecutively. Def.'s Mot. for Summ. J. at 11. Defendant further notes that Plaintiff first contacted the OCR regarding her AWOL charge, her "Minimally Successful" performance rating, and the garnishment action against her on July 8, 2003-the same day that Plaintiff filed her Complaint in this action. As a result, Defendant argues, Plaintiff's claims regarding these allegations should be dismissed because she "did not, in good faith, seek to resolve the matters at the administrative level prior to filing the above-captioned complaint."*Id.* at 12.Finally, Defendant argues that because Plaintiff never filed a formal complaint of harassment or hostile work environment or even contacted the OCR regarding these charges, her claims related to these issues must be dismissed.

"Prior to instituting a court action under Title VII, a plaintiff alleging discrimination in federal employment must proceed before the agency charged with discrimination. This administrative remedies exhaustion requirement is mandatory." *Bayer v. U.S. Dep't of Treasury,* 956 F.2d 330, 332 (D.C.Cir.1992) (internal citations omitted). In addition, federal employees are required to contact an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."29 C.F.R. § 1614.105. Although this 45-day time limit is not jurisdictional, it operates as a statute of limitations defense. *Bayer,*

956 F.2d at 332 (referring to then-applicable thirty-day time limit for contacting an EEO counselor). Furthermore, as the Supreme Court's seminal decision in *National Passenger Railroad Corporation v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("*Morgan* "), makes clear, a Title VII plaintiff is required to exhaust his or her administrative remedies with respect to each discrete allegedly discriminatory or retaliatory act. *Id.* at 122,122 S.Ct. 2061.

Defendant's motion for summary judgment squarely asserts that Plaintiff failed to contact the OCR or file a formal complaint, and thus to exhaust her administrative remedies, with respect to her allegations regarding (1) the Office of Security investigation; (2) the assignment of overtime on the weekend of April 19-20, 2003; (3) her 2001-2002 performance review; or (4) her assignment resulting in her working more than five days consecutively. Def.'s Mot. for Summ. J. at 11; *see also* 10/22/06 Johnson Decl. ¶¶ 4-7 (averring that Plaintiff did not contact the OCR or file a formal EEO complaint regarding these claims). Plaintiff's Opposition offers no evidence to the contrary. Rather, Plaintiff argues that because "her case filing in federal court included charges of retaliation," she effectively alleged ongoing retaliation, such that requiring her to exhaust her administrative remedies with respect to each alleged retaliatory act would "be a cumbersome burden on the system itself and resources made available for such issues by taxpayers."Pl.'s Opp'n at 14. However, "*Morgan* itself rejected the 'continuing violation' theory that would permit plaintiffs to recover for discrete acts of discrimination and retaliation that were not exhausted but were 'sufficiently related' to exhausted claims."*Keeley v. Small,* 391 F.Supp.2d 30, 40 (D.D.C.2005); (citing *Morgan,* 536 U.S. at 105, 122 S.Ct.2061). As such, it is clear that Plaintiff failed to exhaust her administrative remedies with respect to the Office of Security investigation, the assignment of overtime on the weekend of April 19-20, 2003, her 2001-2002 performance review, and her assignment resulting in her working more than five days consecutively, and that she is therefore barred from asserting that these incidents constitute discrete acts of discrimination or retaliation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

**\*32** Furthermore, in her Opposition, Plaintiff mistakenly argues that she was apprised of her AWOL charge on June 9, 2002 and of her " Minimally Successful" performance evaluation on July 8, 2002, and promptly contacted the OCR regarding these claims. *See* Pl.'s Opp'n at 14. Plaintiff's dates are off by one year-the events in question occurred in 2003, not 2002-and the record evidence thus supports Defendant's assertion that Plaintiff first contacted the OCR regarding these claims, as well as the garnishment action against her, on July 8, 2003, the very day on which she filed her Complaint in this action. *See* 10/22/06 Johnson Decl. Attach. 1 (7/8/03 Initial Contact Sheet). As 29 C.F.R. § 1614.105(a) makes clear, federal employees are required to consult an EEO counselor prior to filing a complaint in order "to try to informally resolve the matter." *Id.* Indeed, "Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge." *Park v. Howard Univ.,* 71 F.3d 904, 907 (D.C.Cir.1995). By filing her Complaint in this action on the very day on which she contacted the OCR regarding her AWOL charge, "Minimally Successful" performance evaluation, and garnishment action, Plaintiff foreclosed the possibility of informal resolution of those matters, and thus failed to exhaust the administrative remedies available to her. Plaintiff is therefore barred from asserting that those claims constitute discrete acts of discrimination or retaliation.

Finally, Defendant argues that Plaintiff failed to exhaust her administrative remedies with respect to her claim for harassment or hostile work environment because she never contacted the OCR or filed a formal complaint regarding such a charge. Def.'s Mot. for Summ. J. at 11-12. Defendant is correct that Plaintiff never specifically alleged harassment or hostile work environment before the OCR. However, "a Title VII lawsuit includes the claims that are 'like or reasonably related to the allegations of the administrative charge and growing out of such allegations.'" *Bell v. Gonzales,* 398 F.Supp.2d 78, 85 (D.D.C.2005) (quoting *Jones v. Billington,* 12 F.Supp.2d 1, 7 (D.D.C.1997)). In contacting the OCR on July 8, 2003, Johnson alleged "ongoing retaliation," 10/22/06 Johnson

Decl. Attach. 1 (7/8/03 Initial Contact Sheet; 7/8/03 memo from H. Wada), and in her Opposition, Plaintiff asserts that "actions against Plaintiff occurring over an extended period of time, and usually involving the same individuals, should not be viewed as discrete events as Defendant would have the court see them, but as so related to constitute a pattern of ongoing retaliatory and discriminatory harassment," Pl.'s Opp'n at 14-15. The Court shall therefore assume, *arguendo,* that Plaintiff's July 8, 2003 contact with the OCR and her subsequent January 2, 2004 formal complaint sufficiently asserted a hostile work environment claim. The Court further notes that "a charge alleging a hostile work environment claim ... will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice" and Plaintiff has exhausted his or her administrative remedies with respect to " at least one act." *Morgan,* 536 U.S. at 122, 122 S.Ct. 2061. As such, the Court will consider Plaintiff's allegations regarding the Office of Security investigation, the assignment of overtime on the weekend of April 19-20, 2003, her 2001-2002 performance review, her assignment resulting in her working more than five days consecutively, her AWOL charge, her "Minimally Successful" performance evaluation, and the garnishment action against her in the context of her hostile work environment claim.

### B. Plaintiff's Discrimination Claims

### 1. Proper Standards

**\*33** Pursuant to Title VII, all personnel actions affecting employees of the federal government " shall be made free from any discrimination based on race, color, religion, sex, or national origin."42 U.S.C. § 2000e-16(a). To prove a violation of Title VII, Plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the employer were "more likely than not based on the consideration of impermissible factors" such as race, ethnicity, or national origin. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

quotation marks and citation omitted). Furthermore, "the plaintiff may prove his claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination" under the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).*Brady v. Livingood,* 456 F.Supp.2d 1, 6 (D.D.C.2006). In her Opposition, Plaintiff appears to suggest that Ms. Dillard's selection of Mr. Dare as Hausa Service Chief constitutes "explicit religious discrimination" because Ms. Dillard "went out of her way to select a Christian male from the Yoruba speaking group" over Plaintiff, who, like the majority of Hausa speakers, is Muslim. Pl.'s Opp'n at 2. Plaintiff offers no factual support for this assertion other than a passing reference to the letters sent by Congressmen Weldon and Ehlers in the wake of the October 3 Broadcast. *Id.* Those letters do, in fact, describe "deep concern regarding alleged pro-Muslim, Anti-American reporting by the VOA's Hausa-language programming in Nigeria."Def.'s Disc. Exs. at 21-22 (11/16/01 Letter from V. Ehlers); *see also* Disc. Exs. at 19-20 (10/25/01 Letter from D. Weldon). However, those letters-written by Congressmen unaffiliated with VOA months after Mr. Dare's selection as Hausa Service Chief-in no way constitute direct evidence of religious discrimination on the part of Ms. Dillard. [FN17]

FN17. In addition, in its motion for summary judgment, Defendant notes that in her answers to interrogatories, Plaintiff argued that "[a]ccording to one politically-active openly Christian-oriented publication, "The Weekly Standard," Mr. Dare was hired because he is a Christian male and to deal with allegedly religiously biased broadcasts by Muslim Voice of America staff," and suggested that this article constituted direct evidence of religious discrimination. Def.'s Mot. for Summ. J. at 22 (citing Def.'s Non-Select. Exs. at 3 (Pl.'s Ans. to Interrog. # 3)). In her Opposition, Plaintiff does not indicate that she believes The Weekly Standard article constitutes direct evidence of race, sex, or religious discrimination. Nevertheless, the Court notes that the article in question begins, "In Nigeria the Voice of America has been condemned for being pro-Muslim, anti-Christian, and anti-American. VOA Director Robert Reilly has his hands fully reforming this important service," quotes VOA Director Reilly as being "aware of problems," and continues to state that Mr. Dare, a Christian, was made chief of the Hausa Service. *See* Def.'s Non-Select. Exs. at 46-48 (11/21/01 Weekly Standard Article). However, the statement regarding Mr. Dare's religion is properly attributed to author of the article, and not to VOA Director Reilly. *Id.* As the article does not indicate that anyone at VOA believes Mr. Dare was hired because of his religious affiliation, it cannot constitute direct evidence of religious discrimination.

