Slip Copy                                                                                                                    Page 51

Slip Copy, 2007 WL 1378516 (D.D.C.)
**(Cite as: Slip Copy)**

Plaintiff nevertheless cannot make out a prima facie case of retaliation as to her letter of reprimand because, as Defendant correctly argues, she cannot demonstrate a causal connection between her statutorily protected conduct and her letter of reprimand. Def.'s Mot. for Summ. J. at 35-36. Plaintiff's letter of reprimand was issued on September 25, 2002-more than a year after she engaged in statutorily protected conduct-and those cases that accept mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' " *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (3-month period insufficient) and *Hughes v. Derwinski,* 967 F.2d 1168, 1174-75 (7th Cir.1992) (4-month period insufficient)). Moreover, the deciding official for Plaintiff's letter of reprimand was Ms. Skiba, who was in no way involved in the events underlying Plaintiff's September 2001 EEOC complaint-the Hausa Service Chief selection and the denial of Plaintiff's reclassification request. *Cf. Bieber v. Runyon,* Civ. A. No. 93-1391(JHG), 1996 WL 525372, * 11 (D.D.C. Sept. 9, 1996) (plaintiff failed to establish prima facie case of retaliation where allegedly retaliatory action was taken by individual not implicated in Plaintiff's earlier EEOC complaint). Nor has Plaintiff presented evidence that Ms. Skiba was aware of Plaintiff's EEOC activity when she decided that Plaintiff should receive a letter of reprimand. As such, Plaintiff has failed to demonstrate a causal connection between her EEOC activity and her letter of reprimand, and thus to establish a prima facie case of retaliation.

*56 Plaintiff's claim for retaliatory discipline is therefore limited to her reassignment; however, Plaintiff cannot survive summary judgment on this count for the same reasons that are fatal to her discrimination claim of disparate discipline. Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's reassignment-Plaintiff's failure to review the stringer report containing the interview with Sheikh Bauchi before the October 3 Broadcast-and, for the reasons discussed above in connection with Plaintiff's disparate discipline claim, Plaintiff cannot demonstrate that this reason is mere pretext for retaliation. Nor does Plaintiff offer any "further evidence" from which a reasonable jury could conclude that Plaintiff's reassignment constituted retaliation for her earlier protected activity. The Court shall therefore grant Defendant's motion for summary judgment as to Count IV of Plaintiff's Complaint.

### 2. *Plaintiff's Termination-Application of the McDonnell Douglas Analysis*

By Order dated October 14, 2005, the Court allowed Plaintiff to amend her complaint to include the allegations raised in EEOC Complaint No. 100-2004-00943 and OCR Complaint No. OCV-04-24, which the Court described as a claim " that Plaintiff was terminated by Defendant as part of the pattern of retaliation alleged in her Complaint in this case."*Wada v. Tomlinson,* Civil Action No. 03-1488, Order (D.D.C. Oct. 14, 2005). Neither Defendant's motion for summary judgment nor Plaintiff's Opposition to that motion specifically addresses a claim that Plaintiff's termination constituted retaliation for protected EEOC activity. Nevertheless, the Court notes that Plaintiff's retaliation claim suffers from the same weaknesses that ultimately prove fatal to Plaintiff's claim that her termination constituted impermissible discrimination on the basis of race, sex, or religion.

As an initial matter, the Court notes that Plaintiff would likely have difficulty demonstrating the requisite causal connection between her EEOC activity and her termination. Based on the Court's review, it appears that Plaintiff's last EEOC activity prior to her termination was the formal complaint she filed on January 2, 2004 regarding her " Minimally Successful" performance review, her AWOL charge, and the garnishment action against her. *See* Def.'s Garnish. Exs. at 1-3. Ms. Dillard did not propose to terminate Plaintiff until July 15, 2004, and that termination was not effective until September 10, 2004. However, as noted above, those cases that accept mere temporal proximity between an employer's knowledge of a protected

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' " *Clark County Sch. Dist.*, 532 U.S. at 273-74, 121 S.Ct. 1508 (citing *Richmond,* 120 F.3d at 209 (3-month period insufficient) and *Hughes,* 967 F.2d at 1174-75 (4-month period insufficient)).

**\*57** Furthermore, even if Plaintiff could establish a prima facie case of retaliation based on her termination, she could not avoid summary judgment on that claim. As discussed in detail above, Defendant has adduced a legitimate, non-discriminatory reason for Plaintiff's termination-her making or allowing to be made the unauthorized phone calls to Nigeria and her subsequent refusal to take responsibility for the phone calls-and Plaintiff has not shown that reason to be pretextual. Nor has Plaintiff proffered any " further evidence" of retaliation on the part of Defendant. In sum, as with her discrimination claim, Plaintiff cannot bear her "ultimate burden of persuading the court that [he] has been the victim of intentional [retaliation]."*Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. As no reasonable jury could conclude that Defendant retaliated against Plaintiff for her EEOC activity, Plaintiff's claim that her termination was retaliatory in nature cannot survive Defendant's motion for summary judgment.

*D. Count V-Hostile Work Environment*

Count V of Plaintiff's Complaint is titled " Employment Discrimination-Retaliatory and Discriminatory Harassment," and alleges that Defendant created, engaged in, tolerated, and encouraged a "harassing and hostile environment in retaliation against Plaintiff for her protected activity and because of her race, sex, and/or religion." Compl. ¶ 42. Plaintiff's Complaint further alleges that through their conduct "including but not limited to depressed performance ratings, security office interrogation, improper assignment of hours, and improper leave administration, the Agency, Ms. Dillard and Mr. Dare encouraged, created, engaged in, and tolerated a pattern and practice of continuing retaliatory harassment against Plaintiff."*Id.* ¶ 26.Count V thus amounts, in essence, to a claim of hostile work environment.

To establish a claim of a hostile work environment, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action. *See Baloch v. Norton,* 355 F.Supp.2d 246, 259 (D.D.C.2005) (citing cases); *Gustave-Schmidt v. Chao,* 360 F.Supp.2d 105, 120 (D.D.C.2004). In determining whether a hostile work environment exists, the Supreme Court has directed the courts to look at the totality of the circumstances, including " 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."*Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct.367, 126 L.Ed.2d 295 (1993)). While the plaintiff is not required to plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must be able to support such a claim. *See Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1114 (D.C.Cir.2000).

