## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | | |
|---|---|---|
| JAMES MASON | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.:06-1319 (RMC) |
| | ) | |
| v. | ) | |
| | ) | |
| DAVITA INC. | ) | |
| | ) | |
| | ) | Jury Trial Demand |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNT II OF THE SECOND AMENDED COMPLAINT

Comes now Plaintiff James Mason, by and through counsel, and files Plaintiff's Opposition to Defendant's Motion for Summary Judgment, and in support thereof states as follows.

Introduction

Defendant DaVita has filed a motion for summary judgment on Plaintiff's claims of retaliation arising from his non selection for a position in March 2006 and withdrawing a job offer in February 2007. The record is crowded with the facts but also includes evidence created by DaVita's counsel and many arguments from Defendant's counsel which appear to be post litigation justifications for the actions taken by the Defendant. For example, Defendant's counsel created and offers into evidence a patient census chart that Defendant's counsel created, when there is no evidence that DaVita ever utilized a patient census chart in making any decisions. Defendant's counsel also offers an affidavit from a George Washington hospital staff person, Hullick, who had no involvement whatsoever in the case, and other witnesses, such as Joshua Golomb and

Onwummni Oloyede, have offered post litigation justifications for their actions which are incredible and were not provided at the time of the events in this case.

Defendant is not entitled to summary judgment on the retaliation claim arising from the March 2006 selection because Mr. Mason has established a prima facie case of retaliation and DaVita has not produced a legitimate non-discriminatory reason for its failure to advance Mr. Mason's application in March 2006.  In filling PSR positions, DaVita failed to develop and follow consistent screening and selection procedures, but rather left the screening and hiring decisions to the subjective whims of its Caucasian managers, who were untrained in proper hiring procedures.  Ex. C:19-20.   The decision not to advance Mr. Mason's application for the PSR position was a violation of the DCHRA because it involved discrimination in the District of Columbia and was based on totally subjective reasons by an individual who was biased against Mr. Mason.  The Circuit Court of Appeals has cautioned against relying upon such individuals.  See Aka v. Washington Hospital Center, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (while "employers may of course take subjective considerations into account in their employment decisions, courts traditionally treat explanations that rely heavily on subjective conditions with caution").  The individual who required Mr. Mason to undergo a second telephone interview, Joshua Golomb, DaVita's Rx Director, did not document any specific concerns about Mr. Mason's response to the interview questions, and described Mr. Mason's performance as "solid overall."  Golomb conducted the interview from a Dunkin Donuts parking lot, Ex. L:102:14-16, on his cell phone and did not take any notes from his interview with Mr. Mason, Id. at 102: 5-12, even though he had a note pad in his vehicle. He claims he had concerns about Mr. Mason's response to one question--how Mr. Mason

would sell the service to co-workers (teammates) and physicians, and Mr. Mason

"voiced" concern about travel.  Golomb has now recanted the statement that Mr. Mason

had concerns about travel and now claims it was he-Golomb who was concerned because

Mr. Mason stated that he discussed the travel requirement with his family and they were

fine with the travel requirements.  Golomb's alleged concerns about how Mr. Mason

would sell the service to teammates and physicians is unfounded since: 1) Golomb did

not remember Mr. Mason's specific response to the question; 2) Mr. Mason responded

that he would attempt to convince teammates that there may be a financial incentive if the

program was successful; and 3) Mr. Mason emphasized that he would tell doctors that the

program was good for their patients. Id. at 103: 16-19.   For these flimsy, subjective

reasons, Golomb refused to advance Mr. Mason's application.

DaVita has not presented a legitimate non-discriminatory reason for not

advancing Mr. Mason's application, and Mr. Mason has demonstrated that the reasons

offered are false or unworthy of belief.

Concerning the revocation of the offer of employment for a position on an as

needed basis at the George Washington facility, DaVita is not entitled to summary

judgment because: 1) the facility administrator invited Mr. Mason in for an interview; 2)

the facility administrator offered to employ Mr. Mason on an as needed basis, which

would have resulted in additional compensation for Mr. Mason, and introduced Mr.

Mason to three staff members and three patients as the new technician; 3) DaVita paid for

Mr. Mason to receive the health screening, a procedure which is not done until an

individual is hired; 4) the facility administrator advised Mr. Mason that the only

remaining item was to inform the Regional Administrator that Mr. Mason had been hired;

and 5) the offer was withdrawn after the facility administrator spoke to the regional

administrator, who was aware of Mr. Mason's complaint,  about hiring Mr. Mason.  Ex.

H: 23-43.

Although DaVita claims it did not use any PCT services at the George

Washington facility, it is not disputed that George Washington scheduled employees on

an as needed or PRN basis since November 2006, Ex. I, and Mr. Mason was told he

would be used as an acute technician and because of his education and experience he

could be used on the hospital floor.

While DaVita contends there was no work for an additional PCT at the George

Washington facilitiy, the records demonstrate that the practice was to staff each day with

one PCT and two nurses, and when the PCT was not at work, the records confirm that

DaVita staffed the facility with two to three RNs.  Ex. I.

DaVita claims that the work arrangement that Mr. Mason was denied was a lateral

transfer with no change in benefits, but this assertion is disputed because DaVita's policy

was that if an employee worked at another facility, he would receive additional

compensation.  Further, Mr. Mason's facility often cut his hours, so working at the other

facility would allow him to work a full time schedule and gain additional compensation.

DaVita asserts that Mr. Mason cannot make out the requirement that he applied

for an available job.  To establish his retaliation claim, Mr. Mason is not required to show

that he applied for an available job, but only that he was subjected to action that would

dissuade an employee from pursing an EEO claim.  Here, he has established that after he

filed his EEO complaint and while that complaint was being litigated, his employer

refused to consider him for employment.  Refusing to consider an outstanding employee for available work is the type of action that would be considered retaliation.

DaVita claims that there is no causal connection between this lawsuit and DaVita's failure to use Mr. Mason's services because the DaVita employees, Jurd and Oloyede had nothing to do with the prior lawsuit and Oloyede was not aware of the prior lawsuit, and there was a seven month period between the protected activity and the retaliation.  The evidence, construed in the light most favorable to Mr. Mason is that he was offered a position at the George Washington facility until Oloyede spoke to Jurd, and then the offer was revoked.   Mr. Mason was introduced to three staff members and three patients as the "new" employee; was told he would be placed on the schedule in January 2007; DaVita paid for his health screening, a process which was only done after employees were hired.  According to Mr. Mason, Jurd, who assumed the regional administrator duties at his facility in 2006, appeared at the facility on many occasions after he filed his lawsuit and would speak to all other employees, including employees who were standing next to Mr. Mason, and not acknowledge or speak to Mr. Mason and would simply ignore him.

There is a sufficient basis to conclude that Mr. Mason was offered a PRN position at the George Washington facility and that offer was revoked when Oloyede spoke to Jurd and informed her that she had hired Mr. Mason for a PRN position at her facility.

**Statement of the Facts**

1.      Mr. Mason, an African American male, is an eleven year employee of Davita in Washington, D.C., where he has worked for a number of dialysis centers as a Patient Care Therapist (PCT).  Ex. A:1 (paragraph).  He normally works 12 to 15 hours shifts

three days a week.  Mr. Mason spends almost all of his time providing treatment to

patients, attending to their needs, and  performing dialysis training and patient education.

