**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| JAMES MASON | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.:06-1319 (RMC) |
| | ) | |
| v. | ) | |
| | ) | |
| DAVITA INC. | ) | |
| | ) | |
| | ) | **Jury Trial Demand** |
| Defendant. | ) | |
| | ) | |

**Sworn Declaration of James Mason in Support of Opposition to Motion for Summary Judgment**

I, James Mason, the Plaintiff in this lawsuit, hereby make the following declaration pursuant to the provisions of 28 U.S.C. Sec. 1746. I understand that this declaration is the equivalent of an affidavit. The statements contained herein are based on my personal knowledge.

1.     I am an African American male and an eleven year employee of Davita in Washington, D.C., where I have worked for a number of dialysis centers as a Patient Care Therapist (PCT). I normally work 12 to 15 hours shifts three days a week. I spend almost all of my time providing treatment to patients, attending to their needs, and performing dialysis training and patient education. Throughout my employment with Davita, I have been an excellent employee, and have received the highest award at DaVita, the Shining Star, for being the overall best patient care therapist. I have been consistently voted the best technician at the facility, and asked to teach staff and fellows and patients. I was nominated to speak on behalf of the facility to a U.S. Congressman and his staff about what dialysis is, how the process works, what patients go through on dialysis and the pricing of dialysis treatment. This was an important topic because the

1

amount paid by Medicare and Medicaid has been the same for twenty years but the amount for the dialysis supplies has increased each year. I was asked by the Dr. Wilcox, Medical Director of the Georgetown on the Potomac facility where I work and the head of hypertension nephrology at Georgetown University Hospital to make a three to five minute commercial   Dr. Wilcox and I had speaking parts in the commercial.

2.      In September/October 2005, Davita Rx/Star Rx, a subsidiary of DaVita, announced that it was seeking to hire individuals for pharmacy services representative (PSR) positions to sell medication to dialysis patients of Davita. Davita specifically sought individuals who were working for Davita as patient care technicians. The individuals selected would have to be available for reassignment anywhere in the United States.  A company document announcing the position stated: "Do you know of an outstanding PCT [Patient Care Technician] within your area that would love a new and exciting career development opportunity within DaVita?  We have positions available for Pharmacy Services Representative across the country!   . . . S/he also needs to be willing to travel extensively, as the Star Rx roll-out process requires being on-site in dialysis facilities. Our current PSR's travel 75% of the time."

3.      The pharmacy services representative position had income potential of almost twice my approximate $35,000 per year income.

4.      I  worked at a facility with Christopher Jones, a Caucasian male, who was the office administrative assistant. Jones was given a position announcement for the PSR position by the facility administrator, Gerri McGowen, a Caucasian female, and Jones gave the position announcement to the other staff members who were mostly minorities. Jones had no experience as a patient care technician in dialysis treatment or education.

His "sales" experience was limited to working in the men's department of a department store for a few months over the holidays, working as a clerk in a coffee show, and filling in as needed to show residences to prospective residents and families at an assisted care facility when the marketing people were not available.

5.     At least three other minorities from Washington, D.C. applied for the PSR positions, including two other PCT's and an administrative assistant, and none were offered an interview other than me.

6.     There was no written policy at DaVita Rx on how individuals were to be screened for positions.  The practice which was followed was that after an application was received, Kim Easlon conducted an initial screening and selected some individuals for a telephone interview, and that went well, for an in-person interview with the regional manager, and a final in-person interview in California with a panel.

7.     I was selected for a telephone interview by Kim Easlon. I was called at work while I was on the floor attending to patients.  Easlon requested that I conduct the telephone interview immediately.  I reluctantly agreed to the telephone interview and had to leave my patients to conduct the interview.  At the conclusion of the telephone interview, Easlon requested that I come to Richmond in a few days for an in person interview.   I could not travel to Richmond on the day requested because I was scheduled to work a fifteen hour shift.  I was assured that this was not an issue and I would be rescheduled for an in person interview the first week of January 2006.  I was not concerned about rescheduling the interview because I knew that DaVita Rx was attempting to fill several positions around the country.  Had I been informed that I would

be excluded from positions in the future, I would have made the extraordinary request to take off work to go to Richmond for the in-person interview.

8. I never received a call from Easlon to reschedule, and had to email her to follow up on the selection process.

9. Easlon did not contact me to schedule an in person interview the first week of January as she had previously agreed to do. On January 6, 2006, I received an email indicating the position I sought had been filled and I had not been selected. DaVita Rx continued to advertise for position openings in Maryland, Philadelphia, Pennsylvania, and St. Louis, Missouri. I reported this information to Jones, who had applied for a position at the same time as me. Jones was surprised to hear that the positions were filled because he knew that the individuals selected for the positions could not designate their geographical area and DaVita was still looking to fill positions on the East coast.

