## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES MASON<br>717 Ingraham Street, NW<br>Washington, D.C. 20012,<br><br>          Plaintiff,<br><br>   v.<br><br>DAVITA INC.<br>601 Hawaii Street<br>El Segundo, CA 90245,<br><br>          Defendant. | )<br>)<br>)<br>) Civil Action No. 06-1319 (RMC)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DAVITA INC.'S REPLY MEMORANDUM OF POINTS AND
## AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT ON COUNT II
## OF THE SECOND AMENDED COMPLAINT

Minh N. Vu (Bar No. 444305)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
Tel: (202) 861-1841
Fax: (202) 861-3541

Joseph T. Ortiz
(admitted pro hac vice)
Epstein Becker & Green, P.C.
1875 Century Park East, Suite 500
Los Angeles, CA 90067-2506
(310) 557-9542
(310) 553-2165 (fax)

November 20, 2007          Counsel for Defendant DaVita Inc.

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.   RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS ................................. 3

III.   ARGUMENT ...................................................................................................... 8

   A.   DaVita Rx's non-selection of Mr. Mason in March 2006 does not fall within the
        jurisdiction of the DCHRA. ........................................................................... 8

   B.   The Court should grant summary judgment on Mr. Mason's claim that DaVita
        retaliated against him by not offering him a PSR position in March 2006................ 11

   C.   The Court should grant summary judgment on Mr. Mason's claim that DaVita's
        failure to use his services at the GWUH Facility in 2007 constituted retaliation....... 16

      1.   Mr. Mason did not suffer a materially adverse action. ...........................................16

         a)   There is no genuine dispute that DaVita had no need for the services of
              another PCT at the GWUH Facility after November 2, 2006 and that
              Mr. Mason did not apply for an available job....................................................16

         b)   There is no genuine dispute that Mr. Mason's benefits and
              compensation would not have changed even if DaVita had used Mr.
              Mason's services at the GWUH Facility. ........................................................23

      2.   Mr. Mason has produced no evidence of a causal link between the filing of
           his lawsuit or his internal complaint of discrimination against DaVita and
           DaVita's failure to use his services at the GWUH Facility. ................................26

      3.   Mr. Mason was not qualified to work at the GWUH Facility because he
           never completed his mandatory employee health screening.................................28

      4.   Mr. Mason has put forth no facts that call into question DaVita's non-
           retaliatory reason for not using his services at the GWUH Facility. ....................28

IV.   CONCLUSION.................................................................................................. 29

DC:1201113v3

## I.     INTRODUCTION [1]

Mr. Mason's Opposition to Defendant's Motion for Summary Judgment ("Opp.") makes clear, based on the undisputed facts <u>actually supported by the record</u> as opposed to those that Mr. Mason just asserts in his brief, Mr. Mason cannot establish a case of retaliation against DaVita Inc. ("DaVita") under the D.C. Human Rights Act ("DCHRA").

With regard to Mr. Mason's non-selection for a PSR position with DaVita Rx in March 2006, DaVita has presented evidence that the decisionmaker, Josh Golomb, had reasonable concerns about Mr. Mason's answers to questions about how he would sell the DaVita Rx service to teammates and physicians as well as the extensive travel required for the job. Mr. Golomb documented these concerns <u>in writing</u> on the same day that he advised Mr. Mason of his non-selection, <u>months before</u> Mr. Mason even filed his lawsuit. (Ex. 1(A).) Mr. Golomb did not "recant[]" any statements about his concerns. Mr. Golomb elaborated on these concerns at his deposition and the testimony was entirely consistent with his contemporaneous documentation of them. (Golomb Dep. 103, 106-07, 109, 113-14 (Ex. 5).)

Mr. Mason may disagree with Mr. Golomb's judgment about what a good answer to his interview questions should be, but such a disagreement cannot preclude summary judgment. The D.C. Circuit has made abundantly clear that "[q]uestioning the employer's hiring criteria is not within the province of this court. Particularly given the dynamic nature of the hiring process, moreover, [the Court has] also stated that [it] will not second-guess how an employer weighs

---

[1]     Where appropriate, this memorandum cites to DaVita Inc.'s Statement of Material Facts ("SMF") which contains the specific record citations. However, all citations also reference the exhibits filed by DaVita in connection with the two motions for summary judgment. Exhibits 1-9 were filed on June 25, 2007 with DaVita's Mem. in Support of Summ. J. on Count I. Exhibits 10-14 were filed on August 21, 2007 with DaVita's Reply Mem. in Support of its Motion for Summ. J. on Count I. Exhibits 15-24 were filed on September 28, 2007 in support of DaVita's Motion for Summ. J. on Count II. Exhibits 25-34 are being filed with this Reply Mem.

particular factors in the hiring decision." <u>Jackson v. Gonzales</u>, 496 F.3d 703, 708-09 (D.C. Cir. 2007).

Furthermore, Mr. Golomb's decision was not based on subjective considerations such as Mr. Mason's attitude or interpersonal skills. Mr. Golomb's decision was based on the substance of Mr. Mason's answers about how he would sell the Davita Rx service to teammates and physicians. (Ex. 1(A); Golomb Dep. 103, 106-07, 109, 113-14 (Ex. 5).) Mr. Mason has cited no case holding that this kind of determination is "subjective."

As discussed below, while Mr. Mason understandably has tried to create issues where none exist, a close examination of his assertions reveals that there are simply no facts that undermine the truthfulness of Mr. Golomb's reasons for not selecting Mr. Mason, let alone suggest that Mr. Golomb did not select Mr. Mason because he had filed an internal complaint of discrimination.

Summary judgment is also appropriate with regard to Mr. Mason's claim that DaVita did not use his services at its acute dialysis center located in the George Washington University Hospital (the "GWUH Facility") in 2007 because Mr. Mason had filed an internal complaint of race discrimination and a lawsuit against DaVita in January and May 2006, respectively. Among the many reasons why summary judgment is appropriate, the following are particularly noteworthy: First, Mr. Mason concedes that one of the two decision makers -- the Facility Administrator of the GWUH Facility -- had no knowledge of this lawsuit or any prior complaint against DaVita Rx until Mr. Mason amended his Complaint in this case to assert a claim against her facility. Second, neither decision-maker had anything to do with the lawsuit or the prior complaint, rendering the existence of a retaliatory motive non-existent. Third, Mr. Mason concedes that his services would only be used if there was a need, and after Mr. Mason met with

the Facility Administrator to discuss working at the GWUH Facility, DaVita did not seek or use the services of <u>any</u> Patient Care Technicians (PCT) such as Mr. Mason.  The fact that DaVita continued to use nurses who performed many patient care duties -- including some that he could have performed and many more that he could not -- does not create a genuine dispute about DaVita's need for <u>Mr. Mason's</u> services because he is not a nurse.  By asking the Court to infer a retaliatory motive based on DaVita's continued use of nurses, Mr. Mason is inviting the Court to tell DaVita how to best staff its medical care facility.  The Supreme Court and the D.C. Circuit have both made clear that this invitation must be declined.

## II.    RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS[2]

Mr. Mason's own Statement of Facts contains numerous assertions that are not supported by the record or are disputed.  DaVita reserves the right contest every allegation contained in this Statement at any trial in this matter.  At this juncture, however, DaVita will only address those alleged facts which may be considered material to the disposition of this motion that are misleading, have no basis in the record, or which contradict Mr. Mason's own deposition testimony.

