**EXHIBIT 25**

```
 1               UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3                      CIVIL DIVISION

 4

 5   - - - - - - - - - - - - -x

 6   JAMES MASON,                :

 7           Plaintiff,          :   Civil Action No.

 8      vs.                      :   06-1319(RMC)

 9   DAVITA INC.,                :

10           Defendant.          :

11   - - - - - - - - - - - - -x

12

13            DEPOSITION OF JAMES L. MASON

14

15

16                              Washington, DC

17                              Wednesday, February 1, 2007

18

19

20

21   REPORTED BY:

22      CARMEN SMITH
```

1   A   He asked me about my background. I told
2   him, you know, I had 23 years of experience in
3   dialysis, I worked in the operating room and
4   emergency surgery and in orthopedic surgery, labor
5   and delivery. I told him my experience with
6   training. He asked me if I had experience with --
7   or relationship with the doctors, and I told him,
8   you know, we were the go-between, between the
9   patients and the doctors. It's us, it's the
10  technicians, because we spend most of our time with
11  the patients. We know what type of medications
12  they're supposed to take. We know if they're not
13  taking it by their blood lab results. We know if
14  they're not taking their blood pressure medicine
15  because of the way their pressure is when they come
16  into the facility and they leave.
17        You know, general questions like that. He
18  also asked me some scenarios of how I would handle a
19  situation, training, if I had staff members who --
20  that I was training or presenting the DaVita RX
21  program to, if they were resistant, reluctant
22  because of us, us meaning patient care techs or

1  people in the medical field, being bombarded with
2  people coming, teaching us programs from everywhere,
3  how would I handle that.
4          And I told him that, you know, that this
5  is the DaVita program, and part of the DaVita
6  program is any time that DaVita has a success, it's
7  a success for us.  And sometimes we get profit
8  sharing, and that would help to improve on the
9  profit sharing if this program was successful, and
10 that, you know, it's not just because a lot of
11 people really don't want to hear anything that you
12 have to say from pharmaceutical representatives or
13 anyone, when you have a heavy workload.
14         And I told him that's what I would
15 reassure them, that you're working for a goal, a
16 certain goal.  With the patients.  He asked me the
17 same thing, how would I deal with the patient, who,
18 maybe a senior, who didn't want to switch over
19 because they're used to a pharmacy that they have
20 been dealing with for years.
21         And I told him, you know, that most
22 patients that I'm aware of in dialysis have to use

1  anything like that. So that wasn't a problem.
2      Q   Did you discuss the issue of sales
3  experience or any experience that you had in sales?
4  Did that come up at all?
5      A   I don't remember if he asked me that
6  question. I remember him telling me that it wasn't
7  important, that that wasn't -- you know, that they
8  do the training and that, you know, anything that I
9  needed to know about the way they did sales would be
10 taught to me through DaVita.
11     Q   Did you talk about the fact that you would
12 have to travel extensively?
13     A   Yes, yes. He asked me, he said, well,
14 would you consider relocating? And I said yes, I
15 would consider that. You know, I could speak to my
16 wife. It was sudden for him, you know, to ask me
17 about relocating. So I said yeah, I'll talk to her.
18 I hadn't spoken to her about relocating. So I said
19 yeah, I can talk to my wife, that's not a problem,
20 relocating.
21         The travel, I told him we had already
22 spoken about it, we had a family meeting, sit down

1  privacy consideration.
2          THE WITNESS: I don't have the home
3  number. I have his cell phone number.
4          BY MS. VU:
5     Q    Okay. Well, all I'm saying -- do you have
6  his home number?
7     A    No.
8          MS. VU: Because I've asked for his -- I
9  mean, usually you're supposed to give the contact
10 information when you're asked to identify a witness,
11 unless, of course, you have to contact the person
12 through counsel. So if your client has the
13 information, then he should provide it, although I
14 understand the cell phone concern, that some people
15 are sensitive about calls on their cell phone.
16         So maybe you can just check with him and
17 see if I can speak with him.
18         BY MS. VU:
19    Q    Okay. What about Ignatio Washington?
20    A    Ignatio Washington. Again, he's a friend
21 of mine. We worked in dialysis together a lot. I
22 trained him in dialysis to be a technician.

