# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JAMES MASON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1319 (RMC) |
| | ) | |
| DAVITA INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

James Mason, an African American male, was not selected in January and March 2006 for a Pharmacy Services Representative ("PSR") position by DaVita Rx, a subsidiary of DaVita, Inc., for which Mr. Mason works.  He has sued under the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq.*, alleging that his non-selection was because of his race and/or retaliation for protected activities.  DaVita moves for summary judgment at the close of discovery, opposed by Mr. Mason. *See* Def.'s Mot. for Summ. J. on Count I of the Second Am. Compl. and Mem. of P. & A. in Supp. of Summ. J. on Count I of the Second Am. Compl. (Def.'s Mem. I") [Dkt. #24] and Def.'s Mot. for Summ. J. on Count II of the Second Am. Compl. ("Def.'s Mem. II") [Dkt. #39].

## I.  BACKGROUND FACTS[1]

DaVita operates dialysis centers across the United States.  Def.'s Statement of Undisputed Material Facts In Supp. of Summ. J. on Count I of the Second Am. Compl. ("Def.'s Facts") [Dkt. #24] ¶ 1.  Mr. Mason has worked for DaVita for twelve years as a Patient Care

---

[1]  The facts are undisputed unless otherwise indicated.  *See* LCvR 56.1.

Therapist, responsible for performing dialysis training and patient education.  Pl.'s Second Amended Complaint ("SAC")[Dkt. #22] ¶ 5.  In 2005, he received recognition as a "Shining Star," that is, the staff person at his DaVita dialysis clinic whom patients voted to be the most capable and best liked. Def.'s Facts ¶ 28; Def.'s Mem. I, Ex. 8, Deposition of James Mason ("Mason Dep.") at  46. Throughout the pendency of this lawsuit, Mr. Mason has continued to work for DaVita as a PCT at its Georgetown Facility in Washington, D.C.  Def.'s Mem. II, Ex. 15, Declaration of Janis Bonnet ("Bonnet Decl.") ¶ 2.  DaVita's PCTs perform hemodialysis therapy and data collection. *Id*.

In late 2004, DaVita started to develop a pharmacy business to complement its dialysis centers.  Def.'s Facts ¶ 2.  "DaVita Rx," as it was named, provides prescription drugs by mail to the patients who receive care in the parent company's outpatient care facilities. *Id*. ¶ 1.  From January to July/August of 2005, DaVita ran a "pilot" of the new business, after purchasing a small pharmacy.  Def.'s Mem., Ex. 5,  Deposition of Joshua Golumb ("Golumb Dep.") at 15.  As the new business grew, it hired PSRs, whose job it was to convince DaVita employees (all DaVita employees are called "teammates") in the dialysis clinics that this was a good way to advance patient care; convince patients that they should obtain their medications from DaVita Rx; and convince physicians that the concept would help their patients.[2] *See* Def.'s Mem., Ex. 2(A) (PSR Job Description).  With respect to physicians, the PSRs were expected to "sell them on the value of Davita RX [sic]." Golumb Dep. at 44.  By the time the DaVita Rx business was fully built up, it was anticipated that

---

[2]  The medications are delivered to the clinics by FedEx or United Parcel Service ("UPS"). A clinic teammate inventories the contents and stores them in a locked cabinet.  "There's a set of processes around making sure that the clinic teammate who is responsible for that knows when the patient will be coming to service.  They would then go to the locked cabinet, get the patient's medication when they were there for [dialysis] service, deliver it to the patient, go over the statement of what was in the pack and have the patient sign that they had received the medications."  Golumb Dep. at 43-44.

DaVita Rx would end up with 30-40 PSRs working their own territories.  Def.'s Facts ¶ 6.  But "especially during [the] early stages, they worked very collaboratively.  They worked in teams." Golumb Dep. at 50.

## A.  DaVita RX

In late November 2005, DaVita Rx posted a position vacancy on the DaVita website for a PSR to be based in Washington, D.C.  At that time, Kimberly Easlon was in charge of hiring all PSRs.  *See* Def.'s Mem. I, Ex. 2, Declaration of Kimberly L. Easlon ("Easlon Decl.") ¶ 2.  Ms. Easlon started with DaVita Rx in a part-time position when the business was very new and became full-time in February 2005.  Def.'s Facts ¶ 5.  She developed the PSR position after working in the dialysis clinics doing actual patient enrollments herself "to decide what type of person would be best suited for this type of a position and what their qualifications would be.  And through putting together our process, we also put together a plan on how to train" new PSRs.  Def.'s Mem., Ex. 6, Deposition of Kimberly Easlon ("Easlon Dep.") at 23.

> The pharmacy services rep is responsible for many things and wears many different hats.
>
> They are responsible for working directly with the patients to enroll them in our service.  They are responsible for working with teammates within the facility to make sure they gain teammate buy-in and teammate support.
>
> And they are responsible for working with physicians to make sure that the physicians support and understand our program.
>
> . . . [P]robably 50 percent of the PSR's time is spent doing administrative work alone.  Now, of the remaining 50 percent, about 30 percent of that would be spent with patients, 15 percent with teammates, and 5 percent with physicians.

*Id*. at 26.[3]  Mr. Mason responded to the posting and applied for the D.C.-area PSR position by

sending in his resume in November 2005.  Def.'s Facts ¶ 27.  Mr. Mason's resume did not refer to

his race and listed no work experience in administration, management, or sales.  Def.'s Mem., Ex.

2(C).