Therefore, as the record in the instant case contains no direct evidence of discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting framework. *Cones v. Shalala,* 199 F.3d 512, 516 (D.C.Cir.2000) (citing *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions."*Fischbach v. D.C. Dep't of Corr.,* 86 F.3d 1180, 1183 (D.C.Cir.1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a *"prima facie "* case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If she succeeds, the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for Plaintiff's termination, and to produce credible evidence supporting its claim. *Id.* Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons."*Burdine,* 450 U.S. at 254, 101 S.Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ( "[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C.Cir.2003), *cert. denied,*540 U.S. 881, 124 S.Ct. 325, 157 L.Ed.2d 146 (2003); *see also Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

**\*34** If Defendant is successful, then "the *McDonnell Douglas* framework-with its presumptions and burdens-disappear[s], and the sole remaining issue [is] discrimination *vel non." Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations and quotation marks omitted). At that point, Plaintiff has the burden of persuasion to show that Defendant's proffered reason was not the true reason for the employment decision. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."*Id.* at 256, 101 S.Ct. 1089; *see also Reeves,* 530 U.S. at 143, 120 S.Ct. 2097. " Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097 (citing *St. Mary's Honor Ctr.,* 590 U.S. at 517, 113 S.Ct. 2742) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka,* 156 F.3d at 1290 ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."*Reeves,* 530 U.S. at 147, 120 S.Ct. 2097. "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual."*Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089). The Court of Appeals for the District of Columbia Circuit has distilled this analysis, noting that the fact-finder can infer discrimination from the combination of:

(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements of attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka,* 156 F.3d at 1289. However, evidence in each of the three categories is not required. *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]."*Paquin v. Fed. Nat'l Mortgage Ass'n,* 119 F.3d 23, 27-28 (D.C.Cir.1997)."[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable [fact-finder] could conclude that he has suffered discrimination."*Aka,* 156 F.3d at 1290.

### 2. Count I-Non-Selection-Application of the McDonnell Douglas Analysis

### a. Plaintiff's Prima Facie Case

**\*35** Plaintiff claims that her non-selection as Hausa Service Chief constitutes discrimination, and thus makes out a prima facie case "by showing that: (1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications, she was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants. *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C.Cir.2006) (citing *Lathram v. Snow,* 336 F.3d 1085, 1088 (D.C . Cir.2003)).[FN18] Defendant does not contest that Plaintiff has established a prima facie case of discrimination with respect to her non-selection as Hausa Service Chief by demonstrating that: (1) she is a Muslim woman of color; (2) she applied for the Hausa Service Chief position, and was twice certified as eligible for the position, *see* Def.'s Non-Select. Exs. at 19 (9/13/00 Certificate), 21 (2/9/01 Certificate); (3) she was not selected for the Hausa Service Chief position; and (4) Ms. Dillard continued to seek applicants after initially rejecting Plaintiff's application, *see* 9/27/02 Dillard Decl. ¶¶ 16, 19-20, and eventually selected Mr. Dare to fill the position, *id.* ¶ 25.

> FN18. In its motion for summary judgment, Defendant argues that Plaintiff cannot establish a prima facie case of retaliation with respect to her non-selection as Hausa Service Chief because she cannot show a causal connection between her non-selection and protected activity. *See* Def.'s Mot. for Summ. J. at 16-18. Defendant's argument is superfluous, because Plaintiff's Complaint only alleges that her non-selection constituted discrimination. Nevertheless, the Court notes that Defendant's argument is supported by the record evidence, which indicates that Plaintiff complained to the OCR on September 7, 2000 that she had not received information about her eligibility for the Hausa Service Chief position, *see* Def.'s Non-Select. Exs. at 100 (9/7/00 Initial Contact Sheet), but that Ms. Dillard-the selecting official for the Hausa Service Chief position-was not aware of Plaintiff's OCR contact until after Plaintiff's September 29, 2000 interview with the EEO counselor, *see* 9/27/02 Dillard Decl. ¶ 5; Def.'s Non-Select. Exs.

at 98-99 (9/24/02 Johnson Decl. ¶¶ 12, 14). Thus, by the time Ms. Dillard learned of Plaintiff's EEO activity, she had already decided not to select Plaintiff as Hausa Service Chief. *See* 9/27/02 Dillard Decl. ¶ ¶ 19-24.

### b. Defendant's Proffered Legitimate, Non-Discriminatory Reasons

As Plaintiff has established a prima facie case of discrimination, the burden shifts to Defendant to produce evidence that Plaintiff was not selected for a legitimate, nondiscriminatory reason. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097. Defendant has met its burden in this case. In her September 27, 2002 Declaration, Ms. Dillard describes in detail the reasons why she believed that Plaintiff "was not qualified for the Hausa Service Chief position," as well as her reasons for selecting Mr. Dare for the position. 9/27/00 Dillard Decl. ¶ 21. Specifically, Ms. Dillard avers that she "had observed, first hand, [Plaintiff's] difficulties in resolving conflicts among the staff and resolving administrative issues such as scheduling and shift rotation."*Id* . In addition, Ms. Dillard states that Plaintiff "falsely represented herself as the 'Deputy Chief' of the Hausa Service on the Service's website, although she was told that this was not her title," and avers that "[t]his misrepresentation raised serious questions in my mind about Ms. Wada's honesty and candor."*Id.* ¶ 22.Finally, Ms. Dillard avers that Plaintiff "did not consistently carry out the duties that the Program Manager and I assigned to her," including attending the Africa Division's morning editorial meeting every day, as well as meetings within the Hausa Service. *Id.* ¶ 23.

Ms. Dillard's description of her reasons for not selecting Plaintiff as Hausa Service Chief are consistent with her description of the qualities she sought in filling the position. Significantly, one of the requirements listed in the BBG's position description for the Hausa Service Chief position is " Demonstrated potential to lead and supervise a professional staff ..."*See* Def.'s Non-Select. Exs. at 8 (7/3/00 Announcement); 12 (8/21/00 Announcement). In addition, in her Declaration, Ms. Dillard avers that in filling the Hausa Service

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 34

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

Chief position, she was looking for a candidate who demonstrated, among other qualities, managerial skills and the ability to work collegially with others, team building skills, and an ability to carry out Ms. Dillard's directives. 9/27/02 Dillard Decl. ¶ 17. Finally, in her Declaration, Ms. Dillard asserts that because of the substantial tensions within the Hausa Service, in filling the Hausa Service Chief position, she "was looking for a person who had no involvement in these prior conflicts so that a fresh perspective could be brought into the Service."*Id.* ¶ 18.Moreover, as discussed above, the numerous e-mails proffered by Defendant and referred to by Ms. Dillard in her Declaration support Ms. Dillard's assertion that Plaintiff was directly involved in the ongoing conflicts within the Hausa Service that Ms. Dillard sought to alleviate in filling the Hausa Service Chief position. *See* Def.'s Non-Select. Exs. at 7 (6/14/00 e-mail from S. Kura to G. Dillard); *id.* at 9-10 (8/5/00 e-mail from S. Kura); *id.* at 13-16 (9/7/00 e-mail exchange); *id.* at 17-18 (9/11/00 e-mail exchange).

**\*36** Furthermore, in her Declaration, Ms. Dillard describes her reasons for selecting Mr. Dare as Hausa Service Chief. Ms. Dillard believed that Mr. Dare "possessed the management and journalism background and experience necessary for the position" because he had an extensive educational background in journalism and African and U.S. foreign policy and had served as an online editor for two Nigerian magazines with worldwide readership, including supervising "22 male and female employees from varying racial and ethnic backgrounds." 9/27/02 Dillard Decl. ¶ 27. In addition, Mr. Dare "had an extensive knowledge of Nigeria, its peoples, politics and issues," and was fluent in English, Hausa, and Yoruba. *Id.* ¶ 28.Finally, Ms. Dillard avers that, "as an applicant from outside the Agency, [Mr. Dare] had no involvement in the prior conflicts and would be able to provide a fresh perspective to the Hausa Service." *Id.* ¶ 29.Ms. Dillard's detailed justification of her selection of Mr. Dare over Plaintiff as Hausa Service Chief constitutes a legitimate, nondiscriminatory reason for Defendant's allegedly discriminatory action, which suffices to meet Defendant's burden of production under the second prong of the *McDonnell Douglas* paradigm. *See*

*Holcomb,* 433 F.3d at 896.

*c. Evidence of Pretext or Discrimination Vel Non*

Given this legitimate nondiscriminatory reason identified by Defendant, Plaintiff now must seize the "opportunity to discredit the employer's explanation,"*Aka,* 156 F.3d at 1288, by demonstrating that the proffered reason is mere pretext for discrimination, *see Paquin,* 119 F.3d at 26-27. As always, Plaintiff retains the "ultimate burden of persuading the court that she has been the victim of intentional discrimination."*Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. However, "one way for a plaintiff to show that an adverse employment decision was made for a discriminatory reason is to show that the nondiscriminatory explanation the defendant proffered for its decision was false." *Czekalski v. Peters,* 475 F.3d 360, 366 (D.C.Cir.2007) (citations omitted). The Court therefore turns to considering the "ultimate question of discrimination *vel non.*"*Reeves,* 530 U.S. at 142-43, 120 S.Ct. 2097. As always, Plaintiff retains the "ultimate burden of persuading the court that she has been the victim of intentional discrimination. "*Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. At this point,

a court reviewing summary judgment looks to whether a reasonable [fact-finder] could infer intentional discrimination or retaliation from all the evidence, including (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).

**\*37** *Carter v. George Washington Univ.,* 387 F.3d 872, 878 (D.C.Cir.2004) (internal citations and quotation marks omitted).

Plaintiff responds to Defendant's proffered legitimate, non-discriminatory reason for her non-selection with a number of arguments-some of which appear to be an attempt to demonstrate pretext, others of which might be considered " further evidence of discrimination." First, Plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

attempts to demonstrate that Defendant's reasons for her non-selection are mere pretext for discrimination by arguing that Defendant hired Mr. Dare for the position, despite Plaintiff's qualifications, and despite the fact that hiring Mr. Dare-a non-citizen-allegedly violated 22 U.S.C. § 1474.

As to Plaintiff's argument that she was qualified for the Hausa Service Chief position, courts have consistently declined to serve as a "super-personnel department that reexamines an entity's business decisions."*Fischbach*, 86 F.3d at 1183. However, the D.C. Circuit has concluded that "a factfinder could infer discrimination if the evidence showed a reasonable employer would have found the plaintiff *significantly* better qualified for the job but nevertheless failed to offer the position to her." *Holcomb*, 433 F.3d at 897 (citing *Aka*, 156 F.3d at 1295).