**\*58** The Supreme Court has held that a hostile work environment exists only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."*Harris.* 510 U.S. at 22 (quotation omitted). In addition, the Supreme Court has circumscribed the definition of a hostile work environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' " *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted). Indeed, these standards are intended to "filter out complaints attacking 'the ordinary tribulations of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.' " *Id.* (citations omitted). "Even a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart v. Evans,* 275 F.3d 1126, 1134 (D.C.Cir.2002) (citing *Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 753 (4th Cir.1996) ("holding that the fact that alleged incidents were spread over a seven-year period suggested that the harassment was not sufficiently pervasive to establish [ ] Title VII liability"); *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995) ("holding that nine incidents spread over seven months did not constitute sexual harassment because the supervisor never touched the employee and incidents were not sufficiently severe or pervasive")).

In her Opposition, Plaintiff asserts that she "was indeed subjected to a hostile work environment." Pl.'s Opp'n at 16. In support of this assertion Plaintiff claims that Mr. Dare's "past writings and also ethnic background ... was clearly marked by history as antagonistic to the Hausa Speaking Group. "*Id.* Plaintiff further claims that "[t]he moment [Mr. Dare] arrived in August, a succession of harassments surfaced," which included "forcing a weekend schedule on Plaintiff to run for weeks, and later a four months night shift schedule ... humiliating discussions of Plaintiff's official duties in general meetings and subjecting them to a vote, and ... the removal of Plaintiff's editorial responsibility and a proposal to suspend Plaintiff." *Id.* In addition, Plaintiff asserts that she suffered " intimidatory verbal abuse and harassments" and constant monitoring, and that she was "overworked and not allowed leave taking as other employees."*Id.* at 16-17.

As an initial matter, the Court notes that Plaintiff cannot simply regurgitate her disparate discipline and retaliatory discipline claims in an effort to flesh out her hostile work environment claim. *See Keeley,* 391 F.Supp.2d at 51 ("The remainder of plaintiff's alleged 'hostile' events are the very employment actions he claims are retaliatory; he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim."). Moreover, Plaintiff's hostile work environment claim consists of an amalgam of claims-her 2001-2002 and 2002-2003 performance evaluations, her AWOL charge, the Office of Security investigation, and her overtime and work assignments-for which Plaintiff failed to exhaust her administrative remedies. *See supra* Section A. However, "[P]lainitff cannot cure [her] failure to exhaust [her] complaints about these incidents by sweeping them under the rubric of a hostile work environment claim."*Patterson v. Johnson,* 391 F.Supp.2d 140, 146 (D.D.C.2005). Furthermore, to the extent that Plaintiff's hostile work environment claim is comprised of a series of discrete acts, it suffers from an additional infirmity because "[d]iscrete acts constituting discrimination or retaliation claims ... are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."*Lester v. Natsios,* 290 F.Supp.2d 11, 33 (D.D.C.2003).

*59 Even more fundamentally, Plaintiff's hostile work environment claim lacks merit because many of the allegations she levels are entirely unsupported by documentary evidence. First, Plaintiff has proffered no evidence whatsoever that Mr. Dare's "previous writing" demonstrated a hostility to members of the Hausa ethnic group or, as Plaintiff also claims, that "African sources and Nigerian Scholars, professionals and general public in the United States clearly warned about Mr. Dare's background and his being hostile to Hausa speaking group."Pl.'s Opp'n at 16.[FN25]Nor has Plaintiff offered evidence to substantiate her claim regarding "humiliating discussions of Plaintiff's official duties in general meetings and subjecting them to a vote," or being "confined to her desk by constant monitoring."*Id.* at 16-17.

> FN25. In her "Argument Exhibits" Plaintiff includes two e-mails written in November 2001 by Americans living in Nigeria, neither of which discusses Mr. Dare in any way, and both of which were clearly written after Mr. Dare was hired as Hausa Service Chief. *See* Pl .'s Arg. Exs. (11/11/01 e-mail from C. McCain; 11/11/01 e-mail from R. Rice). In addition, Plaintiff proffers an article from an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 54
Slip Copy, 2007 WL 1378516 (D.D.C.)
(Cite as: Slip Copy)

unidentified online publication entitled "Obasanjo's Tentacles in Washington," which describes Plaintiff's termination; however as that article is dated September 15, 2004 it also post-dates Mr. Dare's selection as Hausa Service Chief. *See* Pl.'s Arg. Exs. (9/15/04 Article).

Moreover, Plaintiff alleges that she was subjected to "intimidatory verbal abuse and harassments," and "a tirade by Mr. Dare which occurred several times (exhib) and had always been directed at Plaintiff and no one else in the Service."Pl.'s Opp'n at 16-17. However, when asked about her allegation of "verbal abuse" during her deposition, the only incident that Plaintiff reported was Mr. Dare shouting at her when she came to work on the morning of April 19, 2002, "Hadiza ... who told you you were going to be MC? I've already chosen my MC."*See* 12/3/04 Wada Dep. at 191:16-192:1. This lone incident, in and of itself, simply does not rise to the level of a hostile work environment. *See Singh v. U.S. House of Representatives,* 300 F.Supp.2d 48, 56 (D.D.C.2004) ( "Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting. ")).

The remaining allegations comprising Plaintiff's hostile work environment claim include "depressed performance ratings, improper assignment of hours and overtime, and improper leave administration," Compl. ¶ 26, by which the Court assumes Plaintiff to be referring to her 2001-2002 "Fully Successful" performance rating, her 2002-2003 "Minimally Successful" performance rating, her AWOL charge, her overtime assignment on the weekend of April 19-20, 2003, and the changes that Mr. Dare made to her work schedule. As discussed above, however, with respect to each of these incidents, Plaintiff fails to allege that Mr. Dare and Ms. Dillard's actions were in any way the result of Plaintiff's race, sex, or religion or to identify the specific protected activity for which she was allegedly retaliated against. *See supra* Section I.E. Nor does Plaintiff allege that Mr. Dare or Ms. Dillard ever made any reference, joking or otherwise, to Plaintiff's race, sex, or religion. *See* 12/3/04 Wada Dep. at 104:8-105:17,

135:1-10; 287:3-288:8. While Plaintiff's arguments regarding these issues clearly evidence her dissatisfaction with Mr. Dare and Ms. Dillard's management, they altogether fail to demonstrate a "workplace ... permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."*Harris,* 510 U.S. at 22 (quotation omitted). Plaintiff has thus failed to adduce evidence of a hostile work environment, let alone a hostile work environment on the basis of race, sex, or religion. "[I]t must be clear that the hostile work environment was the result of discrimination based on a protected status otherwise the federal courts will become a court of personnel appeals."*Singh,* 300 F.Supp.2d at 48 (internal citation and quotation marks omitted); *Lester v. Natsios,* 290 F.Supp.2d 11, 18 (D.D.C.2003). Accordingly, the Court will grant Defendant's Motion for Summary Judgment as to Count V of Plaintiff's Complaint.

**\*60** For the reasons set forth above, the Court shall grant Defendant's Motion for Summary Judgment in its entirety. An appropriate Order accompanies this Memorandum Opinion.