Throughout his employment with Davita, Mr. Mason has been an excellent employee,

and has received the highest award at DaVita, the Shining Star, for being the overall best

patient care therapist. Id.  Mr. Mason was asked to teach new staff and fellows as well as

patients, and served as the vascular access coordinator.  He received the Shining Star

Award on two occasions and the Monitoring Award on two occasions.  Mr. Mason was

nominated by the facility administrator to attend industry meetings, and requested to

assist in recruiting patients for dialysis related treatment.  Id. Mr. Mason and the medical

director of his facility produced a three to five minute company commercial on dialysis

treatment, and Mr. Mason was requested to speak to a U.S. Congressman and staff on the

importance of dialysis treatment.    Ex. H:2.

2.       In September/October 2005, Davita Rx/Star Rx, a subsidiary of DaVita,

announced that it was seeking to hire individuals for pharmacy services representative

(PSR) positions to sell medication to dialysis patients of Davita.  Ex. E:001; 814-17.

Davita specifically sought individuals who were working for Davita as patient care

technicians.  Id.  The individuals selected would have to be available for reassignment

anywhere in the United States.   Id; 833.  A company document announcing the position

stated:  "Do you know of an outstanding PCT [Patient Care Technician] within your area

that would love a new and exciting career development opportunity within DaVita?  We

have positions available for Pharmacy Services Representative across the country!  . . .

S/he also needs to be willing to travel extensively, as the Star Rx roll-out process requires

being on-site in dialysis facilities.  Id.  Our current PSR's travel 75% of the time."  Id.

3.      Earlier in March 2005, Kim Easlon wrote to Laura Mildenberger and stated:  "I am hiring new pharmacy service representatives for Star Rx.  Ex. E:827.  We were looking at Pharmacy Techs for the position, but my gut tells me that PCTs from within the company would do a great job.  Id.  They know dialysis, then know how to approach the patients, they know about problems patients have with their prescriptions and pharmacies."  Id.   Eighty percent of the PSR job was sitting chairside with patients.  The position also required the PSR to interact with doctors and facility administrators, and staff members.   The pharmacy services representative position had income potential of almost twice Mr. Mason's approximate $35,000 per year income.   Ex. A:3; E:814-817.

4.      Mr. Mason worked at a facility with Christopher Jones, a Caucasian male, who was the office administrative assistant.  Ex. E:10-12.  Jones was given a position announcement for the PSR position by the facility administrator, Gerri McGowen, a Caucasian female, and Jones gave the position announcement to the other staff members who were mostly minorities.  Ex. D 46-49.  Jones had no experience as a patient care technician in dialysis treatment or education.  Ex. E:10-12.  His "sales" experience was limited to working in the men's department of a department store for a few months over the holidays, working as a clerk in a coffee show, and filling in as needed to show residences to prospective residents and families at an assisted care facility when the marketing people were not available. Ex. D:38-41.

5.      At least three other minorities from Washington, D.C. applied for the PSR positions, including two other PCT's and an administrative assistant, and none were offered an interview other than Mr. Mason.   Ex. A:5.

6.      There was no written policy at DaVita Rx on how individuals were to be screened for positions.  The practice which was followed was that after an application was received, Kim Easlon conducted an initial screening and selected some individuals for a telephone interview, and if that went well, for an in-person interview with the regional manager, and a final in-person interview in California with a panel.

7.      Mr. Mason was selected for a telephone interview by Kim Easlon. Mr. Mason was called at work while he was on the floor attending to patients. Ex. A:7.  Easlon requested that he conduct the telephone interview immediately, even though her normal practice was to call and schedule telephone interviews later.  Id.  He reluctantly agreed to the telephone interview and had to leave his patients to conduct the interview.  Id.  At the conclusion of the telephone interview, Easlon requested that Mr. Mason come to Richmond in a few days for an in person interview.   Id.  Mr. Mason could not travel to Richmond on the day requested because he was scheduled to work a fifteen hour shift. Id.   He was assured that this was not an issue and he would be rescheduled for an in person interview the first week of January 2006.  Id.  Mr. Mason was not concerned about rescheduling the interview because he knew that DaVita Rx was attempting to fill several positions around the country.  Id.  Had he been informed that he would be excluded from positions in the future, he would have made the extraordinary request to take off work to go to Richmond for the in-person interview.  Id.

8.       Jones traveled to Richmond for his in-person interview and was offered an in-person interview in California, and later hired as a PSR.  Mr. Jones was previously employed as an administrative assistant making $11/hour, but after his selection into the PCT position, he was paid $45,000 year and eligible for a bonus equal to 40% of his

salary.  Ex. D:64-65.  Since being hired, Mr. Jones has also been given additional duties as a trainer.  Ex. D:71-72.  Mr. Mason never received a call from Easlon to reschedule, and had to email her to follow up on the selection process.  Ex. A:8.

9.      Easlon did not contact Mr. Mason to schedule an in person interview the first week of January as she had previously agreed to do.  Ex. A:9.  On January 6, 2006, Mr. Mason received an email indicating the position he sought had been filled and he had not been selected.  DaVita Rx continued to advertise for position openings in Maryland, Philadelphia, Pennsylvania, and St. Louis, Missouri.  Ex. E:003-004.  Mr. Mason reported this information to his Caucasian co-worker, Jones, who had applied for a position at the same time as Mr. Mason.  Jones  was surprised to hear that the positions were filled because he knew that the individuals selected for the positions could not designate their geographical area and DaVita was still looking to fill positions on the East coast.  Ex. A:9.

10.      Mr. Mason filed an internal complaint with Davita alleging discrimination based on race in the hiring process.  An individual in the Davita human resources department interviewed Mr. Mason. Ex. A:10.  During the interview, Mr. Mason asked the human resources staff member if she could determine his ethnic origin based on his voice and his manner of speaking, and she said she could easily identify him as African American.  Id. The human resources employee discouraged Mr. Mason from pursuing a claim and suggested that Easlon may have assumed that Mr. Mason was not an employee of Davita. Id.  Mr. Mason rejected this excuse and decided to proceed with his internal EEO complaint.  Id.

11.     Mr. Mason was later contacted by Easlon's supervisor,  Joshua Golomb, after Golomb was notified of the EEO complaint against Easlon.  Before speaking to Easlon about her activities, Golomb concluded that Easlon had not discriminated against Mr. Mason.  Ex. E: 1464.

12.     Golomb informed Easlon of Mr. Mason's complaint.  Before Mr. Mason's second interview, Golomb solicited Easlon's opinion of  Mr. Mason.  Ex. B:151-153.  According the Golomb, Easlon's impression of Mr. Mason was that he was not as strong a candidate as other candidates.  Id.

13.     Golomb informed Mr. Mason that Davita was not pleased with Easlon's hiring practices and offered to interview Mr. Mason once again.  Ex. A:13.  Mr. Mason agreed to the second interview to give Davita an opportunity to correct a wrong.   Id.

14.     Even though applicants normally only had one telephone interview before an in person interview, Mr. Mason was required to participate in a second telephone interview before an in-person interview, even though he had previously advanced beyond the telephone interview.  During the interview Golomb told Mr. Mason that he performed well, was creative in his responses and knowledgeable.  Ex. A:14.