10. I filed an internal complaint with Davita alleging discrimination based on race in the hiring process. An individual in the Davita human resources department interviewed me. During the interview, I asked the human resources staff member if she could determine my ethnic origin based on my voice and manner of speaking, and she said she could easily identify me as African American. The human resources employee discouraged me from pursuing a claim and suggested that Easlon may have assumed that I was not an employee of DaVita. I rejected this excuse and decided to proceed with his internal EEO complaint.

11. I was later contacted by Easlon's supervisor, Joshua Golomb, after Golomb was notified of the EEO complaint against Easlon.

4

12.     Golomb informed Easlon of my complaint and Easlon informed Golomb. Before my second interview, Golomb solicited Easlon's opinion of me. Ex. B:153. According the Golomb, Easlon's impression of me was that he was not as strong a candidate as other candidates.

13.     Golomb informed me that Davita was not pleased with Easlon's hiring practices and offered to interview me once again. I agreed to the second interview to give Davita an opportunity to correct a wrong.

14.     Even though applicants normally only had one telephone interview before an in person interview, I was required to participate in a second telephone interview before an in-person interview, even though I had previously advanced beyond the telephone interview. Golomb scheduled the interview for 8:00 am but did not specify which time zone. I assumed it was 8a.m. PST because he was in California. During the interview Golomb told me that I performed well, was creative in my responses and knowledgeable.

15.     After the second telephone interview, once again, I was denied an in-person interview. Golomb informed me that I barely missed the cut off for selectees. On March 17, 2006, Golomb wrote an email explaining why he did not advance me in the interview process. Golomb stated: First, as per my discussion with Gail, I personally phone interviewed both James Mason and the other candidate James identified in his call. James is solid overall. Jeff was mediocre. However, neither of them were as strong as other candidates we have been interviewing in terms of the following key areas:

> *   Understanding and experience of sales
> •   Sales effectiveness (in role plays I did with them via phone)
> •   Thoughtfulness about approach for working with Physicians

5

        \*   Flexibility (both voiced some concerns about travel)

16.    At no point during or after the interview did Golomb inform me that there was an issue with the mistake over the start time of the interview. Neither was that any issue with my understanding of sales or experience or sales effectiveness. I was never asked about my sales experience. Golomb told me my sales approach was creative. I never expressed any concerns about travel.

17.    I communicated with other minority employees at Davita from Washington, D.C., including an African American and an individual of Philipian decent who applied for PSR positions. Neither was hired or even interviewed by Easlon. The Philipino employee was interviewed by Golomb but received a telephone message Golomb with the same language he used in rejecting Mr. Mason for the position.

18.    Prior to rejecting me as an applicant and selecting Jones, Davita specifically sought individuals with my background, and Golomb specifically rejected an applicant because he had too much sales experience because he believed that "80%" of the job was related to sitting chair side with the patient to convince the patient to allow Davita to provide their non dialysis medications.

17.    Mr. Mason communicated with other minority employees at Davita from Washington, D.C., including an African American and an individual of Philipino descent who applied for PSR positions. Ex. A:17. Neither was hired or even interviewed by Easlon. Id. The Philipino employee was interviewed by Golomb but received a telephone message Golomb with the same language he used in rejecting Mr. Mason for the position. Id.

18.     Prior to rejecting Mr. Mason as an applicant and selecting Jones, Davita specifically sought individuals with Mr. Mason's background, and Golomb specifically rejected an applicant because he had too much sales experience because he believed that "80%" of the job was related to sitting chair side with the patient to convince the patient to allow Davita to provide their non dialysis medications.  Ex. A 1475.

19.     Easlon indicated that she did not consider me for a PSR position because I sent an email with grammatical errors.  I sent the email from my telephone which accounts for some of the errors.  Both Kim Easlon and Joshua Golomb have sent emails with grammatical and typographical errors.

   Easlon sent the following email to Alex Dellon.

   "He!y [sic] Alex:
    How is it going?  I hope you/re loving your new job.  I have decided that PCTs' [sic] within the company might be great as PSRs.  It would be a great promotion for them, [sic] they know dialysis, and they know how to deal with out patients.
   I was wondering if you knew of anyone one [sic] that might fit within the perameters [sic] of what I am looking for: [sic]
   I need someone who is very outgoing and positive, someone who is very organized and can manage themselves, plus, of course, they need to be willing to travel A LOT!  We are currently asking our PSRs to travel three weeks out and one in.  They will be home every weekend.  After about a year and a half, they will settle into territories where the travel will be reduced substantially.
   What do you think? Do you know of anyone who fits this mold?  I know everyone knows down there, but you still need to keep this quiet.  Bill has told me that I can contact Linda Lansing and Helen Como.  What do you think about them?  Trust their judgement [sic]?" Ex. E:825


   Josh Golomb sent the following email.