<u>Paragraph 2</u>.    Pharmacy Service Representatives (PSRs) sell a pharmacy service, not "medication."  (DaVita Ex. 2(A).)  There is no record support for the statement that PSRs "would have to be available for reassignment anywhere in the United States."  The e-mail cited by Mr. Mason only states that PSRs would have to travel anywhere in the United States, which is different from being reassigned.  There is ample record evidence that PSRs were hired for

---

[2]    DaVita will not address the assertions made by Mr. Mason in disputing DaVita's Statement of Material Facts because the absence of a genuine dispute is either apparent based on the record evidence cited by DaVita or Mr. Mason's failure to provide evidentiary support for his assertions.

specific geographic locations, but were expected to travel extensively for the first several years. (Ex. 2(F); Easlon Dep. 48, 51-52 (Ex. 6).)

Paragraph 4.  Christopher Jones, the person hired for the D.C. PSR position, had administrative, management, and patient care experience that was very relevant to the PSR position.  (Jones Resume (Ex. 2(D)); PSR Job Description (Ex. 2(A)).)  Dialysis experience was not a requirement, or even a plus, for the PSR position, which is a sales job.  (PSR Job Description (Ex. 2(A)).)

Paragraph 5.  In discovery, Mr. Mason identified the other alleged African-American PSR applicant as Ignacio Washington.  (Mason Dep. 178-80 (Ex. 25).)  Mr. Mason claims that Mr. Washington "faxed out his resume a number of times" and even "called" DaVita Rx.  (Id. at 179)  Mr. Washington testified that he only gave his application, with no resume, to his facility administrator and never followed up on it.  (Washington Dep. 26-29 (Ex. 26).)  This is but one of the many instances where Mr. Mason's claims diverge from the record facts.

Paragraph 6.  Mr. Mason's description of the PSR selection process contains no citations to the record.  An accurate description of the process, supported by record citations, is set forth in Paragraph 20 of DaVita's Statement of Material Facts.

Paragraph 9.  DaVita Rx did not "continue to advertise for position openings in Maryland" after Ms. Easlon informed Mr. Mason that the position in his area (i.e., D.C.) had been filled on January 9, 2006.  Mr. Mason's Declaration on this subject is inadmissible because it is not based on personal knowledge.  See Fed. R. Civ. P. 56(e).  All of the record evidence shows that DaVita Rx did not advertise or recruit for a PSR position based in Maryland until February 22, 2006.  (Decl. of Randy Larson ("Larson Decl.") ¶ 2 (Ex. 10); Job Posting Form for Maryland PSR Position (Ex. 11); Easlon Dep. 73-74 (Ex. 13); Ex. 2(F).)

Paragraph 11.  The statement that "[b]efore speaking to Easlon about her activities, Golomb concluded that Easlon had not discriminated against Mr. Mason" is a mischaracterization of Mr. Golomb's e-mail, which speaks for itself.  (Mason Ex. E at 1464.) Upon being informed about Mr. Mason's complaint, Mr. Golomb stated that he was "guessing" that the situation was caused by "poor communications."  Id.

Paragraph 14.  Mr. Mason's claim that he was "required to participate in a second telephone interview before an in-person interview, even though he had previously advanced beyond the telephone interview," is highly misleading for reasons set forth at page 14-15 of this Reply Memorandum, and pages 13-14 of DaVita's Memorandum in Support of its Motion for Summary Judgment on Count II of the Second Amended Complaint.

Paragraph 15.  The statement that "[a]fter the second interview, once again, Mr. Mason was denied an in-person interview" is not accurate.  Ms. Easlon had invited Mr. Mason for an in-person interview in Richmond, which Mr. Mason declined.  (Second Am. Compl. ¶ 6; Mason Dep. 138 (Ex. 8).)

Paragraph 16.  The statement that "[a]t no point during or after the interview did Golomb ask Mr. Mason about his sales experience" is contradicted by Mr. Mason himself who testified that he could not remember whether Mr. Golomb asked him about any experience that he had in sales.  (Mason Dep. 167 (Ex. 25).)

Paragraph 17.  See response to paragraph 5.

Paragraph 18.  The statement that "Davita specifically sought people with Mr. Mason's background" is misleading because it suggests that DaVita placed a priority on dialysis experience in recruiting for the PSR position.  DaVita Rx hired people from many different backgrounds and dialysis experience was not a requirement for the job.  (Ex. 2(A), Ex. 2(G),

Easlon Decl. ¶¶ 14, 15 (Ex. 2), Jones Dep. 67-69 (Ex. 7), Easlon Dep. 26 (Ex. 6).) Sales

experience, on the other hand, was considered a plus, and Mr. Mason did not list any sales

experience on his resume (DaVita Ex. 2(C)), nor did he mention it to anyone at DaVita Rx

(Mason Dep. 23 (Ex.8).) Furthermore, the statement that "Mr. Golomb specifically rejected an

applicant because he had too much sales experience" is not supported by the record. Nowhere in

the e-mail referenced by Mr. Mason does Mr. Golomb express concern about the candidate

having too much sales experience. (Mason Ex. E 1475.)

Paragraph 19. The statement that "Easlon indicated that she did not consider Mr. Mason

for a PSR position because he sent an e-mail with grammatical errors," is taken out of context

and misleading. Ms. Easlon testified that she had already decided not to pursue Mr. Mason's

application once she hired Mr. Jones for the D.C. PSR position. However, when she saw Mr.

Mason's January 6, 2006, e-mail which was full of errors, she concluded that he lacked the

attention to detail required for the position. (Easlon Dep. 83-84 (Ex. 6).)

Paragraph 20. Mr. Mason cites no evidence that Ms. Jurd "intentionally" ignored Mr.

Mason other than his speculation.

Paragraph 21. Because Mr. Mason, by his own account, had not worked at any acute

dialysis facility for more than ten years, he has no personal knowledge of and no basis to know

what "acute dialysis treatment" is. An accurate description of the procedures performed at the

GWUH Facility in 2006 and 2007 are explained in the Declaration of Theresa ("Terrie") Jurd,

DaVita's former Regional Operations Director for the GWUH Facility. (Jurd Decl. ¶¶ 5-9 (Ex.

16).)

Paragraphs 23-43. These paragraphs contain Mr. Mason's account of his interactions

with Ms. Oloyede which DaVita vigorously contests and reserves the right to dispute. Indeed,

Mr. Mason's account of his November 2, 2006 meeting with Ms. Oloyode contains numerous supposed details which he could not recall during his deposition. However, because summary judgment for DaVita is still appropriate even if disputes of material fact are resolved in Mr. Mason's favor, DaVita will only address those items that may be material to the disposition of this motion that are misleading, have no basis in the record, or which contradict Mr. Mason's own deposition testimony.

Paragraph 24. Oloyede did not have any "openings" at the facility. Mr. Mason testified that he was hired "to fill in as needed" and conceded that "if there was no need for [his] services, that the facility would not call [him] to work." (Mason Dep. 389-90 (Ex. 19); Opp. at 3.)