23184
CS

1  Dialysis technician. He used to be an
2  administrative assistant. He used to be a
3  secretary, and we trained him -- I trained him to be
4  a dialysis tech. And he did that for a number of
5  years, I don't know, five, six years maybe, he's
6  been doing that. Maybe five. So I let him know
7  about the position during the same time I let Jeff
8  know.
9      Q    Is he employed by DaVita now?
10     A    Yes, at Union Station.
11     Q    At Union Station, okay. What's his
12 current position?
13     A    Dialysis -- patient care tech.
14     Q    And Mr. Washington is African-American?
15     A    Yes.
16     Q    Now, what is your knowledge of his
17 application for a PSR position?
18     A    He told me that he called, like I did, and
19 didn't receive any response right away. So I told
20 him to, you know, get your resume together, fax it
21 out, try that. And he faxed out his resume a number
22 of times, I'm not sure exactly how many, but he told

23184
CS

1  me, you know, he faxed it out. He didn't get any
2  response from that. So he asked his administrator
3  to call the DaVita RX department to try to see what
4  was going on and what they could do to get him, you
5  know, an interview or whatever.
6  　　　　　And as far as I know, he told me he never
7  got any response at all.
8  　　Q　Did his administrator get back to him
9  after being asked to contact DaVita RX?
10 　　A　I don't know. He just told me that he
11 never received any response so he gave up.
12 　　Q　What were Mr. Washington's qualifications?
13 　　A　He does -- he knows computer work also,
14 and he does part-time work I know of with another
15 company, singing, singing at weddings and stuff like
16 that, and helping to promote -- getting jobs to sing
17 at these wedding events and stuff like that.
18 　　　　　But dialysis, you know, technician, the
19 same thing that I do, the facility. He's a senior
20 technician there where he is now, doing mostly, you
21 know, head of patient education also. He is the one
22 there that's the Shining Star at Union Plaza.

```
 1                UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLUMBIA

 3                       CIVIL DIVISION

 4

 5

 6   - - - - - - - - - - - - - -x

 7   JAMES MASON,                :

 8         Plaintiff,            :    Civil Action Number

 9      vs.                      :    06-1319 (RMC)

10   DAVITA INC.,                :

11         Defendant.            :

12   - - - - - - - - - - - - - -x

13

14            DEPOSITION OF JAMES MASON, VOLUME III
              ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

15

16                                   Washington, D.C.

17                                   Wednesday, August 1, 2007

18

19

20

21   REPORTED BY:

22      CARMEN SMITH
```

1    A    Yes.

2    Q    You're saying that she said that she thought you could actually work on the dialysis floor where normally only the GW nurses worked because of your background; is that right?

6    A    Yes.

7    Q    Okay. What else did you discuss?

8    A    I discussed the times. She told me the times she would need me, from about 7:00 a.m. to about 4:30. Sometimes it ran over, but about 4:30 p.m.

And she discussed some weekend work, being on call because of acute patients coming in and emergency situations, they would call me at home or page me, and I would come in. I'd have to be within 30 minutes of getting to the facility to dialyze the patients.

18    Q    So if I hear you correctly, you said earlier that you had talked about working on Tuesdays usually and sometimes on Thursdays, and then being on call on the weekends. Is that fair?

22    A    Yes, yes.

24410
CS
Case 1:06-cv-01319-RMC    Document 45-3    Filed 11/20/2007    Page 12 of 18

382

1  Q  Would it be fair to say that Ms. Oloyede
2  was saying that if there was a need for you, she
3  would use your services?
4  A  She said during the times when the other
5  staff member, and I can't remember her name, when
6  she needed to go on vacation, because she told me at
7  the time that the young lady hadn't been on vacation
8  in a long time, working the hours that she worked,
9  that I would cover for her.
10     The particular day we talked about was
11 Thursday, I believe, was the day that the young lady
12 would like to take off, and some Saturdays.
13  Q  Is that why Thursdays was a "sometimes"?
14  A  Yes.
15  Q  Okay. So what Ms. Oloyede was saying to
16 you, as I understand it, is that Thursdays you might
17 work if Ms. -- the other PCT wanted to take time
18 off -- wanted to take time off; right?
19  A  Yes. And sometimes they also didn't have
20 as many patients on Thursday, may not have the same
21 amount of patients.
22  Q  So there might not be a need at all?

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700        800-336-6646

1    Q    It's all right. My question is, was it
2    your understanding, coming out of this conversation
3    with Ms. Oloyede, that in order for you to start
4    working at the facility, at the GW University
5    Hospital facility, that you would have to complete
6    the medical/health clearance process that is put in
7    place by the hospital?
8    A    She didn't really specify. I mean, I knew
9    that I would have to take a physical working at
10   other hospitals. You know, each hospital, they have
11   their own requirements after someone is hired. So
12   it was kind of -- I knew that I would have to have a
13   physical done and that they would have to check my
14   PPD and my hepatitis status.
15   Q    Now, in your interrogatory answers, you
16   refer to the position that you were allegedly hired
17   for by Ms. Oloyede as a per diem position. Do you
18   remember that?
19   A    Yes.
20   Q    You also then refer to it as a "PRN
21   position."
22   A    Yes.