      Ms. Easlon screened the resumes she received and called Mr. Mason and Christopher

Jones, another DaVita employee for 15-minute telephone interviews.  She invited both of them to

meet her in Richmond, Virginia, for an in-person interview on December 12, 2005, when she would

be in that city; she was only going to be in Richmond for one day.  *See* Easlon Decl. ¶¶ 5-6.  Mr.

Jones accepted the invitation; Mr. Mason declined because it was a day on which he was to work a

15-hour shift and the clinic was understaffed, making it difficult for him to take the time off. *Id.* ¶¶

6-7; SAC ¶ 6.  Ms. Easlon told Mr. Mason that she was about to go on a vacation and would not

return until January but that she would contact him then.  Def.'s Facts ¶ 33; Def.'s Mem., Ex. 8,

Mason Dep. at 137-40.  However, Mr. Jones traveled to Richmond and was interviewed in person

by Ms. Easlon.  SAC ¶ 6.  She was impressed enough to send him to California, for interviews with

other DaVita Rx managers.  Easlon Decl. ¶ 7. Mr. Jones did well in those interviews.  He was

offered, and accepted, the D.C. PSR position on December 20, 2005. *Id.*

---

[3]  The PSR Job Description identified certain job qualifications:

> Positive Attitude; Active seller (needs to be able to ask direct questions);
> Personable; Ability to train facility teammates; Attention to Detail; Patient;
> Organizational skills; Self-direction; Goal oriented; Time management
> skills; Some computer skills; Problem Solver; Willingness to learn; High
> school diploma or GED required.

Def.'s Mem.,  Ex. 2(A).

When he did not hear from Ms. Easlon in early January 2006, Mr. Mason sent her the following email:

> Re: Davita Pharmacy enterview
>
> Ms Easlon It was very exciting talking with you about the Pharmacy rep. position.  Im just e-maling you, to let you know about my work scedule for Jan.06.  I beleive that I would be a great asset in recruting patients for Davitas Phamacy program, and Im again excited about the posibility.  Again thank you for the opertunity to join the crew.

Def.'s Mem., Ex. 2(E) (errors in original).  Ms. Easlon apologized for not contacting Mr. Mason sooner and told him that she "regret[ted] that we have filled the position that was available in your area."  *Id.*  She was also unimpressed with his email, with its typographical and spelling errors, and decided that he did not have sufficient attention to detail to perform well as a PSR.  Easlon Dep. at 83 ("After I received Mr. Mason's e-mail, it had many errors in it.  He was no longer a candidate. . . . Actually, he was no longer a candidate once Chris was hired.  Chris accepted the job.  But when Mr. Mason sent me the e-mail, it solidified it.").

On January 27, 2006, Mr. Mason filed an internal charge with DaVita, asserting that he was not selected for the D.C. PSR position because of his race.  *See* Def.'s Facts ¶ 45; SAC ¶ 8.  Ms. Easlon did not know Mr. Mason's race prior to his filing of this internal complaint.  Easlon Dep. at 70-72; Easlon Decl. ¶ 2, Ex. 2.  Mr. Mason had never communicated his race to anyone at DaVita Rx in connection with his PSR job application, nor did he mention his race in his communications with Ms. Easlon.  Mason Dep. 131-33, Easlon Decl. ¶ 13.  On or about February 9, 2006, the Human Resources Manager responsible for interviewing Mr. Mason about his complaint, Gail Gardner, spoke to Josh Golomb about Mr. Mason's complaint.  Def.'s Mem. I, Ex. 3, Declaration of Gail

Gardner ("Gardner Decl.") ¶ 5, Ex. 3.   In response, Josh Golomb decided to conduct his own telephone interview with Mr. Mason and come to his own conclusions.  *See* Def.'s Reply I, Ex. 13 at 87.    Mr. Golomb spoke to Ms. Easlon to find out why she had not conducted an in-person interview with Mr. Mason.  Golomb Dep. at 69-70.  Ms. Easlon told him that she had been only considering Mr. Mason for the Washington D.C. post and that that position was filled.  Easlon Dep. at 73.  Although it was not DaVita Rx's practice to relocate people to fill PSR positions, Mr. Golomb decided to interview Mr. Mason for a PSR position outside the Washington D.C. area.  Gardner Decl. ¶ 5.  Ms. Easlon forwarded the January email from Mr. Mason to Mr. Golomb because she "didn't feel Mr. Mason was a qualified candidate" due to the misspellings in the email and the large portion of the PSR job that entails administrative paperwork.  Easlon Dep. at 84.  However, Mr. Golomb was Ms. Easlon's supervisor and had the authority to hire Mr. Mason over her objection. *Id.* at 86-87.

Mr. Golomb called Mr. Mason and arranged for a telephone interview to take place on March 9, 2006, at 8:00 a.m. Eastern Standard Time.  Golomb Dep. at 92-93.  Although he has his office in Northern California, Mr. Golomb was in Orlando, Florida on the day of this interview.  *Id.* at 93.  Mr. Golomb called Mr. Mason at his home at the appointed time but Mr. Mason did not answer.  *Id.* at 94-95. Mr. Golomb left messages at Mr. Mason's home and on his cell phone.  *Id.* at 95.  After waiting for half an hour, Mr. Golomb left his hotel room for his first appointment of the day.  *Id.* at 95-96.  Mr. Mason called Mr. Golomb when the latter was driving and apologized for having thought the time for the call was 8 a.m. Pacific Standard Time, or 11 a.m. on the East Coast. *Id.* at 97.  Mr. Golomb pulled off the road and conducted a 45-minute interview with Mr. Mason. *Id.* at  98.  The interview included questions about how Mr. Mason would handle various situations,

dealing with patients, teammates and physicians. *Id.*. at 100-107; Mason Dep. at 164-66. Mr. Golumb thought Mr. Mason "gave decent but not particularly strong answers." Golomb Dep. at 106.