Such a finding is not supported by a comparison of Plaintiff's application materials and Mr. Dare's application materials. As discussed above, Mr. Dare was born in Nigeria and speaks Hausa, Yoruba, and English fluently. Def.'s Non-Select. Exs. at 23-25 (3/7/01 Memo from G. Dillard), 34-41 (Dare Applic. Mat'ls). Mr. Dare holds a Bachelor of Science degree in International Studies and a Masters degree in International Law and Diplomacy from universities in Nigeria and, at the time that he applied for the Hausa Service Chief position, was a Fellow in the Nieman Fellowship Program at Harvard University. *Id.* Mr. Dare's previous experience includes work as a correspondent, general editor, on-line editor, and head of the Abuja Bureau of the independent communications network in Lagos, Nigeria, where he was responsible for supervising and coordinating the work of 22 correspondents around Nigeria, as well as work on radio and television programs in Nigeria and in the United States. *Id.* In addition, Mr. Dare's coworkers indicated that he possessed effective management skills including team-building skills, and an ability to promote gender and ethnic diversity. *Id.* Finally, as an applicant from outside of VOA, Mr. Dare was not embroiled in the ongoing tensions within the Hausa Service. For her part, Plaintiff's application materials demonstrate that she holds a Bachelor of

Arts in Mass Communications from Bayero University in Nigeria, as well as a Masters of Arts in Theater and Media Arts from the University of Kansas and, at the time she applied for the Hausa Service Chief position, had completed 27 credit hours towards a Ph.D. in Management from California Coast University, a correspondence school. Def.'s Non-Select. Exs. at 26-33 (Wada Applic. Mat'ls). Plaintiff's previous work experience was with VOA, in positions she describes as Translator/Adaptor, an Editor/Writer, and Senior/Managing Editor. *Id.*

**\*38** In her Opposition, Plaintiff also focuses on her positive performance record-asserting that Ms. Dillard endorsed her 1999 performance rating of Highly Successful and her 2000 performance rating of Outstanding. Pl.'s Opp'n at 6. This argument is inapposite, however, because Plaintiff's success as an IRB with editorial duties does not necessarily make her well-qualified to assume the Hausa Service Chief position, a position which entailed significant managerial and supervisory duties. *See* 9/27/02 Dillard Decl. ¶¶ 15, 17. Moreover, as discussed above, the record does not indicate that Plaintiff performed managerial and supervisory duties as Senior Editor, in the absence of a Hausa Service Chief. The record evidence thus fails to demonstrate that Plaintiff was significantly better qualified for the Hausa Service Chief position than was Mr. Dare.

However, Plaintiff is not required to establish such a disparity in order to survive a motion for summary judgment; instead, Plaintiff may seek to expose other flaws in Defendant's explanation. *Holcomb*, 433 F.3d at 897. Here, Plaintiff attempts to do so by arguing that Defendant violated 22 U.S.C. § 1474 by employing Mr. Dare, a non-citizen, rather than Plaintiff, a qualified citizen. Pursuant to 22 U.S.C. § 1474:

[T]he Secretary, or any Government agency ... may (1) employ, without regard to the civil service and classification laws, aliens within the United States and abroad for service in the Untied States relating to the translation or narration of colloquial speech in foreign languages or the preparation and production of foreign language programs *when suitably qualified United States citizens are not*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

*available* when job vacancies occur ...

22 U.S.C. § 1474 (emphasis added). Furthermore, section 822.1 of the BBG's Manual of Operations and Administration (MOA) provides:a. A non-U.S. citizen may be appointed only after reasonable efforts to recruit equally or better qualified U.S. citizens has been made and have been unsuccessful. A non-U.S. citizen may be employed or promoted only if no equally or better qualified U.S. citizen is available to perform the duties of the position....
c. As a matter of Broadcasting policy, non-U.S. citizens will not be employed in or promoted to supervisory positions or positions which involve policy or program decision-making.

Pl.'s Exs. for Issue No. 19 (MOA § 822.1). Plaintiff thus asserts that Mr. Dare's selection as Hausa Service Chief violated 22 U.S.C. § 1474, as well as the BBG's own policies. As Defendant emphasizes, however, Section 822.1c of the MOA also states:(1) Exceptions will be allowed only on an individual basis when the appropriate Office, or Service Head determines, with the concurrence of the Director of Personnel that the unavailability of an equally or better qualified U.S. citizen to perform such supervisory or managerial functions is not only significantly handicapping the ability of the Office, or Service to operate, but is also having an adverse impact on Broadcasting's mission.
**\*39** (2) It is anticipated that positions for which an exception to the U.S. citizenship requirement would be considered will be graded no higher than the GS-13 grade level.

*Id.* Defendant correctly argues that, in the instant case, Ms. Dillard made the determination required by MOA section 822.1c. (1), supported her determination in her detailed memo to the VOA Director of Personnel requesting permission to select and hire Mr. Dare as Hausa Service Chief, and obtained the appropriate approval. See 9/27/02 Dillard Decl. Ex. 3 (3/7/01 Memo from G. Dillard, indicating approval by B. Coniff). As such, it appears that Ms. Dillard properly selected Mr. Dare as Hausa Service Chief, notwithstanding the fact that he was not a United States citizen and Plaintiff was a United States citizen.

Plaintiff nevertheless argues that Ms. Dillard's selection of Mr. Dare was improper because Mr. Dare "does not fit the description of prospective employees for which such exceptions were made" because he was Yoruba and not a native Hausa speaker. Pl.'s Opp'n at 2. However, as Plaintiff herself goes on to acknowledge, section 822.1 of the MOA applies to positions which require "(1) services related to the translation or narration of colloquial speech in foreign languages; (2) the preparation and production of foreign language programs; or (3) the selection, evaluation, editing, writing and adaptation of source material for use in foreign language programming."*Id.* (citing MOA § 821.1). This description discusses only "foreign language programing," and thus clearly encompasses the Hausa Service, without in any way distinguishing between native and non-native speakers of a foreign language.[FN19]Plaintiff's argument that Mr. Dare's selection as Hausa Service Chief violated 22 U.S.C. § 1474 or the BBG's int ernal policy thus fails to demonstrate that Defendant's proffered legitimate, nondiscriminatory reason is mere pretext.

FN19. In addition, although she does not specifically mention it in her Opposition, Plaintiff's exhibits include an Institutional Grievance filed by her Union, alleging that the BBG "have been violating on a routine and continuing basis"22 U.S.C. § 1474 by " hiring non-U.S. citizens in spite of the existence of suitably qualified U.S. citizens. "Pl.'s Exs. for Issue No. 19 (6/7/06 Institutional Grievance). The Court notes, without so finding, that this Institutional Grievance may demonstrate that the BBG's exception policy described in section 822.1c. 1 of the MOA fails to comply with 22 U.S.C. § 1474 because it "places a higher standard on U.S. citizens beyond the suitably qualified standard contained in the law."*Id.* However, even if the BBG's policy violated 22 U.S.C. § 1474, it would not suggest that an inference of discrimination was appropriate based on Ms. Dillard's selection of Mr. Dare over Plaintiff. At most, it would show that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

BBG's erroneous policy had become the norm, such that Plaintiff's non-selection was consistent with BBG policy. *Cf. Fischbach,* 86 F.3d at 1183 ("the Department's having followed a procedure other than that prescribed by its regulations lends no support at all to the plaintiff's inference that its stated reason for choosing [someone else over him] is a pretext. In fact, the procedure that the Department followed was reasonable and was, according to undisputed testimony, its usual procedure. That is, departure from the prescribed procedure had become the norm. In these circumstances, we see no basis for concluding that the procedure the Department followed was implausible or that the Department did not, in fact, rely upon it.").

Plaintiff also attempts to suggest that Ms. Dillard lacked sufficient knowledge of Plaintiff's work experiences, and therefore inappropriately relied on the e-mails she received from other Hausa staff members in determining not to select Plaintiff for the Hausa Service Chief position. Pl.'s Opp'n at 4. In support of this argument, Plaintiff notes that when Ms. Dillard was asked to complete the questionnaire in connection with Plaintiff's reclassification request in June 2001, she indicated that she had "no direct knowledge on these questions " and would therefore "support the views of [Plaintiff's] immediate supervisor, Negussie Mengesha."*Id.; see also* Def.'s Class. Exs. at 7 (7/5/01 Reclassification Form). However, in her Declaration, Ms. Dillard specifically states, " [a]lthough I had an overall awareness of [Plaintiff's] interactions with the Hausa staff, I had no direct knowledge of her day-to-day activities as a senior editor in the service." 9/27/02 Dillard Decl. ¶ 30. This statement is consistent with Ms. Dillard's statement regarding her basis for not selecting Plaintiff for the Hausa Service Chief position: "I had observed, first hand, [Plaintiff's] difficulties in team-building and in maintaining a disciplined workforce. I had observed her difficulties in resolving conflicts among the staff and resolving administrative issues such as scheduling and shift rotation."*Id* . ¶ 21.The fact that Ms. Dillard

believed Mr. Mengesha more qualified to complete the reclassification questionnaire thus does not demonstrate that her reasons for not selecting Plaintiff as Hausa Service Chief are mere pretext. FN20

FN20. In her Opposition, Plaintiff generally asserts-without reference to any particular claim of discrimination or retaliation-that "Ms. Dillard's affidavits alone create [ ] doubt about the trust and legitimacy of the agency's stated reasons to infer to her improper motives," and thus raise an inference of discrimination. Pl.'s Opp'n at 20. While Plaintiff does not support these aspersions with allegations, elsewhere in her Opposition, Plaintiff states that "Dillard's credibility has been questioned many times in Plaintiff's case," alleging that Ms. Dillard "has made misrepresentations to a federal court by claiming not to have interviewed Mr. Sunday Dare; a claim Mr. Dare disputes." *Id.* at 11-12;*see also* Def.'s Term. Exs. at 13 (8/20/04 Letter from C. Zampogna). The Court is, of course, precluded from making assessments of Ms. Dillard's credibility in considering Defendant's motion for summary judgment. However, the Court notes that Plaintiff has not provided any factual support for her allegations regarding Ms. Dillard. To the contrary, the record evidence before the Court does not demonstrate any inconsistency between Ms. Dillard's testimony and Mr. Dare's testimony. In her Declaration, Ms. Dillard avers that she did not interview any of the internal candidates for the Hausa Service Chief position because she had observed them all first-hand and reviewed their applications. 9/27/02 Dillard Decl. ¶ 20. However, Ms. Dillard also admits that met Mr. Dare on three separate occasions prior to his applying for the Hausa Service Chief position, *id.* ¶ 25, a statement which is consistent with Mr. Dare's Declaration, in which he states "I met with Ms. Dillard on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

three separate occasions before being offered the [Hausa Service Chief] position, " Def.'s Disc. Exs. at 41-42 (9/19/02 Dare Decl.) ¶ 3.