D.D.C.,2007.
Wada v. Tomlinson
Slip Copy, 2007 WL 1378516 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                          Page 1
Slip Copy, 2007 WL 744727 (D.D.C.)
**(Cite as: Slip Copy)**

Williams v. Nicholson
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Alexander E. WILLIAMS, Plaintiff,
v.
R. James NICHOLSON, Secretary, Department of Veterans Affairs, Defendant.
**Civil Action No. 06-0845 (EGS).**

March 6, 2007.

Alexander E. Williams, Fort Washington, MD, pro se.
Karen L. Melnik, U.S. Attorney's Office, Washington, DC, for Defendant.

EMMET G. SULLIVAN, United States District Judge.
*1 This matter is before the Court on defendant's motion to dismiss or, in the alternative, for summary judgment. Having considered the motion, plaintiff's opposition, and the entire record of this case, the Court will grant summary judgment for defendant.

I. BACKGROUND

Plaintiff, an African-American male, applied for the position of Legislative Affairs Officer for the Department of Veterans Affairs ("VA").*See* Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment ("Def.'s Mot."), Ex. 1 (Williams Statement) at 4 & Ex. 2 (Announcement No. OCLA-02-15). Plaintiff was deemed eligible for the position, but, because he was not one of the top three candidates for the position, his name was not referred to the selecting official. *See id.,* Ex. 5-6 (Certificate of Eligibles, GS-13 and GS-14) & Ex. 8 (Buffington Statement) at 4. VA offered the position to a white male who at that time was a presidential appointee to the VA's Office of Congressional and Legislative Affairs. *See id.,* Ex. 8 at 4-5 & Ex. 10 (Selecting Official's Endorsement). The selectee declined the offer. *Id.,* Ex. 14 (Mansfield Decl.), ¶ 2. It was decided that a presidential appointee would not be promoted to a career civil service position. *Id.,* Ex. 8 at 5. Further, for budget considerations, it was decided that the Legislative Affairs Officer position would not be filled. *Id.,* Ex. 8 at 6 & Ex. 12 ¶ 3. VA notified plaintiff of his nonselection on October 23, 2002. *Id.,* Ex. 1 at 4. In the end, no person filled the position of Legislative Affairs Officer advertised in Announcement No. OCLA-02-15. *Id.,* Ex. 14 ¶ 4.

Plaintiff alleges that he was not selected for the position of Legislative Affairs Officer because of his race (African-American) and age (over 40 years). Compl.; *see* Further Response to Defendant['*]s Motion to Dismiss or, in the Alternative, for Summary Judgment at 1. He brings this employment discrimination action against the Secretary of Veterans Affairs under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, *see*42 U.S .C. § 2000e*et seq.,* and the Age Discrimination in Employment Act ("ADEA"), *see* 29 U.S.C. § 621*et seq.*

II. DISCUSSION

*A. Summary Judgment Standard*

A party is entitled to summary judgment only when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); Fed.R.Civ.P. 56(c). A material fact is one "that might affect the outcome of the suit under the governing law."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248;*see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 150 (D.C.Cir.1996). When evaluating a summary judgment motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."*Anderson,* 477 U.S. at 255;*see Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 150 (2000).

*B. Analysis Under McDonnell Douglas Corp. v. Green*

*2 Absent direct evidence of race discrimination, it is the plaintiff's initial burden in a Title VII action to establish a *prima facie* case by a preponderance of the evidence. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Stella v. Mineta,* 284 F.3d 135, 144 (D.C.Cir.2002). To establish a *prima facie* case in a Title VII claim for failure to hire, a plaintiff must show "(i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications."*McDonnell Douglas,* 411 U.S. at 802;*Carter v. George Washington Univ.,* 387 F.3d 872, 878 (D.C.Cir.2004); *see Stella,* 284 F.3d at 145 (quoting *Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999)). "As with Title VII, in the absence of direct evidence of discrimination, disparate treatment claims under the ADEA are analyzed under the *McDonnell Douglas* burden-shifting framework."*Teneyck v. Omni Shoreham Hotel,* 365 F.3d 1139, 1155 (D.C.Cir.2004); *Hall v. Giant Food, Inc.,* 175 F.3d 1074, 1077 (D.C.Cir.1999) (applying *McDonnell Douglas* framework to ADEA claims). In this way, plaintiff shows that "his rejection is not attributable to 'the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.' " *Stella,* 284 F.3d at 145 (quoting *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 n. 44 (1977)). A plaintiff's *prima facie case* need not show that a person outside of his protected class was selected. *See O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312 (1996) (fact that plaintiff in ADEA action was replaced by person outside of protected class "is not a proper element of the *McDonnell Douglas prima facie case* "); *Stella,* 284 F.3d at 146.

If a plaintiff succeeds in making out a *prima facie* case of discrimination, the burden shifts to the defendant to rebut the presumption of discrimination by producing "evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason."*Aka v. Washington Hosp. Ctr.,* 156 F .3d 1284, 1289 (D.C.Cir.1998) (en banc) (citation omitted); *see Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981). At this point, the presumption of discrimination generated by the *prima facie* showing drops from the case, and the plaintiff has an opportunity to present evidence that race or age, not defendant's proffered reason, was the true reason for the adverse employment action. *See Burdine,* 450 U.S. at 254-55;*Dunaway v. Int'l Bhd. of Teamsters,* 310 F.3d 758, 761 (D.C.Cir.2002).

The parties do not dispute that plaintiff is a member of a protected class (African American over age 40), that he was qualified for the announced position of Legislative Affairs Officer, that he applied for the position, and that he was not selected. Notwithstanding VA's offer of the Legislative Affairs Officer position to another applicant, the record demonstrates that VA did not fill the position. No person performed work or received pay for work performed under the position advertised in Announcement No. OCLA-02-15. Plaintiff thus fails to make out a *prima facie* case of discrimination, as he does makes no showing "that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications." *McDonnell Douglas,* 411 U.S. at 802.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*3 In employment discrimination cases, summary judgment is appropriate "where either evidence is insufficient to establish a *prima facie* case, or, assuming a *prima facie* case, there is no genuine issue of material fact that the defendant's articulated non-discriminatory reason for the challenged decision is pretextual."*Paul v. Fed. Nat'l Mortgage Ass'n,* 697 F.Supp. 541, 553 (D.D.C.1988) (citations omitted). In this case, plaintiff's showing is insufficient to establish a *prima facie* case of discrimination based on race or age. *See Teneyck,* 365 F .3d at 1152 (plaintiff failed to make out *prima facie* case of discrimination absent evidence that "position remained open after [she] was turned away and that [employer] continued to seek applicants of her qualifications"); *Henderson v. Rice,* 407 F.Supp.2d 47, 51 (D.D.C.2005) (plaintiff did not make out *prima facie* case where employer selected more qualified applicant who turned down the job, and chose to leave position vacant); *Hayslett v. Perry,* 332 F.Supp.2d 93, 100 (D.D.C.2004) (plaintiff "falls short of establishing a prima facie case of discrimination" for lack of evidence that defendant "continued to seek applicants after plaintiff was allegedly passed over for the promotion"); *Morgan v. Fed. Home Loan Mortgage Corp.,* 172 F.Supp.2d 98, 109-12 (D.D.C.2001) (stating that no adverse employment action exists where there was no vacancy or where position was never filled), *aff'd,*328 F.3d 647 (D.C.Cir.), *cert. denied,*540 U.S. 881 (2003).