15.     After the second telephone interview, once again, Mr. Mason was denied an in-person interview.  Golomb informed Mr. Mason that he barely missed the cut off for selectees.  Ex. A:15.  On March 17, 2006, Golomb wrote an email explaining why he did not advance Mr. Mason in the interview process.  Ex. E:1477.  Golomb stated:  First, as per my discussion with Gail, I personally phone interviewed both James Mason and the other candidate James identified in his call.   James is solid overall.  Jeff was mediocre.

However, neither of them were as strong as other candidates we have been interviewing in terms of the following key areas:

> \* Understanding and experience of sales
>
> • Sales effectiveness (in role plays I did with them via phone)
>
> • Thoughtfulness about approach for working with Physicians
>
> \* Flexibility (both voiced some concerns about travel)

Ex. E:1477.

16.     At no point during or after the interview  did Golomb ask Mr. Mason about his sales experience.  Neither did he inform Mr. Mason that there was an issue with his understanding of sales or experience or sales effectiveness, and Mr. Mason never expressed any concerns about travel.  Ex. A:16.

17.     Mr. Mason communicated with other minority employees at Davita from Washington, D.C., including an African American and an individual of Philipino descent who applied for PSR positions.  Ex. A:17.  Neither was hired or even interviewed by Easlon.  Id.  The Philipino employee was interviewed by Golomb but received a telephone message Golomb with the same language he used in rejecting Mr. Mason for the position. Id.

18.     Prior to rejecting Mr. Mason as an applicant and selecting Jones, Davita specifically sought individuals with Mr. Mason's background, and Golomb specifically rejected an applicant because he had too much sales experience because he believed that "80%" of the job was related to sitting chair side with the patient to convince the patient to allow Davita to provide their non dialysis medications.  Ex. A 1475.

19.     Easlon indicated that she did not consider Mr. Mason for a PSR position because

he sent an email with grammatical errors.  Mr. Mason sent the email from his telephone

which accounts for some of the errors.  Both Kim Easlon and Joshua Golomb have sent

emails with grammatical and typographical errors.

Easlon sent the following email to Alex Dellon.

"He!y [sic] Alex:
 How is it going?  I hope you/re loving your new job.  I have decided that PCTs'
[sic] within the company might be great as PSRs.  It would be a great promotion for
them, [sic] they know dialysis, and they know how to deal with out patients.
I was wondering if you knew of anyone one [sic] that might fit within the
perameters [sic] of what I am looking for: [sic]
I need someone who is very outgoing and positive, someone who is very
organized and can manage themselves, plus, of course, they need to be willing to travel A
LOT!  We are currently asking our PSRs to travel three weeks out and one in.  They will
be home every weekend.  After about a year and a half, they will settle into territories
where the travel will be reduced substantially.
What do you think? Do you know of anyone who fits this mold?  I know everyone
knows down there, but you still need to keep this quiet.  Bill has told me that I can
contact Linda Lansing and Helen Como.  What do you think about them?  Trust their
judgement [sic]?"

Ex. E:825

Josh Golomb sent the following email.

"I wil[sic] mark it down [sic]

Let me know if there are any specific thigns [sic] you would like me to prove . . . if not,

I'll give my standard barrage of questions."  Ex. E 832.

20.     In 2006, Terrie Jurd, Caucasian female, became Mr. Mason's regional

administrator.  After Mr. Mason filed his lawsuit, Jurd frequently appeared at his work

place for monthly visits and on each occasion, she would speak to all employees except

Mr. Mason, even when Mr. Mason was present in the room with other employees, and

she intentionally ignored Mr. Mason.  Ex. H: 20.

21.     In October 2006, Mr. Mason called around to different dialysis facilities searching

for part-time work in acute dialysis.  In approximately 1995 and 1996, Mr. Mason

worked at the George Washington Hospital as an acute dialysis technician.  Id. at 21.

Acute dialysis treatment is performed is bedside when patients are too ill to be

transported to a dialysis center.  In his current position at DaVita's Georgetown on the

Potomac center, Mr. Mason performs chronic or ambulatory treatment, which means the

patient can come to the facility in wheelchair or walk.  Id.

22.     He called George Washington Hospital and spoke to the facility administrator,

Onowummi Oloyede.  Id. at 22. Oloyede answered the telephone and she identified

herself and engaged in small talk with Mr. Mason because she had worked with him

many years ago.  Id. She informed Mr. Mason that DaVita owned the facility at George

Washington.  Id.  Mr. Mason did not know this because when he previously worked at

George Washington, it was privately owned.  Id.

23.     Mr. Mason informed Oloyede that he was interested in working part-time work as

an acute dialysis technician now because his hours were being reduced, and maybe full

time at her facility later in the future.  Id. at 23. Oloyede responded that this was "great"

and she would need him to help the PCT and to cover for the PCT when she went on

vacation or took days off.  Id.  Oloyede explained that at the present, she had to get a

nurse to cover for the technician on her days off or get someone from another facility.  Id.

24.     Oloyede told Mr. Mason that she had some openings and she only had one

technician and DaVita was using nurses working from George Washington hospital to do

the acute dialysis and that it cost DaVita a lot of money.  Id. at 24.  According to

Oloyede, DaVita had to pay the hospital, and had a contract with George Washington

hospital and paid the nurses' salary and the contract rate, which was more than what they would have to pay him.  Id.

25.    Oloyede asked  Mr. Mason what was his current salary and he informed her that it was approximately $17/hour.  Id. at 25.  Oloyede stated that  they would talk further about his salary when he came to the office.  Id.

26.    Oloyede invited Mr. Mason to come to her job on his day off to meet with her. Id. at 26.   She stated she wanted him to meet the staff and see the machines and water treatment facility that would be used, and scheduled a time and date for the interview.  Id.

27.    Mr. Mason and Oloyede met at the agreed upon time for the interview in November 2006.  Id. at 27.   They initially met in her office.  During the interview, Oloyede explained how the facility was set up and where he would need to go to treat dialysis patients.  Id.  Mr. Mason stated to Oloyede that he worked at George Washington before and worked on acute patients in private rooms and worked on dialysis patients in emergency surgery.  Id.

28.    Oloyede state that because of Mr. Mason's education and experience and background, she would not have a problem with him dialyzing patients in their rooms and on the floor. Id. at 28.  Oloyede then made an appointment for Mr. Mason to complete his health screening by calling from her office, and she wrote down the date, time and telephone number of the George Washington health screening office.  Id. She later told him he needed to go to orientation at some time in the future, but he could start work before going to orientation.  Id.

29.    Oloyede and Mr. Mason then left her office and she showed him around the facility.  Id. at 29.  Near her office is a main suite where four patients can be dialyzed and

can be brought down from their room to the suite.  Id. Oloyede and Mr. Mason walked

into the room, and there were three patients in the room. Id.  The other PCT, Shanna

McGill, had papers on the other bed and was ordering supplies.  Id.  Oloyede introduced

Mr. Mason to Shanna McGill and said this is James Mason and he is going to be backup

for you and me.  Id.   Oloyede complained that she and McGill had to fix machines and

order supplies.  Id.  Oloyede stated that Mr. Mason would be present so she could take

more days off and would have vacation time.  Id.  Oloyede told McGill that Mr. Mason

would later come over full time.  Id.  McGill shook Mr. Mason's hand and said nice to

meet you and we could use the help.  Id.  Oloyede introduced Mr. Mason as the "new

technician" to three patients who were receiving treatment in beds at the facility.  Mr.