   "I wil[sic] mark it down [sic]

Let me know if there are any specific thigns [sic] you would like me to prove . . . if not, I'll give my standard barrage of questions."  Ex. E 832.

20.     In 2006, Terrie Jurd, Caucasian female, became my regional administrator. After I filed his lawsuit in 2006, Jurd frequently appeared at my work place for monthly visits and on each occasion, she would speak to all employees except me, even when I was present in the room with other employees. She intentionally ignored me.

21.     In October 2006, I called around to different dialysis facilities searching for part-time work in acute dialysis. In approximately 1995 and 1996, I worked at the George Washington Hospital as an acute dialysis technician. Acute dialysis treatment is performed is bedside when patients are too ill to be transported to a dialysis center. In my position at DaVita's Georgetown on the Potomac center, I perform chronic or ambulatory treatment, which means the patient can come to the facility in wheelchair or walk.

22.     I called George Washington Hospital and spoke to the facility administrator, Onowummi Oloyede. Oloyede answered the telephone and she identified herself and engaged in small talk with me because she had worked with me many years ago. She informed me that DaVita owned the facility at George Washington. I did not know this because when I previously worked at George Washington, it was privately owned.

23.     I informed Oloyede that I was interested in working part-time work as an acute dialysis technician now, and maybe full time at her facility later in the future. Oloyede responded that this was "great" and she would need me to help the PCT and to cover for the PCT when she went on vacation or took days off. Oloyede explained that at the present, she had to get a nurse to cover for the technician on her days off or get someone from another facility.

24. Oloyede told me that she had some openings and she only had one technician and DaVita was using nurses working from George Washington hospital to do the acute dialysis and that it cost DaVita a lot of money. According to Oloyede, DaVita had to pay the hospital, and had a contract with George Washington hospital and paid the nurses' salary and the contract rate, which was more than what they would have to pay him.

25. Oloyede asked me what was my current salary and I informed her that it was approximately $17/hour. Oloyede stated that we would talk further about my salary when I came to the office. Id.

26. Oloyede invited me to come to her job on my day off to meet with her. She stated she wanted me to meet the staff and see the machines and water treatment facility that would be used, and scheduled a time and date for the interview.

27. Oloyede and I met at the agreed upon time for the interview in November 2006. We initially met in her office. During the interview, Oloyede explained how the facility was set up and where I would need to go to treat dialysis patients. I stated to Oloyede that I worked at George Washington before and worked on acute patients in private rooms and worked on dialysis patients in emergency surgery.

28. Oloyede state that because of my education and experience and background, she would not have a problem with me dialyzing patients in their rooms and on the floor. Oloyede then made an appointment for me to complete my health screening by calling from her office, and she wrote down the date, time and telephone number of the George Washington health screening office. She later told me I needed to go to orientation at some time in the future, but I could start work before going to orientation.

29. Oloyede and I then left her office and she showed me around the facility. Near her office is a main suite where four patients can be dialyzed and can be brought down from their room to the suite. Oloyede and I walked into the room, and there were three patients in the room. The other PCT, Shanna McGill, had papers on the other bed and was ordering supplies. Oloyede introduced me to Shanna McGill and said this is James Mason and he is going to be backup for you and me. Oloyede complained that she and McGill had to fix machines and order supplies. Oloyede stated that I would be present so she could take more days off and would have vacation time. Oloyede told McGill that I would later come over full time. McGill shook my hand and said nice to meet you and we could use the help. Oloyede introduced me as the "new technician" to three patients who were receiving treatment in beds at the facility. I went to the beds and shook their hands. The patients included two male patients and one female patient. One of the patients asked me how long I had worked in dialysis and I told him he had worked in dialysis 23 years.

30. After meeting the patients, I walked over to the machine in use, a COBE Century Two machine. I. Mason used to work with the COBE machines and informed Oloyede that I did trouble shooting machine and knew how to fix it and knew how to dialyze patients on the machine.

31. Oloyede then announced that she wanted to show me the supply storage room. Oloyede took me to the storage room and I observed that there were supplies on the floor and opened supplies and the supply room was generally a mess. I informed her that I could come in on a non work day and organize the stock room, and find out what supplies needed to be ordered. Oloyede responded that this would be acceptable.

32. While in the storage room, a Caucasian nurse came in to get supplies who worked for George Washington. Oloyede asked the nurse if she was working on a DaVita patient and she responded, "no." This was a nurse that DaVita used to dialyze patients on the hospital floor. Oloyede again introduced me as the new technician to the nurse. She said "[t]his is James, you will see him around, and he will be working on the floors and in this facility. He may need you to give medications that he cannot give by law." The nurse shook my hand and said nice to meet you and said see you around.