Paragraph 37. Mr. Mason's deposition testimony does not support his new assertion that "Oloyede told Mr. Mason that she could work him in on a regular basis on a permanent part-time schedule. She told Mr. Mason that he would have to come in from 7:00 a.m. until 4:00 p.m. on Tuesday, Thursday, Saturday or Sunday." (Opp. at 17.) Mr. Mason testified that he was hired for a PRN position which he defined as "a staff member who they have available to call when it's needed." (Mason Dep. at 388-89 (Ex. 19).) He further testified that he discussed with Ms. Oloyede working usually on Tuesdays, sometimes Thursdays if the other PCT wanted to go on vacation, and being on call on the weekends. (Id. at 374-75 (Ex. 19); 381-82 (Ex. 25).) As a limitation on how much he could work at the GWUH Facility, Mr. Mason testified that Ms. Oloyede and he discussed cutting his hours at his home facility, the Georgetown Facility, so that he would not charge Ms. Oloyede overtime. (Ex. 25 at 390.) Mr. Mason testified that he was already working 30-40 hours a week at the Georgetown Facility. (Id.)

Paragraph 38. Mr. Mason's claims about the "DaVita Agency" program and how he would have been paid $3 more per hour for working at the GWUH Facility have no support in

the record for the reasons set forth at pages 23-25 of this brief and the Declarations of Joan Guest (Ex. 28), the Second Declaration of Theresa Jurd (Ex. 27), and Second Declaration of Omowunmi Oloyede.  (Ex. 29.)

Paragraphs 40-41.  Mr. Mason's account of his dealings with the GWU Employee Health Service and his claim that he completed the health screening are not supported by the official records of this office.  (See Corrected Hulick Decl. generally (Ex. 31).)  Those GWU Health Service records state that Mr. Mason did not receive a health clearance because he did not submit his immunization record and failed to complete a second PPD test.  (Id. ¶ 10, 12.)

## III.    ARGUMENT

### A.    DaVita Rx's non-selection of Mr. Mason in March 2006 does not fall within the jurisdiction of the DCHRA.

Mr. Mason does not dispute that he has the burden of establishing that this Court has subject matter jurisdiction of Mr. Mason's DCHRA claim.  See D.C. Ret. Bd. v. U.S., 657 F. Supp. 428, 431 (D.D.C. 1987) (citing KVOS, Inc. v. Associated Press, 299 U.S. 269 (1936)).  No court has ever asserted subject matter jurisdiction under the DCHRA where, as here, the job in question was to be performed substantially outside of the District and the employment decisions were made outside the District.  In fact, in Grillo v. Lucent Techs., No. 02-0962-JDB, slip op. at 6-7 (D.D.C. July 28, 2004) (Ex. 9), Judge Bates held that this Court did not have subject matter jurisdiction over a case brought under the DCHRA even though the job involved the performance of "a few employment assignments" in the District because the job was performed primarily outside of District and the allegedly discriminatory employment decisions took place outside of the District.

Mr. Mason cannot meet his burden of establishing subject matter jurisdiction by claiming that "he understood that he could be placed anywhere in the United States, including the District

of Columbia." (Opp. at 26.) There is no evidence that anyone at DaVita Rx told him that he was being interviewed for a position that would be substantially performed in D.C. On the other hand, there is ample evidence that there was only one PSR position in Washington, D.C. in 2006 and that position had been filled by Christopher Jones at the end of December 2005. (Golomb Decl. ¶ 4 (Ex. 1); Jones Dep. 80 (Ex. 7); Easlon Decl. ¶¶ 5, 7 (Ex. 2).) Mr. Jones remained in this position until December 2006. (Jones Dep. 70 (Ex. 7).) It was only after December 2006 that Mr. Jones transferred to another PSR position which covered Virginia Beach, North Carolina and Tampa, Florida. (Jones Dep. 21-23) (Ex. 34).)

Mr. Mason has presented no evidence that DaVita Rx sought applicants or hired anyone for a PSR position based in D.C. in 2006. Mr. Mason's citation to an e-mail from Ms. Easlon (bates labeled DAV-3001 and attached as Ex. K to Mr. Mason's Opp.) to claim that "Derrick Camper was assigned to Maryland and the District of Columbia" (Opp. at 27) is misleading. Mr. Camper held the Maryland PSR position. (Ex. 2(H).) However, as is evident from the face of the e-mail, Ms. Easlon only asked Mr. Camper to handle the new patient enrollment at Mr. Mason's dialysis facility because of Mr. Mason's pending lawsuit. She stated: "I was careful not to assign Chris [Jones] to work there because of the person's hard feelings," referencing Mr. Mason. (McGowan Dep. 20-21 (Ex. 33).) This e-mail does not establish that Mr. Camper performed work in D.C. more than once, especially because the DaVita Rx program was never put in place at Mr. Mason's facility. (McGowan Dep. 23 (Ex. 33).)

The fact that PSRs based in one place might be asked to assist with roll-outs of the DaVita RX program in different states, or that some PSRs had territories that covered multiple states (Opp. at 26) does not establish that Mr. Mason would have performed a substantial amount of his work in Washington, D.C. In fact, despite the opportunity to conduct extensive discovery,

Mr. Mason cannot point to any evidence that anyone other than Christopher Jones (the Washington, D.C. PSR) performed any duties in D.C. in 2006, let alone a substantial portion of their duties.

Mr. Mason's reliance on Blake v. Prof'l Travel Corp., 768 A.2d 568, 571 (D.C. 2001), Matthews v. Automated Bus. Sys. & Servs., 558 A.2d 1175, 1180 (D.C. 1989) and Green v. Kinney Shoe Corp., 704 F. Supp. 259, 260 (D.D.C. 1988), is misplaced because there was clear evidence – not speculation -- in those cases that discriminatory acts took place in D.C. or a substantial portion of the work would take place in D.C. In Blake, numerous incidents of alleged in-person sexual harassment took place in Washington, D.C., and the alleged harasser was physically present in D.C. when he made harassing phone calls to the plaintiff. See Blake, 768 A.2d at 570-71. Matthews, 558 A.2d at 1180, lends no support to Mr. Mason's position because forty to sixty percent of the plaintiff's work there was performed in the District, some acts of sex discrimination took place in the District, and some terms of employment were negotiated while the parties were physically present in the District. Green, 704 F. Supp. at 260, is also readily distinguishable because the job in question would be located in the District of Columbia.

Finally, Mr. Mason's citation to forum non conveniens cases is completely irrelevant to the question of whether the Court has subject matter jurisdiction under the DCHRA. See 20 Charles Alan Wright & Mary Kay Kane, Federal Practice and Procedure: Federal Practice Deskbook, § 44 at 349 (2002) ("The distinction must be clearly understood between jurisdiction, which is the power to adjudicate, and venue, which relates to the place where judicial authority may be exercised and is intended for the convenience of the litigants.")

**B.    The Court should grant summary judgment on Mr. Mason's claim that DaVita retaliated against him by not offering him a PSR position in March 2006.**

Mr. Mason claims that DaVita Rx Director Josh Golomb did not advance him in the PSR hiring process in March 2006 because Mr. Mason had filed an internal complaint of race discrimination against DaVita Rx Regional Sales Manager Kimberly Easlon.  Because Mr. Mason has cherry-picked certain sentences from <u>Aka v. Washington Hosp. Ctr.</u>, 156 F.3d 1284 (D.C. Cir. 1998) to support his arguments, DaVita will address this case and why it provides no support for Mr. Mason's opposition to this motion.