 1    Q    Is per diem and PRN the same?

 2    A    Basically.

 3    Q    What do those two terms mean?

 4    A    It's like two -- permanent PRN and just
 5  PRN, a staff member who they have available to call
 6  when it's needed.  Like we were discussing about the
 7  other facilities I worked at and that that person is
 8  known, you know, that person, his or her name is
 9  there and available to help out when needed.

10         And the permanent PRN is a staff member
11  who is -- who has specified days to work, specific
12  days to work, and then other days would fill in when
13  needed.

14    Q    In your interrogatory responses, you said
15  that you were basically hired as a PRN position?

16    A    Yes.

17    Q    Which is to fill in on days where needed?

18    A    Yes, that may have been a mistake.  But I
19  was hired.

20    Q    Well, hired to fill in as needed; correct?

21    A    Yes.

22    Q    Would you agree, Mr. Mason, that if there

1   was no need for your services, that the facility
2   wouldn't call you to work PRN, or per diem?
3       A    Yes.
4       Q    Now, earlier this morning, you said that
5   you and Ms. Oloyede, when you were having this
6   in-person meeting, also talked about how to
7   structure the hours so that you wouldn't go over
8   to -- you wouldn't be into overtime?
9       A    Yes, because the overtime would fall under
10  her budget.
11      Q    Right.  So at the time you were working
12  how many hours at Georgetown on the Potomac?
13      A    40 hours per week, unless the week fell on
14  one of the days where they cut my hours short.
15      Q    Okay.  So you were working basically a
16  40-hour week schedule -- 30 to 40 hours a week
17  already at Georgetown?
18      A    Yes.
19      Q    So then was the expectation with
20  Ms. Oloyede that you would only work a maximum of 10
21  more hours -- I mean, you know, of -- a maximum of
22  10 hours at her facility, so as to avoid her having

```
 1      A    Yes.  In the beginning she needed me right
 2 away.  In January she told me she needed me right
 3 away, she would need me in January.  And later on,
 4 we could scale back my hours at Georgetown and make
 5 up those hours at GW.
 6      Q    Isn't that something that your current
 7 facility administrator would have to sign off on?
 8      A    I don't think so.  I don't know.  I don't
 9 know.  We have -- we have a lot of staff at
10 Georgetown right now.  I just trained a young lady,
11 and I trained another young gentleman, Roger.  And
12 so we had enough staff at our facility, and that's
13 why our days had been shifted around.
14           We also had someone who was working
15 permanent PRN at our facility.
16      Q    At Georgetown?
17      A    Yes, at Georgetown.
18      Q    Now, Mr. Mason, you are not a registered
19 nurse; correct?
20      A    No.
21      Q    Is it your understanding that the GW
22 University Hospital does not allow people who are
```

1  Q   So if you were working on the floor, you
2  would be -- on the hospital floor, you would be
3  assisting the nurses who worked there; correct?
4  A   I would be performing the dialysis
5  procedure.  I would just need the nurses to give the
6  medications.  And if the patient's health status
7  changed, if their blood pressure went up too high, I
8  would notify the nurses.
9  Q   Right.  But that means there would have to
10 be a nurse there at all times while you worked
11 there; correct?
12 A   Yes, on the floor, but not necessarily in
13 the room with me, you know, while I'm dialyzing a
14 patient.
15 Q   Now, was there a discussion when you met
16 with Ms. Oloyede about how much you would be paid?
17 A   What I told her, because of the
18 overtime -- we did discuss that.  I said because of
19 the overtime, my current salary would be okay
20 because I was -- it would be overtime in the
21 beginning.  And I told her after my hours change, we
22 would talk about the difference in pay as far as

```
 1  working in the acute setting.
 2       Q   Did she actually agree to that?
 3       A   Yes.
 4       Q   How long was your meeting with
 5  Ms. Oloyede -- or how long did you spend in the
 6  facility the day that you met Ms. Oloyede in person?
 7       A   I don't know.  I don't know.  Maybe an
 8  hour, maybe longer.
 9       Q   Did you provide Ms. Oloyede or anybody
10  else at the facility with any documents?
11       A   The employee health, after they did the
12  physical and gave me a PPD, I gave them the results
13  of the PPD.
14       Q   Okay.  I am only now talking about the day
15  on which you went in and met Ms. Oloyede in person.
16  Isn't that a separate day from the day that you went
17  to the employee health?
18       A   Yes, yes.
19       Q   Okay.  Let's stick with the day that you
20  went to the GW University Hospital facility and met
21  with Ms. Oloyede in person.  Did you provide her
22  with any documents?
```