When asked about patients, Mr. Mason said that he would emphasize the convenience of having medications delivered to the clinic. *Id.* at 103; Mason Dep. at 164. Mr. Golumb noted that Mr. Mason "focused on the financial aspect" of DaVita's incentive compensation programs when describing how he would approach teammates. Golomb Dep. at 103. Mr. Golumb also said that Mr. Mason "talked about emphasizing that this is good for patients," when asked how he would approach doctors. *Id.* However, Mr. Golumb offered that "[a] strong answer for those questions shows a thoughtfulness and an empathy to understand where the person is coming from and to tailor your answer." *Id.* at 106. "The aspect that gets [teammates] excited about DaVita Rx is that this supports patient care . . . . [As an example,] if a clinic has performed poorly on a metric around bone and mineral metabolism, which is one of our key metrics, then there are a few drugs that we provide that we think we drive greater adherence to and to emphasize patients using DaVita Rx will more likely take those drugs that are needed for that condition and have better outcomes over time." *Id.* at 107-08. Mr. Golumb, comparing Mr. Mason and Mr. Jones, further explained:

> Mr. Jones had demonstrated a greater knowledge of what motivates teammates and physicians, and he demonstrated a better understanding of the sales process in general, which is to understand your customer and what they care about and then tailor your message to them as opposed to deciding yourself what you think they should care about and pushing that message.

*Id.* at 108-09. In addition, Mr. Golumb was concerned that Mr. Mason had not completely thought through the consequences of accepting a job that involved travel for 75% of his time. Mr. Golumb's own experience is that "travel is very challenging and draining on anyone" but Mr. Mason's "very

short, curt response that it was fine" "felt a bit to me like he was telling me what he thought I wanted

to hear as opposed to really demonstrating that he had thought through the implications." *Id.* at 113-

114. Mr. Mason has decried Mr. Golomb's explanations as litigation justifications. *See* Pl.'s Opp'n

to Def.'s Mot. for Summ. J. on Count II of the Second Am. Compl. [Dkt. #43]. But the record

reflects that Mr. Golomb recounted these thoughts in an email on March 17, 2006, months before

this suit was filed. *See* Pl.'s Mem. I, Ex. 1A. Specifically, Mr. Golumb addressed interviews that

he had, not just with Mr. Mason, but also another applicant, and reported:

> James [Mason] was solid overall. Jeff was mediocre. However
> neither of them was as strong as other candidates we have been
> interviewing in terms of the following areas:
> •      Understanding and experience of sales
> •      Sales effectiveness (in role plays I did with them via phone)
> •      Thoughtfulness about approach for working with Physicians
> •      Flexibility (both voiced some concerns about travel)

*Id*. Mr. Golomb called Mr. Mason on March 17, 2006 to "let him know what while he was – had

a lot of great qualities, while he was clearly an excellent PCT and a value to DaVita, we would not

be pursuing going further [sic] in the interview process." Golomb Dep. at 121.

**B. George Washington Hospital Facility**

        In 2006 and continuing to the date DaVita's motion was filed in November 2007 (and

perhaps the present), DaVita has operated an acute care dialysis facility within George Washington

University Hospital ("GW Hospital Facility"). The GW Hospital Facility provides dialysis and other

patient care services for patients of the hospital. Def.'s Mem. II, Ex. 17, Declaration of Omowumni

Oloyede ("Oloyede Decl."). Omowumni Oloyede has been the Facility Administrator since May

2006, with one fulltime PCT/Administrative Assistant, Shanna McGill, and an average of two to

three registered nurses during the facility's hours of operation.[4]

On November 2, 2006, Mr. Mason interviewed with Ms. Oloyede for a position as a patient care technician.  Oloyede Decl. ¶ 12, Ex. 17.  According to Mr. Mason, the two of them discussed having him work on a "per diem" basis from 7:00 A.M. to 4:30 P.M. on Tuesdays, sometimes on Thursdays when Ms. McGill was on vacation, and "some Saturdays."  Mason Dep. 381-82, 388-89, Ex. 19.  Mr. Mason would work only as needed.  *Id.* at 389.  Ms. Oleyede informed Mr. Mason that he would have to contact the George Washington University Hospital's Employee Health Service to go through a medical clearance process, required of all persons working at the hospital with patient care duties.  *Id.* at 386.  Ms. Oloyede informed Theresa Jurd, Regional Operations Director for DaVita's Washington, D.C., Region, that she wanted to use Mr. Mason's services on an as-needed basis, and Ms. Jurd said this would be "okay."  Oloyede Decl. ¶ 13, Ex. 17.