**\*40** Plaintiff also suggests that Ms. Dillard inappropriately relied on the e-mails that she received from other Hausa staffers because she " based her reasons for not Selecting [sic] Plaintiff mainly on comments from employees who perform lower level [sic] of duties than Plaintiff" and whose credibility was questionable. Pl.'s Opp'n at 4-6. As an initial matter, it is entirely irrelevant that the Hausa staffers who sent the various e-mails had less responsibility than Plaintiff, as the e-mails stand on their own as evidence that Plaintiff was embroiled in the conflicts within the Hausa Service. *See* Def.'s Non-Select. Exs. at 7 (6/14/00 e-mail from S. Kura to G. Dillard); *id.* at 9-10 (8/5/00 e-mail from S. Kura); *id.* at 13-16 (9/7/00 e-mail exchange); *id.* at 17-18 (9/11/00 e-mail exchange). Moreover, in assessing whether Plaintiff can show pretext, " [w]hether Plaintiff believes [her co-workers'] complaints were justified is irrelevant, as the issue is whether [Ms. Dillard] received the complaints and believed that plaintiff's performance was deficient." *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 10 (D.D.C.2000), *aff'd,*298 F.3d 989 (D.C.Cir.2002) (citing *Vasilevsky v. Reno,* 31 F.Supp.2d 143, 151 (D.D.C.1998) ("An employer is entitled to rely on his own perception of an employee's work performance.")). Plaintiff's attempts to impugn of the credibility of the Hausa staffers who sent the various e-mails therefore fail to demonstrate that Defendant's proffered reasons for Plaintiff's non-selection as Hausa Service Chief are mere pretext for discrimination.

The Court next moves to considering "any further evidence of discrimination that may be available to the plaintiff[,] such as independent evidence of discriminatory statements or attitudes on the part of the employer [ ]."*Carter,* 387 F.3d at 878 (D.C.Cir .2004) (internal citations and quotation marks omitted). In her Opposition, Plaintiff asserts that, " the stark discrimination against Plaintiff leaning towards Mr. Mustapha the second certified candidate from Hausa Service has been demonstrated. Management demonstrated amply

they prefer Mustapha by many of its actions, but could not justify not selecting Plaintiff officially" Pl.'s Opp'n at 3. As evidence of "management's" alleged preference for Mr. Mustapha, Plaintiff points to the fact that Mr. Mustapha received only an admonishment for his role in the October 3 Broadcast, as well as the fact that he was not terminated for his unauthorized use of a government credit card. Pl.'s Opp'n at 3. As discussed above, Plaintiff has not demonstrated that her letter of reprimand constituted more severe discipline than Mr. Mustapha's written admonishment, *contra* Def.'s Mot. for Summ. J. at 36 ("the actions against both resulted in no effect on their pay or grade."), and Mr. Mustapha's misuse of a government credit card is easily distinguished from the offense for which Plaintiff was terminated, *see* Grace Reply Decl. ¶¶ 8-12. Furthermore, even if Mr. Mustapha received preferential discipline in the wake of the October 3 Broadcast and his alleged misuse of a government credit card, Plaintiff has adduced no evidence that Mr. Mustapha was treated differently with respect to the Hausa Service Chief position. Most significantly, Plaintiff altogether fails to show that Ms. Dillard ever even contemplated selecting Mr. Mustapha for the position.

**\*41** In addition, Plaintiff suggests that evidence of discrimination on the part of Defendant may be inferred because, during the period that the Hausa Service Chief position was open, Ms. Dillard, as Africa Division Director, selected three white supervisors for positions in other services. Pl.'s Opp'n at 3. Plaintiff argues that these three individuals may be used as comparators because there is only one supervisory position for each language unit within the Africa Division. *Id.* at 4. Plaintiff thus asserts that Ms. Dillard "established a pattern of Supervisory selection within the division not favorable to Plaintiff's protected status."*Id.* However, Defendant is correct that Plaintiff is not, strictly speaking, similarly situated to these three individuals because they were selected for positions outside of the Hausa Service, for which Plaintiff did not apply. Def.'s Mot. for Summ. J. at 23. Even more significantly, Plaintiff provides absolutely no evidence of the races or relative qualifications of individuals allegedly not selected for the other three

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 39

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

supervisory positions. As such, the Court has no basis whatsoever from which to infer discrimination on the part of Ms. Dillard from the fact that she allegedly selected three white supervisors.

Finally, Plaintiff appears to suggest that evidence of a history of discrimination by Defendant can be found in the "complaints and grievances filed charging a pattern of the use by Higher Management of African American Managers willing to tow the line, to discriminate against other Black employees, in an effort to make it hard to prove discrimination."Pl.'s Opp'n at 3-4. Plaintiff is correct that in her Memorandum "African and African-American Women for a Just Workplace," Ms. Wiley states "[m]any Black VOA employees feel that Gwen Dillard, an African-American, is being used by management to carry out their abusive personnel practices. It's a known fact that when Blacks are used to discriminate against each other, discrimination is harder to prove."Pl.'s Exs. for Issue No. 15 (2/15/02 Memo from V. Wiley). However, as discussed above, Ms. Wiley's memo consists of hearsay and unsupported allegations, which do not in and of themselves demonstrate a history of discrimination on Defendant's part. Moreover, the Court is "not persuaded that the mere filing of [ ] informal discrimination complaints against [a supervisor], where nothing more is known about the nature, merit, or outcome of those complaints, can be used as a proxy to establish [the supervisor's] discriminatory animus in the present case."Holcomb, 433 F.3d at 900-01 (citations omitted).

Plaintiff has thus failed to demonstrate that Defendant's proffered legitimate, nondiscriminatory reasons for her non-selection as Hausa Service Chief are mere pretext for illegal discrimination on the basis of race, sex, or religion. Nor has Plaintiff presented the Court with any further evidence of discrimination by Defendant from which the Court could infer that Plaintiff's non-selection was discriminatory in nature. As Plaintiff has not carried her "ultimate burden of persuading the trier of fact that [Defendant] intentionally discriminated against" her by not selecting her for the Hausa Service Chief position, the Court shall grant Defendant's motion for summary judgment as to Count I of Plaintiff's

Complaint. *Morgan v. Fed. Home Loan Mortgage Corp.,* 328 F.3d at 651 (D.C.Cir.2003).

### 3. Count II-Reclassification-Application of the McDonnell Douglas Analysis

**\*42** In Count II of her Complaint, Plaintiff alleges that Defendant discriminated against her on the basis of race, sex and religion by refusing her request to reclassify her position from a GS-12 to a GS-13.[FN21] At the outset, the Court notes that Defendant has already articulated a legitimate non-discriminatory reason for the denial of Plaintiff's reclassification request, in the form of the August 14, 2001 Memo that Plaintiff received informing her of that denial. *See* Def.'s Class Exs. at 11 (8/14/01 Memo from M. Conboy). As the D.C. Circuit recently reiterated in *Czekalski,*"once a defendant has proffered such a nondiscriminatory explanation, it has 'done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case.' " 475 F.3d at 364 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1479, 75 L.Ed.2d 403 (1983)). Thus, whether Plaintiff actually made out a prima facie case " 'is no longer relevant,' and the only question is 'whether the defendant intentionally discriminated against the plaintiff.' " *Id.* Nevertheless, the Court evaluates Plaintiff's prima facie case because, as noted above, it " 'is part of the evidence [the Court] must consider in addressing the question' of whether [Plaintiff] has created a genuine issue of [ ] discrimination." *Id.* (quoting *George v. Leavitt,* 407 F.3d 405, 413 (D.C.Cir.2005)).

> FN21. As with Count I, despite the fact that Plaintiff only alleges discrimination in her Complaint, Defendant asserts that Plaintiff cannot prove that the denial of her reclassification request was retaliatory because she cannot show a causal connection between that denial and her protected activity. Def.'s Mot. for Summ. J. at 24. Although this argument is again superfluous, the Court notes that Ms. Whitworth avers that she was unaware of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

Plaintiff's EEOC activity at the time that she denied Plaintiff's reclassification request. Def.'s Class. Exs. at 13, 15 (9/17/02 Whitworth Decl.) ¶¶ 5, 10.

The traditional *McDonnell Douglas* test is adjusted slightly for cases of failure to promote based on a denial of increased pay or grade, such that to make out a *prima facie* case, Plaintiff must prove (1) that she belongs to a protected group; (2) that she was qualified for and applied for a promotion; (3) that she was considered and denied the promotion; and (4) "that other employees of similar qualifications who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied."*Glenn v. Williams,* Civ. A. No. 98-1278(CKK), 2006 WL 401816, *20 (D.D.C. Feb. 21, 2006) (quoting *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir.1981)). The D.C. Circuit reiterated this formulation of the prima facie case for failure to promote based on denial of increased pay or grade in *Taylor v. Small,* 350 F.3d 1286, 1294 (D.C.Cir.2003). However, other recent D.C. Circuit opinions have emphasized that "a plaintiff in a discrimination case need not demonstrate that she was replaced by a person outside her protected class in order to carry her burden of establishing a prima facie case," and further that a plaintiff may "be able to demonstrate that she received unfavorable treatment in the promotion process because she is a woman," notwithstanding the fact that both men and women were promoted to the position for which the plaintiff applied. *Stella v. Mineta,* 284 F.3d 135, 145-46 (D.C.Cir.2002); *see also Czekalski* 475 F.3d at 365-66;*George,* 407 F.3d at 412. It is therefore unclear whether Plaintiff would, in fact, be required to show that individuals outside of her protected class were promoted in the event that she was required to establish a prima facie case.