### III. CONCLUSION

The Court concludes that plaintiff fails to make out a *prima facie* case of discrimination, and defendant's summary judgment will be granted. An Order consistent with this Memorandum Opinion is issued separately on this same date.

D.D.C.,2007.
Williams v. Nicholson
Slip Copy, 2007 WL 744727 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01319-RMC    Document 39-14    Filed 09/28/2007    Page 9 of 19

Westlaw.

Not Reported in F.Supp.                                                                                                 Page 1
Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

C
Bieber v. Runyon
D.D.C.,1996.
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Barbara BIEBER, Plaintiff,
v.
Marvin RUNYON, et al., Defendants.
**Civ. A. No. 93-1391 (JHG).**

Sept. 9, 1996.

*MEMORANDUM OPINION AND ORDER*
JOYCE HENS GREEN, District Judge.
*1 Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 (1994), Plaintiff Barbara Bieber alleges discrimination by the United States Postal Service ("USPS"). Bieber contends that, in December of 1989, USPS did not select her for a position as Program Manager, Logistics (EAS 25), because of her sex and in retaliation for a discrimination complaint that she had filed in June of 1989.[FN1]

   FN1. Bieber filed this suit against Postmaster General Marvin Runyon and her supervisors, Patrick Dempsey and James Orlando. The only proper defendant in a federal sector Title VII action is the head of the agency. 42 U.S.C. § 2000e-16(c) (1994). The defendants did not move to strike Defendants Dempsey or Orlando, and because of the disposition of the case, it is unnecessary for the Court to do so *sua sponte.*

Upon consideration of the record based on the evidence introduced at a three-day bench trial, including the testimony of witnesses whose credibility, demeanor and behavior the Court has had an opportunity to observe and evaluate, judgment shall be entered against Plaintiff Barbara Bieber and in favor of the defendants.

**I. Findings of Fact**

Until her retirement in 1992, Ms. Bieber had been a USPS employee for twenty-three years, advancing from a window clerk in Big Bear City, California, to a Senior Transportation Specialist (EAS-23) in the Network Analysis and Requirements Division at USPS Headquarters in Washington, D.C. The majority of her career was spent in transportation and logistics, and she was assigned to USPS Headquarters as well as to the Western and Eastern Regions, two of the Post Office's five geographical regions. During the mid-to-late 1980s, although an EAS-23 level employee, Bieber was detailed to positions with higher grade responsibilities. In 1988, she was temporarily assigned as an Operations Program Analyst (EAS 25) for the Eastern Region in Philadelphia and, in 1987, she was assigned to act as the Officer in Charge (EAS 24) for Arlington, Virginia.

As an EAS-23 at USPS Headquarters, Bieber was responsible for analyzing and developing mail transportation policies and for providing training to field offices. In performing her duties, she would occasionally intervene in disputes between the regions regarding issues involving the nationwide transportation of the U.S. mail. At trial, numerous witnesses testified that these disputes were inevitable and often heated. In 1989, one of her principal assignments was to coordinate "Christmas Planning," which involved developing an annual operations plan for the holiday mailing period.

From May of 1988 until she left the Network Analysis and Requirements Division, Bieber's supervisor, and the selecting official for the position she sought in 1989, was Patrick Dempsey, General Manager of the Network Analysis and Requirements Division. Dempsey was a twenty-eight year USPS employee who had known

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                 Page 2

Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

Bieber since the early 1980s.

In July of 1989, Bieber filed an administrative discrimination complaint, alleging sex discrimination when she was not selected for an EAS-25 position. The facts underlying that complaint did not involve Dempsey, but, at trial, Dempsey admitted he was aware of the complaint before the December 1989 selection decision. Bieber did not pursue that administrative complaint, however. Because she believed that USPS had taken notice of her concerns, she withdrew the complaint shortly after she filed it.

*2 On August 23, 1989, USPS issued a vacancy announcement for an EAS-25 Program Manager (Logistics) position in Bieber's office, the Network Analysis and Requirements Division at USPS Headquarters. The position involved managing several major mail transportation programs and developing policies and procedures for air, rail, highway, water and other transportation modes. The selectee would have "regular contact with transportation industry representatives, major mailers, customers and suppliers [and] serve[ ] as primary contact with other governmental agencies." Defendants' Exhibit 5 (Vacancy Announcement for Position 11701 (Aug. 23, 1989)). The advertised qualifications were:
Knowledge of transportation, mail distribution programs, and mail processing operations. Ability to analyze transportation needs and design transportation systems and networks to support operations. Ability to organize, coordinate and lead working groups of professionals with diversified levels of background. Ability to prepare, negotiate and monitor transportation contracts. Ability to analyze, interpret, advise on and make recommendations concerning transportation strategy, policies and procedures.

*Id.*

Under USPS procedures, the selection process for competitive positions involves two-stages. During the first stage, the applicants are screened by a review committee of at least three members who recommend to the selecting official "those candidates whose knowledge, skills, and abilities are of such high quality as to strongly indicate a high probability of successful performance in the position." USPS HQ Cir. No. 81-1, at ¶ 4.D.1 (Jan. 15, 1981), attached as Plaintiff's Exhibit 28.
A review committee is required to consider the candidates' applications (Forms 991 A & B), and it can require the submission of writing samples or hold interviews. *Id.* ¶ 4.D.4. Communicating by memorandum, the committee then recommends at least three, but not more than five, candidates. *Id.* ¶ 4.D.4 d. In the memorandum, the candidates are to be listed in alphabetical order and Forms 991 A & B are to be attached. *Id.*

In the second stage of the competitive process, the selecting official decides "who best meets the position requirements from among the candidates recommended by the review committee. *The selecting official must individually interview all the recommended candidates unless the review committee has already done so.*" *Id.* ¶ 4.D.E.1. (emphasis in original). The selecting official "must make the selection exclusively on merit and must not 'preselect' a candidate." *Id.* ¶ 4.D.E.3. Upon making his or her selection, the selecting official is responsible for notifying in writing those candidates who had not been not selected. *Id.* ¶ 4.D.E.4.