Mason went to the beds and shook their hands.  Id.  The patients included two male

patients and one female patient.  Id.  One of the patients asked Mr. Mason how long he

had worked in dialysis and Mr. Mason told him he had worked in dialysis 23 years. Id.

30.     After meeting the patients, Mr. Mason walked over to the machine in use, a

COBE Century Two machine.  Id. at 30.  Mr. Mason used to work with the COBE

machines and informed Oloyede that he did trouble shooting machine and knew how to

fix it and knew how to dialyze patients on the machine.  Id.

31.     Oloyede then announced that she wanted to show Mr. Mason the supply storage

room.  Id. at 31.  Oloyede took Mr. Mason to the storage room and he observed that there

were supplies on the floor and opened supplies and the supply room was generally a

mess.  Id.  Mr. Mason informed her that he could come in on a non work day and

organize the stock room, and find out what supplies needed to be ordered.  Oloyede

responded that this would be acceptable.  Id.

32.     While in the storage room, a Caucasian nurse came in to get supplies who worked for George Washington. Oloyede asked the nurse if she was working on a DaVita patient and she responded, "no."  Id. at 32.  This was a nurse that DaVita used to dialyze patients on the hospital floor. Id.  Oloyede again introduced Mr. Mason as the new technician to the nurse.   Id.  She said "[t]his is James, you will see him around, and he will be working on the floors and in this facility.  Id. He may need you to give medications that he cannot give by law."  Id.  The nurse shook Mr. Mason's  hand and said nice to meet you and said see you around.  Id.

33.     After the nurse left the area, Oloyede complained that the George Washington nurses wasted DaVita supplies by using the supplies on other hospital patients who were not DaVita patients.  Id. at 33.  She commented that the supplies that were being taken were very expensive, and once Mr. Mason was working, hopefully this would put an end to this practice.  Id.  Oloyede also stated that she had a difficult relationship with her George Washington counterpart and she thought it was because she was female and the counterpart was a male.  Id.  Oloyede commented that it was her hope that her George Washington counterpart would treat Mr. Mason differently because they were both men. Id.

34.     Oloyede then took Mr. Mason to the water treatment facility across the hall.  Id. at 34.  As they walked out the door they encountered another George Washington nurse who worked for DaVita, and Oloyede introduced Mr. Mason to the nurse and said he would be working there and to look out for him and he would be asking her to give medications he could not give.  Id.  The nurse shook his hand and said nice to meet you and she looked forward to working with him.  Id.  Oloyede commented that Mr. Mason

was an old dialysis technician and all three laughed.  Id.  The nurse asked Oloyede about

her schedule and Olyede said the nurse should wait until she finished speaking with Mr.

Mason and Oloyede would show her the schedule.  Id.

35.    Oloyede took Mr. Mason to the reverse osmosis or water treatment room.  Id. at

35.  In this room purified water is mixed with two chemicals and this is used to dialysis

the patients.  Id.  Mr. Mason asked how often did they change the filters, and Oloyede

said she did not have time to keep up with that.  Mr. Mason said he was familiar with the

water system and he could do the required water tests and Oloyede said that would be

good. Id.

36.    Oloyede and Mr. Mason went back to her office and let Oloyede gave Mr. Mason

all of her telephone numbers including her cell, home and office numbers.  Id. at 36.  She

told him that if he was at work and he had any questions or met someone who did not

know him, he could call her at any time.  Id.  Mr. Mason gave her his cell and home

telephone number.  Id.  She asked if he would be available from 10 p.m. to 7 a.m. on

weekends because on occasion they had patients who needed to be dialyzed  on an

emergency basis because they had a car accident, drug overdose or some other

emergency to cause the kidney to fail. Id.   Mr. Mason indicated that he would be

available at those times.  Id.

37.    Oloyede showed Mr. Mason the work schedule and Mr. Mason informed Oloyede

that he was off Tuesday, Thursday, Saturday and Sunday.  Id. at 37. Olyede told Mr.

Mason that she could work him in on a regular basis on a permanent part-time schedule.

Id.  She told Mr. Mason he would have to come in from 7:00 a.m. until 4:00 p.m. on

Tuesday, Thursday, Saturday or Sunday.  Id.  Mr. Mason and Oloyede discussed that

many patients at his permanent job at Georgetown on the Potomac are members of Congress or political figures who often leave town or are dialyzed in another state and his hours are cut short, and he could be available at those times. Id.

38.    At DaVita, there is a program known as the DaVita Agency, which allows employees to be paid $3/hour above their normal salary, if they work at another facility. Id. at 38.    For example, Mr. Mason could work 20 hours at $17/hour at Georgetown on the Potomac at his regular salary, and 20 hours at George Washington Hospital, and under the DaVita Agency policy, he would be paid $20/hour at Geoge Washington. Id.

39.    Oloyede told Mr. Mason she would start him on the schedule in January 2007.  Id. at 39.    She asked Mr. Mason who his regional administrator was and he told her it was Terrie Jurd. Oloyede told Mr. Mason she would tell Terrie Jurd that she hired him.  Id. Oloyede and Mr. Mason then talked about the health screening.  Id.  Mr. Mason told Oloyede that he had just gotten a hepatitis test at his current facility, and did not need to get another one.  She responded she would pull it off his records.  Oloyede stated that said after you take the physical you are OK to start work. Id.  Mr. Mason asked Oloyede who pays for the health screening tests and she said DaVita does.  Id.

40.    Mr. Mason took the PPD test which involves a scrap of the skin for less than a second, and asked the nurse if his wife, who is a LPN, could check it, instead of him coming back and she said sure.  Id. at 40.    Mr. Mason's wife sent in negative test results and Mr. Mason later called George Washington Hospital to make sure the test result was received.  He was told that the results were not received and he had to take the test again. Id.    He later took the physical and another PPD test.  Id.

41.    Mr. Mason was never told that there was two parts to the PPD test   Id. at 41.  In January 2007, Mr. Mason called George Washington, and asked if George Washington received the PPD test results and the nurse who answered the telephone put him on hold and checked his records, and told him that the PPD test results were received and everything was done.  Id.  After speaking to her Mr. Mason called Oloyede immediately and left a message that he had completed all of the health screening and was ready to be placed on the schedule.  Id.

42.    In January 2007, Mr. Mason called Oloyede and informed her he had completed the health screening and was ready to be placed on the schedule.  Id. at 42.  Oloyede said she would call the health unit and retrieve the records for DaVita and she would be back in contact with him.  Id.

43.    Mr. Mason continued to call Oloyede from January until February 2007 and she would not return his telephone calls.  Id. at 43.  Mr. Mason finally reached Oloyede in February 2007 and said she was at a conference and she would have to call him right back.  Id. Oloyede did not immediately call him back and in fact did not call him for several days. Id.   A few days after his last call, Mr. Mason called Oloyede again.  She answered the telephone and in a hostile manner, stated that "I can't use you, sorry" and hung up the telephone.  Id. She did not even say good bye; she just  hung up the telephone.  Id.  Oloyede never said anything to Mr. Mason about the census being low. Id.


**Defendant's Statement of Material Facts which are In Dispute.**

Defendant's statement of material facts omits many material facts which are disputed as is detailed above.  The following material facts are disputed.