33. After the nurse left the area, Oloyede complained that the George Washington nurses wasted DaVita supplies by using the supplies on other hospital patients who were not DaVita patients. She commented that the supplies that were being taken were very expensive, and once I was working, hopefully this would put an end to this practice. Oloyede also stated that she had a difficult relationship with her George Washington counterpart and she thought it was because she was female and the counterpart was a male. Oloyede commented that it was her hope that her George Washington counterpart would treat me differently because they were both men.

34. Oloyede then took me to the water treatment facility across the hall. As we walked out the door we encountered another George Washington nurse who worked for DaVita, and Oloyede introduced me to the nurse and said I would be working there and to look out for me and I would be asking her to give medications he could not give. The nurse shook my hand and said nice to meet you and she looked forward to working with me. Oloyede commented that I was an old dialysis technician and all three of us laughed. The nurse asked Oloyede about her schedule and Olyede said the nurse should wait until she finished speaking with me and Oloyede would show her the schedule.

11

35. Oloyede took me to the reverse osmosis or water treatment room. In this room purified water is mixed with two chemicals and this is used to dialysis the patients. I asked how often did they change the filters, and Oloyede said she did not have time to keep up with that. I said I was familiar with the water system and I could do the required water tests and Oloyede said that would be good.

36. Oloyede and I went back to her office and Oloyede gave me all of her telephone numbers including her cell, home and office numbers. She told me that if I was at work and I had any questions or met someone who did not know me, I could call her at any time. I gave her my cell and home telephone number. She asked if I would be available from 10 p.m. to 7 a.m. on weekends because on occasion they had patients who needed to be dialyzed on an emergency basis because they had a car accident, drug overdose or some other emergency to cause the kidney to fail. I indicated that I would be available at those times.

37. Oloyede showed me the work schedule and I informed Oloyede that I was off Tuesday, Thursday, Saturday and Sunday. Olyede told me that she could work me in on a regular basis on a permanent part-time schedule. She told me I would have to come in from 7:00 a.m. until 4:00 p.m. on Tuesday, Thursday, Saturday or Sunday. Oloyede and I discussed that many patients at his permanent job at Georgetown on the Potomac are members of Congress or political figures who often leave town or are dialyzed in another state and his hours are cut short, and he could be available at those times.

38. At DaVita, there is a program known as the DaVita Agency, which allows employees to be paid $3/hour above their normal salary, if they work at another facility. Id. at 38. For example, I can work 20 hours at $17/hour at Georgetown on the Potomac

12

at my regular salary, and 20 hours at George Washington Hospital, and under the DaVita Agency policy, I would be paid $20/hour at Geoge Washington.

39.     Oloyede told me she would start me on the schedule in January 2007. She asked me who my regional administrator was and I told her it was Terrie Jurd. Oloyede told me she would tell Terrie Jurd that she hired me. Oloyede and I then talked about the health screening. I told Oloyede that I had just gotten a hepatitis test at my current facility, and did not need to get another one. She responded she would pull it off my records. Oloyede stated that said after I take the physical you are OK to start work. I asked Oloyede who pays for the health screening tests and she said DaVita does.

40.     I took the PPD test which involves a scrap of the skin for less than a second, and asked the nurse if my wife, who is a LPN, could check it, instead of me coming back and she said sure. My wife sent in negative test results and I later called George Washington Hospital to make sure the test result was received. I was told that the results were not received and I had to take the test again. I later took the physical and another PPD test.

41.     I was never told that there was two parts to the PPD test  In January 2007, I called George Washington, and asked if George Washington received the PPD test results and the nurse who answered the telephone put me on hold and checked my records, and told me that the PPD test results were received and everything was done. After speaking to the nurse, I called Oloyede immediately and left a message that I had completed all of the health screening and was ready to be placed on the schedule.

42.     Oloyede said she would call the health unit and retrieve the records for DaVita and she would be back in contact with me.

43. I continued to call Oloyede from January until February 2007 and she would not return my telephone calls. I finally reached Oloyede in February 2007 and said she was at a conference and she would have to call me right back. Oloyede did not immediately call me back and in fact did not call me for several days. A few days after my last call, I called Oloyede again. She answered the telephone and in a hostile manner, stated that "I can't use you, sorry" and hung up the telephone. She did not even say good bye; she just hung up the telephone. Oloyede never said anything to me about the census being low.

I hereby certify that the statement contained in this sworn declaration are true and correct.

\*        /s/ *James Mason*

_____

James Mason                         November 5, 2007

\* Counsel has a copy of the original signature.