The plaintiff in <u>Aka</u> had applied for a Central Pharmacy Technician position at a hospital. After being denied the position, the plaintiff filed an age and disability discrimination action against the hospital.  The employer in <u>Aka</u> argued that the selectee was more qualified for the position and had displayed more enthusiasm during his interview.  <u>Id.</u> at 1294, 1297-98.  The plaintiff presented overwhelming evidence on which a jury could conclude that the proffered explanation was false.  Specifically, the plaintiff had nineteen years of pharmacy experience and a master's degree in health service management.  <u>Id.</u> at 1295-96.  The selectee had only volunteered at a pharmacy for two months and did not even have a college degree.  With regard to the hospital's finding that the selectee was more "enthusiastic," the Court noted that "[p]articularly in cases where a jury could reasonably find that the plaintiff was otherwise <u>significantly better qualified</u> than the successful applicant, an employer's asserted <u>strong reliance on subjective feelings</u> about the candidates may mask discrimination."  <u>Id.</u> at 1298 (emphasis added).  The court cautioned, however, that "[a]n employer's reliance on disputed subjective assessments will not create a jury issue in every employment discrimination case.  For example, if this reliance is modest, and the employer has other, well-founded reasons for the employment decision, summary judgment for the defendant may be appropriate."  <u>Id.</u>  On the facts presented

in Aka, the Court concluded that summary judgment should not have been granted to the employer.

Mr. Mason's retaliation case bears no resemblance to Aka.

First, Mr. Mason has not pointed to any evidence showing that he was significantly better qualified than any other PSR selectee. The only selectee to which Mr. Mason has compared himself is Christopher Jones. However, as discussed extensively in DaVita's prior briefs, Mr. Mason cannot demonstrate that his qualifications for the PSR position are significantly better than Mr. Jones.[3]

Second, there was nothing "subjective" about Mr. Golomb's evaluation of Mr. Mason's performance during his March 9, 2006 interview for the PSR position. The "subjective" considerations in both Aka and Fichbach v. District of Columbia Dep't Health Corrections, 86 F.3d 1180, 1184 (D.C. Cir. 1996) (cited by Aka), pertained to the applicant's enthusiasm and interpersonal skills. Mr. Golomb did not think that Mr. Mason was as strong as other candidates he had seen in terms of (1) "Understanding and experience of sales," (2) "Sales effectiveness (in role plays [he] did with them via phone)" (3) "Thoughtfulness about approach for working with Physicians" and (4) "Flexibility ([Mr. Mason] voiced some concerns about travel)". (Ex. 1(A).) Mr. Golomb documented these concerns in a March 17, 2006 e-mail written eight days after he interviewed Mr. Mason, many months before Mr. Mason filed this lawsuit. At his deposition, Mr. Golomb elaborated on his concerns and stated that Mr. Mason's answers to questions about how he would sell the DaVita RX service to teammates and physicians were not good answers.

---

[3]    See DaVita Inc.'s Mem. of Points and Authorities in Support of Summ. J. on Count I of the Second Am. Compl. at 13-15; DaVita Inc.'s Reply Mem. of Points and Authorities in Support of Summ. J. on Count I of the Second Am. Compl. at 16-18; DaVita Inc.'s Mem. In Support of Motion for Summ. J. on Count II of the Second Am. Compl. at 15.

(Golomb Dep. 103, 106-107, 109, 113-14 (Ex. 5).)[4]  Mr. Golomb did not select Mr. Mason

because of the substance of his answers to interview questions which Mr. Mason does not

dispute were also asked of Mr. Jones during his second interview.  (SMF ¶ 37; Opp. at 22 (not

disputing fact).)  The evaluation of substantive answers to interview questions is not the

consideration of "subjective" factors such as attitude and interpersonal skills.

Mr. Mason also claims that Mr. Golomb's reasons are not credible, but has not put forth

any evidence on which a reasonable jury could draw this conclusion.  With regard to Mr.

Golomb's concern about Mr. Mason's answer about how he would motivate teammates to

promote the DaVita Rx program, Mr. Mason continues to insist that his answer – that DaVita

Rx's success "would help to improve profit sharing" (Mason Dep. 163-64 (Ex. 25)) – was a good

answer because it focused on financial incentives.  (Opp. at 30.)  However, "profit sharing," as

Mr. Golomb explained, was a not good financial incentive because the benefit to the employee is

too remote.  (Golomb Dep. 106-07 (Ex. 5).)  Both Mr. Golomb and Ms. Easlon explained that a

good answer would have been that the DaVita Rx service would result in better patient care, and

that this would in turn improve a facility's patient care metrics which directly affect a

teammates' bonus.  (Golomb Dep. 106-07 (Ex. 5); Easlon Dep. 126-27 (Ex. 6).)

Mr. Mason also claims that he gave a good answer about how he would sell the DaVita

Rx service to physicians by "explain[ing] that doctors were most concerned about the care of

their patients."  (Opp. at 30.)  It is not up to Mr. Mason to determine whether an answer is good,

---

[4]    There is nothing noteworthy about the fact that Mr. Golomb did not take notes of Mr.
Mason's interview or that he was parked in a Dunkin donuts parking lot when he conducted the
interview.  (Opp. at 31.)  There is no evidence that Mr. Golomb took notes of the many other
interviews that he had conducted for PSR positions.  Moreover, Mr. Golomb had to conduct the
interview from this location because Mr. Mason had not been available at the appointed
interview time and Mr. Golomb started driving to his next appointment.  (Golomb Dep. 92-97
(Ex. 5); Mason Dep. 160-62 (Ex. 8).)

however.  See Jackson, 496 F.3d at 708-09.  Mr. Golomb thought that a good answer would have taken into account the fact that physicians are diverse in their attitudes and what they care about, and would have involved an assessment about the physician's priorities and selling the program based on those priorities.  (Golomb Dep. 109 (Ex. 5).)

Mr. Mason tries to make much ado of the fact that in documenting his concerns about the interview, Mr. Golomb had written that Mr. Mason had "voiced" some concerns about travel, but later said at his deposition that Mr. Mason's very short answer about travel (i.e., that it would be fine) "felt a bit to me like he was telling me what he thought I wanted to hear as opposed to really demonstrating that he had thought through the implications."  (Golomb Dep. 113-14 (Ex. 5).)  While Mr. Mason may not have literally said that he had concerns about travel, what he did say, as perceived by Mr. Golomb, "voiced" a concern.  There is no inconsistency between what Mr. Golomb wrote and his testimony.

Mr. Mason also claims that Mr. Golomb's use of the telephone to conduct Mr. Mason's second interview instead of an in-person meeting is evidence that Mr. Golomb had a retaliatory motive.  He argues that it would not have been acceptable, for example, if DaVita Rx had decided to interview all black applicants by telephone while interviewing all white applicants in person.  (Opp. at 32-33.)  While such a hypothetical set of facts might give rise to an inference of an unlawful motive, those are not the facts here.  As explained at page 13 of DaVita's opening brief, Mr. Golomb's use of the telephone to conduct the second interview was a product of the unique circumstances presented by Mr. Mason's case, and the D.C. Circuit stated in Salazar v. Washington Metropolitan Transit Authority, 401 F.3d 504, 508 (D.C. Cir. 2005), an employer's deviation "from its normal appointment process in response to [the plaintiff's] concerns" is "not all that probative" on the issue of discrimination.  Furthermore, this court has held that "[e]ven if

a court believes that the employer used poor selection procedures, it may not second guess an employer's personnel decision absent a demonstrably discriminatory motive." McNally v. Norton, 498 F. Supp. 2d 167, 182 (D.D.C. 2007) (Collyer, J.) (citations and internal quotations omitted).