Mr. Mason disputes that Ms. Oloyede received the approval of Ms. Jurd because Ms. Oloyede never communicated with him after that point in time.  However, as of March 2007, Ms. Oloyede learned from the Hospital that Mr. Mason had not completed the medical clearance process, Oloyede Decl. ¶ 15, a point that Mr. Mason does not dispute.  In any event, with or without Ms. Jurd's approval, it is uncontested that from and after November 2, 2006, DaVita never offered extra work to Mr. Mason at the GW Hospital Facility.  It is also uncontested that DaVita did not interview any applicants for a PCT position at the Facility and did not use the services of any PCT except Shanna McGill.  Oloyede Decl. ¶ 13; Bonnet Decl. ¶¶ 6, 8, 9.  Mr. Mason insists that "DaVita used

---

[4] Mr. Mason disputes this staffing arrangement but has no evidence to the contrary.  He directs the Court to his Ex. I, submitted with his opposition [Dkt. #43] but, as Ms. Oloyede's declaration states, "[t]he only PCT on these schedules is Shanna McGill" and the other "PRN" employees are all nurses.  *See* Def.'s Reply II, Ex. 29.

PRN employees to perform PCT duties after Mr. Mason's meeting with Ms. Oloyede on November 2, 2006." *See* Pl.'s Opp'n [Dkt. #43] at 24.  Ms. Oloyede first found out that Mr. Mason had filed a lawsuit against DaVita in the Summer of 2007.  Oloyede Decl. ¶ 16.  Prior to this time, she had no knowledge of any complaint that Mr. Mason had against DaVita or DaVita Rx.  *Id.*

### C.  Recognition of Mr. Mason

In December 2006, Ms. Geraldine McGowan, Facility Administrator at the Georgetown Facility, asked Ms. Jurd for approval to recognize Mr. Mason and one other teammate with a "value award."  Def.'s Mem. II, Ex. 18, Deposition of Geraldine McGowan ("McGowan Dep.") at 13-15.  Ms. Jurd approved the request and Mr. Mason received a value award.  *Id.*  At the end of 2006 or the beginning of 2007, Ms. McGowan recommended that Mr. Mason be sent to DaVita's "preceptor university" in Nashville, Tennessee where he would be trained to teach DaVita teammates how to perform dialysis.  *Id.* at 13.  In June 2007, Mr. Mason received a raise from $17.49/hour to $18.01/hour.  Bonnet Decl. ¶ 4.  In July 2007, Mr. Mason received a positive performance evaluation.  *Id.* ¶ 5.

Mr. Mason filed his initial Complaint in the Superior Court of the District of Columbia on May 19, 2006.[5]  It was removed to this Court based on the diversity of citizenship of

---

[5]  In July 2006, the Facility Administrator of the Georgetown Facility, Geraldine McGowan, received an email from DaVita's in-house counsel advising her that Mr. Mason had filed a lawsuit against DaVita Rx, and requesting that she provide Mr. Mason's personnel file to DaVita's outside defense counsel for that lawsuit.  Pl.'s Mem. II, Ex. 16(A) (July 18, 2006 e-mail).  Attorney Cooper made clear in the email that the lawsuit only concerned DaVita Rx (a separate business unit) and had nothing to do with her clinic.  *Id.*  Mr. Cooper also reminded Ms. McGowan that it would be a violation of company policy to take any action against Mr. Mason because of the suit.  *Id.*  Ms. McGowan forwarded this e-mail to Ms. Jurd, as an "FYI."  *Id.*

the parties on July 26, 2006.[6]  Mr. Mason filed a Second Amended Complaint [Dkt. # 22] on June

4, 2007.  It contains two counts, both identified as Count I.  For ease of reference, the Court will call

them Count I and Count II.  In Count I, Mr. Mason alleges:

> Defendant, in violation of the D.C. Human Rights Act, knowingly and intentionally engaged in unlawful discrimination by denying Mason an in-person job interview and selection to the pharmacy services representative and PCT position[s] based on his race.  Defendants[7] have also engaged in a pattern and practice of discrimination against minorities for promotions when the minorities work in centers or facilities which serve the minority population.

SAC ¶ 16.  Count II complains:

> Defendant, in violation of the D.C. Human Rights Act, knowingly and intentionally engaged in unlawful retaliation by denying Mason an in-person job interview and selection to the pharmacy services representative based on his prior protected activity.   After Mr. Mason filed an EEO complaint, Golomb required Mr. Mason to submit to a second telephone interview even though he had previously advanced beyond the telephone interview; changed the selection criteria from an emphasis on patient care to an emphasis on sales; failed to evaluate him fairly in the telephone interview despite his solid performance; and refused to advance his application.   Davita [sic] later revoked an offer of employment at the acute facility at George Washington Hospital because of Mr. Mason's EEO complaint and lawsuit against Davita [sic].

*Id.* ¶ 21.

---

[6] Mr. Mason is a resident of the District of Columbia and DaVita is incorporated in Delaware and has its principal place of business in El Segundo, California.

[7] Despite this plural, the only Defendant is DaVita, Inc.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c); *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).   Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson*, 477 U.S. at 248 (1986).  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Greene*, 164

F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

Finally, the D.C. Circuit has directed that because it is not difficult for a finder of fact to infer discriminatory intent from written documents submitted as evidence in employment discrimination lawsuits, the court should view summary judgment motions in such cases with special caution. *See Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), *overruled on other grounds by Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).

### B.  Claim Under D.C. Human Rights Act

The D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01-1403.17, prohibits employers from discharging or otherwise discriminating against an individual with respect to the terms and conditions of employment based on the individual's membership in a protected category. *See id.* § 2-1402.11(a)(1). "[T]he intent of the Council of the District of Columbia . . . [is] to secure an end . . . to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of race color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression . . . ." *Id.* § 2-1401.01. Mr. Mason's Second Amended Complaint alleges both discrimination and retaliation in violation of the DCHRA. In analyzing a claim of employment discrimination under the DCHRA, courts look to Title VII and its jurisprudence. *Knight v. Georgetown Univ.*, 725 A.2d 472, 478 n.5 (D.C. 1999); *Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2, 3 (D.D.C. 1989) (applying the analysis in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 (1973) to case brought under the DCHRA); *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994) (applying the legal standard of Title VII claims to claims brought under the DCHRA); *Regan v. Grill Concepts-D.C., Inc.*, 338 F. Supp. 2d 131 (D.D.C.