**\*43** Defendant does not contest that Plaintiff is a member of numerous protected classes based on her race, sex, and religion, that she requested a reclassification of her position, and that her request was considered and denied. Instead, Defendant argues that Plaintiff cannot make out a prima facie case of discrimination based on the denial of her reclassification request because she cannot show

that she was eligible for reclassification from a GS-12 to a GS-13. In support of this argument, Defendant relies on the Declarations of Ms. Sellers and Ms. Whitworth. Def.'s Mot. for Summ. J. at 25-26. As discussed above, those Declarations establish that Plaintiff's reclassification request was handled according to the standard procedure followed for such requests-Defendant's supervisor, Mr. Mengesha, completed a reclassification questionnaire that asked whether Plaintiff was satisfying the key indicators for a GS-13 position. 9/27/02 Dillard Decl. ¶ 30; Def.'s Class. Exs. at 7 (7/5/01 Reclass. Form); Def.'s Class. Exs. at 32-33 (9/27/02 Sellers Decl.) ¶ 44. With respect to the three key Indicators listed on the questionnaire, Mr. Mengesha responded that Plaintiff did not have " full editorial responsibility for directing the development and production of a substantial block of complex programming of major importance to VOA" because editorial duties rotated between the six editors in the Hausa Service. Def.'s Class. Exs. at 7-10 (7/5/01 Reclass. Form). Based on this questionnaire, Ms. Whitworth disapproved Plaintiff's promotion to the GS-13 level because she "did not have full editorial responsibility for directing the development and production of a substantial block of complex programming of major importance to VOA including responsibility for the content, style and tone of the program at least 25 percent of her time on a weekly basis," and thus did not meet one of the key indicators for a GS-13 IRB. Def's Class. Exs. at 13 ¶ 6 (9/17/02 Whitworth Decl.); *id.* at 35 (9/27/02 Sellers Decl.) ¶¶ 59-61. [FN22]

FN22. Although Plaintiff was only advised that her reclassification request was denied because she did not meet the key indicators for a GS-13, *see* Def.'s Class. Exs. at 11 (8/14/01 Memo from M. Conboy), Ms. Whitworth also avers in her Declaration that the Hausa Service Chief is ordinarily the only GS-13 employee in the Hausa Service, and that "there was no justification for having two GS-13 level employees in a service as small as the Hausa service."Def.'s Class. Exs. at 14 (9/17/02 Whitworth Decl) ¶ 7.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                         Page 41

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

In her Opposition, Plaintiff fails to respond to Defendant's argument that she was not qualified for the promotion she sought. The Court therefore notes that, although Plaintiff is not actually required to establish a prima facie case, it appears that she would be unable to do so because she cannot demonstrate that she was qualified for the reclassification that she requested. Furthermore, as a legitimate, non-discriminatory reason for the denial of Plaintiff's reclassification request, Defendant proffers Plaintiff's failure to meet one of the key indicators for a GS-13 IRB position. Plaintiff again fails to respond to this argument in her Opposition, and thus presents no evidence whatsoever that it constitutes pretext for discrimination. Instead, Plaintiff offers only her speculation that Plaintiff's reclassification request prompted Defendant to post the vacancy announcement for the Hausa Service Chief position, asking "[w]ould Management have announced the position in July had she not requested, just a month prior in June a fair and equitable compensation for work done?"Pl.'s Opp'n at 6. Plaintiff's assertion is entirely devoid of merit, however, because the BBG initially announced the job vacancy for the Hausa Service Chief position on July 3, 2000, Def.'s Non-Select. Exs. at 8 (7/3/00 Announcement), almost a year before Plaintiff's June 18, 2001 reclassification request, Def.'s Class. Exs. at 1 (6/18/00 Memo from H. Wada).

***44** Plaintiff has thus failed to demonstrate that Defendant's legitimate, non-discriminatory reason for the denial of her reclassification request is pretext for a discriminatory animus, and has presented no further evidence of discrimination in this respect. Furthermore, it appears that Plaintiff would have been unable to establish a prima facie case of discrimination on the basis of race, sex, or religion because she cannot demonstrate that she was qualified for the reclassification that she sought. As a result, based on the totality of the evidence before the Court, a reasonable jury could not conclude that the denial of Plaintiff's reclassification request constituted discrimination on the basis of race, sex, or religion. The Court shall therefore grant Defendant's motion for summary judgment as to Count II of Plaintiff's Complaint.

*4. Count III-Disparate Discipline-Application of the McDonnell Douglas Analysis*

*a. Plaintiff's Prima Facie Case*

In Count III of her Complaint, Plaintiff alleges that Defendant discriminated against her on the basis of her race, sex, and religion by imposing "disparate discipline" upon her after the October 3 Broadcast because Plaintiff was reassigned to a position without editorial duties, given two proposed suspensions, and eventually given a letter of reprimand, while Mr. Mustapha received only a written admonishment. Again, Defendant has already articulated a nondiscriminatory reason for Plaintiff's proposed suspension and letter of reprimand in the form of the letters Plaintiff received informing her of that discipline. *See* Def.'s Disc. Exs. at 33-37 (11/27/01 Letter from G. Dillard); 38 (9/25/02 Letter from M. Skiba). Nevertheless, the Court evaluates Plaintiff's prima facie case because it is "part of the evidence [the Court] must consider in addressing the question of whether she created a genuine issue of [ ] discrimination."*Czekalski,* 475 F.3d at 364 (internal quotation and citation omitted). Plaintiff asserts a claim of disparate treatment discrimination, and thus makes out a prima facie case "by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."*George,* 407 F.3d at 412;*see also Stella,* 284 F.3d at 145.

Defendant argues that none of Plaintiff's allegedly disparate discipline constitutes an adverse employment action. The Court agrees with Defendant with respect to Plaintiff's proposed suspensions because Plaintiff was never actually suspended, and thus experienced no adverse consequence from the proposed suspension. *See Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C.Cir.2002) ("an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm .")

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 42

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

(citing *Brown v. Brody,* 199 F.3d 446, 457
(D.C.Cir.1999)). However, with respect to
Plaintiff's other alleged forms of disparate
discipline-her reassignment to an IRB position
without editorial duties and her letter of
reprimand-the Court will assume that Plaintiff has
suffered an adverse employment action.

**\*45** Defendant argues that Plaintiff's reassignment
does not constitute an adverse employment action
because her pay and benefits remained the same,
her promotion potential was unaffected, and
because the reassignment did not significantly
diminish her responsibilities. Def.'s Mot. for Summ.
J. at 31-33. Defendant is correct that Plaintiff's
reassignment had no effect on her grade or pay. *See*
Def.'s Disc. Exs. at 26 (11/27/01 Reassignment
Letter from S. Dare advising Plaintiff that her "
grade, pay, and benefits [would] not be affected").
With respect to Plaintiff's promotion potential,
however, Plaintiff asserts in her Statement that her
reassignment "curtail[ed][her] competitive ability
for promotional positions within the agency and any
career with any other Agency of the federal
government."Pl.'s Stmt. ¶ 44; *see contra* Def.'s
Class. Exs. at 29 (9/27/02 Sellers Decl.) ¶ 33
(Plaintiff "is at the 'full performance level' of her
position). Plaintiff offers no factual support for this
assertion; nevertheless, the Court notes that the
extent of Plaintiff's editorial responsibilities was
relevant to Plaintiff's request to be reclassified as a
GS-13 and, in fact, that her reclassification request
was denied in part because significant editorial
duties did not comprise 25 percent of her time on a
weekly basis. Class. Exs. at 13 ¶ 6 (9/17/02
Whitworth Decl.); *id.* at 35 (9/27/02 Sellers Decl.)
¶¶ 59-61. Although Plaintiff's editorial duties
appear to have been effectively capped at
approximately 2-3 hours per week at the time of her
reclassification request (because she was one of six
IRBs who divided editorial responsibilities on the
Hausa staff), *see* Def.'s Disc. Exs. at 43 (9/19/02
Dare Decl.) ¶¶ 8, 13, her reassignment to a
position without editorial duties foreclosed the
possibility that she could ever be reclassified to a
GS-13.

Furthermore, the D.C. Circuit has clearly held that "
there are lateral transfers that could be considered

adverse employment actions," including "
reassignment with significantly different
responsibilities." *Czekalski,* 475 F.3d at 364
(quoting *Stewart v. Ashcroft,* 352 F.3d 422, 426
(D.C.Cir.2003)). Defendant asserts that Plaintiff's
reassignment did not significantly diminish
Plaintiff's responsibilities because her editorial
duties "only constituted a small fraction of [her]
overall work, at most 2-3 hours per 40-hour week."
Def.'s Mot. for Summ. J. at 32. While Plaintiff does
not attempt to rebut this assertion, it is at least
possible that Plaintiff's editorial duties represented a
significant responsibility, even if they did not
represent a significant portion of Plaintiff's work
week. Indeed, the D.C. Circuit has recently
reiterated that "[w]hether a particular reassignment
of duties constitutes an adverse action for purposes
of Title VII is generally a jury question."*Czekalski,*
475 F.3d at 365 (citing *Burlington N. & Santa Fe
Ry. Co. v. White,* --- U.S. ----, ----, 126 S.Ct. 2405,
2417, 165 L.Ed.2d 345 (2006)). The Court shall
therefore assume, without so finding, that Plaintiff's
reassignment constituted an adverse employment
action.

**\*46** Finally, Defendant argues that Plaintiff's letter
of reprimand did not constitute an adverse
employment action because it did not affect
Plaintiff's title, pay, or benefits, and thus imposed
no objective harm. Def.'s Mot. for Summ. J. at 35.
Defendant is correct that a letter of reprimand, in
and of itself, does not ordinarily constitute an
adverse employment action. *Brown v. Brody,* 199
F.3d at 458. However, as Plaintiff notes in her
Opposition, in her letter proposing to terminate
Plaintiff, Ms. Dillard cited Plaintiff's letter of
reprimand as evidence of a prior offense. Def.'s
Term. Exs. at 8 (7/15/04 Letter from G. Dillard).
Thus, to the extent that Plaintiff's letter of
reprimand may have factored into Ms. Dillard's
decision to seek Plaintiff's termination, the Court
will assume, without deciding, that it constituted an
adverse employment action.

Plaintiff is also required to meet the third element of
her prima facie case, by showing that "the
unfavorable action gives rise to an inference of
discrimination."*Czekalski,* 475 F.3d at 364;*George,*
407 F.3d at 412;*Stella,* 284 F.3d at 145.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

Traditionally, to meet the third prong of a prima facie case of disparate treatment discrimination, a plaintiff was required to demonstrate "that she was treated differently from similarly situated employees who are not part of the protected class." *Czekalski,* Slip Op. at 9. While Plaintiff asserts that she was disciplined more harshly than Mr. Mustapha, Defendant correctly argues that Mr. Mustapha was not similarly situated to Plaintiff in this instance because he was only the MC for the October 3 Broadcast while Plaintiff was the responsible editor. *See Childs-Pierce v. Util. Workers Union of Am.,* 383 F.Supp.2d 60, 73 (D.D.C.2005) (to be similarly situated, individuals " must have dealt with the same supervisor, have been subject to the same standards and *have engaged in the same conduct*....") (emphasis added).