On October 3, 1989, a review committee convened to consider the applications submitted by Bieber and seven others who competed for the EAS-25 position. The committee was chaired by Elizabeth Williamson and included members Robert Richter, who would later testify at trial, and Paul Barr. In their report to Dempsey, the members stated, in relevant part:
*3 The Committee carefully evaluated the Forms 991 A & B of each applicant against the qualification statement on the Vacancy Announcement.
The individuals considered as best meeting the position requirements in alphabetical order are:
Barbara BieberGeorge MooseJohn Wilcox.

Defendants' Exhibit 6 (Review Committee's Memorandum of Oct. 4, 1989).

The Review Committee's Memorandum is silent as to whether it conducted interviews, although it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01319-RMC    Document 39-14    Filed 09/28/2007    Page 12 of 19

Not Reported in F.Supp.                                                                                              Page 3
Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

implies that the basis for the recommendations involved only a record review. Dempsey testified at trial that he did not conduct any personal interviews before he made his selection. On or about December 28, 1989, Dempsey advised Bieber that she had not been selected, *see* Plaintiff's Exhibit 4, and he confirmed USPS's offer to Wilcox. *See* Plaintiff's Exhibit 5.

Dempsey testified at trial that he selected Wilcox because he believed that Wilcox was best qualified. At the time Dempsey selected him, Wilcox held the grade of EAS-24 in the Network Analysis and Requirements Division, and he had been supervised by Dempsey since November of 1987. Dempsey offered three principal reasons to justify his selection. First, Dempsey testified that Wilcox had more experience than Bieber. In contrast to Bieber's managerial experience of less than one year, Wilcox had over six. *Compare* Defendants' Exhibit 7 (Bieber's Form 991) *with* Defendants' Exhibit 8 (Wilcox's Form 991). Dempsey also testified that he believed that Wilcox's managerial experience was qualitatively better because it had been gained through permanent positions whereas Bieber's was obtained through temporary details. Moreover, Wilcox had significant experience with mail transportation in Alaska-experience that would be directly relevant to the EAS-25 position. Second, based upon both his personal observations and feedback from others, Dempsey testified that he concluded Wilcox's "interpersonal skills" were better than Bieber's. These skills were critical to the EAS-25 position, which involved regular contact with transportation industry representatives, congressional staff and other government agencies. Third, Dempsey testified that he had confidence in Wilcox, because Wilcox had acted on behalf of Dempsey when he was absent from the office.

Considerable evidence was introduced at trial that Wilcox had better interpersonal skills than Bieber. While Dempsey had received only positive comments regarding Wilcox's abilities to deal with others, he had received complaints from USPS employees regarding Bieber's interpersonal skills. Two employees who complained were Robert Richter and Mike Farrell, both of whom testified at trial. Richter, who retired from USPS after 31 years (most of which was spent in the Central Region), worked with Bieber on various projects, including 1989 Christmas Planning. He had also worked with Wilcox. While Richter found Bieber difficult to work with and unresponsive to his region's needs, he reported no such problems with Wilcox. Similarly, Farrell, a 34-year USPS veteran assigned to the Northeast Region, complained that Bieber was rigid and inflexible while he found Wilcox to be cooperative and helpful.

*4 One of Bieber's previous supervisors, Paul Seehaver, also described Bieber's tendency to be abrupt and abrasive. Seehaver, who supervised Bieber for five years in the mid-1980s, stated that she was not capable of engendering cooperation with other employees. Seehaver testified that in 1986, during a merit review, he advised her that her technical skills were good, but that she needed to work on her interpersonal skills. He also recommended that she take certain management classes which included segments on improving personal relations with employees. With the exception of a letter to Judy Carmine, who was Bieber's supervisor prior to Dempsey, Seehaver did not document Bieber's lack of interpersonal skills. Seehaver testified that he would recommend Bieber for other positions, but he was reluctant to document her interpersonal skill deficiencies " because it would stay with her forever." Although he lacked specific recollection, Seehaver believed that he had spoken with Dempsey regarding Bieber's abilities.

The defendants also offered the testimony of Bieber's co-worker George Moose, who sat near Bieber in the office. Moose and Bieber were first supervised by Judy Carmine and then, after she left, by Dempsey. Moose had also worked with Wilcox, and he testified to the marked differences in Wilcox's and Bieber's interpersonal styles. While Moose found Wilcox easy to approach, he felt Bieber was defensive, abrupt and abrasive.

At trial, Bieber herself admitted that she could be difficult to get along with. This testimony was consistent with her statement to the agency EEO counselor:
I will stipulate that I have the ability to annoy, that I

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                               Page 4
Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

have difficulty being tolerant with stupidity and that on occasion I am short-tempered-but isn't everyone?

Plaintiff's Exhibit 19.

Challenging Dempsey's stated reasons for his decision to select Wilcox, Bieber offered evidence from two witnesses who worked with her while she was detailed to Arlington and Philadelphia. Gail Stollenwork, who worked directly with Bieber on several real estate projects, testified that Bieber was a good listener and got along well with both employees and USPS customers. Important to Stollenwork was Bieber's ability to defuse tensions regarding a historical easement involving property owned by residents of the Arlington Colony residential area. Stollenwork testified that, based upon her observations, Bieber displayed a cooperative approach with employees, local government officials and USPS customers. Similarly, Lawrence Lum worked with Bieber in Arlington and testified at trial that while she was quiet and mild-mannered, she was not abrasive. On cross-examination, however, Lum admitted that he had never communicated these observations to Dempsey, and Stollenwork conceded that she had never spoken with Dempsey before he made his selection decision in 1989.

Bieber introduced other evidence to support her argument that Dempsey's stated reasons were not the real reasons for his selection decision. Among other things, she offered her 1987, 1988 and 1989 performance evaluations, which were barren of any negative comments regarding interpersonal skill deficiencies. *See* Plaintiff's Exhibits 7, 8 & 15. Bieber also introduced a series of 1989 documents in which Dempsey recommended her "without reservation" for other EAS-25 positions. *See* Plaintiff's Exhibits 9, 10, 11, 12, 13 & 14. And, finally, she offered a June 1989 Meritorious Service Honor Award that she received from USPS, *see* Plaintiff's Exhibit 24, and a 1987 letter from the Regional Postmaster General of the Central Region complimenting her presentation on Express Mail. *See* Plaintiff's Exhibit 26.