11.  There was no formal process followed for hiring PSRs.  DaVita's managers simply made up the rules as they progressed.  For example, on occasion DaVita took the position that it would only consider candidates for positions in states where they lived but later Golomb stated that strong candidates could be considered for any position. Ex E: 1468. Throughout 2006, DaVita hired individuals for positions outside of their state.  For example, Chris Jones lived in Washington, but was given territories in Virginia, North Carolina and Florida. Ex. D:21.   Derrick Camper was hired in Maryland, but was assigned a facility in Washington, DC. Ex. K:3001

13.     Dispute.  Mr. Mason had sales experience and was never asked about his sales experience.  Ex. A:16.


14.     Dispute.  Mr. Mason was asked to come to Richmond on short notice of a few days and Mr. Mason could not meet Easlon on the day in question because he worked a 15 hour shift and his facility administrator, Geraldine McGowan had a policy against requesting leave on short notice. Ex. H:7.  The facility administrator, however, permitted the Caucasian employee, Chris Jones, to take leave to interview for the position after the same facility administrator only notified the Caucasian administrative assistant employee of the vacant position and not Mr. Mason.

16.     Dispute.  Jones was available for an interview because he was not essential staff. Jones was the administrative assistant and receptionist who answered the telephone and completed some paperwork.  Ex. H:8.

19.    Dispute.  There is no evidence that Easlon was under pressure to fill as many PSR position as quickly as possible under than Easlon's self serving declaration.

20.    Dispute.  Jones had no relevant sales experience and no experience working with dialysis patients.  Ex. H:4 and 8.

21.    Dispute.  Mr. Mason sent the email from his cell phone and this accounts for many of the errors.

22.    Dispute.  There is no evidence that Easlon had not already decided to not pursue Mr. Mason's application before she received the email, except her self serving declaration.  Easlon had not notified Mr. Mason that she was no longer considering his application.

23.    Dispute.  It is disputed that Easlon had an issue with a few minor misspellings in Mr. Mason's email, since Easlon, herself, sent out emails with misspellings and grammatical errors.  Ex. E:825.  It is disputed that a large portion of the PSR's work is administrative.  According to Golomb, 80% of the work is sitting chairside with patients.  Ex. E:1475.   It is also disputed that the email would disqualify Mr. Mason from the position, since Easlon and Golomb both sent emails with typographical and spelling errors.

25.    Dispute.  Although Easlon was identified as the individual who discriminated against Mr. Mason, the facility administrator, McGowan,  also discriminated against Mr. Mason by only notifying the Caucasian administrative assistant employee of the vacant PSR position and not notifying all employees, when the announcement was sent to the facility administrators for referrals of PCTs.

28.     Dispute.  Golomb informed Ms. Gardner that he did not believe Easlon discriminated against Mr. Mason.  Ex. E:1464

29.      Dispute.  There is no evidence that DaVita excluded a qualified candidate because the position was filled in their state.  In fact, the vacancy announcement stated that applicants could be placed any where, Ex. E:833,  and Golomb indicated he was willing to consider an applicant for another position after the position in their state was filled.   Further, several states had multiple PSRs.  Finally, there is no evidence that Easlon told Golomb that Mr. Mason's January 6, 2006 email contained errors which made it clear to her that he did not pay enough attention to detail, other than Easlon's self serving declaration.  This also raises the issue of why Golomb was interviewing Mr. Mason if the person Mr. Mason would report to was not interested in hiring him.

32. Dispute.  There is no written policy at DaVita that employees were to be limited to a geographic area. Ex. E:833.   There was no predetermined position in the District of Columbia.  Chris Jones worked in the District of Columbia, Virginia, North Carolina and Florida, Ex. D:21,  and Derrick Camper worked in Maryland and the District of Columbia.

33.     Dispute.  Mr. Mason had to agree to be placed in a PSR position anywhere in the country.  Ex. E:833.

42.     Dispute.  Golomb rated Mr. Mason as "solid overall" and did not state at the time of the interview that he was concerned about Mr. Mason's response to how he would promote the DaVita Rx service to DaVita teammates.

43.    Dispute.  Golomb rated Mr. Mason as "solid overall" and did not state any concern concerning Mr. Mason's answer to how he would market the program to physicians.

44.    Dispute.   Golomb rated Mr. Mason as "solid overall" and was not legitimately concerned with Mr. Mason's response regarding the travel required for the position.  Mr. Mason had no issue with the travel requirement.

54.  Dispute.  It is disputed that services outside of the hours of 7:00 am to 5:00 pm, Monday through Saturday, are provided exclusively by on- call registered nurses. Oloyede specifically asked Mr. Mason if he could work on call during the overnight hours, and he agreed that he could.  Ex. H:36.

55.  Dispute.  It is disputed that DaVita has staffed the George Washington facility with Oloyede, one full time PCT and an average of two to three registered nurses.  The facility is staffed with Oloyede, one full time PCT, two to three regular registered nurses, and three to four PRN employees, who are able to perform some PCT duties.  Ex. I.

56.    Dispute.  It is disputed that the vast majority of patient care duties performed at the facility must be performed by the nurses.  Oloyede informed Mr. Mason he could perform many of the dialysis duties since he was trained as an acute PCT.  Ex. H:28.

57.  Dispute.    Oloyede specifically asked Mr. Mason if he could work on call during the overnight hours, and he agreed that he could.  Ex. H:36.

58.  Dispute.  McGill is not the only individual who has performed PCT duties since may 2006.  When McGill is not present, the nurses perform PCT duties.

60.     Dispute.  Oloyede specifically informed Mr. Mason that she would hire him on a PRN or as needed basis and advised him of the times he could expect to work.  Ex. H:36-37.

61.     Dispute.  Oloyede specifically informed Mr. Mason that she would hire him on a PRN or as needed basis and advised him of the times he could expect to work.  Ex. H:36-36.

64.     Dispute.  DaVita's policy would have required that DaVita pay Mr. Mason more for working at the George Washington facility.  Ex. H:38.

65.     Dispute.  DaVita's policy would have required that DaVita pay Mr. Mason more for working at the George Washington facility.  Ex. H:38.

69.     Dispute.  Oloyede refused to communicate with Mr. Mason after she spoke to Jurd.  Ex. H:43.

70.     Dispute.  Mr. Mason was informed by a nurse at the Health Service office that the test results were received and he was cleared to work. Ex. H:41.  Mr. Mason was never informed that he had to take a two part PPD test.  Id.  Mr. Mason sent in the PPD test results after the first test, but was later informed that the test results were not received, so he had to take the test again.   Id.

71.     Dispute.  Oloyede never told Mr. Mason that the census was low. Ex. H:43. Oloyede would not have known that the census was low in February 2007 before the month ended.

72.     Dispute.  DaVita used PRN employees to perform PCT duties after Mr. Mason's meeting with Oloyede on November 2, 2006.  Ex. I.

73.     Dispute.  February 2007 was a lower month because it had 10% fewer days than other months and was traditionally a lower month.  January and March 2007 had a higher number than average of patient procedures, and more procedures than November 2006, when Oloyede offered Mr. Mason work as a PRN. Deft Ex. 16.   Further, the first six months of 2007, exceeded the number of procedures performed in the first six months of 2006, and Mr. Mason was not called back at any time as a PRN.  Id.