Mr. Mason also claims that Mr. Golomb had already made up his mind to not offer Mr. Mason a position before he offered to interview him in March 2006. (Opp. at 33.) However, Mr. Mason has cited to no evidence in the record (as opposed to counsel's unsubstantiated assertions) from which a jury could draw this conclusion. For example, Mr. Mason provides no record citation for the assertion that "[b]efore talking to Mr. Mason, Golomb had already come to Easlon's defense on her motivations, and taken the position that Mr. Mason's application should not be advanced." (Opp. at 33.) Mr. Golomb took no such position. In fact, Ms. Easlon testified that -- after she expressed her opinion that Mr. Mason was not a qualified candidate based on the number of misspellings and errors in Mr. Mason's e-mail which showed that he did not have the attention to detail required for the position -- Mr. Golomb stated that he would interview Mr. Mason and arrive at his own conclusions. (Easlon Dep. 84 (Ex. 6); 86-87 (Ex. 13).)

Finally, in response to DaVita's common sense argument that Mr. Golomb's entirely voluntary decision to interview Mr. Mason for other PSR positions outside of D.C. after he filed his internal complaint is inconsistent with a retaliatory motive, Mr. Mason claims that Mr. Golomb had to give him an interview because the EEOC had inquired about an unidentified employment matter, and that "[i]t was only after DaVita was contacted by the EEOC that Golomb offered to interview Mr. Mason." (Opp. at 32.) This assertion is incorrect. Mr. Golomb informed DaVita human resources manager Gail Gardner on or about February 9, 2006

that he would interview Mr. Mason for positions outside of D.C. (Gardner Decl. ¶ 5 (Ex. 3).)

The only evidence submitted by Mr. Mason regarding the inquiry by the EEOC is an e-mail from

Gail Gardner dated <u>March 1, 2006</u> which states that Mr. Golomb had already decided to

interview Mr. Mason as of that date.  (Mason Ex. K, DAV-02272.)  Furthermore, the first

paragraph of this e-mail suggests that the call from the EEOC had nothing to do with Mr. Mason,

as it concerned a complaint of "discrimination & harassment."  (<u>Id.</u>)

        The foregoing discussion makes clear that Mr. Mason has presented no facts on which a

reasonable jury could conclude that Mr. Golomb's reason for not selecting Mr. Mason for a PSR

position is false, or that Mr. Mason's prior complaint played any role in Mr. Golomb's decision.

> **C.    The Court should grant summary judgment on Mr. Mason's claim that
> DaVita's failure to use his services at the GWUH Facility in 2007 constituted
> retaliation.**

> **1.    Mr. Mason did not suffer a materially adverse action.**

> **a)    There is no genuine dispute that DaVita had no need for the
> services of another PCT at the GWUH Facility after November
> 2, 2006 and that Mr. Mason did not apply for an available job.[5]**

        Mr. Mason cannot establish that he suffered a materially adverse action because DaVita

has submitted unrebutted evidence that DaVita had no need for another PCT's services (other

than the one PCT who had been working at the GWUH Facility since May 2006) from

November 2, 2006 when Mr. Mason met with the GWUH Facility's Facility Administrator, Ms.

Oloyede, to the date of this Motion for Summary Judgment.  Ms. Mason concedes that his

services would only be used if there was a need.  (SMF ¶¶ 61- 62; Opp. at 24 (not disputing this

fact); Opp. at 3 (admitting that Ms. Oloyede only "offered to employ Mr. Mason on an as needed

---

[5]       Mr. Mason claims that he "is not required to show that he applied for an available job" to
state a prima facie case of discrimination (Opp. at 4), but cites no authority and makes no attempt
to explain why the clear rule articulated in <u>Morgan v. Fed. Home Loan Mtg. Corp.,</u> 328 F.3d
647, 651 (D.C. Cir. 2003) does not apply here.

basis.")  Mr. Mason also does not dispute that from November 2, 2006 to the present, DaVita (1) did not advertise for or interview any applicants for a PCT position of any kind (full-time, part-time, or PRN) at the GWUH Facility (Oloyede Decl. ¶ 13 (Ex. 17); Bonnet Decl. ¶¶ 6, 9 (Ex. 15)), or (2) use the services of any PCT (in any capacity) at the GWUH Facility other than Shanna McGill who had already been working at the Facility since May 2006.  (Oloyede Decl. ¶ 13 (Ex. 17); Bonnet Decl. ¶ 8 (Ex. 15).) (Opp. at 23 (not disputing these facts).)

Mr. Mason only claims that DaVita did have a need for his services because "DaVita used PRN employees to perform PCT duties after Mr. Mason's meeting with Oloyede on November 2, 2006."  (Opp. at 24).  This assertion does not create a genuine dispute of material fact about whether the services of any PCTs were needed at the GWUH Facility, however, because all of the PRN[6] employees who worked at the GWUH Facility from November 2, 2006 to the present were nurses, not PCTs such as Mr. Mason.  (Second Oloyede Decl. ¶ 3 (Ex. 29).)

Mr. Mason may consider himself to be as skilled as a nurse, but he is not a nurse. (Mason Dep. 392 (Ex. 25).)  He cannot genuinely dispute that nurses can do much more than a PCT at an acute dialysis facility such as the GWUH Facility.  The job description for Acute PCT explicitly states that such PCTs must "perform[] duties under the direct supervision of a Registered Nurse."  (Bonnet Decl. Ex. B (Ex. 15(B).)  Although some patient care duties performed by nurses can be performed by a PCT under the direct supervision of a nurse, there also is no dispute that <u>only nurses</u> can perform all five of the patient procedures offered by the GWUH Facility.  (Jurd Decl. ¶¶ 5-7 (Ex. 16); Oloyede Decl. ¶¶ 5-7 (Ex. 17).)  Both Ms. Oloyede and Ms. Jurd explained in their declarations that a PCT such as Mr. Mason can only perform

---

[6]    As Mr. Mason explained at his deposition, the term PRN is used to describe the status of an employee, not the type of job the employee holds.  Employees who are on "PRN" status are employees who are asked to work on an as needed basis.  (Mason Dep. 389 (Ex. 25).)

limited patient care duties as to <u>one</u> of these five procedures (hemodialysis inside the DaVita unit for patients who can be brought down to the unit) and even then, they must do so <u>under the direct supervision of a nurse</u>. (Jurd Decl. ¶¶ 5-7 (Ex.16); Oloyede Decl. ¶¶ 5-7 (Ex. 17); Bonnet Decl. Ex. B (Ex. 15(B)). Thus, a PCT's utility when the clinic is open is limited to times when there are more than two patients receiving dialysis in the clinic because the PCT can attend to the third and fourth patients under the supervision of the nurse who is already there to attend to the first two patients. (Jurd Decl. ¶ 8 (Ex. 16); Oloyede Decl. ¶ 8 (Ex. 17).) There would be no point in having a PCT attend to the first two patients because there must still be a nurse in the room to provide direct supervision. (<u>Id.</u>) For the same reason, PCT's are not designated to be on call during the evenings or Sundays because the person on call must be able to perform <u>all</u> of the procedures that are offered by the Facility. (Jurd Decl. ¶ 9 (Ex. 16); Oloyede Decl. ¶ 9 (Ex. 17).)[7]