2004).   The requirements for a prima facie case of discrimination are flexible and vary depending on the type of case.  *McDonnell Douglas*, 411 U.S. at 804.

Here, in order to demonstrate a race discrimination claim under the DCHRA, Mr. Mason must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the adverse action gives rise to an inference of discrimination.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Brown v. Brody*, 199 F. 3d 446, 452 (D.C. Cir. 1999).  Although not explicit, Count I, Plaintiff's direct discrimination claim, appears to be one for discriminatory failure to promote.  To establish a prima facie case of discriminatory failure to promote, "the complainant must prove four elements: (1) that [he] was a member of a protected class; (2) that [he] applied for a job for which [he] was qualified; (3) that [he] was rejected in favor of another applicant; and (4) that a substantial factor in the employment decision was [his] membership in the protected class."  *United Planning Org. v. District of Columbia Comm'n on Human Rights*, 530 A.2d 674, 677 n.3 (D.C. 1987); *accord*, *Burdine*, 450 U.S. 248, 253 & n.6.

Count II alleges that Davita engaged in "unlawful retaliation."  Under the DCHRA, it is an unlawful discriminatory practice "to. . . retaliate against. . . any person on account of having exercised. . . any right granted or protected under this chapter."  D.C. Code § 2-1402.61(a) (2001).  To establish a claim of retaliation, Mr. Mason must prove that (1) he engaged in protected activity; (2) he suffered from a materially adverse act; and (3) a causal connection exists between the protected activity and the employer's act.  *See Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006); *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006).  In addition, "where the plaintiff claims that the retaliation took the form of a failure to hire, the plaintiff must also show [(1)] that he applied for an available job, and [(2)] that he was qualified for the position."  *Morgan v. Fed.*

-14-

*Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003).

Retaliatory acts are not limited "to those that are related to employment or occur at the workplace." *Burlington*, 126 S. Ct. at 2409. However, a plaintiff must show that the employer's actions "would have been materially adverse to a reasonable employee." *Id.* Further, "an employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* The Supreme Court has emphasized that the employer's action must be "materially" adverse because the statute protects employees from significant harms and does not protect an employee from "those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 2415. Further, an objective "reasonable person" standard applies. *Id.* Employees are not protected from "all retaliation, but from retaliation that produces an injury or harm." *Id.* at 2414. Cases must be evaluated based on their unique circumstances. *Id.*

In order to show causation, a plaintiff must show that the official responsible for the alleged retaliatory act had knowledge of the protected activity. *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985). A plaintiff may rely on temporal proximity to prove causation, but such proximity must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). For example, many courts have held that time lags of more than three months are too long to show retaliatory causation. *Breeden*, 532 U.S. at 273-74 (20-month lag; citing with approval *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (3-month lag)); *Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85, 94 (D.D.C. 2004) (3-month lag and 15-month lag).

Once a plaintiff establishes a prima facie case[8], the burden shifts to the defendant to

_____

[8] For the purposes of its Motion as to Count I (discrimination), DaVita assumes that Mr. Mason can meet his initial burden under the *McDonnell Douglas* framework. *See* Def.'s Mem. I at

"articulate some legitimate nondiscriminatory reason" for its action. *Burdine*, 450 U.S. at 252-23.

If the defendant meets this burden, then the plaintiff must have the opportunity to prove, by a

preponderance of the evidence, that the legitimate reasons offered by the employer were not its true

reasons, but were a "pretext" for discrimination. *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411

U.S. at 804.

## III. ANALYSIS

Although the SAC is clumsy, it advances four[9] claims in Counts I and II:[10]

1.  Direct discrimination based on race in Ms. Easlon's failure to interview Mr. Mason in person and refer him to California for further consideration for the D.C. PSR position;

2.  Direct discrimination based on race in Mr. Golumb's reliance on a second telephone interview rather than an in-person interview in March 2006 and failure to refer Mr. Mason for interviews in California;

3.  Retaliatory discrimination in Mr. Golumb's reliance on a second telephone interview rather than an in-person interview in March 2006; and

4.  Retaliatory discrimination in revoking an offer of employment at the acute care facility at the G.W. Hospital Facility.

---

8.  Davita in its Motion for Summary Judgment and Memorandum in Support as to Count II of the Amended Complaint challenges whether Mr. Mason can even make out a prima facie case of retaliation. Def.'s Mem. II at 2.

[9]  The Complaint also attempts to establish a direct discrimination claim based on the withdrawal of an offer to work as a PCT at the GW Hospital Facility, but this issue was not addressed by either party in their briefing on the motions for summary judgment and the Court now considers the matter conceded.

[10]  DaVita filed separate motions for summary judgment. Defendant Davita refers to the Counts as Count I and Count II. DaVita's Motion for Summary Judgment as to Count I and its Reply in Support addresses items 1 and 2 from the Court's list above. DaVita's Motion for Summary Judgment as to Count II addresses items 3 and 4.

### A.    Ms. Easlon's Failure to Interview Mr. Mason in Person and Refer Him to California for Further Consideration as a PSR in D.C.