However, the Court notes that recently in the contexts of discharges, reassignments, and failures to promote, the D.C. Circuit has emphasized that a plaintiff may also meet the third prong of a prima facie case of disparate treatment discrimination through alternative means. *See Czekalski,* Slip Op. at 9;*George,* 407 F.3d at 412;*Stella,* 284 F.3d 145-146. Plaintiff, who bears the burden of establishing a prima facie case of disparate treatment discrimination, makes no argument as to how this alternative method would apply to her claims of disparate discipline. Nevertheless, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous,"*Burdine,* 450 U.S. at 253, 101 S.Ct. 1089, and the *McDonnell Douglas* model of the *prima facie* case is not "rigid, mechanized, or ritualistic," its requirements can vary depending on the factual context. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). As a result, and in light of the approach taken in the D.C. Circuit's recent disparate treatment discrimination decisions, the Court shall assume, *arguendo,* that Plaintiff can establish a prima facie case of disparate discipline with respect to her reassignment without editorial duties and her letter of reprimand.

*b. Defendant's Legitimate, Non-Discriminatory Reason*

**\*47** Defendant proffers the same reason for Plaintiff's reassignment to an IRB position without editorial duties and her letter of reprimand-her failure to review the stringer report including the interview with Sheikh Bauchi prior to the October 3 Broadcast. Def.'s Mot. for Summ. J. at 33-35, 37. Defendant asserts that Plaintiff was the assigned editor for the October 3 Broadcast, was aware of her responsibility to review all tapes before they aired, and failed to review the tape or send it to Mr. Dare for review. *Id.* As discussed above, it is clear from Mr. Dare's e-mails prior to the October 3 Broadcast that someone other than the MC was to review stringer reports and live interviews before they were aired. *See* Def.'s Disc. Exs. at 1 (8/21/01 e-mail from S. Dare), *id.* at 2-3 (8/27/01 e-mail from S. Dare), *id.* at 4 (9/19/01 e-mail from S. Dare), *id.* at 5 (9/19/01 e-mail from S. Dare), *id.* at 6 (10/2/01 e-mail from S. Dare). As also discussed above, the record evidence is clear that Plaintiff was the assigned editor for the October 3 Broadcast, that she was aware that Mr. Mustapha might use a stringer report during the October 3 Broadcast, and that she did not review the tape of the stringer report before it aired. Def.'s Stmt. ¶ 3 8; Pl.'s Stmt. ¶ 38; Def.'s Disc. Exs. at 73-74 (8/14/02 Wada Dep. at 146:9-152:24); *id .* at 12 (11/28/01 Memo from H. Wada to S. Dare); *id.* at 9 (12/16/01 Mustapha Aff.); Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report) ¶¶ 21-22. Defendant has thus proffered sufficient evidence in support of its assertion that Plaintiff was disciplined because she " was derelict in her editorial duties during the October 3 broadcast."Def.'s Mot. for Summ. J. at 37.

*c. Evidence of Discrimination Vel Non*

Plaintiff makes a number of arguments in response to Defendant's proffered legitimate, non-discriminatory reason, some of which apply equally to each form of allegedly disparate discipline, and others of which are particular to her reassignment or letter of reprimand. As an initial matter, Plaintiff asserts-without providing any factual support-that her two proposed "suspensions were rescinded because they were not supported by facts."Pl.'s Opp'n at 7-8. The Court notes that Plaintiff's first proposed suspension was, in fact,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

rescinded because it erroneously stated that Plaintiff had received the tape of the stringer report and given it to the MC without reviewing it. *See* Def.'s Disc. Exs. at 33-37 (11/27/01 Suspension Letter from "Tim" to "Denise"). Furthermore, a second proposed suspension letter was issued, along with a second decision letter, but Plaintiff's suspension was ordered held in abeyance by the then-VOA Chief of Staff, Horace Cooper. 9/27/02 Dillard Decl. ¶¶ 37, 39; Def.'s Disc. Exs. at 49 (9/19/02 Dare Decl.) ¶ 31; *id.* at 53-54 (9/27/02 Grace Decl.) ¶¶ 13-15. Plaintiff offers no support, however, for her assertion that this occurred because the proposed suspension was not supported by facts. Instead, the only evidence in the record on this issue is Ms. Dillard's deposition testimony that "Mr. Cooper said that he was going to hold up the suspension because he had other issues pending with the union and they were strongly opposed to this issue, the suspension issue, and he did not want to go forward with that because he wanted to negotiate the other issues."Def.'s Disc. Exs. at 85 (1/25/05 Dillard Dep. at 99:5-20). Ms. Dillard's testimony constitutes inadmissible hearsay evidence, but nevertheless underscores Plaintiff's inability to demonstrate pretext by arguing that her proposed suspension was unsupported by facts.[FN23]

FN23. With respect to her allegedly disparate discipline, Plaintiff's Opposition includes passing references to an alleged " attempt to falsify documents by a Management official from the office of Labor Relations, with the sole purpose of making the charges stick," Pl.'s Opp'n at 8, and an attempt "to produce a false testimony by a White Labor Relations Official forcing Plaintiff's coworker to sign. The testimony is in direct contrast to an earlier testimony provided for the first investigation. Plaintiff's coworker refused to sign,"*id.* at 9 n. 1. In support of these assertions, Plaintiff cites only to her " exhibit" without specifying which documents she refers to. Plaintiff's Opposition does not even identify the individual who allegedly attempted to falsify documents; however, in her

Statement, Plaintiff identifies the individual as Labor Relations Specialist Donna Grace. *See* Pl.'s Stmt. ¶ 64. Plaintiff's exhibits include an undated note from "Tim" to "Denise" stating that Ms. Grace wrote a statement for Mr. Mustapha to sign regarding the October 3 Broadcast, which Mr. Mustapha refused to sign because he believed it to be incorrect. Pl.s' Arg. Exs. Similarly, Plaintiff's Exhibits for Issue No. 27 include an April 30, 2001 Grievance filed by Plaintiff's Union, which alleges that Ms. Grace presented Mr. Mustapha with a written statement for his signature, which contradicted an earlier affidavit executed by Mr. Mustapha regarding the October 3 Broadcast, and which Mr. Mustapha refused to sign because he believed it to be inaccurate. Pl.'s Exs. for Issue No. 27 (4/30/01 Grievance at 5). These documents are, of course, hearsay evidence, which cannot sustain Plaintiff's claim that a "Labor Relations Official" attempted to falsify documents in support of Plaintiff's discipline.

**\*48** As to her reassignment, although Plaintiff does not label it as such, she appears to attempt to demonstrate that Defendant's proffered reason is mere pretext by arguing that "her editorial duties were never restored" despite her exoneration by an independent EEOC investigation. Pl.'s Opp'n at 8. Although Plaintiff does not specify the "EEOC investigation" to which she refers, the Court assumes that she means Mr. Perry's December 17, 2001 report, of which Plaintiff has provided only 4 of 15 pages, and which does not "exonerate" Plaintiff with regards to the October 3 Broadcast. Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report). Mr. Perry's report does state that Plaintiff did not " see or hear the tape that was broadcast on October 3, 2001," that the tape was given directly to Mr. Mustapha by the producer, and that "Mr. Mustapha did not give it to Complainant or Mr. Dare for their review as requested by Mr. Dare in his directives." *Id.* ¶¶ 21-22.However, Mr. Perry's report also notes that Plaintiff was the editor for the October 3 Broadcast and that the "Editor is responsible for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ensuring the broadcast is conducted properly."*Id.* ¶ 20.As such, the portions of Mr. Perry's report that Plaintiff has provided are entirely devoid of any conclusion as to whether Plaintiff was properly disciplined, and certainly do not demonstrate that Defendant's proffered legitimate, non-discriminatory reason for Plaintiff's reassignment is merely pretext.

Plaintiff offers no "further evidence" of discrimination on the part of Defendant, and thus would have the Court conclude that Plaintiff's reassignment to an IRB position without editorial duties constitutes discrimination based solely on: (1) her unsupported assertion that her reassignment affected her promotion potential; (2) the fact that Mr. Mustapha-who was the MC on the October 3 Broadcast while Plaintiff was the editor-received a written admonishment for his role in the October 3 Broadcast; (3) her unproven statement that her proposed suspensions were rescinded because they were not supported by facts; and (4) the findings in Mr. Perry's report that Plaintiff did not hear or see the tape containing the Sheikh Bauchi interview before it was broadcast. However, Defendant's proffered legitimate, non-discriminatory reason for Plaintiff's discipline is supported by record evidence, and it is not the Court's role to second-guess Defendant's employment decisions. *Fischbach,* 86 F.3d at 1183 (The Court does not sit as a "super-personnel department that reexamines an entity's business decisions.") (internal citation and quotation marks omitted); *see also Forman v. Small,* 271 F.3d 285, 291 (D.C.Cir.2001) ( " consistent with the courts' reluctance to became involved in micromanagement of everyday employment decisions, the question before the court is limited to whether [the plaintiff] produced sufficient evidence of ... discrimination, not whether [s]he was treated fairly."). More significantly, Plaintiff presents no evidence whatsoever that her reassignment was in any way connected to her race, sex, or religion. Therefore, based on the totality of the admissible evidence before the Court, a jury could not reasonably conclude that Plaintiff's reassignment constituted discriminatory disparate discipline.