*5 At trial, Bieber argued that Dempsey's statements regarding her interpersonal skills were fictitious, because the alleged deficiencies were never documented in her performance evaluations. USPS regulations require annual performance reviews, but unless the employee's performance is rated as unacceptable,[FN2] the regulations do not require affirmatively documenting those areas in which an employee should improve. *Compare* Plaintiff's Exhibit 1, at ¶ VI-B-4 (USPS Management Instruction, EAS Performance Evaluation Program (Sept. 28, 1985) ("The evaluator *should* discuss with the employee results of the employee's objectives, how well they were accomplished, and how well normal or routine responsibilities were performed."(emphasis added)) *with id.* ¶ X-A ("When the overall evaluation indicates that performance was unacceptable, a formal performance improvement plan *must* be written.... The performance improvement plan *must* include a specification of the deficiencies that led to the rating of unacceptable performance, corrective steps which must be taken to remedy the deficiencies, and the time frame for accomplishing these steps."(emphasis added)). Because the evaluations that Bieber introduced into evidence indicated that her performance had been rated as " very good," the second highest of the five possible categories, formal documentation regarding her interpersonal skills was not required even though performance feedback should have been provided.

   FN2. USPS regulations define unacceptable as: "Work results repeatedly *do not meet* minimum expectations in one or more key areas. 'Unacceptable' describes inadequate, incomplete, incorrect, or untimely work results that hamper or adversely affect the unit's effectiveness." Plaintiff's Exhibit 1, at - IV-D-5 (emphasis in original).

Although no deficiencies were formally documented, evidence was introduced at trial that, in November of 1989, Bieber had been counseled informally by Dempsey and James Orlando, Manager of the Department of Transportation, regarding her interpersonal skills. Additionally, one of Bieber's previous supervisors, Paul Seehaver, had written a letter to Judy Carmine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

stating that Bieber needed to improve in the area of interpersonal skills. Dempsey conceded that he did not formally document Bieber's deficiencies, but stated that he did not do so because he did not want to hurt her chances for promotion. Similarly, Dempsey testified that he recommended her for other positions "without reservation," because to do otherwise would block any possibility of advancement within USPS.

Bieber also introduced evidence that Dempsey failed to follow USPS regulations in making his selection for the EAS-25 position. USPS regulations require either the selecting official or the review committee to interview the candidates. The evidence introduced at trial was equivocal. Dempsey testified that he did not interview the three candidates, because he believed that the Review Committee had done so. In his letter to Bieber, Dempsey stated that "the qualifications of each candidate interviewed were carefully evaluated." *See* Plaintiff's Exhibit 4. Despite this plain language, Bieber testified that she was not interviewed by Dempsey.[FN3] Wilcox and Moose also testified that they were not interviewed by Dempsey. While the Promotion Report prepared at Dempsey's direction stated that he had interviewed all three candidates, *see* Plaintiff's Exhibit 3, he testified at trial that the report was in error. This testimony was consistent with both his January 1990 statement to the EEO counselor and a prior deposition. *See* Plaintiff's Exhibits 19 & 33.

> FN3. While Bieber testified that she was not interviewed, she contended that Dempsey interviewed Wilcox. However, like Bieber, Wilcox denied that he had been interviewed by Dempsey and there is no persuasive evidence to indicate otherwise.

*6 The record is also equivocal as to whether the Review Committee conducted the required interviews. Again, Bieber testified that she had not been interviewed by the Review Committee. Wilcox and Moose could not recall if they had been interviewed by the Committee, but the Committee's memorandum affirmatively reflects only a record review. Although committee member Richter had previously testified at a deposition that he was not sure whether the Review Committee had conducted interviews, he testified differently at trial, stating that it had interviewed all three of the qualified candidates. The Court finds it unlikely that the required interviews were ever conducted.

**II. Conclusions of Law**

Bieber's case is based on two theories of discrimination: She alleges that she was treated disparately on the basis of sex when she was not selected for the EAS-25 position in December of 1989; and she avers that her December 1989 nonselection was in retaliation for filing an administrative complaint of discrimination when she was not selected for a position in June of 1989. At trial, Bieber failed to carry her burden of persuasion.

*A. Disparate treatment*

To analyze Title VII claims, the Supreme Court has established a three-step process. First, Bieber must establish a *prima facie* case of disparate treatment. *McDonnell Douglas v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-25 (1973); *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093-94 (1981). Once she meets this initial burden, a presumption of wrongful discrimination arises, *see United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481 (1983), and the burden then shifts to the employer to "articulate some legitimate, non-discriminatory reason" for the challenged action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *see also Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095-96. The burden on the employer is merely one of production, because "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747 (1993) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). If the defendants carry their burden of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01319-RMC    Document 39-14    Filed 09/28/2007    Page 15 of 19

Not Reported in F.Supp.                                                                                                       Page 6
Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

production, the burden shifts back to Bieber to prove by a preponderance of the evidence that the reasons offered by Dempsey were not the true reasons for her nonselection, but were instead a pretext for discrimination. *Burdine,* 450 U.S. at 252-53, 101 S.Ct. at 1093.

Bieber has simply failed to prove her case. While the defendants dispute whether Bieber established a *prima facie* case of disparate treatment discrimination, whether she did so is no longer relevant once the case has been fully tried on the merits. *Aikens,* 460 U.S. at 714-15, 103 S.Ct. at 1482-82; *Mitchell v. Baldridge,* 759 F.2d 80, 83 (D.C.Cir.1985). Nevertheless, Bieber's claim fails because she did not prove discrimination by a preponderance of the evidence. The defendants have presented persuasive evidence that Dempsey selected Wilcox because he believed that Wilcox was better qualified than either Bieber or Moose, and Bieber did not show that the stated reason was false. *See Aikens,* 460 U.S. at 714-15, 103 S.Ct. at 1481-82; *Mitchell v. Baldridge,* 759 F.2d at 83.

*7 To fill the EAS-25 position, Dempsey sought a person who not only had a broad background in mail distribution systems and operations, but he was looking for someone who had an "[a]bility to organize, coordinate and lead working groups of professionals with diversified levels and background." Defendants' Exhibit 5. Because the selectee would have "regular contact with transportation industry representatives, major mailers, customers, and suppliers, [and would] serve[ ] as [the] primary contact with other governmental agencies (FAA, DOT)," Dempsey reasonably believed that the selectee should have good communication and interpersonal skills. Dempsey explained that the position involved mail transportation in the State of Alaska, a subject that was the source of frequent congressional inquiries. Consequently, Dempsey was looking for someone who was skilled in dealing with conflict and engendering cooperation among persons with different views. At trial, the plaintiff conceded that a position at the EAS-25 level required effective interpersonal skills, which she defined as an ability to communicate and exchange information in a civil manner rather than being antagonistic and argumentative.[FN4] Dempsey's quest to find an individual with effective interpersonal skills was not, therefore, an unreasonable one, even though the words "interpersonal skills" were not expressly included in the Vacancy Announcement.