74.     Dispute.  January and March 2007 had a higher number than average of patient procedures, and more procedures than November 2006, when Oloyede offered Mr. Mason work as a PRN.  Deft Ex. 16.  Further, the first six months of 2007, exceeded the number of procedures performed in the first six months of 2006, and Mr. Mason was not called back at any time as a PRN.  Id.

## **ARGUMENT**

The standard for reviewing a motion for summary judgment requires the court to view the evidence in the light most favorable to the non-moving party.  To decide a motion for summary judgment in an employment discrimination case, "assuming ... that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus ... will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation of its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary

evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)."1

The D.C. Human Rights Act (DCHRA), D.C. Code Sec. 2-1401.01-1403.17 prohibits employers from discriminating against an individual with respect to the terms and conditions of employment based upon the individual's membership in a protected category, and prohibits retaliation for engaging in protected activity.

To establish a prima facie case of retaliation, a plaintiff must establish: (1) he engaged in protected activity; (2) he suffered a materially adverse act; and (3) there is a causal connection between the protected activity and the adverse act.

## A.    The Court has Jurisdiction over the March 2006 Non Selection

Defendant claims that this court lacks subject matter jurisdiction over Mason's March 2006 DCHRA claim because the job was not in the District of Columbia.  This argument fails because it can not be established that the job would not be in the District of  Columbia.  Mr. Mason interviewed for a PSR position and he understood that he could be placed anywhere in the United States, including the District of Columbia. Ex.E:833; Ex. H:2.  There was no understanding that Mr. Mason would be placed somewhere other than the District of Columbia.  Id.  At no point was it discussed with Mr. Mason that he was being considered for a job some place other than the District of Columbia. Id.  The record confirms that PSRs could be assigned anywhere in the country and some PSRs' worked in multiple states.  Ex. E:833. For example, Chris Jones, the Caucasian administrative assistant was assigned to the District of Columbia, Virginia,

---

1Aka v. Washington Hosp. Center, 156 F.3d 1284, 1289 (D.C.Cir. 1998).

North Carolina and Tampa, Florida.  Ex. D:21,23.  Derrick Camper was assigned to
Maryland and the District of Columbia.  Ex. K:3001.

Further, discriminatory events did occur in the District of Columbia. Mr. Mason
was contacted by telephone from his home in the District of Columbia to schedule the
interview, and he returned the call from his home in the District of Columbia and
interviewed for the position over the telephone in the District of Columbia, and Golomb
later called Mr. Mason in the District of Columbia to inform him that his application
would not be advanced.  If, as Mr. Mason contends, Golomb did not intend to advance
his application, but simply scheduled the interview to pacify Mr. Mason and get him to
drop his complaint, and thereafter rejected him for a PSR position, the DCHRA would
prohibit that type of conduct.

The law in the District of Columbia supports jurisdiction by the court in the
District of Columbia over this matter.  In fact, the leading cases on this issue with similar
facts have found that the District of Columbia courts had jurisdiction over DCHRA
claims.    See Blake v. Professional Travel Corp., 768 A.2d 568, 571 (D.C. 2001);
Matthews v. Automated Business Systems & Services, Inc., 558 A.2d 1175, 1180 (D.C.
1989). Green v. Kinney Shoe Corporation, 704 F. Supp. 259, 260 (D.D.C. 1988);

In Blake v. Professional Travel Corp., 768 A.2d 568, 571 (D.C. 2001), the D.C.
Court of Appeals concluded that jurisdiction was proper in the D.C. courts when the
plaintiff established that there were individual acts of sexual harassment including
discriminatory telephone calls, which occurred in the District of Columbia, even though
the Defendant claimed the decision to terminate the plaintiff was made in Virginia or
Colorado.

In <u>Matthews v. Automated Business Systems & Services, Inc.</u>, 558 A.2d 1175, 1180 (D.C. 1989), the D.C. Court of Appeals reversed the trial court's dismissal of the plaintiff's complaint under the DCHRA for lack of subject matter jurisdiction. In concluding that the plaintiff in <u>Matthews</u> established the jurisdiction of District of Columbia courts, the D.C. Court of Appeals focused on the facts in plaintiff's affidavit that there were multiple acts taken against the plaintiff in the District of Columbia. Matthews was an account manager whose duties were to sell computer hardware, software, and services to the employer's customers. 558 A.2d at 1177.

In <u>Green v. Kinney Shoe Corporation</u>, 704 F. Supp. 259, 260 (D.D.C. 1988), an unsuccessful applicant for jobs in the District of Columbia filed a complaint alleging employment discrimination (racial) under the DCHRA. The defendant argued that "since plaintiff applied in Maryland for a position in the Washington, D.C. area, and since the decisions not to hire him were made in Maryland, plaintiff cannot maintain his claim under the District of Columbia act" . . . . 704 F. Supp. at 259. The district court rejected these arguments. The <u>Green</u> court held that "[t]he broad language of the Act [DCHRA] leads the Court to understand that the Human Rights [Act] was intended to cover all discrimination concerning jobs located in the District of Columbia, even if the application and decision to discriminate were made outside the District." Id. (emphasis added).

A review of the law in determining whether the District of Columbia is the proper forum for a complaint is useful. In <u>Jimmerson v. Kaiser Found</u>, 663 A.2d 540, 543 (D.C. 1995), the court noted that the inquiry is not "[w]hether the District of Columbia is the best forum for this litigation," but rather "whether the District has so little to do with this

case that its courts should decline to hear it. Id. (quoting Jenkins v. Smith 535 A.2d 1367, 1371 (D.C. 1987) (en banc).

In reversing a trial court's decision to dismiss a complaint for forum non conveniens, the D.C. Court of Appeals noted that "[I]t  is not a controversy "local" to [another state] which that state has a paramount interest in resolving; it will not burden the Superior Court with the "congest[ion  of] foreign litigation;" and it will not unfairly impose on District citizens the duty to adjudicate a matter "having no relation to" the District of Columbia.  Coulibaly v. Malaquais, 728 A.2d 595, 601 (D.C. 1999).

It cannot be said that Mr. Mason was denied a position outside of the District of Columbia.

B.    **Mason has established a Prima Facie Case of Retaliation from the March 2006 Non Selection.**

DaVita claims that Mr. Mason's application was not advanced because Golomb believed Mr. Mason was not as strong as other candidates in understanding of sales and sales effectiveness in promoting the DaVita Rx service to teammates and doctors, and because Mr. Mason "voiced" concerns about travel.  Closer scrutiny of this explanation reveals that it is false and pretext for discrimination.  At the time of the decision in March 2006, Golomb did not state in any detail why he did not advance Mr. Mason's application.  His post litigation justification which was not recorded at the time of the interview should be rejected.  Golomb's full explanation was not developed until approximately fifteen months after the interview and with the benefit of counsel.

The factual and legal issues in this case are similar to those in Aka.

Here, Golomb claimed he did not consider Mr. Mason because Mr. Mason was asked whether he had any concerns about travel and Mr. Mason responded that he had discussed it with his wife and that the travel would be fine.  In his email to Gardner, Golomb stated that Mr. Mason "voiced" some concerns about travel.  " James Mason was solid overall . . .  However, neither of them were as strong as other candidates we have been interviewing in terms of the following key areas . . .  Flexibility (both voiced some concerns about travel)."  Mr. Mason never voiced any concern about travel.  Golomb later acknowledged that it was he-Golomb who had concerns because Mr. Mason indicated he did not have an issue with the travel requirement.    Thus, Golomb's statement that Mr. Mason voiced concern about travel is false, and his deposition testimony conflicts with his earlier email.