---

[7]    Mr. Mason's attempt to convince the Court that nurses and PCTs perform the same duties by quoting only the first part of Ms. Oloyede's deposition regarding the respective patient care duties of nurses and PCTs is highly misleading. (Opp. at 35-36.) After explaining the PCT duties and stating that nurses can also perform those duties, Ms. Oloyede testified as follows about the many patient care duties that nurses perform that a PCT cannot:

Q.    Plus what? First, do [nurses] do all the duties that the PCTs perform?
A.    Yes, sir.
Q.    And what other duties?
A.    Medication, give the medication during treatment; blood transfusion; order from the doctors, doctor's orders; report from the floors where the patient come from; ICU patient.
Q.    What does that mean, ICU?
A.    Patient in intensive care, bedside patient.
Q.    Can the PCT go into ICU?
A.    No
Q.    Anything else?
A.    Isolation patient.
Q.    Can the PCT go in to treat isolation patients?
A.    No
Q.    Okay, What else?
A.    Apheresis, apheresis therapy that we mentioned above. (continued)

Mr. Mason disputes that he would only be able to perform limited tasks relating to hemodialysis inside the clinic because "Oloyede informed [him] he could perform many of the dialysis duties since he was trained as an acute PCT" and "Oloyede specifically asked Mr. Mason if he could work on call during the overnight hours."  (Opp. at 23.)  Even if Ms. Oloyede made these statements (which she did not), her statements do not create a genuine dispute of fact regarding what tasks he could perform.  Telling Mr. Mason that he could perform "many" of the dialysis duties certainly does not suggest that he could perform <u>all</u> of the dialysis duties of a nurse and says nothing about all the other procedures that must be performed at the GWUH Facility.  Asking Mr. Mason if he could work on call during the overnight hours also does not establish that he could perform all of the duties of a nurse.

Although there is no genuine dispute about the fact that a nurse can perform the full complement of patient care duties at the GWUH Facility while a PCT such as Mr. Mason cannot, Mr. Mason would like this Court to conclude that he suffered a materially adverse action because DaVita did not change its practice of staffing its clinic with only nurses (in addition to the existing PCT, Shanna McGill) so that it could use his services instead.  Mr. Mason is essentially asking this Court to impose its judgment that the GWUH Facility and its patients would have been better served by using a PCT who <u>cannot perform</u> <u>all</u> of the procedures that are offered by

---

Q.    Okay.  Anything else?
A.    CRRTT, continual replacement mentioned above.
Q.    Okay.  Anything else?
A.    Get the -- it's called hand-off communication, hand-off, H-A-N-D off, hand-off communication, to the floor.
Q.    Okay.  Anything else?
A.    The nurses are the only one that take calls in the hospital, on call, on call.
Q.    Okay.  Anything else?
A.    That's it.  And supervise the -- and before I finish, the PCT is still working under the supervision of RN.  So the PCT is not working by them self.  They are working under the supervision of RN.  They are working under the RN license. (Oloyede Dep. 43-45 (Ex. 30).)

DaVita instead of a nurse who can.  Mr. Mason cites no authority for this remarkable proposition

which has been rejected by both the Supreme Court and the D.C. Circuit.

   In Furnco Const. Corp. v. Waters, 438 U.S. 567, 578 (1978), the Seventh Circuit had held

that the employer's practice of not hiring bricklayers at the jobsite was not justified as a business

necessity and therefore discriminatory.  The Seventh Circuit reasoned that there was a better way

to hire bricklayers that would maximize the hiring of minority employees.  The Supreme Court

reversed, holding that the Court had should not have substituted its own judgment for the

employer's.  "Courts are generally less competent than employers to restructure business

practices, and unless mandated to do so by Congress they should not attempt it."  Id.

   The D.C. Circuit very recently reiterated its view of the court's proper role in

employment discrimination actions in Jackson, 496 F.3d at 708-09.  It stated:

> "Courts must not second guess an employer's initial choice of appropriate qualifications;
> rather, the courts must defer to the employer's decision of what non-discriminatory
> qualities it will seek in filling a position. . . . Questioning the employer's hiring criteria is
> not within the province of this court.  Particularly given the dynamic nature of the hiring
> process, moreover, we have also stated that we will not second-guess how an employer
> weighs particular factors in the hiring decision."

Id. (citations and internal quotations omitted).  See also Holcomb v. Powell, 433 F.3d 889, 897

(D.C. Cir. 2006) ("[w]e have consistently declined to serve as a super-personnel department that

reexamines an entity's business decisions") (citations and internal quotations omitted); Stewart v.

Ashcroft, 352 F.3d 422, 429 (D.C. Cir. 2004) ("Because courts are not super personnel

departments that reexamine an entity's business decisions, we defer to the [employer's] decision

of what non-discriminatory qualities it will seek in filling the . . . position.") (citations and

quotations omitted).

   The D.C. Circuit's decision in Barbour v. Browner, 181 F.3d 1342, 1345-46 (D.C. Cir.

1999) is also instructive.  The plaintiff in Barbour claimed that in promoting another candidate

over her, the employer should not have considered the fact that the other candidate had demonstrated the ability to perform the duties of an employee at a higher pay grade (GS-14) because the pay grade of the job in question was lower (GS-13).  This is analogous to Mr. Mason's suggestion that DaVita cannot consider the fact that nurses can perform many more patient care duties than a PCT in making its staffing decisions.  The <u>Barbour</u> Court rejected this argument, stating that "Title VII . . . does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions.  This is precisely the role the court would play, however, were the jury to ignore Peterson's GS-14 level job duties on the basis of the argument Barbour advances."  <u>Id.</u> at 1346.

These cases stand for the fundamental principle that courts will not question an employer's determination of what qualifications it believes would best fulfill its business needs. Here, DaVita had an <u>ongoing</u> practice of staffing its facility with one full-time PCT, Shanna McGill, and nurses.  (Second Oloyede Decl. ¶ 3 (Ex. 2a).)  DaVita continued that practice after Ms. Oloyede met with Mr. Mason on November 2, 2006, and did not use or seek the services of any other PCT such as Mr. Mason.  (Oloyede Decl. ¶ 13 (Ex. 17); Second Oloyede Decl. ¶ 3 (Ex. 29).)  The only way that the Court could conclude that there was work for Mr. Mason to perform would be for the Court to impose its judgment that DaVita should have changed its practice and used Mr. Mason instead of a nurse. [8]  The imposition of such a judgment would be unprecedented.

---

[8]    Mr. Mason does not argue, nor could he argue, that DaVita decided to increase the number of nurses at the Facility instead of using his services.  Ms. Oloyede's monthly work schedules show that DaVita's use of nurses did not vary substantially from November 2006 to May 2007.  <u>See</u> Second Oloyede Decl. ¶ 8 (providing explanation and analysis of the work schedules from November 2006 to May 2007 and attaching legible copies of the schedules) and Attachment A (Ex. 29(A)).

Mr. Mason also does not dispute that the number of procedures conducted in February 2007, when Ms. Oloyede allegedly told Mr. Mason, "I can't use you," was 179, the lowest it had been in the preceding 12 months, and that the average number of patient procedures per month in the 12 months preceding February 2007 was 243.  (Jurd Decl. ¶ 14 and Ex. B & C (Ex. 16(B), 14 (C).)[9]  The work schedule for February 2007 also shows that Ms. Oloyede had to cut the hours of nurses who had been scheduled to work that month.  (Second Oloyede Dep. ¶ 6 and Tab A (Ex. 29(A).)