The record is clear that Ms. Easlon interviewed Mr. Mason by phone, as she did Mr. Jones, and asked each of them to come to Richmond, VA, for an in-person interview.  Mr. Mason declined because his work responsibilities prevented him from being away from the Georgetown Clinic on the date in question.  Mr. Jones traveled to Richmond, had a successful interview with Ms. Easlon, was further interviewed by DaVita Rx management in California, and was offered and accepted the position as the sole D.C.-based PSR on December 20, 2005.  When Mr. Mason attempted to follow up with Ms. Easlon in early January 2006, after her vacation, the vacancy had been filled and was no longer available.  At no point in his application materials did Mr. Mason indicate his race and Ms. Easlon stated that she did not know he is African American until she received his charge of discrimination.

Mr. Mason alleged that DaVita Rx was hiring PSRs for other areas of the country and could have and should have further considered his application.  These allegations from the Second Amended Complaint did not survive discovery: DaVita Rx hired PSRs only for locations in which they already lived unless the applicant indicated a pre-existing intention to move elsewhere.  Mr. Mason lived in the District of Columbia and was a solid candidate for the PSR position based in D.C. but would not, under this nondiscriminatory practice, be considered by Ms. Easlon for positions elsewhere.[11]

---

[11] Mr. Mason's allegation in the Second Amended Complaint that DaVita Rx was recruiting for a PSR in Maryland in January 2006 is not supported by the record developed in discovery.  Ms. Easlon testified under oath that there was no opening in Maryland when she was recruiting for the D.C. position.  Easlon Dep. at 73-74.  Further, DaVita's national database of job postings shows that the first posting for a Maryland PSR occurred on February 23, 2006.  *See* Def.'s Reply I, Ex. 11; *see also id.*, Ex. 10 (Decl. of Randy Larson ("Larson Decl.") ¶ 2).

Ms. Easlon was in a hurry to move DaVita Rx from pilot project to fully operational business; she hired as she interviewed, without waiting for a second candidate if the first demonstrated ability. No onus of discrimination can be laid at her doorstep because she offered to interview Mr. Mason in person and he declined. The reason he did not travel to Richmond for an interview is worthy and to his credit but it means that the early bird – Mr. Jones – got the worm. Presumably, had Mr. Jones not passed muster at interviews in California, Ms. Easlon would have returned to the D.C. area to interview Mr. Mason in January. However, that became unnecessary because Mr. Jones did well in his interviews and got the job.

Mr. Mason argues that his credentials are superior to those of Mr. Jones and the difference supports an inference of discrimination. The Court must disagree. The PSR Job Description set forth the qualities of a successful PSR:

> Positive Attitude; Active seller (needs to be able to ask direct questions); Personable; Ability to train facility teammates; Attention to Detail; Patient; Organization skills; Self-direction; Goal oriented; Time management skills; Some computer skills; Problem Solver; Willingness to learn; High school diploma or GED required.

Def.'s Mem. I, Ex. 2(A). Nothing in these qualities suggests that Mr. Mason's background in patient care was especially pertinent, although clearly he understood DaVita and its patient services well. Even were Mr. Mason's credentials superior, his January 6, 2006, email to Ms. Easlon demonstrated to her a lack of "attention to detail," with its many grammatical and spelling errors. While it is true that Ms. Easlon and Mr. Golumb have, on occasion, sent out email with errors, none of the examples proffered by Mr. Mason equals the errors in his January 6 email, which was sent to a person he presumably wanted to impress. More to the point, no one at DaVita Rx ever compared the

-18-

qualifications of Mr. Jones and Mr. Mason because they were not considered at the same time:  Mr.

Mason could not appear for an interview in Richmond and Mr. Jones went ahead of him in the hiring

process.  Ms. Easlon had no duty to delay her hiring decisions in order to provide him with an in-

person interview.  *See Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C.

Cir. 1996) (holding that "it is not enough for the plaintiff to show that a reason given for a job action

is not just, fair, or sensible.  He must show that the explanation given is a phony reason.").

        The Court concludes that no reasonable jury could find that DaVita discriminated

against Mr. Mason because Ms. Easlon continued her hiring procedures and hired another candidate

without affording Mr. Mason a second opportunity for an in-person interview.

### B.    Mr. Golumb's Reliance on a Second Telephone Interview

        Mr. Golumb broke with the DaVita Rx practice by offering to re-interview Mr. Mason

for a PSR position outside his immediate locale.  He spent 45 minutes on the telephone with Mr.

Mason, asking him questions about his approach to teammates, patients and doctors.[12]  Mr. Mason

assails this courtesy as an example of direct discrimination because he had already "passed" Ms.

Easlon's 15-minute interview and should have received an in-person interview.  Further, he

challenges Mr. Golumb's failure to offer him a PSR position at the end of the interview process.

        Mr. Mason can point to no reason why Mr. Golumb's use of a telephone to interview

him, rather than meet in person, was discriminatory.  According to the record, Mr. Golumb traveled

constantly.  When he set up the phone interview, he was in California.  When he conducted the

interview, he was in Florida.  Although Mr. Mason missed the time for the interview, Mr. Golumb

---

[12]  Mr. Golumb was somewhat annoyed by Mr. Mason's confusion on the timing of the call
but proceeded immediately without re-scheduling.

spent 45 minutes with him on the telephone.  This was by far a more extensive telephone interview than the short qualifying telephone interview conducted by Ms. Easlon.  The fact that Mr. Golomb decided to give Mr. Mason a second chance to interview for a PSR position, although by telephone, cannot be reconciled with Mr. Mason's theory that Mr. Golomb harbored racial animus.