**\*49** With respect to her letter of reprimand,

although she does not state as much, Plaintiff appears to attempt to show pretext by asserting, " [t]he whole issue is questionable, when the same proposing and deciding officials, Dare and Dillard, were also part of the team that are supposed to weigh and make a determination of guilt or innocence."Pl.'s Opp'n at 9. Plaintiff is correct that Mr. Dare and Ms. Dillard were involved in the initial decision to propose Plaintiff's suspension, however, that involvement is irrelevant because the proposed suspensions were never issued, and Ms. Skiba-rather than Mr. Dare or Ms. Dillard-was the deciding official for Plaintiff's letter of reprimand. Plaintiff further asserts that the "legal status" of her letter of reprimand "has been challenged, because it was reached without the review and inclusion of Plaintiff's defense to the charges for which she was to be reprimanded.... Ms. Skiba a new appointee who signed the letter ignored Plaintiff's input and did not consider it in making her decision."*Id.* at 10.Again, Plaintiff cites only to her "exhibit" in support of this argument, which contains e-mails between Ms. Grace and Ms. Dillard noting that Plaintiff's oral reply to Mr. Cooper was to be considered in revising the decision letter regarding Plaintiff's proposed suspension, Pl.'s Exs. for Issue No. 46 (7/12/02 and 7/14/02 e-mails between D. Grace and G. Dillard). Although the record does not contain evidence of the extent to which Ms. Skiba considered Plaintiff's oral reply or spoke to Plaintiff, Mr. Mustapha, or Mr. Cooper before issuing the letter of reprimand, the Court notes that-even if Ms. Skiba was required to and failed to consider these matters before issuing the letter of reprimand-"[a]n employer's failure to 'follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual."*Fischbach,* 86 F.3d at 1183 (citing *Johnson v. Lehman,* 679 F.2d 918, 922 (D.C.Cir.1982)).

Plaintiff similarly presents no "further evidence" of discrimination with respect to her letter of reprimand, and thus would have the Court conclude that it constitutes discrimination based solely on: (1) the fact that it was mentioned as a prior offense in the letter proposing her termination; (2) the fact that Mr. Mustapha received a written admonishment;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 46

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

and (3) the question as to whether or not Ms. Skiba considered Plaintiff's oral reply or spoke with Plaintiff, Mr. Mustapha or Mr. Cooper before issuing the letter of reprimand. Plaintiff presents no evidence, however, that her letter of reprimand was in any way connected to her race, sex, or religion, or even that her letter of reprimand actually constituted disparate discipline from Mr. Mustapha's written admonishment. *Contra* Def.'s Mot. for Summ. J. at 36 ("the actions against both resulted in no effect on their pay or grade."). As such, the record is entirely devoid of evidence from which a jury could reasonably conclude that Plaintiff's letter of reprimand constituted discriminatory disparate discipline. The Court shall therefore grant Defendant's motion for summary judgment as to Count III of Plaintiff's Complaint.

### 5. Plaintiff's Termination-Application of the McDonnell Douglas Analysis

#### a. Plaintiff's Prima Facie Case

**\*50** At the outset, the Court notes that Defendant has again articulated legitimate, nondiscriminatory reasons for Plaintiff's termination in the form of the proposal and decision letters Plaintiff received from Ms. Dillard and VOA Director Jackson with respect to her termination. *See* Def.'s Term. Exs. at 4-10 (7/15/04 Letter from G. Dillard); 23-32 (9/9/04 Letter from D. Jackson). In addition, the Court notes that Defendant does not assert that Plaintiff has failed to establish a prima facie case of discrimination with respect to her termination. The Court nevertheless assesses Plaintiff's prima facie case to the extent that it is part of the evidence to be considered in determining whether she has created a genuine issue of discrimination. *Czekalski,* 475 F.3d at 364. As noted above, Plaintiff makes out a prima facie case of discrimination " 'by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.' " *George,* 407 F.3d at 412;*Stella,* 284 F.3d at 145. Plaintiff is a member of numerous protected classes, and her termination is clearly an adverse employment action, *see Burlington Indus.,*

*Inc. v. Ellerth,* 524 U .S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Plaintiff may satisfy the third prong of her prima facie case "by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class, [however] this is not the only way."*George,* 407 F.3d at 412. Another way is to show that "the discharge was not attributable to the two [most] common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether."*Id.* With respect to the first method, although Plaintiff points to a number of alleged comparators who were not terminated for making unauthorized phone calls, Plaintiff fails to demonstrate that any of those individuals were similarly situated. To do so, Plaintiff must "demonstrate that all of the relevant aspects of their employment situation are nearly identical."*Childs-Pierce,* 383 F.Supp.2d at 73 (citing *Phillips v. Holladay Prop. Servs.,* 937 F.Supp. 32, 37 (D.D.C.1996), *aff'd Phillips v. Holladay Corp.,* No. 96-7202, 1997 WL 411695 (D.C.Cir. Jun. 19, 1997); *see also Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1513-14 (D.C.Cir.1995)), *aff'd*No. 05-7121, 2006 WL 1878891 (D.C.Cir. Jun. 27, 2006)). Thus, the individuals "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct...."*Id.*As discussed above, each of Plaintiff's alleged comparators either dealt with different supervisors or engaged in different conduct, and therefore none is similarly situated to Plaintiff for purposes of her discrimination claim. Still more significantly, as Plaintiff does not present evidence of the race, sex, or religion of her alleged comparators, the Court is unable to determine whether any of Plaintiff's alleged comparators are even outside of her protected class.

**\*51** As to the alternative means of demonstrating an inference of discrimination, there is no evidence in the record to indicate that Plaintiff's position was eliminated altogether. Furthermore, strong evidence exists that Plaintiff did not meet Defendant's legitimate expectations, in the form of Ms. Dillard and VOA Director Jackson's letters regarding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

Plaintiff's termination, which explain how Plaintiff's actions failed to comply with VOA's expectations. It therefore appears that Plaintiff might have difficulty establishing a prima facie case of discrimination with respect to her termination, in the event that she was actually required to do so.

*b. Defendant's Legitimate, Non-Discriminatory Reasons*

In response to Plaintiff's claim that her termination constituted discrimination on the basis of race, sex, and religion, Defendant adduces a legitimate, non-discriminatory reason-the same reason proffered by Ms. Dillard and VOA Director Jackson in terminating Plaintiff. Specifically, Defendant asserts that Plaintiff was terminated because VOA determined that she had either made, or allowed her husband or son to make, 47 unauthorized telephone calls to Nigeria at a cost to the agency of $2,695.12. Def.'s Mot. for Summ. J. at 27. In support of this conclusion, Defendant reiterates that security cameras show Plaintiff's husband being present in the studio from which the phone calls were made, during the times that the phone calls were made, and also that numerous phone calls were made to a phone number listed to an M. Wada, whom Plaintiff did not deny knowing. *Id.;* Def.'s Term. Exs. at 4-10 (7/15/04 Letter from G. Dillard), *id.* at 23-32 (9/9/04 Letter from D. Jackson). Defendant also highlights Ms. Dillard's statement that Plaintiff's "position require[d] shift work and the ability to work independently without supervision," and that Plaintiff's actions-allowing the phone calls to be made and refusing to accept responsibility thereafter-"violated [Ms. Dillard's] trust in [Plaintiff] and [Ms. Dillard's] confidence in [Plaintiff's] integrity. Def.'s Mot. for Summ. J. at 28; Def.'s Term. Exs. at 8 (7/15/04 Letter from G. Dillard). Finally, Defendant notes that Director Jackson found Plaintiff's statement that she came into work on one occasion to work on her performance appraisal to be contradicted by the record of activity on her computer, and further found Defendant's assertion that her husband and son came to the VOA office because they had business to take care of downtown to be inconsistent with the number of hours that they

spent in the office. Def.'s Mot. for Summ. J. at 29; Def.'s Term. Exs. at 25 (9/9/04 Letter from D. Jackson).

*c. Evidence of Discrimination Vel Non*

Although Plaintiff does not label them as such, she advances two arguments that appear to suggest that Defendant's proffered legitimate, non-discriminatory reason for her termination is mere pretext for discrimination. First, Plaintiff asserts that the BBG "admitted that it had never terminated any employee based on charges of unauthorized phone calls before Plaintiff's employment was terminated for those charges."Pl.'s Opp'n at 17. However, Plaintiff's argument fails for the reason noted above in connection with Plaintiff's prima facie case-Plaintiff cannot show that she was similarly situated to any of the individuals that she posits as comparators. Although Plaintiff asserts that "similarly situated employees do not have to be completely identical in all aspects to be comparators," she cites no authority for this proposition. In fact, Plaintiff's assertion contradicts the relevant authority, which holds that "[t]o show that another individual is similarly situated, Plaintiff must "demonstrate that all of the relevant aspects of their employment situation are nearly identical." *Childs-Pierce,* 383 F.Supp.2d at 73.

**\*52** The nine Office of Cuba Broadcasting employees are not similarly situated to Plaintiff because they appear to have self-reported their personal use of government-issued cellular phones, *see* Pl.'s Exs. for Issue No. 67 (10/29/01 Letter from K. Sutton, 11/29/06 list of Unauthorized Personal Calls for BBG), whereas Plaintiff did not self-report the unauthorized phone calls to Nigeria, or even acknowledge responsibility for those phone calls. Moreover, as Director Jackson noted in his September 9, 2004 letter, the Office of Cuba Broadcasting employees were not supervised by Ms. Dillard or Director Jackson. *See* Def.'s Term. Exs. at 30 (9/9/04 Letter from D. Jackson). Similarly, Director Jackson's letter explains that while a VOA "employee called an 800-toll free number from his/her calling card and assumed that it was free. It appears that this was an honest

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

mistake and the employee admitted the conduct and paid the Agency back."*Id.* This situation is again factually dissimilar from Plaintiffs, both because the individual admitted his conduct, and because of the amount of money involved. *Id.*

The Court lacks detailed information as to the case of the Audio Services Branch employee who was allowed to repay $2,127.18 in unauthorized phone calls via a payroll deduction; however, at a minimum that individual was not similarly situated to Plaintiff because she was not supervised by Ms. Dillard or Director Jackson. *See* Def.'s Term. Exs. at 33-34 (11/30/99 Agreement); Pl.'s Exs. for Issue No. 67; Def.'s Reply at 14. Finally, although Plaintiff alleges that Aliyu Mustapha misused a government-issued credit card by incurring approximately $32,000 worth of charges for personal purchases and cash advances, that situation is clearly not factually similar to Plaintiff's because it involves an entirely different offense. Moreover, Ms. Grace avers that, "[w]hen notified of his misuse, Mr. Mustapha agreed immediately" to repay his debt, and the government did not incur any debt in Mr. Mustapha's case. Grace Reply Decl. ¶¶ 11-12. Plaintiff therefore has not identified a comparator to whom she is actually similarly situated for purposes of her termination. As a result, she fails to demonstrate pretext by asserting that Defendant had never fired another employee for unauthorized telephone calls because, as Director Jackson stated in his letter terminating Plaintiff, " [t]here simply is no parallel case."Def.'s Disc. Exs. at 30 (9/9/04 Letter from D. Jackson).