> FN4. Despite this admission, Bieber contends that Dempsey exploited subjective criteria to hide a discriminatory decision. Courts carefully examine decisions based on subjective criteria for evidence of pretext, but reliance upon subjective criteria is often unavoidable in selections for management positions that require skills, such as interpersonal skills, that are not easily quantified.

In Dempsey's judgment, Wilcox was better qualified than Bieber, and the defendants offered ample evidence at trial to support his decision. First, Wilcox had more managerial experience, a fact that Bieber did not dispute. Dempsey's belief that Wilcox's experience was qualitatively better than Bieber's is not an unreasonable one, since the basis of Wilcox's experience involved six years in permanent positions whereas the basis for Bieber's involved approximately fifteen months in two temporary details.

Dempsey's second reason, which generally involved a comparison of Wilcox's and Bieber's interpersonal skills, became the primary battleground at trial. Dempsey developed his views through personal observations and from the reports of others. Some of those individuals testified, painting a picture of the plaintiff as a person who was technically competent, but who could be, and frequently was, abrupt, rigid and inflexible when dealing with others. At trial, Bieber corroborated this testimony, conceding that she told an EEO counselor that she could annoy people, possessed a short temper and was intolerant at times. *See* Plaintiff's Exhibit 5. While Bieber attributed these characteristics to everyone, she failed to offer any evidence that Wilcox exhibited similar traits. In fact, the evidence regarding Wilcox was to the contrary.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 7

Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

To counter the testimony of Dempsey, Seehaver, Moose, Farrell and Richter, Bieber did offer two witnesses who knew her while she was on detail and who testified favorably regarding her interpersonal skills. Specifically, Stollenwork testified that Bieber got along well with others, and Lum testified that Bieber was not abrasive. However, neither witness communicated their views to Dempsey prior to his December 1989 decision. Even if they had, their testimonial endorsements were not overwhelming at trial. Moreover, the breadth of their personal observations is subject to some doubt. Not subject to doubt, however, is the fact that Bieber failed to call even one witness from the Network Analysis and Requirements Division or from any field office with whom she had worked while serving as an EAS-23 in that division.

*8 Instead, Bieber argues that USPS's failure to document her interpersonal skill deficiencies, in the face of good performance evaluations and strong job recommendations, demonstrates that Dempsey's stated reasons are fictitious. An agency that fails to document adequately and accurately the performance of an employee could pay a heavy price when it takes an adverse action against that employee. Based on the facts of this case, however, the lack of formal documentation regarding Bieber's interpersonal skills does not demonstrate that Dempsey's decision masked discriminatory animus.

The defendants did not dispute that Bieber's evaluations lacked any mention of her deficient interpersonal skills. Rather, they introduced evidence at trial that she was counseled informally, including a session just prior to Dempsey's decision to select Wilcox in December of 1989. Additionally, Seehaver had mentioned Bieber's interpersonal skills in a letter to Judy Carmine-the supervisor who immediately preceded Dempsey. Seehaver recommended to Bieber that she enroll in management courses, which, in part, included segments involving communication skills. Although the informal counseling that was provided to Bieber in November of 1989 by Dempsey and James Orlando was less than artful ("Barbara, you need to shovel more bullshit."), she testified that she understood this to mean that she needed to engage in more social chit-chat (to "schmooze") around the office. Dempsey also testified credibly that, while Bieber's interpersonal skills were lacking, the ramifications of documenting her deficiencies-blocking any future advancement with USPS-was unjustified. Seehaver testified similarly.

The evidence introduced by both sides indicates that Bieber was a highly competent career employee, whose technical abilities commanded good evaluations and highly favorable job recommendations. The fact that Bieber received good evaluations and strong recommendations is probably one of the reasons that the Review Committee recommended her to Dempsey in the first place. However, those evaluations and recommendations do not show pretext merely because Dempsey's decisional balance tilted towards Wilcox. The Court rejects as speculative Bieber's argument that Dempsey was more than happy to recommend her without reservation for positions outside of his division while rejecting her for the only position inside his division.

The plaintiff also challenges the basis for Dempsey's personal observations, contending that he lacked an adequate opportunity to observe her interactions with others. However, at trial Dempsey testified that he relied not only upon his own observations, but upon feedback from others. Such reliance is reasonable. Even assuming *arguendo* that Dempsey's personal observations during the eighteen-month period during which he supervised Bieber were limited by the position of his desk, his travels and her details to Arlington and Philadelphia, the third-party communications that he was provided sufficiently corroborated his "limited" experience.

*9 Bieber raises other arguments that are also rejected. First, she contends that the failure to follow USPS regulations which require candidates to be interviewed demonstrates that Dempsey preselected Wilcox and discriminated against her on the basis of sex. The agency's relaxed attitude regarding its selection regulations is troubling, but Bieber's challenge fails nevertheless, because the failure to follow an agency's regulations does not necessarily mean that the resulting decision

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 8
Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

evidences preselection that was based on discriminatory animus. *See, e.g., Goostree v. State of Tennessee,* 795 F.2d 854, 861-62 (6th Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1374 (1987); *Sanchez v. Texas Comm'n on Alcoholism,* 660 F.2d 658, 662 (5th Cir.1981).

Second, Bieber argues that she has been the victim of impermissible sexual stereotyping in that males displaying similar interpersonal skills were treated more favorably. The primary flaw in this argument is simply that the facts of this case do not indicate that Wilcox displayed traits similar to Bieber's.
The Court is clearly sensitive to the unfairness that persons face when they have been impermissibly sexually stereotyped. *See Hopkins v. Price Waterhouse,* 825 F.2d 458, 465-68 (D.C.Cir.1987) (Joyce Hens Green, J., maj. op.). In *Price Waterhouse,* the Court of Appeals affirmed the trial judge's finding of impermissible sexual stereotyping where the plaintiff offered extensive evidence of comments made about her by the firm's partners, expert testimony regarding sexual stereotyping at the firm, and similar comments made about other women at the firm in previous years. *Id.* at 465.
The Supreme Court agreed. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 256, 109 S.Ct. 1775, 1793 (1989). A number of the complaints involved Plaintiff Hopkins's interpersonal skills and "were couched in terms of her sex." *Id.* at 463. The partnership evaluations suggested that she take a " course at charm school" and "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled and wear jewelry." *Id.* She was criticized for being macho and for using profane language, even though the language used by many male partners was considered to be worse. Similar sexist comments about other women at the firm were introduced into evidence at trial. Additionally, the plaintiff offered the testimony of an expert who evaluated the flood of written comments, concluding that the plaintiff was a victim of sexual stereotyping at the firm. *Id.* at 467.