Concerning Mr. Mason's response on how he would sell the service to teammates, Mr. Mason responded that he would attempt to convince the teammate that the service was good for the company and may provide a financial incentive for the employee. Easlon agreed with Mr. Mason that a good answer would be to get the teammates to see a direct financial benefit to the teammate.  It cannot be objectively stated that there was anything wrong with this response, and certainly nothing that would disqualify an individual from consideration.

Finally, DaVita claims Mr. Mason was excluded because he did not demonstrate a good understanding of what physicians want.  Mr. Mason explained that doctors were most concerned about the care of their patients.  Mr. Mason worked directly with doctors for 23 years; received the highest awards given by the company for performance of his duties, which included a substantial amount of time working with doctors; was requested

to speak to Congressional staffers on dialysis treatment; and was requested by the medical director, who is a doctor, to appear in a company commercial to explain dialysis treatment and appeared with the medical director in a commercial. Ex. H:1.  Mr. Mason knew fully well what doctors wanted and he articulated that in the interview. Once again, it cannot be objectively stated that there was anything wrong with his answer to the question.

It is noteworthy that Golomb did not keep any notes for the interview and did not assign any rating or rank to the interview.  The only evidence on Golomb's assessment of Mr. Mason's overall performance at the interview was that it was "solid overall." According to Mr. Mason, at the end of the interview, Golomb told Mr. Mason he had performed well and had provided responses that he had not considered previously.

 DaVita's reasons for not advancing Mr. Mason's application just are not credible. DaVita has not provided a legitimate reason for not advancing Mr. Mason's application. A jury could infer from the falsity of the reasons given by Golomb, that retaliation was the true reason Mr. Mason's application was rejected.  Defendant has not established that no reasonable jury could conclude that retaliation was not the motivating factor in this decision .

DaVita claims that Golomb was not obligated to interview Mr. Mason and he had the option of not taking any action at all.  At the time Mr. Mason filed his complaint, he had been given a telephone interview and invited for an in person interview, which was never provided to him.  The fact that Mr. Mason did not receive an in person interview is a problem that DaVita created.  By offering to re-interview Mr. Mason, Golomb was not extending Mr. Mason any favors.  Golomb was pressured to address the mistreatment of

Mr. Mason. It was only after DaVita was contacted by the EEOC that Golomb offered to interview Mr. Mason. Ex. K:2272. He responded by offering Mr. Mason a "second" telephone interview, even though Mr. Mason already successfully completed a telephone interview and progressed to the in person interview. From DaVita's perspective, it was the only way to avoid liability. If Mr. Mason refused the interview, DaVita could argue that it attempted to give Mr. Mason an interview and he declined. By re-interviewing Mr. Mason, even if it had no intention of advancing his application, it could argue as it argues here that it did consider his application further and found he was not qualified (i.e. a "good deed" that is being punished). From DaVita's perspective, conducting the interview by a subjective -one on one- interview, would make it difficult to show it was in retaliation for prior EEO activity.

After refusing to offer Mr. Mason an in person interview, DaVita was still filling PSR positions and multiple positions were available. Golomb only did what he was obligated to do in offering to re-interview Mr. Mason. DaVita Rx specifically sought individuals with Mr. Mason's PCT background for the PSR position. A superior applicant, Mr. Mason, who was a DaVita employee, advanced to an in person interview but was denied that interview, while DaVita hired the Caucasian office administrative assistant for a PSR position.

DaVita claims that there was nothing improper about the telephone interview. First, no other candidate who had advanced to an in person interview was required to undergo a 45 minute telephone interview. There are certain advantages to an in person interview which can never be conveyed in a telephone interview. Further, the fact that

Golomb scheduled the interview at 8:00 a.m., before the work day even begins, suggests that he was simply going through the motions.

DaVita claims that Mr. Mason was asked the same questions at Chris Jones. While it is not clear that this is true, Defendant simply misses the point. After telling Mr. Mason he would be considered for PSR positions, Golomb should have treated Mr. Mason the same as all other applicants and given him an in person interview. Golomb failed to do so. The court would likely have no problem finding discrimination if an employer decided that it would provide all Caucasian applicants with in person interviews and hired the Caucasian employees, but all African American applicants were given telephone interviews, and denied positions. This is what occurred here.

The record confirms that Golomb had no intentions of advancing Mr. Mason's application or hiring Mr. Mason because Easlon had already told him she would not consider him for any position. Before talking to Mr. Mason, Golomb had already come to Easlon's defense on her motivations, and taken the position that Mr. Mason's application should not be advanced. This was confirmed by Golomb's deposition testimony that after he interviewed Mr. Mason, he had the same conclusion as Easlon— that Mr. Mason was not a strong candidate. Ex. B:150-151. All of this contradicts Golomb's written statement that Mr. Mason was "solid overall."

This claim really turns on Golomb's subject decision and motivations. As the Circuit Court of Appeals cautioned in <u>Aka</u>, "although employers may of course take subjective considerations into account in their employment decisions, courts traditionally treat explanations that rely heavily on subjective conditions with caution. <u>Aka</u> 156 F.3d 1298.

Here, with respect to the 2006 denial of in person interview and non-selection, Mr. Mason has shown that he engaged in protected activity when he filed a complaint of discrimination based on race when Easlon failed to schedule him for an in person interview and did not contact him. He suffered a materially adverse act when Golomb failed to schedule him for an in person interview and failed to otherwise advance his application and he was denied a PSR position, despite the fact that in Golomb's own words, Mr. Mason's performance was "solid overall" at the interview. Finally, he has shown a causal connection because when he complained, before conducting any investigation, Golomb concluded that Easlon had not discriminated against Mr. Mason, and Golomb simply went through the formality with the interview of Mr. Mason, with no serious intention of advancing his application.

DaVita failed to provide a "fairly administered selection process," Salazar v. WMATA, 401 F.3d 504 (D.C. Cir. 2005), in making this hiring decision and a jury could conclude it deviated from a fair process because of retaliation.

### C. Mason has established that DaVita Retaliated Against him when it withdrew the offer to work at the George Washington Facility.

Concerning the withdrawal of the offer of employment at the George Washington facility, Mr. Mason has established that he engaged in protected activity when he filed the lawsuit against DaVita in 2006 and which continued through 2007. He suffered from a materially adverse act because the offer at the George Washington facility was withdrawn. Finally, there is a causal connection because Oloyede extended employment to Mr. Mason until when Oloyede, the George Washington facility administrator, spoke

to Terri Jurd, the regional administrator, about hiring Mr. Mason, and the offer was withdrawn.

According to Mr. Mason, Oloyede explained that she needed help on an as needed basis; invited him in for an interview; discussed his salary; introduced him to three staff members and three patients as the new employee; showed him around the facility; gave him all of her contact telephone numbers so he could reach her if he was at work and someone did not know him; showed Mr. Mason the work schedule; discussed putting him on the schedule in January 2007; paid for health screening, which normally does not take place until an employee is hired; and Oloyede ended all discussions with Mr. Mason after she spoke to Terrie Jurd about hiring Mr. Mason. Ex. H:23-43.