Unable to dispute these numbers, Mr. Mason argues that Mr. Mason should have been called to work in January 2007 when the patient count was higher.  (Opp. at 25, 39).  However, according to his own Declaration, Mr. Mason did not call the GW Employee Health Department to check on the status of his screening until some unspecified date in January 2007.  (Mason Decl. ¶ 41.)  The Director of the Employee Health Service submitted a declaration stating that she did not even receive one of Mr. Mason's PPD test results until January 12, 2007 (Corrected Hulick Decl. dated August 23, 2007 ¶ 9 (Ex. 31)),[10] and there is a fax cover sheet from Mr. Mason in the Health Service file showing that Mr. Mason sent the PPD results on January 12, 2007.  (Ex. 31(1).)  On this fax, Mr. Mason wrote:  "PPD test results . . . will send Hep results next week."  (Id.) (emphasis added).  Thus, by his own admission, Mr. Mason could not have completed his health clearance until the second half of January at the earliest.  Even assuming arguendo that Mr. Mason was cleared to work in the middle of January 2007 (which the corrected Hulick Declaration makes plain that he was not), Mr. Mason would not have been

---

[9]     These totals are based on billing records which were produced to Mr. Mason in discovery, so his complaint about DaVita's chart summarizing the data for the Court is baseless.

[10]     DaVita mistakenly submitted the Declaration of Katherine Hulick dated August 9, 2007, as Ex. 21.  Ms. Hulick had signed a corrected declaration on August 23, 2007, which should have been filed instead.  This document was provided to Mr. Mason in discovery on August 23, 2007.

placed on the schedule for January which was nearly over.  Ms. Oloyede had prepared the

January schedule in the last week of December.  (Second Oloyede Decl. ¶ 4 (Ex. 29).)

      Mr. Mason also claims that Ms. Oloyede should have used him in March 2007 and

thereafter.  However, Ms. Oloyede learned in March 2007 from the Employee Health Service

that Mr. Mason had not completed his screening.  (Oloyede Decl. ¶ 15 (Ex. 17).)  Ms. Oloyede

has explained that she did not call Mr. Mason to tell him that he had not completed the process

because she did not have a need for Mr. Mason.  (Id. ¶ 15; Oloyede Dep. 103 (Ex. 30).)  (Indeed,

the work schedule shows that Ms. Oloyede had to cancel PRN nurses who had been on the

schedule in March 2007.  (Second Oloyede Decl. ¶ 6 and Attachment A at DAV-2973 (Ex.

29(A).))  Ms. Oloyede also explained at her deposition that in March 2007, the accrediting

agency for GWUH – referred to as the "Joint Commission" -- conducted an inspection of the

GWUH Facility and expressed concern about her using a PCT at the Facility.  (Oloyede Dep.

103-105 (Ex. 30.)  The Joint Commission did not like the fact that the PCTs had to insert needles

into the patient's skin to place them onto the dialysis machines because this activity required

more skill.  (Id.)  Ms. Oloyede testified that after this inspection, she became reluctant to use

another PCT at her facility.  (Id.)

             **b)**      **There is no genuine dispute that Mr. Mason's benefits and compensation would not have changed even if DaVita had used Mr. Mason's services at the GWUH Facility.**

      Under Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999), the denial of a lateral

transfer with no increase in pay or additional benefits is not actionable retaliation because it is

not a materially adverse action.  Mr. Mason does not dispute that he would not have received any

additional benefits had he worked additional hours at the GWUH Facility because he was already

a full-time employee at the Georgetown Facility.  (Opp. at 24 (only claiming that Mr. Mason

would have received more compensation.)  Mr. Mason also does not dispute that because Ms.

Oloyede was concerned about paying him overtime rates, he would have had to cut back his hours where he was working (the Georgetown Facility) so that his total hours would not exceed forty hours a week.  (SMF ¶ 63; Opp. at 24 (not disputing this fact).)  However, Mr. Mason now claims for the first time in this litigation that he would have been paid $3/hour above his normal rate had he split his time between the Georgetown Facility and the GWUH Facility under a program called "DaVita Agency".  (Mason Decl. ¶ 38.)  This unsupported assertion does not create a genuine issue of material fact for several reasons.

First, Mr. Mason's own testimony about his discussions with Ms. Oloyede makes no mention of this "DaVita Agency" concept.  Indeed, Mr. Mason admitted in his deposition that he and Ms. Oloyede never agreed to any change to his hourly rate if he were to be called to work at the GWUH Facility.  Mr. Mason testified as follows:

> Q.    Now, was there a discussion when you met with Ms. Oloyede about how much you would be paid?
>
> A.    What I told her, because of the overtime -- we did discuss that.  I said because of the overtime, my current salary would be okay because I was -- it would be overtime in the beginning.  And I told her after my hours change, we would talk about the difference in pay as far as working in the acute setting.

(Mason Dep. 395-96 (Ex. 25).)  In short, Mr. Mason's claim that he would have been paid an additional $3/hour is pure speculation.  Mr. Mason's assertions regarding the "DaVita Agency" program in his declaration should be stricken because there is no indication that it is based on personal knowledge or that he is competent to testify on this subject.  See Fed. R. Civ. P. 56(e).

Second, the former and current Regional Operations Directors ("ROD") for the GWUH Facility who are in a position to know about DaVita's compensation practices have submitted declarations stating that they have never heard of a program called "DaVita Agency."  (Second Jurd Decl. ¶ 3 (Ex. 27); Guest Decl. ¶ 3 (Ex. 28).)  Terri Jurd – the ROD over the GWUH Facilty for more than ten years states in her Second Declaration that only in unusual cases have DaVita

employees been paid a higher hourly rate than their usual rates as an incentive for them work at other DaVita facilities that had staff shortages. (Second Jurd Decl. ¶ 3 (Ex. 27).) The decision to pay a higher hourly rate has been made on a case-by-case basis and would have to be approved by the ROD. (Id.) Joan Guest, Ms. Jurd's replacement since July 2007 and a ROD for outpatient facilities in the D.C. area for more than three years describes the same practice in her Declaration. (Guest Decl. ¶ 3 (Ex. 28).) Ms. Jurd states that at no time did she ever approve a higher salary rate for Mr. Mason. (Second Jurd Decl. ¶ 4 (Ex. 27).) Ms. Oloyede states in her Second Declaration that she never spoke to Ms. Jurd about paying Mr. Mason a higher hourly rate. (Second Oloyede Decl. ¶ 9 (Ex. 29).) She states that she would not have paid him more than his regular rate had she used his services. (Id.)