Ultimately, Mr. Golomb did not advance Mr. Mason to in-person interviews with DaVita Rx management in California.  Mr. Mason argues that a reasonable jury could infer that this decision was based on race because Mr. Golomb's process was allegedly not fairly administered and Ms. Easlon allegedly influenced his decision process by forwarding Mr. Mason's January email and telling Mr. Golomb that she did not believe Mr. Mason was qualified to fulfill the administrative and paperwork functions of the PSR job.  These arguments do not persuade.

Mr. Mason relies on *Salazar v. Wash. Metro. Area Transit Auth. ("WMATA")*, 401 F.3d 504 (D.C. Cir. 2005), to support his cause.  In that case, the D.C. Circuit concluded that "a reasonable jury could infer that [the successful candidate] was unsuited for the Metro Center job and that the selection process was geared not to finding the best person for the position, but rather to keeping [the plaintiff] from advancing." *Id.* at 512.  This conclusion was based on the plaintiff's earlier complaint that a WMATA superintendent discriminated against Latinos and the assurances the plaintiff received from WMATA that that particular superintendent would not participate in consideration of the plaintiff's fifth application for a promotion.  Despite the assurances, the chair of the interviewing panel consulted with the suspect superintendent on what questions to ask and what point values to give for each answer.  As a result, the interview process gave only marginal value to the candidates' experience and education, where plaintiff surpassed others.  A non-Latino was selected for the job but was transferred to an easier job before he ever started work on the

-20-

position in question.  The majority found that the record presented "a close call" but was sufficiently "fishy" to entitle the plaintiff to present his case to a jury.  Mr. Mason argues that Mr. Golomb's process was also "fishy" because he spoke with Ms. Easlon and received from her a copy of Mr. Mason's January email before he interviewed Mr. Mason.

Mr. Golumb properly asked Ms. Easlon why she had not interviewed Mr. Mason as part of his consideration of Mr. Mason's complaint of discrimination.  Ms. Easlon explained the timing issue which resulted in the hire of Mr. Jones in December 2005 prior to any opportunity to interview Mr. Mason.[13]  She also told Mr. Golumb of Mr. Mason's ungrammatical and poorly-spelled January email.  Mr. Golumb went ahead with his interview of Mr. Mason because he wanted "to arrive at his own conclusion."  Easlon Dep. at 187.  There is nothing comparable on this record to *Salazar* in which the superintendent interjected himself unduly into the review process.  Mr. Golumb explored Ms. Easlon's reasons for not interviewing Mr. Mason and decided to give him the benefit of a lengthier telephone interview.  This interview mimicked the interview of Mr. Jones when Mr. Jones went to California, lasting about 45 minutes and concerning itself with situational questions.  Def.'s Facts ¶ 56; Pl.'s Opp'n at 12 (not disputing this fact).  There is no evidence that Mr. Golumb consulted further with Ms. Easlon before he decided that Mr. Mason's performance was "solid" but not stellar.

Mr. Mason appears to hold the belief that he was entitled to be flown to California to have "an opportunity to interview with an unbiased panel," without the step of interviewing with

---

[13]  Mr. Golumb testified that Ms. Easlon told him "that Chris Jones was her top candidate from that area, he was farther along in the process and once he had come out to meet with us in Northern California and there was a unanimous decision to make him a job offer, there were no longer positions that we were trying to fill in D.C."  Golumb. Dep. at 70.

Mr. Golomb by phone. *Id*. at 24. However, DaVita clearly had a three-step hiring process for PSRs in late 2005: 1) on the basis of application packages, Ms. Easlon selected persons for brief telephone interviews of approximately 15 minutes; 2) those who qualified in this first telephone call were invited for lengthier in-person interviews with Ms. Easlon; 3) and those who qualified after the in-person interview were flown to California for further interviews with DaVita management, of whom Mr. Golumb was a Director. Mr. Mason offers no rationale for why he should have been afforded the opportunity to interview in California (with Mr. Golumb and others) without the second step of qualifying by way of a lengthier interview first. Certainly, DaVita's maintenance of a three-step process for considering Mr. Mason's application was not "fishy" when a similar three-step process was used for all other PSR applicants.

Ultimately, *Salazar* is of no help to Mr. Mason. Nothing in the record intimates in any way that Ms. Easlon's hiring process was tainted by race discrimination; in fact, there is no evidence that she ever knew Mr. Mason's race until after he filed his internal charge of discrimination. Therefore, these facts present no one in the role of the superintendent in *Salazar* – the person Mr. Salazar feared discriminated against Latinos and who was not supposed to be involved in the final promotion decision process. Without evidence that Ms. Easlon discriminated against him, Mr. Mason's analogy to *Salazar* collapses.

The Court concludes that no reasonable jury could find that Mr. Golumb discriminated against Mr. Mason when he interviewed him by telephone and when he decided not to recommend him for further interviews in California.