Second, Plaintiff challenges Ms. Dillard's "claim that an investigation was conducted," as well as Director Jackson's investigation of Plaintiff's computer activities for May 22, 2004. Pl.'s Opp'n at 18. Defendant does not respond to these challenges in its Reply, however, the Court has reviewed the factual record for evidence supporting Plaintiff's challenges. In her letter proposing to terminate Plaintiff, Ms. Dillard refers to her "investigation, conducted with assistance from Facilities and Office of Security and Personnel."Pl.'s Opp'n at 18; Def.'s Disc. Exs. at 4 (7/15/04 Letter from G. Dillard). In her Opposition, Plaintiff asserts that "[w]hen the EEOC investigator however asked for a copy of

such report, none was found to have been prepared." Pl.'s Opp'n at 18. Plaintiff cites broadly to her exhibit, which includes a memo written by a Sam Langerman to Melissa Clark of the OCR, in which Mr. Clark requests a copy of the investigation referred to in Ms. Dillard's letter, Pl.'s Exs. for Issue No. 67 (3/4/05 memo from S. Langerman), as well as a responsive memo in which Ms. Clark states that "no written investigation, other than a delineation of the date(s), time(s), and length of the unauthorized calls, as referenced in the notice dated July 15, 2004, has ever been prepared in this case," Pl.'s Exs. for Issue No. 67 (3/7/05 Memo from M. Clark). Although the Court lacks additional information as to the nature of Ms. Dillard's investigation, it is unclear that any factual dispute exists, because Ms. Dillard's letter states only that she conducted an investigation, without indicating that any written report of that investigation was prepared.

**\*53** Plaintiff also asserts that, when questioned during his deposition in this matter, "Director Jackson could not provide any detail of his investigation of [Plaintiff's] Computer activities for [May 22, 2004], claimed in his decision letter of September, 2004."Pl.'s Opp'n at 18. For once, Plaintiff provides a precise record citation in support of this assertion, identifying page 74, line 14 through page 76, line 10 of Director Jackson's deposition. *Id.* Plaintiff fails, however, to actually provide the Court with those pages of Director Jackson's deposition. As such, the Court is unable to verify Plaintiff's assertion that Director Jackson " does not know whether he directly asked the computer specialist, who that computer person was, and whether he reported to him the findings verbally or issued a report," and "does not recall also whether there exists any report of the computer analysis for activities by Plaintiff on that day May 22, 2004."*Id.* Instead, the only record evidence regarding Director Jackson's investigation is his letter regarding Plaintiff's termination, which sets out the details of his investigation into Plaintiff's computer activities, even if his memory may have later proven faulty. Thus, while Plaintiff offers two arguments that might demonstrate pretext as to Defendant's proffered reason for Plaintiff's termination, the Court is unable to credit either

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 49

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

argument because they are unsupported by factual evidence.

In addition to her arguments that appear aimed at demonstrating pretext, Plaintiff offers arguments that, if proven, might provide "further evidence" of discrimination on the part of Defendant. Specifically, Plaintiff argues that "the harsh treatment meted [sic] Plaintiff which include security escort out of the building and the deliberate barring of Plaintiff from persons and offices duly qualified to assist Plaintiff in (exhib) defending herself from the charges were all indicative of Defendant's discrimination, disparate treatment, discriminatory harassment and retaliation."Pl.'s Opp'n at 18. However, Plaintiff does not identify which pages of her multiple-hundred-page "exhibit" purportedly support this argument, and the Court's own review of Plaintiff's exhibit does not reveal any likely candidates.[FN24]As such, the Court has no basis for concluding that Plaintiff's treatment subsequent to her termination was in any way discriminatory in nature.

> FN24. The only evidence in the record that appears related to the issue of Plaintiff's exclusion from BBG buildings following her termination is Ms. Dillard's termination proposal letter, which informed Plaintiff of the procedures she was required to follow in the event that she needed "to enter any BBG/IBB building for the purpose of preparing and/or making [her] reply," Def.'s Term. Exs. at 10 (7/15/04 Letter from G. Dillard), and an August 6, 2004 letter from the BBG Director of Security reminding Plaintiff of those security procedures, 10/22/06 Johnson Decl. Attach. 1 (8/6/04 Letter from L. Smith). The Director of Security's letter stated that within the previous week, Plaintiff had " twice gained access to Agency buildings without following the required security procedures set out in Ms. Dillard's July 15th letter," and warned Plaintiff, "[d]o not attempt to enter the [BBG/IBB buildings] unless you have complied with the security procedures ... [u]nauthorized

access to Agency-occupied buildings may place you in violation of Agency security procedures and further action may be taken. "*Id.* These documents provide no evidence that Plaintiff's exclusion from the BBG buildings following her termination was in any way discriminatory in nature.

Nor does the Court have any basis for crediting Plaintiff's assertion that Defendant proposed to terminate a Hausa Service staff member after Plaintiff was terminated in order to create a comparator for Plaintiff. *See* Pl.'s Opp'n at 19-20. As discussed above, Defendant posits that a comparator for Plaintiff may be found in a Hausa Service IRB who incurred $12,476.38 in unauthorized phone calls between March 28 and June 28, 2004, and whose employment Ms. Dillard recommended be terminated. Def.'s Term. Exs. at 35-50 (1/31/05 Memo from G. Dillard; 2/3/05 Letter from J. Welch). Although Plaintiff bemoans Defendant's allegedly "crafty introduction of a comparator to Plaintiff after the fact," Pl.'s Opp'n at 19, she does not provide any evidence that the individual in question's termination was actually proposed in order to provide a comparator for Plaintiff. As such, Plaintiff's speculation does not constitute "further evidence" of discrimination on the part of Defendant.

**\*54** In sum, Plaintiff would have this Court conclude that her termination was discriminatory based on (1) her denial of responsibility for the unauthorized phone calls; (2) the fact that the BBG did not terminate other individuals-who were not similarly situated to Plaintiff-for unauthorized phone calls; and (3) the fact that Ms. Dillard did not create a written report of her investigation. While it is clear that Plaintiff believes Defendant improperly terminated her, the Court notes that significant circumstantial evidence appears to support Defendant's conclusion that Plaintiff made or allowed to be made unauthorized phone calls to Nigeria at a cost to the BBG of over $2000 and that, in any event, the Court's role is not to second-guess the BBG's employment decisions. *Holcomb,* 433 F.3d at 897. Based on the totality of the admissible evidence before the Court, a jury could not reasonably conclude that Plaintiff's termination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 50

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

constituted impermissible discrimination. As such, the Court shall grant Defendants' Motion for Summary Judgment with respect to Plaintiff's claim that her termination constituted discrimination on the basis of race, sex, or religion.

### C. Plaintiff's Retaliation Claims

"Like claims of discrimination, claims of retaliation are also governed by the *McDonnell Douglas* burden-shifting scheme."*Carney v. Am. Univ.,* 151 F.3d 1090, 1094 (D.C.Cir.1998) (citing *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984)). To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) a reasonable employee would have found the challenged action so materially adverse that he would have been dissuaded from making or supporting a charge of discrimination; and (3) a causal connection exists between the protected activity and the challenged retaliatory act. *Rochon v. Gonzalez,* 438 F.3d 1211, 1219-20 (D.C.Cir.2006)."An activity is 'protected' for the purposes of a retaliation claim 'if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment.' " *Lemmons v. Georgetown Univ. Hosp.,* 431 F.Supp.2d 76, 91 (D.D.C.2006) (quoting *Coleman v. Potomac Elec. Power Co.,* 422 F.Supp.2d 209, 212-13 (D.D.C.2006)). Furthermore, the Supreme Court recently clarified in *Burlington Northern & Santa Fe Railway Co. v. White,* --- U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d 345, that, because Title VII's retaliation and discrimination provisions are not "coterminous," *id.* at 2414, the anti-retaliation provision of Title VII is "not limited to discriminatory actions that affect the terms and conditions of employment," *id.* at 2412-13.In so doing, however, the Supreme Court emphasized that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 2414.Moreover, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 2415.It is therefore " important to separate significant from trivial harms,"

*id.,* and to recognize that "the significance of any given act of retaliation will often depend upon the particular circumstances," *id.* at 2415-16.

### *1. Count IV-Retaliatory Discipline-Application of the McDonnell Douglas Analysis*

**\*55** Count IV of Plaintiff's Complaint alleges that she was disciplined in retaliation for her protected activity, specifically her August 2001 contact with the OCR and her subsequent formal EEO Complaint in September 2001. Compl. ¶¶ 6, 38-40. In its motion for summary judgment, Defendant asserts that Plaintiff's claim of retaliatory discipline fails for a number of reasons. Plaintiff's Opposition contains a heading entitled "Retaliation," however, that section relates to Plaintiff's non-selection as Hausa Service Chief and does not even discuss allegedly retaliatory activities. Pl.'s Opp'n at 11-13. Instead, Plaintiff's sole reference to allegedly retaliatory discipline is an assertion that statements relied upon by Defendant in connection with the October 3 Broadcast "were apparently made only to forcefully implicate Plaintiff and provide reasons for retaliations against her for engaging in protected activity and such actions as seeking honest pay for honest work; reclassification, and seeking to assert her rights to selection for the Supervisory Hausa position by filing an EEOC Complaint."*Id.* at 8. It is therefore unclear whether Plaintiff has conceded her claim of retaliatory discipline; however, the Court will nevertheless briefly address the merits of that claim.

In its motion for summary judgment, Defendant first argues that Plaintiff cannot make out a prima facie case of retaliation because her reassignment, proposed suspensions, and letter of reprimand do not constitute materially adverse actions under the standard set forth in *Burlington Northern.*Def.'s Mot. for Summ. J. at 33, 35. The Court agrees with Defendant as to Plaintiff's proposed suspension, which was never issued; however, for the reasons discussed above in connection with her discrimination claims, the Court will assume that Plaintiff's reassignment and letter of reprimand may constitute materially adverse actions for purposes of her retaliation claim.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.