While Plaintiff Bieber may not be required to introduce the same quantum of evidence as Plaintiff Hopkins in *Price Waterhouse* to meet her burden, Bieber's evidentiary showing here is nevertheless insufficient. At most, Bieber has shown that some males may have had traits similar to hers. While claiming that the criticism of her interpersonal skills constitutes a practice of impermissible sexual stereotyping, Bieber has offered scant evidence of such a practice, unlike the extensive evidence introduced in *Price Waterhouse.* Moreover, she has not shown that the males with similar characteristics were treated differently, and there is simply no evidence that Wilcox displayed similar traits. No evidence was offered to indicate that Bieber's supervisors suggested that she fix her flawed interpersonal skills by wearing a "soft-hued suit or a new shade of lipstick." 490 U.S. at 256, 109 S.Ct. at 1793. Here, Dempsey sought a person with the skills necessary to engender cooperation and deal effectively with others, within and outside of the Postal Service. The evidence showed that Bieber (including through her own admission) could be annoying, intolerant of others and short-tempered. As such, she has not demonstrated that it was her gender, rather than her interpersonal skills, that truly mattered to Dempsey.

*10 Third, Bieber challenges Dempsey's statement that he had confidence in Wilcox's abilities, because Wilcox frequently ran the office in Dempsey's absence. Bieber argues that Dempsey's decision to select Wilcox as acting manager, instead of her, was based on sex. However, the evidence at trial showed something different. Dempsey simply relied upon the employees' pay grades: if he was out of the office, the EAS-25 employee (who previously held the position Wilcox and Bieber sought) would act on Dempsey's behalf; if the EAS-25 employee was also absent, the EAS-24 employee (Wilcox) would serve as acting manager; and, if both the EAS-25 and Wilcox were not available, Dempsey would assign one of the EAS-23 employees. While this arrangement operated to provide Wilcox with more opportunities than Bieber, these opportunities were a function of his seniority, not his gender. Bieber testified that Dempsey assigned her to be the acting office manager only once, but she offered no evidence regarding the frequency with which the other (presumably male) EAS-23 level employees were assigned to act in Dempsey's absence. Dempsey's paradigm necessarily limited the opportunities for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 9
Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

all of the EAS-23 level employees, yet Bieber simply did not demonstrate that her opportunities were limited because of her sex.

Finally, the general statistical evidence offered by Bieber to show a disparity in the promotion rates for men and women at USPS is of limited probative value, if any at all, in a disparate treatment case involving a challenge to a selection decision by a specific individual. The plaintiff offered a statistical report by an EEO investigator providing a breakdown of employees by gender and grade in the Office of Transportation, *see* Plaintiff's Exhibit 19, and a report to Congress setting forth the USPS work force profile by sex and grade level for fiscal years 1989 and 1990. *See* Plaintiff's Exhibit 29. However, this broad proffer requires the Court to assume too much, and it is clearly inadequate to show that Dempsey's decision was based on sex. *See Whitacre v. Davey,* 890 F.2d 1168, 1172 (D.C.Cir.1989), *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3301 (1990); *Metrocare v. Washington Metropolitan Area Transit Authority,* 679 F.2d 922, 930 (D.C.Cir.1982).

Bieber has not demonstrated that Dempsey's stated reasons were but a pretext for discrimination. To prevail, Bieber was required to prove discriminatory animus-not merely that she was the better candidate or that Dempsey misjudged her qualifications. Similarly, the Court's role is not to second-guess Dempsey's selection decision, but to decide whether his decision was made on a discriminatory basis. *See, e.g., Milton v. Weinberger,* 696 F.2d 94, 100 (D.C.Cir.1982); *see also Holder v. City of Raleigh,* 867 F.2d 823, 828 (4th Cir.1989). In this case, Bieber has not demonstrated that Dempsey's decision was based on gender animus. Dempsey's stated reasons are objectively reasonable, and they are supported by credible and persuasive evidence. Bieber has simply not shown that those reasons were false or offered to mask discrimination.

### B. *Retaliation*

\*11 Bieber also alleged that Dempsey's decision to select Wilcox, instead of her, was in retaliation for the administrative complaint that she filed in July of 1989 for a position vacancy announced the previous month. Title VII broadly protects individuals from retaliation that arises from engaging in certain activities, such as the filing of a discrimination complaint. 42 U.S.C. § 2000e-3; *see Barnes v. Small,* 840 F.2d 972, 976 (D.C.Cir.1988). To succeed, Bieber must show that she engaged in activity protected under Title VII, that USPS knew of such activity, that USPS took an adverse employment action and that a causal connection exists between the protected activity and the adverse action. *See Mitchell v. Baldridge,* 759 F.2d at 86; *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984).

In this case, the defendants concede that Bieber engaged in an activity that was statutorily protected under Title VII when she filed a complaint of discrimination (later withdrawn) in July of 1989. The defendants do not contend that they were unaware of the complaint. Nor do they dispute that Dempsey's decision constitutes an adverse personnel action. The only issue is the causal connection, and Bieber has offered nothing but speculation to link her nonselection to her July 1989 administrative complaint. She admits that the earlier complaint was not based on actions taken or decisions made by Dempsey. She has not claimed that he was involved in any way in the facts underlying the July 1989 complaint or that he made sexist comments in the past. Nor has she shown that Dempsey's decisions to assign others to act as division manager on his behalf were based on retaliation. As explained above, the evidence indicates that such decisions were made based on pay grade, not gender. The same analysis applies to her retaliation claim.

Absent evidence from which an inference of a causal connection can be drawn, Bieber cannot establish a *prima facie* case of retaliation let alone prove retaliation by a preponderance of the evidence. Because she has not demonstrated a nexus between the July 1989 administrative complaint and the December 1989 adverse personnel action, Bieber has failed to carry her burden of proof.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 10

Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

### III. Conclusion

Barbara Bieber's record is one of a highly competent, dedicated career employee of the United States Postal Service. She advanced during her 23-year career from a position as a part-time window clerk in Big Bear City, California to a Senior Transportation Specialist in Washington, D.C. She is now retired and it is unfortunate indeed for both her and the Postal Service that the final chapter of her career ended in allegations and denials of discrimination. But, Ms. Bieber did not carry her burden at trial to prove discrimination by a preponderance of the evidence. In accordance with the Findings of Fact and Conclusions of Law set forth above, judgment shall be entered this date in favor of the defendants.

**\*12** IT IS SO ORDERED.

### *JUDGMENT*

In accordance with the Memorandum Opinion and Order issued this date, judgment is hereby entered in favor of the defendants and against the plaintiff, Barbara Bieber.

IT IS SO ORDERED.

D.D.C.,1996.
Bieber v. Runyon
Not Reported in F.Supp., 1996 WL 525372 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.