DaVita claims it had no need for the services of another PCT at the GWUH facility after November 2006. This claim is disputed because it was November 2006 when Oloyede offered the work to Mr. Mason, introduced him to staff and patients as the new technician, and sometime after that when she went to her regional administrator and told her she hired or wanted to hire Mr. Mason. Oloyede had a schedule with regular and PRN employees, and DaVita continued to schedule PRN employees after November 2006 while rejecting Mr. Mason. Ex. I. Oloyede testified that nurses performed PCT duties when the PCT was not at work. Ex. J:42-45.

Q: And what duties does the PCT perform?

A: The PCT duties are set up the machine; put the patient on the machine; take the patient off the machine; monitor the patient blood pressure, pulse, heart rate, how much fluid removed during treatment.

Q: Anything else?

A: That's it.

Q: Okay.  What duties do the RNs perform?

A: The RNs, the same, put the patient on the machine—

Q: Do they do all of the duties that the PCT performs?

A: Plus.

Ex. J:42-42.

Q: Okay.  Who performs the PCT duties on Saturday?

A: Since I mentioned to you that the RN can do the same thing the PCT are doing,

so the RN do the PCT duty on Saturday.

Ex. J:45:3-9.


DaVita claims that the work would have only been a lateral transfer for

Mr.Mason.  Mr. Mason's testimony is that if he had been hired he would have received

higher pay.  Ex. H:38.  DaVita claims that Mr. Mason's responsibilities would have

diminished if he had worked at the George Washington facility.  This fact is disputed.

Mr. Mason's testimony is he was told because of his background of working in

emergency rooms and experience, he would have been permitted to work on the floors

and thus would have had increased responsibility than his normal position.  Thus, he

suffered a loss in pay and responsibilities.

DaVita claims that there is no evidence that Mr. Mason applied for an available

position.   Unlike the cases cited by the Defendant, Mr. Mason has never alleged that he

was denied a permanent position.  Thus, he is not required to establish that there was a

permanent  position which remained open.  He is only required to show that there was a

need for the work/duties he was offered.  Mr. Mason was told that he would permitted to

work when the regular PCT was off, and he could work Tuesday, Thursday, Saturday or

Sunday, and during emergencies in overnight hours.  Ex. H:23, 29 and 37.  Here, after

Mr. Mason was excluded from the PRN position, other individuals were permitted to

perform PCT duties on an as needed basis.  Ex. I.  When the PCT was not at work, an

additional staff member was brought in.  This was the work that was offered to Mr.

Mason.  Mr. Mason was interviewed for and hired for a PRN position.  He was

introduced to three staff members as the new employee and introduced to three patients.

DaVita claims that Mr. Mason was not hired at the George Washington facility

because it had no need for another PCT at the George Washington facility because its

census was low in February 2007.

DaVita cannot credibly argue that Mr. Mason was not offered a job.  At her

deposition, Ms. Oloyede testified that only after individuals are offered jobs are they

allowed to go for a physical.

Q: Is everybody who interviews for a job required to undergo a physical?

A: No.

Q: How is it determined who should undergo a physical?

A: You apply for a job.  You meet with the manager.  The salary is decided, the job offer

is given.  The teammate is already in DaVita because they have to do compliance.  Then

they can go for they physical.

Q: Okay. So the physical only happens after a person applies and a salary is

determined—

A: No.

Q—and a job offer is made?

A: Uh-huh.

Q: Is that correct?

A: Yes.

Q: Now, was Mr. Mason required to undergo a physical?

A: Yes.

Ex. J:71:21-22, 72:1-20.

DaVita claims that Mr. Mason did not suffer a materially adverse action. DaVita argues it is undisputed that after Mr. Mason spoke to Oloyede about working extra hours at the GWUH on November 2, 2006, DaVita had no need for the services of another PCT at the GW UH facility. This fact is disputed. According to Mr. Mason, he was told he would be used on a PRN basis, introduced to staff and patients and scheduled for orientation, among other things. Ex. H:23-43. The only issue was that Oloyede stated she needed to talk to the Regional Administrator.

DaVita claims that the work involved nothing more than a lateral transfer. In fact, according to Mr. Mason he was an acute PCT and he discussed his salary, Ex. H 24-25, 38, and it would have been more than his current salary. Thus, the failure to hire him resulted in lower pay. Thus, this was not a lateral transfer.

DaVita claims that at no time after Mr. Mason's inquiry was there a PCT position open at the GWUH facility or a need for an additional PCT to work there even on a per diem basis. Defendant cannot make this argument since it is undeniable that the facility had a schedule with regular and PRN or as needed employees, Ex. I; the regular PCT

missed days during and after February 2007, and the nurses were required to perform PCT duties in the absence of the PCT and on Saturdays.

DaVita claims Mr. Mason cannot make out the fourth element of his case that he applied for an available job. The Supreme Court has commented that the prima facie case was not intended to be a rigid.   Mr. Mason applied for work at the facility.  According to Oloyede's notes, she interviewed Mr. Mason.  After the interview, she told her supervisor that she wanted to hire Mr. Mason for a PRN basis.  The only fact which is in dispute is whether Oloyede told Mr. Mason that she could not use him because the census was low. According to Mr. Mason, Oloyede did not tell him the census was low; she only told him she could not use him and hung up the telephone.  Oloyede claims that she told him the census was low.  Oloyede's version is not credible because the census was high in January 2007 and she did not schedule him, and the census was higher in March 2007 and she did not schedule him.  The facts can be summed up in the following manner— Mr. Mason was interviewed, offered a job, sent for a health screening, Oloyede told her regional administrator that she was going to hire Mr. Mason, and the offer was revoked after Oloyede spoke to the regional administrator.

Defendant spends a considerable amount of time focusing on February 2007, but the operative month is January 2007.  Mr. Mason was told he would be put on the calendar in January 2007.  In January 2007, he completed the medical screening and was told he was cleared to work.  In January 2007, the census numbers were higher than November 2006, the month that Mr. Mason was offered the job.

Finally, DaVita claims Mr. Mason was not qualified because he did not complete the health screening.  According to Mr. Mason, he was never told that he had to take a 2

part PPD test, and there is no evidence in the record that anyone at DaVita or George Washington ever told him he had to take a 2 part PPD test. Even if he had to take the test, he had already tested negative, and the test would take only a few seconds. More importantly, it is clear that this is a post litigation legal justification since Oloyede never informed Mr. Mason that he needed to complete the health screening.

Q: So did you contact Mr. Mason afterward to tell him that he needed to complete the health, some part of the health services requirements?

A: No, I did not. Ex. J73:15-18.

In light of all of the actions taken to hire Mr. Mason, and the sudden withdrawal of the offer after Oloyede spoke to Terrie Jurd, a reasonable jury could infer that the offer to work was withdrawn as a result of Mr. Mason's EEO complaint.

The Defendant's motion for summary judgment should be denied

Respectfully submitted,

_____/s/_____
David A. Branch #438764
Law Offices of David A. Branch
1825 Connecticut Avenue, NW
Suite 690
Washington, D.C. 20009
(202) 785-2805

**Certificate of Service**

I hereby certify this 6th day of November 2007 that a copy of the foregoing Plaintiff's Opposition to Defendant's Motion for Summary Judgment was sent to Defendants' counsel listed below.

Minh N. Vu
Epstein Becker & Green, P.C.
1227 25th Street, NW, Suite 700
Washington, D.C. 20037-3541

/s/

_____

David A. Branch