Mr. Mason also claims that working at both the Georgetown Facility and the GWUH Facility would not have been a lateral transfer because "Mr. Mason's facility often cut his hours, so working at the other facility would allow him to work a full-time schedule and gain additional compensation." (Opp. at 4) (emphasis added). DaVita's weekly payroll and timesheet records for Mr. Mason for the 51 weeks after Mr. Mason met with Ms. Oloyede on November 2, 2006 (weeks ending November 18, 2006 through October 28, 2007) tell a very different story. (Jason Peek Decl. ¶¶ 2-6 and Attachment A thereto (Ex. 33).) In this period of 51 weeks, there were 26 weeks in which Mr. Mason worked overtime (i.e. more than 40 hours) at the Georgetown Facility. When he worked overtime in these 26 weeks, Mr. Mason sometimes logged as many as six overtime hours per week. He worked a total of 116.28 hours of overtime in these 26 weeks. (Id. ¶ 3.) In 11 of the 51 weeks, Mr. Mason was paid for a full 40 hours. Such hours consisted of either (a) of time worked or (b) time worked and paid time off. (Id. ¶ 4.) In 7 of

these 51 weeks, Mr. Mason was paid for more than 39 hours.   (Id. ¶ 5.)  In the remaining 7 of

these 51 weeks, Mr. Mason was paid for anywhere from 35.95 to 39 hours.  (Id. ¶ 6.)

Because Mr. Mason has worked a full-time schedule and more than 116 overtime hours

since November 2, 2006, it is clear that he could not have increased his hours by working at the

GWUH Facility.  Mr. Mason admits that the arrangement that he discussed with Ms. Oloyede

would have required him to cut back his hours at the Georgetown Facility so that his hours at the

GWUH Facility would not run into overtime.  (SMF ¶ 63; Opp. at 24 (not disputing this fact).)

In fact, Mr. Mason would not have been able to work 116 hours of overtime had he been called

to work at the GWUH Facility.  Thus, DaVita's decision not to use Mr. Mason's services

actually benefited Mr. Mason by allowing him to earn more than $3,000 in overtime since

November 2, 2006 (116 hours multiplied by Mr. Mason's regular rate or $18.00/hour times

150%.)

> **2.      Mr. Mason has produced no evidence of a causal link between the
> filing of his lawsuit or his internal complaint of discrimination against
> DaVita and DaVita's failure to use his services at the GWUH Facility.**

Mr. Mason claims that there were two DaVita managers involved in the decision not to

use his services the GWUH Facility:  Ms. Oloyede and Ms. Jurd.  However, Mr. Mason does not

dispute that Ms. Oloyede had no knowledge about any complaints or lawsuits that Mr. Mason

had filed against DaVita before he filed his Amended Complaint regarding her failure to use him

at the GWUH Facility.  (SMF ¶ 75; Opp. at 5, 25 (not disputing SMF ¶ 75.).  Accordingly, Ms.

Oloyede could not have, as a matter of law, retaliated against Mr. Mason.  See Clark County

School Distr. v. Breeden, 532 U.S. 268, 273 (2001) (summary judgment for the employer on

plaintiff's retaliation claim was proper because no causal connection could be made where the

person alleged to have retaliated had no knowledge about the plaintiff's protected activities.)

Furthermore, Mr. Mason does not dispute that neither Ms. Jurd nor Ms. Oloyede was the subject of the lawsuit he had filed on May 19, 2006, or the internal complaint that he had filed in January 2006. (Opp. at 5.) Courts in this circuit have refused to find a causal connection between a plaintiff's protected activity and the allegedly retaliatory action where the person taking the action was not involved in any of the events that resulted in the protected activity. <u>See</u> <u>Wada v. Tomlinson</u>, No. 03-1488, 2007 WL 1378516 (D.D.C. May 9, 2007) (Ex. 23); <u>Bieber v. Runyan</u>, No. 93-1391, 1996 WL 525372, at *11 (D.D.C. September 9, 1996) (Ex. 23). Mr. Mason has cited no authority to the contrary and does not even attempt to distinguish these cases.

Mr. Mason also does not dispute that in the seven months after Ms. Jurd was advised of Mr. Mason's lawsuit, she approved his being sent to training to become a preceptor and the granting of a value award to him at the end of 2006. (SMF ¶¶ 48, 49; Opp. 23 (not disputing facts).)

In the face of these facts, Mr. Mason argues that "[i]n light of all the actions taken to hire [him], and the sudden withdrawal of the offer after Oloyede spoke to Terri Jurd, a reasonable jury could infer that the offer to work was withdrawn as a result of Mr. Mason's EEO Complaint." (Opp. at 40.) The problem with this argument is that there is not a scintilla of evidence that Ms. Jurd took any action to affect Mr. Mason's chances of being called upon to work at the GWUH Facility. Ms. Oloyede has stated under oath that Ms. Jurd told her that it would be "okay" for her to use Mr. Mason on an as needed basis (SMF ¶ 69; (Oloyede Decl. ¶ 13 (Ex.17)), and Mr. Mason has submitted no evidence that suggests otherwise. Ms. Jurd's alleged failure to acknowledge or speak to Mr. Mason when she visited his facility (Opp. at 5), even if true, is hardly enough to support an inference of retaliation.

### 3. Mr. Mason was not qualified to work at the GWUH Facility because he never completed his mandatory employee health screening.

Mr. Mason contends that the GWUH employee health screening was not mandatory and further claims that he completed the screening. As set forth in the Corrected Declaration of Katherine Hulick, dated August 23, 2007, the health screening is a mandatory requirement of the hospital. As the Director of the GWUH Employee Health Service, Ms Hulick has personal knowledge of this fact. (Corrected Hulick Decl. ¶ 4 (Ex. 31).) Mr. Mason's unsupported assertion to the contrary cannot create a genuine dispute about this fact. In fact, Mr. Mason testified that he "knew that [he] would have to have a physical done and that they would have to check my PPD and my hepatitis status." (Mason Dep. 388 Ex. 25).) Mr. Hulick also states in her declaration that, according to her department's records, Mr. Mason never completed the health screening because he failed to send in an immunization record and did not complete a second PPD test. (Id. ¶¶ 10, 12, 13). Mr. Mason admits that he did not submit the results of two PPD tests, and he does not dispute that he did not submit an immunization record. (Mason Decl. ¶ 39-40.) He only claims that he was told that "everything was done." (Id.) Even assuming arguendo that he was so advised, the fact remains that he did not complete the screening and was not cleared to work by the Employee Health Service. Accordingly, he could not work at the hospital and was not qualified.

### 4. Mr. Mason has put forth no facts that call into question DaVita's non-retaliatory reason for not using his services at the GWUH Facility.

The discussion in Section III.C.(1) supra makes clear that DaVita has articulated a legitimate non-retaliatory reason for not using Mr. Mason's services, and Mr. Mason has not set forth any evidence to suggest that this reason is a pretext for retaliation.

## IV.    CONCLUSION

For all the foregoing reasons, DaVita respectfully requests the Court to grant its Motion

for Summary Judgment on Count II of the Complaint.

Respectfully submitted,

By:    _____/s/ Minh N. Vu_____
Minh N. Vu (Bar No. 444305)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
Tel: (202) 861-0900; Fax: (202) 296-2882


_____/s/ Joseph T. Ortiz_____
Joseph T. Ortiz, (admitted pro hac vice)
Epstein Becker & Green, P.C.
1875 Century Park East, Suite 500
Los Angeles, CA 90067-2506
Tel: (310) 557-9542; (310) 553-2165 (fax)


Dated:  November 21, 2007        Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of November 2007, a copy of DaVita Inc.'s Reply

Memorandum of Points and Authorities in Support of Summary Judgment and Exhibits 25-34

were served through the Court's Electronic Court Filing system to counsel listed below:

> David A. Branch
> Law Office of David A. Branch
> 1825 Connecticut Avenue, NW
> Suite 690
> Washington, D.C. 20009


_____/s/ Minh N. Vu_____
              Minh N. Vu