      **C.**      **Retaliatory Discrimination in Telephone Interview by Mr. Golumb**

Mr. Mason complains that Mr. Golumb subjected him to a second telephone

interview, rather than an in-person interview, and that he "changed the selection criteria from an emphasis on patient care to an emphasis on sales; failed to evaluate him fairly in the telephone interview despite his solid performance; and refused to advance his application," in retaliation for his internal charge that Ms. Easlon had discriminated against him.   SAC Count II (presented erroneously as Count I).   As to the former point, Mr. Mason argues:

> [DaVita's] policy was to conduct in person interviews after an applicant successfully completed the telephone interview. . . . The fact that the Defendant did not follow the normal process when it "normally" would have done so – and thus did not follow its own usual, "normal" procedures in denying Mr. Mason an in person interview, advancing his application and selecting him for a PSR position – is itself evidence that can also support an inference that the legitimate, non-discriminatory reasons articulated by the Defendant are pretext or are unworthy of belief, especially if the decision was made or influenced by a discriminating official.

Pl.'s Opp'n at 26-27; *see also id.* at 24 ("Jones was not interviewed by Golomb until he reached the final in-person interview in California.   Mr. Mason got Golomb's final interview questions during the 45 minute telephone interview.   This deviated from the normal practice, and that alone is evidence of discrimination.").   In addition, Mr. Mason contests that an ability in sales was an important criterion for the selection of PSRs.   *Id.* at 25.   He also challenges Mr. Golomb's report that Mr. Jones had a higher quality of answers to the situational questions because "Golomb interviewed Jones in person in California. [Golumb] interviewed Mr. Mason on his cell phone while he parked at a Dunkin Donuts parking lot.   Golomb did not retain any notes from the interviews.   His evaluation of Mr. Mason and Jones cannot carry any weight because it is self serving and not credible."   *Id.*   Mr. Mason concludes that Mr. Golumb "simply went through the formality with the

interview of Mr. Mason, with no serious intention of advancing his application." *See* Dkt. #43 at 34. He adds, "[f]urther, the fact that Golumb scheduled the interview at 8:00 a.m., before the work day even begins, suggests that he was simply going through the motions." *Id*. at 33.

Argument of counsel does not substitute for facts. As indicated earlier, the entirely reasonable reason that Mr. Golumb interviewed Mr. Mason by telephone and while parked at Dunkin Donuts was that (1) Mr. Golumb was in Florida, not Washington, D.C., and (2) Mr. Mason was not at home when Mr. Golumb called him for the scheduled 8 A.M. interview and Mr. Golumb gave up waiting for a return call at his hotel room. The argument that the telephone interview was retaliatory fares no better than the argument that it is evidence of direct discrimination.

An ability to "sell" the DaVita Rx program to patients, fellow teammates, and physicians was clearly, always, part of the criteria for a successful PSR applicant. The PSR Job Description calls for an "Active seller." Mr. Golumb's use of situational questions, with an emphasis on "selling" the program to its three constituencies, was similar to his use of situational questions when he interviewed Mr. Jones. Mr. Mason was put to no disadvantage and certainly cannot connect Mr. Golumb's desire for a PSR who could sell the program to Mr. Mason's race. It does not serve to argue that Mr. Golumb's comparison of Messrs. Mason and Jones "is self serving and not credible." *Id.* at 25. Mr. Golumb provided detailed comparisons that evidence a non-discriminatory reason for his actions, but, more to the point, the Court does not sit to second-guess an employer's selections unless there is some basis to infer discrimination. *See Fischbach*, 86 F.3d at 1183 (noting that "the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers"). There is no basis for such an inference here.

-24-

D.        **Retaliatory Discrimination in Revoking Offer of Employment**

Mr. Mason alleges that DaVita retaliated against him by revoking an offer to work "as needed" at the GW Hospital Facility.  Mr. Mason was successfully interviewed by Ms. Oloyede about this possibility on November 2, 2006.  They talked about having Mr. Mason fill in when and if needed on Tuesdays, sometimes on Thursdays when Shanna McGill was on vacation, and some Saturdays.  DaVita says that Ms. Oloyede received approval from Ms. Jurd for this arrangement but that the need never arose after November 2, 2006.  Mr. Mason contests that Ms. Jurd gave such approval because he never heard from Ms. Oleyede again after she spoke to Ms. Jurd.

Failing and refusing to offer extra work to an employee because he had filed an equal employment opportunity ("EEO") charge could certainly be sufficient to dissuade him from engaging in further protected activity.  The question of whether the need ever arose for extra PCT assistance at the GW Hospital Facility from November 2, 2006 to the date briefs were filed (in September and November of 2007) resolves to one of credibility.  In November 2006, Ms. Oloyede presumably anticipated that Ms. McGill would take vacations, get sick, or otherwise be unavailable to work on Saturdays and that Mr. Mason could earn extra monies by filling in for her.  Is one to believe that Ms. McGill was never absent *at all* after November 2, 2006?  Or did DaVita just have a registered nurse perform Ms. McGill's duties in her absence in order to avoid having a "need" to call on Mr. Mason?

The papers do not permit resolution of these questions; only live testimony evaluated by a jury can do so.  The Court will deny DaVita's motion for summary judgment on this claim of retaliation.

-25-

## IV.  CONCLUSION

For the reasons stated, DaVita's motions for summary judgment on Counts I and II (as renumbered by the Court) will be granted in part and denied in part.  Summary judgment will be granted to DaVita on the claims that Ms. Easlon directly discriminated against Mr. Mason, that Mr. Golumb directly discriminated against Mr. Mason, and that Mr. Golumb retaliated against Mr. Mason for prior protected activity.  Summary judgment is denied as to Mr. Mason's claim that Davita retaliated against him when it did not allow him to work at the GW Hospital Facility.  A memorializing order accompanies this Memorandum Opinion.


_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

DATE: March 31, 2008